UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:09cv00087-T26TBM

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.

Defendants,

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY IRA FUND, LTD,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT

Relief Defendants.
_____/



## PLAINTIFF'S EMERGENCY MOTION AND MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND OTHER EMERGENCY RELIEF

Plaintiff Securities and Exchange Commission moves this Court for a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure and Middle District of Florida Local Rule 4.05, and other emergency relief, as outlined below, to prevent Defendant Arthur Nadel from continuing to violate the antifraud provisions of the federal securities laws in connection with his fraudulent offer and sale of securities, and to prevent him from misappropriating investors' funds:

1) a Temporary Restraining Order;

2) an Order to Show Cause Why a Preliminary Injunction Should Not be Granted;

3) an Order Freezing Nadel's Assets;

4) an Order Requiring a Sworn Accounting;

5) an Order Prohibiting Destruction of Documents;

6) an Order Expediting Discovery

7) a Repatriation Order; and

8) an Order requiring Nadel to surrender his passport temporarily and prohibiting him from traveling outside the United States.

The grounds for this Motion are fully set forth in the accompanying Memorandum of Law. The Commission also submits a proposed order.

## MEMORANDUM OF LAW

## I. INTRODUCTION

From at least January 2008 through the present, Defendant Arthur Nadel defrauded investors in six hedge funds by massively overstating the value of investors' interests in them even as each of the hedge funds lost money for almost every month in 2008. Nadel, who controlled the hedge fund advisers and managers, used bogus account values and performance figures to attract and defraud investors in six private hedge funds: Scoop Real Estate, L.P ("Scoop Real Estate"), Valhalla Investment Partners, L.P. ("Valhalla Investment Partners"), Victory IRA Fund, Ltd ("Victory IRA Fund"), Victory Fund, Ltd ("Victory Fund"), Viking IRA Fund, LLC ("Viking IRA Fund"), and Viking Fund, LLC ("Viking Fund") (collectively, the "Hedge Funds"). He has now fled, revealing the true disparity between the fantastic profits he showed investors and the hugely diminished value of the Hedge Funds in just this past year.

Through his conduct, Nadel has violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Based on the ongoing nature of his violations and the scienter he has demonstrated through his willful and wanton disregard for the federal securities laws, Nadel has shown he will continue to violate the law unless the Court grants the injunctive and other relief the Commission seeks.

## II. NADEL'S FRAUD

On Thursday, January 15, 2009, prior counsel for the Hedge Funds and others involved in their operations contacted the Commission's Enforcement Division to report that Nadel had disappeared. They also reported they had learned Nadel had established secret bank accounts, which only he had controlled, in the names of at least two of the Hedge Funds, and that he had recently transferred out $1,250,000 belonging to those two funds.

### A. Nadel and the Entities

Nadel controlled Scoop Management and Scoop Capital. Declaration of Michelle Lama attached as Exhibit 1, attachments J-O; Declaration of Christopher Moody attached as Exhibit 7; Declaration of Neil Moody attached as Exhibit 8. Both Scoop Capital and Scoop Management are Florida entities based in Sarasota, Florida. Exhibit 1, attachments J-O. Scoop Management is a Florida corporation incorporated on April 17, 2001, with its principal place of business in Sarasota, Florida.

Nadel is the President, Secretary and a Director of Scoop Management. Scoop Real Estate is a Delaware limited partnership formed on October 15, 2003. According to the Scoop Real Estate PPM, Scoop Capital is its general partner. Exhibit 1, attachment O.

