UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

    Defendants,

CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

    Relief Defendants.
_____/

### RECEIVER'S DECLARATION IN SUPPORT OF THE
### UNOPPOSED MOTION TO EXPAND THE SCOPE OF RECEIVERSHIP

Burton W. Wiand declares as follows:

1. I am an attorney with Fowler White Boggs P.A. ("Fowler White") in Tampa, Florida.

2. In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P., Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory IRA Fund, Ltd.;

Victory Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management (collectively, the "Receivership Entities;" and Scoop Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund are collectively referred to as the "Hedge Funds").

3. By early afternoon on January 21, 2009, I had entered and obtained control of the offices of the Receivership Entities (located at 1618 Main Street, Sarasota, FL 34236) and had begun my investigation into the affairs of the Receivership Entities. Those offices also were used by Arthur Nadel ("Nadel") as the headquarters for administering his control of other businesses (I refer to those offices as the "Office").

4. I have been assisted in my investigation by my attorneys, an accountant, and information technology experts. Since I obtained control of the Receivership Entities, I, my attorneys, and/or my accountant have had discussions – including continuing discussions – with a number of people associated with Nadel and/or the Receivership Entities, including officers of some of the Receivership Entities and persons responsible for maintaining the financial books of the Receivership Entities and of other businesses controlled by Nadel, for operating other businesses controlled by Nadel, for performing accounting services, and for administering the Hedge Funds.

5. We have also reviewed documents located in the Office, documents obtained from the accountant for the Receivership Entities, information stored on the Receivership Entities' computer network, documents obtained from other businesses controlled by Nadel, and information available in the public record.

6. Our investigation has revealed information showing that additional businesses controlled by Nadel and in which he had a full or partial interest were purchased and/or funded with money derived from Nadel's fraudulent investment scheme (the "scheme").

7. In Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC's Emergency Motion") (Doc. 2) and supporting papers, the Securities and Exchange Commission (the "SEC") presented evidence showing that Nadel defrauded investors in the six Hedge Funds from at least January 2008 until the time he fled the jurisdiction by "massively overstating the value of investors' interests in them." SEC Emerg. Mot. at 2, 6.

8. As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now in receivership. *Id.* at 4-6. Through those entities, Nadel was ultimately responsible for controlling the investments funds' investment activities.

9. As noted above, the SEC presented evidence showing that Nadel defrauded investors since at least January 2008. During our investigation, we uncovered evidence showing the fraud began at least as early as 2003 (and in all likelihood before then).

10. Our investigation has revealed that for each Hedge Fund, the fund's performance as disclosed to investors was based mainly on money and trading results that Nadel purported to have in two accounts: a brokerage account cleared through Goldman Sachs Group, Inc. (in which money was purportedly traded to generate the purported returns Nadel was yielding) and a bank account (from which purported distributions and purported redemptions were apparently paid). (While the disclosed performance of some funds at times

also took into account investments purportedly held in other accounts, the value of those purported investments did not meaningfully impact the analysis in the table below – the overwhelming majority of the purported trading was supposed to take place in the Goldman Sachs brokerage accounts).

11. Below is a table comparing actual values of the Hedge Funds to the values as represented to investors. Specifically, for each year-end from 2003 to 2007, the table lists the actual value of the brokerage account of each Hedge Fund (identified as "Actual Brokerage") and the actual value of the bank account of each Hedge Fund (identified as "Actual Bank"). The actual values of each fund for each analyzed time period are added to determine the actual total value of the Hedge Funds as of December 31st; that value is identified in the row labeled "Total Actual Value." Finally, the last row, labeled "Value Represented to Investors," identifies the collective value of the funds as of December 31st of each year analyzed in the table as represented to investors and as used by Receivership Entities to compute fees, returns, and other variables.

