UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.                                 Case No.: 8:09-cv-0087-T-26TBM

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.
_____/

**RECEIVER'S DECLARATION IN SUPPORT OF THE SECOND
UNOPPOSED MOTION TO EXPAND THE SCOPE OF RECEIVERSHIP**

Burton W. Wiand declares as follows:

1.    I am an attorney with Fowler White Boggs P.A. ("Fowler White") in Tampa, Florida.

2.    In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P.; Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory IRA Fund, Ltd.;

Victory Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management (Scoop Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund are collectively referred to as the "Hedge Funds;" Scoop Capital, Scoop Management, Valhalla Management, and Viking Management are collectively referred to as the "Investment Managers").

3. In a January 27, 2009, Order (Doc. 17), the Court also appointed me Receiver over Venice Jet Center, LLC, and Tradewind, LLC (all of the entities in receivership are referred to collectively as the "Receivership Entities").

4. On January 26, 2009, I submitted the Receiver's Declaration in Support of the Receiver's Unopposed Motion to Expand the Scope of Receivership (the "Receiver's January Declaration") (Doc. 16) to include Venice Jet Center, LLC, and Tradewind, LLC.

5. Since my appointment as Receiver, I and professionals that I have retained (including lawyers and accountants) have continued our investigation, which has included having communications with a number of people associated with Nadel and/or the Receivership Entities such as his wife, officers of some Receivership Entities, and persons responsible for maintaining the financial books of Receivership Entities and of other businesses controlled by Nadel, for operating other businesses controlled by Nadel, for performing accounting services, and for administering the Hedge Funds.

6. We have also reviewed documents located in the offices of the Hedge Funds and Investment Managers (the "Office") (located at 1618 Main Street, Sarasota, FL 34236), documents obtained from the accountant for the Receivership Entities, information stored on the Receivership Entities' computer network, documents obtained from other businesses

2

controlled by Nadel, documents obtained from financial institutions and other third parties, and information available in the public record.

7. As shown in the Receiver's January Declaration and in Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC's Emergency Motion") (Doc. 2) and supporting papers, Nadel defrauded investors in the six Hedge Funds from at least 2003 through the time he fled last month by "massively overstating the value of investors' interests in them." SEC Emerg. Mot. at 2, 6. Specifically, from at least 2003 through 2008, the value of the Hedge Funds as represented to investors was significantly overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

8. As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now in receivership. *Id.* at 4-6. Through those entities, Nadel was ultimately responsible for controlling the Hedge Funds' investment activities.

9. Evidence also showed that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, and to other Receivership Entities, in the form of management, advisory, and/or profit incentive fees. *Id.* at 5-6. According to the Hedge Funds' documents, in 2003 the Hedge Funds paid a total of $7,045,509.31 in fees; in 2004, they paid $14,156,501.17 in fees; in 2005, they paid $20,349,897.02 fees; in 2006 they paid $18,257,590.52 in fees; in 2007 they paid $19,873,365.00 in fees; and in 2008 they paid $15,854,930.76 in fees.

10. Consistent with our earlier findings, our investigation has continued to reveal information showing that additional businesses and a trust over which Nadel exerted full or partial control or in which he had a full or partial interest were purchased and/or funded with money derived from Nadel's fraudulent investment scheme (the "scheme").

11. This occurred through direct payments from Scoop Capital or Scoop Management financial accounts.

12. This also occurred through payments from accounts held in the name of Nadel or Nadel and his wife, which accounts were funded with money from the scheme, including with the large sums of "management" and "advisory" fees that Nadel paid himself for purporting to manage money through Receivership Entities. For example, as demonstrated by the copies of checks attached as Exhibit A to the Receiver's January Declaration, in 2008 Nadel signed checks transferring at least $1,003,500.00 from Scoop Capital to himself and his wife. Overall, to date we have uncovered at least $6,426,000.00 that was transferred from Scoop Capital or Scoop Management accounts into personal accounts controlled by Nadel and/or his wife between 2003 and 2009.

13. To date we have not uncovered any source of income for Nadel or his wife that was not in some manner funded with money from the scheme (whether through "management fees" or otherwise). Discussions with Nadel's wife, Marguerite "Peg" Nadel, and others have confirmed that, during the time one or more of the Hedge Funds and Investment Managers were in operation (i.e., beginning in at least 1999), essentially all of Nadel and Mrs. Nadel's income was derived directly from those entities.

14. As detailed in the Receiver's January Declaration and the SEC's Emergency Motion, the Hedge Funds and Investment Managers were operated as part of a fraudulent scheme from at least 2003 forward. As such, the source of Nadel and Mrs. Nadel's income during that period was Nadel's scheme.

15. The information gathered during our investigation shows that money derived from Nadel's scheme was used to purchase and/or fund other businesses, including Laurel Mountain Preserve, LLC, and Laurel Preserve, LLC, and to fund his wife's trust.

