UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.                                                                                    Case No.: 8:09-cv-0087-T-26TBM

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.
_____/

### RECEIVER'S DECLARATION IN SUPPORT OF THE THIRD UNOPPOSED MOTION TO EXPAND THE SCOPE OF RECEIVERSHIP

Burton W. Wiand declares as follows:

1. I am an attorney with Fowler White Boggs P.A. ("Fowler White") in Tampa, Florida.

2. In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P.; Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory IRA Fund, Ltd.;

Victory Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management (Scoop Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund are collectively referred to as the "Hedge Funds;" Scoop Capital, Scoop Management, Valhalla Management, and Viking Management are collectively referred to as the "Investment Managers").

3. In a January 27, 2009, Order (Doc. 17), the Court also appointed me Receiver over Venice Jet Center, LLC, and Tradewind, LLC.

4. In a February 11, 2009, Order (Doc. 44), the Court also appointed me Receiver over Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; and the Laurel Mountain Preserve Homeowners Association, Inc. (all of the entities and the trust in receivership are referred to collectively as the "Receivership Entities").

5. Since my appointment as Receiver, I and professionals that I have retained (including lawyers and accountants) have continued our investigation, which has included communicating with people associated with Nadel and/or the Receivership Entities and persons responsible for maintaining the financial books of Receivership Entities and of other businesses controlled by Nadel; operating other businesses controlled by Nadel or for assisting those businesses with their transactions; performing accounting services; and administering the Hedge Funds.

6. We have also reviewed documents located in the offices of the Hedge Funds and Investment Managers (the "Office") (located at 1618 Main Street, Sarasota, FL 34236); documents obtained from the accountant for Receivership Entities; information stored on

Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's business with their transactions; and information available in the public record.

### The Fraudulent Investment Scheme

7. On January 26, 2009, I submitted the Receiver's Declaration in Support of the Receiver's Unopposed Motion to Expand the Scope of Receivership (the "Receiver's January Declaration") (Doc. 16) to include Venice Jet Center, LLC, and Tradewind, LLC.

8. As shown in the Receiver's January Declaration and in Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC Emergency Motion") (Doc. 2) and supporting papers, Nadel defrauded investors in the six Hedge Funds from at least 2003 through the time he fled in mid-January by "massively overstating the value of investors' interests in them." (SEC Emerg. Mot. at 2, 6.) Specifically, from at least 2003 through 2008, the value of the Hedge Funds as represented to investors was significantly overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

9. As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now in receivership. (*Id.* at 4-6.) Through those entities, Nadel was ultimately responsible for controlling the Hedge Funds' investment activities.

10. Evidence also showed that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, and to other Receivership Entities, in the form of management, advisory, and/or profit incentive fees. (*Id.* at 5-6.) According to the Hedge Funds' documents, in 2003 the Hedge Funds paid a total of $7,045,509.31 in fees; in 2004, they paid $14,156,501.17 in fees; in 2005, they paid $20,349,897.02 fees; in 2006 they paid $18,257,590.52 in fees; in 2007 they paid $19,873,365.00 in fees; and in 2008 they paid $15,854,930.76 in fees.

11. Consistent with our earlier findings, our investigation has continued to reveal information showing that additional entities over which Nadel exerted full or partial control or in which he had a full or partial interest were purchased and/or funded with money derived from Nadel's fraudulent investment scheme (the "scheme").

12. This occurred through direct payments from Scoop Capital or Scoop Management financial accounts.

13. This also occurred through payments from accounts held in the name of Nadel or Nadel and his wife, which accounts were funded with money from the scheme, including with the large sums of "management" and "advisory" fees that Nadel paid himself for purporting to manage money through Receivership Entities. For example, as demonstrated by the copies of checks attached as Exhibit A to the Receiver's January Declaration, in 2008 Nadel signed checks transferring at least $1,003,500.00 from Scoop Capital to himself and his wife. Overall, to date we have uncovered at least $6,426,000.00 that was transferred from Scoop Capital or Scoop Management accounts into personal accounts controlled by Nadel and/or his wife between 2003 and 2009.

14. To date we have not uncovered any source of income for Nadel or his wife that was not in some manner funded with money from the scheme (whether through "management fees" or otherwise). Discussions with Nadel's wife, Marguerite "Peg" Nadel, and others have confirmed that, during the time one or more of the Hedge Funds and Investment Managers were in operation (i.e., beginning in at least 1999), essentially all of Nadel and Mrs. Nadel's income was derived directly from those entities.

