UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

            Defendants,

CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

            Relief Defendants.
_____/

## RECEIVER'S DECLARATION IN SUPPORT OF THE FOURTH UNOPPOSED MOTION TO EXPAND THE SCOPE OF RECEIVERSHIP

Burton W. Wiand declares as follows:

1. I am an attorney with Fowler White Boggs P.A. ("Fowler White") in Tampa, Florida.

2. In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P.; Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory IRA Fund, Ltd.;

Victory Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management (Scoop Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund are collectively referred to as the "Hedge Funds;" Scoop Capital, Scoop Management, Valhalla Management, and Viking Management are collectively referred to as the "Investment Managers.").

3. In a January 27, 2009, Order (Doc. 17), the Court also appointed me Receiver over Venice Jet Center, LLC, and Tradewind, LLC.

4. In a February 11, 2009 Order (Doc. 44), the Court also appointed me Receiver over Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; and the Laurel Mountain Preserve Homeowners Association, Inc.

5. In a March 9, 2009, Order (Doc. 68), the Court also appointed me Receiver over the Guy-Nadel Foundation, Inc. All of the entities in receivership are referred to collectively as the "Receivership Entities."

6. Since my appointment as Receiver, I and professionals that I have retained (including lawyers and an accountant) have continued our investigation, which has included communicating with people associated with Nadel and/or the Receivership Entities and persons responsible for maintaining the financial books of Receivership Entities and of other businesses controlled by Nadel; operating other businesses controlled by Nadel or for assisting those businesses with their transactions; performing accounting services; and administering the Hedge Funds.

7. We have also reviewed documents located in the offices of the Hedge Funds and Investment Managers (the "Office") (located at 1618 Main Street, Sarasota, Florida 34236); documents obtained from the accountant for Receivership Entities; information stored on Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's businesses with their transactions; and information available in the public record.

## The Fraudulent Investment Scheme

8. On January 26, 2009, I submitted the Receiver's Declaration in Support of the Receiver's Unopposed Motion to Expand the Scope of Receivership (the "Receiver's January Declaration") (Doc. 16).

9. As shown in the Receiver's January Declaration and in Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC Emergency Motion") (Doc. 2) and supporting papers, Nadel defrauded investors in the six Hedge Funds from at least 2003 (and likely earlier) through the time he fled in January 2009 by "massively overstating the value of investors' interests in them." (SEC Emerg. Mot. at 2, 6.) Specifically, from at least 2003 through 2008, the value of the Hedge Funds as represented to investors was significantly overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

10. As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now

in receivership. (*Id.* at 4-6.) Through those entities, Nadel was ultimately responsible for controlling the Hedge Funds' investment activities.

11. Evidence also showed that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, and to other Receivership Entities, in the form of management, advisory, and/or profit incentive fees. (*Id.* at 5-6.) According to the Hedge Funds' documents, in 2003 the Hedge Funds paid a total of $7,045,509.31 in fees; in 2004, they paid $14,156,501.17 in fees; in 2005, they paid $20,349,897.02 fees; in 2006 they paid $18,257,590.52 in fees; in 2007 they paid $19,873,365.00 in fees; and in 2008 they paid $15,854,930.76 in fees.

12. Consistent with our earlier findings, our investigation has continued to reveal information showing that additional entities over which Nadel or his wife, Marguerite "Peg" Nadel, exerted full or partial control or in which they had a full or partial interest were purchased and/or funded with money derived from Nadel's fraudulent investment scheme (the "scheme"). This occurred through direct payments from Scoop Capital or Scoop Management financial accounts.

13. This also occurred through payments from accounts held in the name of Nadel or Nadel and his wife, which accounts were funded with money from the scheme, including with the large sums of "management" and "advisory" fees that Nadel paid himself for purporting to manage money through Receivership Entities. For example, as demonstrated by the copies of checks attached as Exhibit A to the Receiver's January Declaration, in 2008 Nadel signed checks transferring at least $1,003,500.00 from Scoop Capital to himself and his wife. Overall, to date we have uncovered at least $14,966,000.00 that was transferred

4

from Scoop Capital or Scoop Management accounts into personal accounts controlled by Nadel and/or his wife between 2003 and 2009.

