UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,
  v.

                                      CASE NO. 8:09-cv-87-T-26TBM

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.

          Defendants,

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY IRA FUND, LTD,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT

          Relief Defendants.
_____/

**PLAINTIFF'S RESPONSE OPPOSING AMENDED MOTION
FOR PAYMENT OF REASONABLE ATTORNEYS' FEES**

      Neither Defendant Arthur Nadel nor his attorneys have given the Court any reason why it should allow Nadel pay his defense team with what little is left of the funds he took from the investors he defrauded. Nadel has no right to lift the asset freeze, to which he consented only six weeks ago, in order to spend victims' money on his own defense. There is no requirement that the Commission trace funds to his fraud before the Court can keep them frozen to satisfy any future disgorgement judgment. Additionally, Nadel certainly cannot justify a release of funds when he has failed to provide the Court-ordered sworn accounting or any evidentiary basis for either the fees his lawyers claim already to have earned or that they seek going forward.

Nor can Nadel complain of a due process violation, since by consenting to the February 3, 2009 Order of Preliminary Injunction and Other Relief (D.E. 29) (the "P.I. Order") he waived his right to a full evidentiary hearing on whether the Court should continue the emergency asset freeze. Nadel has not provided any basis to revisit the asset freeze, and the Court should reject his attempts through counsel to do so by denying the Amended Motion for Payment of Reasonable Attorneys' Fees (the "Amended Motion").

## I. Factual and Procedural Background

The Commission filed suit on January 21, 2009 alleging Nadel, Scoop Capital, LLC, and Scoop Management, LLC conducted a large-scale hedge fund fraud by greatly misleading investors about the value and profitability of hedge funds the defendants controlled, advised, and managed. Commission's Complaint (D.E. 1); Commission's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (D.E. 2) ("TRO Motion"). The Commission sought and the Court granted, among other things, emergency relief against the Defendants and Relief Defendants freezing their assets, prohibiting violations of the anti-fraud provisions of the federal securities laws, and appointing a receiver over the Defendant and Relief Defendant entities (D.E. 2-3, 6, 7-9). On February 2, the Commission's counsel visited Nadel in jail to take his deposition in preparation for the upcoming preliminary injunction hearing. Nadel, after consulting the same lawyers who now seek money for him, consented to a preliminary injunction extending the asset freeze and other emergency relief through the final resolution of this case. (D.E. 24, 29). Having issued the P.I. Order with Nadel's consent, the Court cancelled the preliminary injunction hearing, at which Nadel could have presented argument and evidence in opposition to the asset freeze and other aspects of a preliminary injunction (D.E. 30).

## II. Memorandum of Law

Almost all of the investors' money is gone, and the Court has already found the Commission both presented a *prima facie* case that Nadel violated the federal securities laws and established good cause to believe Nadel would have continued dissipating assets absent a Court order. *See* TRO Motion at 6-8 and accompanying exhibits (hedge funds' total assets no more than approximately $515,000); Temporary Restraining Order and Other Emergency Relief ("TRO") (D.E. 9) at 2. *Id.* Additionally, Nadel consented to the existing asset freeze, postponing the Commission's attempt to depose him and waiving his right to a full hearing that in part would have explored his assets and the disgorgement he owes. Anything Nadel obtains from the freeze now would be yet one more episode in which investor funds go to Nadel for Nadel's benefit only.

### A. The Asset Freeze is Necessary to Protect the Commission's Disgorgement Remedy

Disgorgement is an equitable remedy, the primary purpose of which is to force a defendant to surrender his ill-gotten gains.[1] *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2nd Cir. 1996) (disgorgement amount should be calculated by measuring illegal profits, not amount needed to reimburse defrauded investors); *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993); *SEC v. Commonwealth Chemical Services*, 574 F.2d 90, 102 (2nd Cir. 1978); *SEC v. Drexel Burnham Lambert, Inc.*, 956 F. Supp. 503, 507 (S.D.N.Y. 1997). Courts may order disgorgement even if there are no victims entitled to damages. *Drexel Burnham*, 956 F. Supp. at 507.

