<pre>
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3
    SECURITIES AND EXCHANGE    CASE NO:  8:09-CV-87-T-26TBM
 4  COMMISSION,
 5          Plaintiff,
 6  VS.                                Tampa, Florida
                                       March 20, 2009
 7  ARTHUR NADEL, et al,,              11:00 a.m.
 8         Defendants.
    _____/
 9
10               TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE RICHARD A. LAZZARA
11               UNITED STATES DISTRICT JUDGE
12  APPEARANCES:
13  Counsel for Plaintiff:    SCOTT A. MASEL, ESQUIRE
                              Securites & Exchange Commission
14                            Miami Branch Office, SERO
                              801 Brickell Avenue
15                            Suite 1800
                              Miami, Florida  33131
16                            (305)982-6398
                              masels@sec.gov
17
    Counsel for Receiver:     CARL R. NELSON, ESQUIRE
18                            Fowler White Boggs, PA
                              501 E. Kennedy Boulevard
19                            Suite 1700
                              Tampa, Florida  33601-1438
20                            (813)228-7411 (Ext) 1108
                              cnelson@fowlerwhite.com
21
    Receiver:                 BURTON W. WIAND, ESQUIRE
22
23
24
25
</pre>

```
 1  Counsel for Defendant:    TODD A. FOSTER, ESQUIRE
                              MICHAEL RUBENSTEIN, ESQUIRE
 2                            Cohen, Jayson & Foster, PA
                              201 E. Kennedy Boulevard
 3                            Suite 1000
                              Tampa, Florida  33762-2538
 4                            (813)225-1921
                              tfoster@tampalawfirm.com
 5
    Court Reporter:           CLAUDIA SPANGLER-FRY, RPR, CM
 6                            Official Court Reporter
                              801 North Florida Avenue
 7                            15th Floor
                              Tampa, Florida  33602
 8                            (813)301-5575
                              cookiefry@aol.com
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1              P R O C E E D I N G S

2                 March 20, 2009

3                   * * * * * *

4              THE COURT:  Call the case, please, Madam Clerk.

5              THE CLERK:  The case now before this Court is

6    Case Number 8:09-Civil-87-T-26TBM, Securities and

7    Exchange Commission versus Arthur Nadel, et al.

8              Counsel, please state your appearances.

9              MR. MASEL:  Morning, Your Honor, Scott Masel on

10   behalf of the Plaintiff, Securities and Exchange

11   Commission.

12             MR. NELSON:  Carl Nelson on behalf of the

13   Receiver.

14             MR. WIAND:  I'm the Receiver, Burt Wiand.

15             THE COURT:  Good morning.

16             MR. FOSTER:  Hello, Judge, I'm Todd Foster on

17   behalf of Arthur Nadel.

18             MR. RUBENSTEIN:  Good morning, I'm Mike

19   Rubenstein on behalf of Arthur Nadel.

20             MR. FOSTER:  This is Kimberly Fishback to our

21   right, she's a paralegal with our office.

22             THE COURT:  All right.  Thank you.

23             Yesterday, I entered an order in which I denied

24   a motion to intervene by, I think, 32 people who claimed

25   that they had been defrauded by Mr. Nadel.  And in that

1 order, I, of course, outlined my reasons that in my

2 opinion, they had not adequately demonstrated either

3 under Rule 24-A or Rule 24-B why they were entitled to

4 intervene either as a matter of right or permissively.

5 And in that order, I advised they were, however, more

6 than welcome to attend this hearing or any other hearing.

7            Is anyone here in that regard?  Okay.

8            Have you heard from their lawyers, Mr. Masel?

9            MR. MASEL:  No, Your Honor.

10            THE COURT:  Okay.  All right.  All right.  And

11 I also advised they're more than welcome to attend any

12 future hearings and, of course, I also pointed out that I

13 had the utmost confidence in the Court appointed Receiver

14 and his lawyer to adequately represent their interest,

15 especially with regard to this hearing.

16            All right.  Pending before me is amended motion

17 for payment of -- well, basically, to lift partially the

18 asset freeze enabling Mr. Nadel to pay to Mr. Foster's

19 and to Mr. Rubenstein's firm reasonable fees and costs

20 incurred in the past and to be incurred in the future

21 with regard to representation of Mr. Nadel, not only in

22 this civil proceeding, but in, I assume, future criminal

23 proceedings in the United States District Court for the

24 District of -- for the Southern District of New York.

25            By the way, what is the status of those

1  proceedings, Mr. Foster?

2       MR. FOSTER:  Yes, Your Honor.  Judge, the
3  status is as follows:

4       Mr. Nadel has not been indicted.  By consent of
5  the parties, we have waived the time period in which an
6  Indictment had to be brought, and our firm has entered a
7  limited appearance in that case.  We haven't entered a
8  general.

9       THE COURT:  Limited appearance for what
10  purpose?

11       MR. FOSTER:  Well, right now, our limited
12  appearance was just for the purpose of litigating the
13  detention order, which the Judge in New York set bond,
14  but Nadel doesn't have any funds, so he couldn't meet
15  that.

16       But independent of appearing before the
17  District Court in New York, we have been in continuing
18  conversations with the United States Attorney's Office in
19  the Southern District of New York, and what we're hoping
20  to be able to do is to resolve the matter for Nadel in
21  some reasonable manner, reasonable to both sides.

22       We think it would be unreasonable to ask this
23  Court to pay fees for us to go up to defend Nadel in any
24  protected trial because there would be travel and housing
25  and maybe office space and the expenses would be probably

1  unreasonable to bring some lawyers from New York -- from
2  Tampa with staff to New York.

3          So we're not seeking and we don't anticipate
4  going that far with Mr. Nadel, but we have been in touch
5  with the U. S. Attorney's Office since around January
6  25th when we negotiated Nadel's surrender, and we've been
7  talking to them and they're still waiting for some things
8  from the Receiver and they're still waiting for some
9  other information and they haven't, like I said, indicted
10  yet, and we're supposed to talk next week or the week
11  after to see where we are and if a possible disposition
12  is -- well, in the cards.

13          Mr. Nadel is 76 years old, he's not in great
14  health, he's got a heart issue and some prostate issues
15  and got skin cancer now.  I saw him earlier this week.
16  And for them to ask him to plead to something like 40
17  years is really probably not something that we would
18  advise him to do.

19          THE COURT:  Well, so what exactly are you
20  requesting fees for?

21          MR. FOSTER:  Okay, we're requesting fees for --
22  Judge, we think that there has been a tremendous overlay
23  between what we have been doing on the criminal case and
24  what we have been doing on the civil case.  We've learned
25  a lot in the civil case which we hope to apply -- excuse

 1 | me -- on the criminal case which we hope to apply in the
 2 | civil case.

 3 | We've been talking with -- I have been talking
 4 | and Mr. Cohen and I have met with Mr. Masel and met with
 5 | the attorney for the Receiver and there's been
 6 | communications between both sides, and I can go into
 7 | this, but what we're trying to do, Judge, is we're trying
 8 | to be paid for the time we've spent so far in the case.
 9 | We're tying to be paid for the limited purpose of trying
10 | to resolve the criminal case in New York, not to try and
11 | not to litigate any Pre-Trial motions in New York, and
12 | we'd like to get paid going forward to represent Nadel in
13 | this case before you, sir.

14 | THE COURT:  What -- and how much money are we
15 | talking about because I know you've acquainted me with
16 | what you want in terms of past representation, but what
17 | about future representation.  What do you foresee your
18 | total bill to be, including fees and costs?

19 | MR. MASEL:  I thought you were going to ask me
20 | that and we talked about it and the best answer that I
21 | can give is as follows, Judge:

22 | We don't know -- I don't think it's going to be
23 | especially high because if we can't resolve the criminal
24 | case in New York within the next two or three weeks,
25 | we're going to be out of the criminal case and we won't

1 be going back up there.  If we do resolve the criminal
2 case in New York, we'll have to go up, perhaps go through
3 a sentencing proceeding.  But short of that, what we
4 would do is just work hourly on this case, locally, and
5 what we've done is we've discounted our rates.

6      I thought we talked about in the office that
7 the fairest thing to the investors and to the Receiver
8 was to suggest a blended rate for the time of Mr. Cohen,
9 myself, Mr. Rubenstein, and one other lawyer, which is
10 $300 an hour.  I think that that rate is very competitive
11 and more reasonable than the rate that is being charged
12 to the receivership by the lawyers for the Receiver.

13      So, the amount of hours going forward that we
14 would be required to spend on this case, I don't know
15 what that is going to be, Judge.  If we could resolve
16 this case quickly, it's probably very few.  If it's going
17 to go into some protracted litigation, it's going to be
18 more.  But we don't think the criminal representation is
19 going to, unless we can come up with something quickly,
20 is going to go much longer.

21      And Judge, just a related point that I've
22 discussed yesterday.  Mr. Rubenstein and I discussed
23 yesterday with Mr. Masel, and we shared some documents
24 with the Receiver this morning, with Mr. Nelson and
25 Mr. Wiand, we've identified an independent source of

1  funds belonging to Mrs. Nadel.

2          Mrs. Nadel is 70 years old.  Mrs. Nadel married

3  Mr. Nadel in 2001.  We've identified a series of

4  properties which were owned by her prior to her marriage

5  to Mr. Nadel.  But when she got married to Mr. Nadel,

6  they did, like many people do, they put their assets

7  together.

8          But I have an exhibit here, which I've already

9  shared with the gentlemen to my left, which talk about

10  those properties and they've all been sold, and what the

11  value of those sales were, and we think that there exists

12  this independent source which is not subject to

13  disgorgement, which is not subject to the asset freeze,

14  which is not related in any way, shape or form to any of

15  the conduct which is alleged in the SEC's complaint, and

16  we would like to be able to access a like amount of funds

17  from Mrs. Nadel's independent source in order to

18  participate in the litigation.

19          THE COURT:  What are those properties?

20          MR. FOSTER:  I have a copy here, I can pass it

21  up or I can read it, whatever you want me to do.

22          THE COURT:  I'd like to see it.

23          MR. FOSTER:  All right.

24          (Brief Pause.)

25          THE COURT:  And you're telling me this was her

 1  independent property prior to their marriage, they become
 2  married.  What; did she execute a quitclaim deed to him
 3  and her as tenants by the entirities?

 4         MR. FOSTER:  No, sir, these properties -- these
 5  properties were sold.  These properties were sold by her
 6  and she realized somewhere between 200 and $300,000.  We
 7  can see by looking at the properties that they're listed
 8  in the name Quizenberry.  That's when she was married to
 9  Mr. Quizenberry.

10         THE COURT:  Oh, so it looks like she sold them
11  before their marriage.

12         MR. FOSTER:  Yes, sir, she sold them before she
13  was -- well, she sold one of them, on the bottom, the
14  very last one that talks about Ringling Building
15  Subdivision, the very last one, that was sold after the
16  marriage, but we have some reason to believe that that
17  money may have been given to charity by Mrs. Nadel and
18  not put into the marital estate.

19         THE COURT:  So, there's one for 146,5, one for
20  100 -- that was sold on October 24th of '94, December
21  15th of '94, 115,000, April 16th of 1993, 82,500, and
22  what did she do with this money?

23         MR. FOSTER:  She put it into the -- she put it
24  into the -- she commingled with Mr. Nadel's funds and
25  they put it into Scoop.  Judge, there are also two

condominiums in Orlando which she sold which I think are
on the ensuing pages there.  Now those properties in
Sarasota that we just talked about, she split the
proceeds of those sales with her ex-husband, that was
part of the marital separation agreement.

THE COURT:  And then she commingled that money
with Scoop?

MR. FOSTER:  Yep.  Yes, sir, she commingled it
with Mr. Nadel and they put their money together and put
the money into the Scoop accounts.

THE COURT:  And then on February 14th of 2003,
she sells another piece of property, obviously, it was
after they were married, but she realizes 152,5, and so
she then puts that into Scoop.

