UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,

CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.
_____/

**RECEIVER'S DECLARATION IN SUPPORT OF THE UNOPPOSED MOTION
FOR POSSESSION OF AND TITLE TO THE REAL PROPERTY
LOCATED AT 131 GARREN CREEK ROAD, FAIRVIEW, N.C.**

Burton W. Wiand declares as follows:

1. I am an attorney with Fowler White Boggs P.A. ("Fowler White") in Tampa, Florida.

2. In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P.,

Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory IRA Fund, Ltd.; Victory Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management (Scoop Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund are collectively referred to as the "Hedge Funds;" Scoop Capital, Scoop Management, Valhalla Management, and Viking Management are collectively referred to as the "Investment Managers").

3. In a January 27, 2009, Order (Doc. 17), the Court also appointed me Receiver over Venice Jet Center, LLC, and Tradewind, LLC.

4. In a February 11, 2009 Order (Doc. 44), the Court also appointed me Receiver over Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; and the Laurel Mountain Preserve Homeowners Association, Inc.

5. In a March 9, 2009, Order (Doc. 68), the Court also appointed me Receiver over the Guy-Nadel Foundation, Inc.

6. In a March 17, 2009, Amended Order (Doc. 81), the Court also appointed me Receiver over Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC. All of the entities in receivership are referred to collectively as the "Receivership Entities."

7. Since my appointment as Receiver, I and professionals who I have retained (including lawyers and an accountant) have continued our investigation, which has included communicating with people associated with Nadel and/or the Receivership Entities and persons responsible for maintaining the financial books of Receivership Entities and of other businesses controlled by Nadel; operating other businesses controlled by Nadel or for

assisting those businesses with their transactions; performing accounting services; and administering the Hedge Funds.

8. We have also reviewed documents located in the offices of the Hedge Funds and Investment Managers (the "Office") (located at 1618 Main Street, Sarasota, Florida 34236); documents obtained from the accountant for Receivership Entities; information stored on Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's businesses with their transactions; and information available in the public record.

### The Fraudulent Investment Scheme

9. On January 26, 2009, I submitted the Receiver's Declaration in Support of the Receiver's Unopposed Motion to Expand the Scope of Receivership (the "Receiver's January Declaration") (Doc. 16).

10. As shown in the Receiver's January Declaration and in Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC Emergency Motion") (Doc. 2) and supporting papers, Nadel defrauded investors in the six Hedge Funds from at least 2003 (and likely earlier) through the time he fled in January 2009 by "massively overstating the value of investors' interests in them." (SEC Emerg. Mot. at 2, 6.) Specifically, from at least 2003 through 2008, the value of the Hedge Funds as represented to investors was significantly overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

11. As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now in receivership. (*Id.* at 4-6.) Through those entities, Nadel was ultimately responsible for controlling the Hedge Funds' investment activities.

12. Evidence also showed that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, and to other Receivership Entities, in the form of management, advisory, and/or profit incentive fees. (*Id.* at 5-6.) According to the Hedge Funds' documents, in 2003, the Hedge Funds paid a total of $7,045,509.31 in fees; in 2004, they paid $14,156,501.17 in fees; in 2005, they paid $20,349,897.02 in fees; in 2006, they paid $18,257,590.52 in fees; in 2007, they paid $19,873,365.00 in fees; and in 2008 they paid $15,854,930.76 in fees.

13. Specifically, according to Scoop Management's Profit and Loss Statement for the period from 2003 to 2008, Scoop Management received the following fees from the Hedge Funds: $39,670,763.24 in "Incentive Fees;" $19,065,409.19 in "Management Fees;" and $1,930,000 in "Office Fees." In other words, Scoop Management received a total of $60,666,172.43 in fees from the Hedge Funds between 2003 and 2008.

14. Also according to Scoop Management's Profit and Loss Statement, Scoop Management paid a portion of those fees to others. The amount paid was $23,183,680.84, but $6,040,566.83 of that amount was paid to another Receivership Entity formerly controlled by Nadel, Scoop Capital.

15. In sum, Scoop Management kept $37,482,491.59 in fees from the Hedge Funds between 2003 and 2008, and an additional $6,040,566.83 of the fees it received were transferred to Scoop Capital.

16. Consistent with our earlier findings, our investigation has continued to reveal information showing that additional entities and other assets over which Nadel or his wife, Marguerite "Peg" Nadel ("Mrs. Nadel"), exerted full or partial control or in which they had a full or partial interest were purchased and/or funded with money derived from Nadel's fraudulent investment scheme (the "scheme"). This occurred through direct payments from Scoop Capital or Scoop Management financial accounts.

17. This also occurred through payments from accounts held in the name of Nadel or Nadel and Mrs. Nadel, which accounts were funded with money from the scheme, including with the large sums of "management" and "advisory" fees that Nadel paid himself for purporting to manage money through Receivership Entities. For example, as demonstrated by the copies of checks attached as Exhibit A to the Receiver's January Declaration, in 2008 Nadel signed checks transferring at least $1,003,500.00 from Scoop Capital to himself and his wife.

