**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.                                                    Case No. 8:09-cv-0087-T-26TBM

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.

        Defendants,

SCOOP REAL ESTATE, L.P.
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.
VICTORY IRA FUND, LTD,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT,

        Relief Defendants.
_____/

**THE RECEIVER'S SECOND INTERIM REPORT**

**I.**    **Introduction**

      Burton W. Wiand, the Court-appointed Receiver for (a) Defendants Scoop Capital,

LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") (which, along

with Arthur Nadel, are collectively referred to as "Defendants"); (b) Relief Defendants Scoop

Real Estate, L.P.; Valhalla Investment Partners, L.P.; Victory IRA Fund, Ltd.; Victory Fund,

Ltd.; Viking IRA Fund, LLC; and Viking Fund LLC (collectively referred to as the "Hedge

Funds");[1] (c) Relief Defendants Valhalla Management, Inc. and Viking Management (which, along with Scoop Capital and Scoop Management, are collectively referred to as the "Investment Managers"); and (d) Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; Laurel Mountain Preserve Homeowners Association, Inc.; Marguerite J. Nadel Revocable Trust UAD 8/2/07; Guy-Nadel Foundation, Inc.; Lime Avenue Enterprises, LLC; and A Victorian Garden Florist, LLC (all of the foregoing are collectively referred to as the "Receivership Entities"), hereby files this Second Interim Report in order to inform the Court, the investors, and others interested in the Receivership Entities of activities to date, as well as the proposed course of action.[2]

The Receiver was appointed on January 21, 2009. By January 26, 2009, the Receiver established an informational website www.nadelreceivership.com. The Receiver has updated this website periodically and continues to update it with the Receiver's most significant actions to date; important court filings in this proceeding; and other news that might be of interest to the public. This Second Interim Report, as well as all previous and subsequent reports, will be posted on the Receiver's website.

## II.     Procedural Background

On or about January 14, 2009, Arthur Nadel ("Nadel"), the Hedge Funds' principal investment advisor and the sole officer and director of Scoop Management and sole

---

[1] While these funds are referred to as hedge funds in this report, the Receiver's investigation has raised serious questions as to whether they were ever operated as legitimate investment vehicles.

[2] This Second Interim Report is intended to report on information and activity from March 24, 2009, through May 15, 2009. Thus, unless otherwise indicated, the information reported herein reflects the information in the Receiver's possession as of May 15, 2009.

managing member of Scoop Capital, fled Sarasota county and disappeared for nearly two weeks. On January 21, 2009, the Securities and Exchange Commission (the "SEC" or "Commission") filed a complaint in the United States District Court for the Middle District of Florida charging the Defendants with violations of the federal securities laws (the "SEC Action"). The Commission alleges that Nadel used the Investment Managers to defraud investors in the Hedge Funds from at least January 2008 forward by "massively" overstating investment returns and the value of fund assets to investors in these funds and issuing false account statements to investors. The Commission also asserts that Nadel misappropriated investor funds by transferring $1.25 million from Viking IRA Fund and Valhalla Investment Partners to secret bank accounts. The Court found the Commission demonstrated a *prima facie* case that Defendants committed multiple violations of federal securities laws.

The same day the Commission filed its complaint, the Court entered an order appointing Burton W. Wiand as Receiver for the Investment Managers and Relief Defendants (the "Order Appointing Receiver"). (*See generally* Order Appointing Receiver (Doc. 8).)

Also on that same day, on the SEC's motion, the Court entered (i) an Order of Preliminary Injunction and Other Relief as to the Investment Managers and all Relief Defendants (Doc. 7) and (ii) a Temporary Restraining Order and Other Emergency Relief as to Nadel (the "TRO") (Doc. 9). Among other things, these orders enjoined the Defendants and Relief Defendants from further violations of federal securities laws and froze their assets. On February 3, 2009, the Court entered an Order of Preliminary Injunction and Other Relief

as to Nadel (the "February 3 Preliminary Injunction") (Doc. 29), the terms of which are essentially identical to those of the TRO.[3]

On January 27, 2009, on the Receiver's motion, the Court entered an order expanding the scope of the receivership and appointing the Receiver as receiver also over the Venice Jet Center, LLC, and Tradewind, LLC. (*See* Order, Jan. 27, 2009 (Doc. 17).) On February 11, 2009, on the Receiver's motion, the Court entered an order expanding the scope of the receivership and appointing the Receiver as receiver also over Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; and the Laurel Mountain Preserve Homeowners Association, Inc. (*See* Order, Feb. 11, 2009 (Doc. 44).) On March 9, 2009, on the Receiver's motion, the Court entered an order expanding the scope of the receivership and appointing the Receiver as receiver also over the Guy-Nadel Foundation, Inc. (*See* Order, March 9, 2009 (Doc. 68).) On March 17, 2009, on the Receiver's motion, the Court entered an order expanding the scope of the receivership and appointing the Receiver as receiver also over Lime Avenue Enterprises, LLC, and A Victorian Garden Florist. (*See* Amended Order, March 17, 2009 (Doc. 81).)

Pursuant to the Order Appointing Receiver, the Receiver has the duty and authority to: "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants; marshal and safeguard all of the assets of

---

[3] Both the TRO and the February 3 Preliminary Injunction required Nadel to make a sworn accounting to the Court and the Commission of all funds received by him from any of the Defendants or Relief Defendants and a sworn identification of all accounts in which he has an interest or has the power or right to exercise control. (Docs. 9, 29.) In response to these Orders, on March 31, 2009, Nadel submitted a letter asserting his Fifth Amendment right against self-incrimination and refused to provide this information. (Doc. 102.)

the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors." (Order Appointing Receiver at 1-2.)

On January 27, 2009, Nadel surrendered to the FBI in Tampa, Florida. Nadel was arrested and charged with two counts of securities fraud and wire fraud based on the fraudulent investment scheme discussed below. On January 30, 2009, Magistrate Judge Mark Pizzo of the United States District Court for the Middle District of Florida denied Nadel's request for a release on bond awaiting trial, deciding instead that Nadel should remain in jail based on, among other things, a risk of flight. On or about February 2, 2009, Judge Pizzo entered a Detention Order denying bail and a Removal Order requiring that Nadel be transferred to the Metropolitan Correctional Center in New York, New York to await trial. *See U.S. v. Nadel*, (U.S. Dist. Ct. M.D. Fla., Case No. 8:09-mj-01039-MAP (Docs. 5, 6)).

On February 26, 2009, Judge Denise Cote of the United States District Court for the Southern District of New York agreed to release Nadel on $5 million bail, contingent on a number of conditions including $1 million in cash, living restrictions, and specific bond guarantees. Judge Cote also required Nadel to fully and completely cooperate with the SEC. As of the date of this Report, Nadel has not met the conditions for bail and is still being held in the Metropolitan Correctional Center.

On April 28, 2009, Nadel was indicted on six counts of securities fraud, one count of mail fraud, and eight counts of wire fraud. The maximum sentence for each charge is 20 years of imprisonment. On April 30, 2009, Nadel pleaded not guilty to the fifteen charges.

In the SEC Action, on April 6, 2009, Nadel filed his answer and affirmative defenses, in which he denied nearly every allegation in the Complaint and set forth two affirmative defenses. (Doc. 104.) Nadel also purported to set forth a "Counterclaim," which the Court struck on the Receiver's motion. (Docs. 111, 112.)

