UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,

CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.
_____/

**RECEIVER'S DECLARATION IN SUPPORT OF THE UNOPPOSED MOTION
FOR POSSESSION OF AND TITLE TO THE REAL PROPERTY
LOCATED AT 15576 FRUITVILLE ROAD, SARASOTA, FL.**

Burton W. Wiand declares as follows:

1.     I am an attorney with Fowler White Boggs P.A. ("Fowler White") in Tampa, Florida.

2.     In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P.,

Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory IRA Fund, Ltd.; Victory Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management (Scoop Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund are collectively referred to as the "Hedge Funds;" Scoop Capital, Scoop Management, Valhalla Management, and Viking Management are collectively referred to as the "Investment Managers").

3. In a January 27, 2009, Order (Doc. 17), the Court also appointed me Receiver over Venice Jet Center, LLC, and Tradewind, LLC.

4. In a February 11, 2009 Order (Doc. 44), the Court also appointed me Receiver over Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; and the Laurel Mountain Preserve Homeowners Association, Inc.

5. In a March 9, 2009, Order (Doc. 68), the Court also appointed me Receiver over the Guy-Nadel Foundation, Inc.

6. In a March 17, 2009, Amended Order (Doc. 81), the Court also appointed me Receiver over Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC. All of the entities in receivership are referred to collectively as the "Receivership Entities."

7. Since my appointment as Receiver, I and professionals who I have retained (including lawyers, an accountant, and a financial analyst) have continued our investigation, which has included communicating with people associated with Nadel and/or the Receivership Entities and persons responsible for maintaining the financial books of Receivership Entities and of other businesses controlled by Nadel; operating other businesses

controlled by Nadel or for assisting those businesses with their transactions; performing accounting services; and administering the Hedge Funds.

8. We have also reviewed documents located in the offices of the Hedge Funds and Investment Managers (the "Office") (located at 1618 Main Street, Sarasota, Florida 34236); documents obtained from the accountant for Receivership Entities; information stored on Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's businesses with their transactions; and information available in the public record.

### The Fraudulent Investment Scheme

9. On January 26, 2009, I submitted the Receiver's Declaration in Support of the Receiver's Unopposed Motion to Expand the Scope of Receivership (the "Receiver's January Declaration") (Doc. 16). On June 9, 2009, I submitted the Receiver's Second Interim Report (the "Interim Report") (Doc. 141).

10. As shown in the Receiver's January Declaration, the Interim Report, and Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC Emergency Motion") (Doc. 2) and supporting papers, Nadel defrauded investors in the six Hedge Funds from at least 2003 (and likely earlier) through the time he fled in January 2009 by "massively overstating the value of investors' interests in them." (SEC Emerg. Mot. at 2, 6.) Specifically, from at least 2003 through 2008, the value of the Hedge Funds as represented to investors was significantly

overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

11. As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now in receivership. (*Id.* at 4-6.) Through those entities, Nadel was ultimately responsible for controlling the Hedge Funds' investment activities.

12. Evidence also showed that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, and to other Receivership Entities, in the form of management, advisory, and/or profit incentive fees. (*Id.* at 5-6.) According to the Hedge Funds' documents, in 2003, the Hedge Funds paid a total of $7,450,565 in fees; in 2004, they paid $15,381,774 in fees; in 2005, they paid $20,349,897 in fees; in 2006, they paid $18,257,590 in fees; in 2007, they paid $19,873,365 in fees; and in 2008 they paid $15,854,931 in fees.

13. Specifically, according to Scoop Management's Profit and Loss Statement for the period from 2003 to 2008, Scoop Management received the following fees from the Hedge Funds: $39,670,763.24 in "Incentive Fees;" $19,065,409.19 in "Management Fees;" and $1,930,000 in "Office Fees." In other words, Scoop Management received a total of $60,666,172.43 in fees from the Hedge Funds between 2003 and 2008.

14. Also according to Scoop Management's Profit and Loss Statement, Scoop Management paid a portion of those fees to others. The amount paid was $23,183,680.84, but $6,040,566.83 of that amount was paid to another Receivership Entity formerly controlled by Nadel, Scoop Capital.

15. In sum, Scoop Management kept $37,482,491.59 in fees from the Hedge Funds between 2003 and 2008, and an additional $6,040,566.83 of the fees it received were transferred to Scoop Capital.

16. Consistent with our earlier findings, our investigation has continued to reveal information showing that additional assets over which Nadel or his wife, Marguerite "Peg" Nadel ("Mrs. Nadel"), exerted full or partial control or in which they had a full or partial interest were purchased and/or funded with money derived from Nadel's fraudulent investment scheme (the "scheme"). This occurred through direct payments from Scoop Capital or Scoop Management financial accounts.

17. This also occurred through payments from accounts held in the name of Nadel; in the name of Nadel and Mrs. Nadel; or in the name of other entities, which accounts were funded with money from the scheme, including with the large sums of "management" and "advisory" fees that Nadel paid himself for purporting to manage money through Receivership Entities. For example, as demonstrated by the copies of checks attached as Exhibit A to the Receiver's January Declaration, in 2008 Nadel signed checks transferring at least $1,003,500.00 from Scoop Capital to himself and his wife.

