UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.                                    Case No. 8:09-cv-0087-T-26TBM

ARTHUR NADEL;
SCOOP CAPITAL, LLC;
SCOOP MANAGEMENT, INC.;

    Defendants,

SCOOP REAL ESTATE, L.P.;
VALHALLA INVESTMENT PARTNERS, L.P.;
VALHALLA MANAGEMENT, INC.;
VICTORY IRA FUND, LTD.;
VICTORY FUND, LTD.;
VIKING IRA FUND, LLC;
VIKING FUND, LLC; AND
VIKING MANAGEMENT, LLC

    Relief Defendants.
_____/

## RECEIVER'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR RECOVERY OF ASSETS ACQUIRED WITH INVESTOR FUNDS (DOC. 154)

Burton W. Wiand, as Receiver, by and through his undersigned counsel, files this reply memorandum (the "**Reply**") in support of the Receiver's motion for recovery of assets acquired with investor funds (the "**Motion**"; Doc. 154). This Reply is in response to the objection to the Motion (the "**Objection**"; Doc. 155) filed by non-party LandMark Bank (the "**Bank**"). The Receiver seeks ownership of, including right, title, and interest in, the assets described in the Motion. The Receiver does <u>not</u> seek any ruling as to the (i) validity of any

purported security interest in the assets claimed by the non-party Bank or anyone else or (ii) resolution of any issue regarding the priority of claims to the proceeds from the disposition of the assets.[1]

The evidence submitted by the Receiver in his Motion, this Reply, and the Affidavit of Christopher D. Moody ("**Christopher Moody**"), which is being filed contemporaneously with this Reply (the "**Moody Affidavit**"), establishes that the assets were purchased with Ponzi-scheme proceeds. The Bank offers no evidence to the contrary. At best, the Bank is merely a creditor of the Receivership, evidenced by (i) the Bank's admission that it does not own the assets (Objection at 1); (ii) the Receiver's evidence that at least $2.6 million of the funds used to purchase the assets were Ponzi-scheme proceeds; and (iii) the Bank's failure to put forth any evidence in the record that disputes the Receiver's evidence that these are Receivership assets. The Objection, if granted, would enable the Bank to bypass other creditors, including hundreds of defrauded investors. Such a shortcut would be improper. *See, e.g., Quilling v. Trade Partners, Inc.*, 2006 WL 3694629, *1 (W.D. Mich. Dec. 14, 2006). The Bank's status and the priority of claims are issues to be resolved in the claims process, which will be established by the Receiver with the Court's approval and will fully protect the due process rights of the Bank. Under *SEC v. Elliott*, 953 F.2d 1560, 1571 (11th Cir. 1992) – the primary case relied on by the Bank – summarily resolving the limited issue raised by the Motion is within the power of the Court and is appropriate under these facts at

---

[1] As with all other assets brought into the Receivership, a proposed disposition will be presented to the Court for approval.

this stage of the proceedings. "[S]ummary proceedings do not per se violate claimants' due process interest." *Id.*

Finally, the Motion also should be granted because (i) the Objection is not properly before the Court due to the Bank's failure to intervene; (ii) even if the Bank did move to intervene, the Bank should not be permitted to do so at this early stage of the Receivership because it has no ownership interest in the assets; and (iii) there is no factual dispute regarding the source of the funds used by Christopher Moody to acquire the assets.

