**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.                                                                  Case No. 8:09-cv-0087-T-26TBM

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.

        Defendants,

SCOOP REAL ESTATE, L.P.
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.
VICTORY IRA FUND, LTD,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT,

        Relief Defendants.
_____/

**RECEIVER'S SIXTH UNOPPOSED MOTION TO EXPAND**
**RECEIVERSHIP (TO INCLUDE HOME FRONT HOMES LLC)**
**AND INCORPORATED MEMORANDUM OF LAW**

      Pursuant to 28 U.S.C. § 754, Rule 66 of the Federal Rules of Civil Procedure, and

Local Rule 3.01, Burton W. Wiand, as Receiver, moves the Court to expand the scope of the

receivership in this case to include Home Front Homes LLC ("HFH").   The Receiver's

investigation revealed that HFH is majority-owned and controlled by a receivership entity

and was funded with ill-gotten gains derived from a fraudulent scheme involving Arthur

Nadel   and   certain   receivership   entities.    As   explained   below   and   in   the   Receiver's

Declaration in Support of the Unopposed Sixth Motion to Expand Receivership (the "Receiver's Declaration"), which is being filed along with this motion, HFH should be placed in receivership to preserve its value and to allow the sale of HFH for the benefit of defrauded investors and other creditors of this receivership.

## BACKGROUND

On January 21, 2009, the Securities and Exchange Commission ("Commission") initiated this action to prevent Defendants from further defrauding investors of hedge funds managed by them. That same day, the Court entered an order appointing Burton W. Wiand as Receiver for Defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and Relief Defendants Scoop Real Estate, L.P.; Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory Fund, Ltd.; Victory IRA Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management, LLC (the "Order Appointing Receiver"). (*See generally* Order Appointing Receiver (Doc. 8).)

The Court subsequently granted four motions to expand the scope of the receivership and appointed the Receiver as receiver over the following:

- Venice Jet Center, LLC, and Tradewind, LLC (Order, Jan. 27, 2009 (Doc. 17));

- Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; and the Laurel Mountain Preserve Homeowners Association, Inc. (Order, Feb. 11, 2009 (Doc. 44));

- The Guy-Nadel Foundation, Inc. (Order, Mar. 9, 2009 (Doc. 68)); and

- Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC (Am. Order, Mar. 17, 2009 (Doc. 81)).

2

All of the entities and the trust in receivership are hereinafter referred to collectively as the "Receivership Entities."

Pursuant to the Order Appointing Receiver, the Receiver has the duty and authority to "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants; marshal and safeguard all of the assets of the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors." (Order Appointing Receiver at 1-2.)

The Commission concluded that Defendant Arthur Nadel ("Nadel") used Scoop Capital; Scoop Management; Valhalla Management, Inc.; and Viking Management, LLC to defraud investors of the hedge funds those companies managed, Relief Defendants Scoop Real Estate, L.P.; Valhalla Investment Partners, L.P.; Victory Fund, Ltd.; Victory IRA Fund, Ltd.; Viking IRA Fund, LLC; and Viking Fund, LLC (collectively, the "Hedge Funds"). (*See* Compl. ¶¶ 5-7 (Doc. 1).) The Commission contends Defendants violated federal securities laws from at least January 2008 forward by "massively" overstating investment returns and the value of fund assets to investors and providing false account statements to investors. (*Id.* ¶¶ 3, 36.) The Commission also contends that Nadel misappropriated investor funds by transferring $1.25 million from Viking IRA Fund and Valhalla Investment Partners to secret bank accounts. (*Id.* ¶ 5.) The Court found the Commission demonstrated a *prima facie* case that Defendants committed multiple violations of federal securities laws. (Order Appointing Receiver at 2.)

During the course of his investigation, the Receiver has uncovered evidence that Defendants' violations of federal securities laws began no later than 2003 and, according to

3

Nadel's own admission, before then. (*See* Receiver's 2d Interim Report (the "Interim Report") at 7-15 (Doc. 141); Receiver's Decl. in Support of the Mot. to Expand the Scope of Receivership ¶¶ 10-12 (Doc. 16) (the "Receiver's January Declaration"); Receiver's July Decl. ¶¶ 18-21.) For each year from 2003 through 2007 (and, as shown by the Commission, in 2008), Nadel caused Receivership Entities to grossly overstate the value of the Hedge Funds and to report to investors overstated values and other false performance indicators for those funds. (*See* Interim Report at 7-10; Receiver's Jan. Decl. ¶¶ 10-12.) As detailed in the Receiver's January Declaration (at paragraph 11), the actual values of the Hedge Funds and the purported year-end values represented to investors from 2003 through 2007 are approximately as follows:

| | Value as of 12/31/03 ($) | Value as of 12/31/04 ($) | Value as of 12/31/05 ($) | Value as of 12/31/06 ($) | Value as of 12/31/07 ($) |
|---|---|---|---|---|---|
| **Actual Value** | 80,820,378.06 | 143,073,367.23 | 132,731,986.70 | 63,715,094.39 | 18,042,860.67 |
| **Value Represented To Investors** | 128,953,973.27 | 216,868,604.46 | 274,387,098.31 | 282,379,592.45 | 313,960,110.28 |

