UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,         CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.
_____/

### RECEIVER'S DECLARATION IN SUPPORT OF THE
### UNOPPOSED SIXTH MOTION TO EXPAND RECEIVERSHIP
### (TO INCLUDE HOME FRONT HOMES LLC)

Burton W. Wiand declares as follows:

    1.    I am an attorney with Fowler White Boggs P.A. ("Fowler White") in Tampa, Florida.

    2.    I make this declaration to support my Unopposed Sixth Motion To Expand Receivership, which seeks to expand this receivership to include Home Front Homes LLC ("HFH").

3. In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P., Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory IRA Fund, Ltd.; Victory Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management (Scoop Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund are collectively referred to as the "Hedge Funds;" Scoop Capital, Scoop Management, Valhalla Management, and Viking Management are collectively referred to as the "Investment Managers").

4. Subsequently, in four Orders the Court also appointed me Receiver over Venice Jet Center, LLC, and Tradewind, LLC (Doc. 117); Laurel Mountain Preserve, LLC, Laurel Preserve, LLC, the Marguerite J. Nadel Revocable Trust UAD 8/2/07, and the Laurel Mountain Preserve Homeowners Association, Inc. (Doc. 44); the Guy-Nadel Foundation, Inc. (Doc. 68); and Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC (Doc. 81). All of the entities in receivership are referred to collectively as the "Receivership Entities."

5. My appointment as Receiver over the Receivership Entities was reiterated in the June 3, 2009, Order Reappointing Receiver (Doc. 140).

6. Since my appointment as Receiver, I and professionals whom I have retained (including lawyers, accountants, and a financial analyst) have continued our investigation, which has included communicating with people associated with Nadel and/or the Receivership Entities and persons responsible for maintaining the financial books of

Receivership Entities and of other businesses controlled by Nadel; operating other businesses controlled by Nadel or for assisting those businesses with their transactions; performing accounting services; and administering the Hedge Funds.

7. We have also reviewed documents located in the offices of the Hedge Funds and Investment Managers (the "Office") (located at 1618 Main Street, Sarasota, Florida 34236); documents obtained from the accountant for Receivership Entities; information stored on Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's businesses with their transactions; and information available in the public record.

### The Fraudulent Investment Scheme

8. On January 26, 2009, I submitted the Receiver's Declaration in Support of the Receiver's Unopposed Motion to Expand the Scope of Receivership (the "Receiver's January Declaration") (Doc. 16). On June 9, 2009, I submitted the Receiver's Second Interim Report (the "Interim Report") (Doc. 141).

9. As shown in the Receiver's January Declaration, the Interim Report, and Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC Emergency Motion") (Doc. 2) and supporting papers, Nadel defrauded investors in the six Hedge Funds from at least 2003 (and likely earlier) through the time he fled in January 2009 by "massively overstating the value of investors' interests in them." (SEC Emerg. Mot. at 2, 6.) Specifically, from at least 2003 through 2008, the value of the Hedge Funds as represented to investors was significantly

3

overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

10. As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now in receivership. (*Id.* at 4-6.) Through those entities, Nadel was ultimately responsible for controlling the Hedge Funds' investment activities.

11. Evidence also showed that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, and to other Receivership Entities, in the form of management, advisory, and/or profit incentive fees. (*Id.* at 5-6.) According to the Hedge Funds' documents, in 2003, the Hedge Funds paid a total of $7,450,565 in fees; in 2004, they paid $15,381,774 in fees; in 2005, they paid $20,349,897 in fees; in 2006, they paid $18,257,590 in fees; in 2007, they paid $19,873,365 in fees; and in 2008 they paid $15,854,931 in fees.

12. Specifically, according to Scoop Management's Profit and Loss Statement for the period from 2003 to 2008, Scoop Management received the following fees from the Hedge Funds: $39,670,763.24 in "Incentive Fees;" $19,065,409.19 in "Management Fees;" and $1,930,000 in "Office Fees." In other words, Scoop Management received a total of $60,666,172.43 in fees from the Hedge Funds between 2003 and 2008.

