UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.                                   Case No. 8:09-cv-0087-T-26TBM

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.

      Defendants,

SCOOP REAL ESTATE, L.P.
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.
VICTORY IRA FUND, LTD,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT,

      Relief Defendants.
_____/

**RECEIVER'S MOTION FOR ORDER TO SHOW CAUSE AS TO WHY
CONSERVATION EASEMENT SHOULD NOT BE EXTINGUISHED**

Pursuant to Rule 66 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1651, and Rule 3.01 of the Local Rules for the Middle District of Florida, Burton W. Wiand, as Receiver (the "Receiver"), moves the Court for an order directing the Carolina Mountain Land Conservancy (the "Conservancy") to show cause, within a reasonable amount of time, as to why a 169-acre conservation easement (the "Easement") granted in 2005 and currently

held by the Conservancy should not be extinguished. If the Conservancy cannot show good cause, then the Receiver requests that the Easement be extinguished.

The Receiver's attempts to resolve this matter without court intervention have been unsuccessful. Although the Conservancy's nature conservation efforts are commendable, there is no legal or equitable basis to place that interest above the interests of defrauded investors who collectively lost approximately $168 million as a result of the fraudulent scheme underlying this case. As shown below, the Easement should be extinguished so the land underlying the Easement – which was purchased with proceeds of that scheme – can be sold for the benefit of the receivership estate and, ultimately, defrauded investors. The Receiver files contemporaneously with this Motion the Declaration of Carl R. Nelson ("Nelson Decl."), which attaches four exhibits that further support this Motion.

## BACKGROUND

**Nadel's Fraudulent Scheme**

On January 21, 2009, the Court appointed Mr. Wiand as Receiver in this action. Documents previously filed in this Securities & Exchange Commission (the "Commission") enforcement action detail the underlying fraudulent investment scheme (the "scheme"). (*See, e.g.*, Receiver's 3d Interim Report dated August 17, 2009 (Doc. 176); Receiver's Declaration dated January 26, 2009 ("Receiver's Jan. Decl.") (Doc. 16).)

During his investigation, the Receiver has uncovered evidence that the Defendants' violations of federal securities laws began no later than 2003. (*See* Receiver's Jan. Decl. ¶¶ 10-12.) More recent evidence obtained by the Receiver indicates those violations began no later than 1999, but since the property underlying the Easement was purchased in 2003

(*see* Receiver's Decl. in Support of 2d Unopposed Mot. to Expand Scope of Receivership, dated Feb. 10, 2009 ("Receiver's Decl.") (Doc. 37) ¶ 19.), the evidence currently in the record showing the scheme was being perpetrated in 2003 forward is sufficient for purposes of this motion. Defendant Arthur Nadel ("Nadel") defrauded investors through his control of Defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management"). Scoop Management was the "investment advisor" and/or "investment manager" of the following six hedge funds which are Relief Defendants (collectively, the "Hedge Funds): Scoop Real Estate, L.P.; Valhalla Investment Partners, L.P.; Victory IRA Fund, Ltd.; Victory Fund, Ltd.; Viking IRA Fund, LLC; and Viking Fund LLC. (*See id*. ¶¶ 2, 7-9.) Scoop Capital was the general partner of Victory Fund and Victory IRA Fund. (*See* Compl. for Injunctive and Other Relief ¶¶ 15-16.)

For each year from 2003 through 2007 (and, as shown by the Commission, in 2008), Nadel caused Receivership Entities to grossly overstate the value of the Hedge Funds and to report to investors overstated values and other false performance indicators for those funds. (*Id.*) As detailed in the Receiver's January Declaration (*id.* ¶ 11), following are the actual values of the Hedge Funds and the purported year-end values represented to investors from 2003 through 2007:

|  | **Value as of 12/31/03 ($)** | **Value as of 12/31/04 ($)** | **Value as of 12/31/05 ($)** | **Value as of 12/31/06 ($)** | **Value as of 12/31/07 ($)** |
|---|---|---|---|---|---|
| **Actual Value** | 80,820,378.06 | 143,073,367.23 | 132,731,986.70 | 63,715,094.39 | 18,042,860.67 |
| **Value Represented To Investors** | 128,953,973.27 | 216,868,604.46 | 274,387,098.31 | 282,379,592.45 | 313,960,110.28 |

