# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.                                                          Case No. 8:09-cv-0087-T-26TBM

ARTHUR NADEL;
SCOOP CAPITAL, LLC;
SCOOP MANAGEMENT, INC.

        Defendants,

SCOOP REAL ESTATE, L.P.;
VALHALLA INVESTMENT PARTNERS, L.P.;
VALHALLA MANAGEMENT, INC.;
VICTORY IRA FUND, LTD.;
VICTORY FUND, LTD.;
VIKING IRA FUND, LLC;
VIKING FUND, LLC; AND
VIKING MANAGEMENT, LLC,

        Relief Defendants.

_____/

## THE RECEIVER'S FOURTH INTERIM REPORT

**Receivership Information and Activity from August 13, 2009 through October 30, 2009**

Gianluca Morello, FBN 034997
Maya M. Lockwood, FBN 0175481
WIAND GUERRA KING P.L.
3000 Bayport Drive
Suite 600
Tampa, FL  33607
T: (813) 347-5100
F: (813) 347-5199

*Attorneys for Receiver, Burton W. Wiand*

Dockets.Justia.com

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................2

I.      Procedure and Chronology. .......................................................................................2

II.     The Receiver's Role and Responsibilities. ...............................................................6

     A.    Operating the Business of the Receivership Entities. ...........................6
     B.    Taking Possession of Receivership Property. .......................................6
     C.    Investigating Receivership Affairs and Recovering Funds. ..................7
     D.    Reporting on Assets and Liabilities and Implementing Claims
           Process. ..................................................................................................7

III.    Overview of Preliminary Findings. ..........................................................................8

     A.    Fictitious Trading Results. .....................................................................9
     B.    Depletion of the Hedge Funds' Assets. ...............................................11
     C.    Investor Losses and "Fictitious Profits." ............................................12
     D.    Nadel's Trading Activities in the Hedge Funds. .................................13

ACTIONS TAKEN BY THE RECEIVER .............................................................................16

IV.    Securing the Receivership Estate. ...........................................................................16

     A.    Taking Possession of Defendants' Headquarters. ..............................16
     B.    Securing Receivership Funds. ..............................................................17
     C.    Locating Additional Funds. ..................................................................19
     D.    Receivership Accounting Report. .........................................................20
     E.    Obtaining Information from Third Parties. .........................................21

V.     Asset Analysis and Recovery ...................................................................................21

     A.    Expansion of Receivership to Include Additional Entities. ...............21

           1.    Venice Jet Center, LLC. ...........................................................22
           2.    Tradewind, LLC. ......................................................................25
           3.    Laurel Mountain Preserve, LLC; Laurel Preserve, LLC;
               and Laurel Mountain Preserve Homeowners Association,
               Inc. ............................................................................................27
           4.    Marguerite J. Nadel Revocable Trust UAD 8/2/2007. ...........29
           5.    Guy-Nadel Foundation, Inc. .....................................................30
           6.    Lime Avenue Enterprises, LLC, and A Victorian Garden
               Florist, LLC. .............................................................................31
           7.    Viking Oil & Gas, LLC. ............................................................32

|  |  |  |  |
|---|---|---|---|
|  | 8. | Home Front Homes, LLC. | 33 |
|  | 9. | Summer Place Development Corporation. | 35 |
| B. | | Recovery of Real Property. | 36 |
|  | 1. | Thomasville, Georgia. | 36 |
|  | 2. | Grady County, Georgia. | 37 |
|  | 3. | Graham, North Carolina. | 38 |
|  | 4. | Raleigh, North Carolina. | 39 |
|  | 5. | Tupelo, Mississippi. | 39 |
|  | 6. | Newnan, Georgia. | 40 |
|  | 7. | Fairview, North Carolina. | 40 |
|  | 8. | Sarasota, Florida (Fruitville Road). | 40 |
|  | 9. | Oberlin, Ohio. | 41 |
| C. | | Recovery of Vehicles and Other Items. | 42 |
|  | 1. | Vehicles. | 42 |
|  | 2. | Condominium Note and Mortgage. | 43 |
|  | 3. | Bonds.com Assets. | 43 |
|  | 4. | Quest EMG Promissory Note. | 46 |
|  | 5. | Miscellaneous Items. | 46 |
| D. | | Recovery of Profits from Investors. | 46 |
| E. | | Recovery of Assets from Christopher D. Moody and Neil V. Moody. | 47 |
|  | 1. | Viking Oil's Interest in Quest EMG. | 48 |
|  | 2. | Moodys' Interest in Bonds.com. | 48 |
|  | 3. | Queen's Wreath Jewels, Inc. | 48 |
| F. | | Recovery of Fees from Recipients of Commissions. | 49 |
| G. | | Other Litigation. | 50 |
|  | 1. | Class Action Litigation. | 50 |
|  | 2. | Malpractice Litigation. | 50 |
|  | 3. | Other Potential Litigation. | 51 |
| VI. | | Investigating Receivership Affairs and Tracing Receivership Funds | 51 |
| VII. | | The Next Sixty Days. | 52 |
| | | CONCLUSION | 53 |

## INTRODUCTION

Burton W. Wiand, the Court-appointed Receiver for the Receivership Entities as defined herein, hereby files this Fourth Interim Report (the "**Report**") to inform the Court, the investors, and others interested in this Receivership, of activities to date as well as the proposed course of action.[1] As of the date of filing this Report, the Court has appointed Burton W. Wiand as Receiver over the following entities and trust:

a)      Defendants Scoop Capital, LLC ("**Scoop Capital**") and Scoop Management, Inc. ("**Scoop Management**") (which, along with Arthur Nadel, are collectively referred to as "**Defendants**");

b)      Relief Defendants Scoop Real Estate, L.P. ("**Scoop Real Estate**"); Valhalla Investment Partners, L.P. ("**Valhalla Investment Partners**"); Victory IRA Fund, Ltd. ("**Victory IRA Fund**"); Victory Fund, Ltd. ("**Victory Fund**"); Viking IRA Fund, LLC ("**Viking IRA Fund**"); and Viking Fund LLC ("**Viking Fund**") (collectively referred to as the "**Hedge Funds**");

c)      Relief Defendants Valhalla Management, Inc. ("**Valhalla Management**"), and Viking Management, LLC ("**Viking Management**") (which, along with Scoop Capital and Scoop Management, are collectively referred to as the "**Investment Managers**"); and

d)      Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; Laurel Mountain Preserve Homeowners Association, Inc.; Marguerite J. Nadel Revocable Trust UAD 8/2/07; Guy-Nadel Foundation, Inc.; Lime Avenue Enterprises, LLC; A Victorian Garden Florist, LLC; Viking Oil & Gas, LLC; and Home Front Homes, LLC.

The foregoing entities and trust are collectively referred to as the "**Receivership Entities**."

The Receiver was appointed on January 21, 2009. By January 26, 2009, the Receiver established an informational website, www.nadelreceivership.com. The Receiver has

---

[1] This Report is intended to report on information and activity from August 13, 2009, through October 30, 2009. Thus, unless otherwise indicated, the information reported herein reflects the information in the Receiver's possession as of October 30, 2009.

updated this website periodically and continues to update it with the Receiver's most significant actions to date; important court filings in this proceeding; and other news that might be of interest to the public. This Report, as well as all previous and subsequent reports, will be posted on the Receiver's website.[2]

## BACKGROUND

### I.   Procedure and Chronology.

Defendant Arthur Nadel ("**Nadel**") was the Hedge Funds' principal investment advisor and an officer and director of Scoop Management and sole managing member of Scoop Capital. On or about January 14, 2009, Nadel fled Sarasota County and disappeared for nearly two weeks.

On January 21, 2009, the Securities and Exchange Commission (the "**Commission**") filed a complaint in this Court charging the Defendants with violations of federal securities laws (the "**Commission Proceeding**"). The Commission alleges that Nadel used the Investment Managers to defraud investors in the Hedge Funds from at least January 2008 forward by "massively" overstating investment returns and the value of fund assets to investors in these funds and issuing false account statements to investors. The Commission also asserts that Nadel misappropriated investor funds by transferring $1.25 million from Viking IRA Fund and Valhalla Investment Partners to secret bank accounts. The Court

---

[2] The Receiver has used Fowler White Boggs P.A., as legal counsel, to assist with the receivership. On November 9, 2009, the firm of Wiand Guerra King P.L. ("WGK") opened and most of the lawyers, paralegals, and staff who have dedicated significant time to this matter moved from Fowler White to join WGK. The Receiver is the Chairman of WGK, and going forward, WGK will undertake the primary representation of the Receiver and will do so at the same discounted fee structure as initially agreed to by the Receiver.

found the Commission demonstrated a *prima facie* case that Defendants committed multiple violations of federal securities laws.

On that same day, on the SEC's motion, the Court entered (i) an Order of Preliminary Injunction and Other Relief as to the Investment Managers and all Relief Defendants (Doc. 7) and (ii) a Temporary Restraining Order and Other Emergency Relief as to Nadel (the "**Nadel TRO**") (Doc. 9). Among other things, these orders enjoined the Defendants and Relief Defendants from further violations of federal securities laws and froze their assets. On February 3, 2009, the Court entered an Order of Preliminary Injunction and Other Relief as to Nadel (the "**Nadel Preliminary Injunction**") (Doc. 29), the terms of which are essentially identical to those of the Nadel TRO.[3]

Also on the same day the Commission filed its complaint, the Court entered an order appointing Burton W. Wiand as Receiver for the Investment Managers and Hedge Funds (the "**Order Appointing Receiver**"). (*See generally* Order Appointing Receiver (Doc. 8).) Between January 27, 2009, and August 10, 2009, on the Receiver's motions, the Court entered orders expanding the scope of receivership to include additional entities as follows:

January 27, 2009 (Doc. 17)  Venice Jet Center, LLC
            Tradewind, LLC

---

[3] Both the Nadel TRO and the Nadel Preliminary Injunction required Nadel to make a sworn accounting to the Court and the Commission of all funds received by him from any of the Defendants or Relief Defendants and a sworn identification of all accounts in which he has an interest or has the power or right to exercise control. (Docs. 9, 29.) In response to these Orders, on March 31, 2009, Nadel submitted a letter asserting his Fifth Amendment right against self-incrimination and refused to provide this information. (Doc. 102.)

| February 11, 2009 (Doc. 44) | Laurel Mountain Preserve, LLC |
| | Laurel Preserve, LLC |
| | Marguerite J. Nadel Revocable Trust UAD 8/2/07 |
| | Laurel Mountain Preserve Homeowner Association, Inc. |
| March 9, 2009 (Doc. 68) | Guy-Nadel Foundation, Inc. |
| March 17, 2009 (Doc. 81) | Lime Avenue Enterprises, LLC |
| | A Victorian Garden Florist, LLC |
| July 15, 2009 (Doc. 153) | Viking Oil & Gas, LLC |
| August 10, 2009 (Doc. 172) | Home Front Homes, LLC |

On June 3, 2009, the Court entered an order Reappointing Receiver. (Doc. 140.) The January 21, 2009, and June 3, 2009, Orders will be referred to collectively as the "**Orders Appointing Receiver**." Pursuant to the Orders Appointing Receiver, the Receiver has the duty and authority to: "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants; marshal and safeguard all of the assets of the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors." (Orders Appointing Receiver at 1-2.)

