# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,

CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.

_____/

## RECEIVER'S MOTION FOR APPROVAL OF SALE OF
## THE ASSETS OF THE VENICE JET CENTER AND
## AGREEMENT WITH NORTHERN TRUST, N.A.

Pursuant to 28 U.S.C. § 754, Fed. R. Civ. P. 66, and Rule 3.01 of the Local Rules

of the Middle District of Florida, Burton W. Wiand, as Receiver (the "Receiver"), moves

the Court for an order approving the sale of assets of Receivership Entity Venice Jet Center,

LLC ("VJC") in accordance with the terms of the Asset Purchase Agreement attached as

Exhibit 1. The sale of these assets also involves the resolution of VJC's obligations to

Northern Trust, N.A. ("Northern Trust"), as well as resolution of various other

Securities and Exchange Commission v. Nadel et al      Doc. 394

Dockets.Justia.com

obligations between the Receivership and Northern Trust, as set forth in the Agreement Regarding Claims and Obligations ("Northern Trust Agreement") attached hereto as Exhibit 2.

On January 21, 2009, the Securities and Exchange Commission ("Commission") initiated this action to prevent the defendants from further defrauding investors of hedge funds operated by them. That same day, the Court entered an order appointing Mr. Wiand as Receiver for Defendants Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management") and Relief Defendants Scoop Real Estate, L.P.; Valhalla Investment Partners, L.P.; Valhalla Management, Inc.; Victory Fund, Ltd.; Victory IRA Fund, Ltd.; Viking IRA Fund, LLC; Viking Fund, LLC; and Viking Management, LLC (the "Order Appointing Receiver"). (*See generally* Order Appointing Receiver (Doc. 8).)

The Court subsequently granted six motions to expand the scope of the receivership and appointed the Receiver as receiver over the following:

- Venice Jet Center, LLC, and Tradewind, LLC (Order, Jan. 27, 2009 (Doc. 17));

- Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; and the Laurel Mountain Preserve Homeowners Association, Inc. (Order, Feb. 11, 2009 (Doc. 44));

- The Guy-Nadel Foundation, Inc. (Order, Mar. 9, 2009 (Doc. 68));

- Lime Avenue Enterprises, LLC, and A Victorian Garden Florist, LLC (Amended Order, Mar. 17, 2009 (Doc. 81));

- Viking Oil & Gas, LLC (Order, July 15, 2009 (Doc. 153)); and

- Home Front Homes, LLC (Order, Aug. 10, 2009 (Doc. 172)).

All of the entities and the trust in receivership are hereinafter referred to collectively as the "Receivership Entities."

Pursuant to the Order Appointing Receiver, the Receiver has the duty and authority to: "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants; marshal and safeguard all of the assets of the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors." (Order Appointing Receiver at 1-2.) In particular, the Receiver was directed to:

> [t]ake immediate possession of all property, assets and estates of every kind of the [Receivership Entities], whatsoever and wheresoever located belonging to or in the possession of the [Receivership Entities], including but not limited to all offices maintained by the [Receivership Entities], rights of action, books, papers, data processing records, evidences of debt, bank accounts, savings accounts, certificates of deposit, stocks, bonds, debentures and other securities, mortgages, furniture, fixtures, office supplies and equipment, and all real property of the [Receivership Entities] wherever situated, and to administer such assets as is required in order to comply with the directions contained in this Order, and to hold all other assets pending further order of this Court . . . .

(*Id.* at 2.) In accordance with that Order, the Receiver has taken possession of the assets of VJC and seeks this Court's permission to sell certain of those assets. Specifically, the Receiver seeks the Court's approval of the sale of the assets identified on Exhibit A to the Asset Purchase Agreement and an order directing the transfer of assets and conditions related thereto as stated in the Asset Purchase Agreement. *See* Exhibit 1.

