UNITED STATES DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
WASHINGTON, DC

Venice Jet Center, LLC

        Complainant,

v.                                      Docket No. _____

City of Venice, Florida

        Respondent.

_____/

## COMPLAINT

Complainant Venice Jet Center, LLC ("VJC"), by and through the undersigned counsel, hereby file a Part 16 Complaint pursuant to Title 14, Code of Federal Regulations, Part 16 (Rules of Practice for Federally Assisted Airport Enforcement Proceedings) against the Respondent City of Venice ("the City" or "Respondent"), and in support thereof, states as follows:

## PARTIES

1.      The Complainant VJC is a Florida limited liability company, of which Arthur Nadel was previously a managing member. On January 27, 2009, Burton W. Wiand was appointed by the United States District Court, Middle District of Florida, Tampa Division to serve as the Receiver over a number of entities, including the VJC. **See Exh. 1: Order Appointing Receiver Over VJC.** The VJC is located at 400 Airport Ave. East, Venice, Florida 34285, and may be contacted through its undersigned counsel.

**EXHIBIT 3**

2.     The Respondent City of Venice, Florida is the sponsor, proprietor and operator of a Federally assisted airport, the Venice Municipal Airport ("the Airport"). Respondent is located at 401 West Venice Avenue, Venice, Florida 34285 and may be contacted through its counsel, Robert C. Anderson of Hall & Anderson, P.A, who is located at 1314 East Venice Ave., Ste. E, Venice, Florida 34285. Respondent has seven members on its City Council, which is the legislative body authorized to enact municipal laws for the City.

3.     Certain current and/or former City Council Members took action on behalf of Respondent in violation of FAA law, which is the subject of this Complaint.

4.     Suzanne Lang ("Lang") was elected to the Venice City Council in November 2007. She currently holds the position of Vice Mayor. Lang is the past president of the Venice Neighborhoods Coalition, Inc., a private interest group that opposes expansion of the Airport. Lang resides in a neighborhood located in close proximity to the Airport.

5.     Ed Martin ("Martin") was elected to the Venice City Council in November 2007. He currently holds the position of Mayor. Martin resides in a neighborhood located in close proximity to the Airport.

6.     Ernie Zavodnyik ("Zavodnyik") was elected to the Venice City Council in November 2007. He is currently a Council Member. He is a member of the Venice Neighborhoods Coalition, Inc. Zavodnyik resides in a neighborhood located in close proximity to the Airport.

2

7.    John K. Moore ("Moore") was elected to the Venice City Council in 2002 and reelected in 2008. He is currently a Council Member. Moore resides in a neighborhood located in close proximity to the Airport.

## JURISDICTION AND STANDING

8.    Jurisdiction to hear this matter is conferred upon the FAA by Congress through the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. § 47101 *et seq*. The AAIA authorizes the FAA to grant federal funds to public airports for construction and other improvement projects via the AAIA's Airport Improvement Program ("AIP"). Recipients of such AIP grants must provide "written assurances" that they will comply with numerous statutory requirements. 49 U.S.C. § 47107(a). **Exh. 2: Sponsor Grant Assurances**. The FAA has jurisdiction to hear this Complaint and to order the Respondent to comply with its grant assurances pursuant to 14 C.F.R. Part 16.

## NATURE OF THE CASE AND BACKGROUND

9.    In June of 1947 and pursuant to the Surplus Property Act of 1944, the federal government conveyed the Venice Municipal Airport, a general aviation facility, to the Respondent.

10.   The Airport includes approximately 835 acres of City owned property, about which approximately 490 acres are dedicated to aviation use. One of the funding programs for the Airport is the AIP.

11.   The source of the AIP funds is the Aviation Trust Fund ("ATF"). The ATF was established by Congress in 1970 to provide funding for aviation capital investment

programs. The AIP funds are discretionary and distributed each year by the FAA. Additional funding for Airport improvements is administered by the Florida Department of Transportation ("FDOT").

12.     VJC is a Fixed Based Operator ("FBO") that entered into a 25-year lease, containing a 5 year renewal option, with the City on May 23, 2006. **Exh. 3: VJC's Lease.**

13.     Pursuant to the lease, VJC is obligated to pay the City approximately $9,500 per month, in addition to all taxes and assessments as they became due, in return for the right to "[c]onduct any commercial aeronautical activity permitted under the Minimum Standards for Commercial Aeronautical Activities at Venice Municipal Airport . . . ." **Exh. 4: Aeronautical Activities Minimum Standards Document, ¶ 14.**

14.     The minimum standards documents incorporated into the lease discuss the general operational requirements for FBOs and the City's purported goals and philosophy concerning Airport operations:

> [T]he City of Venice's goal in adopting these standards it to encourage development of quality aeronautical services and to make the airport available for commercial aeronautical activities on a fair and reasonable term without unjust discrimination . . . . It is the intent of the City of Venice to offer the maximum variety of aviation related services in order to maximize the choice of service providers to the public using the airport.

**Exh. 4: ¶¶ 1, 3(A).**

15.     Despite the above communicated goals and intent of the Respondent, it has over the past year and a half discriminated against VJC and taken active measures to limit aviation related services to the public.

16.     VJC's lease with Respondent covers three separate parcels of land totalling approximately 9.7 acres. One parcel is entirely vacant. A building and hangers were located on sections of the other two parcels.

17.     Pursuant to obligations under the lease, VJC was required to demolish and rebuild the old hangers and refurbish the existing building, which it did. The rebuilt hangers were filled upon completion in approximately the Fall of 2007.

18.     In May 2008, VJC applied to the City for approval to construct four new hangars on approximately 2.5 acres of vacant land. VJC sought to build four "box hangars," designed to service medium-sized aircrafts, including smaller jets and turboprops.

19.     As an FBO at the Airport, VJC has the right to construct hangars not less than 6,400 square feet in floor space and to engage in the business of rental space for aircraft storage. **See Exh. 5: FBO Minimum Standards Document, ¶ 10.**

20.     The site plan for the hangars was reviewed by the City departments, and no flaws have been reported.

21.     By June 2008, VJC was ready to proceed to the final building stage when the City Council halted the permitting process and refused to permit construction. The Council demanded to review a "concept plan" prior to allowing any further processing of permits.

22.     VJC was permitted to make a 10-minute presentation on August 26, 2008 to the City Council. The purpose of VJC's presentation at the meeting was to obtain approval of the site plan so that the permitting process could continue. The Council did not review the site plan and no vote was taken at the meeting.

23. The intent of the Council in refusing to permit the hanger construction soon became clear. A four-member majority voting bloc on the Council opposes expansion of the Airport to facilitate medium-sized aircraft.

24. Respondent's opposition to hangar construction, and any other Airport expansion that would provide services to jets and turbo-props, has been widely publicized in local newspapers. **See Composite Exh. 6: Venice Herald Tribune, Venice Gondolier Sun and Sarasota Herald Tribune Articles.**

25. The FAA has developed an airport coding system called the Airport Reference Code ("ARC") based on the operational and physical characteristics of the aircraft that operate at a particular airport. The ARC has two components. The first is depicted by letter and relates to aircraft approach speed. The second is depicted by Roman numeral and relates to wingspan.

26. The Airport has 2 runways, presently classified as C-II. Category C represents aircrafts that approach at speed 121 knots or more but less than 141 knots. Group II encompasses aircraft with wingspans of 49 feet up to but not including 79 feet.

27. The ARC classification of the Airport has been a controversial City Council issue. Certain Council Members, including Lang, Martin, Moore and Zavodnyik, oppose the current classification and any further expansion of the Airport, and would like the Airport to be reclassified as B-II in order to limit the types of aircraft that are serviced. **See e.g., Exh. 7: Emails From Suzanne Lang to Kit McKeon Dated December 6, 2007; Composite Exh. 6-I.**

28.     Reclassification of the Airport as B-II would diminish, rather than develop, aviation services provided by the Airport to the public and would significantly undermine the value of VJC's lease.

29.     Lang, Martin, Moore and Zavodnyik's opposition to Airport growth is taken to placate a small group of residents that lived near the runway and to protect their own personal interests.  Upon information and belief, all four Council Members live within a mile of the Airport in adjacent neighborhoods that could potentially be affected by the hangar construction and noise stemming from service to jets and turbo-props.

30.     Council Member Lang has been most vocal in opposing any classification that "[w]ould encourage larger jet and plane traffic here, and, increase flying over homes in Gulf Shores, Golden Beach, Sunset Beach, etc. . . ." **Exh. 8: Lang's Correspondence to Interim City Manager Nancy Woodly Dated September 24, 2008.**  According to Lang, "Maintaining the airport for pre-dominantly privately owned single engine aircraft should be the primary objective." **Exh. 8.**

31.     Led by this four-person majority voting bloc, the Respondent refused to permit the hangars construction and has engaged in one stall-tactic after another since May of 2008 to ensure no such construction takes place.

32.     Much of the Council's attempts to limit aeronautical activities at the Airport took place off the record -- in non-public meetings and correspondence -- in violation of the Public Records Act and the Florida Government-In-The-Sunshine Law.  Respondent and Council Members Lang, Martin and Moore were sued by Citizens for Sunshine, Inc. (a non-

profit corporation) and its President in Sarasota Circuit Court in connection with the prohibited activities. **See Exh. 9: Complaint for Declaratory Relief and Injunction.**

33.     This court action was ultimately settled when Respondent capitulated and agreed to provide electronic correspondence requested pursuant to the Sunshine and Public Records Act.  Upon information and belief, the City spent approximately $850,000 worth of taxpayers' monies in legal fees and costs in connection with this action and the Plaintiffs are seeking a substantial multiplier of this amount in their fee application.