Valhalla Investment Partners is a Delaware limited partnership formed on October 15, 2003. Exhibit 1, attachment L. According to the Valhalla Investment Partners PPM, Valhalla Management, Inc. is its general partner, and its principal place of business is Sarasota, Florida. *Id.* Valhalla Management is a Florida corporation organized on February 16, 1999, with its principal place of business is Sarasota, Florida. *Id.*

Victory IRA Fund is a Florida limited partnership formed on April 3, 2003, with its principal place of business in Sarasota, Florida. Exhibit 1, attachments J-N. Scoop Capital is the general partner of Victory IRA Fund. *Id.* Victory Fund is a Florida limited partnership formed on May 1, 2005, with its principal place of business in Sarasota, Florida. *Id.* Scoop Capital is the general partner of Victory Fund. *Id.*

Viking IRA Fund is a Florida limited liability company organized on March 27, 2001, with its principal place of business in Sarasota, Florida. *Id.* Viking Management, LLC ("Viking Management") is its sole managing member. Exhibit 1, attachment K. Viking Management is a Florida limited liability company organized on May 21, 2001, with its principal place of business in Sarasota, Florida. *Id.* Viking Fund is a Florida limited liability company organized on March 23, 2001, with its principal place of business in Sarasota, Florida, with Viking Management as its sole managing member. *Id.*

The Private Placement Memoranda ("PPMs") for the Hedge Funds describe the interests offered as securities. *Id.*

### B. Formation of the Scoop and Victory Entities

According to offering materials provided to investors, Nadel has managed one or more hedge funds since 1999. Exhibit 1, attachments G-I. Scoop Capital formed Scoop Real Estate in 2003 to acquire interests in vacant land and residential, commercial, office and industrial real

estate properties. Exhibit 1, attachment O. Scoop Capital was responsible for managing Scoop Real Estate's portfolio and day-to-day operations, with Nadel responsible for investment decisions. Exhibit 7; Exhibit 8.

In 2005, Scoop Capital formed Victory IRA Fund and Victory Fund. The investment objective of these two Funds was to invest or trade in securities. Exhibit 1, attachments M and N. Nadel, with Defendants Scoop Capital and Scoop Management, offered investments in the Scoop Real Estate, Victory IRA, and Victory Funds pursuant to PPMs mailed to investors, which described the Funds' purported investment strategies and operations. Exhibit 7. According to the PPMs for Victory IRA Fund and Victory Fund, Scoop Capital was responsible for the management of those funds' portfolios and their day to day operations, with Nadel responsible for their day-to-day investment decisions. Exhibit 1, attachments M, N, O; Exhibit 7. These PPMs also stated Scoop Capital would invest Victory IRA Fund and Victory Fund assets according to "trading signals and other technical and fundamental principles" developed by the Fund's investment manager, Scoop Management. Exhibit 1, attachments M, N, O.

The Victory IRA Fund and Victory Fund PPMs further represented to investors that Scoop Management had been engaged in market research and developing technical and proprietary trading systems used by other hedge funds since 1999. Exhibit 1, attachments M and N. The PPMs stated the Victory IRA Fund and Victory Fund would pay quarterly management fees to Scoop Capital and Scoop Management based upon a percentage of those funds' net assets. *Id.* at attachments M and N.

### C. Formation of Valhalla Investment Partners, Viking Fund, and Viking IRA Fund

In 1999, Valhalla Management formed Valhalla Investment Partners to invest in and trade in securities. Exhibit 1, attachment L. In 2001, Viking Management formed Viking IRA

Fund and Viking Fund, with both intending to invest or trade in the securities of medium to large cap companies. *Id.* at attachments J and K.

According to the PPMs, Viking Management and Valhalla Management were responsible for all of the investment decisions for their respective funds. *Id.* However, the PPMs also stated that Viking Management and Valhalla Management would rely upon the investment advice, signals, and other principles developed by Scoop Management. *Id.* More specifically, the Viking Fund and Viking IRA Fund PPMs stated Scoop Management would provide trading signals, market data, computer investment and trading programs, technical and fundamental research, and entry of trades for them. *Id.* Scoop Management also was to provide Viking Management and Valhalla Management with office management and technical services in connection with the Viking IRA and Viking Funds' operations, including the use of office space, facilities, and bookkeeping. *Id.*

According to these same PPMs, the Viking IRA Fund and Viking Fund would pay Valhalla Management and Viking Management a management and performance fee, and also pay Scoop Management a monthly advisory fee of $5,000. *Id.* The PPMs also explained that Valhalla Management and Viking Management would share their management and performance fees with Scoop Management. *Id.*