|  | Value as of 12/31/03 ($) | Value as of 12/31/04 ($) | Value as of 12/31/05 ($) | Value as of 12/31/06 ($) | Value as of 12/31/07 ($) |
|---|---|---|---|---|---|
| Scoop Real Estate | | | | | |
| Actual Brokerage | fund not in existence | 16,670,254.69 | 20,435,896.75 | 17,597,319.95 | 2,689,054.53 |
| Actual Bank | | 2,595,096.26 | 2,568,381.69 | 202,116.95 | 1,443,406.92 |
| Victory Fund | | | | | |
| Actual Brokerage | 22,680,904.69 | 23,848,019.27 | 23,324,285.51 | 7,890,073.11 | 2,586,116.58 |
| Actual Bank | 3,672,956.54 | 2,051,485.25 | 724,809.85 | 326,132.15 | 551,836.41 |
| Victory IRA | | | | | |
| Actual Brokerage | 5,898,125.28 | 13,070,558.97 | 17,746,441.12 | 9,981,754.77 | 1,096,190.22 |
| Actual Bank | 283,477.20 | 1,733,770.80 | 2,223,265.61 | 325,675.56 | 178,009.43 |
| Valhalla Investment | | | | | |
| Actual Brokerage | 8,448,343.09 | 19,448,979.03 | 14,249,335.95 | 7,017,679.33 | 3,429,805.83 |
| Actual Bank | 576,760.49 | 3,391,544.40 | 3,027,125.65 | 406,661.65 | 13,281.47 |
| Viking Fund | | | | | |
| Actual Brokerage | 23,411,778.98 | 33,375,622.75 | 25,983,502.33 | 10,054,454.11 | 2,036,992.89 |
| Actual Bank | 1,382,193.93 | 5,184,911.26 | 2,112,871.29 | 185,311.70 | 1,583,671.26 |
| Viking IRA | | | | | |
| Actual Brokerage | 14,172,117.08 | 18,767,696.52 | 19,787,093.85 | 9,539,919.21 | 1,738,703.93 |
| Actual Bank | 293,720.78 | 2,935,428.03 | 548,977.10 | 187,995.90 | 695,791.20 |
| TOTAL ACTUAL VALUE | 80,820,378.06 | 143,073,367.23 | 132,731,986.70 | 63,715,094.39 | 18,042,860.67 |
| VALUE REPRESENTED TO INVESTORS | 128,953,973.27 | 216,868,604.46 | 274,387,098.31 | 282,379,592.45 | 313,960,110.28 |

12. As the previous table shows, for 2003 through 2007 (and, as shown by the SEC, also in 2008), the value of the Hedge Funds as represented to investors was significantly overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

13. Evidence also showed that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, and to other Receivership Entities, in the form of management, advisory, and/or profit incentive fees. SEC Emerg. Mot. at 5-6. According to the Hedge Funds' documents, in 2003 the Hedge Funds paid a total of $7,045,509.31 in fees; in 2004, they paid $14,156,501.17 in fees; in 2005, they paid $20,349,897.02 fees; in 2006 they paid $18,257,590.52 in fees; in 2007 they paid $19,873,365.00 in fees; and in 2008 they paid $15,854,930.76 in fees.

14. Based on our investigation, it is likely that a significant sum of the proceeds of Nadel's scheme made its way into other accounts controlled by Nadel and/or his wife, Marguerite Nadel. For example, as demonstrated by the copies of checks attached hereto as Exhibit A, in 2008 Nadel signed checks transferring at least $1,003,500.00 from Scoop Capital to himself and his wife. Further, in 2003 and 2004 I have already seen documentation showing that at least $685,000.00 was transferred to Nadel and his wife (and have reason to believe that significantly more money was transferred to them). In short, it is apparent from the documentation that large quantities of money were diverted from the Hedge Funds to Nadel and Mrs. Nadel. Indeed, to date we have not uncovered any source of income for Nadel or his wife that was not in some manner funded with money from the scheme.

15. Documentation and other information that we have collected shows that money derived from the scheme was used by Nadel to purchase and/or fund other businesses, including Venice Jet Center, LLC, and Tradewind, LLC.

### Venice Jet Center, LLC

16. To date, our investigation has revealed that Venice Jet Center, LLC ("VJC"), is a Florida limited liability company formed in April 2006. *See* VJC filings with Florida Secretary of State, attached hereto as Exhibit B. Its principal address is the Office, and Nadel is its registered agent and the managing member.