**Laurel Mountain Preserve, LLC; Laurel Preserve, LLC;**
**& Laurel Mountain Preserve Homeowners Association, Inc.**

16. To date, our investigation has revealed that Laurel Mountain Preserve, LLC ("Laurel Mountain"), was a North Carolina limited liability company formed in or about December 2003. *See* Laurel Mountain filings with N.C. Secretary of State, attached hereto as Exhibit 1. Laurel Mountain was "withdrawn" as a limited liability company in January 2006. *Id.* Its principal address was the Office (the Office address in the records -- 1668 Main St. -- is the address before the current one), and its manager and member was Nadel. *See id.*

17. Laurel Preserve, LLC ("Laurel Preserve"), was formed as a North Carolina limited liability company in February 2006. *See* Laurel Preserve filings with N.C. Secretary of State, attached hereto as Exhibit 2. Its principal address is the Office, Nadel is its registered agent, and the "Registered Office" address (131 Garren Creek Road, Fairview, N.C. 28730) is a home titled in the names of Nadel and his wife. The manager is Nadel, and although Laurel Preserve's 2006 Operating Agreement identifies Nadel and his wife as members of Laurel Preserve with each having made a "capital contribution" of $750, the Laurel Preserve 2007 federal income tax return indentifies Scoop Capital as owner of 100%

5

of Laurel Preserve. *See* Laurel Preserve 2007 Tax Return, Schedule K-1, attached hereto as Exhibit 3.

18. Finally, Laurel Mountain Preserve Homeowners Association, Inc. (the "HOA"), is a North Carolina non-profit corporation formed in March 2006. *See* HOA filings with N.C. Secretary of State, attached hereto as Exhibit 4. Its principal address is the home in Fairview, N.C., and its registered agent is Nadel. *See id.*

19. The information we have reviewed, including documents retrieved from the Office, tax returns, public records, information provided by Mrs. Nadel, and information provided by an attorney who assisted with transactions relating to these entities, shows that Laurel Preserve holds title to approximately 430 acres near Asheville, N.C., intended for development of home-sites. The information also shows that property was originally purchased by Laurel Mountain in 2003, and that in February 2006, Laurel Preserve was created, the land held by Laurel Mountain was "sold" to Laurel Preserve, and Laurel Mountain provided financing for that purchase in the form of a $2,900,000 loan to Laurel Preserve.

20. According to a balance sheet retrieved from the Office, Laurel Mountain received funding in the form of "loans" from Scoop Capital (at least $200,000.00), Scoop Management (at least $1,335,753.09), Tradewind (at least $59,000.00), and Nadel and Mrs. Nadel (at least $214,467.80). *See* Laurel Mountain Balance Sheet, attached hereto as Exhibit 5.

21. Similarly, according to another balance sheet retrieved from the Office, Laurel Preserve received funding in the form of "loans" from Scoop Capital (at least $711,000.00),

Scoop Management (at least $349,862.67), Laurel Mountain (at least $929,434.45), Tradewind (at least $61,410.85), as well as a loan from BB&T Bank (at least $360,157.37). *See* Laurel Preserve Balance Sheet, attached hereto as Exhibit 6.

22. According to documents retrieved from the Office and obtained from financial institutions, Scoop Capital has made at least the following transfers of money directly to Laurel Mountain or for its benefit:

| Date | Payee | Amount |
|---|---|---|
| 2/27/2004 | Rose Law Firm * | $67,760 |
| 6/23/2004 | Laurel Mountain Preserve, LLC | $100,000 |
| 7/13/2004 | Laurel Mountain Preserve, LLC | $100,000 |
| 8/23/2004 | Laurel Mountain Preserve, LLC | $100,000 |
| Undated (probably 02/2005) | Laurel Mountain Preserve, LLC | $50,000 |
| 3/31/2005 | Laurel Mountain Preserve, LLC | $50,000 |
| | **TOTAL:** | **$467,760** |

\* According to notes inputed into the account ledger, this transfers was "[f]or mortgage reduction for Laurel Mountain"