15. As detailed in the Receiver's January Declaration and the SEC Emergency Motion, the Hedge Funds and Investment Managers were operated as part of a fraudulent scheme from at least 2003 forward. As such, the source of Nadel and Mrs. Nadel's income during that period was Nadel's scheme.

16. The information gathered during our investigation shows that money derived from Nadel's scheme was used to fund the Guy-Nadel Foundation, Inc.

**Guy-Nadel Foundation, Inc.**

17. The Guy-Nadel Foundation, Inc. (the "Foundation"), is a Florida non-profit corporation formed in December 2003 for "charitable, educational and scientific purposes." *See* Article II of the Foundation's Articles of Incorporation, dated December 2, 2003, attached hereto as **Exhibit A**, filed with the Florida Secretary of State. Nadel is the Foundation's incorporator and its registered agent. (Ex. A Arts. V, VI, IX.)

18. The Foundation's directors are Nadel, Mrs. Nadel, and Mrs. Nadel's son and daughter, Geoff Quisenberry and Alexandra Quisenberry, respectively. *See* the Foundation's Annual Reports for the years 2004, 2005, 2006, 2007, and 2008, attached hereto collectively as **Exhibit B**, filed with the Florida Secretary of State. Further, according to its 2006 federal

tax return, the Foundation's President is Nadel. *See* 2006 Tax Return of the Foundation, attached hereto as **Exhibit C**.

19. The Foundation's current principal address is the Office. (Ex. B 2008 Annual Report; Ex. C at 1.)

20. The information we have gathered indicates the Foundation was funded with proceeds of Nadel's scheme, which were transferred directly from Scoop Capital or indirectly through transfers from the Nadels' personal accounts. Specifically, we have uncovered the following transfers of money from Scoop Capital and the Nadels' personal accounts to the Foundation between 2004 and 2008:

| DATE | PAYOR ACCOUNT | AMOUNT |
|---|---|---|
| 12/20/2004 | Arthur & Peg Nadel | $500,000.00 |
| 12/6/2005 | Arthur & Peg Nadel | $1,000,000.00 |
| 4/17/2006 | Arthur & Peg Nadel | $250,000.00 |
| 11/1/2006 | Arthur & Peg Nadel | $500,000.00 |
| 12/22/2006 | Arthur & Peg Nadel | $500,000.00 |
| 12/12/2008 | Arthur & Peg Nadel | $50,000.00 |
| 12/23/2008 | Scoop Capital | $50,000.00 |
| | **TOTAL:** | **$2,850,000.00** |

21. In addition, in December 2004 and December 2003, the Foundation was deeded several real estate lots located in North Carolina from (i) Laurel Mountain Preserve, LLC (one of the receivership entities) and (ii) Nadel and his wife. A true and correct copy of each of these deeds is attached hereto as **Exhibit D** and **Exhibit E**, respectively. The records we have reviewed for Laurel Mountain Preserve and the Nadels show that these lots are essentially adjacent to each other. The lots appear to have been purchased by Laurel Mountain Preserve and the Nadels as part of the same general transaction in which Laurel

Mountain Preserve purchased a large tract of land in North Carolina. (*See* Receiver's Decl. in Support of Second Unopposed Mot. to Expand the Scope of Receivership (Doc. 37) ¶ 21.)

22. As noted in the Receiver's Second Unopposed Motion to Expand the Scope of Receivership (Doc. 36 at 5-6) and the Receiver's declaration in support thereof (Doc. 37 ¶¶ 16-22), Laurel Mountain Preserve was funded with proceeds of Nadel's scheme and is now in receivership. The December 2004 deed (Ex. D) granted a tract of land from Laurel Mountain Preserve, LLC, to the Foundation.

23. The tract the Nadels deeded to the Foundation was purchased by them in December 2003. A true and correct copy of the deed granting the land to the Nadels is attached hereto as **Exhibit F**. The same month, they deeded it to the Foundation. (*See* Ex. E.) As explained above at paragraphs 7 through 16, at the time of those transactions, Nadel was already perpetrating his scheme, and essentially all of the Nadels' income was derived from that scheme.

I declare under the penalty of perjury that the foregoing is true and correct and is executed this 4 day of March, 2009.

_____
Burton W. Wiand, as Receiver
c/o FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd.
Suite 1700
Tampa, FL 33602
Tel. 813.228.7411
Fax 813.229.8313
bwiand@fowlerwhite.com