14. To date we have not uncovered any source of income for Nadel or his wife that was not in some manner funded with money from the scheme (whether through "management fees" or otherwise). Discussions with Nadel's wife and others have confirmed that, during the time one or more of the Hedge Funds and Investment Managers were in operation (i.e., beginning in at least 1999), essentially all of Nadel and Mrs. Nadel's income was derived directly from those entities.

15. As detailed in the Receiver's January Declaration and the SEC Emergency Motion, the Hedge Funds and Investment Managers were operated as part of a fraudulent scheme from at least 2003 forward. As such, the source of Nadel and Mrs. Nadel's income during that period was Nadel's scheme.

16. The information gathered during our investigation shows that money derived from Nadel's scheme was used to fund (i) a building purchased by Lime Avenue Enterprises, LLC, and (ii) the business operations of A Victorian Garden Florist, LLC (d/b/a Mr. Florist A Victorian Garden), which is a flower shop housed in that building.

**Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC**

17. Lime Avenue Enterprises, LLC ("Lime"), is a Florida limited liability company formed in August 2006 for "any and all lawful business." (*See* Article III of Lime's Articles of Incorporation, dated August 1, 2006, filed with the Florida Secretary of State and attached hereto as **Exhibit A**.)

18. According to the Articles of Incorporation, Mrs. Nadel initially was appointed Lime's manager. (Ex. A Art. V.) However, a 2007 annual report shows that Nadel was added as Managing Member of Lime. (*See* Lime's Annual Reports for the years 2007 and 2008, filed with the Florida Secretary of State and attached hereto collectively as **Exhibit B**.) Notably, the 2007 tax return for Lime, which was prepared in the Fall of 2008, identifies Scoop Capital – one of the Receivership Entities – as the managing member of Lime and having a 100% share of Lime's profits, losses, and capital. (*See* Redacted 2007 Tax Return of Lime, attached hereto as **Exhibit C** at 5.) Lime's principal address is the Office. (Ex. C at 1, 5.)

19. Lime owns a building located at 599 North Lime Avenue, Sarasota, Florida 34237 (the "Lime Building"). (Ex. C at 8.) The Lime Building is described as a "commercial building used as a flower shop." (Ex. C at 8.)

20. Lime purchased the Lime Building in August 2006. (*See* 2009 Detail Information for Parcel 2028-11-0017, from Sarasota County Property Appraiser website, attached hereto as **Exhibit D**; *see also* General Warranty Deed, attached hereto as **Exhibit E**.) The property records identify the Lime Building's address as 2258 6th Street, Sarasota, Florida 34237, which is another address for 599 N. Lime Avenue. (Ex. D.) The public records and other information we have received indicate that Lime was formed by the Nadels for the specific purpose of purchasing the Lime Building.

21. The Lime Building houses a flower shop which, according to the records we have received, is owned by a limited liability company controlled by Mrs. Nadel and funded in whole or in part with proceeds of Nadel's scheme. Specifically, the flower shop is owned

by A Victorian Garden Florist, LLC ("Victorian Garden"), which is a Florida limited liability company formed in April 2005. (*See* Victorian Garden's Articles of Incorporation and subsequent Amendment, filed with the Florida Secretary of State and attached collectively hereto as **Exhibit F**.) Victorian Garden was originally formed as ELPE, LLC, on April 2005. (*See* Ex. F at 1.) On or about April 29, 2005, papers were filed to change its name to A Victorian Garden Florist, LLC. (*See* Ex. F at 2-4.) At that time, an individual named Elaine Getchius was added as a managing member of Victorian Garden, but by April 2007, Mrs. Nadel was the only member of Victorian Garden according to filings with the Florida Secretary of State. (*See* Victorian Garden's Annual Reports for the years 2006, 2007, and 2008, filed with the Florida Secretary of State and attached hereto collectively as **Exhibit G**.)