The burden on the Commission for "showing the amount of assets subject to

---

[1] The Commission may well propose distributing any disgorged funds to investors at the conclusion of this case, but the ultimate use of disgorged funds should not be confused with the purpose of disgorgement.

disgorgement (and, therefore available for freeze) is light." *SEC v. ETS Payphones*, 408 F.3d 727, 735 (11th Cir. 2005). All that is required is "a reasonable approximation of a defendant's ill-gotten gains . . . . Exactitude is not a requirement." *Id.* *See also SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989). The amounts should include "all gains flowing from the illegal activities." *SEC v. Cross Fin. Servs.,* 908 F. Supp. 718, 734 (C.D. Cal. 1995). Upon a reasonable approximation, the burden shifts to the defendant to show the amount is unreasonable. *Calvo*, 378, F.3d at 1217-18. The defendant then must *clearly* demonstrate the disgorgement figure is not a reasonable approximation of his gains. *First City Fin.*, 890 F.2d at 1232. The wrongdoer, who has created any uncertainty in the amounts through his violations of the securities laws, bears the risk of any uncertainty. *Calvo*, 378 F.3d at 1217; *First City Fin.*, 890 F.2d at 1232; *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983).[2]

The purpose of the asset freeze is "to preserve sufficient funds" for the payment of a disgorgement award. *SEC v. ETS Payphones*, 408 F.3d 727, 734 (11th Cir. 2005); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) ("district court may exercise its full range of equitable powers, including a preliminary asset freeze, to ensure that permanent equitable relief will be possible"); *SEC v. Musella*, 578 F. Supp. 425, 429-31 (S.D.N.Y.1984) ("[t]he objective, of course, is to ensure that defendants' assets will remain available to satisfy any future court order to disgorge illegal profits.") Accordingly, the Court should compare the amount of a defendant's potential equitable liability with the value of his or her frozen assets. *ETS Payphones*, 408 F.3d at 735-36.

The Receiver has identified to date more than $397 million Nadel and the advisers and

---

[2] Nadel has contributed to any uncertainty in the amounts he received from the fraud by failing to comply with the Court's order that he provide a sworn accounting by February 8, 2009. P.I. Order at 4.

managers he controlled took in his hedge fund fraud. Declaration of Receiver Burton Wiand at ¶ 16, attached as Exhibit 1 to this response. Nadel ran the advisers and managers. TRO Motion at 3-5 and accompanying exhibits. The Commission therefore may seek disgorgement of the entire amount of ill-gotten gains from Nadel – at this point more than $397 million – under a theory of joint and several liability.[3]

Even if the Court focused only on the amounts traced directly to Nadel or entities he controlled *so far*, the frozen assets still fall far short of covering Nadel's ill-gotten gains. Although the Receiver's investigation and work is less than two months old, he has identified more than $17 million transferred from Scoop Management to Nadel and his wife, with Scoop Management collecting approximately $60 million from the hedge funds during the fraud. Ex. 1 at ¶¶ 21, 24. The Receiver has also identified more than $6 million dollars in putative fees from Scoop Management to Scoop Capital, both of which Nadel controlled. *Id.* at ¶¶ 22-23; TRO Motion at 3-5.

As Exhibit 1 demonstrates, Nadel's potential disgorgement is at a minimum more than $17 million, and that number applies only if one considers solely transfers directly to Nadel and his wife while ignoring transfers through entities Nadel controlled or any salary he paid his wife. Because the value of the Receivership and frozen funds currently add up to only approximately $12 million to $13 million at best – without considering costs of maintaining or liquidating the