MR. FOSTER:  No, sir, I think there was a
$70,000 mortgage on that property, and the equity,
80,000, I think she gave to charity.

THE COURT:  All right.

MR. FOSTER:  I think, I don't have confirmation
on that, but I have reason to believe, but I don't want
to tell you that that exists because I'm not sure that it
does, but I think she gave that money to charity.

THE COURT:  So the total of these funds which
you claim were derived from her sole property prior to
the marriage totals what?

1          MR. FOSTER:  About 250.  I didn't put a tab to
2 it, but I think it's somewhere around 250.

3          THE COURT:  That includes the sales of the
4 Orlando condominiums?

5          MR. FOSTER:  It does, it does not include the
6 2003 sale.

7          THE COURT:  How much are those?

8          MR. FOSTER:  Well, that's the one that she gave
9 to charity.

10          THE COURT:  No, no, I'm talking about -- you
11 mentioned she also sold two condominiums in Orlando.

12          MR. FOSTER:  This is total, the number I gave
13 you is inclusive of that.

14          THE COURT:  So you want me to authorize the
15 Receiver to release to -- I don't know, just unfreeze
16 $250,000 in cash?

17          MR. FOSTER:  Well, I think that is one of the
18 possible remedies here.  I think that under the law
19 there's something else here that I -- we mentioned in the
20 pleading that is relevant to discuss.

21          There has been no action here by the United
22 States Attorney's Office or the Department of Justice on
23 civil forfeiture.  There's been none.  The Justice
24 Department has stood back and is letting the Receiver
25 proceed against funds with the hope that the Receiver

1  will recover funds and be able to disburse appropriately
2  as directed by this Court.

3  If this were an asset forfeiture case, what
4  would happen is under those causes we cite in the memo,
5  the Jones Farmer Rule which picks up on some Supreme
6  Court cases, if we came forward with evidence of
7  untainted funds as we did, I think we'd be entitled to
8  use those funds for attorneys fees under this
9  circumstance because they're not traceable, not traceable
10 to the fraud.

11 But we don't have that exact remedy because
12 there's no -- there's nothing been filed by the U. S.
13 Attorney's Office for civil forfeiture.  So we have to
14 pursue that remedy before you, sir, in this forum, even
15 though this forum, you're sitting in equity reviewing
16 disgorgement and an asset freeze and we're talking about
17 this other forfeiture-related remedy, but I don't have
18 anywhere else to bring that Jones Farmer claim because
19 there's no other Court who's presiding over this property
20 who can give us the relief for the assets.

21 So I would hope that that would factor in, and
22 independent of the non-fraudulent funds that came from
23 Mrs. Nadel.  There are cases, and we cite them in the
24 memo and I could talk about them a little bit here, that
25 say notwithstanding an inability to segregate out or to

 1  identify independent funds, a Court, reviewing a matter
 2  such as this, has the authority and the discretion to
 3  permit funds to go for attorneys fees.
 4          And I read the response by Mr. Masel and he
 5  attaches to his response a declaration of the Receiver,
 6  Mr. Wiand, who is in Court.  They identify -- Mr. Wiand
 7  identifies in his declaration that they have traced $17
 8  million in funds going to Nadel and Mrs. Nadel.
 9          Now, Mrs. Nadel is not a Defendant or a relief
10  Defendant, so I don't know how much of that 17 went to
11  her.  But let's assume, I'll just go with the $17 million
12  figure, although I think we should be able to agree that
13  that figure is less, the part that went to Art Nadel.
14          Mr. Wiand also details in his declaration that
15  he estimates that they currently have assets under
16  seizure which are worth somewhere between 11 and $12
17  million.  And those are assets, those are real estate
18  assets which were acquired prior to 2009, so that's at
19  today's values.  That's at a depressed value, so
20  hopefully, for all of us in all context, the values of
21  that real estate is going be higher and was higher at the
22  time of acquisition.
23          The Receiver also identifies in his declaration
24  $1.2 million in cash that he has in bank accounts.  So
25  then what we have, we have what they say are profits to

1  Mr. and Mrs. Nadel of 17 million compared to
2  approximately somewhere between 13.2 and 14.2 million in
3  assets.  So, these cases talk about that the purpose of
4  disgorgement is to take the profits, the ill-begotten
5  profits of the Defendant away from the Defendant.

6          We looked up the definition of disgorgement and
7  literally one of the definitions of disgorgement is vomit
8  or to force somebody to disgorge, to dislodge that which
9  is within them.  So if we talk about the purpose of the
10 disgorgement, and the purpose of the asset freeze is to
11 make sure that there are assets available to disgorge
12 when and if the time is appropriate.

13         So, in several cases, and there's one case that
14 came out of the District Court here, it was a case from
15 last year where Judge K affirmed an R & R of Judge Pizzo,
16 and there's one other cases in the memo, it's the ETS
17 Payphones case, and another case in the memo, the Noble
18 Metals case, they talk about when the amount of potential
19 disgorgement is disproportionately high compared to
20 what's been seized, that it's an inappropriate exercise
21 of discretion for a Court to grant attorneys fees.  This
22 is -- we're not talking about when there's a separate
23 identifiable source of independent funds, I'm talking
24 about when the funds can't be separated out, when all the
25 funds that have been seized are potentially ill-begotten.

1          So even when there are ill-begotten fees, I
2 think in the case that Judge K and Judge Pizzo had, there
3 was $25 million in ill-begotten gains and there was
4 $700,000 frozen and they said, well, the disparity is
5 just too great, we're not going to exercise discretion to
6 pay fees.

7          And in the Payphones Phones case, I think it
8 was between 21 million in gains and 7 million in
9 seizures.  So, the focus of the disgorgement, again,
10 Judge, is the gains, not the overall loss.  But it's the
11 gains, to disgorge the gains.  It's a lot different than
12 forfeiture, it's to disgorge the gains of Arthur Nadel.

13          And I submit to you, sir, that the amount of
14 money that they currently have under seizure, if we
15 include the cash and we include these properties, and by
16 the way, I believe that two of these properties are asset
17 producing.  One of the properties is the Venice Jet
18 Center which is down in Venice, Florida, I think that is
19 making money, and I believe that another one of these
20 properties is a set of hangars, airplane hangars
21 somewhere up in South Georgia.  I understand that those
22 are also producing money.  So we have performing assets
23 here.

24          So, under that line of cases, sir, I would say
25 that as a second point, even if there wasn't an

1 independent source of funds, that since the amount under
2 seizure is essentially very close to the disgorgement
3 amount, that we should be able to get fees from the
4 seized funds.  And by the way, there is another asset
5 that hasn't even been discussed here, but it was
6 discussed in the motion for the intervenor in our motion
7 in response about that mortgage for that property down
8 there in Sarasota.

9      So that's yet another asset which is out there
10 and I think there's an affidavit that we presented to
11 you, sir, where Mrs. Nadel had told us that part of the
12 funds that she brought to the marriage, she took out to
13 buy that condominium.  So that is another asset there
14 which is independent of what the Receiver has under his
15 seizure in his bank account.  So that's another hundred
16 and something hopefully thousand dollars, but who knows
17 what that condo is worth today.  That's the other part of
18 that problem.

19           THE COURT:  Mr. Masel.

20           MR. MASEL:  Thank you, Your Honor.

21           Mr. Nadel's arguments don't undercut at all the
22 position that the Commission has taken in its filings.
23 The asset freeze is to preserve the disgorgement remedy,
24 the disgorgement remedy covers any gain that went to
25 Mr. Nadel or went to him jointly and severally.

1           The $17 million and change figure that counsel
2    is referring to is really the extreme low end.  If we
3    look at only the money that, at this point, has directly
4    gone to Mr. Nadel, there are millions of other dollars
5    discussed in the Receiver's declaration that went to the
6    entities Mr. Nadel controlled, there's money that went to
7    Mrs. Nadel, and I think possibly to them jointly, and if
8    you look at the joint and several liability aspect of
9    this case, which the law allows us to pursue in pursuing
10   our remedies, the possible disgorgement here is well over
11   $300 million.  And there's just no asset, no group of
12   assets today that covers that.

13           Additionally, the case that counsel referred
14   to, and I believe it was the case FTC versus USA
15   Financial, was that the case you were referring to -- and
16   that is 2008 WestLaw 3165930, in that case, the Middle
17   District held consistent with what we are urging the
18   Court to do today which is not lift the asset freeze at
19   all.

20           And the ruling explains that and pretty much
21   parallels the Commission's position here.  The only
22   freeze, quote, unquote, that was lifted in that case was
23   a freeze over an unrelated entity that the Defendant
24   happened to be an officer in and which all parties agreed
25   was just frozen because the bank seemed to be being very

 1  cautious.

 2          So in that case, the asset freeze wasn't

 3  touched, there was no discussion of assets traceable to

 4  the fraud or not traceable.  And on that point, I think

 5  the implicit argument in Mr. Nadel's position is that

 6  anything that the Commission Receiver can't trace to the

 7  fraud should be his to use as he sees fit.  That's not

 8  what the law says in these types of actions.

 9          THE COURT:  How about his argument with regard

10  to Mrs. Nadel when she's Quizenberry, prior to their

11  marriage, she sells these properties.  When did they get

12  married?

13          MR. FOSTER:  2001.

14          THE COURT:  Well, let me ask you this, 'cause

15  these properties were sold in '94 and '93, I mean, did

16  she keep all that money in a little pot somewhere and all

17  of a sudden when she's married to Mr. Nadel, she just

18  magically gives -- puts it into Scoop?  Is that what

19  happened here, I mean, for all these years, she just had

20  this money set aside.

21          MR. FOSTER:  She tells us -- Judge, she worked

22  during the years after she got divorced and she was

23  earning and she was being paid about $26 thousand a year

24  in alimony.  And she had a job, I think, I saw one of the

25  tax returns, she was making about another 17 or 18,000 a

1 month -- a year, rather, in income.  She tells us that

2 these are assets that she put, that when she got married

3 to Art, she put that amount into the marriage.

4        Now, Mr. Nadel -- Mr. Masel, when we were

5 talking, he says, look, can you trace that, and I said,

6 we can't trace it.  The FBI did a search warrant at the

7 Nadel's house and there are 38 boxes of documents that

8 are in the U. S. Attorney's Office in Manhattan now,

9 which we can't -- we haven't been paid and, you know,

10 they're being copied now and we don't have copies of

11 those, and the Receiver has locked down their office.

12 But she tells us that -- and that's in that affidavit

13 before you, sir, that she had at least that amount of

14 money when she got into the marriage with Arthur.

15        Judge, may I say something else, I know I'm

16 interrupting Mr. Masel, but I don't know whether you were

17 finished or you were ready for me.

18        THE COURT:  Where is that affidavit of

19 Mrs. Nadel?

20        MR. FOSTER:  Judge, it's attached to our

21 response in opposition -- in our response to the

22 Receiver, to the intervenor.

23        THE COURT:  Okay, wait a minute.

24        MR. FOSTER:  This is not hers, this is the

25 affidavit of our CPA in the firm.  I have it in my hand

 1  if you can't find it.

 2          THE COURT:  No, I have it.  Well, but that

 3  doesn't speak to these three pieces of property.

 4          MR. FOSTER:  But this is independent, these

 5  three pieces.  We met with her yesterday and we went over

 6  these pieces of property, asked her where her money came

 7  from.

 8          THE COURT:  Why isn't she here today?

 9          MR. FOSTER:  Well, she has her own lawyer,

10  Judge, and that's something else.  Under the order

11  originally issued by this Court, the SEC agreed that she

12  should get fees for her lawyer and for her living

13  expense, but there has been no provision for us.

14          THE COURT:  Well, obviously, your client

15  doesn't need money for living expenses, he's being taken

16  care of courtesy of the United States Marshal Service and

17  the American taxpayers.