18. As of December 31, 2008, according to the Balance Sheet for Scoop Management, Scoop Management had transferred $6,761,000 to Nadel, $5,090,000 to Mrs. Nadel, and an additional $5,326,896.56 jointly to Nadel and his wife. These amounts are in addition to the amounts Mrs. Nadel received from Scoop Management as compensation.

19. Scoop Management also had transferred $6,433,804.40 to other entities controlled by Nadel.

20. Also as of December 31, 2008, according to the Balance Sheet for Scoop Capital, it had transferred at least $1,300,000 to Nadel. It also had transferred $6,293,637.12 to other entities controlled by Nadel.

21. To date we have not uncovered any source of income for Nadel or Mrs. Nadel that was not in some manner funded with money from the scheme (whether through "management fees" or otherwise). Discussions with Mrs. Nadel and others have confirmed that, during the time one or more of the Hedge Funds and Investment Managers were in operation (i.e., beginning in at least 1999), essentially all of Nadel and Mrs. Nadel's income was derived directly from those entities.

22. As detailed in the Receiver's January Declaration and the SEC Emergency Motion, the Hedge Funds and Investment Managers were operated as part of a fraudulent scheme from at least 2003 forward. As such, the source of Nadel and Mrs. Nadel's income during that period was Nadel's scheme.

23. The information gathered during our investigation shows that money derived from Nadel's scheme was used to purchase the real property located at 131 Garren Creek Road, Fairview, North Carolina 28730 ("the Property") and pay the Property's mortgage.

24. According to the information that we have gathered, the Property is a secondary residence of the Nadels, located in the mountains of North Carolina near the large real estate holdings of Laurel Preserve, LLC, one of the Receivership Entities.

**The Property**

25. On June 14, 2004, Nadel and Mrs. Nadel purchased the Property.

26. As shown by the copy of check number 1936, attached as **Exhibit A**, Nadel wrote a check in the amount of $5,000 to Coldwell Banker dated April 12, 2004. As indicated in the memo line, this check served as the deposit, or earnest money, for the purchase of the Property. The check was written from Nadel's personal account with SouthTrust Bank (which subsequently merged with Wachovia Bank), which ended in the numbers 489 (the "489 Account").

27. Coldwell Banker appears to have held this $5,000 in escrow until the closing of the Nadels' purchase of the Property. As shown by check number 8220 dated June 14, 2004, and attached as part of **Exhibit B**, Coldwell Banker produced these funds at closing. The $5,000 deposit is also reflected in the settlement statement for the Property, attached hereto as **Exhibit C**.

28. As shown by the copy of the wire transfer confirmation, attached as **Exhibit D**, Nadel wired $68,000 from a SouthTrust Bank account to Cogburn Goosman Brasil & Rose, P.A. on June 9, 2004. The July 2004 bank statement for the 489 Account shows that the wire came from that account. *See* 489 Account Statement, attached hereto as **Exhibit E**.

29. Cogburn Goosman Brasil & Rose, P.A. prepared the deed and mortgage for the purchase of the Property and also served as the settlement agent. *See* **Exhibit C**. Copies of the deed and mortgage for the Property are attached hereto as **Exhibits F and G** respectively.

30. As shown by the copy of the settlement statement for the Property, attached as **Exhibit C**, Nadel and his wife owed $67,415.34 as "cash from borrower" at the closing of their purchase of the Property. It appears that Nadel used the $68,000 wired from his 489

Account to Cogburn Goosman Brasil & Rose, P.A., on June 9, 2004, to cover the cash owed at closing. The balance of the purchase price was paid with a loan from Branch Banking & Trust Co. ("BB&T"). *See* **Exhibit C**.

31. Both the $5,000 deposit and the additional $68,000 down-payment from the 489 Account are directly traceable to one of the receivership entities, Scoop Capital. According to the ledger for Scoop Capital's bank account with SouthTrust, a check was written on Scoop Capital's account on June 9, 2004 for $85,000, and the check's memo stated, "acquisition of Garren Creek NC house." Also according to the ledger, that check was made payable to Nadel and his wife. The statement for the 489 Account covering the June 2004 period shows the $85,000 check from Scoop Capital relating to the purchase of the Property was deposited in Nadel's 489 Account. *See* **Exhibit E** at 1.

32. According to documents located in the Office and obtained from financial institutions to date, Nadel and Mrs. Nadel have used funds from a Northern Trust bank account titled in his and his wife's names to pay the mortgage on the Property. Specifically, according to the account ledger, Nadel and Mrs. Nadel have made at least the following payments from the Northern Trust account for the mortgage on the Property:

| Date | Payee | Memo | Amount |
|---|---|---|---|
| 07/24/2004 | BB&T Mortgage | | $1,377.89 |
| 09/01/2004 | BB&T Mortgage | | $1,377.89 |
| 10/01/2004 | BB&T Mortgage | | $1,377.89 |
| 11/01/2004 | BB&T Mortgage | | $1,377.89 |
| 01/04/2005 | BB&T Mortgage | | $1,377.89 |
| 02/02/2005 | BB&T Mortgage | Garren Creek | $1,377.89 |
| 03/02/2005 | BB&T Mortgage | | $1,377.89 |
| 04/04/2005 | BB&T Mortgage | | $1,377.89 |
| 05/03/2005 | BB&T Mortgage | | $1,377.89 |
| 06/02/2005 | BB&T Mortgage | Garren Creek | $1,377.89 |