## III. The Receiver's Role and Responsibilities

The Receiver functions as an independent agent of the court. The United States Supreme Court has explained that:

> [a receiver] . . . is an officer of the court; his appointment is provisional. He is appointed on behalf of all parties, and not of the complainant or of the defendant only. He is appointed for the benefit of all parties who may establish rights in the cause. The money in his hand is *in custodia legis* for whoever can make out a title to it . . . It is the court itself which has the care of the property in dispute. The receiver is but the creature of the court; he has no power except such as are conferred upon him by the order of his appointment and the course and practice of the court.

*Booth v. Clark*, 58 U.S. 322, 331 (1854). Generally, the Receiver is charged by the Court with maximizing investors' and creditors' recoveries. To this end, the Court directed the Receiver to engage in the following activities:

### A. Operating the Business of the Receivership Entities.

The Court granted the Receiver the "full and exclusive power, duty, and authority" to "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants . . . ." (Order Appointing Receiver at 1.)

### B. Taking Possession of Receivership Property.

The Court directed the Receiver to "[t]ake immediate possession of all property, assets and estates of every kind of the Defendants and Relief Defendants, whatsoever and

6

wheresoever, located, belonging to or in the possession of the Defendants and Relief Defendants . . . ." (Order Appointing Receiver ¶ 1.)

## C. Investigating Receivership Affairs and Recovering Funds.

The Court also directed the Receiver to "[i]nvestigate the manner in which the affairs of the Defendants and Relief Defendants were conducted and institute such actions and legal proceedings, for the benefit and on behalf of the Defendants and Relief Defendants and their investors and other creditors as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in the Defendants or Relief Defendants . . . ." (Order Appointing Receiver ¶ 2.)

## D. Reporting on Assets and Liabilities and Implementing Claims Process.

The Court further directed the Receiver to "[p]resent to this Court a report reflecting the existence and value of the assets of the Defendants and Relief Defendants and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Defendants and Relief Defendants." (Order Appointing Receiver ¶ 3.) As contemplated by the Order, the Receiver will ultimately institute a claims process primarily for the benefit of the Receivership Entities' investors who have been defrauded and suffered legitimate losses as a result of the activities of Nadel and others.

## IV. Overview of Preliminary Findings

The Receiver is in the process of reviewing voluminous records from the offices of Receivership Entities, as well as records from more than thirty (30) different institutions,

including banks and brokerage firms. The Receiver also is in the process of obtaining documents from additional third parties. The Receiver has formed some preliminary conclusions based on his review of a portion of the records received. While these conclusions are not final, and may change as the review becomes more complete, the Receiver believes they should be shared with the Court, the investors, and other potentially interested parties.

In the Commission's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief ("SEC's Emergency Motion") (Doc. 2) and supporting papers, the Commission presented evidence showing Nadel defrauded investors through his control of the Hedge Funds' advisers and/or managers, Scoop Capital and Scoop Management. Through the Investment Managers, Nadel, along with Christopher Moody and Neil Moody, were ultimately responsible for controlling the Hedge Funds' investment activities. While the Commission's evidence showed that Nadel defrauded investors since at least January 2008, the Receiver's investigation has uncovered evidence showing that the fraud began at least as early as 2003 and in all likelihood before then.

The Receiver's investigation has revealed that for each Hedge Fund, the Hedge Fund's performance as disclosed to investors from at least 2003 forward was based mainly on trading results that Nadel purported to have in brokerage transactions cleared through Goldman Sachs Group, Inc. (in which money was purportedly traded to generate the purported returns Nadel was paying). The returns reported to investors and potential investors were based on fictitious performance results that were created by Nadel and then

included in a database maintained by Scoop Management. These fictitious performance results formed the basis of gross misrepresentations to investors.

Table 1, below, shows a comparison of actual trading results in the Hedge Funds' Goldman Sachs accounts to the values represented to investors and to distributions paid. Specifically, for each year from 2003 to 2008, the table lists from, left to right, (1) the pertinent year; (2) the amount of gains the Investment Managers represented that the Hedge Funds had achieved that year (identified as "Company Represented Amounts"); (3) the actual combined total gain or loss experienced that year in the accounts for the Hedge Funds (identified as "Hedge Funds"); (4) the difference between what the Investment Managers represented the Hedge Funds had achieved in performance versus the actual trading results in the Goldman Sachs accounts for the Hedge Funds (identified as "Difference"); and (5) the actual distributions paid by the Hedge Funds for the pertinent year, including distributions to investors and management and performance incentive fees paid (identified as "Distributions").

## Table 1

| | Gains/(Losses) | | | |
|---|---|---|---|---|
| Year | Company Represented Amounts | Hedge Funds Actual Amounts (Per Goldman Sachs statements) | Difference | Distributions |
| 2003 | 23,716,749 | 17,237,008 | 6,479,741 | 16,729,147 |
| 2004 | 46,950,345 | 4,637,878 | 42,312,467 | 49,329,387 |
| 2005 | 61,169,058 | 5,739,301 | 55,429,756 | 75,078,840 |
| 2006 | 50,003,778 | (18,549,355) | 68,553,133 | 75,444,122 |
| 2007 | 54,665,571 | (24,989,307) | 79,654,879 | 60,034,321 |
| 2008 | 36,334,794 | (2,493,654) | 38,828,448 | 73,443,310 |
| **Total** | **272,840,295** | **(18,418,129)** | **291,258,424** | **350,059,127** |

As Table 1 shows, for 2003 through 2008, the Hedge Funds' performance as represented to investors was significantly overstated and thus, false. For instance, for the years 2003 to 2008, the Investment Managers represented that the Hedge Funds' trading activity generated more than $272 million in gains when, in reality, the Hedge Funds' investment accounts actually lost approximately $18.4 million. Further, while the Hedge Funds lost approximately $18.4 million for this same period, more than $350 million was paid by the Investment Managers in distributions to investors and to themselves and others as fees. As this table shows, from at least 2003 through 2008, the Investment Managers were making distributions and paying fees that the investment performance of the Hedge Funds never supported. The Investment Managers were also crediting fictitious profits to accounts where the accountholders were not taking distributions. These fictitious profits were likewise unsupported by the Hedge Funds' investment performance and only served to further increase the Hedge Funds' insolvency. This negative cash flow made the eventual collapse of Nadel's enterprise inevitable.

In short, the investment returns and performance as represented to investors were based on grossly overstated performance numbers created by Nadel, and the results reported to investors were fiction. The true results of the trading activity that actually occurred was never included in data reported to investors or potential investors.

Evidence also shows that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, to other Receivership Entities, and to other third parties in the form of management, advisory, and/or profit incentive fees and "finder" fees. As reflected in **Table 2**, below, according to the Hedge Funds' documents from 2003 through

2008, they paid approximately $97,168,122 in total fees. Profit incentive fees were paid to Scoop Management, Viking Management and Valhalla Management (and sometimes split with third parties) based on a percentage of profits that never occurred and thus significantly depleted the Hedge Funds' assets and diverted those assets to Scoop Capital and Scoop Management, which were controlled by Nadel, and to Valhalla Management and Viking Management, which were controlled by Neil and Christopher Moody.