18. As of December 31, 2008, according to the Balance Sheet for Scoop Management, Scoop Management had transferred $6,761,000 to Nadel, $5,090,000 to Mrs. Nadel, and an additional $5,326,896.56 jointly to Nadel and his wife. These amounts are in addition to the amounts Mrs. Nadel received from Scoop Management as compensation.

19. Scoop Management also had transferred $6,433,804.40 to other entities controlled by Nadel.

20. Also as of December 31, 2008, according to the Balance Sheet for Scoop Capital, it had transferred at least $1,300,000 to Nadel. It also had transferred $6,293,637.12 to other entities controlled by Nadel.

21. To date we have not uncovered any source of income for Nadel or Mrs. Nadel that was not in some manner funded with money from the scheme (whether through "management fees" or otherwise). Discussions with Mrs. Nadel and others have confirmed that, during the time one or more of the Hedge Funds and Investment Managers were in operation (i.e., beginning in at least 1999), essentially all of Nadel and Mrs. Nadel's income was derived directly from those entities.

22. As detailed in the Receiver's January Declaration, the Interim Report, and the SEC Emergency Motion, the Hedge Funds and Investment Managers were operated as part of a fraudulent scheme from at least 2003 forward, and according to Nadel's own admission, earlier.

23. Indeed, Nadel essentially admitted as much in several letters he wrote for family at the time of his disappearance in January of this year. In one letter in which he suggested how to calculate the Hedge Funds' investment losses he wrote, "go back as far as possible, to 1998 if we can, to Spear, Leeds & Kellogg from Goldman Sachs, and determine the actual trading losses," and added that his "recollection of the more recent losses, say from 2001 on, is about an average of about $20M per year." Nadel Letter attached hereto as **Exhibit A**.

24. In another letter, which was shredded, he wrote (emphasis added): "<u>For more than ten [years] I have truly believed that [I could] trade my way out of this mess, and in</u>

2008 did it finally penetrate my addled [brain] that this is not to be." Nadel Letter attached hereto as **Exhibit B**.

25. All of the above information shows that from at least 2003, and likely earlier, the source of Nadel and Mrs. Nadel's income was Nadel's scheme.

26. The information gathered during our investigation shows that money derived from Nadel's scheme was used to purchase the real property located at 15576 Fruitville Road, Sarasota, FL 34240 ("the Property") in March 2003 and subsequently to pay the Property's mortgage.

27. According to the information that we have gathered, the Property is a home that was rented to a third party.

### The Property

28. On March 5, 2003, Nadel and Mrs. Nadel purchased the Property. Norton Hammersley, Lopez & Skokos, P.A. prepared the deed and also served as the settlement agent. A copy of the March 2003 deed for the Property is attached hereto as **Exhibit C**.

29. On January 5, 2006, Nadel and Mrs. Nadel deeded a 50% interest in the Property to Nadel's trust, the Arthur Nadel Revocable Trust UAD November 3, 2004, and the remaining 50% interest to Mrs. Nadel's trust, the Marguerite J. Nadel Revocable Trust UAD November 3, 2004. A copy of the January 2006 deed for the Property is attached hereto as **Exhibit D**.

30. As shown by the copy of the settlement statement for the Property, attached hereto as **Exhibit E**, Nadel and his wife owed $201,163.93 at the closing of their purchase of the Property in March 2003.

31. Nadel used a SouthTrust Bank cashier's check drawn on a SouthTrust Bank account held in the name of Intex Trading Corporation ("Intex") in the amount of $131,170.97 to fund part of the cash owed at closing. A copy of that cashier's check and the check used to purchase it are attached hereto as **Exhibit F**.

32. Nadel also used a Northern Trust Bank of Florida cashier's check drawn on a Northern Trust Bank of Florida account held in the name of Nadel and his wife (the "4320 Account") in the amount of $70,000 to fund the cash owed at closing. A copy of that cashier's check is attached hereto as **Exhibit G**. Further, a $5,000 deposit paid on the purchase of the Property on or about February 11, 2003, also was paid with a check drawn on the joint 4320 Account.

33. The funds used to purchase the SouthTrust Bank cashier's check in the amount of $131,170.97 are directly traceable to receivership entities and Nadel's scheme. According to filings with the Florida Secretary of State, Intex was the General Partner of Scoop Investments, Ltd. (*see* **Exhibit H**), which is the predecessor of Relief Defendant Victory Fund, Ltd., one of the Hedge Funds in receivership (*see* **Exhibit I**). Scoop Investments, Ltd. was renamed Victory Fund, Ltd., on November 27, 2002 (*see id.*), and on December 20, 2002, the general partner for that Hedge Fund was changed from Intex to Scoop Capital (*see* **Exhibit J**).

34. Also according to filings with the Florida Secretary of State, Nadel created Intex in August 1996, and served as its sole director and registered agent. *See* **Exhibit K**. Nadel remained Intex's sole director and officer at all times, including in 2003 when Nadel used $131,170.97 from Intex's account to purchase the Property. *See* **Exhibit L**. Nadel

dissolved Intex in September 2005 (because it has been dissolved, I have not sought to include it in this receivership). *See* **Exhibit M**.