## Background[2]

The details of the fraudulent investment scheme that underlies this action (the "**scheme**") are set forth in previous pleadings. (*See, e.g.*, Receiver's Decl. dated July 14, 2009 (Doc. 152).) From at least 2003 until the time of the commencement of the Receivership on January 21, 2009, Christopher Moody was vice president of Valhalla Management, Inc. ("**Valhalla Management**"), which was the general partner of Valhalla Investment Partners, LLP ("**Valhalla Investment Partners**"), and he was a co-managing member of Viking Management, LLC ("**Viking Management**") which was the managing member of Viking Fund, LLC ("**Viking Fund**") and Viking IRA Fund, LLC ("**Viking IRA Fund**"). (Moody Aff. ¶ 2.) All of these entities are in receivership. For purposes of this motion, Valhalla Management, Valhalla Investment Partners, Viking Management, Viking Fund, and Viking IRA Fund will hereinafter be referred to as the "**Business Entities**." Christopher Moody received from the Business Entities a combination of performance

---

[2] The procedural details of this Securities & Exchange Commission enforcement action (the "**Commission Proceeding**") and the factual details of the Receiver's investigation are set forth in numerous documents previously filed with the Court. This Reply discusses only those facts pertinent to the Motion.

3

allocations and management fees (the "**Fees**"). (*Id.* ¶ 3.) Specifically, from 2003 to 2008, as a result of his participation in the Business Entities, Christopher Moody received $12,189,776.48 in fees from Valhalla Management and $6,655,122.67 from Viking Management. In total, Christopher Moody received $18,844,899.15 in fees from the Business Entities from 2003 through 2008.

I. **Bonds.com Assets.**

Christopher Moody is trustee of the Christopher D. Moody Revocable Trust (the "**Trust**"). (Moody Aff. ¶ 4.) Christopher Moody, as trustee for the Trust, used the Fees to acquire certificated shares of stock in Bonds.com Group, Inc. ("**Bonds.com**"). Copies of the certificates are attached to the Motion as Exhibit A and are dated January 8, 2008, January 8, 2008, and January 18, 2008, respectively (the "**Stock**"). He also used the Fees to acquire two secured convertible promissory notes made by Bonds.com (the "**Notes**"), copies of which are attached to the Motion as Exhibit B. (*See generally* Mot. at 1-2; Mot. Ex. A; Moody Aff. ¶ 7.) The Stock and Notes are collectively referred to hereinafter as the "**Bonds.com Assets.**" The Summary of Transactions attached as Exhibit A to the Moody Affidavit shows the flow of funds relevant to the Trust's investments in Bonds.com. (*See* Moody Aff. ¶ 6; Moody Aff. Ex. A.)

II. **Loans with Non-Party LandMark Bank.**

Between January 2007 and November 2, 2008, the Bank entered into three loan agreements with Christopher Moody, which were guaranteed by the Trust (the "**Loans**"). (Moody Aff. ¶ 5.) As reflected in the third agreement, the Loans were consolidated and totaled $2,000,000; they were due on November 1, 2009; and they were collateralized by the

Trust's uncertificated investment account with Viking Fund, which the Trust pledged to the Bank. (Moody Aff. ¶ 5.) The Loans operated as lines of credit with the Bank. (*See, e.g.,* Moody Aff. Ex. A.)

Following the commencement of this receivership, on or about January 30, 2009,[3] Christopher Moody entered into an Amended and Restated Renewal Promissory Note, which "amends, restates and renews" the previous notes in the amount of $2,000,000. (Objection Ex. A at 7.) This note purports to be secured by additional collateral, including the Stock and Notes. (Objection Ex. A at 7.)

That same day, Christopher Moody, through the Trust, pledged the Bonds.com Assets as additional collateral to secure the $2,000,000 Loans. (Objection Ex. B; Moody Aff. Ex. D, hereinafter referred to as the "**Stock Pledge Agreement**.") The Stock Pledge Agreement notified the Bank that Christopher Moody was "not in possession of the certificates for the collateral referenced herein [the Bonds.com Assets], if any exist, at the time of execution of this Stock Pledge Agreement." (Objection Ex. B, ¶ 3.) Indeed, Christopher Moody was "not in possession" of the certificates because the Receiver was in possession of the certificates, and he continues to possess the certificates.

### III. Chronology.

The following is a chronology of the remainder of events relevant to the Motion:

1. On January 14, 2009, Defendant Arthur Nadel fled Sarasota County.

---

[3] Although the note is dated January 26, 2009, upon information and belief, Christopher Moody signed the note on January 30, 2009.