Further, Nadel essentially admitted in letters he wrote for family at the time of his disappearance in January of this year that he had perpetrated his scheme beginning before 2003. (*See* Receiver's Decl. ¶¶ 19-20.)

The Receiver also uncovered evidence that Scoop Capital and Scoop Management received substantial amounts of money from the Hedge Funds in the form of management, profit incentive, and/or advisory fees. (*See* Receiver's Decl. ¶¶ 11-14.) During the course of his investigation, the Receiver also learned that other businesses, including HFH, were funded with proceeds of Nadel's fraudulent scheme, including through direct transfers of funds from Scoop Capital and Scoop Management. (*See id.* ¶¶ 15-16.) Specifically, at least

$12,727,441.52 was transferred to those businesses from Scoop Capital and Scoop Management. (*See id.* ¶ 16.)

## HOME FRONT HOMES LLC

**Background.** As detailed in the Receiver's Declaration, HFH is a Florida limited liability company that was formed on March 27, 2006 and is engaged in the business of manufacturing, marketing, and selling energy-efficient panelized homes. (*Id.* ¶ 23.) At the inception of HFH, Scoop Capital held a 20% equity interest in HFH and three other parties (BCV Holdings, LLC ("BCV"); Connell Holdings, LLC ("Connell"); and Brian Bishop ("Bishop")) each owned portions of the remaining 80% interest. (*Id.* ¶ 24.). As part of a corporate reorganization in September 2007, Scoop Capital's equity interest increased to a controlling 60%, Nadel was named Manager and President and thus obtained managerial control, and BCV shed its interest. (*Id.* ¶¶ 25-26.) Earlier this year, Bishop relinquished his remaining equity interest (*id.* ¶ 27), and today Scoop Capital has a 75% equity interest in HFH and Connell has the remaining 25% equity interest (*id.* ¶¶ 27-28.)

According to the evidence reviewed to date, since May 2006, HFH has received $2,161,297.24 from Scoop Capital and $30,000.00 from Scoop Management. (*Id.* ¶¶ 29-30.) That money was used to fund the startup and operations of HFH, and enabled Nadel and Scoop Capital to obtain managerial and equity control of HFH in September 2007. (*Id.* ¶ 29.) As detailed in the Receiver's Declaration, those funds were derived from Nadel's fraudulent scheme, and thus the proceeds of that scheme were used to fund HFH. (*Id.* ¶¶ 9-15, 31.)

**HFH's Current Condition.** Currently, HFH is in significant financial distress. (*Id.* ¶ 33.) It has account payables of several hundred thousand dollars and has little income.

5

(*Id.*) Further, it has major obligations which consist of obligations to me as Receiver for Scoop Capital in the amount of approximately $2,150,000; obligations to Connell and BCV in the aggregate of over $1 million; a secured loan of approximately $3 million from M&I Bank; and a mortgage payable to another creditor for approximately $601,738.00, which is secured by real estate owned by HFH. (*Id.*)

Notwithstanding HFH's poor financial condition, the panelized building system it has developed has value and the Receiver recently reached agreement to sell HFH. (*Id*. ¶ 34.) That transaction, for which the Receiver will seek Court approval in the near future, will, in relevant part, provide for payment to the receivership estate, which will benefit defrauded investors and other creditors.

However, for that transaction to succeed, HFH must be placed in receivership. Indeed, placement in receivership is critical because the mortgage-holder noted above has initiated foreclosure proceedings on the mortgage. That proceeding – if allowed to continue – would sabotage the sale of HFH, wrestle HFH real estate assets away from the receivership estate, and likely leave HFH with no value. Indeed, without being placed in receivership, HFH will have to cease operations and, in all likelihood, will be subjected to a destructive attack by its creditors – that will destroy the financial benefit HFH could provide to the receivership estate. On the other hand, placing HFH in receivership will allow for the orderly sale of the company and the maximization of the value of its assets for the benefit of defrauded investors and all other creditors on an equitable basis.