13. Also according to Scoop Management's Profit and Loss Statement, Scoop Management paid a portion of those fees to others. The amount paid was $23,183,680.84, but $6,040,566.83 of that amount was paid to another Receivership Entity formerly controlled by Nadel, Scoop Capital.

14. In sum, Scoop Management kept $37,482,491.59 in fees from the Hedge Funds between 2003 and 2008, and an additional $6,040,566.83 of the fees it received were transferred to Scoop Capital.

15. Consistent with our earlier findings, our investigation has continued to reveal information showing that additional assets over which Nadel or his wife, Marguerite "Peg" Nadel ("Mrs. Nadel"), exerted full or partial control or in which they had a full or partial interest were purchased and/or funded with money derived from Nadel's fraudulent investment scheme (the "scheme").

16. In part, this occurred through direct payments from Scoop Capital and Scoop Management financial accounts. As of December 31, 2008, according to the Balance Sheet for Scoop Management, it had transferred $6,433,804.40 to other entities controlled by Nadel. Similarly, as of December 31, 2008, according to the Balance Sheet for Scoop Capital, it had transferred at least $6,293,637.12 to other entities controlled by Nadel.

17. In relevant part, to date we have not uncovered any source of income for Nadel, Mrs. Nadel, Scoop Capital, or Scoop Management that was not in some manner funded with money from the scheme (whether through "management fees" or otherwise).

18. As detailed in the Receiver's January Declaration, the Interim Report, and the SEC Emergency Motion, the Hedge Funds and Investment Managers were operated as part of a fraudulent scheme from at least 2003 forward, and according to Nadel's own admission, earlier.

19. Indeed, Nadel essentially admitted as much in several letters he wrote for family at the time of his disappearance in January of this year. In one letter in which he

suggested how to calculate the Hedge Funds' investment losses he wrote, "go back as far as possible, to 1998 if we can, to Spear, Leeds & Kellogg from Goldman Sachs, and determine the actual trading losses," and added that his "recollection of the more recent losses, say from 2001 on, is about an average of about $20M per year." Nadel Letter attached as Exhibit A to the July 7, 2009, Receiver's Declaration in Support of the Unopposed Motion for Possession of and Title to the Real Property Located at 15576 Fruitville Road, Sarasota, FL. (the "Receiver's July Declaration") (Doc. 147).

20. In another letter, which was shredded, he wrote (emphasis added): "<u>For more than ten [years]</u> I have truly believed that [I could] trade my way out of this mess, and in 2008 did it finally penetrate my addled [brain] that this is not to be." Nadel Letter attached as Exhibit B to the Receiver's July Declaration.

21. All of the above information shows that, in relevant part, from at least 2003, and likely earlier, the source of Scoop Capital's and Scoop Management's income was Nadel's scheme.

22. The information gathered during our investigation shows that money derived from Nadel's scheme was used to fund the startup and operations of HFH and to gain control of it.

### Home Front Homes LLC

23. HFH is a Florida limited liability company that was formed on March 27, 2006 (*see* Articles of Incorporation, a copy of which is attached as Exhibit 1) and is engaged in the business of manufacturing, marketing, and selling energy-efficient panelized homes (*see* Operating Agrmnt. at 2 "Recitals", a copy of which is attached as Exhibit 2).

24. BCV Holdings, LLC ("BCV"); Connell Holdings, LLC ("Connell"); Scoop Capital; and Brian Bishop ("Bishop") were the initial members of HFH. (*See* Ex. 2 Section 1.15 & Ex. A.) BCV, Connell, and Scoop Capital each held a 20% interest and Bishop held the remaining 40% interest. (Ex. 2 at Ex. A.)