**Transfer of Scheme Proceeds to Laurel Mountain and Laurel Preserve**

In relevant part, Nadel's misrepresentations concerning the performance of the Hedge Funds precipitated their payment, directly or indirectly, of substantial fees to Scoop Management and Scoop Capital in the form of "management," "advisory," "profit incentive," and/or "service" fees. (*See* Receiver's Jan. Decl. ¶ 13.) Such payments significantly depleted the Hedge Funds' assets and improperly diverted assets to Scoop Capital and Scoop Management, and, because of his control of those entities, Nadel himself. Significant sums from the proceeds of Nadel's scheme also made their way into personal accounts controlled by Nadel and/or his wife, Marguerite "Peg" Nadel, and into the accounts of other Receivership Entities controlled by Nadel, including Tradewind, LLC ("Tradewind"). (*See id*. ¶¶ 15, 24-29.) Notably, all of the evidence in the Receiver's possession indicates that, during the time of Nadel's scheme, neither Nadel nor his wife had a source of meaningful income other than from the scheme. (*See id*.)

Documentation and other information that the Receiver has collected shows that money derived from the scheme was used by Nadel to fund other businesses. The Receiver's investigation revealed that two such businesses which were controlled by Nadel were Laurel Mountain Preserve, LLC ("Laurel Mountain") and Laurel Preserve, LLC ("Laurel Preserve"). (*See generally* Receiver's Decl. in Support of 2d Unopposed Mot. to Expand Scope of Receivership, dated Feb. 10, 2009 ("Receiver's Decl." (Doc. 37).) Laurel Mountain was a North Carolina limited liability company formed in or about December 2003; its manager and member was Nadel; and Nadel controlled it. (*Id*. ¶ 16.) Laurel Mountain was "withdrawn" as a limited liability company in January 2006. (*Id*.) Laurel Preserve was

formed as a North Carolina limited liability company in February 2006, and its manager was Nadel. (*Id.* ¶ 17.) At all relevant times, Nadel, through Receivership Entity Scoop Capital, LLC, was the sole owner of 100% of Laurel Preserve and controlled it. (*Id.*)

According to their balance sheets, Laurel Mountain received at least $1,594,753.09 in the form of "loans" from Receivership Entities Scoop Capital, Scoop Management, and Tradewind, and at least $214,467.80 from Nadel and his wife. (*See id.* ¶ 20.) Similarly, Laurel Preserve received at least $1,122,273.52 in the form of "loans" from Receivership Entities (Scoop Capital, Scoop Management, and Tradewind) and at least $929,434.45 from Laurel Mountain. (*See id.* ¶ 21.) To date, the Receiver has identified transfers of at least $467,760.00 from Scoop Capital to or for the benefit of Laurel Mountain between February 2004 and March 2005. (*See id.* ¶ 22.) Further, he has identified transfers of at least $541,000.00 from Scoop Capital to Laurel Preserve between September 2006 and January 2009. (*See id.* ¶ 23.) The Receiver has not uncovered any funds of Laurel Mountain or Laurel Preserve that were not diverted from the scheme other than money from a mortgage collateralized by the land underlying the Easement and adjacent land.

In sum, Nadel's operation and control of Scoop Capital and Scoop Management enabled him to improperly divert investors' funds from the Hedge Funds and to use those funds to purchase real property titled in the name of Laurel Mountain, and subsequently Laurel Preserve, part of which is subject to the Easement.

**The Easement**

In 2003, Nadel caused Laurel Mountain to purchase approximately 430 acres in Buncombe and McDowell Counties, North Carolina (the "Property") with funds improperly

diverted from the Hedge Funds. (*See* Receiver's Decl. ¶¶ 16-23.) On or about December 1, 2005, Nadel caused Laurel Mountain to grant the Easement to the Conservancy as a gift with no monetary consideration. (*See* Nelson Decl. Ex. A at 1.) An appraisal of the Easement shows that, as of November 1, 2005, (i) if the land comprising the Easement had been developed as a 12-site subdivision, it would have been worth $2,398,000.00; (ii) without the development, the land comprising the Easement was worth $422,000.00; (iii) the value of the Easement was thus $1,976,000.00 (the difference between (i) and (ii)); and (iv) as a result of the transfer, Nadel received a substantial, personal tax deduction. (*See* Nelson Decl. Ex. B at 4, 6-7.)

Pages from Nadel and his wife's income tax return for the year 2005 show that Nadel took a deduction of $1,800,000 as "not capital gain property donated to 30% limit organizations." (Nelson Decl. Ex. C at 4.) Therefore, Nadel and his wife ultimately took a personal tax deduction of $1,800,000 from the transfer of the Easement to the Conservancy, while Laurel Mountain received nothing and, in fact, gave up a valuable and substantial piece of land to the Conservancy. In February 2006, the Property, subject to the Easement, was "sold" to Laurel Preserve, and Laurel Mountain provided financing for that purchase in the form of a $2,900,000 loan to Laurel Preserve. (Receiver's Decl. ¶ 19.) This transaction was nothing more than a transfer of the Property from one entity controlled by Nadel to another such entity, and it appears to have been done for financial and tax planning reasons.