On January 27, 2009, Nadel surrendered to the FBI in Tampa, Florida. Nadel was arrested and charged with two counts of securities fraud and wire fraud based on the fraudulent investment scheme discussed herein. On January 30, 2009, Magistrate Judge Mark Pizzo of the United States District Court for the Middle District of Florida denied Nadel's request for a release on bond awaiting trial, deciding instead that Nadel should remain in jail based on, among other things, a risk of flight. On or about February 2, 2009, Judge Pizzo entered a Detention Order denying bail and a Removal Order requiring that

Nadel be transferred to the Metropolitan Correctional Center in New York, New York to await trial. *U.S. v. Nadel*, Case No. 8:09-mj-01039 M.D. Fla. (Docs. 5, 6).

On February 26, 2009, Judge Denise Cote of the United States District Court for the Southern District of New York agreed to release Nadel on $5 million bail, contingent on a number of conditions including $1 million in cash, living restrictions, and specific bond guarantees. Judge Cote also required Nadel to fully and completely cooperate with the SEC. On April 28, 2009, Nadel was indicted on six counts of securities fraud, one count of mail fraud, and eight counts of wire fraud. The maximum sentence for each charge is 20 years of imprisonment. On April 30, 2009, Nadel pleaded not guilty to the fifteen charges.

In June 2009, Nadel sought a reduction of bail. Judge John G. Koeltl agreed to remove the $1 million cash security and instead imposed a $1 million personal recognizance bond, requiring Nadel to find four financially sound co-signers. On or about September 24, 2009, Nadel sought another modification of bail conditions. (*See U.S. v. Nadel*, Doc. 38.) On October 23, 2009, following a hearing, Judge Koeltl denied Nadel's application for modification of conditions of release. Nadel is still being held in the Metropolitan Correctional Center.

In the Commission Proceeding, on April 6, 2009, Nadel filed his answer and affirmative defenses, in which he denied nearly every allegation in the Complaint and set forth two affirmative defenses. (Doc. 104.) Nadel also purported to set forth a "Counterclaim," which the Court struck on the Receiver's motion. (Docs. 111, 112.)

## II. The Receiver's Role and Responsibilities.

The Receiver functions as an independent agent of the court. The United States Supreme Court has explained that:

> [a receiver] . . . is an officer of the court; his appointment is provisional. He is appointed on behalf of all parties, and not of the complainant or of the defendant only. He is appointed for the benefit of all parties who may establish rights in the cause. The money in his hand is *in custodia legis* for whoever can make out a title to it . . . It is the court itself which has the care of the property in dispute. The receiver is but the creature of the court; he has no power except such as are conferred upon him by the order of his appointment and the course and practice of the court.

*Booth v. Clark*, 58 U.S. 322, 331 (1854). Generally, the Receiver is charged by the Court with maximizing investors' and creditors' recoveries. To this end, the Court directed the Receiver to engage in the following activities:

### A. Operating the Business of the Receivership Entities.

The Court granted the Receiver the "full and exclusive power, duty, and authority" to "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants . . . ." (Orders Appointing Receiver at 1.)

### B. Taking Possession of Receivership Property.

The Court directed the Receiver to "[t]ake immediate possession of all property, assets and estates of every kind of the Defendants and Relief Defendants, whatsoever and wheresoever, located belonging to or in the possession of the Defendants and Relief Defendants . . . ." (Orders Appointing Receiver ¶ 1.)

**C.  Investigating Receivership Affairs and Recovering Funds.**

The Court also directed the Receiver to "[i]nvestigate the manner in which the affairs of the Defendants and Relief Defendants were conducted and institute such actions and legal proceedings, for the benefit and on behalf of the Defendants and Relief Defendants and their investors and other creditors as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in the Defendants and Relief Defendants . . . ." (Orders Appointing Receiver ¶ 2.)

**D.  Reporting on Assets and Liabilities and Implementing Claims Process.**

The Court further directed the Receiver to "[p]resent to this Court a report reflecting the existence and value of the assets of the Defendants and Relief Defendants and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Defendants and Relief Defendants . . . ." (Orders Appointing Receiver ¶ 3.) As contemplated by the Orders Appointing Receiver, the Receiver will ultimately institute a claims process primarily for the benefit of the Receivership Entities' investors who have been defrauded and suffered legitimate losses as a result of the activities of Nadel and others. (*See also* Order dated Sept. 24, 2009 (Doc. 207) ("[A]as previously observed by this Court, there will come a time when 'the Court will implement a claims procedure designed to afford all disaffected investors the process they are due under the law with regard to their claimed interest in the estate's assets consistent with the principles of

*Securities and Exchange Commission v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) (citing Order dated Sept. 8, 2009 (Doc. 192)).)

### III.    Overview of Preliminary Findings.

The Receiver continues the process of reviewing voluminous records from the offices of Receivership Entities, as well as records from more than thirty (30) different institutions, including banks and brokerage firms. The Receiver also is in the process of obtaining documents from additional third parties. The Receiver has formed some preliminary conclusions based on his review of a portion of the records received. While these conclusions are not final, and may change as the review becomes more complete, the Receiver believes they should be shared with the Court, the investors, and other potentially interested parties.

In the Commission's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (Doc. 2) and supporting papers, the Commission presented evidence showing Nadel defrauded investors through his control of the Hedge Funds' advisers and/or managers, Scoop Capital and Scoop Management. Through the Investment Managers, Nadel, along with Christopher Moody and Neil Moody, was ultimately responsible for controlling the Hedge Funds' investment activities.

While the Commission's evidence showed that Nadel defrauded investors since at least January 2008, the Receiver's investigation has uncovered evidence showing that the fraud began at least as early as 2003 and in all likelihood before then. Indeed, Nadel essentially admitted as much in several letters he wrote for family at the time of his disappearance in January of this year. In one letter in which he suggested how to calculate

the Hedge Funds' investment losses he wrote, "go back as far as possible, to 1998 if we can, to Spear, Leeds & Kellogg from Goldman Sachs, and determine the actual trading losses," and added that his "recollection of the more recent losses, say from 2001 on, is about an average of about $20M per year." In another letter, which was shredded, he wrote (emphasis added): "<u>For more than ten [years]</u> I have truly believed that [I could] trade my way out of this mess, and in 2008 did it finally penetrate my addled [brain] that this is not to be." In yet another letter, Nadel wrote, "[a]t first moderate profits were achieved, but by 1999 the volatile tech bubble created losses. When the bubble burst I began to 'doctor' the trading results." All of the above information shows that from at least 2003, and likely earlier, the source of Nadel and Mrs. Nadel's income was Nadel's scheme.

### A. Fictitious Trading Results.

The Receiver's investigation has revealed that for each Hedge Fund, the Hedge Fund's performance as disclosed to investors from at least 2003 forward was based mainly on trading results that Nadel purported to have in brokerage transactions cleared through Goldman Sachs Group, Inc. (in which money was purportedly traded to generate the purported returns Nadel was paying). The returns reported to investors and potential investors were based on fictitious performance results that were created by Nadel and then included in a database maintained by Scoop Management. These fictitious performance results formed the basis of gross misrepresentations to investors.

**Table 1**, below, shows a comparison of actual trading results in the Hedge Funds' Goldman Sachs accounts to the values represented to investors and to distributions paid. Specifically, for each year from 2003 to 2008, the table lists from, left to right, (1) the

pertinent year; (2) the amount of gains the Investment Managers represented that the Hedge

Funds had achieved that year; (3) the actual combined total gain or loss experienced that year

in the accounts for the Hedge Funds, per statements from Goldman Sachs; (4) the difference

between what the Investment Managers represented the Hedge Funds had achieved in

performance versus the actual trading results in the Goldman Sachs accounts for the Hedge

Funds (identified as "Difference"); and (5) the actual distributions paid by the Hedge Funds

for the pertinent year, including distributions to investors and management and performance

incentive fees paid.

### Table 1: Gains/(Losses)

| Year | Investment Managers' Represented Gains ($) | Hedge Funds Actual Amounts($) | Difference ($) | Distributions ($) |
|-------|-------------|-------------|-------------|-------------|
| 2003 | 23,716,749 | 17,237,008 | 6,479,741 | 16,729,147 |
| 2004 | 46,950,345 | 4,637,878 | 42,312,467 | 49,329,387 |
| 2005 | 61,169,058 | 5,739,301 | 55,429,756 | 75,078,840 |
| 2006 | 50,003,778 | (18,549,355) | 68,553,133 | 75,444,122 |
| 2007 | 54,665,571 | (24,989,307) | 79,654,879 | 60,034,321 |
| 2008 | 36,334,794 | (2,493,654) | 38,828,448 | 73,443,310 |
| **Total** | **272,840,295** | **(18,418,129)** | **291,258,424** | **350,059,127** |

As Table 1 shows, for 2003 through 2008, the Hedge Funds' performance as

represented to investors was significantly overstated and thus, false. Specifically, for the

years 2003 to 2008, the Investment Managers represented that the Hedge Funds' trading

activity generated more than $272 million in gains when, in reality, the Hedge Funds'

investment accounts actually lost approximately $18.4 million. Further, while the Hedge

Funds lost approximately $18.4 million for this same period, more than $350 million was

paid by the Investment Managers in distributions to investors and to themselves and others as

fees. As this table shows, from at least 2003 through 2008, the Investment Managers were

making distributions and paying fees that the investment performance of the Hedge Funds never supported.

The Investment Managers also were crediting fictitious profits to accounts where the accountholders were not taking distributions. These fictitious profits were likewise unsupported by the Hedge Funds' investment performance and served only to further increase the Hedge Funds' insolvency. This negative cash flow made the eventual collapse of Nadel's enterprise inevitable.

In short, the investment returns and performance as represented to investors were based on grossly overstated performance numbers created by Nadel, and the results reported to investors were fiction. The true results of the trading activity that actually occurred were never included in data reported to investors or potential investors.

### B. Depletion of the Hedge Funds' Assets.

Evidence also shows that the Hedge Funds directly or indirectly paid substantial fees to Scoop Capital and Scoop Management, to other Receivership Entities, and to other third parties in the form of management, advisory, and/or profit incentive fees and "finder" fees. As reflected in **Table 2**, below, according to the Hedge Funds' documents, from 2003 through 2008 they paid approximately $97,168,122 in total fees. Profit incentive fees were paid to Scoop Management, Viking Management, Valhalla Management, and third parties, based on a percentage of profits that never occurred. Such payments significantly depleted the Hedge Funds' assets and diverted those assets to Scoop Capital and Scoop Management, which were controlled by Nadel, and to Valhalla Management and Viking Management, which were controlled by Neil and Christopher Moody.