## I.    VENICE JET CENTER, LLC

The VJC is a Florida limited liability company formed in April 2006. Arthur Nadel was its managing member and registered agent, and its principal address was 1618 Main Street, Sarasota, Florida, 34236. The physical address of the VJC is 400 Airport Avenue East, Venice, Florida, 34285. Nadel acquired and developed the VJC and its properties and invested approximately $2.9 million of investors' funds in connection with this effort. On January 27, 2009, the Court expanded the Receivership to include the VJC (*see* Doc. 17).

The VJC is an authorized and fully operating fixed-base operator, or "FBO," at the Venice Municipal Airport in Venice, Florida (the "airport"). The VJC operates as an FBO pursuant to a lease agreement with the City of Venice ("the City"). The VJC's FBO business includes the operation of a flight school, fueling services, facility rentals to other businesses, hangar rentals and other aeronautical related services. Since the Receiver's appointment as receiver of the VJC, he has taken control of it and has continued to operate the business. The VJC has generated average monthly revenues of approximately $160,000, which are generated by: (1) rent and commissions from Hertz Corporation ("Hertz"), (2) hangar and tie-down rentals, (3) monthly rent from the Cockpit Café, and (4) fuel sales. The VJC incurs varying monthly expenses, which include: rent of approximately $10,500 to the City of Venice, bulk fuel purchases, payroll, and utilities.

The primary asset of the VJC is its leasehold estate arising under its lease with the City of Venice (the "lease"). The lease is by and between the City, as lessor, and the VJC, as lessee; is dated May 23, 2006; demises the real property located in Sarasota County, Florida; and was recorded in Instrument Number 2006107331 and Instrument Number 2006160491,

of the public records of Sarasota County, Florida.[1]  Its premises presently include two hangars, a tie-down area, a fuel farm, a main building, and a secondary building.  The VJC's main building and two hangars have one known encumbrance: a loan with Northern Trust, on which there is a remaining balance of approximately $1,960,169.00.  The Receiver made payments on this loan until June of this year.

Since the Receiver took control of the VJC, its revenue potential has been significantly undermined by the City's interference with its property rights.  Since before this receivership, the VJC has been engaged in a longstanding pursuit of approval to build four new hangars on an empty plot of land on its leasehold.  The City has repeatedly responded in a discriminatory and anti-competitive fashion in attempts to prevent the VJC from constructing the hangars.[2]  The new hangars would allow the VJC to service additional aircraft and their construction has been encouraged by the Federal Aviation Administration, which has directed the City on multiple occasions to approve the hangars project.  The City Council has actively prevented the hangars construction, presumably because of the personal interests of certain council members who live in close proximity to the airport and who openly oppose airport expansion.  Indeed, consistent with its desire to stop the VJC's continued development, the City has gone so far as to publicly announce in light of the

---

[1]  See Memorandum of Lease and Supplemental Memorandum of Lease, attached hereto Exhibit 7.

[2]  In the same vein and with the same goal in mind, the City is presently allowing (1) cost-free, municipal use of airport property for non-aeronautical purposes, (2) non-aeronautical usage of airport property without prior FAA approval, and (3) "the majority of its runways and taxiways" to remain in "poor" condition to deter additional aircraft traffic. Further, and as discussed herein, the VJC's business as an FBO has been directly and detrimentally impacted by the City's improper efforts to restrict aeronautical activities at the airport.

Receivership its intent to purchase the VJC for a nominal amount and take over the VJC's operations.

If the VJC is able to continue its development, its value would be significantly enhanced. The VJC derives the bulk of its income from hangar rentals and fuel sales. Further development will result in greater fuel sales. The ongoing development activity and the VJC's attempts to build additional hangars on vacant space it currently controls comply with all laws and regulations governing the airport. After taking control of the VJC, the Receiver has continued the VJC's pursuit to build more hangars to make the VJC more attractive to potential purchasers and ultimately increase the value of the business.[3] This pursuit led to the filing of an action against the City before the Federal Aviation Administration ("FAA").