34.     The Respondent has refused to authorize the hangar construction on VJC's leasehold despite: (1) approving funding for new hangars that would be constructed elsewhere on the premises and run by the City in competition with VJC, and (2) permitting other tenants at the Airport to build and lease hangars to aircraft operators.

35.     There is a great need for construction of the hangars.  Upon information and belief, there are approximately 50 individuals and/or entities who are on a waiting list to rent hangar space at the Airport.

36.     On September 2, 2008, VJC submitted an informal Part 13 complaint to Ms. Rebecca R. Henry, the Program Manager, Planning and Compliance, at the Federal Aviation Administration.  **See Exh. 10: VJC's Informal Complaint to FAA.**

37.     The informal complaint discussed how Respondent's actions in vetoing the hangar construction was in violation of federal law, assurances made under the AIP, and in derogation of the lease agreement.  **See Exh. 10.**

38.     The FAA forwarded the informal complaint to the City of Venice.   On September 15, 2008, the City responded to the FAA regarding the allegations made in the informal complaint.  Respondent represented that VJC had never, in fact, presented a request to the City Council to approve construction of the hangars.  See **Exh. 11: City's Response to VJC's Informal Complaint to FAA.**

39.     In a letter dated December 4, 2008, directed to the Interim Manager of the City of Venice, the FAA unequivocally communicated that "*[t]he FAA agrees that the City of Venice appears to be unnecessarily delaying the expansion of the Venice Jet Center.* The FAA believes the airport sponsor's primary concern in the development of airport properties should be meeting aeronautical demand . . . . These delays created by the city appear to be restricting aeronautical access to the Airport, *which is inconsistent with federal grant assurances and the Surplus Property Deed restrictions.*" (emphasis added).  **Exh. 12: FAA Letter Dated December 4, 2008.**

40.     Despite the FAA's warning, Respondent sought a second legal opinion as to whether it had authority to deny VJC's request to construct hangars.  See **Exh. 13: Kaplan Kirsch & Rockwell Legal Opinion.**

41.     City Attorney Robert C. Anderson and the City's outside counsel both advised Respondent that it "[w]ould run a significant risk of being found in violation of its grant assurances if it denied the Jet Center's request to construct additional hangar space on its leasehold." **Exh. 13: p. 1.**

42.     The legal opinion also advised that "[a]n airport sponsor's prime obligation is to operate the airport for aeronautical use, including the opportunity for leaseholders to develop airport property for aeronautical use" and provided examples of supporting FAA proceedings. **Exh. 13: p. 6.**

43.     The City was further advised that "[t]he fact that the City has allowed other tenants to build and lease out hangars would make the City vulnerable to charges of unjust discrimination if it denied Jet Center the right to build hangars." **Exh. 13: p. 9.**

44.     After receiving its counsels' legal opinion, Respondent continued to prevent construction of the hangars. **See Composite Exh. 6-G.**

45.     On December 29, 2008, the FAA wrote to VJC in response to the Part 13 informal complaint and stated "[y]our application to expand at the Venice Municipal Airport has not been included on the City Council agenda for approval, and the FAA believes you are being unnecessarily delayed. This position was communicated to the Interim City Manager, Dr. Nancy Woodly, on December 4, 2008." **See Exh. 14: FAA Letter Dated December 29, 2008.**

46.     The FAA stated "[i]t appears we will be unable to assist you with an informal resolution to this complaint, as the City of Venice is unwilling to address your application for expansion . . . If you are unable to resolve this matter informally, you are free to file a formal Part 16 complaint." **See Exh. 14.**

47.     After Mr. Wiand was appointed Receiver over VJC on January 29, 2009, he continued VJC's attempts to informally resolve this matter with Respondent.

48.     On February 2, 2009, the Receiver submitted a written request to City Mayor Ed Martin on behalf of the VJC, requesting the City release its hold on the hangars project, which had been pending for 9 months. **See** **Exh. 15: Receiver's Letter Dated February 2, 2009.** This request was denied.

49.     As yet another tactic to delay the hangar construction, Respondent asserted that the area sought to be improved was designated "terminal area" and "future apron area" in the Airport Layout Plan ("ALP"). Respondent contended that, accordingly, the hangars could not be built in that space.

50.     The FAA responded to the City's argument in correspondence dated February 19, 2009, and made it clear that those designations were not binding. **See** **Exh. 16: FAA Letter Dated February 19, 2009.**

51.     The FAA, in fact, reiterated that "*[t]he City of Venice may and should approve the construction of hangars in the area you mention.* The land is designated for aeronautical use, and the FAA has even processed a 'pen and ink' change to the 2000 ALP incorporating hangars in this vicinity. . . *In accordance with my previous advice concerning airport compliance matters, this proposal should be forwarded to this office without further delay.*" Exh. 16 (emphasis added); **Composite Exh. 6-F.**

52.     No action was taken on behalf of the City to conform to the FAA's request.

53.     On February 25, 2009, another letter was sent to the Mayor and City Counsel Members on behalf of the VJC asking that the City release its hold on the hangars

construction and stating any further delay was unreasonable. **Exh. 17: VJC Letter Dated February 25, 2009.** This request was denied.

54.     On March 3, 2009, the FAA wrote to the Airport Manager, Mr. Fred Watts, and informed him that Respondent had improperly entered into a non-aeronautical lease for Airport property without obtaining prior approval from the FAA. **See Exh. 18: FAA Letter Dated March 3, 2009.** Respondent's execution of the lease without FAA approval was in violation of FAA law.

55.     On March 10, 2009, the Receiver met with the City Council and again requested approval to build the hangars on behalf of VJC. The City formally denied the Receiver's request and intimated that VJC's lease was void now that the company is in receivership. **See Composite Exh. 6-D; Composite Exh. 6-E.**

56.     This argument was yet another stall-tactic designed to prevent VJC from improving its leasehold. Respondent sought another outside legal opinion to determine, in part, whether VJC's lease is valid now that the company is in receivership and whether the City could terminate the lease due to the alleged fraudulent acts of VJC's former manager. **See Exh. 19: Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A. Legal Opinion**

57.     The legal opinion concluded that the lease remains valid and enforceable and that Respondent could not terminate the lease due to alleged infractions of VJC's former managing member. **See Exh. 19: pp. 2, 14.**

58.     Mr. Wiand, the Receiver, has communicated to Respondent that he is interested in selling VJC and is in the process of submitting bids from prospective

purchasers. Every potential purchaser has indicated that ability to construct the hangars is a material consideration to their interest in purchasing.

59.     Despite its knowledge that the Receiver intends to sell the VJC to a willing and able purchaser, the City contended that approval of the hangars project required that the Receiver demonstrate the receivership had the financial ability to construct the hangars.

60.     The Receiver orally and in writing has assured the City that the receivership has the financial ability to construct the four hangars. As of the date of this filing, the receivership fund contains over $10 million in assets and approximately $4 million in cash in bank accounts.

61.     On May 4, 2009, Mr. Wiand enclosed in a letter to Respondent the materials provided to potential buyers of the VJC. Mr. Wiand stated that the City's refusal to permit the hangar construction constituted an intentional interference with an asset of the federal Receivership and was prohibited by the order of the United States District Court in Tampa. He again renewed his request that the City grant VJC authorization to construct the four proposed hangars. Mr. Wiand indicated that if the request was yet again denied, he would be forced to seek legal avenues of redress. **See Exh. 20: Receiver's Letter Dated May 4, 2009; Composite Exh. 6-B.** His request was denied.

62.     Council Member Lang has publicly stated she "would welcome a formal complaint process with the FAA" and has publically invited the filing of a federal enforcement proceeding against the City. **See Composite Exh. 6-H.**

63. Respondent has recently publically expressed its intent to buy VJC for a nominal amount and develop its own hangars in competition with the VJC. **See Composite Exh. 6-A; Composite Exh. 6-C.**

64. Respondent has assured it will comply will all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds. Respondent's refusal to grant VJC the right to construct and rent the hangars constitutes predatory conduct, is an illegal restraint of trade in violation of 15 U.S.C. § 1, *et. seq*, and violates assurances made under the AIP.

65. On May 18, 2009, the FAA acknowledged in email correspondence to Mr. Wiand that informal attempts to resolve this dispute have been ineffective and that, "[y]ou are free to file a Formal Part 16 Complaint . . . ." **Exh. 21: Email From the FAA Dated May 18, 2009.**

66. Mr. Wiand, on behalf of VJC, has met with the City and/or its representatives and communicated with the Respondent numerous times in attempts to secure approval for constructing the hangars. He has complied with every requirement demanded by Respondent and countered every hurdle and delay tactic the City constructed in order to prevent VJC from improving its leasehold. His efforts have been to no avail.

67. Most recently, on June 19, 2009, the City Manager and City Attorney met with the Receiver, purportedly to discuss amicable resolution of this dispute. The City Manager, however, repeatedly emphasized that he had no authority to negotiate on behalf of the City and no authority to make any proposal for resolution.

## VJC HAS BEEN DIRECTLY AND SUBSTANTIALLY HARMED

68.     The VJC is entitled to institute this Part 16 Complaint because it is and has been doing business with Venice Municipal Airport and paying rent and other expenses to the Airport, and is directly and substantially affected by the City's noncompliance with its legal duties under the AIP and revenue diversion.