### D. Misrepresentations to the Hedge Funds' Investors Concerning the Value of the Funds' Assets

The Hedge Funds' internal books and records falsely indicate the value of the Funds' assets exceeds $200 million. Exhibit 1, attachment C. However, the actual value of the Hedge Funds' total assets does not exceed approximately $515,000. Dumornay Supplemental Declaration, attached as Exhibit 9. Securities account statements show the following values for the Hedge Funds as of January 14, 2009:

6

(a) Victory Fund - $1,901.31;

(b) Scoop Real Estate - $2,119.81;

(c) Viking IRA Fund - $2,923.58;

(d) Viking Fund - $917.70;

(e) Valhalla Investment Partners - $4,413.66;

(f) Victory IRA Fund - $2,938.86.

*Id.* Thus, the total value of the Hedge Funds' securities holdings as of January 14, 2009 actually is $15,214.92.

According to the principals of Viking Management and Valhalla Management, bank account statements examined after Nadel's disappearance show the following bank account balances for the Hedge Funds as of January 16, 2009:

(a) Victory Fund - $78,764.37;

(b) Scoop Real Estate - $122,830.40;

(c) Viking IRA Fund - $77,025.20;

(d) Viking Fund - $65,708.33;

(e) Valhalla Investment Partners - $16,158.05;

(f) Victory IRA Fund - $131,139.52.

*Id.* Thus, the total cash balance in the Funds' bank accounts is $491,625.87. Nadel, with and through Defendants Scoop Capital and Scoop Management, therefore has grossly misrepresented to investors the value of their accounts with the Hedge Funds by providing them completely false account statements. Exhibit 7; Declaration of Chester Vincentz attached as Exhibit 2; Declaration of Michael Sullivan, attached as Exhibit 3; Declaration of David Cava, attached as Exhibit 4; Declaration of Patricia Vincentz, attached as Exhibit 5.

For example, Nadel and the Scoop entities mailed one Virginia investor in the Victory IRA Fund an October 2008 statement indicating his investment was valued at $599,551.55 and a November 2008 statement indicating his investment was valued at $602,965.39. Exhibit 2. This same investor made a second investment in Victory IRA Fund through another account and the Defendants subsequently mailed him an October 2008 statement indicating this additional investment was valued at $172,354.07 and a November 2008 statement indicating his investment was valued at $173,335.45. *Id.* All of these statements were false because Victory IRA Fund's securities account statements indicate that fund's overall value was only $2,938.86 at the end of October and November 2008. Exhibit 1, attachment A.

This same Virginia investor also invested in Scoop Real Estate. Exhibit 2. Nadel, Scoop Management, and Scoop Capital sent him account statements for October and November 2008 indicating his Scoop Real Estate account was valued at $586,862.54 and $590,321.18, respectively. Exhibit 2. These statements were false because Scoop Real Estate's securities account statements indicate that fund's overall value was only $8,088.35 at the end of October and $198,224.13 at the end of November 2008. Exhibit 1, attachment A.

The Virginia investor's wife also made two separate investments of her own in the Victory IRA Fund and received statements mailed from the Defendants for October and November 2008 which grossly misrepresented the value of her investments in that fund. Exhibit 5. She also invested in the Victory Fund, and the Defendants mailed her an account statement for November 2008 misrepresenting the value of her investment as $419,824.89. *Id.* This also was utterly false because Victory Fund's securities account statements indicate its overall value was only $91,823.49 at the end of November 2008. Exhibit 1, attachment A.

Another investor from California also received false account statements for October and November 2008 for his investments in Victory IRA Fund and Scoop Real Estate. Exhibit 4.

### E. Misrepresentations in Connection with the Offer or Sale of the Hedge Funds' Securities

In addition to misrepresenting to the Hedge Funds' investors the actual value of investors' accounts, Nadel misrepresented the Hedge Funds' yearly historical returns and total capital invested to investors and prospective investors. Exhibit 1, attachments A, D, E, F, G, H, and I; Exhibit 7. From at least 2008, Nadel, through and with Defendants Scoop Capital and Scoop Management, prepared, approved or disseminated offering materials to investors containing materially false and misleading information concerning yearly historical returns and the total capital invested in the Funds. Exhibit 1, at attachments G, H, and I; Exhibit 6; Exhibit 7.