17. Based on communications with counsel for Mrs. Nadel and documentation that we have reviewed, it appears that Mrs. Nadel owns a 50% interest in VJC. However, the information we have gathered shows that the assets of VJC were purchased with proceeds of the scheme, and that over time additional proceeds of the scheme have been transferred to VJC.

18. As part of my investigation, I and/or my attorneys have had discussions with one of Nadel's sons (Chris Nadel) and with Roger Gernigans. Based on those discussions, we have learned that Mr. Gernigans is responsible for VJC's day-to-day operations and that VJC is a viable business with potential to generate assets for the receivership estate.

19. However, Nadel's legal problems have created difficulties for VJC to access money for its day-to-day operations and it is at risk of going out of business. I believe VJC's business operations would benefit from VJC's inclusion in this receivership and that the eventual sale of the business could generate assets for eventual distribution to creditors.

20. According to documentation retrieved from the Office, on August 8, 2005, Nadel entered into an Asset Purchase Agreement to purchase a fixed base operation known as "Triple Diamond Jet Center," which operated in the Venice Airport in Venice, Florida (a copy of the Asset Purchase Agreement is attached hereto as Exhibit C).

21. Under the terms of the Asset Purchase Agreement, Nadel agreed to pay $2,795,000.00, including $2,695,000.00 payable at closing, and Dooley & Drake, P.A. was named as the escrow agent and the location for closing. *See* Ex. C ¶¶ 1.4.1., 1.8. Further, the Asset Purchase Agreement contemplated that Nadel would assign his interest to the purchased assets (which was a 100% interest) to an LLC. *See id.* ¶ 4.1.

22. The documentation reveals that VJC was formed in April 2006, and in the same month the Triple Diamond Jet Center was purchased with a transfer of money on June 8, 2006, from Scoop Capital to Dooley & Drake, P.A., for $2,793,587.12. The ledger for the Scoop Capital account from which the transfer occurred identified the purpose of the transfer as "For VJC Closing." Thus, despite the possible co-ownership of VJC by Nadel and his wife, the assets held by VJC were purchased with money from Scoop Capital (and thus, Nadel's scheme).

23. Further, according to documents located in the Office, since the formation of VJC and its acquisition of assets as discussed above, Scoop Capital has made at least the following transfers of money to VJC (it is likely that significantly more money was transferred to VJC from Receivership Entities, and we continue to look for evidence of additional transfers):

| Date | Payee | Amount |
|---|---|---|
| 06/11/06 | VJC | $100,000 |
| 06/28/06 | VJC | 100,000 |
| 10/24/06 | VJC | 75,000 |
| 12/12/06 | VJC | 50,000 |
| | **TOTAL:** | **$325,000.00** |

### Tradewind, LLC

24. The information that we have reviewed to date shows that Nadel was also the managing member of another limited liability company named Tradewind, LLC ("Tradewind"). Tradewind was formed in Delaware in January 2004, and registered for the first time in Florida in March 2008. *See* Tradewind Filings With Florida Secretary of State, attached hereto as Exhibit D. Nadel is Tradewind's managing member and its registered agent, and Tradewind's principal address is the Office. As with VJC, it appears that Mrs. Nadel has an interest in Tradewind.

25. Based on my discussions with Receivership Entities' personnel, Chris Nadel, and an individual involved in Tradewind's business affairs (Edward Loughlin) and a review of information obtained from the Office, I have learned that Tradewind owns and controls at least 5 aircraft and owns airport hangars at the Newnan-Coweta County Airport in Georgia.

26. My investigation has also revealed that Tradewind was funded with money from Nadel's scheme. Specifically, recent financial statements obtained from Nadel's and Receivership Entities' files show that Tradewind's liabilities include loans from Scoop Capital (in the amount of $2,490,146.77), Scoop Management (in the amount of $80,000), and Nadel and his wife ($676,575.00). *See* Tradewind Balance Sheet at 1, attached hereto as Exhibit E. Because, in all likelihood, significant sums of Receivership Entities' money were transferred to Nadel and his wife (*see supra* ¶ 14), even the loan from them likely consisted of Receivership Entities' money. Even though Mrs. Nadel may have an interest in the company, Tradewind was overwhelmingly, if not completely, funded with proceeds from Nadel's scheme.