23. Similarly, according to documents retrieved from the Office and obtained from financial institutions, Scoop Capital has made at least the following transfers of money directly to Laurel Preserve:

| Date | Payee | Amount |
|---|---|---|
| 9/19/2006 | Laurel Preserve, LLC | $50,000.00 |
| 11/3/2006 | Laurel Preserve, LLC | $100,000 |
| 1/8/2007 | Laurel Preserve, LLC | $50,000 |
| 3/2/2007 | Laurel Preserve, LLC | $100,000 |
| 3/28/2008 | Laurel Preserve, LLC | $10,000 |
| 4/9/2008 | Laurel Preserve, LLC | $20,000 |
| 4/22/2008 | Laurel Preserve, LLC | $10,000 |
| 7/7/2008 | Laurel Preserve, LLC | $10,000 |
| 8/14/2008 | Laurel Preserve, LLC | $10,000 |

| | | |
|---|---|---|
| 8/25/2008 | Laurel Preserve, LLC | $35,000 |
| 9/2/2008 | Laurel Preserve, LLC | $10,000 |
| 9/30/2008 | Laurel Preserve, LLC | $15,000 |
| 10/22/2008 | Laurel Preserve, LLC | $5,000 |
| 10/25/2008 | Laurel Preserve, LLC | $25,000 |
| 11/17/2008 | Laurel Preserve, LLC | $5,000 |
| 12/1/2008 | Laurel Preserve, LLC | $25,000 |
| 12/9/2008 | Laurel Preserve, LLC | $1,000 |
| 12/15/2008 | Laurel Preserve, LLC | $5,000 |
| 12/23/2008 | Laurel Preserve, LLC | $10,000 |
| 1/6/2009 | Laurel Preserve, LLC | $20,000 |
| 1/7/2009 | Laurel Preserve, LLC | $10,000 |
| 1/12/2009 | Laurel Preserve, LLC | $15,000 |
| | **TOTAL:** | **$541,000.00** |

24. Our investigation indicates the HOA was formed to serve as the homeowners' association following the development and sale of the land held by Laurel Preserve.

### Marguerite J. Nadel Revocable Trust UAD 8/2/2007

25. According to a copy of a trust agreement provided to Goldman Sachs Group, Inc. ("Goldman Sachs"), in connection with the opening of an account in the name of the Marguerite J. Nadel Revocable Trust Under Agreement Dated 8/2/2007 (the "Trust"), the Trust was created on August 2, 2007. *See* Revocable Trust Agreement at 1, attached hereto as part of Composite Exhibit 7. The trustee is identified as Mrs. Nadel (the subsequent trustees are Nadel and Michael Zucker, the Hedge Funds' accountant). *See id.* at 1, 2.

26. According to information in our possession, the Trust had financial accounts at two institutions: (i) at Northern Trust, N.A., it had a checking account (ending with numbers 9316 and referred to herein as the "NT 9316 Account") and an investment account (ending with numbers 5397 and referred to herein as the "NT 5397 Account") (collectively referred to as the "NT Accounts"); and (ii) at Goldman Sachs it had a trading account which

was controlled by Nadel (the "GS Account") (*see* Account Opening Documents at A-1, F-1, attached hereto as part of Composite Ex. 7 (showing Nadel's authority over GS Account)).

27. Our investigation revealed the Trust was funded with an initial deposit of $500,000.00 into the NT 9316 Account from Scoop Management on or about August 2, 2007. *See* Deposit ticket & copy of deposited check, attached hereto as Exhibit 8; NT 9316 Acct. Statement for 8/2/07 through 8/5/07 at 1, attached hereto as Exhibit 9. On August 15, 2007, $450,000.00 of the initial deposit was transferred to the GS Account. *See* NT 9316 Acct. & NT 5397 Acct. Statement for 8/6/07 through 9/5/07 at 3, attached hereto as Exhibit 10; GS Acct. Activity Report for 8/1/07 through 2/4/09 at 5, attached hereto as Exhibit 11. That was the only money deposited into the GS Account. *See generally* Ex. 11.

28. Funds were transferred out of the GS Account as follows: $51,546.90 on October 1, 2007; $55,479.87 on November 26, 2007; $69,848.61 on April 1, 2008; $50,000.00 on July 2, 2008; $53,350.00 on September 2, 2008; and $179,000.00 on January 6, 2009. *See* Ex. 11 at 5, 6, 7. Each of those transfers was made to one of the NT Accounts, and the statements for the NT Accounts show those accounts did not receive any other transfers of money except, as noted in the next paragraph, for one transfer from Scoop Capital the day before Nadel fled. *See id.*

29. According to records obtained from Wachovia Bank and Northern Trust, on January 13, 2009, $150,000.00 was transferred from Scoop Capital's account to the NT 9316 Account. *See* NT 9316 Acct. Statement for 1/6/09 through 2/5/09 at 3, attached hereto as Exhibit 12; Activity Report for Wachovia account ending with 2157, attached hereto as Exhibit 13.

30. Attached as Exhibit 14 is a true and correct copy of the complaint filed in *United States v. Nadel*, Case No. 09 MAG 169 (S.D.N.Y.).

I declare under the penalty of perjury that the foregoing is true and correct and is executed this 10th day of February, 2009.

_____
Burton W. Wiand, as Receiver
c/o FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd.
Suite 1700
Tampa, FL 33602
Tel. 813.228.7411
Fax 813.229.8313
bwiand@fowlerwhite.com