22. Victorian Garden's principal address is the Lime Building, and Mrs. Nadel is Victorian Garden's registered agent and managing member. (Ex. F; Ex. G at 2-3.)

23. In October 2006, Victorian Garden registered the following fictitious name with the Florida Secretary of State: "Mr. Florist A Victorian Garden" (*see* Application for Registration of Fictitious Name, attached hereto as **Exhibit H**), and currently does business under that name (*see, e.g.*, www.victoriangardenflorist.org).

24. The information we have gathered thus far indicates that Lime and Victorian Garden were purchased and/or funded with proceeds of the scheme.

25. Specifically, Lime's balance sheet indicates that Nadel and Mrs. Nadel have "loaned" it $539,000.00. (*See* Lime Balance Sheet, attached hereto as **Exhibit I**.)

26. According to documents located in the Office and obtained from financial institutions to date, Nadel and his wife have made at least the following transfers of money

directly to or for the benefit of Lime and/or Victorian Garden from their joint financial accounts:

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 5/8/2006 | Michael Saunders* | $25,000.00 |
| 8/2/2006 | Mr. Florist** | $200,000.00 |
| 5/3/2007 | Lime | $15,000.00 |
| 8/23/2007 | Lime | $10,000.00 |
| 10/10/2007 | Lime | $5,000.00 |
| 11/19/2007 | Lime | $15,000.00 |
| 1/2/2008 | Lime | $10,000.00 |
| 3/3/2008 | Lime | $10,000.00 |
| 5/7/2008 | Lime | $15,000.00 |
| 8/12/2008 | Lime | $10,000.00 |
| 10/13/2008 | Lime | $2,000.00 |
| 10/21/2008 | Lime | $7,000.00 |
| 11/19/2008 | Lime | $10,000.00 |
| 12/23/2008 | Lime | $5,000.00 |
| | **TOTAL:** | **$339,000.00** |

\*      According to notes on the ledger, this transfer was for: "Escrow Mr. Florist." This appears to indicate that the money was an escrow deposit relating to the Victorian Garden.

\*\*     According to notes on the ledger, this transfer was for: "Open Acct. NT." This appears to indicate that the money was used to open Victorian Garden's bank account at Northern Trust.

27.    Similarly, according to documents located in the Office and obtained from financial institutions to date, Scoop Management, Inc., made at least the following transfers of money directly to or for the benefit of Lime and/or Victorian Garden:

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 2/22/2006 | Victorian Garden | $20,000.00 |
| 3/7/2006 | Victorian Garden | $367.57 |
| 4/7/2006 | Victorian Garden | $313.00 |
| 5/10/2006 | Victorian Garden | $437.65 |
| 6/6/2006 | Victorian Garden | $313.00 |
| 7/12/2006 | Victorian Garden | $678.40 |
| 8/2/2006 | Victorian Garden | $400,000.00 |

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 9/5/2006 | Victorian Garden | $15,000.00 |
| 4/30/2008 | Lime | $1,000.00 |
| | **TOTAL:** | **$438,109.62** |

28. Thus, Nadel, his wife, and/or Scoop Management collectively made at least 23 payments totaling **$777,109.62** directly to or for the benefit of Lime and/or Victorian Garden.

29. According to the information that we have uncovered, at all times during the existence of Lime and Victorian Garden and the Nadels' involvement with the florist located in the Lime building, Nadel was perpetrating his scheme, from which essentially all of the Nadels' income was derived. Thus, Lime and Victorian Garden were funded with proceeds of that scheme.

I declare under the penalty of perjury that the foregoing is true and correct and is executed this 16th day of March, 2009.

_____
Burton W. Wiand, as Receiver
c/o FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd.
Suite 1700
Tampa, FL 33602
Tel. 813.228.7411
Fax 813.229.8313
bwiand@fowlerwhite.com