---

[3] "Where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they [may be] held jointly and severally liable for the disgorgement of the illegally obtained proceeds." *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1117 (9th Cir. 2006) (holding architect of fraud and his associated companies jointly and severally liable for all amounts fraudulently raised from investors), quoting *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). *See also Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) ("it is a well settled principal that joint and several liability is appropriate in securities law cases where two or more individuals or entities have close relationships in engaging in illegal conduct" and finding founder and owner of partnership jointly and severally liable for all partnership gains where he was a "substantial factor" in illegal securities sales); *First Jersey*, 101 F.3d at 1474-75 (owner firm jointly and severally liable for firm's profits, not just his own ill-gotten gains, where he participated in and profited from illegal conduct).

assets – (Ex. 1 at ¶¶ 27-28), a blanket freeze remains appropriate under *ETS Payphones*, because the potential disgorgement – particularly the *actual* potential disgorgement – far exceeds the frozen funds.[4] Furthermore, some case law holds an asset freeze is also appropriate to cover an award of prejudgment interest a civil penalty *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2nd Cir. 1990).

### B. The Commission does not have to trace frozen assets to the fraud

Contrary to the argument in Nadel's Amended Motion, which focuses on criminal forfeiture cases (Amended Motion at 5-6), it is irrelevant whether the frozen assets are traceable to or "tainted" by Nadel's fraud. Nadel ignores not only the disgorgement and asset freeze law discussed above, but also federal case law rejecting such a requirement. It is well settled that a Court may impose an interim asset freeze on *all* of a defendant's assets up to the amount of the defendant's ill-gotten gains to preserve funds for equitable remedies such as disgorgement. *Levi Strauss & Co.*, 51 F.3d at 987 ("district court may exercise its full range of equitable powers, including a preliminary asset freeze, to ensure that permanent equitable relief will be possible").

---

[4] Numerous courts in other circuits have also upheld the ability of the Commission and other litigants to obtain a freeze to preserve assets for equitable remedies. *United States ex rel Rahman v. Oncology Assoc.*, 198 F.3d 489, 494-99 (4th Cir. 1999) (asset freeze appropriate in case brought by U.S. government under the federal False Claims Act to preserve assets for equitable remedy of unjust enrichment); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (upholding district court's imposition of an asset freeze over all defendants' personal and business assets because plaintiff sought equitable remedy of profit disgorgement); *In re Focus Media, Inc.*, 387 F.3d 1077, 1084-85 (9th Cir. 2004) (upholding bankruptcy court decision to issue preliminary injunction freezing assets to preserve defendant's assets in action alleging equitable causes of action such as fraudulent conveyance and constructive trust); *Comcast of Illinois X, LLC v. Till,* 293 F.Supp.2d 936, 942 n.9 (E.D. Wisc. 2003) (granting *ex parte* order barring defendants from disposing of any assets because the freeze was to preserve assets for the equitable remedy of profit disgorgement); *Trafalgar Power Inc. v. Aetna Life Ins. Co.,* 131 F.Supp.2d 341, 349-50 (N.D.N.Y. 2001) (district court may grant asset freezes or like relief in cases involving equitable remedies); *Fairview Machine & Tool Co. v. Oakbrook Int'l, Inc.,* 77 F.Supp.2d 199, 201-206 (D. Mass 1999) (granting injunction freezing assets to potentially satisfy equitable remedies of unjust enrichment and restitution); *Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, No. CIV A. 02-213, 2002 WL 649086 at *3 (D. Minn. April 17, 2002), (district court issued preliminary injunction preserving assets in case seeking equitable remedies of constructive trust and equitable lien); *FTC v. Windermere Big Win Int'l*, No. 98 C 8066, 1999 WL 608715 at *3 n.2 (N.D. Ill. Aug. 5, 1999) (issuing asset freeze against defendants in FTC action to insure that assets were available for restitution, an equitable remedy).

*See also CFTC v. American Metals Exchange,* 991 F.2d 71, 79 (3rd Cir. 1993); *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1103 (2nd Cir. 1972).