18          MR. FOSTER:  Well, that's right, but I suggest

19  he's in much more desperate need of attorneys than

20  Mrs. Nadel.

21          THE COURT:  Well, who represents Mrs. Nadel?

22          MR. FOSTER:  Clifford Hunt.

23          THE COURT:  I'm sorry?

24          MR. FOSTER:  Clifford Hunt.

25          THE COURT:  Is he from Tampa or Sarasota?

1          MR. FOSTER:  Clearwater.

2          MR. NELSON:  St. Petersburg.

3          MR. FOSTER:  St. Petersburg.

4          THE COURT:  Is he a criminal defense lawyer?

5          MR. FOSTER:  No, securities lawyer.

6          THE COURT:  All right.  'Cause he hasn't filed

7    a notice of appearance in this case, has he?

8          MR. MASEL:  No, Your Honor.

9          MR. FOSTER:  She's not named.

10          MR. MASEL:  If I may continue, Your Honor.

11          THE COURT:  What?  Well, let me ask you a

12   question.  If we were to bring Mrs. Nadel here, would she

13   testify or would she invoke her rights under the Fifth

14   Amendment or do you know?

15          MR. FOSTER:  I think that -- that's part of the

16   reason I didn't bring her or get an affidavit from her

17   because she's represented by counsel.  I didn't want to

18   take the position with this -- I could ask Clifford Hunt

19   or ask her.  I can't imagine why she would tell you

20   something different than she would tell us, but --

21          THE COURT:  She'd be under oath.  I'm sure that

22   the -- Mr. Masel and Mr. Nelson would like an opportunity

23   to examine her.  Have you been able to depose her yet?

24          MR. MASEL:  We've not deposed her yet.

25          THE COURT:  All right.  Is that in the offing?

1             MR. MASEL:  That certainly will be in the
2    offing, Your Honor.
3             THE COURT:  Have you talked with Mr. Hunt about
4    what her position would be?
5             MR. MASEL:  We have talked with -- I have
6    talked with Mr. Hunt in the past about the concept that
7    we're going to need to take her deposition.  He says he
8    understands that, and at this time -- and was unclear
9    whether he would still be representing her at that point.
10            THE COURT:  All right.
11            MR. NELSON:  Your Honor, may I add something to
12   that?
13            THE COURT:  Yes, sir.
14            MR. NELSON:  I have talked to Mrs. Nadel.  She
15   came to our offices, accompanied by Mr. Hunt, and we had
16   a chat with her.  And this room is just filled full of
17   hearsay, so we might as well just keep it going.  What
18   she said to me was that these properties, you know, 15
19   and 16 years ago were sold, and that she largely lived
20   off of that money, and then she invested it in a business
21   called Harmony and Mind that failed.
22            THE COURT:  So if I get the gist of what you're
23   telling me, this money, although acquired by her and her
24   alone, was probably no longer in existence, if you will,
25   at the time she married Mr. Nadel?

1          MR. NELSON:  That was our assumption from the
2     way the conversation went.
3          THE COURT:  You're right about all this
4     hearsay, and I know, you all are good lawyers and you
5     wouldn't make misrepresentations to me, but that's why I
6     say, why isn't she here.  You know, I may have some
7     questions I what to ask about her.
8          MR. MASEL:  To that --
9          MR. NELSON:  Can I make one more observation,
10    Your Honor?
11         THE COURT:  Yeah, go ahead.
12         MR. NELSON:  Mr. Foster, in response to the
13    motion of the intervenors, in that response says that the
14    property they were trying to get this mortgage on was
15    acquired with a Scoop Capital check.  So although paid
16    for by her personal funds, it was paid for by a Scoop
17    Capital check.  So even that asset that is referred to,
18    you know, is something that the Receiver is very
19    interested in and will probably be filing a motion within
20    the next few days regarding that mortgage and that
21    condominium down in Sarasota.
22         So there's -- so far, there is no substance
23    here, and quite frankly, Your Honor, we expected her to
24    be here today and there would have been an opportunity to
25    cross-examine her and for Your Honor to examine her, but

 1  there is nothing factually before the Court, competent

 2  evidence, to support the relief requested.

 3          THE COURT:  Okay.  Thank you.

 4          MR. MASEL:  Your Honor, the discussion about

 5  independent assets and where things came in and timing,

 6  that really is a misnomer and is apples and oranges here.

 7  As the law shows from what the Commission presented,

 8  there is no requirement that the Commission trace, the

 9  law comes down against Mr. Nadel being able to use funds

10  left over from his fraud in his own defense.

11          THE COURT:  Would that law -- let's assume

12  Mrs. Nadel came in here, and let's assume she testified

13  that, you know, I sold this piece of property before I

14  ever met Mr. Nadel, I realized after taxes, $100,000.

15  Okay.  I put that in a certificate of deposit.  I then

16  married Mr. Nadel, and with interest, I had $120,000, and

17  because, you know, I loved him and I trusted him and

18  spend the rest of my life with him, you know, I wrote --

19  I closed out this CD, I received a cashier's check and I

20  put it into Scoop.

21          Okay.  And let's assume I credit her testimony.

22  Would I then have the discretion under that unique

23  scenario to say, well, I'll lift the asset freeze to the

24  extent of $120,000, or would the basic law of

25  disgorgement say, no, it went into, you know, one of

 1 these Defendant's bank accounts, et cetera, and should be
 2 used to satisfy disgorgement.

 3     MR. MASEL:  I think even with the broad
 4 discretion that the Court has under equity, Your Honor,
 5 the over-arching problem for that argument is the
 6 assumption that those funds were not commingled.

 7     Now, they were commingled, we know that, and
 8 the problem is that Mrs. Nadel or Mr. Nadel would have to
 9 pursue quite a complicated and in-depth tracing analysis
10 to be able to show that Mrs. Nadel's money wasn't taken
11 out and used for the fraud.  And since we don't have to
12 trace, the money that's in Scoop and that was put into
13 Scoop goes to disgorgement.

14     The other aspect of that, Your Honor, is as the
15 Receiver's declaration shows, and as many of the -- some
16 of the assets that the Receiver has expanded over, show
17 Mrs. Nadel benefited or received, directly or indirectly,
18 a huge amount of money from the fraud.  And the tracing
19 --

20     THE COURT:  And obviously, I'm sure you'd like
21 to examine her about that and I would, you gentlemen, I
22 don't know, I have a tendency when there is not and
23 sometimes even when there is a jury, when there's an
24 issue out that hasn't been addressed by the lawyers and I
25 know it won't prejudice anybody, I'll step in and I'll

 1  ask my own questions, especially when I'm sitting in the
 2  fact-finding capacity.

 3          I just -- maybe it's the old lawyer in me, I
 4  don't know.  But, you know, that's an area I'd like to --
 5  I would like to hear about, too, in terms of, all right,
 6  so assuming you put, we'll call it, untainted money into
 7  Scoop, you know, after that, did you -- to what extent
 8  did you profit from this scheme.  You know, that would be
 9  another area I'd wish to pursue myself.

10          MR. MASEL:  Well, clearly, Your Honor, that's
11  an area that the Commission and I believe the Receiver
12  would like to explore.  The comfort level for the Court
13  today is it's actually irrelevant for what you're being
14  asked to do, which is to lift part of the asset freeze,
15  and nothing that the Court has heard and that's before
16  the Court now gives any basis for lifting the asset
17  freeze.

18          Even if we had to trace, so much money went to
19  Mrs. Nadel that the little bit of money she commingled
20  wouldn't justify lifting the freeze.  But again, the law
21  is fairly solid on the idea that we don't need to trace,
22  that the asset freeze is to preserve the disgorgement
23  remedy.  As we've shown and the Receiver has shown, the
24  disgorgement remedy realistically is going to be much
25  bigger than anything that's been preserved so far and

1 there is no basis for Mr. Nadel to use more investor
2 money for his own defense.

3          THE COURT:  I know that you were prepared to
4 depose him, but that was short-circuited when he agreed
5 to the entry of a preliminary injunction.

6          MR. MASEL:  Yes, Your Honor.

7          THE COURT:  All right.  So you never took any
8 statements from him?  Did you ever take any statements
9 from him?

10          MR. MASEL:  That's correct, Your Honor, we
11 never took any statement from him.

12          THE COURT:  All right.  Do you intend to do
13 that.

14          MR. MASEL:  We intend to seek Mr. Nadel's
15 deposition.

16          THE COURT:  Notwithstanding the fact that he
17 obviously may have a legitimate good faith basis to
18 invoke his rights under the Fifth Amendment?

19          MR. MASEL:  That's correct, Your Honor.  It's
20 my practice to take the deposition anyways and in detail
21 ask the questions and see what the response is.  We're
22 waiting for Mr. Nadel's response to the complaint and
23 move from there.  Also, the --

24          THE COURT:  I assume we are all still waiting
25 for an overdue accounting?

1         MR. MASEL:  That was my next point, Your Honor,
2    that the accounting is overdue.  The Court has given
3    Mr. Nadel an extension on his response to the complaint.
4    That accounting would, of course, go a long way to answer
5    a lot of these questions.

6         THE COURT:  But what recourse do I have if he
7    files a statement saying I respect your order, I
8    understand it, but in view of my current predicament up
9    here in the Southern District of New York, I respectfully
10   decline to furnish that information on the basis that it
11   may violate my rights under the Fifth Amendment?  Not
12   much I can do about that, is there?

13        MR. MASEL:  Your Honor, I think the simple
14   answer is, without having to explore whether the Court
15   could order or hold him in contempt for not following the
16   order, I think we don't even need to get to that issue
17   because, in essence, we, under the law, starting with --
18   well, as far back as Baxter v Pumigiano,  [sic], can
19   hold that against Mr. Nadel.

20        THE COURT:  I know, in a civil proceeding.  Oh,
21   sure.

22        MR. MASEL:  Right, we can take an adverse
23   inference and in essence assume, and the Court may
24   assume, the law makes clear, that if he had provided a
25   sworn accounting, it would have been adverse to his

 1  position on all those issues that were required and it
 2  would have been a detailed accounting, of course.

 3          THE COURT:  All right.  Mr. Nelson, is there
 4  anything you care to add, sir, or Mr. Wiand?

 5          MR. NELSON:  Mr. Wiand would like to make a
 6  comment, Your Honor.

 7          THE COURT:  Yes, sir.

 8          MR. WIAND:  Your Honor, I just wanted to be
 9  heard on this because of the, I guess, the constituency
10  that I have in this matter.  Beginning from like 2002
11  forward, the records that we worked through show that 397
12  some odd million dollars was raised for investment from
13  investors.  They are out now some 167 million.  60
14  million in total fees went to the Scoop entities.  And
15  there has been a tremendous harm to these people.

16          With respect to Mrs. Nadel, there is, so far,
17  and I won't represent it's exhaustive, we see no evidence
18  of any of her funds coming into these matters.  We do see
19  that for a period of time, certainly in the latter years,
20  she was receiving a salary for $250,000 a year, her
21  personal money, and --

22          THE COURT:  Who paid her $250,000 a year?

23          MR. WIAND:  Scoop Management.

24          THE COURT:  To do what?

25          MR. WIAND:  I'm not sure about that, Judge.  I

1 think she worked part-time, but I'm sure she was -- I

2 mean, I don't know what she did. And there are various

3 other personal business interests and things like that

4 that millions and millions of dollars went to that she

5 personally participated in.

6 She was active in this business, she was not

7 totally inactive, I don't think. I question the

8 $250,000, but she was clearly involved in the business.

9 And from my point of view, the idea of utilizing this

10 money, and I've only got 1.2 million in cash and that's a

11 lot of money.

12 THE COURT: Well, it pales in comparison to the

13 scope of the fraud, though.

14 MR. WIAND: And with the scope of the work that

15 I just have to do in order to just account for it, to

16 find all these various different ventures, properties and

17 things of that nature and try to control and liquidate

18 them, so I would just like to express to the Court my

19 opposition and anxiety that funds of this nature would be

20 used to pay Mr. Nadel's legal fees.

21 THE COURT: All right. Mr. Foster, one last

22 say.