| Date | Payee | Memo | Amount |
|---|---|---|---|
| 07/01/2005 | BB&T Mortgage | Garren Creek | $1,377.89 |
| 08/02/2005 | BB&T Mortgage | | $1,377.89 |
| 09/02/2005 | BB&T Mortgage | Garren Creek | $1,377.89 |
| 10/04/2005 | BB&T Mortgage | | $1,377.89 |
| 11/01/2005 | BB&T Mortgage | | $1,377.89 |
| 12/02/2005 | BB&T Mortgage | Garren Creek | $1,377.89 |
| 01/04/2006 | BB&T Mortgage | | $1,377.89 |
| 02/02/2006 | BB&T Mortgage | | $1,377.89 |
| 03/02/2006 | BB&T Mortgage | March Payment | $1,377.89 |
| 04/04/2006 | BB&T Mortgage | April Payment | $1,377.89 |
| 05/02/2006 | BB&T Mortgage | May Payment | $1,377.89 |
| 06/02/2006 | BB&T Mortgage | June Payment | $1,377.89 |
| 07/06/2006 | BB&T Mortgage | July Payment | $1,377.89 |
| 08/02/2006 | BB&T Mortgage | Aug. Payment | $1,377.89 |
| 09/05/2006 | BB&T Mortgage | Sept. Payment | $1,377.89 |
| 10/03/2006 | BB&T Mortgage | Oct. Payment | $1,377.89 |
| 11/02/2006 | BB&T Mortgage | Nov. Payment | $1,377.89 |
| 12/05/2006 | BB&T Mortgage | Dec. Payment | $1,377.89 |
| 01/03/2007 | BB&T Mortgage | Jan. 2007 Payment | $1,377.89 |
| 02/02/2007 | BB&T Mortgage | Feb. 2007 Payment | $1,377.89 |
| 03/02/2007 | BB&T Mortgage | March 2007 Payment | $1,377.89 |
| 04/02/2007 | BB&T Mortgage | April 2007 Payment | $1,377.89 |
| 05/02/2007 | BB&T Mortgage | May Payment | $1,377.89 |
| 06/04/2007 | BB&T Mortgage | June Payment | $1,377.89 |
| 07/03/2007 | BB&T Mortgage | July Payment | $1,377.89 |
| 08/02/2007 | BB&T Mortgage | Aug. Payment | $1,690.12 |
| 09/05/2007 | BB&T Mortgage | Sept. Payment | $1,690.12 |
| 10/02/2007 | BB&T Mortgage | Oct. Payment | $1,690.12 |
| 11/02/2007 | BB&T Mortgage | Nov. Payment | $1,690.12 |
| 12/04/2007 | BB&T Mortgage | Dec. Payment | $1,690.12 |
| 01/03/2008 | BB&T Mortgage | Jan. Payment | $1,690.12 |
| 02/04/2008 | BB&T Mortgage | Feb. Payment | $1,690.12 |
| 03/04/2008 | BB&T Mortgage | March Payment | $1,690.12 |
| 04/02/2008 | BB&T Mortgage | April Payment | $1,690.12 |
| 05/02/2008 | BB&T Mortgage | May Payment | $1,690.12 |
| 06/02/2008 | BB&T Mortgage | June Payment | $1,690.12 |
| 07/01/2008 | BB&T Mortgage | July Payment | $1,690.12 |
| 08/01/2008 | BB&T Mortgage | Aug. Payment | $1,496.16 |
| 09/01/2008 | BB&T Mortgage | Sept. Payment | $1,496.16 |
| 10/02/2008 | BB&T Mortgage | Oct. Payment | $1,496.16 |
| 11/04/2008 | BB&T Mortgage | Nov. Payment | $1,496.16 |

| 12/01/2008 | BB&T Mortgage | Dec. Payment | $1,496.16 |
|---|---|---|---|
| | | **Total:** | **$77,366.28** |

33. For the period during which payments on the mortgage were being made, the records we have reviewed show that at least $80,000 was deposited into that Northern Trust bank account directly from Scoop Capital or Scoop Management, and additional money was transferred into it from other accounts controlled by the Nadels in which money from Scoop Capital or Scoop Management had been deposited.

34. At all times during these transactions, Nadel was perpetrating his scheme, and essentially all of the Nadels' income was derived from that scheme.

35. Thus, the information in our possession indicates that the purchase of the Property and payment of the Property's mortgage were funded with proceeds of Nadel's scheme.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief and is executed this 27th day of March, 2009.

_____
Burton W. Wiand, as Receiver
c/o FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd.
Suite 1700
Tampa, FL 33602
Tel. 813.228.7411
Fax 813.229.8313
bwiand@fowlerwhite.com