**Table 2**

| Year | Management Fees | Performance Incentive Fees | Total Fees |
|------|-----------------|----------------------------|------------|
| 2003 | 1,521,377 | 5,929,187 | 7,450,565 |
| 2004 | 3,644,188 | 11,737,586 | 15,381,774 |
| 2005 | 5,057,633 | 15,292,264 | 20,349,897 |
| 2006 | 5,756,646 | 12,500,945 | 18,257,590 |
| 2007 | 6,206,972 | 13,666,393 | 19,873,365 |
| 2008 | 6,771,232 | 9,083,698 | 15,854,931 |
| **Total** | **28,958,048** | **68,210,074** | **97,168,122** |

Significant sums from the proceeds of Nadel's scheme also made their way into other accounts controlled by Nadel and/or his wife, Marguerite Nadel. As of December 31, 2008, according to the balance sheet for Scoop Management, Scoop Management had transferred approximately $17,177,896.56 to accounts owned either individually or jointly by the Nadels. These amounts are in addition to the amounts Mrs. Nadel received from Scoop Management as compensation. According to its balance sheet, Scoop Management also transferred approximately $6,433,804.40 to other entities controlled by Nadel. To date, the Receiver has not uncovered any source of income for Nadel or his wife (during the time of Nadel's scheme) that was not in some manner funded with money from that scheme.

Documentation and other information that the Receiver has collected shows that money derived from the scheme was used by Nadel to purchase and/or fund other businesses. The Receiver has expanded the Receivership to include additional businesses controlled by Nadel. *See* discussion of expansion at Section V.B. below.

To date, the Receiver has discovered and identified approximately 371 investors who invested slightly more than $397 million. Based on documentation analyzed to date, it appears that investors have out of pocket losses of approximately $168 million. The Receiver has also discovered that some investors were paid more than their total investments. These overpayments were "fictitious profits." At this time, the Receiver has discovered approximately $53.5 million in such fictitious profits. Further, it appears that, although separately numbered investor accounts were used in communications with investors and brokerage accounts were used for each Hedge Fund, in reality there were not separate funds. Due to the method Nadel used to trade securities, distinctions made between the individual Hedge Funds and between investor "accounts" have little meaning. The documents reviewed reveal that Nadel treated the Hedge Funds as a single source of money regardless of with which Hedge Fund investors purportedly invested. The Receiver has reached the preliminary conclusion based on available research and evidence that investor funds were commingled in Nadel's and the Receivership Entities' accounts.

A.    **Nadel's Trading Activities in the Hedge Funds.**

In the Executive Summaries disseminated to investors, Nadel represented that the Hedge Funds were generating the annual returns reflected in **Table 3**, below, primarily through trading in the quadruple Qs.[4]

**Table 3**

**Fund Performance as Represented in Executive Summaries**

| Year | Valhalla | Victory | Viking | Viking IRA | Victory IRA | Scoop Real Estate |
|---|---|---|---|---|---|---|
| 2002 | 21.59% | 40.93% | 26.98% | 26.88% | N/A | N/A |
| 2003 | 41.57% | 42.52% | 46.42% | 45.23% | 30.43% | N/A |
| 2004 | 28.96% | 30.30% | 30.46% | 29.93% | 32.16% | 48.67% |
| 2005 | 30.19% | 25.90% | 27.40% | 26.36% | 27.31% | 32.14% |
| 2006 | 19.99% | 18.94% | 19.08% | 18.93% | 19.50% | 21.15% |
| 2007 | 19.24% | 19.65% | 20.60% | 20.55% | 20.02% | 21.75% |
| 2008* | 10.97% | 11.82% | 11.43% | 11.52% | 11.72% | 12.31% |

* Results are for an incomplete year.

While Nadel did trade in quadruple-Qs, he did not achieve for the Hedge Funds the amount of returns he represented to investors. Rather, based on the documents the Receiver's financial expert has analyzed to date, the Hedge Funds as a whole lost significant sums from their inception. Specifically, **Table 4**, below, shows the actual account profits and losses for the Hedge Funds for the indicated time.

---

[4] The term "Quadruple Qs" (ticker symbol: QQQQ) refers to the NASDAQ-100 Tracking Stock, an exchange-traded fund ("ETF") listed on the NASDAQ intended to track the NASDAQ index.

**Table 4**

| Account Name | Account Profit/Losses | Overall Annualized Rate of Return |
|---|---|---|
| Scoop Real Estate Ltd. 2/1/04 – 12/31/08 | ($6,637,880) | -33.35% |
| Valhalla Investment Partners, LP 10/01/02 – 12/31/08 | $2,863,875 | 3.98% |
| Viking Fund LLC 3/01/03 – 12/31/08 | ($8,073,752) | -19.40% |
| Viking IRA Fund Ltd. 3/01/03 – 12/31/08 | ($2,053,443) | -24.53% |
| Victory Fund, Ltd. 6/01/02 – 12/31/08 | $1,825,701 | -16.70% |
| Victory Fund, Ltd. 2/01/03 – 8/31/03 | ($66,776) | -18.45% |
| Victory IRA Fund, Ltd. | ($5,941,164) | -18.63% |
| **Hedge Fund Total** | **($18,083,439)** | |

Between 2002 and 2008, the highest annualized rate of return Nadel appears to have achieved was approximately 4%, while the rest of the Hedge Funds experienced annualized returns of -16.70% to -33.25%. While these actual performance numbers demonstrate the disparity between what Nadel and others were claiming the Hedge Funds were achieving and the returns the Hedge Funds were actually achieving, the performance of each individual Hedge Fund is not significant because it appears that Nadel arbitrarily allocated daily results of trading transactions among the Hedge Funds. This activity resulted in the commingling of the Hedge Funds' assets and makes the performance results of each individual Hedge Fund immaterial. In short, Nadel was losing significant sums of money while representing that he was achieving annual returns from 18.93% to 48.67% (for years with full activity).

Further, as shown in **Table 5**, below, while the Hedge Funds' accounts experienced losses, all but one of Nadel's personal accounts and other accounts maintained essentially for

the benefit of Nadel and in the sole control of Nadel (collectively referred to herein as "Nadel's Accounts") experienced significant gains.

**Table 5**

| Account Name | Account Profit/Losses | Overall Annualized Rate of Return |
|---|---|---|
| Scoop Capital LLC 12/01/04 – 12/31/08 | $11,331,464 | 49.37% |
| Scoop Management 10/01/02 – 12/31/08 | $737,141 | 36.72% |
| Arthur Nadel 6/01/02 – 10/31/08 | $10,781,029 | 71.62% |
| Marguerite Nadel 8/01/07 – 1/30/09 | $10,033 | -15.49% |
| **Non-Fund Total** | **$22,859,667** | |

The trading activity in the Hedge Funds' accounts and Nadel's Accounts appears to have been essentially the same, and trading in those accounts was done concurrently. Virtually all trading allocated to every account was in quadruple-Qs. Given the dramatic differences in trading results in Nadel's accounts as compared to the Hedge Funds' accounts and preliminary information received by the Receiver concerning Nadel's trading practices, the Receiver believes that this evidence may indicate that Nadel engaged in a fraudulent practice known as "cherry picking." In cherry picking, the trader allocates profitable trades to himself and unprofitable trades to clients. *See, e.g.*, *S.E.C. v. K.W. Brown and Co.*, 555 F. Supp. 2d 1275, 1302-1307 (S.D. Fla. 2007) (holding that "cherry-picking" day-trading scheme operated by officers constituted scheme to defraud under Securities Exchange Act). Analysis of the trading activity and cash flows is ongoing. However, in light of the fact that Nadel traded the same investments for all Hedge Funds and the accounts he owned and/or controlled for his benefit and that there was a wide disparity between the results allocated to

the Hedge Funds' accounts and those allocated to Nadel's Accounts, there is no apparent logical explanation other than the improper diversion of profitable transactions by Nadel.