35. According to records that we have reviewed, between February 2002, and January 2003, approximately $533,375.90 was deposited into Intex's account at SouthTrust Bank directly from accounts held in the names of Receivership Entities Valhalla Management, Inc. and Viking Management, Inc. Specifically, $20,089.76 was transferred from Viking Management, LLC, and $513,286.14 was transferred from Valhalla Management, Inc. As a result, the money used to purchase the Intex cashier's check referenced above in paragraph 33 came from Receivership Entities.

36. The Nadels did not take a mortgage out on the Property until March 27, 2003. A copy of the mortgage for the Property, which was provided by Northern Trust Bank of Florida, is attached hereto as **Exhibit N**. The mortgage amount was $191,250.00.

37. According to documents located in the Office and obtained from financial institutions to date, Nadel and his wife used money mainly from two Northern Trust Bank accounts titled jointly in both their names to pay the mortgage on the Property. Specifically, for almost a year and a half from at least July 2003 through November 2004, payments on the mortgage were made from the 4320 Account. During that period, $15,994.28 was made in mortgage payments.

38. In 2003 and 2004, the time during which money in the 4320 Account was used to fund part of the purchase price and mortgage payments for the Property, at least $50,000 was deposited into that account from Intex's SouthTrust Bank account, and over $1,150,000.0 was deposited from Scoop Management, Inc.'s bank account.

39. For the next approximately four years, or from December 2004 until the collapse of Nadel's scheme earlier this year, payments on the mortgage for the Property were made from another Northern Trust Bank of Florida account titled in the names of Nadel and his wife (the "8757 Account"). Specifically, the following payments were made on the mortgage from that account:

| Date | Payee | Memo | Amount |
|---|---|---|---|
| 12/1/2004 | Northern Trust Bank | | $940.84 |
| 1/3/2005 | Northern Trust Bank | Fruitville property | $940.84 |
| 2/1/2005 | Northern Trust Bank | Fruitville mortgage | $940.84 |
| 3/1/2005 | Northern Trust Bank | Fruitville | $940.84 |
| 4/1/2005 | Northern Trust Bank | Fruitville Mortgage | $940.84 |
| 5/2/2005 | Northern Trust Bank | Fruitville mortgage | $940.84 |
| 6/1/2005 | Northern Trust Bank | Fruitville House | $940.84 |
| 7/1/2005 | Northern Trust Bank | Fruitville Mortgage | $940.84 |
| 8/1/2005 | Northern Trust Bank | Fruitville House | $940.84 |
| 9/1/2005 | Northern Trust Bank | Fruitville Mortgage | $940.84 |
| 10/3/2005 | Northern Trust Bank | | $940.84 |
| 11/1/2005 | Northern Trust Bank | | $940.84 |
| 12/1/2005 | Northern Trust Bank | Fruitville House | $940.84 |
| 1/3/2006 | Northern Trust Bank | Mortgage interest | $940.84 |
| 2/1/2006 | Northern Trust Bank | Fruitville House | $940.84 |
| 3/1/2006 | Northern Trust Bank | Fruitville House | $940.84 |
| 4/3/2006 | Northern Trust Bank | Fruitville House | $940.84 |
| 5/1/2006 | Northern Trust Bank | Fruitville House | $940.84 |
| 6/1/2006 | Northern Trust Bank | Fruitville House | $940.84 |
| 7/3/2006 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 8/1/2006 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 9/1/2006 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 10/02/2006 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 11/1/2006 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 12/1/2006 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 1/2/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 2/1/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 3/1/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 4/2/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 5/1/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |

| | | | |
|---|---|---|---|
| 6/1/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 7/2/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 8/1/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 9/4/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 10/1/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 11/1/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 12/3/2007 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 1/2/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 2/1/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 3/3/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 4/1/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 5/1/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 6/2/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 7/1/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 8/1/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 9/2/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 10/1/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 11/3/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 12/1/2008 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| 1/2/2009 | Northern Trust Bank | Automatic Loan Payment | $1,158.79 |
| | | **Total:** | **$53,798.45** |

40. For the period during which payments on the mortgage were made from the 8757 Account, the records we have reviewed show that at least $80,000 was deposited into that account directly from Scoop Capital or Scoop Management, and additional money was transferred into it from other accounts controlled by the Nadels in which money from Scoop Capital or Scoop Management had been deposited.

41. At all times during these transactions, Nadel was perpetrating his scheme, and essentially all of the Nadels' income was derived from that scheme.

42. Thus, the information in our possession indicates that the purchase of the Property and payment of the Property's mortgage were funded with Receivership Entities' money and proceeds of Nadel's scheme.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief and is executed this 7th day of July, 2009.

*[signature]*
Burton W. Wiand, as Receiver
c/o FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd.
Suite 1700
Tampa, FL 33602
Tel. 813.228.7411
Fax 813.229.8313
bwiand@fowlerwhite.com