2. On January 15, 2009, Christopher Moody notified Thomas Quale, the Bank's President, that Nadel had disappeared and that the Business Entities were insolvent. (Moody Aff. ¶ 9.)

3. On January 16, 2009, Mr. Quale advised Christopher Moody that, because of the collapse of the Business Entities, the Bank required additional security for the $2,000,000 second renewal promissory note of November 2, 2008. (Moody Aff. ¶ 10.) Records in the Receiver's possession reveal the Bank's Chairman of the Board, T. Raymond Suplee, was, coincidentally, Christopher Moody's personal accountant and was thus aware that virtually all of Christopher Moody's income came from the Business Entities as reflected on W-2 forms and K-1 Schedules.

4. On January 21, 2009, the Court appointed Burton W. Wiand as Receiver in this action. (Order Appointing Receiver.) Upon appointment, the Receiver took possession and control of the offices of the Hedge Funds and Investment Managers (the "**Office**"), which was located at 1618 Main Street, Sarasota, Florida 34236. (*See also* Order Appointing Receiver ¶ 1.) Because the Stock and Notes were "property . . . located . . . in . . . [the] office[] maintained by the Defendants and relief Defendants . . ." (*id.*), the Receiver also took possession of the Stock and Notes.

5. On January 27, 2009, Nadel surrendered to the FBI in Tampa, Florida.

6. On January 30, 2009, nine days <u>after</u> the appointment of the Receiver and the Receiver's acquisition of all property in the Office, including the Stock and Notes, Moody purported to pledge the Bonds.com Assets. (Objection Exs. A, B.) By this time, the circumstances clearly demonstrated that the Bonds.com Assets were acquired with funds of

defrauded investors. Nonetheless, the Bank negotiated for and accepted a purported security interest in the Assets.

7. On July 16, 2009, the Receiver filed the Motion, seeking an order transferring all right, title, and interest in the Assets to the Receiver. (Mot. at 4.) The Receiver signed the Motion, verifying all factual representations. (*Id.* at 5.)

8. On or about July 20, 2009 – <u>after</u> the Receiver filed his Motion – the Bank declared the loan in default. (Objection Ex. E.)

9. Also on July 20, 2009, the Bank filed its Objection, claiming a "substantial interest" in the Assets; admitting that the Trust owns the Assets; and "assert[ing] an immediate right of possession to satisfy its loan." (Objection at 1-2.)

The Objection is not verified and is not accompanied by any sworn statement. (*See id.*) Although the Bank purports to have a "good faith belief that some or all of the subject assets were acquired with funds other than those from investors in Ponzi scheme, as alleged by the Receiver," the Bank offers no factual support whatsoever for this "belief." (*Id.* at 2.)

The Objection seeks due process in the form of a case management order setting deadlines for (1) the Receiver to give notice to the Bank of the legal claims related to the Assets; (2) the Receiver's evidence in support of those claims; (3) an opportunity for the Bank to present affirmative defenses; (4) an opportunity for the Bank to conduct discovery of "the Receiver, parties to this action, or non-parties which relate to the issues to be litigated"; and (5) an evidentiary hearing "to determine the issues to be adjudicated," which issues would "include [the Bank's] request that any notes or stock pledged to [the Bank] for its loan which have been seized by the Receiver be turned over to [the Bank] in accordance with Mr.

Moody's agreement with [the Bank.]" (Objection at 4.) In support of its request for relief, the Bank attaches to the Objection copies of the promissory notes, the Stock Pledge Agreement, the Notes (including Allonges), UCC filings, and the letter dated July 20, 2009, declaring the Loan in default. (Objection Exs. A-E.) The Bank also alleges that it has raised sufficient factual disputes to necessitate a hearing. (Objection at 5.)