Notably, the remaining equity participant in HFH, Connell, has consented to the placement of HFH in receivership. Further, major creditors of HFH, except for the

mortgage-holder (who is pursuing the foreclosure action), either have already reached agreement with the buyer of HFH with respect to disposition of HFH's obligations to them or have consented to the relief requested in this motion.  (*Id.* ¶¶ 40.)

## MEMORANDUM OF LAW

The Court's power to supervise an equity receivership and determine the appropriate action to be taken in the administration of the receivership is extremely broad.  *SEC v. Elliott,* 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989).  The Court's wide discretion derives from the inherent powers of an equity court to fashion relief.  *Id.* at 1566 (citing *SEC v. Safety Fin. Serv., Inc.,* 674 F.2d 368, 372 (5th Cir. 1982)).

Such discretion may be properly exercised in the form of expansion of a receivership where a party seeking expansion establishes (1) a commingling of funds, (2) intertwined business operations, (3) utilization of an identical business address or identical offices and addresses, (4) or co-identity of officers, directors, or principals.  *See SEC v. Elmas Trading Corp.,* 620 F. Supp. 231, 233 (D. Nev. 1985), *aff'd*, 805 F.2d 1039 (9th Cir. 1986); *see also Elliott,* 953 F.2d at 1565, n.1 (holding that court may extend equitable receivership over related entities).

In determining whether or not to extend a receivership to include related entities, a federal court has broad discretion to disregard corporate separateness and form and to give effect to the substance of the enterprise.  *Elmas Trading Corp.,* 620 F. Supp. at 233.  A corporate entity may be disregarded under federal law "in the interests of public convenience, fairness, and equity . . . ."  *Id.* at 234; *see In re Bowen Transp., Inc.*, 551 F.2d 171, 179 (7th

Cir. 1977) (stating that "[t]he separate corporateness of affiliated corporations owned by the same parent may be equally disregarded under the proper circumstances."). The key goal behind a proposed receivership expansion should be "to ensure that all available assets are brought within the receivership and may properly be distributed to creditors." *Id.* at 233.

Given the Court's wide discretion and authority, the receivership estate in this case should be expanded to encompass HFH. As discussed above and in the Receiver's Declaration, the evidence uncovered by the Receiver's investigation shows that (1) Receivership Entity Scoop Capital currently holds a controlling 75% equity interest in HFH; (2) Nadel was HFH's Manger and President; and (2) HFH, its operations, and Nadel's control over it have been funded with proceeds of Nadel's Ponzi scheme transferred to it directly from Receivership Entities Scoop Capital and Scoop Management. In short, the information gathered thus far shows that Nadel and Receivership Entities funded and controlled HFH.

This Court's Order Appointing Receiver already requires the Receiver to "marshal and safeguard all of the assets of the Receivership Entities and take whatever actions are necessary for the protection of the investors." (Doc. 8). Marshalling and safeguarding HFH pending its sale is necessary to protect investors and to preserve its value. Notably, this Court's Order Appointing Receiver contemplates the expansion of the receivership. The Order expressly states:

> In the event that the Receiver discovers that funds of persons who have invested in the Corporate Defendants have been transferred to other persons or entities, the Receiver shall apply to this Court for an Order giving the Receiver possession of such funds and, if the Receiver deems it advisable, *extending this receivership over any person or entity holding such investor funds*.

(Doc. 8 ¶ 24 (emphasis added).)

Because (1) the Court has the authority to expand the receivership to include HFH; (2) the evidence shows that Nadel misappropriated investor funds and transferred them to HFH through Receivership Entities; and (3) expansion of the receivership is necessary for the protection of the investors and the receivership estate, the Receiver respectfully requests that this Court modify the Order Appointing Receiver or otherwise expand the Receivership to include Home Front Homes LLC.

## LOCAL RULE 3.01(G) CERTIFICATION OF COMPLIANCE

The undersigned counsel for the receiver has conferred with counsel for the SEC and is authorized to represent to the Court that this motion is unopposed.

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participant:

> Arthur G. Nadel
> Register No. 50690-018
> MCC New York
> Metropolitan Correctional Center
> 150 Park Row
> New York, NY  10007

s/ Gianluca Morello
Carl R. Nelson, FBN 0280186
cnelson@fowlerwhite.com
Gianluca Morello, FBN 034997
gianluca.morello@fowlerwhite.com
FOWLER WHITE BOGGS P.A.
P.O. Box 1438
Tampa, FL  33601
T: (813) 228-7411
F: (813) 229-8313
Attorneys for the Receiver, Burton W. Wiand

42281719v1