25. As part of a corporate reorganization, in a September 26, 2007, Resolution of the Members of Home Front Homes, LLC (the "Resolution"), HFH's members approved the transfer of BCV's 20% interest and Connell's 20% interest to Scoop Capital and the transfer of Bishop's 20% to Connell. (*See* Resolution, a copy of which is attached as Exhibit 3.) Thus, as a result of the Resolution, Scoop Capital's interest in HFH grew to a controlling 60%; Bishop's interest declined to 20%; Connell's 20% interest was swapped for a 20% interest of a different "class"; and BCV was left with no interest in HFH.

26. Further, the Resolution appointed Nadel as the "Manager and President" of HFH, which gave him managerial control over HFH. (*See* Ex. 3 at 2.)

27. To resolve litigation between Bishop and HFH earlier this year, which related to Bishop's departure from HFH and his alleged violation of a non-compete agreement, HFH and Bishop entered into a Stipulation of Settlement (the "Stipulation"). The Stipulation cancelled Bishop's 20% interest in HFH as of April 7, 2009. Three-fourths of that interest was transferred to me as Receiver for Scoop Capital and the remaining one-fourth was transferred to Connell.

28. Thus, I, as Receiver for Scoop Capital, now hold a 75% interest in HFH and Connell holds the remaining 25% interest.

29. According to the evidence reviewed to date, since May 2006, HFH has received $2,161,297.24 from Scoop Capital and $30,000.00 from Scoop Management. As previously noted, that money was used to fund the startup and operations of HFH and to allow Nadel to obtain control of it.

30. Specifically, according to the records in the Receiver's possession, the following transfers of money were made from Scoop Capital and Scoop Management to HFH:

| Date | Payor | Amount |
|---|---|---|
| 05/26/2006 | Scoop Capital | $400,000.00 |
| 08/25/2006 | Scoop Capital | 50,000.00 |
| 12/31/2006 | Scoop Capital | 21,247.00 |
| 01/19/2007 | Scoop Capital | 200,000.00 |
| 01/31/2007 | Scoop Capital | 4,310.00 |
| 02/26/2007 | Scoop Capital | 100,000.00 |
| 02/28/2007 | Scoop Capital | 4,814.00 |
| 03/31/2007 | Scoop Capital | 6,059.00 |
| 04/30/2007 | Scoop Capital | 5,864.00 |
| 05/21/2007 | Scoop Capital | 50,000.00 |
| 05/31/2007 | Scoop Capital | 6,186.00 |
| 06/30/2007 | Scoop Capital | 6,244.00 |
| 07/30/2007 | Scoop Capital | 30,000.00 |
| 07/31/2007 | Scoop Capital | 6,460.00 |
| 08/15/2007 | Scoop Capital | 5,000.00 |
| 08/22/2007 | Scoop Capital | 65,000.00 |
| 08/31/2007 | Scoop Capital | 6,856.00 |
| 09/04/2007 | Scoop Management | 30,000.00 |
| 09/17/2007 | Scoop Capital | 20,000.00 |
| 09/20/2007 | Scoop Capital | 150,000.00 |
| 09/28/2007 | Scoop Capital | 100,000.00 |
| 09/30/2007 | Scoop Capital | 7,698.00 |
| 10/26/2007 | Scoop Capital | 80,000.00 |

| Date | Payor | Amount |
|---|---|---|
| 10/31/2007 | Scoop Capital | 9,696.00 |
| 11/13/2007 | Scoop Capital | 80,000.00 |
| 11/30/2007 | Scoop Capital | 7,322.92 |
| 12/10/2007 | Scoop Capital | 50,000.00 |
| 12/31/2007 | Scoop Capital | 7,322.92 |
| 01/08/2008 | Scoop Capital | 50,000.00 |
| 02/04/2008 | Scoop Capital | 80,000.00 |
| 02/19/2008 | Scoop Capital | 50,000.00 |
| 02/26/2008 | Scoop Capital | 75,000.00 |
| 03/06/2008 | Scoop Capital | 30,000.00 |
| 03/19/2008 | Scoop Capital | 40,000.00 |
| 03/31/2008 | Scoop Capital | 40,000.00 |
| 06/23/2008 | Scoop Capital | 65,000.00 |
| 06/30/2008 | Scoop Capital | 114,400.00 |
| 11/12/2008 | Scoop Capital | 10,000.00 |
| 12/10/2008 | Scoop Capital | 25,000.00 |
| 12/15/2008 | Scoop Capital | 25,000.00 |
| 12/31/2008 | Scoop Capital | 6,847.50 |
| 01/14/2009 | Scoop Capital | 40,000.00 |
| | **Total** | **$2,161,327.34** |