On February 10, 2009, the Receiver filed (i) his second unopposed motion to expand the scope of Receivership (the "Motion to Expand" (Doc. 36)) to include, *inter alia*, Laurel Mountain and Laurel Preserve and (ii) his declaration in support of the Motion to Expand,

with exhibits (Receiver's Decl. (Doc. 37)). On February 11, 2009, the Court granted the Motion to Expand and appointed Mr. Wiand as Receiver over Laurel Mountain and Laurel Preserve. (Order dated Feb. 11, 2009, Doc. 44.) As a result, the Property is now part of the Receivership estate, but it is still subject to the Easement.

## ARGUMENT

**I. EXTINGUISHING THE CONSERVANCY EASEMENT IS WITHIN THE COURT'S POWER AND WOULD BE IN THE BEST INTERESTS OF THE RECEIVERSHIP.**

The Court has broad power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership. *SEC v. Elliott,* 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989). The Court's wide discretion derives from the inherent powers of an equity court to fashion relief. *Elliott*, 953 F.2d at 1566 (citing *SEC v. Safety Fin. Serv., Inc.,* 674 F.2d 368, 372 (5th Cir. 1982)). The purpose of establishing a receivership is "to protect the estate property and ultimately return that property to the proper parties in interest," and a receiver is vested with the duty and authority to marshal and preserve assets to effectuate an orderly, efficient, and equitable administration. *SEC v. Credit Bancorp, Ltd.*, 93 F. Supp. 2d 475, 476-77 (S.D.N.Y. 2000); *see also* 28 U.S.C. § 754 (noting that a receiver "appointed in any civil action or proceeding involving property . . . shall be vested with complete jurisdiction and control of all such property with the right to take possession thereof.").

As in *Credit Bancorp*, this Court's Order Appointing Receiver requires the Receiver to "marshal and safeguard all of the assets of the Receivership Entities and take whatever

actions are necessary for the protection of the investors." (Doc. 8). The Order expressly states:

> In the event that the Receiver discovers that funds of persons who have invested in the Corporate Defendants have been transferred to other persons or entities, the Receiver shall apply to this Court for an Order giving the Receiver possession of such funds and, if the Receiver deems it advisable, extending this receivership over any person or entity holding such investor funds.

(Doc. 8 ¶ 24.)

Here, the land that comprises the Easement was purchased with investor funds derived from the scheme. (*See* Mot. to Expand (Doc. 36) at 4-6.) That land would add significant value to the Receivership estate, and although nature conservation is a commendable endeavor, there is no legal (or other) basis for placing those interests above those of defrauded investors. Marshalling and safeguarding that land are necessary to protect all investors and to preserve the asset's value. The Property was purchased with money diverted from Receivership Entities, yet neither the investors nor any Receivership Entity received a benefit from the transfer of the Easement. As a result, as a matter of equity the Easement should be extinguished so the property that is subject to the Easement can be returned to the Receivership estate and liquidated so that ultimately, the proceeds of its sale can be distributed, along with other assets, to defrauded investors who funded its purchase in the first place.

## II. NADEL'S GRANTING OF THE EASEMENT WAS A FRAUDULENT TRANSFER, AND THE EASEMENT SHOULD BE EXTINGUISHED ACCORDINGLY.

Aside from being compelled by equity, the Easement should be extinguished as a matter of law because its transfer to the Conservancy violated the Uniform Fraudulent

Transfer Act ("UFTA"). As an initial matter, charitable organizations are not exempt from claims under UFTA. *Scholes v. Lehmann*, 56 F.3d 750, 761 (7th Cir. 1995) (finding that UFTA "makes no distinction among different kinds of recipient of fraudulent conveyances. Every kind is potentially liable"). In *Scholes*, although the appellate court was sympathetic to the transferees, who were religious organizations, it rejected their plea to exclude charities from the Illinois fraudulent transfer statute. *Id.* at 761.

Here, the Deed of Conservation Easement and related documents establish that Nadel caused Laurel Mountain to transfer the Easement to the Conservancy, that the Conservancy did not give any value in return, and that neither Laurel Mountain, Laurel Preserve, nor any of the Hedge Funds received any value from the transfer of the Easement. *See* N.C. Gen. Stat. §§ 39-23.3, 39-23.6. This transfer significantly depleted Laurel Mountain's assets. Specifically, it deprived it (and later Laurel Preserve) of more than $1.9 million of property value. The transfers provided no benefit whatsoever – let alone reasonably equivalent value – to Laurel Mountain, Laurel Preserve, or any of the Hedge Funds (or any other Receivership Entity). Instead, the transfer provided a <u>personal</u> tax break to Nadel and his wife.