**Table 2: Fees Paid from Hedge Funds to Investment Managers and Others**

| Year | Management Fees | Performance Incentive Fees | Total Fees |
|------|-----------------|----------------------------|------------|
| 2003 | 1,521,377 | 5,929,187 | 7,450,565 |
| 2004 | 3,644,188 | 11,737,586 | 15,381,774 |
| 2005 | 5,057,633 | 15,292,264 | 20,349,897 |
| 2006 | 5,756,646 | 12,500,945 | 18,257,590 |
| 2007 | 6,206,972 | 13,666,393 | 19,873,365 |
| 2008 | 6,771,232 | 9,083,698 | 15,854,931 |
| **Total** | **28,958,048** | **68,210,074** | **97,168,122** |

Significant sums from the proceeds of Nadel's scheme also made their way into other accounts controlled by Nadel and/or his wife, Marguerite "Peg" Nadel. As of December 31, 2008, according to the balance sheet for Scoop Management, Scoop Management had transferred approximately $17,177,896.56 to accounts owned either individually or jointly by the Nadels. These amounts are in addition to the amounts Mrs. Nadel received from Scoop Management as compensation. According to its balance sheet, Scoop Management also transferred approximately $6,433,804.40 to other entities controlled by Nadel. To date, the Receiver has not uncovered any source of income for Nadel or his wife (during the time of Nadel's scheme) that was not in some manner funded with money from that scheme.

Documentation and other information that the Receiver has collected shows that money derived from the scheme was used by Nadel to purchase and/or fund other businesses. The Receiver has expanded the Receivership to include additional businesses controlled by Nadel. (*See* discussion of expansion in Section V.A, below.)

## C.     Investor Losses and "Fictitious Profits."

To date, the Receiver has discovered and identified approximately 371 investors who invested slightly more than $397 million. Based on documentation analyzed to date, it

appears that investors have out-of-pocket losses of approximately $168 million. The Receiver has also discovered that some investors were paid more than their total investments. These overpayments were of "fictitious profits." To date, the Receiver has discovered approximately $39 million in such fictitious profits. The Receiver has initiated efforts to recover these fictitious profits, and those efforts are discussed in Section V.D, below.

Further, it appears that, although separately numbered investor accounts were used in communications with investors and brokerage accounts were used for each Hedge Fund, in reality there were not separate funds. Due to the method Nadel used to trade securities, distinctions made between the individual Hedge Funds and between investor "accounts" have little meaning. The documents reviewed reveal that Nadel treated the Hedge Funds as a single source of money regardless of the Hedge Fund with which investors purportedly invested. The Receiver has reached the preliminary conclusion based on available research and evidence that investor funds were commingled in Nadel's and the Receivership Entities' accounts.

### D. Nadel's Trading Activities in the Hedge Funds.

In the Executive Summaries disseminated to investors, Nadel represented that the Hedge Funds were generating the annual returns reflected in **Table 3**, below, primarily through trading in the quadruple Qs.[4]

---

[4] The term "Quadruple Qs" (ticker symbol: QQQQ) refers to the NASDAQ-100 Tracking Stock, an exchange-traded fund ("ETF") listed on the NASDAQ intended to track the NASDAQ index.

**Table 3: Fund Performance as Represented in Executive Summaries**

| Year | Valhalla | Victory | Viking | Viking IRA | Victory IRA | Scoop Real Estate |
|------|----------|---------|--------|------------|-------------|-------------------|
| 2002 | 21.59% | 40.93% | 26.98% | 26.88% | N/A | N/A |
| 2003 | 41.57% | 42.52% | 46.42% | 45.23% | 30.43% | N/A |
| 2004 | 28.96% | 30.30% | 30.46% | 29.93% | 32.16% | 48.67% |
| 2005 | 30.19% | 25.90% | 27.40% | 26.36% | 27.31% | 32.14% |
| 2006 | 19.99% | 18.94% | 19.08% | 18.93% | 19.50% | 21.15% |
| 2007 | 19.24% | 19.65% | 20.60% | 20.55% | 20.02% | 21.75% |
| 2008* | 10.97% | 11.82% | 11.43% | 11.52% | 11.72% | 12.31% |

* Results are for an incomplete year.

While Nadel did trade in quadruple-Qs, he did not achieve for the Hedge Funds the amount of returns he represented to investors. Rather, based on the documents the Receiver's financial expert has analyzed to date, the Hedge Funds as a whole lost significant sums. Specifically, **Table 4**, below, shows the actual account profits and losses for the Hedge Funds for the indicated time.

**Table 4:  Actual Profits and Losses for the Hedge Funds**

| Account Name | Account Profit/(Losses) | Overall Annualized Rate of Return |
|--------------|-------------------------|-----------------------------------|
| Scoop Real Estate Ltd. 2/1/04 – 12/31/08 | ($6,637,880) | -33.35% |
| Valhalla Investment Partners, LP 10/01/02 – 12/31/08 | $2,863,875 | 3.98% |
| Viking Fund LLC 3/01/03 – 12/31/08 | ($8,073,752) | -19.40% |
| Viking IRA Fund Ltd. 3/01/03 – 12/31/08 | ($2,053,443) | -24.53% |
| Victory Fund, Ltd. 6/01/02 – 12/31/08 | $1,825,701 | -16.70% |
| Victory Fund, Ltd. 2/01/03 – 8/31/03 | ($66,776) | -18.45% |
| Victory IRA Fund, Ltd. | ($5,941,164) | -18.63% |
| **Hedge Fund Total** | **($18,083,439)** | |

Between 2002 and 2008, the highest annualized rate of return Nadel appears to have achieved was approximately 4%, while the rest of the Hedge Funds experienced annualized returns of -16.70% to -33.25%. Although these actual performance numbers demonstrate the disparity between what Nadel and others were claiming the Hedge Funds were achieving and the returns the Hedge Funds were actually achieving, the performance of each individual Hedge Fund is not significant because it appears that Nadel arbitrarily allocated daily results of trading transactions among the Hedge Funds. This activity resulted in the commingling of the Hedge Funds' assets and makes the performance results of each individual Hedge Fund immaterial. In short, Nadel was losing significant sums of money while representing that he was achieving annual returns from 18.93% to 48.67% (for years with full activity).

Further, as shown in **Table 5**, below, while the Hedge Funds' accounts experienced losses, all but one of Nadel's personal accounts and other accounts maintained essentially for the benefit of Nadel and in the sole control of Nadel (collectively referred to herein as "**Nadel's Accounts**") experienced significant gains.

<u>Table 5: Actual Profits and Losses for Nadel's Accounts</u>

| Account Name | Account Profit/Losses | Overall Annualized Rate of Return |
|---|---|---|
| Scoop Capital LLC<br>12/01/04 – 12/31/08 | $11,331,464 | 49.37% |
| Scoop Management<br>10/01/02 – 12/31/08 | $737,141 | 36.72% |
| Arthur Nadel<br>6/01/02 – 10/31/08 | $10,781,029 | 71.62% |
| Marguerite Nadel<br>8/01/07 – 1/30/09 | $10,033 | -15.49% |
| **Nadel's Accounts Total** | **$22,859,667** | |

The trading activity in the Hedge Funds' accounts and Nadel's Accounts appears to have been essentially the same, and trading in those accounts was done concurrently. Virtually all trading allocated to every account was in quadruple-Qs. Given the dramatic differences in trading results in Nadel's accounts as compared to the Hedge Funds' accounts and preliminary information received by the Receiver concerning Nadel's trading practices, the Receiver believes that this evidence may indicate that Nadel engaged in a fraudulent practice known as "cherry picking." In cherry picking, the trader allocates profitable trades to himself and unprofitable trades to clients. *See, e.g., S.E.C. v. K.W. Brown and Co.*, 555 F. Supp. 2d 1275, 1302-1307 (S.D. Fla. 2007) (holding that "cherry-picking" day-trading scheme operated by officers constituted scheme to defraud under Securities Exchange Act). Analysis of the trading activity and cash flows is ongoing. However, in light of the fact that Nadel traded the same investments for all Hedge Funds and the accounts he owned and/or controlled for his benefit and that there was a wide disparity between the results allocated to the Hedge Funds' accounts and those allocated to Nadel's Accounts, there is no apparent logical explanation other than the improper diversion of profitable transactions by Nadel.

### ACTIONS TAKEN BY THE RECEIVER

Since his appointment on January 21, 2009, the Receiver has taken a number of steps to fulfill his mandates under the Order Appointing Receiver, described in Section II, above.

**IV.     Securing the Receivership Estate.**

**A.     Taking Possession of Defendants' Headquarters.**

On the day of his appointment, the Receiver took possession of the Receivership Entities' offices at 1618 Main Street, Sarasota, FL 34236 (the "**Office**"). The Office was

used by Nadel as the headquarters for administering his control of the Investment Managers, Hedge Funds, and other Receivership Entities. The Receiver secured the premises by changing the locks and inventoried all of the physical property at the premises. The Receiver provided change of address notifications to the United States Postal Service and Federal Express, as well as all known service providers to the Receivership Entities. The Receiver also ended the Office's lease, turned over the keys, and sold the office furniture and other items for $3,500.00. All of the original documents from the Office were moved to the Tampa office of Fowler White Boggs P.A. ("**Fowler White**"). The majority of those documents have been transferred into the custody of the United States Attorney's Office for the Southern District of New York in connection with its criminal prosecution of Nadel and the rest have been moved to the office of WGK.

The Receiver also removed several servers and computer-related equipment from the premises that were used by Nadel and the entities he controlled. The Receiver retained experienced forensic information technology experts with the firm E-Hounds, Inc. ("**E-Hounds**"), to assist in securing and analyzing the electronic data on the computers. E-Hounds personnel have possession of the equipment, have secured the data, and are underway in their forensic analysis.