### The VJC's Part 16 Proceeding Against the City of Venice Before the FAA

On May 14, 2009, the Court granted the Receiver's request for leave to file a complaint against the City pursuant to Title 14 of the Code of Federal Regulations, Part 16 ("Part 16 Complaint"). *See* Part 16 Complaint attached hereto as Exhibit 3. On or about July 2, 2009, on behalf of the VJC, the Receiver served the complaint on the City and filed it with the FAA's Office of the Chief Counsel (Docket No. 16-09-05). On or about September 2, 2009, the City filed its answer and affirmative defenses and motion to dismiss, to which the VJC replied on or about September 30, 2009. The City filed its surreply on October 28, 2009.

Although the action is now fully briefed, the parties have the opportunity to engage in limited discovery and to then present their case in an evidentiary hearing before the FAA.

---

[3] Indeed, all potential purchasers indicated that the ability to develop the leasehold was a very material component to their interest in this asset.

The current posture of that proceeding presents a good moment to sell the VJC's assets. The filing of the Part 16 complaint has enhanced the value of the VJC by preserving the opportunity for future growth and greater potential profitability of the facility. The proposed purchaser plans to proceed with that action in an effort to build the additional hangars. The sale of VJC's assets and the pursuit of that proceeding by the proposed purchaser alleviates the future litigation expenses and the risk of a negative outcome in the litigation.[4]

### Receiver's Marketing Efforts for the Sale of the VJC

The Receiver has conducted extensive marketing efforts for the sale of the VJC. Specifically, the Receiver prepared detailed marketing packages about the VJC, which were sent to more than 100 FBOs operating in the state of Florida. *See* Declaration of Burton W. Wiand attached hereto as Exhibit 4, ¶ 16. The Receiver also posted the marketing materials on his website, www.nadelreceivership.com, in a specific "Assets for Sale" section. (*Id.* ¶ 17.) The Receiver received replies from a number of FBO's who had received marketing materials, and was also contacted by five prospective purchasers who had seen the information posted on the website or heard of the potential sale through word of mouth. (*Id.*) The City was also provided with the marketing materials and invited to participate in the sale process but did not. (*Id.* ¶ 25.)

The Receiver requested that all parties interested in purchasing the VJC sign a mutual confidentiality agreement. (*Id.* ¶ 18.) Twenty prospective purchasers executed such an agreement and requested additional information regarding the VJC. (*Id.*) Discussions were

---

[4] The Receiver believes the VJC has a good likelihood of success in the FAA proceeding.

had with each of these prospective purchasers in an effort to gauge their level of interest and possible value of any deal for the VJC. (*Id.*)

In early May 2009, the Receiver sent letters to the interested parties who appeared to be viable purchasers of the VJC and invited them to tour the VJC and review pertinent documents, such as the VJC's financial statements, lease agreements, and loan documentation. (*Id.* ¶ 19.) In the following weeks, a number of other interested parties were sent a similar invitation to tour the facility and review documents. (*Id.* ¶ 20.)

On July 8, 2009, the Receiver sent a follow-up communication giving prospective purchasers who had executed a confidentiality agreement until July 16, 2009 to tour the facility and until July 28, 2009 to make an offer for the purchase of the VJC. (*Id.* ¶ 21.) In response, the Receiver received six proposals for the purchase of the VJC. (*Id.* ¶ 22.) The Receiver carefully reviewed each proposal and engaged in appropriate negotiations. Of these six proposals, only two appeared to be viable offers. [5] (*Id.*) Of those two proposals, the Receiver believes that the offer by Tristate Aviation Group of Florida LLC ("Tristate") is in the best interests of the Receivership. (*Id.*) The offer by Tristate far exceeds the next highest offer. (*Id.* ¶ 23.)[6]

The salient terms of the next highest offer included only the payment of $500,000 with no provision for the satisfaction of the outstanding loan with Northern Trust of

---

[5] The City was orally advised with respect to the progress of the marketing efforts as they were proceeding and still chose not to participate in the bidding process. (*Id.* ¶ 25.)