69.     VJC has paid approximately $237,500 in rent to the City, plus expended at least $100,000 in development costs, and has been denied the ability to develop its leasehold due to delay tactics taken by Respondent in direct contravention of assurances made under federal law.

## SPECIFIC ALLEGATIONS

70.     The City is bound by the terms of a quitclaim deed incorporating legal duties that arise from the Surplus Property Act.

71.     As the sponsor for federal grants received by the Airport as part of the AIP, Respondent is obligated to comply with federal law and related FAA sponsor assurances.

72.     After accepting an AIP grant, Respondent's assurances became a binding obligation between it and the federal government.

### COUNT I
### Violation of Grant Assurance No. 1: Sponsor's Violation of Federal Law

73.     Complainant realleges paragraphs 1 through 72 as if fully set forth herein.

74.     Respondent has assured it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds.

75.     Respondent's refusal to grant VJC the right to construct and rent the hangars is predatory conduct and an illegal restraint of trade in violation of 15 U.S.C. § 1, *et. seq.*

76.     Respondent's violation of 15 U.S.C. § 1 *et. seq.*, the Sherman Act, is a violation of Grant Assurance No. 1.

## COUNT II
### Violation of Grant Assurance No. 5: Preserving Rights and Powers

77.     Complainant realleges paragraphs 1 through 72 as if fully set forth herein.

78.     Respondent has assured that it will not take or permit any action which would operate to deprive it of any or all of the terms, conditions, and assurances in the grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor.

79.     Respondent's actions, including: its attempts to downgrade the Airport to a B-II classification, repeatedly denying VJC the right to improve its leasehold, and construing VJC's lease narrowly as not permitting construction of the hangars is a violation of Grant Assurance No. 5.

## COUNT III
### Violation of Grant Assurance No. 19: Operation and Maintenance

80.   Complainant realleges paragraphs 1 through 72 as if fully set forth herein.

81.   Respondent has assured it will operate the airport in a manner necessary to serve the aeronautical users of the Airport.

82.   Respondent's actions in precluding construction of the hangars when there is an established need for hangar space and denying Airport users the ability to service medium sized aircraft such as smaller jets and turbo props is a violation of Grant Assurance No. 19.

## COUNT IV
### Violation of Grant Assurance No. 22: Economic Nondiscrimination

83.   Complainant realleges paragraphs 1 through 72 as if fully set forth herein.

84.   Respondent is obligated as a sponsor receiving AIP funding to make the Airport available for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

85.   Respondent has actively limited a kind or class of aeronautical use of the Airport and has not demonstrated the limitation is necessary for the safe operation of the Airport or necessary to serve the civil aviation needs of the public.

86.   Respondent has refused to permit hangar construction that would provide utilization of medium-sized aircraft and aviation services to the public.

87. This refusal is improperly driven by Respondent's impermissible desire to limit the growth of the Airport.

88. Operating the Airport for aeronautical use is Respondent's primary obligation. Part of this primary obligation is to provide the opportunity for leaseholders to develop airport property for aeronautical use.

89. Respondent has an obligation to make suitable areas or space available on reasonable terms to those who are willing and otherwise qualified to offer the needed services.

90. There is a need for hangar space on the leasehold and VJC has demonstrated it is qualified to offer the needed services.

91. VJC has submitted a proposal to build hangars on reasonable and favorable terms and Respondent has failed to negotiate the hangar project in good-faith.

92. Attempting to construe VJC's lease terms in a manner that limits the Airport's aeronautical utility by restricting development is inconsistent with Respondent's Federal obligations and contrary to VJC's rights under the lease and incorporated documents.

93. Respondent has permitted other tenants to build and lease out hangars to aircraft operators.

94.     Respondent has purposefully refused to allow the construction of hangars on usable land within the boarders of the Airport in contravention of the requirements of the FAA and the assurances it made under the AIP.

95.     Respondent's refusal is an unreasonable denial of access to aeronautical development and a violation of Grant Assurance No. 22.

## COUNT V
### Violation of Grant Assurance No. 23: Exclusive Rights

96.     Complainant realleges paragraphs 1 through 72 as if fully set forth herein.

97.     Respondent has assured it would permit no exclusive right for the use of the Airport by any person providing, or intending to provide, aeronautical services to the public.

98.     Respondent may not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the Airport to conduct any aeronautical activities.

99.     Upon information and belief, Respondent presently operates 144 hangars at the Airport.

100.    There is a need for additional hangar space on the leasehold and VJC has demonstrated it is qualified to offer the needed services.

101.    Respondent has denied VJC the right to construct and lease hangars in competition with the City and other tenants who have been granted the right to build and lease hangars.

102. Respondent desires to terminate VJC's lease or buy the VJC in order to eliminate the competition completely and take greater control of the Airport.

103. Respondent has granted special rights or privileges to others making the same or similar desired use of the Airport and has denied this right to VJC.

104. Respondent has not demonstrated the limitation directed at VJC is necessary for the safe operation of the Airport or necessary to serve the civil aviation needs of the public.

105. Respondent's refusal to permit VJC to construct and rent hangars is a violation of Grant Assurance No. 23.

## LIST OF EXHIBITS

106. Pursuant to 14 C.F.R. §§ 16.15 and 16.23(b), the documentary support for th allegations contained in this Complaint that is presently available to VJC, in the exercise of reasonable diligence, are served concurrently with this Complaint, are incorporated herein by reference as though fully set forth, and are identified as follows:

1. Order Appointing Receiver Over VJC.
2. Sponsor Grant Assurances.
3. VJC's Lease.
4. Aeronautical Activities Minimum Standards Document.
5. FBO Minimum Standards Document.
6. Composite Exhibit: Venice Herald Tribune, Venice Gondolier Sun and Sarasota Herald Tribune Articles.
7. Lang's Emails to Kit McKeon Dated December 6, 2007.
8. Lang's Correspondence to Nancy Woodly Dated September 24, 2008.
9. Complaint for Declaratory Relief and Injunction.
10. VJC's Informal Complaint to FAA.
11. City's Response to VJC's Informal Complaint to FAA.

12. FAA Letter Dated December 4, 2008.
13. Kaplan Kirsch & Rockwell Legal Opinion.
14. FAA Letter Dated December 29, 2008.
15. Receiver's Letter Dated February 2, 2009.
16. FAA Letter Dated February 19, 2009.
17. Receiver's Letter Dated February 25, 2009.
18. FAA Letter Dated March 3, 2009.
19. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A. Legal Opinion
20. Receiver's Letter Dated May 4, 2009.
21. Email From the FAA Dated May 18, 2009.

## CORRECTIVE ACTION

107.    VJC respectfully requests that FAA issue an order: (1) denying Respondent

future federal AIP grants and suspending current grand fund payments for 6 months or until

the violations alleged herein are rectified, wherever period is longer; (2) requiring

Respondent to submit a corrective action plan within 20 days of a adverse Director's

Determination demonstrating how it intends to eliminate the violations; (3) requiring

Respondent to grant VJC the right to build the four hangars as proposed within 10 days of the

order; and (4) making an explicit finding that VJC is entitled to construct hangars on its

leasehold pursuant to the terms of the lease and Venice Municipal Airport Minimum

Standards documents.

## SEC. 16.21 CERTIFICATION

The undersigned counsel certifies that substantial and reasonable good faith efforts to

resolve this disputed matter informally prior to filing this Complaint have been made on

behalf of the VJC and there is no reasonable prospect for timely resolution. The extensive

efforts taken by VJC to obtain resolution are detailed above and, among other efforts,

include: (1) sending numerous letters to Respondent in efforts to secure approval of the

hangars project; (2) holding numerous meetings with Respondent in efforts to secure approval of the hangars project; and (3) filing an informal Part 13 Complaint with the FAA. Any efforts by Respondent to amicably resolve this dispute informally have been nothing more than thinly veiled tactics to further delay construction of the hangars on VJC's leasehold. The FAA has stated that informal efforts to resolve this matter have been ineffective and VJC may properly initiate this Part 16 proceeding at this time.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing Part 16 complaint on the following persons at the following addresses by first-class mail:

City of Venice
401 West Venice Avenue
Venice, Florida 34285

Robert C. Anderson
Hall & Anderson, P.A
1314 East Venice Avenue, Suite E
Venice, Florida 34285

s/ _Dominique Pearlman_
Gianluca Morello, FBN 034997
Gianluca.morello@fowlerwhite.com
Dominique Pearlman, FBN 0044135
Dominique.Pearlman@fowlerwhite.com
FOWLER WHITE BOGGS, P.A.
501 E. Kennedy Blvd., Suite 1700
Tampa, FL 33602
Phone (813) 228-7411, Fax (813) 229-8313

Attorneys for the Complainant, Venice Jet
Center, LLC

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

### CASE NO.: 8:09-cv-87-T-26TBM

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

    v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.

Defendants,

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY IRA FUND, LTD,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT

Relief Defendants.