The offering materials Nadel prepared with and through Scoop Capital and Scoop Management misrepresented the Hedge Funds' yearly historical returns and total invested capital. Exhibit 1, at attachments, G and H; Exhibit 7. In particular, the offering materials for the Victory Fund and Victory IRA Fund, represented that the Funds had approximately $342 million in capital as of November 30, 2008. Exhibit 1, at attachments G, H, and I. In fact, the total value of the Hedge Funds' assets through the end of November 2008, according to their securities account statements was $963,123.85. Exhibit 1, at attachment A. The offering materials also represented that the Hedge Funds had generated investment returns ranging from 10.97% to 11.82% between January and November of 2008. *Id.* at attachments G, H, and I. In fact, these claimed returns were bogus, since brokerage account statements for the Hedge Funds show at least three of the Hedge Funds lost money on their investments from January through November 2008, and a fourth reported lower returns. *Id.* at attachment A.

## III. ARGUMENT

### A. Standard for Obtaining a Temporary Restraining Order

Section 20(b) of the Securities Act, 15 U.S.C. § 77t, and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that in Commission actions the Court shall grant injunctive relief upon a proper showing. SEC v. Unifund SAL, 910 F.2d 1028, 1035 (2d Cir. 1990); SEC v. Lybrand, No. 00#Civ.1387, 2000 WL 913894 *1, *9 (S.D.N.Y. July 6, 2000); SEC v. Unique Fin. Concepts, Inc., 119 F. Supp. 2d 1332, 1338 (S.D. Fla. 1998), aff'd, 196 F.3d 1195 (11th Cir. 1999). This "proper showing" has been described as "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved." SEC v. Gen. Refractories Co., 400 F. Supp. 1248, 1254 (D.D.C. 1975).

The Commission is entitled to a temporary restraining order if it establishes: (1) a *prima facie* case showing the Defendants have violated the securities laws, and (2) a reasonable likelihood they will repeat the wrong. Unique Fin. Concepts, 119 F. Supp. 2d at 1338; SEC v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975). The Commission appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." Management Dynamics, 515 F.2d at 808. The Commission faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Hecht Co. v. Bowles, 321 U.S. 321, 331 (1944); accord SEC v. International Loan Network, Inc., 770 F. Supp. 678, 688 (D.D.C. 1991), aff'd, 968 F.2d 1304 (D.C. Cir. 1992). Unlike private litigants, the Commission need not demonstrate irreparable harm or the unavailability of an adequate remedy at law. Unique Fin. Concepts, 119 F.Supp.2d at 1338; Lybrand, 2000 WL 913894 at *9.

Nor is it required to show a balance of equities in its favor. Unifund SAL, 910 F.2d at 1036; SEC v. Musella, 578 F. Supp. 425, 434 (S.D.N.Y. 1984).

The Commission's evidence in this case warrants entry of the requested injunctive relief on all applicable grounds. The exhibits and declarations amply demonstrate Nadel has been violating the anti-fraud provisions of the federal securities laws discussed below for almost a year, and, particularly in light of his sudden flight, that he will continue to violate the law if the Court does not immediately restrain and enjoin him from fraudulent activity.

### B. The Commission has Established *Prima Facie* Violations of the Securities Laws

The Commission has met its burden of establishing a *prima facie* showing of violations of the securities laws as alleged in its Complaint

#### 1. The Offered Investments are Securities

As explained above, the Hedge Funds' PPMs describe the interests offered as securities. Exhibit 1, attachments J-O. Even without that self-description, limited partnership interests such as those offered and sold here are securities. Goodman v. Epstein, 582 F.2d 388, 406 (7th Cir. 1978) (citing United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852 (1975)); McGreghar Land Co. v. Megular, 521 F.2d 822, 824 (9th Cir. 1975) (applying SEC v. W. J. Howey Co., 328 U.S. 293, 301 (1946)); SEC v. Friendly Power Co., 49 F.Supp.2d 1363, 1370 (S.D. Fla. 1999) (investors' partnership interests were securities as they gave investors no meaningful control over the partnership's operations). Nadel therefore violated the federal securities laws when he defrauded the Hedge Funds' investors by mailing false account statements and offering materials to them.