27. For example, the Receivership Entities' documentation shows that between January 2004 and December 2008, at a minimum the following transfers of money were made from Scoop Capital directly to Tradewind or for Tradewind's benefit.

| Date | Payee | Amount |
|---|---|---|
| 01/16/04 | Insured Aircraft Title* | $50,000 |
| 01/29/04 | Unizan Bank* | 152,000 |
| 03/31/05 | Tradewind | 200,000 |
| 02/07/06 | Tradewind | 100,000 |
| 03/08/06 | Tradewind | 50,000 |
| 04/05/06 | Insured Aircraft Title* | 100,000 |
| 05/05/06 | Tradewind | 200,000 |
| 05/05/06 | Tradewind | 200,000 |
| 05/08/06 | Tradewind | 50,000 |
| 05/09/06 | Tradewind | 50,000 |
| 05/22/06 | Tradewind | 50,000 |
| 06/11/06 | Tradewind | 100,000 |
| 06/28/06 | Tradewind | 50,000 |
| 07/05/06 | Tradewind | 50,000 |
| 08/03/06 | Tradewind | 100,000 |
| 08/17/06 | Tradewind | 50,000 |
| 08/24/06 | Tradewind | 100,000 |
| 09/11/06 | Tradewind | 50,000 |
| 09/11/06 | Tradewind | 50,000 |
| 09/28/06 | Tradewind | 150,000 |
| 10/16/06 | Tradewind | 150,000 |
| 11/03/06 | Tradewind | 100,000 |
| 11/14/06 | Tradewind | 100,000 |
| 12/11/06 | Tradewind | 100,000 |
| 12/19/06 | Tradewind | 50,000 |
| 01/08/07 | Tradewind | 50,000 |
| 01/12/07 | Tradewind | 50,000 |
| 01/29/07 | Tradewind | 50,000 |
| 02/14/07 | Tradewind | 50,000 |
| 04/09/08 | Tradewind | 75,000 |
| 05/07/08 | Tradewind | 50,000 |
| 05/13/08 | Tradewind | 20,000 |
| 05/14/08 | Tradewind | 10,000 |
| 06/02/08 | Tradewind | 90,000 |

| 07/07/08 | Tradewind | 100,000 |
|---|---|---|
| 08/14/08 | Tradewind | 80,000 |
| 08/25/08 | Tradewind | 20,000 |
| 09/02/08 | Tradewind | 60,000 |
| 09/30/08 | Tradewind | 20,000 |
| 10/03/08 | Tradewind | 20,000 |
| 10/13/08 | Tradewind | 20,000 |
| 10/25/08 | Tradewind | 20,000 |
| 11/11/08 | Tradewind | 25,000 |
| 11/18/08 | Tradewind | 5,000 |
| 11/21/08 | Tradewind | 30,000 |
| 12/09/08 | Tradewind | 6,000 |
| 12/15/08 | Tradewind | 30,000 |
| 12/23/08 | Tradewind | 13,000 |
| | **TOTAL:** | **$3,296,000** |

\* Theses transfers were made in connection with the purchase or lease of one or more aircraft for Tradewind.

28. Those documents also reveal that the following transfers of money were made from an account titled in the name of Scoop Management to Tradewind:

| Date | Payee | Amount |
|---|---|---|
| 02/17/04 | Tradewind | 1,000.00 |
| 03/01/04 | Tradewind | 50,000.00 |
| 05/27/04 | Tradewind | 50,000.00 |
| 09/19/05 | Tradewind | 50,000.00 |
| 10/25/05 | Tradewind | 20,000.00 |
| 04/17/06 | Tradewind | 50,000.00 |
| | **TOTAL** | **$221,000.00** |

29. Similarly to VJC, Tradewind appears to be a viable business with potential to generate assets for the receivership estate. However, Nadel's legal problems have created operational difficulties for Tradewind, and I believe Tradewind's business operations would benefit from the inclusion of Tradewind into this receivership.

I declare under the penalty of perjury that the foregoing is true and correct and is executed this 26th day of January, 2009.

_____
Burton W. Wiand, as Receiver
c/o FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd.
Suite 1700
Tampa, FL 33602
Tel. 813.228.7411
Fax 813.229.8313
bwiand@fowlerwhite.com