Courts here and elsewhere frequently freeze assets a defendant owned even before the fraud began to preserve them for potential disgorgement. *SEC v. Spear & Jackson, et al.,* Case No. 04-80354-CIV-MIDDLEBROOKS/JOHNSON, Slip. Op. at 3 (S.D. Fla. Aug. 19, 2004) ("there is no requirement that frozen assets be traceable to the fraudulent activity underlying a lawsuit");[5] *SEC v. A.B. Financing and Inv., Inc.*, Case No. 02-23487-CIV-UNGARO-BENAGES, Slip. Op. at 2 (S.D. Fla. Feb. 10, 2003) ("a district court may freeze assets not specifically traced to illegal activity");[6] *SEC v. Current Fin. Servs.*, 62 F.Supp.2d 66, 68 (D.D.C. 1999) (refusing to release personal funds not traceable to the fraud because Defendant's liability exceeded total funds frozen); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) ("[i]t is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity") (*aff'd*, 101 F.3d 109 (2nd Cir. 1996)); *SEC v. Roor*, No. 99 Civ. 3372 (JSM), 1999 WL 553823 at *3 (S.D.N.Y. July 29, 1999) (denying motion to release so-called "untainted" funds from mortgage of property that pre-existed alleged fraud); *SEC v. Glauberman*, No. 90 Civ. 5205 (MBM), 1992 WL 175270 at *2 (S.D.N.Y. July 16, 1992) (rejecting defendant's argument that funds subject to disgorgement must be traced "dollar for dollar" to the illegal activity).

The cases Nadel cites such as *U.S. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001) and *U.S. v. Michelle's Lounge*, 39 F.3d 684, 700-01 (7th Cir. 1994) are not on point, because they involve litigation where the Department of Justice brought both criminal and civil forfeiture actions. Unlike this case, where the Commission seeks its own independent equitable relief separate from any criminal prosecution, the bases for a pretrial restraint in cases such as *Farmer* are criminal

---

[5] A copy of Magistrate Judge Johnson's opinion is attached as Exhibit 2.

[6] A copy of Judge Ungaro-Benages' opinion is attached as Exhibit 3.

7

forfeiture statutes and probable cause requirements that often *do* require tracing. However as set forth immediately above, criminal forfeiture cases are inapplicable here, where the Commission seeks the equitable remedy of disgorgement.

### *C. Nadel cannot justify requiring investors to pay for his defense*

In considering requests to use frozen funds for attorneys' fees, courts typically and properly place investors' interests over those of defendants, using an approach consistent with the purpose of the asset freeze discussed above. They require a defendant to establish that the frozen assets exceed possible disgorgement, and in many cases penalties, before releasing any funds. *See, e.g., SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) ("until such time as the Court can determine whether the frozen assets exceed the SEC's request for damages, defendants will not be permitted to use any of the frozen assets").

In *SEC v. Comcoa*, 887 F. Supp. 1521 (S.D. Fla. 1995), the court refused to modify an asset freeze to allow payment of legal fees, noting that the use of frozen funds for those fees had been disallowed even in cases involving civil forfeiture and criminal violations. *Id.* at 1524 (citing cases). The court observed that "in all of [those] cases, the courts have essentially held that a defendant has no right to spend another's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain counsel of his choice." *Id. See also SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) ("just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime"); *Roor*, 1999 WL 553823 at *2 (SEC defendant "may not use income derived from alleged violations of the

8

securities laws to pay for legal counsel")[7]; *SEC v. Coates*, No. 94 Civ. 5361, 1994 WL 455558 at *3 (S.D.N.Y. Aug. 23, 1994) ("defendant is not entitled to foot his legal bill with funds that are tainted by his fraud").