23 MR. FOSTER: Judge, thank you.

24 I'll point out and go in reverse order.

25 Mr. Wiand talks about all these fees that came out of

1  Scoop.  Judge, those fees didn't all come to Arthur
2  Nadel.  They were split with another individual.  And
3  that other individual hasn't been sued, the SEC nor the
4  Receiver has taken any move against this other
5  individual.  This other individual has hired lawyers who
6  have been contacting me, and I've been contacted by three
7  separate lawyers on behalf of this other individual.
8              THE COURT:  You're talking about Mrs. Nadel?
9              MR. FOSTER:  No, the co-manager, talking about
10  a gentleman named Moody.
11              THE COURT:  I'm sorry?
12              MR. FOSTER:  Moody, who got half the fees.  So,
13  when the Receiver and the SEC come in here and talk about
14  that every single one of these dollars is ill-begotten
15  gain, well, half of it is out there and since January,
16  they haven't, as far as I know, taken any action to
17  recover any of it.
18              THE COURT:  Well --
19              MR. FOSTER:  And then to suggest that it's
20  contraband.  The other thing is, Judge, disgorgement is
21  designed to take away profits.  So when Mr. Wiand tells
22  us that there were $397 million invested in the fund,
23  that's not all profit to Mr. Nadel.  What he says in his
24  declaration is that he could know about $17 million going
25  to Mr. Nadel.  That is the figure that's on the table

1  here.  These other figures really don't have any
2  relevance.

3        And Judge, so you know, I know it's apparent
4  from the complaint, this is not the Madoff case.  In
5  Madoff, he collected the money and he kept the money.
6  What happened in here, exclusive of the fees, which we
7  have heard about, is that this money was put into the
8  stock market and there were tremendous losses.  So there
9  was investing and there was some attempt to make money
10 and to recover lost money.

11       Judge, the other thing is, just a couple other
12 points.  If there is going to be a response, a meaningful
13 response, anyway, to the SEC's complaint and some
14 cooperation with the complaint, the problem which you
15 identify has to be addressed.  There's a criminal case,
16 he has a Fifth Amendment Right, how does he navigate
17 between what he has to do here, how does he comply with
18 your orders while he's still under prosecution?  He's not
19 going to be able to do that by himself, he needs a
20 lawyer.

21       Judge, he wants to cooperate and we have done
22 certain things, some small things which we have tried to
23 cooperate with the SEC, and he'd like to continue, but we
24 have to take care, globally, of all these different
25 problems which are affecting him.  That's why he can't do

1  this by himself, he needs somebody to help him.

2           And Judge, disgorgement is only -- it's in

3  Mr. Masel's pleadings, disgorgement is only profits of

4  ill-gotten gains.  Unless and until they prove or even

5  allege that Mrs. Nadel profited illegally, nothing that

6  she has is subject to disgorgement.

7           And the final thing I'd like to close on, I

8  e-mailed the site for this case, the one that I mentioned

9  was decided by Judge K and Judge Pizzo, I e-mailed this

10 to Mr. Masel yesterday evening, but, in fact, in this

11 case, Judge, they do write that there is a failure to

12 show separately derived funds, and that failure to show

13 separately derived funds justified the continuation of

14 the asset freeze.

15          In this case, also, you had the disparity of

16 $25 million in profit and $700,000 in what was seized and

17 that, I submit to you, sir, is what justified the

18 conclusion that they wouldn't modify the freeze to permit

19 the payment of attorneys fees.  It's not a blanket ipso

20 facto rule there.

21          Judge, you have, sitting in equity, you have

22 the right to do this and under these cases where the

23 amount of money that's been seized is close or may exceed

24 the ill-begotten profits that are alleged to have been

25 obtained by Mr. Nadel, you very well can and we ask that

1  you do give that money to us.

2          In a recent case, and I don't know, sir, if you

3  have had a chance or even the inclination to have looked

4  at the transcript of the detention hearing that was held

5  here in Tampa, but what happened in that detention

6  hearing is that Terry Zitek was representing the

7  Government and Terry Zitek was telling the Court, look,

8  the people in New York tell me that the most analogous

9  factual situation is the case of Mark Dryer, and in the

10  Mark Dryer case, what happened initially is the

11  Government detained him and subsequently he was admitted

12  to conditions of bond, which we couldn't meet because we

13  can't afford $80,000 a month for private guards.

14          But on the SEC side of that Dryer case, he was

15  a lawyer, he ran a law firm, and the allegation in Dryer

16  was that he stole $450 million.  But in the Dryer case,

17  they made provisions for the payment of attorneys fees to

18  him.

19          There's an article in the newspaper and I spoke

20  to the attorney who got the money.  He says, look, he was

21  a lawyer and he had independent funds.  They knew that he

22  made money through means other than what they alleged he

23  did, so, therefore, they allowed him to keep that money.

24  That was worked out between the parties and really didn't

25  ever get to the Court.

1          But Judge, whether or not we reach, and I don't

2   know if Mr. Hunt is going to bring Ms. Nadel in here, I

3   don't think it would be my -- I don't think it would be

4   appropriate for us to bring her in here without talking

5   to him first, we'll see what he wants to do, hopefully

6   he'll do it, but independent of that, since they have

7   seized as much as they have compared to the profits that

8   they want to dislodge from Arthur, there's a series of

9   cases which say that you can and, we submit, should make

10  provisions for us to get those fees.

11          And we cite those, we cite those in the memo.

12  The Dowdell case which is cited out of Virginia, the

13  Gonzalez case, and even the Lauer case, which we've all

14  talked about out of the Southern District, he was getting

15  $10,000 a month for attorneys fees and living expenses.

16          THE COURT:  Then he got greedy.

17          MR. FOSTER:  He got greedy.

18          THE COURT:  I can't believe those Judges down

19  there let him file so many motions, but in any event --

20          MR. FOSTER:  In those cases, Courts approved,

21  under the circumstances, and this is so complex here

22  because of the interplay of the criminal and the civil in

23  the Middle District of Florida and Southern District of

24  New York.  I think it facilitates and behooves everybody

25  that this man be represented.  Thank you.

1          THE COURT:  All right.  Well --

2          MR. MASEL:  Your Honor, may I respond?

3          THE COURT:  One more time, Mr. Masel.

4          MR. MASEL:  I'll be happy to sit down.

5          THE COURT:  Go ahead, one more time.

6          MR. MASEL:  One of the phrases Mr. Foster used

7   was "under the circumstances."  Under the facts before

8   this Court, under the evidence before this Court,

9   whatever -- I think we're now up to quadruple hearsay, in

10  other cases and other people, I mean, the evidence before

11  this Court shows that the potential maximum disgorgement

12  could actually be $397 million.  Ill-gotten gains,

13  anything that went to the Defendants as gain through

14  there would be countable as disgorgement.  If Mr. Nadel

15  and the Defendants distributed that some other way, that,

16  of course, is still held against them as disgorgement.

17  If they want to come in and show some complicated tracing

18  that shouldn't be held against them, they can do that,

19  but they haven't done that yet.

20          The asset freeze, disgorgement, those are all

21  designed to preserve the potential disgorgement remedy

22  for the Commission and that is the key issue here, not

23  what can be independently traced, not what might be

24  independently traced here.

25          THE COURT:  All right.

1            MR. MASEL:  Thank you, Your Honor.

2            THE COURT:  Well, I'm going to give you a

3    ruling right now.  One of the key cases that everybody

4    cited to me is the Securities and Exchange Commission

5    versus ETS Payphones at 408 Fed. 3d., 727, decided by the

6    Eleventh Circuit in 2005, which is obviously binding on

7    me.  And there are other cases cited in the memo out of

8    the Eleventh Circuit which are obviously binding on me to

9    the exclusion of any other Circuit case or District case.

10           And the Eleventh Circuit has made it very clear

11   that the burden on the Securities and Exchange Commission

12   in a case such as this for establishing the amount of

13   disgorgement and therefore, you know, subject to asset

14   freeze is light.  They don't have to come in here with

15   exactitude, just a reasonable approximation.

16           And the evidence of record before me in terms

17   of the declaration of the Receiver, Mr. Wiand, which has

18   not been refuted in any way whatsoever -- well, it

19   clearly shows a reasonable approximation of Mr. Nadel's

20   ill-gotten gains, if you will.  Even conservatively, it's

21   around 17 million and that doesn't take into account

22   interest which can be assessed.  And right now, the value

23   of the receivership and the frozen funds are

24   approximately 12 to 13 million.  Okay.  That's in the

25   light most favorable to Mr. Nadel, all right.  And I

1  have, you know, based on the evidence, that it can be

2  reasonably approximated that the amount subject to

3  disgorgement far exceeds that amount, but even taking

4  that amount, that's a $6 million difference, that's a

5  substantial difference.

6          And there is no evidence whatsoever and I'm not

7  in any way disparaging the representations of Mr. Foster,

8  I know him, he'd never mislead me, but it's Hornbook Law,

9  the representations of counsel, unless agreed to by the

10  other side, are not evidence that I can consider.  There

11  is absolutely no evidence before me from Mr. Nadel that

12  would undermine the findings by the Receiver as detailed

13  in his sworn declarations and that's his burden to

14  demonstrate that the approximate -- the reasonably

15  approximated disgorgement figure is not a reasonable

16  approximation to begin with.

17          So, what I'm also concerned about here is

18  there's been a representation that Mrs. Nadel had

19  separate funds which she brought to the marriage.  I

20  haven't heard one word from her.  I'm also concerned

21  about and I respect the Fifth Amendment Rights of

22  Mr. Nadel, I am concerned about the fact he's not honored

23  this Court's order by furnishing an accounting or by even

24  filing any type of statement; Judge, I respect your

25  order, I understand it, but considering my circumstances,

1  I must respectfully decline to respond under my Fifth

2  Amendment privilege not to incriminate me.

3           So, you know, under the cases, even the case

4  cited, the decision by Judge Kovachevich accepting the

5  report and recommendation of my good friend Judge Pizzo

6  who I hope to work out with in a few minutes in the

7  Marshal's gym, like I do everyday, even that case would

8  authorize me denying the motion.

9           I recognize that this, you know, Mr. Nadel

10  finds himself in a very difficult position in both -- on

11  both the civil side of the Justice System and the

12  criminal side of the Justice System, but like I tell a

13  lot of people when they come into this Courtroom, I don't

14  bring you here, you bring yourself here by the acts that

15  you commit.

16           And in my view, it would be an abuse of

17  discretion, extreme abuse of discretion, and I recognize

18  the reason for disgorgement is not necessarily tied to

19  having these investors recoup their losses, but I think

20  it would be contrary to their best interest and the law

21  to lift this asset freeze to the extent Mr. Foster's law

22  firm is asking me to lift it.

23           You know, I appreciate the assistance they have

24  given to Mr. Nadel.  I know them well, they're fine

25  lawyers.  If it comes to pass in New York that they're

1  unable to represent him and he's financially unable, we

2  have the Criminal Justice Act in the Federal Statutes

3  which would authorize the appointment of what we call CJA

4  counsel.  I'm assuming the Southern District of New York

5  is the same as the Middle District of Florida, that they

6  have very, very competent lawyers on their CJA list, if

7  you will.

8          So, based on the evidence in front of me, I

9  find it would be a gross abuse of my discretion to lift

10  the asset freeze to allow the payment of fees to

11  Mr. Nadel.  So for that reason, the amended motion is

12  denied.  It's always subject to be revisited as -- what

13  was that, the Lara case out of the Southern District,

14  I'll deal with it as it comes.  All right.  Thank you.

15          What I'll do is, I don't know whether it's an

16  appealable order or not, I'll do an order adopting my

17  findings and conclusions, and we'll go from there.

18          All right, thank you everybody, have a good

19  weekend.