### B. Funds Located by the Receiver.

#### 1. Funds at Inception of Receivership.

At the outset of the Receivership, approximately $556,758.33 in cash and cash equivalents in financial accounts titled in the name of the Hedge Funds and Investment Managers (which include Scoop Management, Scoop Capital, Valhalla Management, and Victory Management) had been identified and frozen pursuant to the Court's TRO and Preliminary Injunction Orders. In addition, cash and cash equivalents in financial accounts titled in the name of other Receivership Entities[5] at the time the entities were brought into receivership were approximately $556,654.72. Thus, total cash and cash equivalents at the inception of the Receivership and as the Receivership was expanded to include each additional Receivership Entity indicated was approximately $1,113,413.05.[6]

#### 2. Additional Funds Located.

One of the Receiver's highest priorities is to locate and recover any additional funds. The Receiver has retained a forensic accounting firm to assist in tracing funds. As of the date

---

[5] These other Receivership Entities include Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; and the Marguerite J. Nadel Revocable Trust UAD 8/2/2007.

[6] This amount does not include any sum for non-cash or non-cash equivalent assets the Receiver has recovered. For a discussion of these assets, please refer to Sections V.B. & V.D. below.

of this report, the Receiver has also identified and recovered $120,000.[7] Also, on April 29, 2009, the Court granted the Receiver exclusive interest in a note and mortgage for a condominium located in Sarasota, Florida. The condominium's owner, an employee of one of the Receivership Entities (see Section V.B.6, below), had executed a promissory note payable to Mrs. Nadel for $126,556.24. The note was secured by a mortgage held by Mrs. Nadel. On February 9, 2009, Mrs. Nadel had assigned the note and mortgage to Nadel's criminal-defense attorneys, Cohen, Jayson & Foster, P.A. The principal balance due under the note is $124,637.64, with $5,457.66 due in outstanding interest.

The Receiver will continue to diligently investigate, and will update the Court and the investors if additional funds are located.

### 3.    Business and Miscellaneous Income and Interest.

From March 1, 2009 through April 30, 2009, the Receiver received $579,205.43 in business income from ongoing operations of some Receivership Entities, $18,056.53 in interest/dividend income, and $2,582.18 in miscellaneous income.

### 4.    Profiteer Settlements.

In April 2009, the Receiver sent letters to 85 investors, each of whom, according to the records in the Receiver's possession, made "fictitious profits" by receiving monies from the Hedge Funds in an amount that exceeded his or her investments (the "Profiteers"). With the SEC's approval, the Receiver offered to settle with each such investor for payment by the

---

[7] This amount is comprised of two $60,000 payments the Receiver recovered from two individuals. The Receiver determined that the transfers made to these individuals in the amount of $60,000 each were an improper diversion of investor funds and obtained court orders to recover these funds.

investor of 90% of his or her fictitious profits.[8] Collectively, if accepted, these settlements would yield $14,586,005.14. As of May 15, 2009, the Court has approved five profiteer settlements totaling $683,778.64. Settlement discussions with other profiteers are ongoing. The Receiver continues to work to identify additional profiteers and intends to send settlement offers to additional profiteers in the near future.

## V.    **Actions Taken By the Receiver.**

Since his appointment on January 21, 2009, the Receiver has taken a number of steps to fulfill his mandates under the Order Appointing Receiver.

### A.    **Taking possession of Receivership Property.**

#### 1.    **Physical premises and tangible assets.**

On the day of his appointment, the Receiver took possession of the Receivership Entities' offices at 1618 Main Street, Sarasota, FL 34236 (the "Office"). The Office was used by Nadel as the headquarters for administering his control of the Receivership Entities. The Receiver secured the premises by changing the locks and inventoried all of the physical property at the premises. The Receiver has provided change of address notifications to the United States Postal Service and Federal Express, as well as all known service providers to the Receivership Entities.

Since the filing of the last Interim Report, the Receiver ended the Office's lease; turned over the keys; and sold the office furniture and other items for $3,500.00. All of the documents from the Office have been moved to the Tampa offices of Fowler White Boggs P.A. The Receiver also removed several servers and computer-related equipment from the

---

[8] See Section V.D.1 below, regarding litigation against profiteers.

18

premises that were used by the Receivership Entities and Mr. Nadel. The Receiver retained experienced forensic information technology experts with the firm E-Hounds, Inc., to assist in securing and analyzing the electronic data on the computers. E-Hounds personnel have secured the data and are underway in their forensic analysis.

Since obtaining control of the Receivership Entities, the Receiver and his professionals have had discussions – including continuing discussions – with a number of people associated with Nadel and/or the Receivership Entities, including officers of some of the Receivership Entities and persons responsible for maintaining the financial books of Receivership Entities, for operating the business of Receivership Entities, for performing accounting services, and for administering the Hedge Funds.

The Receiver and his professionals have also reviewed documents located in the Office; documents obtained from the accountant for one or more Receivership Entities; information stored on the Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's businesses with their transactions; and information available in the public record.

**B.     Expansion of the Receivership.**

As a result of the review of these records and of the discussions noted above, the Receiver sought and successfully obtained the expansion of the Receivership to include: Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; Laurel Mountain Preserve Homeowners Association, Inc.; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; the Guy-Nadel Foundation, Inc.; Lime Avenue Enterprises,

LLC; and A Victorian Garden Florist, LLC. The Receiver's investigation revealed that Nadel had control and/or a full or partial interest in these additional businesses and that they were purchased and/or funded with money derived from Nadel's fraudulent investment scheme. Further, by virtue of Scoop Capital's ownership interest in Home Front Homes, LLC and Summer Place Development Corporation the Receiver also has control of these entities but, for various reasons, a formal order expanding the Receivership to include Home Front Homes or Summer Place Development has not been sought.

The following discussion of these entities includes a description of assets the Receiver has acquired as a result of their inclusion in the Receivership. Where possible the Receiver has included estimated values of these assets. However, given the state of the U.S. economy at the time of this Report, it is important to note that any such estimations, valuations or appraisals are subject to change. In particular, due to the poor state of the real estate markets, the estimates provided may differ markedly from the actual amounts realized upon the selling of any real property.

### 1. Venice Jet Center, LLC.

Venice Jet Center, LLC ("VJC"), is a Florida limited liability company formed in April 2006. Its principal address is the Office, and Nadel was its registered agent and the managing member. The assets of VJC were purchased with proceeds of Nadel's scheme, and over time additional proceeds of the scheme were transferred to VJC. VJC is a viable business with potential to generate assets for the Receivership estate.

On January 27, 2009, the Court expanded the Receivership to include VJC. VJC is a fully operating fixed-base operator, or "FBO," business. It includes a flight school, fueling

service, hangar rentals, and a café. Since the Receiver's appointment as Receiver of VJC, he has taken control of it and is continuing to operate the business. The Receiver is continuing VJC's longstanding pursuit of a permit to build new hangers at the VJC. The Receiver believes that the permit to build more hangars, which was requested well before the Receiver's appointment, will make the VJC more attractive to potential purchasers and ultimately increase the value of the business.