## Argument

### I. The Bank (At Best, a Creditor of the Receivership Estate), Cannot Take a Shortcut and Bypass Other Creditors of the Receivership Estate.

"[I]n the context of [a] receivership, the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy." *Elliott*, 953 F.2d at 1569 (citations omitted). Equity does not permit a preference among creditors who are victims of a Ponzi scheme; "equality is equity." *Id.* at 1570 (internal quotation marks omitted).

The Bank is merely a potential creditor and cannot claim an ownership interest in the Bonds.com Assets. First, the Bank admits that it does not own the Bonds.com Assets. (Objection at 1.) Second, the Summary of Transactions reveals that, between July 13, 2006, and January 7, 2009, (i) Christopher Moody received at least $9,804,293.56 from the Business Entities; (ii) he invested $2,724,976.94 with Bonds.com; and (iii) only $50,000 (less than two percent) of his investments in Bonds.com are arguably traceable to any "legitimate" funds he received by drawing on his line of credit. (*See* Moody Aff. Ex. A.) This *de minimis* amount of "legitimate" funds is dwarfed by the more than $2.6 million in Ponzi-scheme proceeds used to purchase the Bonds.com Assets. *See, e.g., In re Fin. Federated Title & Trust, Inc.*, 273 B.R. 706, 718-19 (Bankr. S.D. Fla. 2001). Third, although

the Bank asserts an unsupported "right of possession" of the Bonds.com assets, there is simply no evidence that the Bank is entitled to any ownership interest in the Bonds.com Assets.

In short, the Receiver is entitled to title in and ownership of the Bonds.com Assets subject to a purported security interest by the Bank. At best for the Bank, such an interest makes it a creditor that will have its interest (and any other rights) considered as part of a claims process. This well established procedure allows the Court to efficiently consider claims at an appropriate time and avoids the inefficient and burdensome, piecemeal consideration of asserted creditors' claims, such as the Bank's Objection.

## II. The Bank is Not Entitled to Intervene in the Commission Proceeding. (Fed. R. Civ. P. 24.)

### A. The Bank Did Not Move to Intervene. (Fed. R. Civ. P. 24(c).)

As an initial matter, the Bank is precluded from objecting to the Motion because the Bank has not sought, and the Court has not granted, leave to intervene.[4] The Bank is a non-party to the Commission Proceeding and should not be permitted to circumvent the Federal Rules by filing a procedurally defective "Objection" to the Receiver's Motion. Indeed, when other third parties previously desired to be heard in the Commission Proceeding, they duly filed motions to intervene. (*See* Docs. 32 and 82.) The Commission

---

[4] As alternative relief, the Bank "requests that the Receiver's motion be denied and that the Receiver be given an opportunity to file a motion for intervention." (Objection at 5.) It appears that the Bank inadvertently stated "Receiver" where it should have stated "the Bank be given an opportunity to file a motion for intervention." If so, this passing reference to intervention can hardly be construed as a motion to intervene and certainly cannot serve to single-handedly defeat the Receiver's Motion. Even if it is construed as such, the Bank cannot intervene under Rule 24 of the Federal Rules of Civil Procedure for the reasons discussed in section II.B., below.

Proceeding is unique and complex and involves the interest of hundreds of defrauded investors. The investigation into the Receivership Entities and the scheme has, thus far, required the Court, the Commission, the Receiver and his lawyers and other professionals, to spend numerous hours investigating, reviewing, and litigating many legal and factual issues related to the underlying investment scheme. The Bank should not be allowed to disrupt this collective effort by sidestepping the Rules of Procedure with its unsworn and unverified Objection, especially an Objection that is not supported by affidavits, declarations, or other proof. Therefore, the Bank's Objection should be denied, and the Receiver's Motion should be granted.