31. At all times during these transactions, Nadel was perpetrating his scheme, including through Scoop Capital and Scoop Management, and essentially all money flowing to Scoop Capital and Scoop Management, and consequently money flowing to HFH, was derived from that scheme.

32. Thus, the information in our possession indicates that a Receivership Entity has a 75% interest in HFH and that proceeds of Nadel's scheme funded HFH's startup and operations.

## HFH's Current Condition

33. At the present time, HFH is in very significant financial distress, and operates on a "shoe string" budget. Currently, it has account payables of several hundred thousand dollars and little income. Its major obligations (those in excess of $500,000) consist of obligations to me as Receiver for Scoop Capital of approximately $2,150,000; obligations to Connell and BCV in the aggregate of over $1 million; a secured loan of approximately $3 million from M&I Bank; and a mortgage payable to another creditor for approximately $601,738.00, which is secured by real estate owned by HFH.

34. HFH's value is in the building system that it has developed. Despite the bleak conditions of HFH and its sizeable obligations, advertising on the Receivership's website and other efforts to secure buyers for HFH successfully identified two interested parties, and on August 4th a transaction was agreed to with one of these potential buyers.

35. That transaction, for which I will seek approval from the Court soon, will provide for payments to the receivership estate and for a mechanism to accommodate certain major creditors of HFH. That transaction will salvage for the benefit of the receivership estate (and thus for the benefit of defrauded investors) the remaining value of HFH, but for that transaction to succeed, HFH must be placed in receivership.

36. Immediate placement of HFH in receivership is especially important because the mortgage-holder noted above in paragraph 33 has initiated foreclosure proceedings against HFH on the mortgage.

37. In sum, the placement of HFH in receivership is appropriate because (1) Receivership Entity Scoop Capital currently holds a controlling 75% equity interest in HFH;

(2) HFH has been funded with proceeds of Nadel's Ponzi scheme transferred to it directly from Receivership Entities Scoop Capital and Scoop Management; and (3) HFH has obligations to Scoop Capital in excess of $2 million.

38. Placing HFH in receivership will permit the orderly sale of the company and the maximization of the value of its assets for the benefit of defrauded investors and other creditors of the Receivership Estate on an equitable basis.

39. Without being placed in receivership, HFH will have to cease operations and, in all likelihood, will quickly lose all value, and thus will not generate any financial benefit to the receivership estate. Further, HFH has insufficient assets to satisfy the debts of its secured creditors, and certainly does not have the assets to satisfy its debt of more than $2 million to Scoop Capital

40. Notably, the remaining equity participant in HFH, Connell, consents to the placement of HFH in receivership, and the major creditors of HFH except for the mortgage-holder noted above in paragraph 33 (who is pursuing a foreclosure action in an attempt to wrestle HFH real estate assets away from the receivership estate and thus from defrauded investors) either have consented to this motion or have reached agreement with the buyer of HFH with respect to disposition of HFH's obligations to them.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief and is executed this 7th day of August, 2009.

Burton W. Wiand, as Receiver
c/o FOWLER WHITE BOGGS P.A.
501 E. Kennedy Blvd.
Suite 1700
Tampa, FL 33602
Tel. 813.228.7411
Fax 813.229.8313
bwiand@fowlerwhite.com