As discussed below, because Nadel, through his scheme, improperly diverted assets from the Hedge Funds, including assets that were used to purchase the Property, the Hedge Funds have claims against Nadel, and consequently they are creditors and he is a debtor under UFTA. *See* N.C. Gen. Stat. § 39-23.1, *et seq.*[1] Similarly, because Nadel improperly

---

[1] This Motion presumes that North Carolina's Uniform Fraudulent Transfer Act applies because (i) the Property is situated in North Carolina, and (ii) all pertinent agreements were entered into in North Carolina. *See Denison v. Denison*, 658 So. 2d 581, 582 (Fla. 4th DCA 1995) ("It is a general and universal rule that real property is subject to the laws of the state in which it is situated."); *Beale v. Beale*, 807 So. 2d 797, 798, (Fla. 1st DCA 2002)

diverted assets from Laurel Mountain for his and his wife's personal benefit by transferring the Easement to the Conservancy, Laurel Mountain and Laurel Preserve have claims against Nadel, so they are creditors and Nadel is a debtor under UFTA. *See id.*

The *Scholes* court described similar circumstances as follows:

> The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more [the defendant's] evil zombies. Freed from his spell they became ***entitled to the return of the moneys-for the benefit not of [the defendant] but of innocent investors-that [the defendant] had made the corporations divert to unauthorized purposes***.

*Scholes*, 56 F.3d 750, 754 (emphasis added). Accordingly, the Receiver moves on behalf of the Hedge Funds, Laurel Mountain, and Laurel Preserve to avoid the transfer of an asset that Nadel wrongfully transferred to the Conservancy in the form of the Easement.

### A. Fraudulent Transfer Under Section 39-23.4(a)(1), N.C. Gen. Stat.

The transfer of the Easement was fraudulent under Section 39-23.4(a)(1), which states,

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With intent to hinder, delay, or defraud any creditor of the debtor . . . .

---

("Florida's conflict of law rule is *lex loci rei sitae* (laws of the situs of the real property govern)."); *Rossi v. Pocono Point, LLC*, 2009 WL 435064, *4 (M.D. Fla. Feb. 20, 2009) ("Florida adheres to the doctrine of *lex loc[i] contractus* in causes of action arising in contract. *Lex loci contractus* looks to the place where the contract was executed."). Nevertheless, the result would be the same under Florida's Uniform Fraudulent Transfer Act because the two Acts are essentially the same.

Here, the transfer of the Easement to the Conservancy was made "[w]ith intent to hinder, delay, or defraud" the Hedge Funds, Laurel Mountain, and Laurel Preserve because it involved diversion of assets through Nadel's fraudulent scheme. *See, e.g., In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 850 (Bankr. M.D. Fla. 2005).

### B. Fraudulent Transfer Under Section 39-23.4(a)(2)a., N.C. Gen. Stat.

The transfer of the Easement also was fraudulent under N.C. Gen. Stat. Section 39-23.4(a)(2)a., which states,

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . .
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction ….

Here, the Easement was transferred without the receipt of reasonably equivalent value. Neither the Hedge Funds, Laurel Mountain, nor Laurel Preserve received anything of value in exchange for the Easement. And although Nadel took a tax deduction as a result of that transfer, that benefit did not inure to Laurel Mountain or any other Receivership Entity and was not "in exchange for" the Easement. Therefore, there was no "reasonably equivalent value in exchange for the transfer or obligation." *See, e.g., Scholes*, 56 F.3d at 759 ("If one thing is clear, it is that a ***gift*** to a charity (to anyone, for that matter) is not in exchange for full in the sense of commensurate consideration." (emphasis added)). Further, the remaining assets of Nadel were unreasonably small – indeed he was insolvent – as he faced potential

claims from all defrauded investors, each of whom is a tort creditor for, at a minimum, the amount of their losses from the scheme. *See Scholes*, 56 F.3d at 754, 755.

## C. Fraudulent Transfer Under Section 39-23.4(a)(2)b., N.C. Gen. Stat.

The transfer of the Easement also was fraudulent under N.C. Gen. Stat. Section 39-23.4(a)(2)b., which states,

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . .
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: . . .
>
> b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The previous Section addresses the lack of requisite reasonably equivalent value received in exchange for the transfer of the Easement. Further, by improperly diverting pertinent assets in connection with the scheme, Nadel intended to incur debts beyond his ability to pay them as the diversion of those assets created obligations to the victims (and the Hedge Funds).