**B.     Securing Receivership Funds.**

At the outset of the Receivership, approximately $556,758.33 in cash and cash equivalents in financial accounts titled in the name of the Hedge Funds and Investment Managers were identified and frozen pursuant to the Nadel TRO and the Preliminary Injunction, itemized as follows:

| | |
|---|---|
| Scoop Capital | $12,506.98 |
| Scoop Management | $30,343.53 |
| Scoop Real Estate | $139,554.86 |
| Valhalla Investment Partners | $16,248.68 |
| Valhalla Management | $7,309.98 |
| Victory IRA Fund | $134,101.58 |
| Victory Fund | $80,686.75 |
| Viking IRA Fund | $70,212.65 |
| Viking Fund | $56,896.07 |
| Viking Management | $8,897.25 |

In addition, cash and cash equivalents in financial accounts titled in the name of other Receivership Entities at the time those entities were brought into receivership were approximately $629,276.56, itemized as follows:

| | | |
|---|---|---|
| 1/27/09 (Doc. 17) | Venice Jet Center, LLC | $69,761.41 |
| 1/27/09 (Doc. 17) | Tradewind, LLC | $77,782.72 |
| 2/11/09 (Doc. 44) | Laurel Mountain Preserve, LLC | $5,328.03 |
| 2/11/09 (Doc. 44) | Laurel Preserve, LLC | $22,640.22 |
| 2/11/09 (Doc. 44) | Marguerite J. Nadel Rev. Trust | $381,142.34 |
| 2/11/09 (Doc. 44) | Laurel Mtn. Preserve Homeowner Assoc. | $0.00 |
| 3/9/09 (Doc. 68) | Guy-Nadel Foundation, Inc. | $58,092.49 |
| 3/17/09 (Doc. 81) | Lime Avenue Enterprises, LLC | $1,623.89 |
| 3/17/09 (Doc. 81) | A Victorian Garden Florist, LLC | $10,456.96 |
| 7/15/09 (Doc. 153) | Viking Oil & Gas, LLC | $0.00 |
| 8/10/09 (Doc. 172) | Home Front Homes, LLC | $2,448.50 |

Thus, total cash at the inception of the Receivership and as the Receivership was expanded to include each additional Receivership Entity indicated was approximately $1,186,034.89.[5]

Upon his appointment, the Receiver was initially concerned that the Receivership Entities might hold positions in volatile securities that would require an exit strategy to avoid or minimize losses. The Receiver immediately investigated the nature of the Receivership's

---

[5] This amount does not include any sum for non-cash or non-cash equivalent assets the Receiver has recovered. For a discussion of these assets, please refer to Section V, below).

holdings and determined that no such exit strategies were required because almost all of the relatively liquid holdings were in cash or cash equivalents.

The Receiver coordinated with the SEC to move swiftly to freeze all funds of which they were aware. The Receiver and his attorneys engaged in a preliminary review of documents and other information for the purpose of identifying institutions that potentially held relevant financial accounts or lines of credit. The Receiver immediately forwarded copies of the asset freeze orders to the pertinent institutions and confirmed that they understood their obligations under the freeze orders.

Receivership funds are currently being held in three institutions: (1) Northern Trust Bank, N.A.; (2) Bank of Coweta; and (3) Thomasville National Bank. Venice Jet Center, LLC, also maintains an insignificant amount of funds in a small operating account with Bank of America. All Receivership funds are currently being held in non-interest bearing accounts. The Receiver is contemplating the most appropriate action to take with respect to these funds in light of the current state of the economy and financial institutions. He will likely consolidate the funds into one to three institutions and will explore the relative benefits and risks of moving the funds into interest-bearing accounts and/or revenue-generating investments.

## C. Locating Additional Funds.

One of the Receiver's highest priorities is to locate and recover any additional funds. The Receiver has retained a forensic accounting firm to assist in tracing funds. As of the date

of this report, the Receiver has also identified and recovered an additional $120,000[6] as well as a certificate of deposit ("CD") issued by Northern Trust Bank for approximately $1.5 million. There is also a loan with Northern Trust for $1.5 million with a maturity date of December 1, 2011. The Receiver will likely resolve all claims and obligations with Northern Trust under this loan in connection with the sale of certain assets of Venice Jet Center, LLC. The Receiver will continue to diligently investigate and will update the Court and the investors if additional funds are located.

### D. Receivership Accounting Report.

Attached as **<u>Exhibit A</u>** to this Interim Report is a cash accounting report showing the amount of money on hand at inception of the Receivership (January 21, 2009) less operating expenses plus revenue through August 31, 2009. This cash accounting report does not reflect non-cash or cash-equivalent assets. Thus, the value of all property discussed in Section V below is not included in this accounting report. From July 1, 2009, through August 31, 2009, the Receiver received $357,684.56 in business income from ongoing operations of some Receivership Entities;[7] $804.43 in cash and securities; $18,472.76 in interest/dividend income; $5,100 in business asset liquidation; and $303,592.20 in third-party litigation income. (Ex. A.)

---

[6] This amount is comprised of two $60,000 payments the Receiver recovered from two individuals. The Receiver determined that the transfers made to these individuals in the amount of $60,000 each were an improper diversion of investor funds and obtained court orders to recover these funds.

[7] As discussed in Section V.A. below, much of the entities' business income is derived from rental payments. The Venice Jet Center's income is derived from fuel sales and storage of aircraft.

**E.    Obtaining Information from Third Parties.**

Since obtaining control of the Receivership Entities, the Receiver and his professionals have had discussions – including continuing discussions – with a number of people associated with Nadel and/or the Receivership Entities, including:

* Officers of some of the Receivership Entities
* Persons responsible for maintaining the financial books of Receivership Entities
* Persons responsible for operating the business of Receivership Entities
* Persons responsible for performing accounting services, and
* Persons responsible for administering the Hedge Funds.

The Receiver and his professionals have also reviewed documents located in the Office; documents obtained from the accountant for several Receivership Entities; information stored on the Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's businesses with their transactions; and information available in the public record.

**V.    Asset Analysis and Recovery.**

**A.    Expansion of Receivership to Include Additional Entities.**

As a result of the review of these records and of the discussions noted above, the Receiver sought and successfully obtained the expansion of the Receivership to include: Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; Laurel Mountain Preserve Homeowners Association, Inc.; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; the Guy-Nadel Foundation, Inc.; Lime Avenue Enterprises, LLC; A Victorian Garden Florist, LLC; Viking Oil & Gas, LLC; and Home Front Homes, LLC. Along with Summer Place Development Corporation, these entities will hereinafter be

referred to collectively as the "**Additional Entities**."[8] The Receiver's investigation revealed that the Additional Entities were purchased and/or funded with money derived from Nadel's fraudulent investment scheme.

The following discussion of the Additional Entities includes a description of assets the Receiver has acquired as a result of the businesses' inclusion in the Receivership; known encumbrances related to those assets; and actions taken by the Receiver with respect to those assets. Where possible the Receiver has included estimated values of these assets. However, given the state of the U.S. economy at the time of this Report and the possibility for additional information not yet uncovered by the Receiver, it is important to note that any such estimations, valuations or appraisals are subject to change. Due to the poor state of the real estate markets, the estimates provided may differ markedly from the actual amounts realized upon the selling of any real property.

### 1.    Venice Jet Center, LLC.

Venice Jet Center, LLC ("**VJC**"), is a Florida limited liability company formed in April 2006. Nadel was its managing member and registered agent, and its principal address is the Office. The assets of VJC were purchased with proceeds of Nadel's scheme, and over time additional proceeds of the scheme were transferred to VJC. VJC is a viable business with potential to generate assets for the Receivership estate.

On January 27, 2009, the Court expanded the Receivership to include VJC. VJC is a fully operating fixed-base operator, or "FBO," and includes a flight school, fueling service,

---

[8] The Receiver gained control of Summer Place Development Corporation by virtue of Scoop Capital's ownership interest in that entity. However, for various reasons, a formal order expanding the Receivership to include this entity has not been sought.

hangar rentals, and a café. Since the Receiver's appointment as Receiver of VJC, he has taken control of it and is continuing to operate the business. The Receiver is continuing VJC's longstanding pursuit of a permit to build new hangars at the VJC. The Receiver believes that the permit to build more hangars, which was requested well before the Receiver's appointment, will make the VJC more attractive to potential purchasers and ultimately will increase the value of the business.

### Part 16 Complaint Against City of Venice

The City of Venice (the "**City**"), in contravention of its lease and specific direction from the Federal Aviation Authority ("**FAA**"), has refused to grant VJC authorization to develop four hangars at the VJC facility. The City officials have publicly announced their intent to terminate the VJC's lease with the City and take over VJC's operations. The Receiver continues to vigorously resist any unwarranted interference by the City with what appears to be a substantial and valuable property right of VJC (and of the Receivership estate). On May 14, 2009, the Court granted the Receiver's request for leave to file a complaint against the City of Venice pursuant to Title 14 of the Code of Federal Regulations, Part 16. (Doc. 132.) On or about July 2, 2009, on behalf of the VJC, the Receiver served the complaint on the City and filed it with the FAA's Office of the Chief Counsel (FAA Docket No. 16-09-05). On or about September 2, 2009, the City filed its answer and affirmative defenses and motion to dismiss, to which VJC replied on or about September 30, 2009. The Receiver is also contemplating filing a lawsuit against the City based on its conduct with respect to Receivership assets and the damages and expenses incurred due to the City's unwarranted infringement of rights guaranteed by the VJC's lease. It is clear that the City of

Venice's conduct is impeding development rights of the VJC under its lease with the City. The City has thus undermined and adversely impacted the Receiver's attempt to market the VJC.

## VJC Building

The Receiver has possession and control of a building owned by VJC located at 400 Airport Avenue East, Venice, Florida, 34285 (the "**VJC Building**"). The VJC Building has one known encumbrance: a loan with Northern Trust Bank, N.A., on which there is a remaining balance of $1,963,790.00.

### Marketing Efforts and Sales Agreement

The Receiver conducted extensive marketing efforts regarding the VJC and the VJC Building. The City of Venice was given an opportunity to participate in these efforts but chose not to do so. On April 23, 2009, the Receiver sent marketing packets to approximately 114 Florida FBOs. Recipients were asked to execute a mutual confidentiality agreement and return it. On or about May 13, 2009, the "Assets for Sale" page on the Receivership Website (http://www.nadelreceivership.com/assetsforsale.html), which included the marketing packets, went live and yielded several additional inquiries. Word-of-mouth marketing also took place, in which case marketing packets would be sent via letter or email to interested parties. In response to these marketing efforts, twenty (20) interested parties executed mutual confidentiality agreements and requested additional information.

Beginning May 2009, the Receiver sent letters to interested parties who had executed mutual confidentiality agreements. The letter invited the interested parties to tour the VJC and review documentation such as financial statements for year ending December 2008, the

VJC general ledger for 2008, loan documentation from Northern Trust, leases with the City of Venice, operational agreements, expansion plans, and communications with the FAA regarding expansion plans.

On July 8, 2009, correspondence was sent to parties who had executed mutual confidentiality agreements inviting them to tour the VJC by July 16, 2009 if they had not already done so. The letter also invited these parties to make an offer by July 28, 2009 to acquire the VJC. In response to the July 8, 2009 letter, the Receiver received six offers and began meeting and communicating with the potential purchasers to negotiate an agreement to sell the VJC and its assets that would best suit the Receivership estate. The Receiver received five proposals for the purchase of the VJC and the VJC building and entered into negotiations with certain of these bidders in accordance with the best interests of the receivership estate.