[6] Before the Receiver accepted the offer, the City was advised that the sale would likely take place in the near future and informed that, if it wanted to participate, it should make an offer that would include cash as well as resolution of the debt to Northern Trust. It was suggested that $1,000,000 was a reasonable offer, but the City never made a proposal to the Receiver.

approximately $1.9 million. (*Id.*) As such, the Receiver has determined that acceptance of the offer by Tristate as described below and in the Asset Purchase Agreement attached as Exhibit 1 is in the best interests of the Receivership.

## Asset Purchase Agreement

Tristate is a Florida limited liability company formed for the purpose of purchasing the VJC. Tristate's Managing Director, Marty Kretchman, is a former corporate pilot who has extensive experience in private aviation management. (*Id.* ¶ 26.) He spent over three years as General Manager of Avion Jet Center at the Orlando-Sanford International Airport before accepting the position of General Manager at Volo Aviation's newly acquired FBO in Sarasota in early 2008. (*Id.* ¶ 26B.) Since that time, he has overseen an operation that delivers over one million gallons of fuel annually including a combined staff of 15 fuelers, customer service representatives, and mechanics, as well as over 40,000 square feet of hangar and office space. (*Id.*)

In addition to Mr. Kretchman, Tristate's leadership team will include two other individuals, Brian Ciambra and Henry Paulino. (*Id.* ¶ 26C.) Mr. Ciambra has over 17 years of aviation experience, half of which was spent working with the world's largest FBO chain, Signature Flight Support. (*Id.*) Within that organization, he held the title of Regional General Manager covering White Plains and LaGuardia airports in New York and Morristown airport in New Jersey, some of the largest and most successful operations of Signature Flight Support's worldwide network. (*Id.*) He personally oversaw the establishment of the Volo Aviation brand name and the acquisition of five FBOs across the country. (*Id.*) Mr. Paulino has worked in aviation for over 16 years. (*Id.* ¶ 26D.) He spent

12 years with Signature Flight Support as General Manager of several of their facilities in the Northeast. Along with Mr. Ciambra, he also worked with an entity that acquired a small underutilized FBO in Westchester County, New York in June 2004. (*Id.*) As Director of Operations there, he was able to help turn the average EBITDA from $500,000 annually to over $3 million in less than two years. (*Id.*)

Tristate's leadership team will be responsible for the daily operations of the business, and will use well-established connections within the industry as well as extensive industry knowledge and experience to help make it successful while working with the community to ensure the airport and the business are both given the best opportunity to thrive. As such, Tristate is a qualified purchaser and plainly capable of effectively operating an FBO in accordance with FAA guidelines and airport standards.

Tristate has agreed to purchase the assets of the VJC, including the VJC Building, and the leasehold estate arising under the lease, all according to the following salient terms as set forth more fully in the attached Asset Purchase Agreement.[7] *See* Exhibit 1. Tristate agrees to (1) pay to the Receiver $300,000 cash at closing, (2) execute an unsecured promissory note to the Receiver in the amount of $250,000 payable over a term of three years,[8] (3)

---

[7] By structuring the sale as a sale of all of the assets of the VJC through an asset purchase agreement, the Receiver is able to streamline the sales process and sell the assets "as is," without any further warrantees with respect to those assets. The Receiver will maintain control and ownership of Venice Jet Center, LLC. ("LLC"). However, the LLC will have no assets and no continuing business other than the collection of payments of the promissory note that is part of this sale. The Receiver believes that this structure is in the best interests of the Receivership.

[8] The terms of the note require that Tristate obtain the Receiver's written consent to sell, transfer, or otherwise encumber any of the assets subject to the Asset Purchase Agreement outside the scope of the ordinary course of business. The note requires payment of simple

resolve the loan with Northern Trust such that Tristate will be named as the new debtor, and (4) assume prosecution of the Part 16 Complaint subject to an offset of the note obligations to the Receiver up to $50,000 for expenses and costs actually incurred in connection with efforts to resolve all disputes with the City, including the Part 16 Complaint.