_____/

## ORDER REAPPOINTING RECEIVER

**WHEREAS**, Plaintiff Securities and Exchange Commission ("Commission") filed an

emergency motion for the appointment of a Receiver over Defendants Scoop Capital LLC and

Scoop Management Inc. ("Defendants"), and Relief Defendants Scoop Real Estate L.P., Valhalla

Investment Partners L.P., Valhalla Management Inc., Victory IRA Fund LTD, Victory Fund

LTD, Viking IRA Fund LLC, Viking Fund LLC and Viking Management ("Relief Defendants"),

with full and exclusive power, duty and authority to: administer and manage the business affairs,

funds, assets, choses in action and any other property of the Defendants and Relief Defendants;

marshal and safeguard all of the assets of the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors; and

**WHEREAS**, the Commission has made a sufficient and proper showing in support of the relief requested by evidence demonstrating a *prima facie* case of violations of the federal securities laws by the Defendants; and

**WHEREAS**, the Commission submitted the credentials of Burton W. Wiand to be appointed as Receiver of all of the assets, properties, books and records, and other items of the Defendants and Relief Defendants, including any properties, assets and other items held in the names of the Defendants and Relief Defendants, and the Commission has advised the Court that Burton W. Wiand was prepared to assume this responsibility if so ordered by the Court; and

**WHEREAS**, Burton W. Wiand was appointed Receiver over the Defendants and Relief Defendants; and

**WHEREAS**, upon sufficient and proper showing by Burton W. Wiand and, for the protection of the investors and the Receivership Estate, the Court expanded the Receivership to include Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; the Laurel Mountain Preserve Homeowners Association, Inc.; The Guy-Nadel Foundation, Inc.; Lime Avenue Enterprises, LLC; and A Victorian Garden Florist, LLC,

**NOW, THEREFORE, IT IS ORDERED AND ADJUDGED** that Burton W. Wiand is hereby reappointed the Receiver over the Defendants and Relief Defendants and Venice Jet Center, LLC; Tradewind, LLC; Laurel Mountain Preserve, LLC; Laurel Preserve, LLC; the Marguerite J. Nadel Revocable Trust UAD 8/2/07; the Laurel Mountain Preserve Homeowners Association, Inc.; The Guy-Nadel Foundation, Inc.; Lime Avenue Enterprises, LLC; and A Victorian Garden Florist,

LLC (collectively "Receivership Entities"), their subsidiaries, successors and assigns, and is hereby authorized, empowered, and directed to:

1.     Take immediate possession of all property, assets and estates of every kind of the Receivership Entities, whatsoever and wheresoever located belonging to or in the possession of the Receivership Entities, including but not limited to all offices maintained by the Receivership Entities, rights of action, books, papers, data processing records, evidences of debt, bank accounts, savings accounts, certificates of deposit, stocks, bonds, debentures and other securities, mortgages, furniture, fixtures, office supplies and equipment, and all real property of the Receivership Entities wherever situated, and to administer such assets as is required in order to comply with the directions contained in this Order, and to hold all other assets pending further order of this Court;

2.     Investigate the manner in which the affairs of the Receivership Entities were conducted and institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Entities and their investors and other creditors as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in the Receivership Entities, including against their officers, directors, employees, affiliates, subsidiaries, or any persons acting in concert or participation with them, or against any transfers of money or other proceeds directly or indirectly traceable from investors in the Receivership Entities; provided such actions may include, but not be limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, et. seq. or otherwise, rescission and restitution, the collection of debts, and such orders from this Court as may be necessary to enforce this Order;

3

3.    Present to this Court a report reflecting the existence and value of the assets of the Receivership Entities and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Entities;

4.    Appoint one or more special agents, employ legal counsel, actuaries, accountants, clerks, consultants and assistants as the Receiver deems necessary and to fix and pay their reasonable compensation and reasonable expenses, as well as all reasonable expenses of taking possession of the assets and business of the Receivership Entities, and exercising the power granted by this Order, subject to approval by this Court at the time the Receiver accounts to the Court for such expenditures and compensation;

5.    Engage persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities, including, but not limited to, the United States Marshal's Service or a private security firm;

6.    Defend, compromise or settle legal actions, including the instant proceeding, in which the Receivership Entities or the Receiver is a party, commenced either prior to or subsequent to this Order, with authorization of this Court; except, however, in actions where the Receivership Entities are a nominal party, where the action does not effect a claim against or adversely affect the assets of the Receivership Entities, the Receiver may file appropriate pleadings in the Receiver's discretion. The Receiver may waive any attorney-client or other privilege held by the Receivership Entities;

7.    Assume control of, and be named as authorized signatory for, all accounts at any bank, brokerage firm or financial institution which has possession, custody or control of any assets or funds, wherever situated, of the Receivership Entities and, upon order of this Court, of any of their subsidiaries or affiliates, provided that the Receiver deems it necessary;

4

8.     Make or authorize such payments and disbursements from the funds and assets taken into control, or thereafter received by the Receiver, and incur, or authorize the incurrence of, such expenses and make, or authorize the making of, such agreements as may be reasonable, necessary, and advisable in discharging the Receiver's duties;

9.     Have access to and review all mail of the Receivership Entities (except for mail that appears on its face to be purely personal or attorney-client privileged) received at any office or address of the Receivership Entities.

**IT IS FURTHER ORDERED AND ADJUDGED** that, in connection with the reappointment of the Receiver provided for above:

10.     The Receivership Entities and all of their directors, officers, agents, employees, attorneys, attorneys-in-fact, shareholders, and other persons who are in custody, possession, or control of any assets, books, records, or other property of the Receivership Entities shall deliver forthwith upon demand such property, monies, books and records to the Receiver, and shall forthwith grant to the Receiver authorization to be a signatory as to all accounts at banks, brokerage firms or financial institutions which have possession, custody or control of any assets or funds in the name of or for the benefit of the Receivership Entities;

11.     All banks, brokerage firms, financial institutions, and other business entities which have possession, custody or control of any assets, funds or accounts in the name of, or for the benefit of, the Receivership Entities shall cooperate expeditiously in the granting of control and authorization as a necessary signatory as to said assets and accounts to the Receiver;

12.     Unless authorized by the Receiver, the Receivership Entities and their principals shall take no action, nor purport to take any action, in the name of or on behalf of the Receivership Entities;

13.    The Receivership Entities, and their respective officers, agents, employees, attorneys, and attorneys-in-fact, shall cooperate with and assist the Receiver.  The Receivership Entities and their principals, respective officers, agents, employees, attorneys, and attorneys-in-fact shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver in the conduct of the Receiver's duties or to interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the Receiver of the funds, assets, premises, and choses in action described above;

14.    The Receiver, and any counsel whom the Receiver may select, are entitled to reasonable compensation from the assets now held by or in the possession or control of or which may be received by the Receivership Entities; said amount or amounts of compensation shall be commensurate with their duties and obligations under the circumstances, subject to approval of the Court;

15.    Without prior permission from this Court, during the period of this receivership all persons, including creditors, banks, investors, or others, with actual notice of this Order, are enjoined from filing a petition for relief under the United States Bankruptcy Code or from in any way disturbing the assets or proceeds of the receivership or from prosecuting any actions or proceedings which involve the Receiver or which affect the property of the Receivership Entities;

16.    The Receiver is fully authorized to proceed with any filing the Receiver may deem appropriate under the Bankruptcy Code as to the Receivership Entities;

17.    Title to all property, real or personal, all contracts, rights of action and all books and records of the Receivership Entities and their principals, wherever located within or without this state, is vested by operation of law in the Receiver;

18.    Upon request by the Receiver, any company providing telephone services to the Receivership Entities shall provide a reference of calls from any number presently assigned to any of the Receivership Entities to any such number designated by the Receiver or perform any other changes necessary to the conduct of the receivership;

19.    Any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to the Receivership Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver;

20.    The United States Postal Service is directed to provide any information requested by the Receiver regarding the Receivership Entities, and to handle future deliveries of the mail of the Receivership Entities as directed by the Receiver;

21.    No bank, savings and loan association, other financial institution, or any other person or entity shall exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

22.    No bond shall be required in connection with the appointment of the Receiver. Except for an act of gross negligence or greater, the Receiver shall not be liable for any loss or damage incurred by the Receivership Entities or by the Receiver's officers, agents or employees, or any other person, by reason of any act performed or omitted to be performed by the Receiver in connection with the discharge of the Receiver's duties and responsibilities;

23.    In the event that the Receiver discovers that funds of persons who have invested in the Receivership Entities have been transferred to other persons or entities, the Receiver shall apply to this Court for an Order giving the Receiver possession of such funds and, if the Receiver deems it advisable, extending this receivership over any person or entity holding such investor funds; and

24.    This Court shall retain jurisdiction of this matter for all purposes.

**DONE AND ORDERED** in Chambers at Tampa, Florida, on June 3, 2009.

_s/ Richard A. Lazzara_____
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

<u>COPIES FURNISHED TO</u>:
Counsel of Record
Arthur G. Nadel, Register No. 50690-018
MCC New York
Metropolitan Correctional Center
150 Park Row
New York, NY 10007

**ASSURANCES**
**Airport Sponsors**

## A.   General.

1.   These assurances shall be complied with in the performance of grant agreements for airport development, airport planning, and noise compatibility program grants for airport sponsors.

2.   These assurances are required to be submitted as part of the project application by sponsors requesting funds under the provisions of Title 49, U.S.C., subtitle VII, as amended.  As used herein, the term "public agency sponsor" means a public agency with control of a public-use airport; the term "private sponsor" means a private owner of a public-use airport; and the term "sponsor" includes both public agency sponsors and private sponsors.

3.   Upon acceptance of the grant offer by the sponsor, these assurances are incorporated in and become part of the grant agreement.