## 2. Defendants' Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 Thereunder

Section 17(a) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) and Rule 10b-5 of the Exchange Act, which proscribe fraudulent conduct in connection with the purchase or sale of securities, prohibit essentially the same type of conduct. United States v. Naftalin, 441 U.S. 768, 773 (1979); Unique Financial, 119 F.Supp.2d at 1339. To establish a violation, the Commission must show: (1) a misrepresentation or omission (2) that is material (3) in the offer of or in connection with the purchase or sale of a security (4) made with scienter (5) in interstate commerce. SEC v. Chemical Trust, No. 00-8015-CIV-Ryskamp, 2000 WL 33231600 at *9 (S.D. Fla. Dec. 19, 2000); SEC v. Hasho, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992).[1]

### a. Nadel's False Statements and Omissions are Material

Courts generally consider a statement or omission to be material if "a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." SEC v. Carriba Air, Inc., 681 F.2d 1318, 1327 (11th Cir. 1982). Under that standard, Nadel's false account statements and PPMs are obviously material. The account statements and PPMs describe a very profitable company providing a lucrative investment, even during extremely difficult economic conditions. "It is well established that information concerning the financial condition of a company is presumptively material." In re AIG, No. 3-11254, 2003 WL 22469910 at *13 (S.D.N.Y. Sept. 11, 2003); SEC v. Blavin, 557 F. Supp. 1304, 1313 (E.D. Mich. 1983). Such information would be critical and material to any reasonable investor in

---

[1] Scienter is only required for Section 10(b) and Section 17(a)(1). Violations of Sections 17(a)(2) and (3) of the Securities Act do not require a finding of scienter. Aaron v. SEC, 446 U.S. 680, 697 (1980). Violations of these sections may be established by showing negligence. SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3rd Cir. 1997).

12

deciding whether to invest in the securities Nadel offered and sold – which is of course exactly why he employed the outlandish account statements and inflated PPM performance figures.

### b. The "In Connection With" Requirement

We explained above why the Hedge Funds' interests are securities. Because Nadel and the Scoop entities have been issuing their fake account statements and false PPMs in connection with the offer, purchase and sale of the Hedge Funds' securities, Nadel and the other defendants made these false statements and omissions in the offer of and in connection with the purchase and sale of securities.

### c. The Defendants Acted with Scienter

Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act require a showing the defendants acted with scienter, which is a mental state embracing intent to deceive, manipulate or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). The Commission may establish scienter for violations of Sections 17(a) and 10(b) by showing that defendants made representations to investors "without basis and in reckless disregard of their truth or falsity." SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 10 (D.D.C. 1998). The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness. Carriba Air, 681 F.2d 1318, 1324 (11th Cir. 1982).

There is no question Nadel acted with the highest degree of scienter. The account statements and PPMs he prepared and had mailed to investors painted a vision of the Hedge Funds that was nothing more than a fantasy designed to attract and keep investors. As the central figure running the Hedge Funds and their advisors and managers, Nadel saw the information that provided the real picture of what happened to investors' money. At best he was extremely

reckless in issuing the phony account statements and exaggerated PPMs, and most likely he knew the information he sent out was misleading and not even close to being correct.

#### d. Interstate Commerce

Nadel has indisputably been offering and selling the Hedge Fund securities in interstate commerce, having mailed the PPMs and account statements to investors.