Nadel has failed to submit the sworn accounting this Court ordered, and his counsel has not provided the supplemental information the Court required for the Amended Motion. The Court's March 11, 2009 Order (D.E. 72) directs Nadel's counsel to "file a separate pleading on or before March 13, 2009, detailing the amount of reasonable attorneys' fees they are seeking and, if known, the source from which those fees should be paid." In their Supplement to Motion for Payment of Reasonable Attorneys' Fees (D.E. 74), Nadel's counsel gives billing rates and, without any evidentiary support, a figure of almost $100,000 for time and expenses they claim to have expended on Nadel's criminal and civil matters. They do not indicate how much they seek going forward. Not only does the case law not require a release of investor assets to pay for Nadel's defense, but it would simply be unfair to order such a payment here. Having consulted with counsel before consenting to the asset freeze, Nadel has avoided being deposed or giving testimony at the hearing he could have had. He now seeks to vitiate the same asset freeze without providing a sworn accounting, testimony, or an explanation of how his counsel incurred the past defense costs and calculates future legal expenses. He provides the Court no

---

[7] Of particular note in *Roor* is the court's refusal to release even funds not directly attributable to the fraud to pay attorneys' fees, explaining that "while money borrowed against the equity in [defendant's] home may not be the proceeds of fraud, there exists a likelihood that [defendant] will soon have significant personal liabilities to the government and to the victims of a fraud he is alleged to have perpetrated." *Roor*, 1999 WL 553823 at *3.

justification for letting him reduce the money available to pay a disgorgement judgment and potentially recompense victims.[8]

### D. Treated as a motion for reconsideration, Nadel's request must fail

The Amended Motion seems to be a motion for reconsideration of the very preliminary injunction to which Nadel consented. Nadel provides no evidence or legal argument to justify revisiting the P.I. Order. A motion for reconsideration "must demonstrate why the court should reconsider its prior decision and 'set forth facts or law *of a strongly convincing nature* to induce the court to reverse its prior decision.'" *Dalton v. FMA Enterprises, Inc.*, No. 95-396-CIV-FTM-17D, 1996 WL 684441 at *2 (M.D. Fla. Nov. 25, 1996) (emphasis added), *quoting Cover v. Wal-Mart Stores, Inc.*, 148 F.R.D. 294, 295 (M.D. Fla. 1993). *See also Dawkins v. GMAC Ins. Holdings, Inc.*, No. 3:03CV322J20HTS, 2006 WL 580988 at *1 (M.D. Fla. March 8, 2006) (same). Generally, courts recognize only three grounds for granting a motion for reconsideration: (1) an intervening change in the law, (2) the availability of new evidence, and (3) the need to correct clear error or prevent manifest injustice. *Id.*

Nadel has not provided any real basis for the Court to re-examine this consent order, much less any support for the three required factors. There certainly is no manifest injustice in requiring him to abide by an order to which he consented only seven weeks ago.

### E. Nadel has had due process

In the Amended Motion, Nadel demands a hearing, claiming without one he will not receive the due process to which he is entitled. Amended Motion at 4. Nadel primarily relies on

---

[8] On page 7 of the Amended Motion, Nadel argues he is not seeking to set aside the P.I. Order, although he clearly is trying to gut the asset freeze provision, to which he consented, by seeking to drain the remaining investor assets for his legal needs. Ironically, Nadel also "affirms his willingness to accept responsibility by assisting the Receiver in the recovery of assets for the benefit of investors," but still has not submitted his sworn accounting or disclosed any previously undisclosed assets to the Commission.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) in which the United States Supreme Court held that due process is a flexible concept, the outlines of which depend on the nature of the private and governmental interests involved in the dispute. However, that case did not alter the basic premise of due process – notice and an opportunity to be heard. Nadel certainly has had that. The Court scheduled an evidentiary hearing on the Commission's requests for an asset freeze and a preliminary injunction. Nadel, with experienced counsel by his side (who "spent a considerable amount of time in defense of [his] civil and criminal cases"),[9] chose to forego the *already-set* hearing and consent to the P.I. Order. *Mathews v. Eldridge* does not hold that a litigant who voluntarily waives his right to a hearing has not received due process, and Nadel should not be able to invade investors' remaining funds in the asset freeze by ignoring his choice to forego a hearing after enjoying the benefits of consenting to the P.I. Order.