20          MR. MASEL:  Thank you, Your Honor, you too.

21          (Thereupon, the proceedings concluded.)

22                    *******

23

24

25

1                          CERTIFICATE

2

3   STATE OF FLORIDA           )
                               SS
4   COUNTY OF HILLSBOROUGH     )

5

6          I, CLAUDIA SPANGLER-FRY, Official Court Reporter

7   for the United States District Court, Middle District,

8   Tampa, Division,

9          DO HEREBY CERTIFY, that I was authorized to and

10  did, through use of Computer Aided Transcription, report

11  in shorthand the proceedings and evidence in the

12  above-styled cause, as stated in the caption hereto, and

13  that the foregoing pages numbered 1 to 42, inclusive,

14  constitute a true and correct transcription of my

15  shorthand report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17  in the City of Tampa, County of Hillsborough, State of

18  Florida, this 23rd day of March, 2009.

19

20         CLAUDIA SPANGLER-FRY, Official Court Reporter

21

22

23         BY:   /s/ CLAUDIA SPANGLER-FRY

24

25

## A

able 5:20 9:16 13:1 14:12 17:3 22:23 25:9 26:10 33:19
above-styled 42:12
absolutely 39:11
abuse 40:16,17 41:9
accepting 40:4
access 9:16
accompanied 23:15
account 17:15 31:15 38:21
accounting 28:25 29:2,4,25 30:2 39:23
accounts 11:10 14:24 26:1
acquainted 7:15
acquired 14:18 23:23 24:15
acquisition 14:22
Act 41:2
action 12:21 32:16
actions 19:8
active 31:6
acts 40:14
add 23:11 30:4
Additionally 18:13
addressed 26:24 33:15
adequately 4:2,14
admitted 35:11
adopting 41:16
adverse 29:22,25
advise 6:18
advised 4:5,11
affidavit 17:10 20:12,18,25 22:16
affirmed 15:15
afford 35:13
ago 23:19
agree 14:12
agreed 18:24 21:11 28:4 39:9
agreement 11:5
ahead 24:11 37:5
Aided 42:10
airplane 16:20
al 1:7 3:7
alimony 19:24
allegation 35:15
allege 34:5
alleged 9:15 34:24 35:22
allow 41:10
allowed 35:23
allows 18:9
amended 4:16 41:11
Amendment 22:14 28:18 29:11 33:16 39:21 40:2
American 21:17
amount 8:13 9:16 15:18 16:13 17:1 17:3 20:3,13 26:18 34:23 38:12 39:2,3,4
analogous 35:8
analysis 26:9
answer 7:20 29:4,14
anticipate 6:3
anxiety 31:19
anybody 26:25
anyway 33:13
anyways 28:20
apparent 33:3
appealable 41:16
appearance 5:7,9,12 22:7
appearances 1:12 3:8
appearing 5:16
apples 25:6
apply 6:25 7:1
appointed 4:13
appointment 41:3
appreciate 40:23
appropriate 15:12 36:4
appropriately 13:1
approved 36:20
approximate 39:14
approximated 39:2,15
approximately 15:2 38:24
approximation 38:15,19 39:16
April 10:21
area 27:4,9,11
argument 19:5,9 26:5
arguments 17:21
Art 14:13 20:3
Arthur 1:7 3:7,17,19 16:12 20:14 32:1 36:8
article 35:19
aside 19:20

asked 21:6 27:14
asking 40:22
aspect 18:8 26:14
assessed 38:22
asset 4:18 9:13 13:3,16 15:10 16:16 17:4,9,13,23 18:11,18 19:2 24:17 25:23 27:14,16,22 34:14 37:20 38:13 40:21 41:10
assets 9:6 13:20 14:15,17,18 15:3 15:11 16:22 18:12 19:3 20:2 25:5 26:16
assistance 40:23
assume 4:22 14:11 25:11,12,21 28:24 29:23,24
assuming 27:6 41:4
assumption 24:1 26:6
attached 20:20
attaches 14:5
attempt 33:9
attend 4:6,11
attorney 14:5 35:20
attorneys 13:8 14:3 15:21 21:19 34:19 35:17 36:15
Attorney's 5:18 6:5 12:22 13:13
authority 14:2
authorize 12:14 40:8 41:3
authorized 42:9
available 15:11
Avenue 1:14 2:6
a.m 1:7

## B

back 8:1 12:24 29:18
bank 14:24 17:15 18:25 26:1
based 39:1 41:8
basic 25:24
basically 4:17
Baxter 29:18
Beginning 30:10
behalf 3:10,12,17,19 32:7
behooves 36:24
believe 10:16 11:20 16:16,19 18:14 27:11 36:18
belonging 9:1
benefited 26:17
best 7:20 40:20
bigger 27:25
bill 7:18
binding 38:6,8
bit 13:24 27:19
blanket 34:19
blended 8:8
Boggs 1:18
bond 5:13 35:12
bottom 10:13
Boulevard 1:18 2:2
boxes 20:7
Branch 1:14
Brickell 1:14
Brief 9:24
bring 6:1 13:18 22:12,16 36:2,4 40:14,14
broad 26:3
brought 5:16 17:12 39:19
Building 10:14
burden 38:11 39:13
Burt 3:14
BURTON 1:21
business 23:20 31:3,6,8
buy 17:13

## C

C 3:1
call 3:4 27:6 41:3
called 23:21
cancer 6:15
can't 7:23 15:24 19:6 20:6,9 21:1 22:19 33:25 35:13 36:18
capacity 27:2
Capital 24:15,17
caption 42:12
cards 6:12
care 21:16 30:4 33:24
Carl 1:17 3:12
case 1:3 3:4,5,6,5 6:7 6:23,24,25 7:1 7:2,8,10,13,24,25 8:2,4,14,16 13:3 15:13,14,17,17,18 16:2,7

18:9,13,14,15,16,22 19:2 22:7 33:4,15 34:8,11,15 35:2,9,10,14 35:16 36:12,13,13 38:9,9,12 40:3,7 41:13
cases 13:6,23 15:3,13,16 16:24 34:22 36:9,20 37:10 38:7 40:3
cash 12:16 14:24 16:15 31:10
cashier's 25:19
cause 19:14 22:6 42:12
causes 13:4
cautious 19:1
CD 25:19
Center 16:18
certain 33:22
certainly 23:1 30:19
certificate 25:15 42:1
CERTIFY 42:9
cetera 26:1
chance 35:3
change 18:1
charged 8:11
charity 10:17 11:17,22 12:9
chat 23:16
check 24:15,17 25:19
Circuit 38:6,8,9,10
circumstance 13:9
circumstances 36:21 37:7 39:25
cite 13:4,23 36:11,11
cited 36:12 38:4,7 40:4
City 42:17
civil 4:22 6:24,25 7:2 12:23 13:13 29:20 36:22 40:11
CJA 41:3,6
claim 11:24 13:18
claimed 3:24
CLAUDIA 2:5 42:6,20,23
clear 29:24 38:10
clearly 27:10 31:8 38:19
Clearwater 22:1
Clerk 3:4,5
client 21:14
Clifford 21:22,24 22:18
close 17:2 34:7,23
closed 25:19
CM 2:5
cnelson@fowlerwhite.com 1:20
Cohen 2:2 7:4 8:8
collected 33:5
come 8:19 32:1,13 37:17 38:14 40:13
comes 25:9 40:25 41:14
comfort 27:12
coming 30:18
comment 30:16
commingled 10:24 11:6,8 26:6,7 27:19
Commission 1:4,13 3:7,11 17:22 19:6 25:7,8 27:11 37:22 38:4,11 Commission's 18:21
commit 40:15
communications 7:6
compared 15:1,19 36:7
comparison 31:12
competent 25:1 41:6
competitive 8:10
complaint 9:15 28:22 29:3 33:4,13 33:14
complex 36:21
complicated 26:9 37:17
comply 33:17
Computer 42:10
concept 23:6
concerned 39:17,20,22
concluded 41:21
conclusion 34:18
conclusions 41:17
conditions 35:12
condo 17:17
condominium 17:13 24:21
condominiums 11:1 12:4,11
conduct 9:15
confidence 4:13
confirmation 11:19
consent 5:4
conservatively 38:20
consider 39:10
considering 39:25
consistent 18:17
constituency 30:9
constitute 42:14

contacted 32:6
contacting 32:6
contempt 29:15
context 14:20
continuation 34:13
continue 22:10 33:23
continuing 5:17
contraband 32:20
contrary 40:20
control 31:17
controlled 18:6
conversation 24:2
conversations 5:18
cookiefry@aol.com 2:8
cooperate 33:21,23
cooperation 33:14
copied 20:10
copies 20:10
copy 9:20
correct 28:10,19 42:14
costs 4:19 7:18
couldn't 5:14 35:12
counsel 1:13,17 2:1 3:8 18:1,13 22:17 39:9 41:4
countable 37:14
County 42:4,17
couple 33:11
course 4:1,12 29:4 30:2 37:16
courtesy 21:16
Courtroom 40:13
Courts 36:20
Court's 39:23
covers 17:24 18:12
co-manager 32:9
CPA 20:25
credit 25:21
criminal 4:22 6:23 7:1,10,23,25 8:1 8:18 22:4 33:15 36:22 40:12 41:2
cross-examine 24:25
current 29:8
currently 14:15 16:14

## D

D 3:1
day 42:18
days 24:20
December 10:20
decided 34:9 38:5
decision 40:4
declaration 14:5,7,14,23 18:5 26:15 32:24 38:17
decline 29:10 40:1
deed 10:2
defend 5:23
Defendant 2:1 14:9,10 15:5,5 18:23
Defendants 1:8 37:13,15
Defendant's 26:1
defense 22:4 25:10 28:2
definition 15:6
definitions 15:7
defrauded 3:25
demonstrate 39:14
demonstrated 4:2
denied 3:23 41:12
denying 40:8
Department 12:22,24
depose 22:23 28:4
deposed 22:24
deposit 25:15
deposition 23:7 28:15,20
depressed 14:19
derived 11:24 34:12,13
designed 32:21 37:21
desperate 21:19
detail 28:20
detailed 30:2 39:12
details 14:14
detained 35:11
detention 5:13 35:4,5
didn't 12:1 22:16,17 32:1 35:24
difference 39:4,5
different 16:11 22:20 31:16 33:24
difficult 40:10
directed 13:2
directly 18:3 26:17