The Receiver has possession and control of a building owned by VJC located at 400 Airport Avenue East, Venice, Florida, 34285 (the "VJC Building"). The VJC Building has one known encumbrance: a loan with Northern Trust Bank, N.A., on which there is a remaining balance of $1,963,790.00.

The Receiver has encountered some problems in connection with the ongoing management of the VJC. The City of Venice (the "City"), in contravention of its lease and specific direction from the Federal Aviation Authority ("FAA"), has refused to grant VJC authorization to develop four hangars at the VJC facility. The City officials have publicly announced their intent to terminate the VJC lease with the City and take over VJC's operations. The Receiver intends to vigorously resist any unwarranted interference by the City with what appears to be a substantial and valuable property right of VJC (and of the Receivership estate). On May 14, 2009, the Court granted the Receiver's request for leave to file a complaint against the City of Venice pursuant to Title 14 of the Code of Federal Regulations, Part 16. (Doc. 132.) As of the date of filing this Report, the City has not yet voted on whether it intends to further resist the development of the hangars at the VJC.

The Receiver estimates VJC has significant value in excess of the funds owed to Northern Trust. However, this value is subject to change depending on the resolution of the hangar permit issue. The Receiver has received significant interest in the purchase of VJC and continues to actively marketing the business. Parties interested in marketing or purchasing this property should contact the Receiver directly.

### 2. Tradewind, LLC.

The information reviewed to date shows that Nadel was also the managing member of Tradewind, LLC ("Tradewind"). Tradewind was formed in Delaware in January 2004, and registered for the first time in Florida in March 2008. Nadel was Tradewind's managing member and its registered agent, and Tradewind's principal address was the Office. The Receiver discovered that Tradewind owned and controlled five planes and one helicopter. Tradewind also owns 31 airport hangars at the Newnan-Coweta County Airport in Georgia (the "Georgia Hangars"). The Receiver's investigation revealed that Tradewind was funded with money from Nadel's scheme. Similar to VJC, Tradewind appears to be a viable business with potential to generate assets for the Receivership estate.

On January 27, 2009, the Court expanded the Receivership to include Tradewind. Tradewind is a fully operating business. Since the Receiver's appointment as Receiver of Tradewind, he has taken control of it and is continuing to operate the business. Tradewind collects approximately $28,000 in monthly rent (mainly from the hangars) and incurs varying monthly expenses, which include land rent, loan payments, payroll, and various utilities. The Receiver is entertaining offers to purchase this business or any of its assets.

The Receiver has possession and control of the Georgia Hangars. The Georgia Hangars have one known encumbrance: a loan with the Bank of Coweta with a remaining balance of approximately $958,265.79, and monthly payments of $8,055. There is also monthly rent of $3,079.89 due to the Newnan Coweta Aviation Authority. The Receiver has been making these monthly payments as he believes they are in the best interest of the Receivership.

The Receiver also gained possession and control of the five planes and helicopter. The following table shows the year, model, and known encumbrances relating to each aircraft.

**Aircraft in Receiver's Possession**

| Model | Year | Type of Aircraft | Known Encumbrance |
|-------|------|------------------|-------------------|
| Piper PA-28/140 | 1971 | Airplane | None. |
| Cessna 152 | 1978 | Airplane | None. |
| Learjet 31A | 1996 | Airplane | Loan with General Electric Capital Corporation ("GECC") entered into on May 17, 2006, for approximately $2.4 million. |
| Citation | 1992 | Airplane | Loan with VFS Financing, Inc. ("VFS") entered into on May 23, 2008, for approximately $2.1 million |
| Baron | 1977 | Airplane | None. |
| Schweizer 300 | 1997 | Helicopter | None. |

On April 17, 2009, the Court authorized the sale of the Schweizer helicopter for $200,000.00. (Doc. 108.) On May 1, 2009, the Court authorized the Receiver's settlements with GECC and VFS to dispose of the Learjet and the Citation, respectively, in full satisfaction of the respective loans. (Doc. 119.) Because it appeared that the aircraft were

valued significantly less than the amount of the loans on the aircraft, the Receiver determined that these settlements were in the best interest of the receivership. The Receiver is currently evaluating the value of the other three aircraft and determining the appropriate method of their disposition.

### 3. Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; and Laurel Mountain Preserve Homeowners Association, Inc.

The Receiver's investigation revealed that Laurel Mountain Preserve, LLC ("Laurel Mountain"), was a North Carolina limited liability company formed in or about December 2003. Laurel Mountain was "withdrawn" as a limited liability company in January 2006. Its principal address was the Office, and its manager and member was Nadel. Laurel Preserve, LLC ("Laurel Preserve"), was formed as a North Carolina limited liability company in February 2006. Its principal address was the Office, Nadel was its registered agent, and the "Registered Office" address was a home in Fairview, North Carolina titled in the names of Nadel and his wife. The manager was Nadel, and although Laurel Preserve's 2006 Operating Agreement identifies Nadel and his wife as members of Laurel Preserve with each having made a "capital contribution" of $750, the Laurel Preserve 2007 federal income tax return identifies Scoop Capital as owner of 100% of Laurel Preserve.

Laurel Mountain Preserve Homeowners Association, Inc. (the "HOA"), is a North Carolina non-profit corporation formed in March 2006. Its principal address was the Fairview, North Carolina home, and its registered agent was Nadel.

Documentation reviewed and information obtained by the Receiver showed that Laurel Preserve holds title to approximately 420 acres near Asheville, North Carolina in Buncombe and McDowell counties, intended for development of home-sites (the "Laurel

Mountain Property"). The Laurel Mountain Property was originally purchased by Laurel Mountain in 2003 and then "sold" to Laurel Preserve in February 2006. Laurel Mountain provided financing for that purchase in the form of a $2,900,000 loan to Laurel Preserve.

According to documentation retrieved from the Office, Laurel Mountain and Laurel Preserve received significant funding in the form of "loans" from Scoop Capital, Scoop Management, Tradewind, Nadel and Mrs. Nadel and BB&T Bank. On February 11, 2009, the Court expanded the Receivership to include Laurel Mountain, Laurel Preserve, and the HOA. Since the Receiver's appointment as Receiver of these entities, he has taken control of them and is working on marketing for sale the Laurel Mountain Property. This property currently does not generate any income.

The Laurel Mountain Property encompasses 29 lots, including 23 estate-sized and 6 cottage-sized lots. There is also a cabin on this property that, according to the Buncombe County Property Appraiser, is valued at $319,800. The Laurel Mountain Property is fully developed: infrastructure and utilities are currently in place and are fully functional.

The Laurel Mountain Property has three known encumbrances. The first encumbrance is a $360,157.37 loan from BB&T Bank. The second encumbrance is a $1,900,000 interest only loan from Wachovia Bank, N.A. There is a monthly payment of $5,149.66 due on this latter loan and the Receiver presently is not making payments on this loan. The third encumbrance is an easement of approximately 169 acres of the Laurel Mountain Property, which was granted to a land conservancy in 2005. It appears that this donation was made in part for the Nadels' own tax benefit. The Receiver is contemplating

whether it would be in the best interests of the Receivership to seek to recover this easement from the conservancy as it may create an exponential increase in the value of the full acreage.