### B. The Bank Failed to Set Forth Any Requisite Factors for Intervention. (Fed. R. Civ. P. 24(a), (b).)

Even if the Court overlooks the Bank's failure to file a motion to intervene, the substance of the Objection fails to establish the Bank's right to intervene in the Commission Proceeding. *See* Fed. R. Civ. P. 24(a), (b). The Court has already denied two motions to intervene. (*See* Order dated February 11, 2009 (Doc. 45) (the "First Intervention Order") and Order dated March 19, 2009 (Doc. 88) (the "Second Intervention Order").) In both instances, the Court found the proposed interveners had failed to address multiple factors enumerated in Rule 24 of the Federal Rules of Civil Procedure. (Doc. 45 at 3; Doc. 88 at 2.)

On February 4, 2009, General Electric Capital Corporation and VFS Financing, Inc. (the "First Interveners") filed a motion to intervene (the "First Motion to Intervene"). (Doc. 32.) The First Interveners, in a position similar to the Bank here, claimed they were secured creditors of a Receivership Entity who financed the purchase of two aircraft by that entity and that, under the terms of the respective notes and security agreements, the entity was in

10

default. (1st Intervention Order at 2.) The First Interveners argued that they were precluded from taking any action against the Receivership Entity under their contractual agreements. (*Id.*) The First Interveners sought to intervene for the purpose of seeking a modification of the Order Appointing Receiver to allow the First Interveners to obtain possession of (1) the aircraft in which they had a security interest and (2) the books and maintenance records related to maintaining and selling that aircraft. (*Id.*) In denying the First Motion to Intervene, the Court found it necessary to resolve <u>only</u> whether the First Interveners "demonstrate[d] that they qualif[ied] for intervention either as a matter of right or permissively under Rule 24 of the Federal Rules of Civil Procedure." (*Id.* at 3.)

On March 17, 2009, twenty-two (22) investors in the scheme (the "Second Interveners") filed a motion to intervene (the "Second Motion to Intervene"). (Doc. 82.) They asserted an interest in certain receivership assets that Nadel's former counsel sought to acquire as payment of attorneys' fees. (2d Mot. to Intervene at 3.) The Court denied the Second Motion to Intervene because "the investors [had] wholly failed to address why they qualify for intervention under either prong of [Rule 24] in light of the governing principles of law." (2d Intervention Order at 2.) The Court also noted its "utmost confidence in the skills and ability of the court-appointed Receiver to protect the financial interests of these individuals . . . ." (*Id.*)

Therefore, the Court has already determined that (1) allegations of a security interest, without more, fail to meet the criteria set forth in Rule 24(a) and (b), and (2) previous interveners could not better protect the rights in receivership assets than the Receiver himself.

With those rulings in mind, the next two sections analyze the Objection under subsections (a) and (b) of Rule 24 of the Federal Rules of Civil Procedure.

### 1. The Bank is Not Entitled to Intervene as a Matter of Right. (Fed. R. Civ. P. 24(a).)

Rule 24(a) of the Federal Rules of Civil Procedure requires a court to permit anyone to intervene who "(1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Here, there is no indication that the Bank has a statutory right to intervene. Fed. R. Civ. P. 24(a)(1). Therefore, the Bank's only basis for intervention as of right would be based in subsection (a)(2).

To establish entitlement to intervene as a matter of right under Rule 24(a)(2), the Bank must establish: (1) its application is timely; (2) it has an interest relating to the property or transaction that is the subject of the action; (3) it is so situated that disposition of the action as a practical matter may impair or impede its ability to protect its interest; and (4) the parties to the action will not adequately represent its interest. (1st Intervention Order at 3 (citing *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302-03 (11th Cir. 2008).) "Failure to satisfy any one [of the four] requirement[s] precludes intervention of right." *Haspel & Davis Milling & Planting Co. Ltd. v. Board Of Levee Comm'rs of The Orleans Levee Dist. and State Of Louisiana*, 493 F.3d 570, 578 (5th Cir. 2007). Rule 24 "continues to set bounds that must be observed. The original parties have an interest in the prompt disposition of their controversy

and the public also has an interest in efficient disposition of court business." *Fox*, 519 F.3d at 1302 (emphasis added; citations omitted).