## D. Fraudulent Transfer Under Section 39-23.5, N.C. Gen. Stat.

Finally, the transfer of the Easement also was fraudulent under N.C. Gen. Stat. Section 39-23.5, which states,

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

As explained above, the transfer of the Easement was made without an exchange of the requisite reasonably equivalent value and, as a result of Nadel's improper diversion of funds, he was insolvent at the time of that transfer.

* * *

On behalf of the Hedge Funds, Laurel Mountain, and Laurel Preserve, the Receiver is entitled to avoid the transfer of the Easement to the Conservancy, and thus to have that Easement extinguished, and to any other pertinent remedy, including those available under Section 39-23.7 of the North Carolina General Statutes.

**III. THE CONSERVANCY SHOULD BE ORDERED TO SHOW CAUSE AS TO WHY THE EASEMENT SHOULD NOT BE EXTINGUISHED.**

The Court has jurisdiction over the Property because, within ten days after the entry of the Order Reappointing Receiver (Doc. 140), the Receiver filed the Order Reappointing Receiver and a certified copy of the Complaint in the United States District Court for the Western District of North Carolina, Asheville Division, which is where the Property is located (Nelson Decl. Ex. D). *See* 28 U.S.C. § 754; *see also* 28 U.S.C. § 1692. As long as the Conservancy receives due process, the matters addressed in this motion may be resolved in summary proceedings before this Court. *See, e.g.*, *SEC v. Univ. Fin.*, 760 F.2d 1034, 1037 (9th Cir. 1985) ("We agree with the Receiver . . . that the distinction between summary and plenary proceedings was of no consequence here because the district court afforded Investors virtually all of the procedural protections which would have been available in plenary proceedings."); *see also SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) ("In granting relief, it is appropriate for the district court to use summary proceedings. . . . A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and

prevents further dissipation of receivership assets."). In compliance with due process requirements, the Receiver seeks an order directed to the Conservancy to show cause, within a reasonable amount of time, as to why the Easement should not be extinguished.

## CONCLUSION

WHEREFORE, the Receiver asks the Court to enter an order to show cause as to why the easement transferred by Laurel Mountain to the Carolina Mountain Land Conservancy should not be extinguished. If the Conservancy cannot show good cause, then the Receiver requests that the Easement be extinguished.

Respectfully submitted,

s/ Carl R. Nelson
Carl R. Nelson, FBN 0280186
cnelson@fowlerwhite.com
Ashley Bruce Trehan, FBN 0043411
ashley.trehan@fowlerwhite.com
FOWLER WHITE BOGGS P.A.
P.O. Box 1438
Tampa, FL 33601
T: (813) 228-7411
F: (813) 229-8313

- and -

Gianluca Morello, FBN 034997
gmorello@wiandlaw.com
WIAND GUERRA KING P.L.
3000 Bayport Drive
Suite 600
Tampa, Florida 33607
T: (813) 347-5100
F: (813) 347-5199

Attorneys for the Receiver, Burton W. Wiand

## LOCAL RULE 3.01(g) CERTIFICATION OF COMPLIANCE

Counsel for the Receiver has conferred with counsel for the SEC, and the SEC does not object to the relief sought in this Motion. Further, counsel for the Receiver has conferred with counsel for the Conservancy but could not reach an agreement on the resolution of this motion.

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

Arthur G. Nadel
Register No. 50690-018
Metropolitan Correctional Center, New York
150 Park Row
New York, NY  10007

I further certify that I mailed the foregoing document and the notice of electronic filing by certified mail and email to counsel for the Carolina Mountain Land Conservancy and the Assistant Attorney General for the State of North Carolina at the following addresses:

| | |
|---|---|
| Sharon B. Alexander<br>Prince, Youngblood & Massagee, PLLC<br>240 Third Avenue West<br>Hendersonville, NC 28739<br>sbalexander@pym-law.com<br>Co-Counsel for the Carolina Mountain Land Conservancy | William W. Weeks<br>The Conservation Law Center<br>116 S. Indiana Avenue<br>Bloomington, Indiana 47408<br>wwweeks@indiana.edu<br>Co-Counsel for the Carolina Mountain Land Conservancy |

Sueanna P. Sumpter
North Carolina Department of Justice
Attorney General's Western Office
42 North French Broad Avenue
Asheville, North Carolina 28801
wossumpt@ncdoj.gov
Assistant Attorney General, State of North Carolina

                                                  s/ Carl R. Nelson
                                                  Carl R. Nelson, FBN 0280186