The Receiver has reached an agreement in principle to sell the assets of the VJC. The sale will include the VJC Building and the transfer of the lease the VJC has with the City. The Receiver believes that this structure is in the best interests of the Receivership and anticipates presenting the proposed sales transaction to the Court in the immediate future.

### 2. Tradewind, LLC.

Tradewind, LLC ("**Tradewind**") was formed in Delaware in January 2004 and registered for the first time in Florida in March 2008. Nadel was Tradewind's managing member and registered agent, and its principal address is the Office. Tradewind owns and controls five planes and one helicopter and owns 31 airport hangars at the Newnan-Coweta County Airport in Georgia (the "**Georgia Hangars**"). The Receiver's investigation revealed

that Tradewind was funded with money from Nadel's scheme. Tradewind is a viable business with potential to generate assets for the Receivership estate.

On January 27, 2009, the Court expanded the Receivership to include Tradewind. Tradewind is a fully operating business. Since the Receiver's appointment as Receiver of Tradewind, he has taken control of it and is continuing to operate the business. Tradewind collects approximately $12,000 to $30,000 in monthly rent and incurs varying monthly expenses, which include land rent, loan payments, payroll, and various utilities. The Receiver is entertaining offers to purchase this business or any of its assets.

The Receiver has possession and control of the Georgia Hangars, which have one known encumbrance: a loan with the Bank of Coweta with a remaining balance of approximately $947,115.53, and monthly payments of $8,055. There is also monthly rent of $3,079.89 due to the Newnan Coweta Aviation Authority. The Receiver has been making these monthly payments as he believes they are in the best interest of the Receivership.

The Receiver also acquired possession and control of the five planes and helicopter. The following table shows the year, model, and known encumbrances relating to each aircraft, as well as the Court-approved disposition of three of the aircraft:

| Model | Year | Type of Aircraft | Known Encumbrance | Action Taken by Receiver |
|-------|------|------------------|-------------------|--------------------------|
| Piper PA-28/140 | 1971 | Airplane | None. | |
| Cessna 152 | 1978 | Airplane | None. | |
| Baron | 1977 | Airplane | None. | |
| Learjet 31A | 1996 | Airplane | Loan with General Electric Capital Corporation ("**GECC**") entered into on May 17, 2006, for approximately $2.4 million. | Settled with GECC; disposed of Learjet (Doc. 119) |

| Model | Year | Type of Aircraft | Known Encumbrance | Action Taken by Receiver |
|-------|------|------------------|-------------------|--------------------------|
| Citation | 1992 | Airplane | Loan with VFS Financing, Inc. ("**VFS**") entered into on May 23, 2008, for approximately $2.1 million | Settled with VFS; disposed of Citation (Doc. 119) |
| Schweizer 300 | 1997 | Helicopter | None. | Sold for $200,000 (Doc. 100) |

The Receiver is presently making arrangements to dispose of the remaining three aircraft.

### 3. Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; and Laurel Mountain Preserve Homeowners Association, Inc.

Laurel Mountain Preserve, LLC ("**Laurel Mountain**"), was formed in Florida in December 2003. Nadel was Laurel Mountain's manager and member, and its principal address is the Office. Laurel Mountain was "withdrawn" as a limited liability company in January 2006.

Laurel Preserve, LLC ("**Laurel Preserve**"), was formed as a North Carolina limited liability company in February 2006. Nadel was Laurel Preserve's registered agent and manager, and its principal address is the Office. Additionally, Laurel Preserve's "Registered Office" address was a home in Fairview, North Carolina titled in the names of Nadel and his wife. Although Laurel Preserve's 2006 Operating Agreement identifies Nadel and his wife as members of Laurel Preserve with each having made a "capital contribution" of $750, the Laurel Preserve 2007 federal income tax return identifies Scoop Capital as owner of 100% of Laurel Preserve. The Laurel Mountain Preserve Homeowners Association, Inc. (the "**HOA**"), is a North Carolina non-profit corporation formed in March 2006. Nadel was the HOA's registered agent, and its principal address was the Fairview, North Carolina home.

Documentation reviewed and information obtained by the Receiver shows that Laurel Preserve holds title to approximately 420 acres near Asheville, North Carolina in Buncombe and McDowell counties, intended for development of home-sites (the "**Laurel Mountain Property**"). The Laurel Mountain Property was originally purchased by Laurel Mountain in 2003 and then "sold" to Laurel Preserve in February 2006. Laurel Mountain provided financing for that purchase in the form of a $2,900,000 loan to Laurel Preserve. According to documentation retrieved from the Office, Laurel Mountain and Laurel Preserve received significant funding from Scoop Capital, Scoop Management, Tradewind, Nadel and Mrs. Nadel and BB&T Bank.

On February 11, 2009, the Court expanded the Receivership to include Laurel Mountain, Laurel Preserve, and the HOA. Since the Receiver's appointment as Receiver of these entities, he has taken control of them and is working on marketing for sale the Laurel Mountain Property. This property currently does not generate any income. The Laurel Mountain Property encompasses 29 lots, including 23 estate-sized and 6 cottage-sized lots. There is also a cabin home on this property that, according to the Buncombe County Property Appraiser, is valued at $319,800. The Laurel Mountain Property's infrastructure is fully developed: infrastructure and utilities are currently in place and are fully functional.

The Laurel Mountain Property has three known encumbrances. The first encumbrance is a $360,157.37 loan from BB&T Bank. The second encumbrance is a $1,900,000 interest only loan from Wachovia Bank, N.A. There is a monthly payment of $5,149.66 due on this latter loan and the Receiver presently is not making payments on this loan. The third encumbrance is an easement of approximately 169 acres of the Laurel

Mountain Property, which was granted to a land conservancy in 2005 (the "**Easement**"). It appears that this donation was made in part for the Nadels' own tax benefit. The Receiver determined that it would be in the best interests of the Receivership to recover this Easement from the conservancy as it may generate an exponential increase in the value of the full acreage. The Receiver instituted proceedings to extinguish the Easement on November 23, 2009.

The Receiver has consulted with a realtor who previously listed the Laurel Mountain Property and is entertaining offers to purchase or proposals to market this developed property either by lot or in its entirety. The Receiver is still evaluating the current value of this property, but it appears that the value is higher than the amount of the encumbrances. Parties interested in purchasing this property should contact the Receiver directly.

For more information regarding the Laurel Mountain Property, please visit http://www.laurelmountainpreserve.com.

### 4. Marguerite J. Nadel Revocable Trust UAD 8/2/2007.

The Marguerite J. Nadel Revocable Trust Under Agreement Dated 8/2/2007 (the "**Trust**") was created on August 2, 2007. The trustee is identified as Mrs. Nadel. The Receiver's investigation revealed that the Trust was funded entirely with proceeds of Nadel's scheme through (1) a transfer of $500,000 from Scoop Management in August 2007 and (2) a transfer of $150,000 from Scoop Capital on the day before Nadel fled. It also revealed that Nadel controlled the account in which the money held by the Trust purchased and sold securities. Significantly, as alleged in the criminal complaint against Nadel, in an apparent note Nadel left for his wife before fleeing, he instructed her to "use the trust (yours) to your

benefit as much and as soon as possible." *United States v. Nadel*, Case No. 09 MAG 169 (S.D.N.Y.), Compl. ¶ 17, attached as Exhibit 14 to the Receiver's Declaration in Support of Second Unopposed Motion to Expand receivership (Doc. 37-15).

On February 11, 2009, the Court expanded the Receivership to include the Trust. Since the Receiver's appointment as Receiver of this Trust, he has taken control of its bank account. The Receiver has used these funds for Receivership costs and expenses.

### 5. Guy-Nadel Foundation, Inc.

The Guy-Nadel Foundation, Inc. (the "**Foundation**"), is a Florida non-profit corporation formed in December 2003 for "charitable, educational and scientific purposes." Nadel was its incorporator and registered agent and, according to the Foundation's 2006 federal tax return, also its President. The Foundation's principal address is the Office.

On March 9, 2009, the Court expanded the Receivership to include the Foundation. Since the Receiver's appointment as Receiver of the Foundation, he has taken control of it and is working on marketing the real property owned by the Foundation. The Foundation was funded with proceeds of Nadel's scheme.

### North Carolina Parcels

The Receiver has possession and control of approximately eight lots that are essentially adjacent to each other and to the Laurel Mountain Property. The lots appear to have been purchased by Laurel Mountain and the Nadels as part of the same general transaction in which Laurel Mountain purchased the Laurel Mountain Property. In December 2003 and December 2004, Laurel Mountain and Nadel and his wife deeded these lots to the Foundation. The Receiver is currently determining how best to market the

property and considering including it in the sale of the Laurel Mountain Property. Parties interested in purchasing this property should contact the Receiver.

Thomasville, Georgia Parcels

Additionally, the Receiver has possession and control of two small parcels of unimproved land in Thomasville, Georgia (this land is separate from the Thomasville Property discussed in Section V.B.1, below) owned by the Foundation. According to the Thomas County Board of Tax Assessors, the first lot (located on North Stevens Street) has a 2009 tax valuation of $34,745, and the second lot (located on Church Street) has a 2009 tax valuation of $4,276. Parties interested in purchasing these parcels should contact:

Brad Parker
Tallahassee Land Company, Inc.
217 John Knox Road
Tallahassee, Florida 32303
Office: (850) 385-6363
Mobile: (850) 566-2629
Fax: (850) 385-6337
Email: Brad@tlhland.com

**6.  Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC.**

Lime Avenue Enterprises, LLC ("**Lime**") was formed in Florida in August 2006, and Nadel was a managing member of Lime. Lime owns a building located at 599 North Lime Avenue, Sarasota, Florida 34237 (the "**Lime Building**"). Lime purchased the Lime Building in August 2006. Public records and other information reviewed by the Receiver indicate that Lime was formed by Nadel and Mrs. Nadel (who also was a manager of Lime) for the purpose of purchasing the Lime Building. The Lime Building houses a flower shop, which is owned by A Victorian Garden Florist, LLC ("**Victorian Garden**"), which was formed in

Florida in April 2005. The Receiver's investigation revealed that Lime and Victorian Garden were funded with proceeds from Nadel's scheme.

On March 17, 2009, the Court expanded the Receivership to include Lime and Victorian Garden. The Receiver has possession and control of the Lime Building. The Lime Building has one known encumbrance: a mortgage owed to the individuals who sold the building to Lime on which the balance is approximately $600,000.

The Receiver also took control of the business and determined that ownership of the florist was not in the best interest of the Receivership. The flower shop did not have sufficient revenue to cover its expenses, thus the Receiver originally planned to close the business. The Receiver is presently attempting to negotiate a resolution of the obligations relating to the Lime Building.