In return, the Receiver agrees to (1) sell and transfer all rights in the assets listed on Exhibit A to the Asset Purchase Agreement on an "As Is," "Where Is" basis without any warranties of any kind and without any indemnification provisions of any kind and (2) transfer by assignment VJC's rights and interests in its lease with the City and two subleases. The two subleases (collectively, the "subleases") are: (1) the sublease agreement by and between the VJC and Hertz Corporation, a car rental company (the "Hertz sublease"); and (2) the sublease agreement by and between the VJC and the Cockpit Café, LLC, a restaurant (the "Cockpit Café sublease").[9] The cash paid at closing and the resolution of the Northern Trust loan alone provide greater value to the Receivership than any other offer received for the purchase of the VJC. The transaction is conditioned on an Order of the Court approving these terms.

<u>VJC's Lease with City</u>

---

interest at a rate of 4% per annum. Principal payments under the note will be amortized over a 15-year period with a balloon payment upon maturity of the note on November 13, 2012. Tristate may obtain up to two extensions of payment of the note upon maturity provided that it is reasonable for the Receiver to consent to such extensions and Tristate pays additional fees of 2% of the outstanding loan balance for each extension. Monthly payments of principal and interest would continue during the term of any extension.
[9] The VJC will also assign its rights in the Part 16 proceeding that will be continued by Tristate.

The City was deeded the airport property by the federal government pursuant to the Surplus Property Act of 1944 for the purpose of operating a general aviation facility. The VJC entered into a lease agreement with the City on May 23, 2006 to operate as an FBO at the airport. Pursuant to the lease agreement:

> [VJC] shall not assign this lease, or any interest in this lease, or sublet the leased premises, or any part of the premises, or any right or privilege appurtenant to it, or allow any person other than [VJC] and [VJC's] agents and employees to occupy or use the premises or any part of them, without first obtaining [the City's] written consent, **which consent shall not be unreasonably withheld.**

(emphasis added).

By a letter attached hereto as Exhibit 5 that was delivered to the City on December 11, 2009, the City was provided a copy of this motion and asked to consent to the transfer of VJC's lease. Based upon the City's past conduct, the Receiver has cause to believe there is a substantial likelihood the City will unreasonably withhold consent to the transfer of the VJC's lease.[10] The City continues to engage in conduct designed to prevent development of the VJC's leasehold, even though the FAA has on multiple occasions directed the City to approve the hangar project. Indeed the City has thwarted the VJC's efforts and has been overtly obstructionist to prevent the VJC from building the hangars. The City's actions include:

- denying the VJC's request to construct four box hangars in July 2008 even though the proposed construction complied with all applicable planning and

---

[10] Should the City consent to the transfer of the lease, the Receiver is unaware of any reason why the Court could not expeditiously approve this sale.

building code provisions and met all Minimum Standards for the Venice Municipal Airport and Fixed Based Operations (the "minimum standards");

- denying the VJC's request to construct hangars in August 2008 and requiring the VJC to submit a "concept plan," even though the VJC had not previously been required to produce a concept plan when it built its first hangars on the leasehold;

- misrepresenting to the FAA in September 2008 that the reason the VJC's request was denied was that the VJC made no formal request to build the hangars;

- seeking legal advice as to whether the City could terminate the VJC's lease;

- ignoring three separate letters from the FAA encouraging approval of the VJC's hangars project and warning that denying the request would be contrary to federal grant assurances;

- ignoring advice received from the City Attorney and its outside counsel that warned the City would likely be exposed to liability if it continued to deny the VJC's request to build the hangars;

- denying the VJC's written request dated February 2, 2009 to build the hangars;

- asserting for the first time on February 4, 2009, that the current Airport Layout Plan ("ALP") prohibited construction in the area sought to be improved and then ignoring the FAA's communication indicating the ALP

presented no such barrier to the project and again encouraging the City to approve construction;

- denying the VJC's written request dated February 25, 2009 to build the hangars;