## B.   Duration and Applicability.

1.   **Airport development or Noise Compatibility Program Projects Undertaken by a Public Agency Sponsor.**  The terms, conditions and assurances of the grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise compatibility program project, or throughout the useful life of the project items installed within a facility under a noise compatibility program project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project.  However, there shall be no limit on the duration of the assurances regarding Exclusive Rights and Airport Revenue so long as the airport is used as an airport. There shall be no limit on the duration of the terms, conditions, and assurances with respect to real property acquired with federal funds. Furthermore, the duration of the Civil Rights assurance shall be specified in the assurances.

2.   **Airport Development or Noise Compatibility Projects Undertaken by a Private Sponsor.**  The preceding paragraph 1 also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of the facilities developed or equipment acquired under an airport development or noise compatibility program project shall be no less than ten (10) years from the date of acceptance of Federal aid for the project.

3.   **Airport Planning Undertaken by a Sponsor.**  Unless otherwise specified in the grant agreement, only Assurances 1, 2, 3, 5, 6, 13, 18, 30, 32, 33, and 34 in section C apply to planning projects.  The terms, conditions, and assurances of the grant agreement shall remain in full force and effect during the life of the project.

## C.   Sponsor Certification.  The sponsor hereby assures and certifies, with respect to this grant that:

1.   **General Federal Requirements.**  It will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for this project including but not limited to the following:

**Federal Legislation**

a.   Title 49, U.S.C., subtitle VII, as amended.
b.   Davis-Bacon Act - 40 U.S.C. 276(a), et seq.[1]
c.   Federal Fair Labor Standards Act - 29 U.S.C. 201, et seq.
d.   Hatch Act - 5 U.S.C. 1501, et seq.[2]

e.      Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 Title 42 U.S.C. 4601, et seq.[1][2]

f.      National Historic Preservation Act of 1966 - Section 106 - 16 U.S.C. 470(f).[1]

g.      Archeological and Historic Preservation Act of 1974 - 16 U.S.C. 469 through 469c.[1]

h.      Native Americans Grave Repatriation Act - 25 U.S.C. Section 3001, et seq.

i.      Clean Air Act, P.L. 90-148, as amended.

j.      Coastal Zone Management Act, P.L. 93-205, as amended.

k.      Flood Disaster Protection Act of 1973 - Section 102(a) - 42 U.S.C. 4012a.[1]

l.      Title 49 ,U.S.C., Section 303, (formerly known as Section 4(f))

m.      Rehabilitation Act of 1973 - 29 U.S.C. 794.

n.      Civil Rights Act of 1964 - Title VI - 42 U.S.C. 2000d through d-4.

o.      Age Discrimination Act of 1975 - 42 U.S.C. 6101, et seq.

p.      American Indian Religious Freedom Act, P.L. 95-341, as amended.

q      Architectural Barriers Act of 1968 -42 U.S.C. 4151, et seq.[1]

r.      Power plant and Industrial Fuel Use Act of 1978 - Section 403- 2 U.S.C. 8373.[1]

s.      Contract Work Hours and Safety Standards Act - 40 U.S.C. 327, et seq.[1]

t.      Copeland Anti kickback Act - 18 U.S.C. 874.[1]

u.      National Environmental Policy Act of 1969 - 42 U.S.C. 4321, et seq.[1]

v.      Wild and Scenic Rivers Act, P.L. 90-542, as amended.

w.      Single Audit Act of 1984 - 31 U.S.C. 7501, et seq.[2]

x.      Drug-Free Workplace Act of 1988 - 41 U.S.C. 702 through 706.

## Executive Orders

Executive Order 11246 - Equal Employment Opportunity[1]

Executive Order 11990 - Protection of Wetlands

Executive Order 11988 -- Flood Plain Management

Executive Order 12372 - Intergovernmental Review of Federal Programs.

Executive Order 12699 - Seismic Safety of Federal and Federally Assisted New Building Construction[1]

Executive Order 12898 - Environmental Justice

## Federal Regulations

a.      14 CFR Part 13 - Investigative and Enforcement Procedures.

b.      14 CFR Part 16 - Rules of Practice For Federally Assisted Airport Enforcement Proceedings.

c.      14 CFR Part 150 - Airport noise compatibility planning.

d.      29 CFR Part 1 - Procedures for predetermination of wage rates.[1]

e.      29 CFR Part 3 - Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States.[1]

f.      29 CFR Part 5 - Labor standards provisions applicable to contracts covering federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act).[1]

g.      41 CFR Part 60 - Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements).[1]

| | |
|---|---|
| h. | 49 CFR Part 18 - Uniform administrative requirements for grants and cooperative agreements to state and local governments.[3] |
| i. | 49 CFR Part 20 - New restrictions on lobbying. |
| j. | 49 CFR Part 21 - Nondiscrimination in federally-assisted programs of the Department of Transportation - effectuation of Title VI of the Civil Rights Act of 1964. |
| k. | 49 CFR Part 23 - Participation by Disadvantage Business Enterprise in Airport Concessions. |
| l. | 49 CFR Part 24 - Uniform relocation assistance and real property acquisition for Federal and federally assisted programs.[1][2] |
| m. | 49 CFR Part 26 – Participation By Disadvantaged Business Enterprises in Department of Transportation Programs. |
| n. | 49 CFR Part 27 - Nondiscrimination on the basis of handicap in programs and activities receiving or benefiting from Federal financial assistance.[1] |
| o. | 49 CFR Part 29 – Government wide debarment and suspension (non-procurement) and government wide requirements for drug-free workplace (grants). |
| p. | 49 CFR Part 30 - Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors. |
| q. | 49 CFR Part 41 - Seismic safety of Federal and federally assisted or regulated new building construction.[1] |

**Office of Management and Budget Circulars**

| | |
|---|---|
| a. | A-87 - Cost Principles Applicable to Grants and Contracts with State and Local Governments. |
| b | A-133 - Audits of States, Local Governments, and Non-Profit Organizations |

[1] These laws do not apply to airport planning sponsors.
[2] These laws do not apply to private sponsors.
[3] 49 CFR Part 18 and OMB Circular A-87 contain requirements for State and Local Governments receiving Federal assistance. Any requirement levied upon State and Local Governments by this regulation and circular shall also be applicable to private sponsors receiving Federal assistance under Title 49, United States Code.

Specific assurances required to be included in grant agreements by any of the above laws, regulations or circulars are incorporated by reference in the grant agreement.

2. **Responsibility and Authority of the Sponsor.**

| | |
|---|---|
| a. | **Public Agency Sponsor:** It has legal authority to apply for the grant, and to finance and carry out the proposed project; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required. |
| b. | **Private Sponsor:** It has legal authority to apply for the grant and to finance and carry out the proposed project and comply with all terms, conditions, and assurances of this grant agreement. It shall designate an official representative and shall in writing direct and authorize that person |

to file this application, including all understandings and assurances contained therein; to act in connection with this application; and to provide such additional information as may be required.

3. **Sponsor Fund Availability.** It has sufficient funds available for that portion of the project costs which are not to be paid by the United States. It has sufficient funds available to assure operation and maintenance of items funded under the grant agreement which it will own or control.

4. **Good Title.**

   a. It, a public agency or the Federal government, holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance satisfactory to the Secretary that good title will be acquired.

   b. For noise compatibility program projects to be carried out on the property of the sponsor, it holds good title satisfactory to the Secretary to that portion of the property upon which Federal funds will be expended or will give assurance to the Secretary that good title will be obtained.

5. **Preserving Rights and Powers.**

   a. It will not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in the grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor. This shall be done in a manner acceptable to the Secretary.

   b. It will not sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests in the property shown on Exhibit A to this application or, for a noise compatibility program project, that portion of the property upon which Federal funds have been expended, for the duration of the terms, conditions, and assurances in the grant agreement without approval by the Secretary. If the transferee is found by the Secretary to be eligible under Title 49, United States Code, to assume the obligations of the grant agreement and to have the power, authority, and financial resources to carry out all such obligations, the sponsor shall insert in the contract or document transferring or disposing of the sponsor's interest, and make binding upon the transferee all of the terms, conditions, and assurances contained in this grant agreement.

   c. For all noise compatibility program projects which are to be carried out by another unit of local government or are on property owned by a unit of local government other than the sponsor, it will enter into an agreement with that government. Except as otherwise specified by the Secretary, that agreement shall obligate that government to the same terms, conditions, and assurances that would be applicable to it if it applied directly to the FAA for a grant to undertake the noise compatibility program project. That agreement and changes thereto must be satisfactory to the Secretary. It will take steps to enforce this agreement against the local government if there is substantial non-compliance with the terms of the agreement.

   d. For noise compatibility program projects to be carried out on privately owned property, it will enter into an agreement with the owner of that

property which includes provisions specified by the Secretary. It will take steps to enforce this agreement against the property owner whenever there is substantial non-compliance with the terms of the agreement.

e.   If the sponsor is a private sponsor, it will take steps satisfactory to the Secretary to ensure that the airport will continue to function as a public-use airport in accordance with these assurances for the duration of these assurances.

f.   If an arrangement is made for management and operation of the airport by any agency or person other than the sponsor or an employee of the sponsor, the sponsor will reserve sufficient rights and authority to insure that the airport will be operated and maintained in accordance Title 49, United States Code, the regulations and the terms, conditions and assurances in the grant agreement and shall insure that such arrangement also requires compliance therewith.