### 3. Nadel is Likely to Continue to Violate the Securities Laws

To obtain injunctive relief upon showing Nadel has violated the securities laws, the Commission need only show a "reasonable likelihood" of future violations. SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972). In assessing whether there is a "reasonable likelihood" of future violations, courts look to the following factors: the egregiousness of defendant's actions; the isolated or recurrent nature of the infraction; the degree of scienter involved; the sincerity of a defendant's assurances against future violations; a defendant's recognition of the wrongful nature of the conduct; and the likelihood of opportunities for future violations. Carriba Air, 681 F.2d at 1322; Unique Financial, 119 F.Supp.2d at 1340. Past illegal conduct is highly suggestive of the likelihood of future violations. CFTC v. Matrix Trading Group, 2002 WL 31936799 at *12 (S.D. Fla. Oct. 3, 2002).

There is no question injunctive relief is appropriate here. Nadel's conduct is extremely egregious. As the central figure managing and advising the hedge funds, he supplied investors with fantastically overstated account values and performance figures, even as the accounts he controlled lost value month after month. At the very least, Nadel has been violating the securities laws for almost a year through the moment he disappeared, defrauding investors month after month, statement after statement, most likely after luring them into investing with overstated historic returns in the Hedge Funds' PPMs.

In defrauding investors based on utterly fictional account statements and PPMs, Nadel's violations demonstrate the highest degree of scienter. Even if Nadel had not absconded and was present to offer assurances he would commit no further violations, these would ring hollow in light of the way he has been defrauding investors. For all those reasons, Nadel will almost surely continue violating the law unless this Court restrains and enjoins him.

## C. RELIEF REQUESTED

### 1. A Temporary Restraining Order is Necessary

Through the facts and legal arguments set forth above, the Commission has met its burden of showing that there is *prima facie* evidence Nadel has violated the securities laws and will continue to violate them unless this Court immediately issues an temporary restraining order. Because Nadel's fraudulent conduct is severe, and his disappearance makes it impossible to know at this point whether he has stopped violating the securities laws, the Commission has established the necessity of a temporary restraining order and other emergency relief. Nadel has demonstrated a level of wanton and willful disregard for the federal securities laws that supports a quite reasonable assumption he will continue his violations and his harm to investors absent the injunctive and other relief the Commission seeks.

The Commission, therefore, requests the Court to issue the proposed Order accompanying this motion and memorandum. After Nadel has been heard by the Court, the Commission also requests the Court enter a preliminary injunction imposing, among other things, an asset freeze, an injunction against violating the federal securities laws, and other relief pending the adjudication of this case on its merits.

## 2. A Freeze of Assets is Necessary

Pursuant to their general equity powers, federal courts may order ancillary relief to effectuate the purposes of the federal securities laws. See, e.g., Unifund SAL, 910 F.2d at 1041; SEC v. Wencke, 622 F.2d 1363, 1369 (9th Cir. 1980); Manor Nursing Ctrs., Inc., 458 F.2d at 1103-04. An asset freeze "facilitate[s] enforcement of any disgorgement remedy that might be ordered" and may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established." Unifund SAL, 910 F.2d at 1041. It is well recognized an asset freeze is sometimes necessary to ensure a future disgorgement order will not be rendered meaningless. See United States v. Cannistraro, 694 F. Supp. 62, 71-72 (D.N.J. 1988), aff'd in part, vacated in part, 871 F.2d 1210 (3d Cir. 1989); SEC v. Vaskevitch, 657 F. Supp. 312, 315 (S.D.N.Y. 1987). When there are concerns that defendants might dissipate assets, or transfer or secret assets beyond the jurisdiction of the Court, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze. Unifund SAL, 910 F.2d at 1041-42; SEC v. Tyler, 2002 U.S. Dist. Lexis 2952 (N.D. Tex. February 22, 2002); SEC v. Comcoa, Ltd., 887 F. Supp. 1521, 1524 (S.D. Fla. 1995); SEC v. Margolin, 1992 U.S. Dist. Lexis 14872 at 19-20 (S.D.N.Y. Sept. 30, 1992); SEC v. Grossman, 1987 U.S. Dist. Lexis 1666 at *35-*36 (S.D.N.Y. Feb 17, 1987).

Given the egregious nature of this fraud, the fact that Nadel already has somehow dissipated millions of dollars from investors who thought they had built up substantial accounts investing with him, the risk to any remaining assets held in any form by Nadel, and the fact that the recent discovery of these violations makes it difficult to determine what Nadel has done with all investor proceeds, an order freezing Nadel's assets to aid in the potential recovery and return of investor funds is necessary.