### III. CONCLUSION

The law does not entitle Nadel to draw yet more money from the investor proceeds of his fraud. The asset freeze is to preserve whatever it can for the Commission's disgorgement remedy and potential return to defrauded investors, and the Commission does not have to trace the particular frozen assets to Nadel's fraud in order to protect the availability of that money. Nadel has no right to use what funds he did not dissipate to defend himself, and he certainly cannot complain about a lack of due process when he consented to the preliminary injunction he now challenges and waived his right to a hearing on the matter. Even if Nadel had some ground to seek relief, the Court should not permit him to demand investor money without providing a sworn accounting, a deposition, and an evidentiary basis for the amount of money he seeks.

---

[9] Amended Motion at 3.

For the foregoing reasons, the Securities and Exchange Commission respectfully requests the Court deny Nadel's Amended Motion.

March 18, 2009								Respectfully submitted,

											By:	s/ Scott A. Masel
												Scott A. Masel
												Senior Trial Counsel
												Florida Bar No. 0007110
												Direct Dial:  (305) 982-6398
												E-mail: masels@sec.gov
												*Lead and Trial Counsel*

												Attorney for Plaintiff
												**SECURITIES AND EXCHANGE COMMISSION**
												801 Brickell Avenue, Suite 1800
												Miami, Florida  33131
												Telephone: (305) 982-6300
												Facsimile:   (305) 536-4154

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Burton W. Wiand, Esq.
Fowler White Boggs, P.A.
501 East Kennedy Blvd., Suite 1700
Tampa, FL 33602
Telephone:  (813) 222-7411
Facsimile:  (813) 229-8313
Email:  bwiand@fowlerwhite.com
*Court-appointed Receiver for Corporate Defendants and Relief Defendants*

Carl R. Nelson, Esq.
Fowler White Boggs, P.A.
501 East Kennedy Blvd., Suite 1700
Tampa, FL 33602
Telephone:  (813) 222-7411

Facsimile: (813) 229-8313
Email: cnelson@fowlerwhite.com
*Counsel for Receiver Burton W. Wiand*

Gianluca Morello, Esq.
Fowler White Boggs, P.A.
501 East Kennedy Blvd., Suite 1700
Tampa, FL 33602
Telephone: (813) 222-7411
Facsimile: (813) 229-8313
Email: gianluca.morello@fowlerwhite.com
*Co-counsel for Receiver Burton W. Wiand*

Ashley Bruce Trehan, Esq.
Fowler White Boggs, P.A.
501 East Kennedy Blvd., Suite 1700
Tampa, FL 33602
Telephone: (813) 222-7411
Facsimile: (813) 229-8313
Email: atrehan@fowlerwhite.com
*Co-counsel for Receiver Burton W. Wiand*

Maya M. Lockwood, Esq.
Fowler White Boggs, P.A.
501 East Kennedy Blvd., Suite 1700
Tampa, FL 33602
Telephone: (813) 228-7411
Facsimile: (813) 229-8313
*Co-counsel for Receiver Burton W. Wiand*

Donald R. Kirk, Esq.
Fowler White Boggs, P.A.
501 East Kennedy Blvd., Suite 1700
Tampa, FL 33602
Telephone: (813) 228-7411
Facsimile: (813) 229-8313
*Co-counsel for Receiver Burton W. Wiand*

Barry A. Cohen, Esq.
E-mail: bcohen@tamplawfirm.com
Todd A Foster, Esq.
E-mail: tfoster@tampalawfirm.com
Michael L. Rubinstein, Esq.
E-mail:  mrubinstein@tampalawfirm.com
Cohen, Jayson & Foster, P.A.
201 E. Kennedy Boulevard, Suite 100
Tampa, Florida  33602
Telephone:  (813) 225-1655
Facsimile:  (813) 225-1921
*Counsel for Defendant Arthur Nadel*

                                                                s/ Scott A. Masel
                                                                Scott A. Masel, Esq.