**disburse** 13:1
**discounted** 8:5
**discretion** 14:2 15:21 16:5 25:22 26:4 40:17,17 41:9
**discuss** 12:20
**discussed** 8:22,22 17:5,6 18:5
**discussion** 19:3 25:4
**disgorge** 15:8,11 16:11,12
**disgorgement** 9:13 13:16 15:4,6,7 15:10,19 16:9 17:2,23,24 18:10 25:25 26:2,13 27:22,24 32:20 34:2,3,6 37:11,14,16,20,21 38:13 39:3,15 40:18
**dislodge** 15:8 36:8
**disparaging** 39:7
**disparity** 16:4 34:15
**disposition** 6:11
**disproportionately** 15:19
**distributed** 37:15
**District** 1:1,1,11 4:23,24,24 5:17 5:19 15:14 18:17 29:9 36:14,23 36:23 38:9 41:4,5,13 42:7,7
**Division** 1:2 42:8
**divorced** 19:22
**documents** 8:23 20:7
**doesn't** 5:14 21:3,15 38:21
**doing** 6:23,24
**dollars** 17:16 18:4 30:12 31:4 32:14
**Dowdell** 36:12
**Dryer** 35:9,10,14,15,16

**E**

**E** 1:18 2:2 3:1,1
**earlier** 6:15
**earning** 19:23
**either** 4:2,4
**Eleventh** 38:6,8,10
**enabling** 4:18
**ensuing** 11:2
**entered** 3:23 5:6,7
**entirities** 10:3
**entities** 18:6 30:14
**entitled** 4:3 13:7
**entity** 18:23
**entry** 28:5
**equity** 11:16 13:15 26:4 34:21
**especially** 4:15 7:23 27:1
**ESQUIRE** 1:13,17,21 2:1,1
**essence** 29:17,23
**essentially** 17:2
**establishing** 38:12
**estate** 10:18 14:17,21
**estimates** 14:15
**et** 1:7 3:7 26:1
**ETS** 15:16 38:5
**evening** 34:10
**event** 36:19
**everybody** 36:24 38:3 41:18
**everyday** 40:7
**evidence** 13:6 25:2 30:17 37:8,10 38:16 39:1,6,10,11 41:8 42:11 42:15
**exact** 13:11
**exactitude** 38:15
**exactly** 6:19
**examine** 22:23 24:25 26:21
**exceed** 34:23
**exceeds** 39:3
**Exchange** 1:3,13 3:7,10 38:4,11
**exclusion** 38:9
**exclusive** 33:6
**excuse** 6:25
**execute** 10:2
**exercise** 15:20 16:5
**exhaustive** 30:17
**exhibit** 9:8
**existence** 23:24
**exists** 9:11 11:21
**expanded** 26:16
**expected** 24:23
**expense** 21:13
**expenses** 5:25 21:15 36:15
**explains** 18:20

**explore** 27:12 29:14
**express** 31:18
**Ext** 1:20
**extension** 29:3
**extent** 25:24 27:7 40:21
**extreme** 18:2 40:17
**ex-husband** 11:4
**e-mailed** 34:8,9

**F**

**facilitates** 36:24
**fact** 28:16 34:10 39:22
**facto** 34:20
**factor** 13:21
**facts** 37:7
**factual** 35:9
**factually** 25:1
**fact-finding** 27:2
**failed** 23:21
**failure** 34:11,12
**fairest** 8:7
**fairly** 27:21
**faith** 23:22
**far** 6:4 7:8 24:22 27:25 29:18 30:16 32:16 39:3
**Farmer** 13:5,18
**favorable** 38:25
**FBI** 20:6
**February** 11:11
**Fed** 38:5
**Federal** 4:17
**fees** 4:19 5:23 6:20,21 7:18 13:8 14:3 15:21 16:1,6 17:3 21:12 30:14 31:20,25 32:1,12 33:6 34:19 35:17 36:10,15 41:10
**Fifth** 22:13 28:18 29:11 33:16 39:21 40:1
**figure** 14:12,13 18:1 32:25 39:15
**figures** 33:1
**file** 36:19
**filed** 13:12 22:6
**files** 29:7
**filing** 24:19 39:24
**filings** 17:22
**filled** 23:16
**final** 34:7
**Financial** 18:15
**financially** 41:1
**find** 21:1 31:16 41:9
**findings** 39:12 41:17
**finds** 40:10
**fine** 40:24
**finished** 20:17
**firm** 4:19 5:6 20:25 35:15 40:22
**first** 36:5
**Fishback** 3:20
**fit** 19:7
**Floor** 2:7
**Florida** 1:1,6,15,19 2:3,6,7 16:18 36:23 41:5 42:3,18
**focus** 16:9
**following** 29:15
**follows** 5:3 7:21
**force** 15:8
**foregoing** 42:13
**foresee** 7:17
**forfeiture** 12:23 13:3,13 16:12
**forfeiture-related** 13:17
**form** 9:14
**forum** 13:14,15
**forward** 7:12 8:13 13:6 30:11
**Foster** 2:1,2 3:16,16,20 5:1,2,11 6:21 9:20,23 10:4,12,23 11:8,15 11:19 12:1,5,8,12,17 19:12,21 20:20,24 21:4,9,18,22,24 22:1,3 22:5,9,15 24:12 31:21,23 32:9 32:12,19 36:17,20 37:6 39:7
**Foster's** 4:18 40:21
**Fowler** 1:18
**frankly** 24:23
**fraud** 13:10 19:4,7 25:10 26:11,18 31:13
**freeze** 4:18 9:13 13:16 15:10 17:23 18:18,22,23 19:2 25:23 27:14,17 27:20,22 34:14,18 37:20 38:14 40:21 41:10
**friend** 40:5
**front** 41:8
**frozen** 16:4 18:25 38:23

**FTC** 18:14
**full** 23:16
**funds** 5:14 9:1,16 10:24 11:23 12:25 13:1,7,8,22 14:1,3,8 15:23 15:24,25 17:1,4,12 24:16 25:9 26:6 30:18 31:19 34:12,13 35:21 38:23 39:19
**furnish** 29:10
**furnishing** 19:23
**future** 4:12,20,22 7:17

**G**

**G** 3:1
**gain** 17:24 32:15 37:13
**gains** 16:3,8,10,11,11,12 34:4 37:12 38:20
**general** 5:8
**gentleman** 32:10
**gentlemen** 9:9 26:21
**Georgia** 16:17
**getting** 36:14
**gist** 23:22
**give** 7:21 13:20 35:1 38:2
**given** 10:17 29:2 40:24
**gives** 19:18 27:16
**globally** 33:24
**go** 5:23 7:6 8:2,2,17,20 14:3,11 24:11 29:4 31:24 37:5 41:17
**goes** 26:13
**going** 6:4 7:12,19,22,25 8:1,13,15 8:16,17,19,20 14:8,21 16:5 23:7 23:17 27:24 32:24 33:12,19 36:2 38:2
**Gonzalez** 36:13
**good** 3:15,18 24:4 28:17 40:5 41:18
**Government** 35:7,11
**grant** 15:21
**great** 6:13 16:8
**greedy** 36:16,17
**gross** 41:9
**group** 18:11
**guards** 35:3
**guess** 30:9
**gym** 40:7

**H**

**half** 32:12,15
**hand** 20:25 42:16
**hangars** 16:20,20
**happen** 13:4
**happened** 18:24 19:19 33:6 35:5 35:10
**happy** 37:4
**harm** 30:15
**Harmony** 23:17
**hasn't** 17:5 22:6 26:24 32:3
**haven't** 5:7 6:9 20:9 32:16 37:19 39:20
**health** 6:14
**hear** 27:5
**heard** 4:8 27:15 30:9 33:7 39:20
**hearing** 1:10 4:6,6,15 35:4,6
**hearings** 4:12
**hearsay** 23:17 24:4 37:9
**heart** 6:14
**held** 18:17 35:4 37:16,18
**Hello** 3:16
**help** 34:1
**hereto** 42:12
**hereunto** 42:16
**he'd** 33:23 39:8
**he'll** 36:6
**he's** 6:13,14 21:15,19 33:18,18 39:22 41:1
**high** 7:23 15:19
**higher** 14:21,21
**Hillsborough** 42:4,17
**hired** 32:5
**hold** 29:15,19
**Honor** 3:9 4:9 5:2 17:20 22:8,10 23:2,11 24:10,23,25 25:4 26:4 26:14 27:10 28:6,10,19 29:1,13 30:6,8 37:2 38:1 41:20
**HONORABLE** 1:10
**honored** 39:22
**hope** 6:25 7:1 12:25 13:21 40:6
**hopefully** 14:20 17:16 36:5

**hoping** 5:19
**Hornbook** 39:8
**hour** 8:10
**hourly** 8:4
**hours** 8:13
**house** 20:7
**housing** 5:24
**huge** 26:18
**hundred** 17:15
**Hunt** 21:22,24 22:18 23:3,6,15 36:2

**I**

**idea** 27:21 31:9
**identifiable** 15:23
**identified** 8:23 9:2
**identifies** 14:7,23
**identify** 14:1,6 33:15
**illegally** 34:5
**ill-begotten** 15:4,25 16:1,3 32:14 34:24
**ill-gotten** 34:4 37:12 38:20
**imagine** 22:19
**implicit** 19:5
**inability** 13:25
**inactive** 31:7
**inappropriate** 15:20
**inclination** 35:3
**include** 12:5 16:15,15
**includes** 12:3
**including** 7:18
**inclusive** 12:13 42:13
**income** 20:1
**incriminate** 40:2
**incurred** 4:20,20
**independent** 5:16 8:25 9:12,17 10:1 13:22 14:1 15:23 17:1,14 21:4 25:5 35:21 36:6
**independently** 37:23,24
**indicted** 5:4 6:9
**Indictment** 5:6
**indirectly** 26:17
**individual** 32:2,3,5,5,7
**inference** 29:23
**information** 6:9 29:10
**initially** 35:10
**injunction** 28:5
**intend** 28:12,14
**interest** 4:14 25:16 38:22 40:20
**interested** 24:19
**interests** 31:3
**interplay** 36:22
**interrupting** 20:16
**intervene** 3:24 4:4
**intervenor** 17:6 20:22
**intervenors** 21:14
**invested** 23:20 32:22
**investing** 33:9
**investment** 30:12
**investor** 28:1
**investors** 8:7 30:13 40:19
**invoke** 22:13 28:18
**involved** 31:8
**ipso** 34:19
**irrelevant** 27:13
**isn't** 21:8 24:6
**issue** 6:14 26:24 29:16 37:22
**issued** 21:11
**issues** 6:14 30:1
**it's** 7:22 8:16,16,17 12:2 15:16,20 16:10,11,12 20:20 27:13,23 28:19 30:17 32:19 33:3 34:2,19 38:20 39:8 41:12,15
**I'd** 9:22 27:4,9 34:7
**I'll** 14:11 25:23 26:25,25 31:24 37:4 41:14,15,16
**I'm** 3:14,16,18 11:21 12:10 15:23 20:15 21:23 22:21 26:20 27:1 30:25 31:1 32:11 38:2 39:6,17 39:20 41:4
**I've** 8:21 9:8 31:10 32:6

**J**

**January** 6:5 32:15
**Jayson** 2:2
**Jet** 16:17
**job** 19:24
**joint** 18:8
**jointly** 17:25 18:7

**Jones** 13:5,18
**Judge** 1:11 3:16 5:2,13 6:22 7:7,21
8:15,21 10:25 15:15,15,16 16:2,2
16:10 19:21 20:15,20 21:10
30:25 31:23 32:1,20 33:3,11,21
34:2,9,9,11,21 36:1 39:24 40:4,5
**Judges** 36:18
**jury** 26:23
**Justice** 12:22,23 40:11,12 41:2
**justified** 34:13,17
**justify** 27:20

**K**

**K** 15:15 16:2 34:9
**keep** 19:16 23:17 35:23
**Kennedy** 1:18 2:2
**kept** 33:5
**key** 37:22 38:3
**Kimberly** 3:20
**knew** 35:21
**know** 7:15,22 8:14 12:15 14:10
20:9,15,16 22:14 23:18 24:4,6
24:18 25:13,17,18,25 26:7,22,25
27:4,4,7,8 28:3 29:20 31:2 32:16
32:24 33:3,3 35:2 36:2 38:13
39:1,8 40:3,9,23,24 41:15
**knows** 17:16
**Kovachevich** 40:4

**L**

**Lara** 41:13
**largely** 23:19
**Lauer** 36:13
**law** 12:18 18:9 19:8 25:7,9,11,24
27:20 29:17,24 35:15 39:8 40:20
40:21
**lawyer** 4:14 8:9 21:9,12 22:4,5 27:3
33:20 35:15,21
**lawyers** 4:8 6:1 8:12 24:4 26:24
32:5,7 40:25 41:6
**LAZZARA** 1:10
**learned** 6:24
**left** 9:9 25:10
**legal** 31:20
**legitimate** 28:17
**letting** 12:24
**let's** 14:11 25:11,12,21
**level** 27:12
**liability** 18:8
**life** 25:18
**lift** 4:17 18:18 25:23 27:14 40:21
40:22 41:9