The Receiver has consulted with a realtor who previously listed the property and is entertaining offers to purchase or proposals to market this developed property either by lot or in its entirety. The Receiver is still evaluating the current value of this property, but it appears that the value is higher than the amount of the encumbrances. For more information regarding this property, please refer to http://www.laurelmountainpreserve.com/. Parties interested in marketing or purchasing this property should contact the Receiver directly.

### 4.     Marguerite J. Nadel Revocable Trust UAD 8/2/2007.

The Marguerite J. Nadel Revocable Trust Under Agreement Dated 8/2/2007 (the "Trust") was created on August 2, 2007. The trustee is identified as Mrs. Nadel. The Receiver's investigation revealed that the Trust was funded entirely with proceeds of Nadel's scheme through (1) a transfer of $500,000 from Scoop Management in August 2007 and (2) a transfer of $150,000 from Scoop Capital on the day before Nadel fled. It also revealed that Nadel controlled the account in which the money held by the Trust purchased and sold securities. Significantly, as alleged in the criminal complaint against Nadel, in an apparent note Nadel left for his wife before fleeing, he instructed her to "use the trust (yours) to your benefit as much and as soon as possible." *United States v. Nadel*, Case No. 09 MAG 169 (S.D.N.Y.), Compl. ¶ 17, attached as Exhibit 14 to the Receiver's Declaration in Support of Second Unopposed Motion to Expand receivership (Doc. 37-15).

Since the Receiver's appointment as Receiver of this Trust, he has taken control of the bank account owned by the Trust. Currently, there is approximately $381,142.34 remaining in this account.

### 5. Guy-Nadel Foundation, Inc.

The Guy-Nadel Foundation, Inc. (the "Foundation"), is a Florida non-profit corporation formed in December 2003 for "charitable, educational and scientific purposes." Nadel was the Foundation's incorporator and its registered agent. Further, according to its 2006 federal tax return, the Foundation's President is Nadel. The Foundation's current principal address is the Office.

The Receiver has gathered information that indicates the Foundation was funded with proceeds of Nadel's scheme, which were transferred directly from Scoop Capital or indirectly through transfers from the Nadels' personal accounts. In addition, in December 2003 and December 2004, the Foundation was deeded approximately 22 lots located in North Carolina from Laurel Mountain and Nadel and his wife. These lots are essentially adjacent to each other. The lots appear to have been purchased by Laurel Mountain and the Nadels as part of the same general transaction in which Laurel Mountain purchased the Laurel Mountain Property. At the time of those transactions, Nadel was already perpetrating his scheme, and essentially all of the Nadels' income was derived from that scheme.

Additionally, the Receiver has possession and control of two small parcels of unimproved land in Thomasville, Georgia (this land is separate from the Thomasville Property discussed in section V.D.1.a, below) owned by the Foundation. According to the Thomas County Tax Assessor's Office, one of the parcels is approximately 1.17 acres with a

land value of $30,762 and a free-standing garage with a value of $3,928. The other parcel is .12 acres with a land value of $4,276.

On March 9, 2009, the Court expanded the Receivership to include the Foundation. Since the Receiver's appointment as Receiver of the Foundation, he has taken control of it and is working on marketing the real property owned by the Foundation.

### 6. Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC.

Lime Avenue Enterprises, LLC ("Lime") is a Florida limited liability company formed in August 2006 for "any and all lawful business." Lime owns a building located at 599 North Lime Avenue, Sarasota, Florida 34237 (the "Lime Building"). Lime purchased the Lime Building in August 2006. Public records and other information reviewed by the Receiver indicate that Lime was formed by the Nadels for the specific purpose of purchasing the Lime Building. The Lime Building houses a flower shop, which is owned by A Victorian Garden Florist, LLC ("Victorian Garden"), a Florida limited liability company formed in April 2005. The Receiver's investigation revealed that Lime and Victorian Garden were funded with proceeds from Nadel's scheme.

On March 17, 2009, the Court expanded the Receivership to include Lime and Victorian Garden. Since the Receiver's appointment as Receiver of these entities, he has taken control of them and is working on reviewing their books and records and determining the most prudent course of action to take. In that regard, the Receiver is evaluating whether the flower shop's operations are profitable and whether it is in the best interest of the Receivership estate to maintain ownership of this business.

The Receiver has possession and control of the Lime Building. The Lime Building has one known encumbrance: a mortgage owed to the individuals who sold the building to Lime on which the balance is approximately $600,000. The Receiver is presently attempting to determine the value of this property. The Receiver also has possession and control of two vans owned by Lime: a 1999 Ford van and a 2003 Dodge van. The Receiver does not have any estimation of value of these vans at this time. There are no known encumbrances on these vans.

### 7.    Home Front Homes, LLC.

Home Front Homes, LLC ("Home Front Homes") is a Florida limited-liability company that was formed in 2006 for the purpose of "any and all lawful business." The Receiver has not sought a formal order expanding the Receivership to include Home Front Homes. However, as of April 15, 2008, Nadel was the sole managing member of Home Front Homes, and Scoop Capital owns a majority equity interest in Home Front Homes. By virtue of this controlling interest, the Receiver has assumed control over Home Front Homes and is directing the operation of that company for the benefit of the Receivership estate.[9]

---

[9] On behalf of Home Front Homes, the Receiver initiated a lawsuit against Brian C. Bishop, a former employee who also had an ownership interest in Home Front Homes. Home Front Homes sued Mr. Bishop for breach of non-compete covenants in his employment agreement and of a purchase agreement (wherein Home Front Homes purchased the assets, goodwill, and customers of Mr. Bishop's company, Home Front, Inc.), as well as breach of a promissory note and tortious interference with a business relationship. Since ending his employment with Home Front Homes, Mr. Bishop had started a competing business in direct violation of his non-compete agreement and had solicited Home Front Homes customers. The Receiver, through Home Front Homes, instituted this litigation to preserve the value of Home Front Homes for the Receivership estate.

(footnote cont'd)

Home Front Homes is engaged in the business of manufacturing, marketing, and selling energy-efficient homes. Home Front Homes is an operating business. The Receiver intends to sell Scoop Capital's equity interest in this entity in a manner which would be most beneficial to the Receivership estate. To date, the Receiver has not sought to bring this business as a whole into the Receivership and likely will not do so absent a necessity to protect the operation from creditors while the business or the Receiver's interest therein is being sold. The Receiver is currently negotiating the sale of the receivership's interest in this business. If a transaction is confirmed, the Receiver will apply to the Court for approval of the sale of the Receiver's interest. Parties interested in marketing or purchasing this business should contact the Receiver directly.

### 8. Summer Place Development Corporation.

Summer Place Development Corporation ("Summer Place") is a Florida company that was formed in 2005 for the purpose of "any and all lawful business." The Receiver has not sought a formal order expanding the Receivership to include Summer Place. However, as of January 20, 2007, Nadel was a managing member of Summer Place, and Scoop Capital owns a fifty-percent interest in Summer Place. By virtue of this fifty-percent interest, the Receiver has not assumed full control over Summer Place, but is working with the other managing member and fifty-percent owner in directing the operation of Summer Place for the benefit of the Receivership estate.

---

This matter has been settled and the litigation is no longer pending. Mr. Bishop was asked to comply with the restrictive covenants, and the company forgave certain purported debt owed from Mr. Bishop to Home Front Homes, which debt appeared uncollectible.