The Court found that the First Interveners "utterly failed to address substantively" factors (2), (3), and (4), "other than to claim they have a security interest in the aircraft." (1st Intervention Order at 3.) Similarly, here, the Bank has not established any facts supporting its intervention other than to claim it has a security interest in the Bonds.com Assets. The Bank's purported interest should not preclude the Receiver from fulfilling his Court-imposed duty to recover receivership assets to be distributed among victimized investors. In that regard, the Bank is in a similar situation as the hundreds of investors: they are claiming a right to assets that were funded with Ponzi-scheme proceeds.

### 2. The Bank is Not Entitled to Permissive Intervention. (Fed. R. Civ. P. 24(b).)

Unless the intervenor has a conditional right to intervene by federal statute, a non-governmental intervenor may be entitled to permissive intervention only if it "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). However, permissive intervention is merely discretionary, and it requires the court to "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Here, the Bank might argue that its purported security interest is a "claim" that shares a "common question of law" with the Receiver's Motion in the "main action." Such a construction of Rule 24 must fail because it would subsume the established proceedings for a federal equity receivership in an SEC enforcement action. Allowing the Bank to intervene in this action on this basis would lead to a dangerous precedent of any purported claimant's interrupting a receivership in its early,

investigatory and recovery stages. Intervention essentially would undermine the efficient administration of this receivership, which will otherwise address the Bank's and other asserted creditors' claims as part of an efficient claims process. Therefore, the Bank's Objection should be denied and the Receiver's Motion be granted.

### III. Even if the Bank Were Entitled to Intervene, Summary Proceedings Are Appropriate.

"Due process essentially requires that the procedures be fair." *Elliott*, 953 F.2d at 1566. "[A] hearing is not required if there is no factual dispute." *Id*. The Bank has not (and cannot) assert an ownership interest in the Assets; at best, it has a security interest. The priority of the Bank's claim, if any, will be determined at the appropriate time in the appropriate context: the Receiver-established claims process to be established under the supervision of the Court with full consideration of the Bank's due process rights. The Transaction Summary shows that, of the $2,724,976.94 invested by Christopher Moody in Bonds.com, arguably $50,000 was with the proceeds of the loans from the Bank. This proportionally small amount does not alter the Receiver's right to <u>ownership</u> of the Assets because (i) the Assets were acquired almost entirely with funds from Receivership Entities and, (ii) per the Moody Affidavit, Christopher Moody makes no claim to the assets, which are in the physical possession of the Receiver.

### Conclusion

Based on the foregoing, and also for the reasons discussed in the Motion (Doc. 154), the Receiver respectfully requests that the Court grant his motion for an order transfering to the Receiver all right, title, and interest in the Bonds.com Assets, with the nature and extent of the Bank's purported security interest to be determined in the claims process.

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participant:

Arthur G. Nadel,
Register No. 50690-018
MCC New York
Metropolitan Correctional Center
150 Park Row
New York, NY 10007

    s/ Carl R. Nelson
    Carl R. Nelson, FBN 0280186
    cnelson@fowlerwhite.com
    Gianluca Morello, FBN 034997
    gianluca.morello@fowlerwhite.com
    Maya M. Lockwood, FBN 0175481
    mlockwood@fowlerwhite.com
    Ashley Bruce Trehan, FBN 0043411
    ashley.trehan@fowlerwhite.com
    FOWLER WHITE BOGGS P.A.
    P.O. Box 1438
    Tampa, FL 33601
    T: (813) 228-7411
    F: (813) 229-8313
    Attorneys for the Receiver, Burton W. Wiand

## VERIFICATION

I hereby certify under penalty of perjury that the above and foregoing factual representations are true and correct to the best of my knowledge, information, and belief.

Carl R. Nelson
Attorney for the Receiver, Burton W. Wiand