The Receiver also has possession and control of two vans owned by Lime: a 1999 Ford van and a 2003 Dodge van. The two vans are of minimal value, and the Receiver is attempting to sell them. There are no known encumbrances on these vans.

### 7. Viking Oil & Gas, LLC.

Viking Oil & Gas, LLC ("**Viking Oil**") is a Florida limited liability company formed in January 2006 by Neil V. Moody and Christopher D. Moody (the "**Moodys**") to make personal investments in an oil and gas venture. Its principal address is the Office. The Receiver's investigation revealed that Viking Oil was funded with proceeds from Nadel's scheme. The funds invested in Viking Oil were used to purchase an investment interest in Quest Energy Management Group, Inc. ("**Quest EMG**"). Between February 2006 and April

32

2007, through Viking Oil, the Moodys invested $4 million to fund a working interest in Quest EMG.

As discussed in Section V.C.4, below, the Receiver also has possession of a promissory note from Quest EMG and two individuals to Valhalla Investment Partners in the amount of $1,100,000. On July 15, 2009, the Court expanded the Receivership to include Viking Oil. Since the Receiver's appointment as Receiver of this entity, he has taken control of it and is determining the most prudent course of action to take with respect to the working interest in Quest EMG. An examination of this venture has caused the Receiver to question the viability and value of this investment. The Receiver has hired a forensic accountant – Otto L. Wheeler, CPA/ABV – who is reviewing materials and determining what recommendation to make to the Receiver.

### 8. Home Front Homes, LLC.

Home Front Homes, LLC ("**Home Front Homes**"), is a Florida limited-liability company that was formed in 2006. Nadel was the sole managing member of Home Front Homes, and Scoop Capital owned a majority membership interest in it. By virtue of this controlling interest, the Receiver assumed control over Home Front Homes before it was placed in receivership. Home Front Homes was engaged in the business of manufacturing, marketing, and selling energy-efficient homes. Home Front Homes was an operating business until September 2009.

The Receiver instituted litigation to preserve the value of Home Front Homes for the Receivership estate. *Home Front Homes, LLC v. Brian C. Bishop*, Case No. 2009-CA-2037NC (12th Jud. Cir., Sarasota County, Florida). On behalf of Home Front Homes, the

Receiver sued Brian C. Bishop, a former employee who also had an ownership interest in Home Front Homes for breach of non-compete covenants in his employment agreement and of a purchase agreement (wherein Home Front Homes purchased the assets, goodwill, and customers of Mr. Bishop's company, Home Front, Inc.), as well as breach of a promissory note and tortious interference with a business relationship. Since ending his employment with Home Front Homes, Mr. Bishop had started a competing business in direct violation of his non-compete agreement and had solicited Home Front Homes customers.

This matter was settled and Mr. Bishop was ordered to comply with the restrictive covenants, and the company forgave certain purported debt owed from Mr. Bishop to Home Front Homes, which debt appeared uncollectible. However, Mr. Bishop has been violating the Court's order against him with impunity. The Receiver thus filed a motion for entry of order finding Bishop in contempt and for sanctions, which is set for hearing on December 1, 2009.

Following the litigation with Mr. Bishop, the Receiver (as Receiver for Scoop Capital) gained control of a 75% interest in Home Front Homes. On or about August 4, 2009, the Receiver entered into an agreement to sell Home Front Homes in exchange for $800,000 as follows: $600,000 by wire transfer as well as a secured promissory note in the principal amount of $200,000.00. The proposed sale would have provided $280,000.00 to the Receivership and would have given the purchasers the opportunity to resolve claims of creditors of Home Front Homes. On August 10, 2009, the Court expanded the Receivership to include Home Front Homes. (Doc. 170.)

The purchaser had agreed to take over the business operations of Home Front Homes and to fund that business. (*See also* Receiver's Decl. in Support of Resp. in Opp. to William F. Bishop's Mot. to Intervene, filed Sept. 23, 2009 (Doc. 205).) In September 2009 the purchaser notified the Receiver that it refused to satisfy its obligations under the binding agreement. The Receiver has learned that the individual who negotiated the transaction on behalf of the purchaser and who was a principal of the purchaser had been charged in 2007 with several counts of scheme to defraud. In October 2007 he was released pending trial and was placed under pretrial supervision by the United States District Court for the Middle District of Florida. Within the past month, he was arrested for violating conditions of pretrial release. The purchaser walked away from the transaction, and the Receiver was left with an absence of appropriate personnel to operate the business and capital to meet the company's operational demands. Given those circumstances, the Receiver determined that it is in the best interest of the Receivership to close Home Front Homes and cease all business operations. The Receiver is not aware of any potential options that might revive the business. The Receiver is in the process of selling Home Front Homes' remaining assets.

### 9.    Summer Place Development Corporation.

Summer Place Development Corporation ("**Summer Place**") is a Florida company that was formed in 2005. The Receiver has not sought a formal order expanding the Receivership to include Summer Place. However, Nadel had purchased 50% of the holdings in Summer Place with a $200,000 investment in Home Front Homes and payment of $50,000 to the co-managing-member's investment company. Nadel became a managing member of Summer Place, and Scoop Capital owns a fifty-percent interest in Summer Place. By virtue

of this fifty-percent interest, the Receiver has not assumed full control over Summer Place but is working with the other managing member and fifty-percent owner in directing the operation of Summer Place for the benefit of the Receivership estate.

Summer Place is an operating business and owns a 6-acre parcel in Bradenton, Florida. The owners originally intended to build thirty (30) affordable home sites on this property. However, due to the decline in the market for affordable housing, no development has taken place. Taxes on the property are approximately $3,000 a year. The Receiver intends to sell Scoop Capital's equity interest in this entity in a manner which would be most beneficial to the Receivership estate. Parties interested in marketing or purchasing Scoop Capital's interest in this business should contact the Receiver directly.

### B.    Recovery of Real Property.

In addition to the assets discussed in conjunction with the expansion of the Receivership in Section V.A, the Receiver has also recovered a number of other assets, most of which are in the process of being valued, assessed, and otherwise analyzed for liquidation, disposition, or other action. Again, given the state of the U.S. economy at the time of submission of this Report, the Receiver emphasizes that any estimates, appraisals, or valuations are subject to change because of market forces. In particular, due to the poor state of the real estate markets, the estimates provided in this section may be significantly different from the amounts realized upon selling such real property.

### 1.    Thomasville, Georgia.

The Receiver has possession and control of approximately 14 acres in Thomasville, Georgia (the "**Thomasville Property**"). The Thomasville Property encompasses 45 lots, 44

of which are vacant. A home on one of the Thomasville Property lots was built by Home Front Homes. After the purchase of the Thomasville Property, approximately $750,000 of infrastructure was added. The Thomasville Property's infrastructure is fully developed: infrastructure and utilities are currently in place and are fully functional. First Realty & Appraisal Services, Inc., prepared appraisal reports of two lots on the Thomasville Property. As of February 5, 2009, the lot with the home on it was valued at $123,500. Also as of February 5, 2009, a vacant lot on the Thomasville Property was valued at $14,000.

The Thomasville Property has two known encumbrances. The first encumbrance is a $600,000 loan, on which a $571,816 balance is due. Interest on the borrowings is current through 2009. The second encumbrance is a loan for $141,366 for the construction of the house. Both of these loans mature in December 2009. The Thomasville Property currently is not generating any income.

The Thomasville Property is ready for sale with 45 lots having all utilities, roads, and other improvements. Parties interested in purchasing this property should contact

John A. Skicewicz, CCIM
Coldwell Banker Commercial NRT
1988 Gulf to Bay Blvd.
Clearwater, Florida 33765
Office: (727) 642-3965
Fax: (727) 466-4119
Toll Free: (800) 775-1696

Howard Broadway
Century 21
116 East Jackson Street
Thomasville, Georgia 31792
(229) 227-0021
http://www.broadway21.com

## 2. Grady County, Georgia.

The Receiver is in possession of approximately 37.5 acres owned by Scoop Capital in Grady County, Georgia (the "**Grady Property**"). According to Grady County public records, the land value of the Grady Property in 2008 was $151,125. The Receiver is

currently determining the best course of action to take regarding this land. Parties interested in marketing or purchasing the Grady Property should contact

Brad Parker
Tallahassee Land Company, Inc.
217 John Knox Road
Tallahassee, Florida 32303
Office: (850) 385-6363
Mobile: (850) 566-2629
Fax: (850) 385-6337
Email: Brad@tlhland.com

### 3. Graham, North Carolina.[9]

The Receiver has possession and control of a building located at 841 South Main Street, Graham, North Carolina 27253 (the "**Rite-Aid Building**"). This building was purchased for $5,310,000 and is currently being leased to a Rite-Aid Pharmacy for $33,073.08 per month under an absolute triple net lease.[10] The Rite-Aid Building has one known encumbrance: a $2,655,000 interest-only loan with Wachovia Bank, which matured in June 2009, on which the Receiver has paid all interest. Parties interested in purchasing the Rite-Aid Building should contact:

Jim Hamilton
Director
Holliday Fenoglio Fowler, L.P.
3414 Peachtree Road, NE
Suite 736
Atlanta, GA 30326
Telephone: (404) 942-2212

C. Whitney Knoll
Senior Managing Director
Holliday Fenoglio Fowler, L.P.
3414 Peachtree Road, NE
Suite 736
Atlanta, GA 30326
Telephone: (404) 942-3192

---

[9] The properties described in this subsection and the following subsections (4), (5), and (6) appear to have been purchased through Scoop Real Estate Fund. However, in light of the commingling of assets among all Receivership Entities, these properties appear to be appropriately attributed as general assets of the Receivership estate.

[10] Under an "absolute triple net lease," a tenant is required to pay all property taxes, property insurance, and maintenance in addition to a monthly lump sum rent.

Mobile: (404) 219-7383　　　　　　Mobile: (404) 664-4493
Fax: (404) 942-2181　　　　　　　Fax: (404) 942-2181
Email: jhamilton@hfflp.com　　　　Email: wknoll@hfflp.com

### 4.　　　Raleigh, North Carolina.

The Receiver has possession and control of a building located at 4905 Waters Edge, Raleigh, North Carolina 27060 (the "**EDS Building**"). This building was purchased for $1,900,000 and is currently being leased to Electronic Data Systems ("**EDS**"), a technology services provider, for $29,688.54 per month under a triple net lease. The EDS Building has no known encumbrances. Parties interested in purchasing the EDS Building should contact:

John A. Skicewicz, CCIM
Coldwell Banker Commercial NRT
1988 Gulf to Bay Blvd.
Clearwater, Florida 33765
Office:　(727) 642-3965
Fax:　　(727) 466-4119
Toll Free: (800) 775-1696

### 5.　　　Tupelo, Mississippi.

The Receiver has possession and control of a building located at 2433 West Main Street, Tupelo, Mississippi 38801 (the "**Starbucks Building**"). This building was purchased for $941,000 and is currently being leased to Starbucks (Store #8809) for $5,745.83 per month under a triple net lease. The Starbucks Building has no known encumbrances. Parties interested in purchasing the Starbucks Building should contact

John A. Skicewicz, CCIM
Coldwell Banker Commercial NRT
1988 Gulf to Bay Blvd.
Clearwater, Florida 33765
Office:　(727) 642-3965
Fax:　　(727) 466-4119
Toll Free: (800) 775-1696

### 6.    Newnan, Georgia.

The Receiver has possession and control of a gas station located at 5 McCollum Station, Newnan, Georgia 30265 (the "**Gas Station**"). This gas station was purchased for $2,450,000 and is currently being leased to a Shell Gas franchisee. The tenant defaulted on his lease, and an eviction proceeding has been filed against him. The Gas Station has no known encumbrances. There is presently a proposed transaction to sell this property.