- formally denying the VJC's request on March 10, 2009 at a City Council meeting and contending the VJC's lease was void because the company is in receivership;

- seeking yet another legal opinion to determine whether the City could terminate the VJC's lease because the company is in receivership;

- ignoring its outside counsel's opinion that the VJC's lease remains valid and enforceable and a reasonable construction of the lease permits additional hangars; and

- denying the VJC's request to build hangars on the basis that the Receiver did not demonstrate financial capability despite the fact that: (1) the VJC had not previously been required to demonstrate financial capability to build hangars; (2) no other airport tenants who have built hangars have been required to show financial capability; and (3) the VJC has satisfied the financial capability requirement.

The forgoing pattern of conduct strongly suggests the City will withhold consent unreasonably and without accountability in absence of a court order requiring the City to demonstrate why the transfer of the lease should not occur. Tristate is a qualified purchaser with an experienced management team plainly capable of effectively operating the FBO in

accordance with FAA guidelines and airport standards. There is no reasonable basis for the City to withhold its consent to the transfer of the lease to Tristate, and to allow the transfer of all rights as set forth in the Lease, including quiet enjoyment, and the Court should approve that transfer.

Subleases, Fuel Leases and Fuel Obligation Agreement

The Court also should approve the transfer to Tristate of the VJC's subleases with Hertz and the Cockpit Café. The Hertz sublease involves the operation of a car rental business and the Cockpit Café sublease involves the operation of a restaurant on the VJC's premises. The subleases are appurtenant to the operation of the VJC and must be transferred to ensure the continuation of those operations. As part of the Asset Purchase Agreement, Tristate is willing to assume the obligation associated with the assignment of these subleases. Accordingly, this Court should approve transfer of the subleases to Tristate as well.

The VJC currently has existing agreements with Hiller Group Incorporated ("Hiller Group") which will be terminated. The VJC has a Refueler Lease Agreement with the Hiller Group for the lease of two fuel vehicles ("Refueler Agreement"). The lease agreement was entered into on July 1, 2006 and terminates July 1, 2011. The VJC also has an Aviation Fuel Supply Agreement with the Hiller Group, Inc. for the provision of jet fuel to the VJC ("Fuel Supply Agreement"). This agreement was entered into on December 1, 2006 and is set to terminate on November 30, 2011. Tristate has its own equipment and fuel supply and is not interested in assuming these agreements. Once the assets of the VJC have been sold, neither the LLC nor the Receiver will have any business reason to continue these agreements and will not honor them. The Hiller Group has been informed that Tristate will not assume

responsibility under the VJC's Refueler Agreement or Fuel Supply Agreement and it has agreed to the termination of those agreements at the time of the sale.[11]  Exhibit 4, ¶ 38.

## II.    NORTHERN TRUST AGREEMENT

As part of the negotiations with Tristate to sell the VJC's assets, it was necessary for the Receiver to negotiate certain obligations owed to Northern Trust by the VJC, as well as other Receivership entities.  The Receiver has reached an agreement with Northern Trust that will alleviate significant obligations owed to the bank.  The Northern Trust Agreement, attached hereto as Exhibit 2, resolves the following obligations:

- Northern Trust made a loan to Scoop Capital ("Scoop Capital Loan") in the amount of $1,500,000.  Scoop Capital is responsible for the payoff amount of this loan, which was $1,534,941 as of October 27, 2009.

- The Scoop Capital loan is secured by a certificate of deposit in the amount of $1,500,000 with a maturity date of December 1, 2011 ("CD").  The value of early surrender of the CD is approximately $1,515,853, not including penalties and fees.

- An interest rate swap agreement ("Scoop Capital Swap") in the amount of $133,000 as of October 27, 2009, for which Scoop Capital is also responsible, accompanied the Scoop Capital Loan.

---

[11] Had the Hiller Group not agreed to the termination of those agreements, it would have had the opportunity to pursue any claim it believed it had as a result of the termination of those agreements in a future claims process in this case.