6.   **Consistency with Local Plans.** The project is reasonably consistent with plans (existing at the time of submission of this application) of public agencies that are authorized by the State in which the project is located to plan for the development of the area surrounding the airport.

7.   **Consideration of Local Interest.** It has given fair consideration to the interest of communities in or near where the project may be located.

8.   **Consultation with Users.** In making a decision to undertake any airport development project under Title 49, United States Code, it has undertaken reasonable consultations with affected parties using the airport at which project is proposed.

9.   **Public Hearings.** In projects involving the location of an airport, an airport runway, or a major runway extension, it has afforded the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of the airport or runway location and its consistency with goals and objectives of such planning as has been carried out by the community and it shall, when requested by the Secretary, submit a copy of the transcript of such hearings to the Secretary. Further, for such projects, it has on its management board either voting representation from the communities where the project is located or has advised the communities that they have the right to petition the Secretary concerning a proposed project.

10.   **Air and Water Quality Standards.** In projects involving airport location, a major runway extension, or runway location it will provide for the Governor of the state in which the project is located to certify in writing to the Secretary that the project will be located, designed, constructed, and operated so as to comply with applicable air and water quality standards. In any case where such standards have not been approved and where applicable air and water quality standards have been promulgated by the Administrator of the Environmental Protection Agency, certification shall be obtained from such Administrator. Notice of certification or refusal to certify shall be provided within sixty days after the project application has been received by the Secretary.

11.   **Pavement Preventive Maintenance.** With respect to a project approved after January 1, 1995, for the replacement or reconstruction of pavement at the airport, it assures or certifies that it has implemented an effective airport pavement maintenance-management program and it assures that it will use such program for the useful life of any pavement constructed, reconstructed or repaired with Federal financial assistance at the airport. It will provide such

reports on pavement condition and pavement management programs as the Secretary determines may be useful.

12. **Terminal Development Prerequisites.** For projects which include terminal development at a public use airport, as defined in Title 49, it has, on the date of submittal of the project grant application, all the safety equipment required for certification of such airport under section 44706 of Title 49, United States Code, and all the security equipment required by rule or regulation, and has provided for access to the passenger enplaning and deplaning area of such airport to passengers enplaning and deplaning from aircraft other than air carrier aircraft.

13. **Accounting System, Audit, and Record Keeping Requirements.**

    a.    It shall keep all project accounts and records which fully disclose the amount and disposition by the recipient of the proceeds of the grant, the total cost of the project in connection with which the grant is given or used, and the amount or nature of that portion of the cost of the project supplied by other sources, and such other financial records pertinent to the project. The accounts and records shall be kept in accordance with an accounting system that will facilitate an effective audit in accordance with the Single Audit Act of 1984.

    b.    It shall make available to the Secretary and the Comptroller General of the United States, or any of their duly authorized representatives, for the purpose of audit and examination, any books, documents, papers, and records of the recipient that are pertinent to the grant. The Secretary may require that an appropriate audit be conducted by a recipient. In any case in which an independent audit is made of the accounts of a sponsor relating to the disposition of the proceeds of a grant or relating to the project in connection with which the grant was given or used, it shall file a certified copy of such audit with the Comptroller General of the United States not later than six (6) months following the close of the fiscal year for which the audit was made.

14. **Minimum Wage Rates.** It shall include, in all contracts in excess of $2,000 for work on any projects funded under the grant agreement which involve labor, provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor, in accordance with the Davis-Bacon Act, as amended (40 U.S.C. 276a-276a-5), which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

15. **Veteran's Preference.** It shall include in all contracts for work on any project funded under the grant agreement which involve labor, such provisions as are necessary to insure that, in the employment of labor (except in executive, administrative, and supervisory positions), preference shall be given to Veterans of the Vietnam era and disabled veterans as defined in Section 47112 of Title 49, United States Code. However, this preference shall apply only where the individuals are available and qualified to perform the work to which the employment relates.

16. **Conformity to Plans and Specifications.** It will execute the project subject to plans, specifications, and schedules approved by the Secretary. Such plans, specifications, and schedules shall be submitted to the Secretary prior to commencement of site preparation, construction, or other performance under this grant agreement, and, upon approval of the Secretary, shall be incorporated into this grant agreement. Any modification to the approved

plans, specifications, and schedules shall also be subject to approval of the Secretary, and incorporated into the grant agreement.

17. **Construction Inspection and Approval.** It will provide and maintain competent technical supervision at the construction site throughout the project to assure that the work conforms to the plans, specifications, and schedules approved by the Secretary for the project. It shall subject the construction work on any project contained in an approved project application to inspection and approval by the Secretary and such work shall be in accordance with regulations and procedures prescribed by the Secretary. Such regulations and procedures shall require such cost and progress reporting by the sponsor or sponsors of such project as the Secretary shall deem necessary.

18. **Planning Projects.** In carrying out planning projects:

    a.    It will execute the project in accordance with the approved program narrative contained in the project application or with the modifications similarly approved.

    b.    It will furnish the Secretary with such periodic reports as required pertaining to the planning project and planning work activities.

    c.    It will include in all published material prepared in connection with the planning project a notice that the material was prepared under a grant provided by the United States.

    d.    It will make such material available for examination by the public, and agrees that no material prepared with funds under this project shall be subject to copyright in the United States or any other country.

    e.    It will give the Secretary unrestricted authority to publish, disclose, distribute, and otherwise use any of the material prepared in connection with this grant.

    f.    It will grant the Secretary the right to disapprove the sponsor's employment of specific consultants and their subcontractors to do all or any part of this project as well as the right to disapprove the proposed scope and cost of professional services.

    g.    It will grant the Secretary the right to disapprove the use of the sponsor's employees to do all or any part of the project.

    h.    It understands and agrees that the Secretary's approval of this project grant or the Secretary's approval of any planning material developed as part of this grant does not constitute or imply any assurance or commitment on the part of the Secretary to approve any pending or future application for a Federal airport grant.

19. **Operation and Maintenance.**

    a.    The airport and all facilities which are necessary to serve the aeronautical users of the airport, other than facilities owned or controlled by the United States, shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal, state and local agencies for maintenance and operation. It will not cause or permit any activity or action thereon which would interfere with its use for airport purposes. It will suitably

operate and maintain the airport and all facilities thereon or connected therewith, with due regard to climatic and flood conditions. Any proposal to temporarily close the airport for non-aeronautical purposes must first be approved by the Secretary.

In furtherance of this assurance, the sponsor will have in effect arrangements for-

(1) Operating the airport's aeronautical facilities whenever required;

(2) Promptly marking and lighting hazards resulting from airport conditions, including temporary conditions; and

(3) Promptly notifying airmen of any condition affecting aeronautical use of the airport.

Nothing contained herein shall be construed to require that the airport be operated for aeronautical use during temporary periods when snow, flood or other climatic conditions interfere with such operation and maintenance. Further, nothing herein shall be construed as requiring the maintenance, repair, restoration, or replacement of any structure or facility which is substantially damaged or destroyed due to an act of God or other condition or circumstance beyond the control of the sponsor.

b.      It will suitably operate and maintain noise compatibility program items that it owns or controls upon which Federal funds have been expended.

**20.    Hazard Removal and Mitigation.** It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

**21.    Compatible Land Use.** It will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft. In addition, if the project is for noise compatibility program implementation, it will not cause or permit any change in land use, within its jurisdiction, that will reduce its compatibility, with respect to the airport, of the noise compatibility program measures upon which Federal funds have been expended.

**22. Economic Nondiscrimination.**

a.      It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

b.      In any agreement, contract, lease, or other arrangement under which a right or privilege at the airport is granted to any person, firm, or corporation to conduct or to engage in any aeronautical activity for furnishing services to the public at the airport, the sponsor will insert and enforce provisions requiring the contractor to-

(1) furnish said services on a reasonable, and not unjustly discriminatory, basis to all users thereof, and

(2) charge reasonable, and not unjustly discriminatory, prices for each unit or service, provided that the contractor may be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

c. Each fixed-based operator at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport and utilizing the same or similar facilities.

d. Each air carrier using such airport shall have the right to service itself or to use any fixed-based operator that is authorized or permitted by the airport to serve any air carrier at such airport.

e. Each air carrier using such airport (whether as a tenant, non tenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and utilize similar facilities, subject to reasonable classifications such as tenants or non tenants and signatory carriers and non signatory carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

f. It will not exercise or grant any right or privilege which operates to prevent any person, firm, or corporation operating aircraft on the airport from performing any services on its own aircraft with its own employees [including, but not limited to maintenance, repair, and fueling] that it may choose to perform.

g. In the event the sponsor itself exercises any of the rights and privileges referred to in this assurance, the services involved will be provided on the same conditions as would apply to the furnishing of such services by commercial aeronautical service providers authorized by the sponsor under these provisions.

h. The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport.

i. The sponsor may prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

23. **Exclusive Rights.** It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of the services at an airport by a single fixed-based operator shall not be construed as an exclusive right if both of the following apply:
   a. It would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and
   b. If allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport.
It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities, including, but not limited to charter flights, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations,

aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other aeronautical activity, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can be regarded as an aeronautical activity, and that it will terminate any exclusive right to conduct an aeronautical activity now existing at such an airport before the grant of any assistance under Title 49, United States Code.