### 3. A Sworn Accounting Is Necessary

An accounting is necessary to enable the Commission and the Court to determine the amounts raised and squandered by Nadel in perpetrating his fraud. This will enable the Court to determine the proper amount of disgorgement and aid the Court-appointed Receiver in marshalling assets and reporting back to the Court. Federal courts have frequently applied their broad powers in the context of Commission actions to prevent securities violators from enjoying the fruits of their misconduct. Manor Nursing Ctrs., 458 F.2d at 1104 ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits."). Without an immediate accounting, securing disgorgement from Nadel will be difficult at best, enabling him to dissipate assets or hide assets not yet located.

### 4. An Order Requiring the Repatriation of Assets is Necessary

For related reasons the Court should also order Nadel to repatriate any assets he may have transferred abroad. As stated above, Nadel secretly transferred more than $1.2 million using two secret bank accounts that his associates knew nothing about. This is in addition to the tremendous difference between the actual value of the Hedge Funds and what Nadel led investors to believe it was. It is therefore quite possible Nadel has transferred assets abroad which he should immediately to this jurisdiction so as to preserve any future disgorgement remedy, prevent further dissipation of assets, and allow the Commission and the Court-appointed Receiver to determine the status and use of investor money.

### 5. An Order Prohibiting the Destruction of Records is Necessary

An order prohibiting record destruction is appropriate to prevent the destruction of documents before this Court can adjudicate the Commission's claims. SEC v. R.J. Allen & Assocs., Inc., 386 F. Supp. 866, 881 (S.D. Fla. 1974). To preserve the Commission's ability to take effective discovery, the Court should order Nadel not to alter or destroy relevant documents.

### 6. An Order Allowing Expedited Discovery is Necessary

For similar reasons, the Court should order expedited discovery so the Commission may take meaningful discovery in the period between entry of the temporary restraining order and any hearing on the Commission's application for a preliminary injunction.

### 7. An Order Requiring Nadel to Surrender His Passport is Necessary

The Court should order Nadel to surrender his passport temporarily and prohibit him from traveling outside the United States. Nadel has already disappeared, and it is unclear at this early stage whether he has taken or hidden investor funds or important evidence with him. With Nadel's disappearance and the discovery of his year-long scheme, there is a significant risk he may try to leave to country to avoid the Commission's enforcement action and any potential parallel criminal charges. Nadel likely is using money taken from investors while he controlled the Hedge Fund managers and advisers to finance his flight from law enforcement.

The Court has this equitable power to preserve the status quo and to prevent further harm to investors. See SEC v. Fulcrum Holding Co., Inc., 1994 SEC LEXIS 3473 (Nov. 1, 1994) (TRO for violations of § 17(a) of Securities Act and § 10(b) of the Exchange Act and Rule 10b-5 thereunder required surrender of all passports and prohibition from leaving United States); SEC v. Global Investment Brokers, Ltd., 1989 SEC LEXIS 672 (N.D. Ill. 1989) (TRO for securities laws violations required surrender of passport to court); SEC v. Shiu, 1987 SEC LEXIS 3725

(Sept. 11, 1987) (TRO for violation of securities laws required surrender of passport to court). To prohibit Nadel from fleeing and further dissipating investor funds (and undermining any disgorgement remedy), as well as to preserve the Commission's ability to take necessary discovery of Nadel, the Court should issue this order.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant the Commission's Emergency Motion for Temporary Restraining Order and Other Emergency Relief, and issue the accompanying proposed Order.

January 21, 2009

Respectfully submitted,

By: _____

Scott Masel
Senior Trial Counsel
Florida Bar No. 007110
Telephone: (305) 982-6398
Facsimile: (305) 536-4154
masels@sec.gov
*Lead and Trial Counsel*

Andre Zamorano
Senior Counsel
Florida Bar No. 0967361
Telephone: (305) 982-6324
Facsimile: (305) 536-4154
zamoranoa@sec.gov.

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154