**lifted** 18:22
**lifting** 27:16,20
**light** 38:14,25
**limited** 5:7,9,11 7:9
**line** 16:24
**liquidate** 31:17
**list** 41:6
**listed** 10:7
**literally** 15:7
**litigate** 7:11
**litigating** 5:12
**litigation** 8:17 9:18
**little** 13:24 19:16 27:19
**lived** 23:19
**living** 21:12,15 36:15
**locally** 8:4
**locked** 20:11
**long** 29:4
**longer** 8:20 23:24
**look** 18:3,8 20:5 35:7,20
**looked** 15:6 35:3
**looking** 10:7
**looks** 10:10
**loss** 16:10
**losses** 33:8 40:19
**lost** 33:10
**lot** 6:25 16:11 29:5 31:11 40:13
**loved** 25:17
**low** 18:2

**M**

**Madam** 3:4
**Madoff** 33:4,5
**magically** 19:18
**making** 16:19 19:25
**man** 36:25
**Management** 30:23

**Manhattan** 20:8
**manner** 5:21
**March** 1:6 3:2 42:18
**marital** 10:18 11:5
**Mark** 35:9,10
**market** 33:8
**marriage** 9:4 10:1,11,16 11:25
17:12 19:11 20:3,14 39:19
**married** 9:2,5 10:2,8 11:13 19:12
19:17 20:2 23:25 25:16
**Marshal** 21:16
**Marshal's** 40:7
**Masel** 1:13 3:9,9 4:8,9 7:4,19 8:23
14:4 17:19,20 20:4,16 22:8,10
22:22,24 23:1,5 24:8 25:4 26:3
27:10 28:6,10,14,19 29:1,13,22
34:8 37:2,3,4,6 38:1 41:20
**masels@sec.gov** 1:16
**Masel's** 34:3
**matter** 4:4 5:20 14:1 30:10
**matters** 30:18
**maximum** 37:11
**mean** 19:15,19 31:2 37:10
**meaningful** 33:12
**means** 35:22
**meet** 5:14 35:12
**memo** 13:4,24 15:16,17 36:11 38:7
**mentioned** 12:11,19 34:8
**met** 7:4,4 21:5 25:14
**Metals** 15:18
**Miami** 1:14,15
**MICHAEL** 2:1
**Middle** 1:1 18:16 36:23 41:5 42:7
**Mike** 3:18
**million** 14:8,11,17,24 15:1,2 16:3,8
16:8 18:1,11 30:12,13,14 31:10
32:22,24 34:16 35:16 37:12
38:21,24 39:4
**millions** 18:4 31:4,4
**Mind** 23:21
**minute** 20:23
**minutes** 40:6
**mislead** 19:8
**misnomer** 25:6
**misrepresentations** 24:5
**modify** 34:18
**money** 7:14 10:17,22 11:6,9,10,22
16:14,19,22 18:3,6 19:16,20
20:14 21:6,15 23:20,23 26:10,12
26:18 27:6,18,19 28:2 30:21
31:10,11 33:5,5,7,9,10 34:23
35:1,20,22,23
**month** 20:1 35:13 36:15
**Moody** 32:10,12
**morning** 3:9,15,18 8:24
**mortgage** 11:16 17:7 24:14,20
24:19 40:8 41:11
**motion** 1:10 3:24 4:16 17:6,6 24:13
**motions** 7:11 36:19
**move** 28:23 32:4

**N**

**N** 3:1
**Nadel** 1:7 3:7,17,19,25 4:18,21 5:4
5:14,20,23 6:4,13 7:12 9:1,2,2,3
9:5,5 10:17 11:9 13:23 14:8,8,9
14:13 15:1 16:12 17:11,25 18:4
18:6,7 19:10,17 20:4,19 21:20
21:21 22:12 23:14,25 25:9,12,14
25:16 26:8,8,17 27:19 28:1 29:3
29:19 30:16 32:2,8,23,25 34:5
34:25 36:2 37:14 38:25 39:11,18
40:2,24 41:11
**Nadel's** 6:6 9:17 10:24 17:21 19:5
20:7 26:10 28:14,22 31:20 38:19
**name** 10:11
**named** 22:9 32:10
**nature** 31:17,19
**navigate** 33:16
**necessarily** 40:18
**need** 11:15,19 23:7 27:21 29:16
**needs** 33:19 34:1
**negotiated** 6:6
**Nelson** 1:17 3:12,12 8:24 22:2,22
23:11,14 24:1,9,12 30:3,5
**never** 28:7,11 39:8
**New** 4:24 5:13,17,19 6:1,2 7:10,11
7:24 8:2 29:9 35:8 36:24 40:25
41:4

**newspaper** 35:19
**Noble** 15:17
**non-fraudulent** 13:22
**North** 2:6
**notice** 22:7
**notwithstanding** 13:25 28:16
**number** 3:6 12:12
**numbered** 42:13

**O**

**O** 3:1
**oath** 22:21
**observation** 24:9
**obtained** 34:25
**obviously** 11:12 21:14 26:20 28:17
38:6,8
**October** 10:20
**odd** 30:12
**office** 1:14 3:21 5:18,25 6:5 8:6
12:22 13:13 20:8,11
**officer** 18:24
**offices** 23:15
**Official** 2:6 42:6,20
**offing** 22:25 23:2
**Oh** 10:10 29:20
**Okay** 4:7,10 6:21 20:23 25:3,15,21
38:24
**old** 6:13 9:2 27:3
**opinion** 4:2
**opportunity** 22:22 24:24
**opposition** 20:21 31:19
**oranges** 25:6
**order** 3:23 4:1,5 5:13 9:17 21:10
29:7,15,16 31:15,24 39:23,25
41:16,16
**orders** 33:18
**originally** 21:11
**Orlando** 11:1 12:4,11
**outlined** 4:1
**overall** 16:10
**overdue** 28:25 29:2
**overlay** 6:22
**over-arching** 26:5
**owned** 9:4

**P**

**P** 3:1
**PA** 1:18 2:2
**pages** 11:2 42:13
**paid** 7:8,9,12 19:23 20:9 24:15,16
30:22
**pales** 31:12
**paralegal** 3:21
**parallels** 18:21
**part** 11:5 14:13 17:11,17 22:15
27:14
**partially** 4:17
**participate** 9:18
**participated** 31:5
**parties** 5:5 18:24 35:24
**part-time** 31:1
**pass** 9:20 40:25
**Pause** 9:24
**pay** 4:18 5:23 16:6 31:20
**payment** 4:17 34:19 35:17 41:10
**Payphones** 15:17 16:7 38:5
**Pending** 4:16
**people** 3:24 9:6 30:15 35:8 37:10
40:13
**performing** 16:22
**period** 5:5 30:19
**permissibly** 4:4
**permit** 14:3 34:18
**personal** 24:16 30:21 31:3
**personally** 31:5
**Petersburg** 22:2,3
**Phones** 16:7
**phrases** 37:6
**picks** 13:5
**piece** 11:12 25:13
**pieces** 21:3,5,6
**Pizzo** 15:15 16:2 34:9 40:5
**Plaintiff** 1:5,13 3:10
**plead** 6:16
**pleading** 12:20
**pleadings** 34:3
**please** 3:4,8
**point** 8:21 16:25 18:3 19:4 23:9
29:1 31:9,24

**pointed** 4:12
**points** 33:12
**position** 17:22 18:21 19:5 22:18
23:4 30:1 40:10
**possible** 6:11 12:18 18:10
**possibly** 18:7
**pot** 19:16
**potential** 15:18 37:11,21
**potentially** 15:25
**practice** 28:20
**predicament** 29:8
**prejudice** 26:25
**preliminary** 28:5
**prepared** 28:3
**presented** 17:10 25:7
**preserve** 17:23 27:22 37:21
**preserved** 27:25
**presiding** 13:19
**pretty** 18:20
**Pre-Trial** 7:11
**prior** 9:4 10:1 11:24 14:18 19:10
**private** 35:13
**privilege** 40:2
**probably** 5:25 6:17 8:16 23:24
24:19
**problem** 17:18 26:5,8 33:14
**problems** 33:25
**proceed** 12:25
**proceeding** 4:22 8:3 29:20
**proceedings** 4:23 5:1 41:21 42:11
42:15
**proceeds** 11:4
**producing** 16:17,22
**profit** 27:8 32:23 34:16
**profited** 34:5
**profits** 14:25 15:4,5 32:21 34:3,24
36:7
**properties** 9:4,10,19 10:4,5,5,7
11:2 16:15,16,17,20 19:11,15
23:18 31:16
**property** 10:1 11:12,16,24 13:19
17:7 21:3,6 24:14 25:13
**prosecution** 33:18
**prostate** 6:14
**protected** 5:24
**protracted** 8:17
**prove** 34:4
**provided** 29:24
**provision** 21:13
**provisions** 35:17 36:10
**Pumigiano** 29:18
**purpose** 5:10,12 7:9 15:3,9,10
**pursue** 13:14 18:9 26:9 27:8
**pursuing** 18:9
**put** 9:6 10:18,23,23,25 11:9,9 12:1
20:2,3 25:15,20 26:12 27:6 33:7
**puts** 11:14 19:18

**Q**

**quadruple** 37:9
**question** 22:12 31:7
**questions** 24:7 27:1 28:21 29:5
**quickly** 8:16,19
**quitclaim** 10:2
**quite** 24:23 26:9
**Quizenberry** 10:8,9 19:10
**quote** 18:22

**R**

**R** 1:17 3:1 15:15,15
**raised** 30:12
**ran** 35:15
**rate** 8:8,10,11
**rates** 8:5
**reach** 36:1
**read** 9:21 14:4
**ready** 20:17
**real** 14:17,21
**realistically** 27:24
**realized** 10:6 25:14
**realizes** 11:13
**really** 6:17 18:2 25:6 33:1 35:24
**reason** 10:16 11:20 22:16 40:18
41:11
**reasonable** 4:19 5:21,21 8:11
38:15,19 39:15
**reasonably** 39:2,14
**reasons** 4:1
**received** 25:19 26:17

**Receiver** 1:17,21 3:13,14 4:13 6:8 7:5 8:7,12,24 12:15,24,25 14:5 14:23 17:14 19:6 20:11,22 24:18 26:16 27:11,23 32:4,13 38:17 39:12
**receivership** 8:12 38:23
**Receiver's** 18:5 26:15
**receiving** 30:20
**recognize** 40:9,17
**recommendation** 40:5
**record** 38:16
**records** 30:11
**recoup** 40:19
**recourse** 29:6
**recover** 13:1 32:17 33:10
**referred** 18:13 24:17
**referring** 18:2,15
**refuted** 38:18
**regard** 4:7,15,21 19:9
**regarding** 24:20
**related** 8:21 9:14
**release** 12:15
**relevance** 33:2
**relevant** 12:20
**relief** 13:20 14:9 25:2
**remedies** 12:18 18:10
**remedy** 13:11,14,17 17:23,24 27:23,24 37:21
**report** 40:5 42:10,15
**Reporter** 2:5,6 42:6,20
**represent** 4:14 7:12 30:17 41:1
**representation** 4:21 7:16,17 8:18 39:18
**representations** 39:7,9
**represented** 22:17 36:25
**representing** 23:9 35:6
**represents** 21:21
**requested** 25:21
**requesting** 6:20,21
**required** 8:14 30:1
**requirement** 25:8
**resolve** 5:20 7:10,23 8:1,15
**respect** 29:7 30:16 39:21,24
**respectfully** 29:9 40:1
**respond** 37:2 40:1
**response** 14:4,5 17:7 20:21,21 24:12,13 28:21,22 29:3 33:12,13
**rest** 25:18
**returns** 19:25
**reverse** 31:24
**reviewing** 13:15 14:1
**revisited** 41:12
**RICHARD** 1:10
**right** 3:21,22 4:4,10,10,16 5:11 9:23 11:18 21:18 22:6,25 23:10 24:3 27:5 28:7,12 29:22 30:3 31:21 33:16 34:22 37:1,25 38:3 38:22,25 41:14,18
**rights** 22:13 28:18 29:11 39:21
**Ringling** 10:14
**room** 23:16
**RPR** 2:5
**Rubenstein** 2:1 3:18,19 8:9,22
**Rubenstein's** 4:19
**rule** 4:3,3 13:5 34:20
**ruling** 18:20 38:3

**S**

**s** 3:1 6:5 13:12 20:8 42:23
**salary** 30:20
**sale** 12:6
**sales** 9:11 11:4 