Summer Place is the owner of a proposed affordable residential housing development site in Manatee County, Florida. Summer Place is an operating business. The Receiver intends to sell Scoop Capital's equity interest in this entity in a manner which would be most beneficial to the Receivership estate. Parties interested in marketing or purchasing this business should contact the Receiver directly.

### C.  Securing Receivership Funds.

Upon his appointment, the Receiver was initially concerned that the Receivership Entities might hold positions in volatile securities that would require an exit strategy to avoid or minimize losses. The Receiver immediately investigated the nature of the Receivership's holdings and determined that no such exit strategies were required because almost all of the relatively liquid holdings were in cash or cash equivalents.[10]

The Receiver coordinated with the SEC to move swiftly to freeze all funds of which they were aware. The Receiver and his attorneys engaged in a preliminary review of documents and other information for the purpose of identifying institutions that potentially held relevant financial accounts or lines of credit. The Receiver immediately forwarded copies of the asset freeze orders to the pertinent institutions and confirmed that they understood their obligations under the freeze orders.

Receivership funds are currently being held in six different institutions: (1) Northern Trust Bank, N.A.; (2) Wachovia Bank, N.A.; (3) Shoreline Trading Group, LLC; (4) Branch Banking and Trust Company ("BB&T"); (5) Bank of Coweta; and (6) Thomasville National Bank. VJC also maintains an insignificant amount of funds in a small operating account with

---

[10] *See* Section V.D.2.b. *infra* for a discussion of the Receivership estate's securities holdings.

Bank of America.  Attached as Exhibit A to this Interim Report is a cash accounting report showing the amount of money on hand at inception of the Receivership (January 21, 2009) less operating expenses plus revenue through April 30, 2009.  This cash accounting report does not reflect non-cash or non-cash equivalent assets.  Thus, the value of all property discussed in Section V.B. above and Section V.D. below is not included in this report.  All Receivership funds are currently being held in non-interest bearing accounts.  The Receiver is contemplating the most appropriate action to take with respect to these funds in light of the current state of the economy and financial institutions.  He will likely consolidate the funds into one to three institutions and will explore the relative benefits and risks of moving the funds into interest-bearing accounts and/or revenue-generating investments.

### D.    Other Assets Recovered.

In addition to the assets discussed in conjunction with the expansion of the Receivership in section V.B. above, the Receiver has also recovered a number of other assets, most of which are in the process of being valued, assessed, and otherwise analyzed for liquidation, disposition, or other action.  Again, given the state of the U.S. economy at the time of submission of this Report, the Receiver emphasizes that any estimates, appraisals, or valuations are subject to change because of market forces.  In particular, due to the poor state of the real estate markets, the estimates provided in section V.D.1 below may be significantly different from the amounts realized upon selling such real property.

1.      **Real Property.**

      a.      **Thomasville, Georgia.**

The Receiver has possession and control of approximately 14 acres in Thomasville, Georgia (the "Thomasville Property"). The Thomasville Property encompasses 45 lots, 44 of which are vacant. A home on one of the Thomasville Property lots was built by Home Front Homes. After its purchase, approximately $750,000 of infrastructure was added to the Thomasville Property. The Thomasville Property is fully developed: infrastructure and utilities are currently in place and are fully functional. First Realty & Appraisal Services, Inc., prepared appraisal reports of two lots on the Thomasville Property. As of February 5, 2009, the lot with the home on it was valued at $123,500. Also as of February 5, 2009, a vacant lot on the Thomasville Property was valued at $14,000.

The Thomasville Property has two known encumbrances. The first encumbrance is a $600,000 loan, on which a $571,816 balance is due. All interest has been paid for the year 2008, and no interest is due until December 2009. The second encumbrance is a loan for $141,366 for the construction of the house. Both of these loans mature in December 2009. The Thomasville Property currently is not generating any income.

The Thomasville Property is ready for sale with 45 lots having all utilities, roads, and other improvements. RE/MAX of Thomasville had previously listed the property on its website. The Receiver is presently determining the appropriate method and agents to use to market this property. Parties interested in marketing or purchasing this property should contact the Receiver directly.

### b.  Grady County, Georgia.

The Receiver very recently was made aware of approximately 37.5 acres owned by Scoop Capital in Grady County, Georgia (the "Grady Property").  According to Grady County public records, the land value of the Grady Property in 2008 was $151,125.  The Receiver is currently determining the best course of action to take regarding this land. Parties interested in marketing or purchasing this property should contact the Receiver directly.

### c.  Graham, North Carolina.[11]

The Receiver has possession and control of a building located at 841 South Main Street, Graham, North Carolina 27253 (the "Rite-Aid Building").  This building was purchased for $2,655,000 and is currently being leased to a Rite-Aid Pharmacy for $33,073.08 per month under an absolute net lease.[12]  The Rite-Aid Building has one known encumbrance: a loan with Wachovia Bank on which there is a remaining balance of approximately $2,655,000.  Parties interested in marketing or purchasing this property should contact the Receiver directly.

---

[11] The properties described in this subsection and the following subsections d, e, and f appear to have been purchased through Scoop Real Estate Fund.  However, in light of the commingling of assets among all Receivership Entities, these properties appear to be appropriately attributed as general assets of the Receivership estate.

[12] Under an "absolute net lease," a tenant is required to pay all operating expenses of the property, and the landlord receives a net rent.

### d.  Raleigh, North Carolina.

The Receiver has possession and control of a building located at 4905 Waters Edge, Raleigh, North Carolina 27060 (the "EDS Building").  This building was purchased for $1,900,000 and is currently being leased to Electronic Data Systems ("EDS"), a technology services provider, for $29,688.54 per month under a double net lease.[13]  The EDS Building has no known encumbrances.  Parties interested in marketing or purchasing this property should contact the Receiver directly.

### e.  Tupelo, Mississippi.

The Receiver has possession and control of a building located at 2433 West Main Street, Tupelo, Mississippi 38801 (the "Starbucks Building").  This building was purchased for $941,000 and is currently being leased to Starbucks (Store #8809) for $5,745.83 per month under an absolute net lease.  The Starbucks Building has no known encumbrances. Parties interested in marketing or purchasing this property should contact the Receiver directly.

### f.  Newnan, Georgia.

The Receiver has possession and control of a gas station located at 5 McCollum Station, Newnan, Georgia 30265 (the "Gas Station").  This gas station was purchased for $2,450,000 and is currently being leased to a Shell Gas franchisee for $10,800 per month. The Gas Station has no known encumbrances.  Parties interested in marketing or purchasing this property should contact the Receiver directly.

---

[13] Under a "double net lease," the tenant pays all taxes and insurance expenses that arise from the use of the property.  The tenant pays rent, and the landlord pays maintenance expenses.

### g.     Fairview, North Carolina.

On March 30, 2009, the Court granted the Receiver's motion (Doc. 98) for possession of property located in Fairview, North Carolina (the "Fairview Property"). (Doc. 100.) On June 14, 2004, Nadel and his wife purchased the Fairview Property for $335,000.00. The Fairview Property was a secondary residence of the Nadels that is located in the mountains of North Carolina near the large property owned by Laurel Preserve, LLC (see Section V.B.3, above). The Fairview Property has one known encumbrance: a loan with BB&T Bank on which there is a remaining balance of approximately $248,560.62  Parties interested in marketing or purchasing this property should contact the Receiver directly.