### 7.    Fairview, North Carolina.

On March 30, 2009, the Court granted the Receiver's motion (Doc. 98) for possession of property located in Fairview, North Carolina (the "**Fairview Property**"). (Doc. 100.) On June 14, 2004, Nadel and his wife purchased the Fairview Property for $335,000.00. The Fairview Property was a secondary residence of the Nadels that is located in the mountains of North Carolina. The Fairview Property has one known encumbrance: a loan with BB&T Bank on which there is a remaining principal balance of approximately $248,941.73. Parties interested in purchasing the Fairview Property should contact:

*The Armour Team*
Mike and Nona Armour
Keller Williams Professionals
86 Asheland Avenue
Asheville, NC 28801
Mike Armour: (828) 771-2342
Nona Armour: (828) 771-2336
http://armourteam.homesandland.com, listing ID #13704540

### 8.    Sarasota, Florida (Fruitville Road).

On July 8, 2009, the Court granted the Receiver's motion (Doc. 146) for possession of property located at 15576 Fruitville Road in Sarasota, Florida (the "**Fruitville Property**"). (Doc. 148.) To purchase the property, Nadel paid a $5,000 deposit on March 5, 2003, and

$201,163.93 at closing. The Fruitville Property is residential property that was purchased in the names of Nadel and Mrs. Nadel, was deeded to their trusts, and was rented to third parties. Presently, the tenant pays a monthly rent of $500. The Fruitville Property has one known encumbrance: a loan with Northern Trust on which there is a remaining principal balance of approximately $173,929.23. Parties interested in purchasing the Fruitville Property should contact:

John A. Skicewicz, CCIM
Coldwell Banker Commercial NRT
1988 Gulf to Bay Blvd.
Clearwater, Florida 33765
Office:    (727) 642-3965
Mobile:   (727) 642-3965
Fax:       (727) 466-4119
Toll Free: (800) 775-1696

### 9.    Oberlin, Ohio.

The Receiver recently became aware of a condominium in Oberlin, Ohio (the "**Oberlin Property**"). The Oberlin Property was purchased on or about September 23, 2003, with the funds of Intex Trading Corp. ("**Intex**")[11] and was originally titled in Nadel's name. On or about September 2, 2004, title in the Oberlin Property was transferred to the Clark/Nadel Revocable Trust. On or about October 9, 2008, Nadel as Trustee of the Clark/Nadel Revocable Trust transferred title in the Oberlin Property to Nadel's son, Chris Nadel. On or about July 15, 2009, Chris Nadel and his wife, Amy L. Nadel, executed a quitclaim deed, which transferred all right, title, and interest in the Oberlin Property to the

---

[11]    Nadel created Intex and at all times was its sole director and officer. Intex was the General Partner of Scoop Investments, Ltd., which is the predecessor of Victory Fund. On November 27, 2002, Scoop Investments, Ltd. was renamed Victory Fund, Ltd. On December 20, 2002, Intex was replaced by Receivership Entity, Scoop Capital, as Victory Fund's general partner.

Receiver. There are no known encumbrances on the Oberlin Property. Parties interested in purchasing the Oberlin Property should contact

> Jackie Meinke
> Howard Hanna Real Estate Services
> 1240 N. Abbe Road
> Elyria, Ohio 44035
> Phone: (440) 365-8392
> Fax: (440) 365-2769

### C.    Recovery of Vehicles and Other Items.

#### 1.    Vehicles.

The Receiver assumed control of three vehicles: (1) 2008 Mercedes-Benz E63 ("Mercedes"); (2) 2009 Volkswagen EOS ("Volkswagen"); and (3) Maserati Grand Turismo ("Maserati"). These vehicles were used by Neil and Christopher Moody. The Mercedes and Volkswagen were leased by Valhalla Management. Because there was no value to these vehicles and only the continuing obligation of lease payments, the Receiver surrendered them to the leasing company without penalty and without the lessor retaining any claim to Receivership assets. The Maserati was leased by Viking Management. As with the Mercedes and Volkswagen, because there was no value to this vehicle and only the continuing obligation of lease payments, the Receiver surrendered the Maserati to the leasing company without penalty and without the lessor retaining any claim to Receivership assets.

Scoop Capital, LLC and Nadel's wife also owned a 1998 Jeep Wrangler. Upon Mrs. Nadel executing a dealer's reassignment of title, the Receiver sold this car to a dealership for $4,500.

On July 7, 2009, the Court authorized the Receiver to bring into receivership a 2006 Subaru Legacy Outback. The Subaru was purchased with proceeds of Nadel's scheme. Mrs.

Nadel delivered the Subaru to the Receiver. Parties interested in purchasing this vehicle should contact the Receiver directly.[12]

### 2. Condominium Note and Mortgage.

On April 30, 2009, the Court granted the Receiver exclusive interest in a note and mortgage for a condominium located in Sarasota, Florida. (Doc. 116.) The condominium's owner, an employee of the florist (*see* Section V.A.6, above), had executed a promissory note payable to Mrs. Nadel for $126,556.24. The note was secured by a mortgage held by Mrs. Nadel. On February 9, 2009, Mrs. Nadel assigned the note and mortgage to Nadel's former criminal-defense attorneys, Cohen, Jayson & Foster, P.A., who subsequently assigned the note and mortgage to the Receiver, per the Court's order. The principal balance due under the note is $125,742.24, and the outstanding interest is $11,692.56. The condominium's owner is in default, and the Receiver has initiated foreclosure proceedings.

### 3. Bonds.com Assets.

The Receiver's investigation revealed that proceeds of the scheme were used to fund a number of assets related to Bonds.com, Inc. ("**Bonds.com**").

Two Promissory Notes (Valhalla Investment Partners)

The Receiver has two promissory notes that were executed by Receivership Entity Valhalla Investment Partners, L.P., and Bonds.com. One of the notes is for $400,000.00 with 9% interest secured by the domain name www.bonds.com. Bonds.com has paid all of the interest due on that note and recently made a $100,000.00 payment on the principal. The

---

[12] Title to the Subaru is in the process of being transferred from the Venice Jet Center to Tradewind.

Receiver and Bonds.com are currently negotiating a repayment plan with a new principal balance of $300,000 in a manner that is in the best interests of the Receivership.

The other note is for $203,800.00; is due to mature on September 22, 2010; and is owing and outstanding. The $203,800 note is a convertible note that can be converted into an equity interest in the company at the Receiver's option.

### Stock (Valhalla Investment Partners)

The Receiver has possession and control of one-million, five-hundred ninety-one thousand, three-hundred ninety-five (1,591,395) shares of stock in Bonds.com made in the name of Receivership Entity Valhalla Investment Partners, L.P. The shares are currently held in a brokerage account with Wells Fargo and are valued at $620,644.05.

### Stock and Promissory Note (Christopher D. Moody)

Christopher D. Moody had assets related to Bonds.com Group, Inc. ("**Bonds.com**"), as follows:

1) Three million, one hundred sixteen thousand, one hundred seventy-one (3,116,171) fully paid and non-assessable common shares of stock in Bonds.com; and

2) A secured convertible promissory note made by Bonds.com on September 22, 2008, in the amount of $1,236,836, and a secured convertible promissory note made by Bonds.com on December 12, 2008, in the amount of $50,000

On August 5, 2009, on the Receiver's motion, the Court entered an order transferring all right, title, and interest in Christopher D. Moody's stock and notes to the Receiver. The Receiver has filed (i) a Schedule 13D (commonly known as the "Beneficial Ownership

Report") with the U.S. Securities and Exchange Commission to report beneficial ownership of stock received from The Christopher D. Moody Revocable Trust and (ii) a Form 3 (Initial Statement of Beneficial Ownership of Securities) for the stock, as required under the Securities Exchange Act of 1934.

Along with Valhalla Investment Partners' shares, Christopher Moody's shares are currently held in a brokerage account with Wells Fargo. At the time Christopher Moody's shares were brought into Receivership, they were worth $810,204.46. As of October 26, 2009, the value of the shares was $1,215,306.00 (an increase in value of $405,101.60).

### Stock and Promissory Note (Neil V. Moody)

Neil V. Moody also has stock in and notes from Bonds.com of a similar nature to Christopher Moody's relevant assets:

1) Two-million, forty-eight thousand, nine-hundred forty-six  (2,048,946) shares of stock in Bonds.com; and

2) A secured convertible promissory note made by Bonds.com in the amount of $250,000 that is due in September 2010, convertible to six-hundred sixty-six thousand, six-hundred sixty-seven (666,667) shares of stock in Bonds.com.

The Receiver is in the process of acquiring Neil Moody's interest in Bonds.com.

Warrants, which give the holder rights to acquire more shares on a fully diluted basis, also were issued in conjunction with the Moodys' notes with Bonds.com. The Receiver is still investigating these grants of warrants.

### 4. Quest EMG Promissory Note.

As mentioned above in Section V.A.7, the Receiver also has a promissory note from Quest EMG and two individuals to Valhalla Investment Partners in the amount of $1,100,000. Interest is being paid monthly on this note.

### 5. Miscellaneous Items.

The Receiver has also recovered a myriad of other items that he may be able to sell, including a variety of furniture, artwork, sculptures, fixtures, computers, and miscellaneous supplies. The Receiver will make reasonable efforts to maximize the amount he is able to recover from the possible sale of all of these items.

### D. Recovery of Profits from Investors.

As discussed in Section III.C., above, the Receiver has determined that some purported investor accounts received monies in an amount that exceeded their investments. To date, the Receiver has discovered approximately $39 million in such fictitious profits. The Receiver has spent substantial time identifying recipients of these fictitious profits and intends to proceed with recovering these fictitious profits to redistribute them more equitably among investors holding legitimate and allowed claims.