- Northern Trust made a loan to the VJC for $1,960,169 ("VJC Loan"). The VJC is responsible for the payoff amount for this loan, which was $1,976,998 as of October 27, 2009.

- An interest rate swap agreement ("VJC Swap") in the amount of $247,000 as of October 27, 2009, for which VJC is also responsible, accompanied the VJC Loan.

- The Receiver has taken control of a residential property located at 15576 Fruitville Road, Sarasota, Florida ("Fruitville Road Property"). Northern Trust holds a mortgage on the Fruitville Road Property in the amount of $173,929 and the payoff amount for this mortgage was $181,938 as of October 27, 2009.

- Northern Trust had banking relationships with Arthur Nadel as well as certain Receivership entities.

The Receiver has reviewed these obligations and the banking activities in order to bring the sale of the VJC's assets to fruition. Following prolonged negotiations, the Receiver and Northern Trust have reached the following agreement, as set forth more fully in Exhibit 2.

- Northern Trust will release the Receiver from any deficiency owed on the Scoop Capital Loan and all liability for the Scoop Capital Swap. In return, the Receiver has agreed to abandon all further claims to the CD securing the Scoop Capital Loan, the proceeds of which will apply to pay the debt.

- The Receiver agrees to sell the VJC to Tristate and will retain the proceeds of the sale. Northern Trust and Tristate have negotiated a new loan. Northern Trust has agreed to release the Receiver from any deficiency under the VJC loan and is waiving all payments on the VJC swap.

- With respect to the Fruitville Road Property, the Receiver will continue his efforts to sell the property. Upon the sale of this Property, Northern Trust will be paid, in full satisfaction of the mortgage on the Property, the principal amount of the mortgage owed when the Property became a Receivership asset, exclusive of all fees and penalties, provided a sale of the property is closed within one year of this Court's order approving the agreement and transaction. If the sale of the Property is not closed within the one year period, the Receiver will agree to further negotiate in good faith with the Bank regarding disposition of the Property.

- The Receiver has released Northern Trust of all potential claims that the Receiver has or may have against the bank as a result of Northern Trust's banking relationships with Nadel or the Receivership Entities[12] and will continue to use Northern Trust as one of his depository banks.

As a result of this agreement, Northern Trust is waiving over $400,000 in swap penalties and approximately $1,000,000 of debt obligations, and the Receivership will gain over $500,000 from the sale of the VJC's assets. Accordingly, it is the Receiver's position

---

[12] The Receiver has examined information relating to Northern Trust's banking relationship with the Nadels and the Receivership Entities. The Receiver has concluded that no significant viable claims against Northern Trust exist. Any possible claims that do exist would have little potential value to the Receivership and would be subject to significant litigation risks.

and recommendation that the proposed agreement with Northern Trust should be approved because it provides substantial funds for the Receivership and alleviates significant obligations the Receivership would otherwise have. The Receiver believes that the concessions by Northern Trust set forth above surpass the value of pursuing any possible litigation against Northern Trust. Accordingly, the Receiver asks that this Court enter an order approving the Northern Trust Agreement attached hereto as Exhibit 2.

### III.  MEMORANDUM OF LAW

The Court's power to supervise an equity receivership and to determine the appropriate actions to be taken in the administration of the receivership is extremely broad. *Securities Exchange Comm'n v. Elliott,* 953 F.2d 1560, 1566 (11th Cir. 1992); *Securities Exchange Comm'n v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). The Court's wide discretion derives from the inherent powers of an equity court to fashion relief. *Elliott*, 953 F.2d at 1566; *Securities Exchange Comm'n v. Safety Finance Service, Inc.,* 674 F.2d 368, 372 (5th Cir. 1982). The relief sought by the Receiver falls squarely within those powers. This relief includes approval of the disposition of assets and settlement of claims.