24. **Fee and Rental Structure.** It will maintain a fee and rental structure for the facilities and services at the airport which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport, taking into account such factors as the volume of traffic and economy of collection. No part of the Federal share of an airport development, airport planning or noise compatibility project for which a grant is made under Title 49, United States Code, the Airport and Airway Improvement Act of 1982, the Federal Airport Act or the Airport and Airway Development Act of 1970 shall be included in the rate basis in establishing fees, rates, and charges for users of that airport.

25. **Airport Revenues.**

    a. All revenues generated by the airport and any local taxes on aviation fuel established after December 30, 1987, will be expended by it for the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport. Provided, however, that if covenants or assurances in debt obligations issued before September 3, 1982, by the owner or operator of the airport, or provisions enacted before September 3, 1982, in governing statutes controlling the owner or operator's financing, provide for the use of the revenues from any of the airport owner or operator's facilities, including the airport, to support not only the airport but also the airport owner or operator's general debt obligations or other facilities, then this limitation on the use of all revenues generated by the airport (and, in the case of a public airport, local taxes on aviation fuel) shall not apply.

    b. As part of the annual audit required under the Single Audit Act of 1984, the sponsor will direct that the audit will review, and the resulting audit report will provide an opinion concerning, the use of airport revenue and taxes in paragraph (a), and indicating whether funds paid or transferred to the owner or operator are paid or transferred in a manner consistent with Title 49, United States Code and any other applicable provision of law, including any regulation promulgated by the Secretary or Administrator.

    c. Any civil penalties or other sanctions will be imposed for violation of this assurance in accordance with the provisions of Section 47107 of Title 49, United States Code.

26. **Reports and Inspections.** It will:

    a. submit to the Secretary such annual or special financial and operations reports as the Secretary may reasonably request and make such reports available to the public; make available to the public at reasonable times and places a report of the airport budget in a format prescribed by the Secretary;

    b. for airport development projects, make the airport and all airport records and documents affecting the airport, including deeds, leases, operation and use

agreements, regulations and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request;

c.  for noise compatibility program projects, make records and documents relating to the project and continued compliance with the terms, conditions, and assurances of the grant agreement including deeds, leases, agreements, regulations, and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request; and

d.  in a format and time prescribed by the Secretary, provide to the Secretary and make available to the public following each of its fiscal years, an annual report listing in detail:
    (i) all amounts paid by the airport to any other unit of government and the purposes for which each such payment was made; and
    (ii) all services and property provided by the airport to other units of government and the amount of compensation received for provision of each such service and property.

27.  **Use by Government Aircraft.** It will make available all of the facilities of the airport developed with Federal financial assistance and all those usable for landing and takeoff of aircraft to the United States for use by Government aircraft in common with other aircraft at all times without charge, except, if the use by Government aircraft is substantial, charge may be made for a reasonable share, proportional to such use, for the cost of operating and maintaining the facilities used. Unless otherwise determined by the Secretary, or otherwise agreed to by the sponsor and the using agency, substantial use of an airport by Government aircraft will be considered to exist when operations of such aircraft are in excess of those which, in the opinion of the Secretary, would unduly interfere with use of the landing areas by other authorized aircraft, or during any calendar month that-
    a.  Five (5) or more Government aircraft are regularly based at the airport or on land adjacent thereto; or
    b.  The total number of movements (counting each landing as a movement) of Government aircraft is 300 or more, or the gross accumulative weight of Government aircraft using the airport (the total movement of Government aircraft multiplied by gross weights of such aircraft) is in excess of five million pounds.

28.  **Land for Federal Facilities.** It will furnish without cost to the Federal Government for use in connection with any air traffic control or air navigation activities, or weather-reporting and communication activities related to air traffic control, any areas of land or water, or estate therein, or rights in buildings of the sponsor as the Secretary considers necessary or desirable for construction, operation, and maintenance at Federal expense of space or facilities for such purposes. Such areas or any portion thereof will be made available as provided herein within four months after receipt of a written request from the Secretary.

29.  **Airport Layout Plan.**

    a.  It will keep up to date at all times an airport layout plan of the airport showing (1) boundaries of the airport and all proposed additions thereto, together with the boundaries of all offsite areas owned or controlled by the sponsor for airport purposes and proposed additions thereto; (2) the location and nature of all existing and proposed airport facilities and structures (such as runways, taxiways, aprons, terminal buildings, hangars and roads), including all proposed extensions and reductions of existing airport facilities; and (3) the location of all existing and proposed nonaviation areas and of all existing improvements thereon. Such airport layout plans and each amendment, revision, or modification thereof, shall

be subject to the approval of the Secretary which approval shall be evidenced by the signature of a duly authorized representative of the Secretary on the face of the airport layout plan. The sponsor will not make or permit any changes or alterations in the airport or any of its facilities which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport.

b. If a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary (1) eliminate such adverse effect in a manner approved by the Secretary; or (2) bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities.

30. **Civil Rights.** It will comply with such rules as are promulgated to assure that no person shall, on the grounds of race, creed, color, national origin, sex, age, or handicap be excluded from participating in any activity conducted with or benefiting from funds received from this grant. This assurance obligates the sponsor for the period during which Federal financial assistance is extended to the program, except where Federal financial assistance is to provide, or is in the form of personal property or real property or interest therein or structures or improvements thereon in which case the assurance obligates the sponsor or any transferee for the longer of the following periods: (a) the period during which the property is used for a purpose for which Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits, or (b) the period during which the sponsor retains ownership or possession of the property.

31. **Disposal of Land.**

a. For land purchased under a grant for airport noise compatibility purposes, it will dispose of the land, when the land is no longer needed for such purposes, at fair market value, at the earliest practicable time. That portion of the proceeds of such disposition which is proportionate to the United States' share of acquisition of such land will, at the discretion of the Secretary, (1) be paid to the Secretary for deposit in the Trust Fund, or (2) be reinvested in an approved noise compatibility project as prescribed by the Secretary, including the purchase of nonresidential buildings or property in the vicinity of residential buildings or property previously purchased by the airport as part of a noise compatibility program.

b. For land purchased under a grant for airport development purposes (other than noise compatibility), it will, when the land is no longer needed for airport purposes, dispose of such land at fair market value or make available to the Secretary an amount equal to the United States' proportionate share of the fair market value of the land. That portion of the proceeds of such disposition which is proportionate to the United States' share of the cost of acquisition of such land will, (1) upon application to the Secretary, be reinvested in another eligible airport improvement project or projects approved by the Secretary at that airport or within the national airport system, or (2) be paid to the Secretary for deposit in the Trust Fund if no eligible project exists.

    c.        Land shall be considered to be needed for airport purposes under this assurance if (1) it may be needed for aeronautical purposes (including runway protection zones) or serve as noise buffer land, and (2) the revenue from interim uses of such land contributes to the financial self-sufficiency of the airport. Further, land purchased with a grant received by an airport operator or owner before December 31, 1987, will be considered to be needed for airport purposes if the Secretary or Federal agency making such grant before December 31, 1987, was notified by the operator or owner of the uses of such land, did not object to such use, and the land continues to be used for that purpose, such use having commenced no later than December 15, 1989.

    d.        Disposition of such land under (a) (b) or (c) will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with operation of the airport.

**32. Engineering and Design Services.** It will award each contract, or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping or related services with respect to the project in the same manner as a contract for architectural and engineering services is negotiated under Title IX of the Federal Property and Administrative Services Act of 1949 or an equivalent qualifications-based requirement **prescribed** for or by the sponsor of the airport.

**33. Foreign Market Restrictions.** It will not allow funds provided under this grant to be used to fund any project which uses any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**34. Policies, Standards, and Specifications.** It will carry out the project in accordance with policies, standards, and specifications approved by the Secretary including but not limited to the advisory circulars listed in the Current FAA Advisory Circulars for AIP projects, dated _____ and included in this grant, and in accordance with applicable state policies, standards, and specifications approved by the Secretary.

**35.**    **Relocation and Real Property Acquisition.** (1) It will be guided in acquiring real property, to the greatest extent practicable under State law, by the land acquisition policies in Subpart B of 49 CFR Part 24 and will pay or reimburse property owners for necessary expenses as specified in Subpart B. (2) It will provide a relocation assistance program offering the services described in Subpart C and fair and reasonable relocation payments and assistance to displaced persons as required in Subpart D and E of 49 CFR Part 24. (3) It will make available within a reasonable period of time prior to displacement, comparable replacement dwellings to displaced persons in accordance with Subpart E of 49 CFR Part 24.

**36.**    **Access By Intercity Buses.** The airport owner or operator will permit, to the maximum extent practicable, intercity buses or other modes of transportation to have access to the airport, however, it has no obligation to fund special facilities for intercity buses or for other modes of transportation.

**37.**    **Disadvantaged Business Enterprises.** The recipient shall not discriminate on the basis of race, color, national origin or sex in the award and performance of any DOT-assisted contract or in the administration of its DBE program or the requirements of 49 CFR Part 26. The Recipient shall take all necessary and reasonable steps under 49 CFR Part 26 to ensure

non discrimination in the award and administration of DOT-assisted contracts. The recipient's DBE program, as required by 49 CFR Part 26, and as approved by DOT, is incorporated by reference in this agreement. Implementation of this program is a legal obligation and failure to carry out its terms shall be treated as a violation of this agreement. Upon notification to the recipient of its failure to carry out its approved program, the Department may impose sanctions as provided for under Part 26 and may, in appropriate cases, refer the matter for enforcement under 18 U.S.C. 1001 and/or the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. 3801).