12:3
**Sarasota** 11:3 17:8 21:25 24:21
**satisfy** 26:2
**saw** 6:15 19:24
**saying** 29:7
**says** 19:8 20:5 23:7 24:13 32:23 35:20
**scenario** 25:23
**scheme** 37:8
**Scoop** 10:25 11:7,10,14 19:18 24:15,16 25:20 26:12,13 27:7 30:14,23 32:1
**scope** 31:13,14
**Scott** 1:13 3:9
**search** 20:6
**SEC** 21:11 32:3,13 33:23 35:14
**second** 16:25
**Securites** 1:13

**securities** 1:3 3:6,10 22:5 38:4,11
**SEC's** 9:15 33:13
**see** 6:11 9:22 10:7 28:21 30:17,18 36:5
**seek** 28:14
**seeking** 6:3
**sees** 19:7
**segregate** 13:25
**seized** 15:20,25 17:4 34:16,23 36:7
**seizure** 14:16 16:14 17:2,15
**seizures** 16:9
**sells** 11:12 19:11
**sentencing** 8:3
**separate** 15:22 32:7 39:19
**separated** 15:24
**separately** 34:12,13
**separation** 11:5
**series** 9:3 36:8
**SERO** 1:14
**Service** 21:16
**set** 5:13 16:20 19:20 42:16
**severally** 17:25
**shape** 9:14
**shared** 8:23 9:9
**She'd** 22:21
**she's** 3:21 19:10,17 22:9,17
**short** 8:3
**shorthand** 42:11,15
**short-circuited** 28:4
**shouldn't** 37:18
**show** 26:10,16 30:11 34:12,12 37:17
**shown** 27:23,23
**shows** 25:7 26:15 37:11 38:19
**sic** 29:18
**side** 35:14 39:10 40:11,12
**sides** 5:21 7:6
**simple** 29:13
**single** 32:14
**sir** 7:13 10:4,12 11:8,15 13:14 16:13,24 17:11 20:13 23:13 30:4 30:7 34:17 35:2
**sit** 37:4
**site** 34:8
**sitting** 13:15 27:1 34:21
**situation** 35:9
**skin** 6:15
**small** 33:22
**sold** 9:10 10:5,5,10,12,13,15,20 11:1 12:11 19:15 23:19 25:13
**sole** 11:24
**solid** 27:21
**somebody** 15:8 34:1
**sorry** 21:23 32:11
**source** 8:25 9:12,17 15:23 17:1
**South** 16:21
**Southern** 4:24 5:19 29:9 36:14,23 41:4,13
**space** 5:25
**SPANGLER-FRY** 2:5 42:6,20,23
**speak** 21:3
**spend** 8:14 25:18
**spent** 7:8
**split** 11:3 32:2
**spoke** 35:19
**SS** 42:3
**St** 22:2,3
**staff** 6:2
**starting** 29:17
**state** 3:8 42:3,17
**stated** 42:12
**statement** 28:11 29:7 39:24
**statements** 28:8,8
**States** 1:1,11 4:23 5:18 12:22 21:16 42:7
**status** 4:25 5:3
**Statutes** 41:2
**step** 26:25
**stock** 33:8
**stole** 35:16
**stood** 12:24
**Subdivision** 10:15
**subject** 9:12,13 34:6 38:13 39:2 41:12
**submit** 16:13 34:17 36:9
**subsequently** 35:11
**substance** 24:22
**substantial** 39:5
**sudden** 19:17
**sued** 32:3

**suggest** 8:8 21:18 32:19
**Suite** 1:15,19 2:3
**support** 25:2
**supposed** 6:10
**Supreme** 13:5
**sure** 11:21 15:11 22:21 26:20 29:21 30:25 31:1
**surrender** 6:6
**sworn** 29:25 39:13
**System** 40:11,12

**T**

**tab** 12:1
**table** 32:25
**take** 15:4 22:18 23:7 28:8,20 29:22 32:21 33:24 38:21
**taken** 17:22 21:15 26:10 32:4,16
**talk** 6:10 9:9 13:24 15:3,9,18 32:13
**talked** 7:20 8:6 11:3 23:3,5,6,14 36:14
**talking** 6:7 7:3,3,15 12:10 13:16 15:22,23 20:5 32:8,9 36:4
**talks** 10:14 31:25
**Tampa** 1:2,6,19 2:3,7 6:2 21:25 35:5 42:8,17
**tax** 19:25
**taxes** 25:14
**taxpayers** 21:17
**tell** 11:21 22:19,20 35:8 40:12
**telling** 9:25 23:23 35:7
**tells** 19:21 20:1,12 32:21
**tenants** 10:3
**tendency** 26:22
**terms** 7:16 27:5 38:16
**Terry** 35:6,7
**testified** 25:12
**testify** 22:13
**testimony** 25:21
**tfoster@tampalawfirm.com** 2:4
**thank** 3:22 17:20 25:3 31:23 36:25 38:1 41:14,18,20
**that's** 10:8 12:8 14:18,19 17:9,15 17:17 19:7 20:12 21:10,18 22:15 24:5 26:12 27:4,10,15,25 28:10 28:19 31:10 32:23,25 33:25 34:23 38:24 39:4,4,13
**there's** 7:5 10:19 12:19,23 13:12 13:12,19 15:13,16,22 17:10 18:6 18:11 24:22 26:23 33:15 35:19 36:8 39:18
**they're** 4:11 6:7,8 10:7 13:9 20:10 40:24,25
**they've** 9:10
**thing** 8:7 32:20 33:11 34:7
**things** 6:7 25:5 31:3,17 33:22,22
**think** 3:24 5:22 6:22 7:22 8:10,18 9:11 11:1,15,17,19,22 12:2,17 12:18 13:7 14:12 16:2,7,18 17:10 18:7 19:4,24 22:15 26:3 29:13,16 31:1,7 36:3,3,24 37:9 40:19
**thought** 7:19 8:6
**thousand** 17:16 19:23
**three** 7:24 21:3,5 32:6
**tied** 40:18
**time** 5:5 7:8 8:8 14:22 15:12 23:8 23:25 30:19 37:3,5
**timing** 25:5
**today** 17:17 18:12,18 21:8 24:24 27:13
**today's** 14:19
**Todd** 2:1 3:16
**told** 17:11
**total** 7:18 11:23 12:12 30:14
**totally** 31:7
**totals** 11:25
**touch** 6:4
**touched** 19:3
**trace** 19:6 20:5,6 25:8 26:12 27:18 27:21
**traceable** 13:9,9 19:3,4
**traced** 14:7 37:23,24
**tracing** 26:9,18 37:17
**transcript** 1:10 35:4
**transcription** 42:10,14
**travel** 5:24
**tremendous** 6:22 30:15 33:8
**trial** 5:24
**tried** 33:22

**true** 42:14
**trusted** 25:17
**try** 7:10 31:17
**trying** 7:7,7,9 24:14
**two** 7:24 10:25 12:11 16:16
**tying** 7:9
**type** 39:24
**types** 19:8

**U**

**U** 6:5 13:12 20:8
**unable** 41:1,1
**unclear** 23:8
**undercut** 17:21
**undermine** 39:12
**understand** 16:21 29:8 39:25
**understands** 23:8
**unfreeze** 12:15
**unique** 25:22
**United** 1:1,11 4:23 5:18 12:21 21:16 42:7
**unquote** 18:22
**unreasonable** 5:22 6:1
**unrelated** 18:23
**untainted** 13:7 27:6
**urging** 18:17
**USA** 18:14
**use** 13:8 19:7 25:9 28:1 42:10
**utilizing** 31:9
**utmost** 4:13

**V**

**v** 29:18
**value** 9:11 14:19 38:22
**values** 14:19,20
**various** 31:2,16
**Venice** 16:17,18
**ventures** 31:16
**versus** 3:7 18:14 38:5
**view** 29:8 31:9 40:16
**violate** 29:11
**Virginia** 36:12
**vomit** 15:7
**VS** 1:6

**W**

**W** 1:21
**wait** 20:23
**waiting** 6:7,8 28:22,24
**waived** 5:5
**want** 7:16 9:21 11:20 12:14 22:17 36:8 37:17
**wanted** 30:8
**wants** 33:1 36:5
**warrant** 20:6
**wasn't** 16:25 19:2 26:10
**way** 4:25 9:14 16:16 17:4 24:2 29:4 37:15 38:18 39:7
**week** 6:10,10,15
**weekend** 41:19
**weeks** 7:24
**welcome** 4:6,11
**went** 14:10,13 17:24,25 18:5,6 21:5 24:2 25:25 27:18 30:14 31:4 37:13
**WestLaw** 18:16
**we'd** 7:12 13:7
**we'll** 8:2 27:6 36:5 41:17
**we're** 5:19 6:3,10,21 7:7,7,9,25 13:16 15:22 16:5 23:7 28:1 37:9
**we've** 6:6,24 7:3,8 8:5,5,25 9:3 22:24 27:23 36:13
**whatsoever** 38:18 39:6
**what's** 15:20
**WHEREOF** 42:16
**White** 1:18
**who's** 13:19
**Wiand** 1:21 3:14,14 8:25 14:6,6,14 30:4,5,8,23,25 31:14,25 32:21 38:17
**wish** 27:9
**WITNESS** 42:16
**won't** 7:25 26:25 30:17
**word** 39:20
**work** 8:4 31:14 40:6
**worked** 19:21 30:11 31:1 35:24
**worth** 14:16 17:17
**wouldn't** 24:5 27:20 34:18

**write** 34:11
**wrote** 25:18

---
**Y**
---

**Yeah** 24:11
**year** 15:15 19:23 20:1 30:20,22
**years** 6:13,17 9:2 19:19,22 23:19
   30:19
**Yep** 11:8
**yesterday** 3:23 8:22,23 21:5 34:10
**York** 4:24 5:13,17,19 6:1,2 7:10,11
   7:24 8:2 29:9 35:8 36:24 40:25
   41:4
**you'd** 26:20
**you're** 9:25 13:15 23:22 24:3 27:13
   32:8
**you've** 7:15

---
**Z**
---

**Zitek** 35:6,7

---
**$**
---

**$1.2** 14:24
**$10,000** 36:15
**$100,000** 25:14
**$12** 14:16
**$120,000** 25:16,24
**$17** 14:7,11 18:1 32:24
**$25** 16:3 34:16
**$250,000** 12:16 30:20,22 31:8
**$26** 19:23
**$300** 8:10 18:11
**$300,000** 10:6
**$397** 32:22 37:12
**$450** 35:16
**$6** 39:4
**$70,000** 11:16
**$700,000** 16:4 34:16
**$80,000** 35:13

---
**1**
---

**1** 42:13
**1.2** 31:10
**100** 10:20
**1000** 2:3
**11** 14:16
**11:00** 1:7
**1108** 1:20
**115,000** 10:21
**12** 38:24
**13** 38:24
**13.2** 15:2
**14th** 11:11
**14.2** 15:2
**146,5** 10:19
**15** 23:18
**15th** 2:7 10:21
**152,5** 11:13
**16** 23:19
**16th** 10:21
**167** 30:13
**17** 14:10 15:1 19:25 38:21
**1700** 1:19
**18,000** 19:25
**1800** 1:15
**1993** 10:21

---
**2**
---

**20** 1:6 3:2
**200** 10:6
**2001** 9:3 19:13
**2002** 30:10
**2003** 11:11 12:6
**2005** 38:6
**2008** 18:16
**2009** 1:6 3:2 14:18 42:18
**201** 2:2
**21** 16:8
**23rd** 42:18
**24th** 10:20
**24-A** 4:3
**24-B** 4:3
**25th** 6:6
**250** 12:1,2

---
**3**
---

**3d** 38:5

**305)982-6398** 1:16
**3165930** 18:16
**32** 3:24
**33131** 1:15
**33601-1438** 1:19
**33602** 2:7
**33762-2538** 2:3
**38** 20:7
**397** 30:11

---
**4**
---

**40** 6:16
**408** 38:5
**42** 42:13

---
**5**
---

**501** 1:18

---
**6**
---

**60** 30:13

---
**7**
---

**7** 16:8
**70** 9:2
**727** 38:5
**76** 6:13

---
**8**
---

**8:09-Civil-87-T-26TBM** 3:6
**8:09-CV-87-T-26TBM** 1:3
**80,000** 11:17
**801** 1:14 2:6
**813)225-1921** 2:4
**813)228-7411** 1:20
**813)301-5575** 2:8
**82,500** 10:21

---
**9**
---

**93** 19:15
**94** 10:20,21 19:15