### 2.     Vehicles and Other Items.

### a.     Vehicles.

The Receiver assumed control of three vehicles: (1) 2008 Mercedes-Benz E63 ("Mercedes"); (2) 2009 Volkswagen EOS ("Volkswagen"); and (3) Maserati Grand Turismo ("Maserati"). These vehicles were used by Neil and Christopher Moody. The Mercedes and Volkswagen were leased by Valhalla Management. Because there was no value to these vehicles and only the continuing obligation of lease payments, the Receiver surrendered them to the leasing company without penalty and without the lessor retaining any claim to Receivership assets. The Maserati was leased by Viking Management. As with the Mercedes and Volkswagen, because there was no value to this vehicle and only the continuing obligation of lease payments, the Receiver surrendered the Maserati to the leasing company without penalty and without the lessor retaining any claim to Receivership assets.

### b. Other Items.

The Receiver has also recovered a myriad of other items that he may be able to sell, including a variety of furniture, fixtures, computers, and miscellaneous supplies. The Receiver will take reasonable efforts to maximize the amount he is able to recover from the possible sale of all of these items.

The Receivership Entities also have a certificate of deposit ("CD") and a promissory note. Northern Trust Bank issued the CD for approximately $1.5 million. There is also a loan with Northern Trust for $1.5 million with a maturity date of December 1, 2011. The Receiver is still reviewing the nature of this loan and its relationship to the CD. The promissory note is from Quest Energy Management and two individuals to Valhalla Investment Partners in the amount of $1,100,000. Interest is being paid on this note.

The Receiver also has two promissory notes that were executed by Valhalla Investment Partners, L.P., and Bonds.com, Inc. ("Bonds.com"). One of the notes is for $400,000.00 with 9% interest secured by the domain name www.bonds.com. Bonds.com paid all of the interest due on this note, and the parties amended and revised the note in the best interest of the Receivership. The $400,000.00 note is due on October 31, 2009, per a six-month extension granted by the Receiver. The other note is for $203,800.00; is due to mature on September 22, 2010; and is still owing and outstanding. The $203,800 note is a convertible note that can be converted into equity fo the company at the Receiver's option.

### E.    Litigation.

#### 1.    False Profits Obtained by Some Investors.

As discussed above in Section IV.B.4, the Receiver has determined that some purported investor accounts received monies in an amount that exceeded their investments. The Receiver intends to seek to recover these fictitious profits and redistribute the funds more equitably among investors holding legitimate and allowed claims.  The Receiver has continued to move toward initiating these "clawback" lawsuits by filing a Motion to Reappoint Receiver (Doc. 139).  That motion was granted on June 3, 2009

#### 2.    Moodys.

From the Receiver's investigation to date, it appears that a significant portion of activities of certain Hedge Funds were managed and directed by Christopher and Neil Moody.  The Receiver believes that the Moodys had fiduciary responsibility with respect to the management of these Hedge Funds.  From the documentation reviewed to date, the Moodys have received millions of dollars as a result of their efforts and participation in Nadel's activities.  The Receiver is preparing to institute appropriate legal action against the Moodys to recover this money and assets that were acquired with this money.

#### 3.    Recipients of Commissions.

Information available to the Receiver reveals that several individuals received commissions in connection with distribution of investments by the Receivership Entities. The Receiver is considering instituting litigation to seek the recovery of all such sums.

#### 4.    Other Litigation.

The Receiver previously has been contacted by the law firm of Johnson, Pope, Bokor, Ruppel & Burns, LLP ("Johnson Pope") regarding the institution of a class action against

Holland & Knight, the law firm that prepared the private placement memoranda used to solicit investors into the Nadel scheme. On March 20, 2009, Johnson Pope on behalf of Michael Sullivan and others similarly situated, instituted a class action suit against Holland & Knight, *Michael Sullivan v. Holland & Knight LLP*, Case No. 09-cv-0531-EAJ (M.D. Fla.). Should Johnson Pope be successful in this litigation it is likely that the claims process created for the Receivership estate for distributions to investors with legitimate and allowed claims will be used to distribute any proceeds.

The Receiver continues to examine the actions of other professionals and businesses that provided services to Receivership Entities to determine whether he needs to take additional steps with respect to any of those professionals and businesses to recover assets for the receivership.

**F.      Investigating Receivership Affairs, and Recovering Receivership Funds.**

The Receiver has retained the services of PDR Certified Public Accountants ("PDR"), forensic accountants, to assist in investigating and analyzing the flow of funds both in and out of the Receivership Entities, and to assist in locating additional funds, if any. The Receiver has also retained the services of Riverside Financial Group ("Riverside"), financial analysts to assist in investigating and analyzing all of the trading activity. In conjunction with the Receiver, PDR and Riverside are further attempting to identify additional individuals and/or entities who may be in possession of Receivership funds. PDR will also assist in determining the amount of each investor's loss.

**VI.    The Next Sixty Days**

The Receiver has received only a portion of the documents he has subpoenaed from third parties. It will be necessary to obtain and review all such documents in order to complete an understanding of the flow of funds through the Receivership Entities, to identify any additional sources of recovery, and to prepare an accounting. The Receiver is working diligently on this task, but without knowing the volume of documents he expects to receive, it is difficult to estimate the time needed for completion.

During this process, the Receiver is also compiling and analyzing individual investor accounts. This is a necessary task to assess and administer investor claims. The Receiver will likely ask all investors to send him copies of all documentation related to their investments in the Hedge Funds. He will review and analyze all documents relating to each investment to determine the amounts owed, if any, to each investor. The Receiver does not expect to commence the claims process until late 2009 or early 2010. The Receiver will provide a more definitive time estimate as his analysis progresses.

The Receiver is also reviewing information to determine if any third parties may have liability either to the Receivership estate or investors. In this regard it should be anticipated that the Receiver will bring actions in the future.

The Receiver will continue to attempt to locate additional funds and other assets and, if appropriate, will institute proceedings to recover assets on behalf of the Receivership Entities. In an effort to more fully understand the conduct at issue and in an attempt to locate more assets, the Receiver will continue to conduct interviews and/or depositions of parties and third parties with knowledge.

The Receiver will also continue the operations of all ongoing businesses of the Receivership Entities to maintain and, if possible, enhance their value. The Receiver will continue to market properties for sale and entertain offers for purchase.

## VII. Conclusion.

Creditors and investors in the Receivership Entities are encouraged to periodically check the informational website (http://www.nadelreceivership.com/) for current information concerning this Receivership. The Receiver and his counsel have received an enormous amount of emails and telephone inquiries and have had to expend significant resources to address them. To minimize those expenses, creditors and investors are strongly encouraged to consult the Receiver's website before contacting the Receiver or his counsel. However, the Receiver continues to encourage individuals or attorneys representing investors who may have information that may be helpful in securing further assets for the Receivership estate or identifying other potential parties who may have liability to either the Receivership estate or investors directly to either email ksalo@fowlerwhite.com, or call Kathy Salo at 813-228-7411.

Dated this 9th day of June, 2009.

Respectfully submitted,

s/ Burton W. Wiand
Burton W. Wiand, Receiver

FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd., Suite 1700
Tampa, Florida 33602
Phone: 813-228-7411
Fax: 813-229-8313

40693714v3