The Receiver has begun efforts to recover these funds. In April 2009, the Receiver sent letters to 85 investors, each of whom, according to the records in the Receiver's possession, made "fictitious profits" by receiving monies from Hedge Funds in an amount that exceeded his or her investments (the "**Profiteers**"). These 85 investors' total amount of fictitious profits is $16,206,672.38. With the SEC's approval, the Receiver offered to settle with each of these 85 Profiteers for payment by the investor of 90% of his or her fictitious

profits. Collectively, if accepted and approved, these 85 settlements would yield $14,586,005.14. As of October 30, 2009, the Court has approved fifteen (15) Profiteer settlements totaling $1,566,090.85. With respect to these initial 85 letters, those who do not settle with the Receiver should anticipate that litigation will be commenced in the immediate future. Should those investors wish to resolve these claims, they should do so promptly. Once litigation is commenced, the opportunity to settle at a 90% discount will no longer be available.

In anticipation of initiating lawsuits, the Receiver filed a Motion to Reappoint Receiver (Doc. 139). That motion was granted on June 3, 2009. Except in situations where individuals had, or should have had, knowledge of the fraudulent investment scheme, or otherwise did not act in good faith, the Receiver will seek to recover fictitious profits but not the amount equivalent to the principal investment.

The Receiver continues to work to identify additional profiteers to recover the remaining $22,793,327.62 ($39 million in fictitious profits minus the $16,206,672.38 in fictitious profits received by the 85 investors mentioned above) and intends to send settlement offers to additional profiteers in the near future.

### E. Recovery of Assets from Christopher D. Moody and Neil V. Moody.

From the Receiver's investigation to date, it appears that a significant portion of activities of certain Hedge Funds were managed and directed by Christopher D. Moody and Neil V. Moody (the "**Moodys**"). Together, the Moodys received approximately $42 million in fees from certain Receivership Entities.

In April 2009, the Receiver initiated contact with the Moodys' counsel. On April 17, 2009, the Receiver received a letter from the Moodys agreeing that they would not transfer any assets of value owned by them, nor would they remove any such asset from the state of Florida without prior written notice to the Receiver. To date, the Moodys have cooperated with the Receiver to achieve an orderly turnover of assets. The following assets have been identified by the Receiver as having been funded with such proceeds.

### 1.    Viking Oil's Interest in Quest EMG.

Through their control of Viking Oil, the Moodys had an investment with Quest EMG, an oil and gas venture. On July 15, 2009, the Receiver gained control of Viking Oil and its interest in Quest EMG. Please see discussion at Section V.A.7, above, for more details.

### 2.    Moodys' Interest in Bonds.com.

The Moodys each had stock in and promissory notes from Bonds.com. Please see discussion above at Section V.C.3, above, for more details.

### 3.    Queen's Wreath Jewels, Inc.

The Receiver's investigation, aided with the cooperation of the Moodys, revealed that the Moodys invested $400,000 in Queen's Wreath Jewels, Inc. ("**Queen's Wreath**"), with each of the Moodys receiving a 20% interest in the company. The Moodys also made several loans to Queen's Wreath. The funds used to acquire the Moodys' ownership interest in Queen's Wreath and to make the loans were primarily transfers from Receivership Entities. On or about April 7, 2009, Queen's Wreath transferred ownership of the remaining jewelry to the Moodys in exchange for their interest in the company and in satisfaction of all

outstanding loans, with the understanding that Queen's Wreath would retain the jewelry on consignment.

On September 3, 2009, the Court granted the Receiver's motion (i) for possession of the jewelry and (ii) to enjoin a court proceeding brought by an investor, Louis Paolino, in which the state court had directed another receiver to hold possession of the jewelry. (Doc. 190; *see also Paolino v. Neil V. Moody and Christopher D. Moody*, Case No. 2009-ca-001876 (Cir. Ct. 12th Jud. Cir., Sarasota County, Fla.).) On September 8, 2009, the Court denied Paolino's motion for reconsideration of the order enjoining the state court proceeding. (Doc. 192.) The Receiver has possession of the jewelry. Bids have been secured from several potential purchasers. The Receiver anticipates selling this jewelry shortly and prior to sale, will seek the Court's approval.

\* \* \*

The Moodys have a number of assets that would add significant value to the Receivership estate, including interest in other companies, houses, vehicles, boats, et cetera. These assets are being identified and transferred by the Moodys to the Receivership as part of an ongoing process.

### F. Recovery of Fees from Recipients of Commissions.

Information available to the Receiver reveals that at least four individuals who, individually or through one or more entities, received commissions as "compensation" with respect to solicitation of investors in the Receivership Entities. In June and July 2009, the Receiver sent demand letters seeking to recover a total of $7,616,331.72 in both commissions and false profits from these particular individuals and entities. The letters offered to settle for

the amount of commissions received without interest. To date, no settlements have been entered into with these individuals and entities. The Receiver is preparing to initiate lawsuits to recover this money for the benefit of the Receivership estate.

### G. Other Litigation.

#### 1. Class Action Litigation.

The Receiver had communications with the law firm of Johnson, Pope, Bokor, Ruppel & Burns, LLP ("**Johnson Pope**") regarding the institution of a class action against Holland & Knight, LLP ("**H&K**"), the law firm that prepared the private placement memoranda used to solicit investors into the Nadel scheme. On March 20, 2009, Johnson Pope on behalf of investor Michael Sullivan and others similarly situated, instituted a class action suit against H&K, *Michael Sullivan v. Holland & Knight LLP*, Case No. 09-cv-0531-EAJ (M.D. Fla.). Should Johnson Pope be successful in this litigation, the Receiver expects that investors who suffered losses as a result of the fraudulent scheme will be able to pursue a valid claim.

#### 2. Malpractice Litigation.

The Receiver entered into a contingency fee agreement with Johnson Pope whereby Johnson Pope will pursue professional malpractice claims by the Hedge Funds against H&K, seeking damages of more than $50 million. (*See also* Order dated August 12, 2009 (Doc. 175).) On or about August 31, 2009, the Receiver initiated an action against H&K on behalf of the Hedge Funds. *Scoop Real Estate, L.P., et al. v. Holland & Knight, LLP, et al.*, Case No. 2009-ca-014887-NC (Sarasota County, Fla., 12th Jud. Cir.). On or about September 30, 2009, H&K removed the action to the Middle District of Florida. *See* Notice of Removal,

Doc. 1, *Scoop Real Estate, L.P., et al. v. Holland & Knight LLP, et al.*, Case No. 8:09-cv-1992 (M.D. Fla.). The Receiver does not believe H&K had any colorable basis for removing the action, and on or about October 7, 2009, he moved (i) to remand the action back to state court in Sarasota County and (ii) for an award of costs, expenses, and attorneys fees under 28 U.S.C. § 1447(c). *See id.*, Doc. 7. On November 16, 2009, the Court granted the Receiver's motion to remand. The case is again proceeding in state court.

### 3. Other Potential Litigation.

The Receiver continues to examine the actions of other professionals and businesses that provided services to Receivership Entities to determine whether he needs to take additional steps with respect to any of those professionals and businesses to recover assets for the receivership.

## VI. Investigating Receivership Affairs and Tracing Receivership Funds.

The Receiver has retained the services of PDR Certified Public Accountants ("**PDR**"), forensic accountants, to assist in investigating and analyzing the flow of funds both into and out of the Receivership Entities, and to assist in locating additional funds, if any. The Receiver has also retained the services of Riverside Financial Group ("**Riverside**"), financial analysts to assist in investigating and analyzing all of the trading activity. In conjunction with the Receiver, PDR and Riverside are further attempting to identify additional individuals and/or entities who may be in possession of Receivership funds. PDR will also assist in determining the amount of each investor's loss. The Receiver has also retained the services of Otto L. Wheeler, CPA/ABV, of Wheeler Fairman & Kelly Certified

Public Accountants in Austin, Texas, in connection with the Viking Oil & Gas venture discussed at Section V.A.7, above.

## VII.    The Next Sixty Days.

The Receiver has received useful information from investors and third parties during the course of the receivership. A number of people have contacted him with respect to the location of assets. The Receiver would like to thank those parties for their efforts. For anyone who may have information that they believe would be of use to the Receivership, the Receiver encourages those parties to bring that information to the Receiver.

The Receiver has received most but not all of the documents he has subpoenaed from third parties. It will be necessary to obtain and review all such documents in order to complete an understanding of the flow of funds through the Receivership Entities, to identify any additional sources of recovery, and to prepare an accounting. The Receiver is working diligently on this task, but without knowing the full volume of documents he expects to receive, it is difficult to estimate the time needed for completion.

During this process, the Receiver is also compiling and analyzing individual investor accounts. This is a necessary task to assess and administer investor claims. He will review and analyze all documents relating to each investment to determine the amounts owed, if any, to each investor. The Receiver does not expect to commence the claims process until 2010. The Receiver will provide a more definitive time estimate as his analysis progresses.

The Receiver is also reviewing information to determine if any third parties may have liability either to the Receivership estate or investors. In this regard it should be anticipated that the Receiver will bring actions in the future.

The Receiver will continue to attempt to locate additional funds and other assets and, if appropriate, will institute proceedings to recover assets on behalf of the Receivership Entities. In an effort to more fully understand the conduct at issue and in an attempt to locate more assets, the Receiver will continue to conduct interviews and/or depositions of parties and third parties with knowledge.

The Receiver will also continue the operations of all ongoing businesses of the Receivership Entities to maintain and, if possible, enhance their value. The Receiver will continue to market properties for sale and entertain offers for purchase.

## CONCLUSION

Creditors and investors in the Receivership Entities are encouraged to periodically check the informational website (http://www.nadelreceivership.com) for current information concerning this Receivership. The Receiver and his counsel have received an enormous amount of emails and telephone inquiries and have had to expend significant resources to address them. To minimize those expenses, creditors and investors are strongly encouraged to consult the Receiver's website before contacting the Receiver or his counsel. However, the Receiver continues to encourage individuals or attorneys representing investors who may have information that may be helpful in securing further assets for the Receivership estate or identifying other potential parties who may have liability to either the Receivership estate or investors directly to either email jrizzo@wiandlaw.com or call Jeffrey Rizzo at 813-347-5100.

Dated this 25th day of November, 2009.

Respectfully submitted,

**s/ Burton W. Wiand** _____
Burton W. Wiand, Receiver

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participant:

> Arthur G. Nadel,
> Register No. 50690-018
> MCC New York
> Metropolitan Correctional Center
> 150 Park Row
> New York, NY 10007

**s/ Gianluca Morello**
Gianluca Morello, FBN 034997
gmorello@wiandlaw.com
Maya M. Lockwood, FBN 0175481
mlockwood@wiandlaw.com
WIAND GUERRA KING P.L.
3000 Bayport Drive
Suite 600
Tampa, FL 33607
T: (813) 347-5100
F: (813) 347-5199

*Attorneys for the Receiver, Burton W. Wiand*