The Court also has the power to compel the transfer to Tristate of the VJC's lease with the City. *See, e.g., Ring v. Mpath Interactive, Inc.*, 2005 WL 1076561 (2d Cir. 2005) (holding that "landlord failed to demonstrate existence of any reasonable justification for withholding consent to Tenant's assignment of the lease" when the only asserted reason for withholding was a belief the purchaser would be a financial risk); *Chrysler Capital Corp. v. Lavender*, 934 F.2d 290, 294 (11th Cir. 1991) (affirming finding that refusal to consent to the

lease was commercially unreasonable and lessee was thus excused from further performance under the lease); *Buck Consultants, Inc. v. Glenpointe Assoc.*, 2007 WL 431149, *9 (3d Cir. 2007) (affirming district court's holding that landlord's refusal to consent to proposed sublease was unreasonable and in breach of lease's reasonable consent clause but reversing district court's determination to terminate the lease); *Murphy v. 253 Garth Tenants Corp.*, 579 F.Supp.1150, 1156 (S.D.N.Y. 1983) (granting mandatory injunctive relief to plaintiff when consent to the transfer of cooperative housing shares was unreasonably withheld); *Fourchon Docks, Inc. v. Milchem, Inc.*, 1987 WL 8036, *1 (E.D. La. 1987) (discussing that tenant may seek "a judicial declaration that the withholding of consent was unreasonable and that the sublease was therefore valid").

The Court should exercise that power so the City cannot sabotage the sale of VJC's assets by delaying or unreasonably withholding consent to a transfer of pertinent leases. The Receiver and his professionals have spent a substantial amount of time marketing and negotiating the sale of the VJC's assets, and have found a qualified and experienced purchaser and negotiated a sale that is in the best interests of the Receivership estate. The City's past conduct and its Council Member's public statements demonstrate a real likelihood the City may try to delay or otherwise reject the requested lease transfers in an effort to prevent the sale of the VJC's assets so they may be ultimately rendered worthless. To balance the interest of the Receivership and of the City, the Receiver respectfully suggests the Court provide the City with 15 calendar days to review the transaction that is the subject of this motion and to object to the transfer of the leases and subleases. The Court could then review those objections and make a final determination of whether the transaction —

including the transfer of the leases and subleases — should be approved. This procedure would prevent the City from improperly thwarting the proposed sale of the VJC's assets.

WHEREFORE, Burton W. Wiand as Receiver respectfully requests this Court enter an Order[13] allowing the City of Venice to file with the Court any objections it may have with respect to approval of the sale as provided herein within 15 days of the City's receipt of this motion;

(1)     Approving the sale of VJC's assets as provided in the Asset Purchase Agreement as attached hereto as Exhibit 1;

(2)     Transferring all of the VJC's rights, title, and interest in the lease with the City and the subleases with Hertz and the Cockpit Café to Tristate for the unexpired terms stated therein, including the right to be substituted in the VJC's stead in the proceeding before the FAA (FAA Docket No. 16-09-05);

(3)     Granting Tristate all rights appurtenant to those leases including but not limited to the quiet enjoyment and the right to development of the same; and

(4)     Approving the agreement between the Receiver and Northern Trust as reflected in the Northern Trust Agreement attached as Exhibit 2.

## LOCAL RULE 3.01(g) CERTIFICATION OF COMPLIANCE

Counsel for the Receiver has conferred with counsel for the SEC and is authorized to represent to the Court that this motion is unopposed. The SEC does not object to the requested relief, but takes no position on any underlying disputes with the City.

---

[13] A proposed order granting this Motion is attached as Exhibit 6.

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participant:

Arthur G. Nadel
Register No. 50690-018
MCC New York
Metropolitan Correctional Center
150 Park Row
New York, NY  10007

s/ Gianluca Morello
Gianluca Morello, FBN 034997
Email: gmorello@wiandlaw.com
WIAND GUERRA KING P.L.
3000 Bayport Drive
Suite 600
Tampa, FL  33607
Tel.:   (813) 347-5100
Fax:   (813) 347-5155

*Attorneys for the Receiver, Burton W. Wiand*