**38.** **Hangar Construction.** If the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose.

**39. Competitive Access.**

   a.    If the airport owner or operator of a medium or large hub airport (as defined in section 47102 of title 49, U.S.C.) has been unable to accommodate one or more requests by an air carrier for access to gates or other facilities at that airport in order to allow the air carrier to provide service to the airport or to expand service at the airport, the airport owner or operator shall transmit a report to the Secretary that-

      1.  Describes the requests;

      2.  Provides an explanation as to why the requests could not be accommodated; and

      3.  Provides a time frame within which, if any, the airport will be able to accommodate the requests.

   b.    Such report shall be due on either February 1 or August 1 of each year if the airport has been unable to accommodate the request(s) in the six month period prior to the applicable due date

## LEASE

This lease is made and executed on the _23rd_ day of ___May___, 2006, by and between the CITY OF VENICE, a Florida municipality, herein referred to as "lessor", and VENICE JET CENTER, LLC, a Florida limited liability company, herein referred to as "lessee".

WHEREAS, lessor is the owner and operator of the Venice Municipal Airport; and

WHEREAS, the premises are currently leased by the lessor to TRIPLE DIAMOND ENTERPRISES, LLC pursuant to two leases dated September 26, 1995 and March 23, 1999, both as amended; and

WHEREAS, the purpose of this lease is to consolidate the two leaseholds and to replace the September 26, 1995 and March 23, 1999 leases with one lease.

NOW THEREFORE, in consideration of the covenants and promises contained herein, the parties agree as follows:

## 1. DESCRIPTION OF PREMISES

Lessor leases to lessee and lessee rents from lessor, for the purpose of conducting business as a fixed base operator, and for no other purpose, the following described premises located in Venice, Florida:

Exhibit "A" attached hereto.

As used in this lease, the term "premises" refers to the real property described above and to any improvement located on the property from time to time during the term of this lease.

## 2. TERM

The initial term of this lease shall be for 25 years, commencing on June 1, 2006 and ending

1

on May 31, 2031. As used in this lease, the expression "term of this lease" refers to such initial term and to any renewal of the lease as outlined herein.

### 3. RENT

The lessee shall pay rent in the amount of $9,580.59 per month, in advance, on the first day of each month beginning on June 1, 2006 and continuing on the first day of each and every month thereafter throughout the term of this lease and subject to the rent adjustments provided for herein. The rent shall be paid to lessor without notice or demand and without abatement, deduction, or setoff. A late charge equal to 5% of the rent payment shall be assessed for each rent payment paid ten or more days after its due date. In addition, Lessee shall pay sales tax on all rent payments.

The rent specified herein shall be net to lessor and all costs, expenses, and obligations of every kind related to the leased property which may arise or become due during the term of this lease shall be paid by lessee. Lessor shall be indemnified by lessee against such costs, expenses and obligations.

The total annual rent for subsequent years of the term of this lease shall be adjusted every three years commencing on June 1, 2009 based on fluctuations in the Consumer Price Index for Urban Wage Earners and Clerical Workers as promulgated by the Bureau of Labor Statistics of the United States Department of Labor. Said adjustment shall be made on June 1 and shall be effective for the ensuing three year period. Each rental adjustment shall be the result obtained by multiplying the then existing total annual rent by a fraction, the numerator of which shall be the Index for the month preceding the month in which the adjustment is made and the denominator of which shall be the Index for the month three years preceding the month from which the Index used in the numerator was chosen.

2

It is the parties intent that the total annual rent shall be increased by the same percent amount

as the percent increase in the Index during the three year period preceding the adjustment. In no

event shall the total annual rent ever be decreased.

Should the Bureau of Labor Statistics change the manner of computing the subject Index, the

Bureau shall be requested to furnish a conversion factor designed to adjust the new Index to the one

previously in use, and adjustment to the new Index shall be made on the basis of such conversion

factor. Should publication of the subject Index be discontinued by the Bureau of Labor Statistics,

then whichever Index published by the United States Government most nearly approximating said

discontinued Index shall be used in making the adjustments provided for herein.

## 4. WARRANTIES OF TITLE AND QUIET POSSESSION

Lessor covenants that lessor is seized of the leased premises in fee simple and has full right

to make this lease and that lessee shall have quiet and peaceable possession of the leased premises

during the term of this lease.

## 5. DELIVERY OF POSSESSION

If, for any reason whatsoever, lessor cannot deliver possession of the leased premises to

lessee at the commencement of the lease term, as specified above, this lease shall not be void or

voidable, nor shall lessor be liable to lessee for any loss or damage resulting from the inability to

deliver possession; in that event there shall be a proportionate reduction of rent covering the period

between the commencement of the lease term and the time when lessor can deliver possession.

## 6. USES PROHIBITED

Lessee shall not use or permit the leased premises, or any part of them, to be used for any

purposes other than the purposes for which the premises are leased. No use shall be made or

permitted to be made of the premises, or acts done, that will cause a cancellation of any insurance policy covering the building located on the premises, or any part of the premises; nor shall lessee sell, or permit to be kept, used, or sold, in or about the premises, any article prohibited by the standard form of fire insurance policies. Lessee shall, at its sole cost, comply with all requirements, pertaining to the leased premises, of any insurance organization or company, necessary for the maintenance of insurance, as provided in this lease, covering any building and appurtenances at any time located on the leased premises.

## 7. WASTE AND NUISANCE PROHIBITED

During the term of this lease, lessee shall comply with all applicable laws affecting the leased premises. Lessee shall not commit or suffer to be committed any waste on the leased premises, or any nuisance.

## 8. ABANDONMENT OF PREMISES

Lessee shall not vacate or abandon the premises at any time during the term of this lease. If lessee abandons, vacates, or surrenders the leased premises, or is dispossessed by process of law, or otherwise, any personal property belonging to lessee and left on the premises shall be deemed to be abandoned, at the option of lessor, except such property as may be encumbered to lessor.

## 9. LESSOR'S RIGHT OF ENTRY

Lessee shall permit lessor and the agents and employees of lessor to enter the leased premises at all reasonable times for the purpose of inspecting them, or for the purpose of posting notices of nonresponsibility for alterations, additions, or repairs, without any rebate of rent and without any liability to lessee for any loss of occupation or quiet enjoyment of the premises.

4

## 10. ENCUMBRANCE OF LESSEE'S LEASEHOLD INTEREST

Lessee may encumber by mortgage or deed of trust, or other proper instrument, its leasehold interest and estate in the leased premises, together with all buildings and improvements placed by lessee on the premises, as security for any indebtedness of lessee. The execution of any mortgage, or deed of trust, or other instrument, or the foreclosure of the instrument, or any sale under the instrument, either by judicial proceedings or by virtue of any power reserved in the mortgage or deed of trust, or conveyance by lessee to the holder of such indebtedness, or the exercising of any right, power, or privilege reserved in any mortgage or deed of trust, shall not be held as a violation of any of the terms or conditions of this lease, or as an assumption by the holder of such indebtedness personally of the obligations of this lease. No such encumbrance, foreclosure, conveyance, or exercise of right shall relieve lessee from its liability under this lease.

If lessee shall encumber its leasehold interest and estate in the leased premises, and if lessee or the holder of the indebtedness secured by the encumbrance shall give notice to lessor of the existence of the encumbrance and the address of the holder, then lessor will mail or deliver to the holder, a duplicate copy of all notices in writing which lessor may, from time to time, give to or serve on lessee under and pursuant to the terms and provisions of this lease. Copies shall be mailed or delivered to the holder at, or as near as possible to, the same time the notices are given to or served on lessee. Holder may, at its option, at any time before the rights of lessee shall be terminated as provided in this lease, pay any of the rents due under this lease, or pay any taxes and assessments, or do any other act or thing required of lessee by the terms of this lease, or do any act or thing that may be necessary and proper to be done in the observance of the covenants and conditions of this lease, or to prevent the termination of this lease. All payments so made, and all things so done and

5

performed by the holder shall be as effective to prevent a foreclosure of the rights of lessee under the lease as they would have been if done and performed by lessee.

## 11. SUBLETTING AND ASSIGNMENT

Lessee shall not assign this lease, or any interest in this lease, or sublet the leased premises, or any part of the premises, or any right or privilege appurtenant to it, or allow any person other than lessee and lessee's agents and employees to occupy or use the premises or any part of them, without first obtaining lessor's written consent, which consent shall not be unreasonably withheld. Lessor's consent to one assignment, sublease, or use shall not be a consent to any subsequent assignment or sublease, or occupancy or use by another person. Any unauthorized assignment or sublease shall be void, and shall terminate this lease at the lessor's option. Lessee's interest in this lease is not assignable by operation of law without lessor's written consent.

## 12. NOTICES

All notices, demands, or other writings in this lease provided to be given or made or sent, or which may be given or made or sent, by either party to this lease to the other, shall be deemed to have been fully given or made or sent when made in writing and deposited in the United States mail, registered and postage prepaid, and addressed as follows:

TO LESSOR: City Clerk, Venice City Hall, 401 W. Venice Ave., Venice, FL 34285

TO LESSEE: 1618 Main Street, Sarasota, FL 34236

The address to which any notice, demand, or other writing may be given or made or sent to any party mentioned above may be changed by written notice given by the party mentioned above.

## 13. TAXES AND ASSESSMENTS

a.    Taxes as additional rent.  As additional rent under this lease, lessee shall pay and

6