# Jet Center to ask city for hangars permit

**AIRPORT** *from 1B*

Management Inc. in Sarasota.

A federal receiver has assumed oversight of the Jet Center after determining that investor funds were used to purchase it. Nadel also has a $2 million lien on the Jet Center so its value is not clear.

City officials had hoped that Nadel's problems would end the permit issue, but the receiver, Burton Wiand, told the city he intended to pursue the permit, which would increase the Jet Center's value for a future sale. Some council members want the city to pursue buying the lease.

After advising the council it had to grant the permit, City Attorney Bob Anderson got a second legal opinion from a Washington, D.C., firm, which backed him. City officials then found what they viewed as an inconsistency between the permit and FAA rules and delayed voting again.

The FAA sent a letter Feb. 19 telling the city it "may and should approve the construction of hangars."

"In accordance with my previous advice concerning airport compliance matters," said Rebecca Henry, an FAA planning specialist, "this proposal should be forwarded to this office without further delay."

Anderson sent a letter to Wiand last week asking the receiver to prove the center had money to build the hangars.

It is not clear how that latest correspondence may affect today's vote at the council's regular meeting.

"I don't think we have to approve the hangars," said council member Kit McKeon. "I think we need to take a more coordinated view" of airport operations.

McKeon said if the city has to approve the hangars, it should look at moving them farther from the residential area on Airport Avenue.

The council will hold a morning workshop on plans for the hangars and its vision for the airport.

Also, four of the council members will vote on approving a settlement of the open government lawsuit against three other council members and four former city officials. The lawsuit centered on private e-mails between two groups of city officials on opposite sides of the airport growth issue.



river charged

# FAA: airport plan no impediment to new hangars

**BY GREG GILES**
NEWS EDITOR

The Federal Aviation Administration last week rebuffed another attempt to derail the building of hangars at the Venice Jet Center.

Responding to an inquiry from City Attorney Bob Anderson, Planning Specialist Rebecca Henry reiterated the FAA's position urging the city to move forward with construction of the hangars.

In February 2008, the jet center proposed building four 8,000-square-foot hangars big enough to house small corporate jets. That immediately raised the hackles of citizens intent on reducing airport operations and noise. They've been fighting construction of the hangars ever since.

In the FAA's latest letter, written Feb. 24, Henry states the city "may and should approve the construction of hangars."

Anderson was seeking guidance on whether the location of the proposed hangars would violate the FAA-approved Airport Layout Plan.

Opponents of the hangars keyed in on the ALP map, which has the words "terminal area" and "future apron" written near the location of the proposed hangars, to claim the hangars are inconsistent with the ALP.

## Unbound

Henry said it isn't. She called the ALP a conceptual plan.

"When completing the ALP, airport sponsors frequently label aeronautical parcels with specific aeronautical uses, such as 'terminal area' and 'future apron area,' but they are not bound to develop these aeronautical lands with those specific uses," Henry wrote.

Further, she confirmed that the FAA processed a "pen and ink" change to the 2000 ALP "incorporating hangars in this vicinity," including a separate airspace analysis required to approve construction.

Critics of the airport are also arguing that the jet center's legal status — it's in receiver-

Please see FAA, 5A

---

**FAA** from Page 1A

ship because co-owner Art Nadel was arrested over a multi-million hedge fund scheme — is reason enough to deny city approval of the hangars.

The receiver, however, let the city know he supports the hangar construction and continued operation of the jet center.

Others are seeking to delay hangar construction at least until a new airport layout plan and airport master plan are developed. That's been in the works for two years. In 2007 city council balked at a nearly complete master plan and layout plan update. Seeking to scale back airport operations, council fired its airport consultant and hired DY Consultants to complete the updates. That process is just beginning and is expected to take another year to finalize.

A half-day workshop is scheduled for Tuesday, March 10, at 9 a.m. to kick off the new effort as well as discuss some long-range initiatives proposed by individual council members.

ggiles@venicegondolier.com



ERIC
ERNST

COMMENT

# Bigger issues on this city's plate

Last week's column about the Venice Jet Center's attempt to build four hangars at the city airport prompted a number of e-mails and phone calls.

The gist: that the proposed hangars are an attempt to turn Venice into a commercial jetport, that the City Council is obligated to deny them, and that anyone who thinks otherwise has been deluded.

Critics even discounted a 15-page analysis by a Washington law firm concluding the city could risk a costly legal fight with little chance of success if it turned down the hangars.

Councilwoman Sue Lang surmised that someone fed the Washington attorneys incomplete information or posed the wrong question.

To her, the question is not whether the jet center has the right to build the hangars, but whether the city has the right to turn them down.

I posed Lang's question to the Federal Aviation Administration, which has the ultimate say on the airport.

Here's the response from Kathleen Berger, manager of external communications:

"If the city of Venice denies the jet center's request to build hangars, the city could potentially be in violation with the Federal Grant Assurances, which airport sponsors must agree to before accepting Federal Airport Improvement Program funding for airport development. The city might also be in violation of the Surplus Property Deed Restrictions (which) require the property to be used for public airport purposes on reasonable terms and without unjust discrimination."

Bureaucrats are like politicians; they rarely give you a straight answer. But these words imply that the FAA does not like the city's resistance to the hangars, which in all fairness would house no more than a dozen planes, including prop planes already stored elsewhere at the airport.

And although the 2000 airport layout plan designates the land on which the hangars would sit as "future apron" or "terminal area," the FAA views those assignments as "placeholders."

"The FAA has already approved the construction of hangars on that site, and thus approved a change to the ALP," Bergen wrote. "We have made a 'pen and ink' change to the ALP to indicate that approval. At such time as the airport updates its master plan, a new ALP will be generated with the change."

That does not mean the city has no legitimate concern about the airport's future size, uses, safety zones and noise. It suggests the energy and money spent on fighting four hangars would be better spent developing the airport's master plan, which is long overdue.

Contact Eric Ernst at eric.ernst@heraldtribune.com or 486-3073.

# Neighborhood group objects to proposed hangars at airport



Martin     Zavodnyik          Lang          Boone

City gives itself another 28 days to get FAA clarification before making a decision on whether to approve the building of four hangars at the Venice Jet Center.

**BY GREG GILES**
NEWS EDITOR

Venice City Council on Tuesday voted to delay approval necessary for the Venice Jet Center to move forward with building new hangars, despite a warning from outside counsel, its own city attorney and the Federal Aviation Administration that it could draw legal action if it ultimately denies the application.

Instead, council voted 5-2, following nearly three hours of discussion, to give itself another 28 days while the city seeks yet another opinion from the FAA on whether the hangars can legally be built where the jet center proposes. Members John Moore and John Simmonds voted against the delay.

Council Member Sue Lang and Ernie Zavodnyik argued the hangars aren't allowed in that area of the airport according to the 2000 airport layout plan. Lang, who doesn't want the hangars built at all, earlier argued the application to construct the hangars should be delayed at least until after the comprehensive plan is finalized and a new airport layout plan is adopted. That could take up to a year or two.

Members of the Venice Neighborhoods Coalition spoke against the proposed hangars from numerous angles. Attorney Jeff Boone, representing the Jet Center, rebuffed the arguments, calling them "misinformed."

"The FAA (already) approved these hangars. We do know that," said Attorney Dan Boone.

Still, Martin urged other council member to go along with the delay. Council Member Vicki Noren Taylor agreed, but only if council agreed to make a final decision upon receiving the FAA's response.

## Opinions

The city entered a 30-year

Please see GROUP, 4A

## GROUP from Page 1A

lease with the jet center in 2006 calling for the construction of "improvements" and allowing it to conduct any commercial aeronautical activity permitted under the city's minimum airport standards, which includes building hangars.

"The lease specifically allows for improvements to be made," wrote jet center owner Art Nadel in an October letter to council. "Venice Jet Center would not have entered into a 30-year lease without this understanding."

Further, he wrote, the jet center has met all of the city's conditions to build the hangars.

A legal opinion offered last week by outside Washington, D.C., aviation counsel Kaplan Kirsch & Rockwell warned the city that "grant assurances" it made to the federal government when Venice Municipal Airport was deeded to the city in perpetuity must be honored.

"(T)he city of Venice would run a significant risk of being found in violation of its grant assurances if it denied the Jet Center's request to construct additional hangar space on its leasehold," the firm advised the city.

The FAA asked council to put the item on this week's agenda after issu-

ing its own warning that the city was unnecessarily delaying the project, contrary to FAA policy.

Nadel filed an informal complaint with the FAA, and has the option to file a formal (Part 16 proceeding) complaint.

### Bring it on

Lang said she invited a lawsuit.

"We should not be making decisions out of fear of lawsuits. If ever there was something worth fighting, this is it," she said, referring to aviation business owners as "special interests."

"I would welcome a formal complaint process

with the FAA," Lang said. "A formal process would ensure we have a seat at the table ... and result in concessions to our community and the taxpayers," Lang said.

Even if it depletes the airport enterprise fund, Council Member John Simmonds added.

Martin earlier raised the prospect that pushing too hard might cause the FAA to rethink its position and raise the prospect of taking over operation of the airport as it did at Sarasota-Bradenton airport.

"If the city were to deny permission ... there would be some time before the

city would be subject to formal sanctions by the agency," Kaplan said in its legal review. "However, the FAA would not look favorably upon this action, and the city should consider whether it has other issues before the FAA, or other reasons not to antagonize the agency. A formal Part 16 proceeding would be expensive and (the) city's ultimate likelihood of success is very low," concluded Kaplan.

Lang scoffed at the idea

of the FAA taking control of the airport, dismissed the loss of future FAA grant funds or having to repay the FAA millions for previous projects. She cited a recent Sarasota County commission decision not to allow the construction of hangars at Englewood's Buchan Airport based on citizen complaints. There were no repercussions, she said.

ggiles@
venicegondolier.com

# Condolier Sun

SOUTHERN SOUTHWEST FLORIDA'S AWARD-WINNING COMMUNITY NEWSPAPER

**High holy days**
Jews prepare
to remember,
atone and
celebrate

1B



## Lang: Focus on single-engine planes

Council Member Sue Lang,
... leading the campaign to
... airport operations, to
... provided the impetus
... with her vision of
... airport's future
...

... was responding to In-
terim City Manager Nancy
... detail request for
... from city council
... the scope of work

being negoti-
ated with its
new airport
consultant DY
Services.

Not unex-
pectedly, it in-
cludes some
controversial
aspects, like
scaling back
operations that would essential-
ly change the airport from a "C-
II" to a "B-II" classification for
smaller single-engine aircraft

Lang

only, something the federal
Aviation Administration oppos-
es.

It also suggests diverting cer-
tain practices, like commercial
flight training, to other regional
airports and decommissioning
portions of the airport to non-
aviation uses.

Now that the Airport Advisory
Board is no longer — city coun-
cil disbanded the board at its
Sept. 23 meeting — there'll likely
to be less organized resistance to
Lang's efforts to downscale the

airport and reduce its noise
level. It was that mission that
transformed her from a retired
city union representative to a
neighborhood activist.

**Local funds, not FAA**

So far she's been successful at
eliminating the airport board.
Earlier she led the change to
eliminate dozens of mainte-
nance and other projects from a
key list required to receive mil-
lions in federal Aviation
Administration and state fund-

ing. It took millions of dollars in
grants off the table, grants that
critics said were a shoo-in for the
city to receive.

Lang thinks the airport can
survive without those funds, and
she has a plan to replace the
funds with money from those
who use the airport.

"An analysis of opportunities
for new revenue for the city's
general fund by declining future
FAA and FDOT grants and de-

Please see LANG, 7A

liens ... at the non-aviation property such as the Mobile home park and Fairway Apartments. ... of the Golf Course. ... parking lot, etc. that is still in ... should be included," Lang wrote, until its release is

"Recommendations for attracting and locating small, clean and quiet businesses which do not increase air traffic or negatively impact sensitive habitat or nearby residents, would be desirable," wrote Lang.

**Regional objectives**

Another tactic to reduce operations at the airport is to divert operations elsewhere. Lang has previously discussed trying to limit hours of operations for touch-and-go flight lessons, and banning jet operations altogether.

"Charlotte Regional Airport and SRQ (Sarasota), both of which are, for all intents and purposes within the same region as Venice and very close by, serve the needs of larger aircraft owners and businesses.

"The MPO [master plan update] should show how each of the three airports along with Buchan Field in Englewood, complement rather than duplicate each other.

"Venice should not be identified as a

'reliever' for SRQ, Charlotte Regional, which has longer runways, is the appropriate reliever except for small aircraft operations using other data available.

Commercial flight training, helicopter training, jet sales, hangars and service, should say 'either runway meets all criteria for 'C' class and it would not be 'Nel jes,' 'Dayfet,' etc. should be encouraged at Charlotte Regional instead of Venice.

"Recommendations for limiting these activities through lease agreements and/or by not adding new hangars or tie downs or control towers or instrument landing systems ... need to be included," Lang said.

She wants recommendations for the improvement of runway 4-22 to be limited to "repairing the runway instead of complete reconstruction." She also recommended including plans for mitigating and controlling soot and fumes.

**No noise study**

Lang made suggestions to reduce noise levels, but stopped short of recommending a Part 150 Noise Study. In fact, she asked it not be included in future plans for the airport.

A Part 150 is the FAA-sponsored study that many say is definitive on the issue. The last study conducted said the city didn't have a noise problem. Critics say a new one might say the same thing — something that would undermine efforts to reduce airport operations.

Instead, Lang suggested using the

Airport Tenants Union's statistics on airport operations, and revising aviation operations using other data available.

While she didn't expressly come out and support a new "B/H" classification, she did say "either runway meets all criteria for 'C' class and it would not be acceptable to utilize waivers, extensions, etc. in order to classify (runway) 13-31 as a 'C' when we need to stress departures on (runway) 4-22, our only noise abatement runway.

"Any extension added to runway 13-31 in order to have this classified as a 'C' would be especially objectionable as this would encourage larger jet and plane traffic here and increase flying over homes in Gulf Shores, Golden Beach, Sunset Beach, etc."

Runway protection and safety zones "need to be contained on the existing airfield with the exception, if necessary of very minor deviations for runway 22 so that the (Lake Venice) Golf Course is not impacted."

"Maintaining the airport for predominantly privately owned single-engine aircraft should be the primary objective."

Woolley will compile the comments from city council members in the coming weeks. She hopes to have a scope-of-work agreement ready for council review by mid to late October.

ggillas@venicegondolier.com

# Council blocks airport building permi

Earlier this year city council approved funding for a dozen new hangars run by the city. Now it's hesitating to allow construction of four by a private enterprise.

**BY GREG GILES**
NEWS EDITOR

A legal battle is on the horizon over whether city council has the authority to require the owner of the Venice Jet Center to seek permission to apply for a building permit.

Venice Jet Center's managing partner Art Nadel spoke before city council Tuesday requesting the "green light" to process a building permit to construct four 8,000-square-foot corporate airplane hangars. He didn't get it.

Council thanked Nadel for his presentation, but refused to act on his request until City Attorney Bob Anderson returns from a leave of absence.

Nadel said he always contemplated more aircraft hangars for his business, and there was an implied understanding of that intent when he renegotiated 30-year lease in 2006.

Currently the city rents 14 hangars, and it recently appr ed the construction of 12 mo

The Venice Jet Center's le provisions call for "impro ments" on leased land, and building of two hangars replace old ones torn down, building four new hangars is specified.

Instead, the lease refers city document incorpora city standards already in e tence for an airport "fixed-l

Please see **PERMI**

operator." The standards specifically include an expectation of constructing hangars for aircraft.

Assistant City Attorney Wayne Hall said it was his position, and that of City Attorney Bob Anderson, that the "lease doesn't specifically authorize this." Based partly on a letter dating back to June, penned by then-City Manager Marty Black, Hall said the site was on city property and would need city approval.

He did give council the option to approve Nadel's presentation as a site plan, or authorize the city manager to approve it, but council hesitated.

## Left hanging

Four months ago Jet Center staff walked into city hall with a building permit application filled out, but building department staff refused to accept it, saying they were under a city council directive not to, Nadel said.

In June a meeting took place with numerous department heads to make sure the permits were in order, according to Dan Boone, attorney for Nadel. Everything was in order, he said, and there was no staff opposition.

"Just prior to the execution of

## BOIL-WATER NOTICE

The city of Venice experienced a water main break Tuesday around 3 p.m. on Tarpon Center Drive.

Residents who live along Tarpon Center Drive, south of Gibbs Road, should boil water for 72 hours, or use bottled water, as a precaution.

City utilities workers have fixed the broken pipe, which required the street to be closed for a few hours. The cause of the break is not known at this time.

our lease, Swiftmud (Southwest Florida Water Management District) had issued a permit for hangar construction on the very same site on which we plan to construct these four hangars," Nadel wrote in an Aug. 18 letter to Mayor Ed Martin. "We would not have entered into the lease without this understanding."

And he wasn't buying the notion that he was required, at this stage — after negotiating a new lease — to seek council's permission to build something it already implicitly approved. Nadel said he understood his business would be required to go through the normal building permit process and comply with city codes, but not this new intermediary step in which he would be required to get council approval simply to process the building permit.

"There are no references in the lease to a requirement of city council permission for construction," he wrote. "Requirements in the lease ... refer to various required city departmental approvals. We know of no instance in which vacant land at the airport was leased by the city for specific uses, and thereafter the tenant had to go to city council for express permission to construct a building for a permitted use on that land."

## Unprecedented

Nadel's position was that council didn't have any say about issuing a building permit.

"No action needs to be taken today simply because council does not have a voting option on this matter," said Attorney Jeff Boone, who spoke on Nadel's behalf. "There wasn't a vote required. There is no site and development plan required for a GU (govern-

ment unit zoning district). This totally falls in an undefined area.

"(I) realize there is a changing political climate, and if new regulations need to be made to affect that political climate" then so be it. But "none have been enacted, and you should treat this client in the same fashion as other property owners."

"Until the rules and regulations are changed, you cannot require the Jet Center to go through a process that has not been (legislated). The Jet Center should be allowed to file a building permit,

## AIRPORT BOARD STILL ALIVE

Venice City Council decided Tuesday to postpone the vote to abolish the Airport Advisory Board.

The motion was made by Council Member John Moore, who said the postponement was needed due to the third amended Sunshine Law complaint filed Aug. 20 by Anthony Lorenzo against the city and individual members of council and the airport board.

Lorenzo's attorney, Andrea Mogensen, reportedly filed paperwork this week requesting more than $200,000 in attorney fees from the city. A judge has yet to rule on that request.

Council hasn't had the discussion yet over whether the city should pay some or all of the attorney fees that are expected on behalf of council or airport board members.

The decision to abolish the board was postponed until Sept. 23.

and be processed the way any such permits would be processed in the city."

Dan Boone placed blame for the delay squarely on the shoulders of Council Member Sue Lang, a longtime airport critic who has successfully led a movement to scale back development at the airport.

"We are very concerned they will deny it because Lang opposes it so vehemently," he said. "She wants to bring the airport down ... for it not to even survive."

ggiles@venicegondolier.com

From: suelang99@hotmail.com
To: mckeon628@verizon.net
Subject: RE: Point Paper
Date: Thu, 6 Dec 2007 12:05:43 -0500

Confidential: Kit, I recommend you put your name in for the Airport Advisory Bd in addition the Planning Commission. I have encouraged Jim Marble and Mike Rafferty to submit also, but Mike is a little reluctant because he is typically away for several months in the summer. In the event Mike feels he can't do it, we need another person so that both Carlucd and Bartanowitz can be replaced when their terms come up in Feb. Of course, our first preference is to disband the AABd, but that may take a while and if there are 3 members of the AABd that suggest disbandment and creation of something that is more akin to a citizens oversight board, that would also help the cause!

From: suelang99@hotmail.com
To: mckeon628@verizon.net
Subject: RE: Point Paper
Date: Thu, 6 Dec 2007 12:30:34 -0500

Confidentially I think your chances of getting on Plan Com are very good as only 3 including yourself have applied for the 3 seats. I was thinking that in the event Mike didn't apply for AABd, maybe you could do both and help to get the airport classed as BII, etc. then disband the AABd...

> Date: Thu, 6 Dec 2007 11:16:04 -0600
> From: mckeon628@verizon.net
> Subject: Re: RE: Point Paper
> To: suelang99@hotmail.com
>
> Sue: I am up in DC and it snowed - bad news bears! I will be back home Saturday early afternoon. As you and I discussed, I have submited already for the Planning Commission but would be willing to serve in which ever area provide us the best bets on moving forward. I think Ed still favors me for Planning vs Airport.
>
> Jim & Mike have gotten good info this week from the previous airport consultants - I assume you have heard of that. I can talk if you want to - today or over the weekend.
>
> Kit
.

From: Sue Lang Wednesday - September 24, 2008 1:33 PM
To: Nancy Woodley
Subject: Re: Suggestions for Airport Scope/DY Contract

Thank you Nancy! Following are some quick and rough suggestions for the scope of work for the DY contract. I also urge you to consider suggestions from other members of the community, especially persons with considerable knowledge on this subject such as members of the Airport Pilots Tenants Union and other residents with engineering and airport experience, as well as residents who are directly impacted by the airport.

Since we are paying for this work, deliverables would come to the City of Venice, not FAA or FDOT. One of the deliverables would be to assist Venice in making its case for the revised MPU/ALP to FAA. Note: FAA does not approve the MPU, only the ALP).

All forecasts throughout the MPU need to be revised to reflect accurate data on operations, desiign aircraft, and actual economic impact from aviation/aviation businesses using approved methodology.

Operations Count: 3-4 months is sufficient given the recent counts documented by the Airport Pilots Tenants Union and the data available on flightaware.com

Classification of Airport/ALP: Rwy 22 departing to the southwest is our noise abatement runway and this needs to be stressed in the plan. Neither Runway meets all criteria for "C" class and it would not be acceptable to utilize waivers, extensions, etc. in order to classify 13-31 as a "C" when we need to stress departures on Rwy 22, our only noise abatement runway. Any extension added to Rwy 13-31 in order to have this Runway classified as a "C" would be especially objectionable as this would encourage larger jet and plane traffic here, and, increase flying over homes in Gulf Shores, Golden Beach, Sunset Beach, etc. RSA's, RPZ's, etc. need to be contained on the existing airfield with the exception, if necessary, of very minor deviations for RWy 22 so that the Golf Course is not impacted. Maintaining the airport for pre-dominantly privately owned single engine aircraft should be the primary objective. Charlotte Regional Airport and SRQ, both of which are, for all intents and purposes within the same region as Venice, and very close by, serve the needs of larger aircraft owners and businesses. The MPU should show how each of the three airports along with Buchan Field in Englewood, complement rather than duplicate each other. Venice should not be identified as a "reliever" for SRQ. Charlotte Regional which has longer runways is the appropriate reliever except for small aircraft. Commercial flight training, heliocopter training, jet sales, hangars and service, "Net jets," "DayJet," etc. should be encouraged at Charlotte Regional instead of Venice. Recommendations for limiting these activities through lease agreements and by not adding new hangars or tie downs or control towers or instrument landing systems, etc. need to be included.

Recommendations for improvement of RWy 4-22 including consideration of the Airport Pilots Tenants Union suggestion for repairing the runway instead of complete re-construction should be included.

Recommendations for mitigating and controlling soot and fumes need to be included.

Recommendations for a Comprehensive Noise Abatement Program need to be included. Staff and the AABoard have failed to produce and implement such a program which most other airports have. We do not need recommendations for studies such as doing another Part 150 Noise Study. One was done 15 years ago and most of the recommendations were not followed including never establishing a Citizens Noise Committee, limiting hours for touch and goes, voluntary agreements on limits of night take offs and landings, etc. Assistance is needed with implementing a right turn for departures on Rwy 4 similar to Rwy 13. This would alleviate much of the noise from Bellagio, Venice Isles, etc. without negatively impacting others because the right turn is over an industrial commercial area. Assistance is also needed with implementing the suggested "sidestep" for departures on 31 in order to reduce impact on Gulf Shores, Golden Beach, Sunset Beach, etc.

An analysis of opportunities for new revenue for the City's General Fund by declining future FAA and FDOT grants and de-designating more of the non-aviation areas of the airport such as the Mobile Home Park and Holiday Apts, the Circus Arena property, the Golf Course, that part of Sharky's parking lot, etc. that is still airport property, should be included. The FAA would be paid to release its liens just as was done with the Wastewater Treatment Plant/Tramonto Vista Park and other former airport deeded property. It would appear that a reasonable price could be negotiated with the FAA and over the long term, the revenue from these properties would greatly surpass the cost of paying off the FAA and assuming full maintenance of the airport. Revenue from aviation leases and other fees, etc. can and should pay to maintain the airport. Selling aviation fuel directly instead of receiving only 5 cents per gallon from the Jet Center would also provide revenue for the maintenance of the airport and should be considered.

Recommendations for attracting and locating small, clean and quiet businesses which do not increase air traffic or negatively impact sensitive habitat or nearby residents, would be desirable.

Environmental recommendations that recognize and protect sensitive habitat located on airport property, and, preserve the quality of life of residents near the airport should also be included in the MPU.

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

CITIZENS FOR SUNSHINE, INC., a
Florida not-for-profit corporation, and
ANTHONY LORENZO,

       Plaintiffs,

v.

                             CASE NO.: 2008 CA 8108 SC

CITY OF VENICE, ED MARTIN, SUZANNE LANG,
JOHN K. MOORE, JOHN SIMMONDS, NICHOLAS
CARLUCCI, ROBERT BARTANOWICZ, SUSAN
BALSINGER, PAUL HOLLOWELL,
and FRED HAMMETT,

       Defendants.

_____/

## CORRECTED FOURTH AMENDED COMPLAINT
## FOR DECLARATORY RELIEF AND INJUNCTION

Plaintiffs, CITIZENS FOR SUNSHINE, INC., and ANTHONY LORENZO, by and

through undersigned counsel, sues defendants, CITY OF VENICE, ED MARTIN, SUZANNE

LANG, JOHN K. MOORE, JOHN SIMMONDS, NICHOLAS CARLUCCI, ROBERT

BARTANOWICZ, SUSAN BALSINGER, PAUL HOLLOWELL, and FRED HAMMETT.

### Introduction

1.    This is an action seeking declaratory, injunctive and other relief for violations of

the Florida Government-In-The-Sunshine Law and the Public Records Act by members of the

Venice City Council and the Airport Advisory Board. Plaintiffs contend that certain Defendants

have held electronic meetings and used liaisons to discuss public business which has not been

noticed to the public. Additionally, certain Defendants have failed to comply with the Public

Records Act and have destroyed and failed in their duty to preserve public records in their

possession.

## Jurisdiction

2.    This Court has jurisdiction under Art. I, Sec. 24, of the Florida Constitution, and sections 119.07 and 286.011, Florida Statutes.

## Parties

3.    CITIZENS FOR SUNSHINE, INC., is a Florida not-for-profit corporation which promotes awareness of and compliance with the Florida Government-in-the-Sunshine Law. ANTHONY LORENZO is the President of Citizens for Sunshine, Inc.

4.    Defendant, CITY OF VENICE (City), is a Florida municipal corporation and a board within the meaning of Art. I, Sec. 24, Fla. Const., and section 286.011(1), Fla. Stat., and exercises final decision-making authority. The City has seven members of a council (City Council), which is the legislative body and is authorized to enact municipal laws for the City.

5.    Defendant, ED MARTIN, is a council member of the City.

6.    Defendant, SUZANNE LANG, is a council member of the City.

7.    Defendant, JOHN K. MOORE, is a council member of the City.

8.    Defendant, JOHN SIMMONDS, is a council member of the City and Ex-Officio member of the Airport Advisory Board.

9.    Defendant, NICHOLAS CARLUCCI, is the former Chairperson of the Airport Advisory Board.

10.    Defendant, ROBERT BARTANOWICZ, is a former member of the Airport Advisory Board.

11.    Defendant, SUSAN BALSINGER, is a current member of the Airport Advisory Boad.

2

12.     Defendant PAUL HOLLOWELL is a current member of the Airport Advisory

Board.

13.     Defendant FRED HAMMETT is the former Mayor of the CITY.

14.     For all purposes herein, Defendants are agents of the CITY.

### General Allegations Common to All Counts

**A.     Background**

15.     Originally constructed in the early 1940's as a World War II training airfield, the

Venice Municipal Airport (Airport) includes approximately 835 acres of City owned property

about which 490 acres are dedicated to aviation use.   One of the funding programs for the

Airport is the Airport Improvement Program (AIP). The source for AIP funds is the Aviation

Trust Fund (ATF).   The ATF was established by the United States Congress in 1970 to provide

funding for aviation capital investment programs.   The AIP funds are discretionary and

distributed each year by the Federal Aviation Administration (FAA) under authorization from

Congress.     Additional funding for Airport improvements is administered by the Florida

Department of Transportation (FDOT).

16.     The Airport Reference Code (ARC) is a coding system developed by the FAA to

relate airport design criteria to the operational and physical characteristics of the airplane types

that will operate at a particular airport. The ARC has two components relating to the airport

design aircraft. The first component, depicted by a letter, is the aircraft approach category and

relates to aircraft approach speed. The second component, depicted by a Roman numeral, is the

airplane design group and relates to airplane wingspan.

17.     Both runways at the Airport are presently classified by the FAA as C-II, which is

Category C -- aircraft approach speed 121 knots or more but less than 141 knots, Group II:

3

wingspan of 49 feet up to but not including 79 feet. To maintain the C-II classification substantial improvements to the Airport are necessary.

18. In March 2005, the City began an update to the Airport's Master Plan ("MPU") as well as an Airport Layout Plan ("ALP"). The City hired a consultant, MEA Group, Inc., to assist in the MPU and ALP process. The MPU and ALP are submitted to the FAA and FDOT for approval and must reflect all future development for which federal/state funding is requested. Otherwise, any proposed development is ineligible for federal/state funding.

19. The Airport Advisory Board (AAB) was established to advise the Mayor and City Council on public issues pertaining to the airport.

20. In 2007, two years into the update of the MPU and ALP, the AAB began a series of meetings to finalize its recommendations to the City Council on the MPU and ALP.

21. At the same time, significant public interest in the City focused on the development of the Airport and the City's obligation to update the MPU and ALP.

22. In late May 2007, the AAB recommended that the Airport keep its C-II designation as part of the MPU and ALP process and that substantial improvements be made to Airport property.

23. On May 22, 2007, citizen Mike Rafferty wrote to the FAA urging rejection of the proposed MPU and ALP, specifically requesting consideration of a change from the C-II designation to B-II.

24. At an AAB meeting on May 30, 2007, substantial citizen opposition was expressed to the C-II classification. Defendants MARTIN and LANG, then private citizens, along with Jim Marble, Randall Greene, and Walter Hake, appeared at that meeting and expressed their opposition to the continued C-II classification.

4

25.     In June 2007, the City Council requested that the AAB revisit and reconsider various options relating to development of the Airport.

26.     In November 2007, the City held municipal elections for several City Council seats. Defendants MARTIN and LANG ran for election. Ernie Zavodnyik also ran for election to City Council in November 2007.

27.     Defendants MARTIN, LANG and Mr. Zavodnyik ran on a platform which opposed expansion and development of the Airport as well as other similar issues. Together, Defendants MARTIN and LANG, along with Mr. Zavodnyik, sought to establish a unified voting bloc on the City Council.

28.     Prior to the election in November 2007, Defendant LANG was the President of the Venice Neighborhoods Coalition, Inc., ("VNC"), an entity which opposed development and expansion of the Airport.

29.     Prior to the election in November 2007, and continuing thereafter until this writing, Defendant MARTIN administered a private website and Internet web blog available at www.insideveniceflorida.com. Defendant MARTIN is a regular contributor to the website which serves as a public forum for citizen discussion and debate on issues likely to come before the City Council for official action. Defendant MARTIN used a non-city email account for the purpose of facilitating the website. The use of the website allows an electronic means of posting comments and other matters relating to the public business of the City.

30.     In early November 2007, Defendants MARTIN and LANG and Mr. Zavodnyik were elected as members of the City Council.

5

31. Two of the issues which Defendants MARTIN and LANG desired to accomplish was: i) the development of an alternate ALP for submission to the FAA and FDOT; and ii) replacement of AAB board members with a long-term goal of dissolving the AAB.

32. In 2007 and 2008, the City Council had extensive discussion of matters relating to the Airport.

**B.  Alternate FAA airport plan**

33. As early as November 19, 2007, four days after Defendants MARTIN, LANG, and Mr. Zavodnyik were sworn in, Defendant LANG had electronic communications with Jim Marble at jimbythesea@yahoo.com, in which Mr. Marble was used as a liaison between Defendant LANG and MARTIN to discuss matters then pending before, or reasonably foreseeable to come before, the City Council, specifically, the submission of an alternate ALP to the FAA that would slow development of the Airport. Mr. Marble wrote to Defendant LANG indicating that he had met with Defendant MARTIN about such matters, stating:

> Hi Sue,
>
> My mail program would not allow all the GB's addresses at once, so I had to split it into 4 groups......and the word processor made mild hash out of some text....but, otherwise life is GREAT tee hee. I may re-send the text.
>
> For your info only -- Mike [Rafferty] is chomping at the bit to DO something. I told him I prefer to cool it to give everyone a chance to re-think the airport "next steps" -- he and Tom want to go ahead anyway. I really don't want to get too much "out in the open" right now. So, just thot [sic] I would let you know what The Marble is up to. I spoke with Ed [Martin] and we -- just two of us -- are going to get together for a couple of hours in probably early Dec. -- I plan to tell him everything I know -- give him copies of all documents -- offer a couple of "slow it down" solutions. I thought about talking with Marty, but don't think that is a good idea -- better that the Council "strategize" this problem..... Is that good with you ??? Jim

6

See Exhibit A, attached hereto.

34.     On that same date, Defendant LANG wrote back to Mr. Marble and requested that he act as a liaison to Defendant MARTIN regarding the development of the alternate ALP, stating:

> that's a good idea to meet with Ed; keep in mind that i can't talk to Ed about anything that Council may vote on.... so you have to convince Ed to convince Marty that instead of sending 50 questions to FAA that it would be better to send FAA a draft alternate plan such as the one you prepared and really lobby for it; if Venice is really behind it, FAA will only make them change what is absolutely necessary from their perspective.... maybe Ed should bring this up at Council meeting so we can vote to direct Marty and Fred to do this.... i have already suggested this before i was sworn in, to Ed, Ernie, John Moore, and just put it in a response to marty that was part of a whole list that he asked us to give him some direction on... so now is the time to get Ed to push for this...

See Exhibit B, attached hereto.

35.     The very same day, Mr. Marble emailed Defendant MARTIN and specifically discussed an alternative plan. Defendant MARTIN then emailed Defendant MOORE stating that Mr. Marble had things to offer on airport issues. Defendant MARTIN forwarded a copy of the email he received from Mr. Marble to Defendant MOORE. See Exhibit C, attached hereto.

36.     On December 27, 2007, Defendant LANG communicated via email with other members of the City Council, making reference to a specific issue relating to the Airport MPU and ALP which was anticipated to come before the City Council for future consideration. In that email, Defendant LANG announced how she would vote on that matter, stating:

> Response to Council Member Simmonds: To my knowledge, no one is suggesting that Venice ban certain aircraft. What is being proposed is an alternate Airport Layout Plan that is more compatible with our community and which is more conducive to our airfield given the constraints we presently have surrounding

7

the airfield. It is very clear that the implication of a CII layout/classification is that two dozen homes would be in the Runway Protection Zone and that the FAA's ultimate resolution for this condition is to fund the acquisition and demolition of these homes. (MEA is currently facilitating just such a project on the East coast, I understand, for which they are being paid quite handsomely).

I, for one, will not vote for a Master Plan/layout plan with that implication and I do not believe it is necessary or in the interest of our community. All the aircraft coming into this airport would still be able to come in here with a BII classification/plan. As you know we have utilized a declared distance at the northeast end of runway 4-22 due to the bridge and this has not prevented any aircraft from using that runway. In fact, the City was proposing to greatly increase the declared distance at that end. The BII plan proposed by Mr. Rafferty and Mr. Marble keeps the runways at 5000 ft. with declared distances at each of the other ends, similar to the one we have now. All reports are that private jet aircraft are getting smaller and more fuel efficient, so they will not need longer take off or approach distances. Unless there is a hidden agenda to expand into commercial or quasi commercial/charter service at this airport, there is no reason for this airport to have a CII classification. Note that the previous Council and Mayor Hammett stated on the record that there were no such plans for expansion of this airport.

If the FAA can fund the re-construction of 13-31 with an incorrect layout plan, erroneous counts, and knowing full well there are 24 homes in a CII RPZone, they should have no problem funding re-construction of our noise abatement runway regardless of whether the MPU is completed or whether the layout is BII vs. CII. The Airport Advisory Board and Airport Manager should be spending their time procuring this grant and making sure that the airport is compatible with the surrounding community. If they are not able to do that, they need to step aside and let others take over who are capable.

See Exhibit D, attached hereto.

37. Between November 2007 and continuing until March 2008, in furtherance of the

plan to develop an alternate ALP, an ad hoc committee consisting of Mr. Marble, Kit McKeon,

8

Mike Rafferty, Chuck Schmieler and others (ad hoc committee) met and discussed issues relating to development of an alternate ALP.

38. On January 8, 2008, the City Council discussed several matters relating to the Airport, including, but not limited to, the Airport MPU and ALP, the AAB, hiring a consultant to draft a plan to map the ALP plan within existing parameters, and citizen involvement in the planning process.

39. On January 14, 2008, in furtherance of the plan to develop an alternate ALP Defendant MARTIN attempted to use the alternate ALP developed by the ad hoc committee in a meeting with FAA officials in Washington D.C. in January 2008.

40. In March 2008, Defendant MARTIN briefed City Council on his intent to utilize the alternate ALP created by the ad hoc committee in meetings scheduled with FAA officials in Orlando, FL.

### C. Reconstitution and Dissolution of AAB

41. On November 24, 2007, in furtherance of the goal to reconstitute and dissolve the AAB, Defendant LANG sent an email to her successor at the VNC, Thomas Brener, requesting that he act as a liaison to Defendant MOORE, stating:

> Tom, don't forget for the Dec. meeting to remind members that January is the Annual meeting and Jan 2008 is election of Officers and Directors (3 year terms). You may need to draft some people into being on the Board, etc. Try to get Maxine to stay on and also Ted, Bill Newnam and Bill Steen. Margaret has stated that she won't run; she's having health problems and very old.. I'd like to see Mike Rigdon on the Board and Tim MacFerrin; also, Mike Rafferty; Bruce Lebedun; Randal Greene. *[I] agree with your approach on dissolving the AAB. If you can confirm Moore, we should have 4...*

See Exhibit E, attached hereto (emphasis added).

9

42.     On December 1, 2007, Defendant LANG announced via email that she no longer desired to send or receive email relating to matters pending before the City Council, or foreseeable to come before City Council.  Defendant LANG asked that such email be sent to her city email account, stating:

> Dear Friends and Coalition Board Members:
>
> Just a quick email to advise you that communications sent to me that are about a subject that is either on the City Council agenda or may in the foreseeable future come before Council, are subject to sunshine laws, freedom of information, etc.  To avoid a problem with subjecting my personal email box (suelang99@hotmail.com) to public disclosure, please send any email which concerns or could conceivable concern a matter which is or might be on a City Council agenda to my city email address:  slang@ci.venice.fl.us Keep in mind that everything sent to this box is open to the public and can be viewed by other elected and appointed officials.  We are also not allowed to discard anything sent to us except incidental announcements, etc.

See Exhibit F, attached hereto.

43.     The very next day, Defendant LANG engaged in a private "off the record" email discussion with Defendant MARTIN in furtherance of the plan to disband the AAB, and stated:

> ...the important thing is to replace Corlucci and Bartaniwicz in February, and *as soon as possible, disband and replace this Board.*

See Exhibit G, attached hereto (emphasis added).

44.     On December 6, 2007, Defendant LANG continued to send and receive email communications marked as "Confidential" to various individuals in furtherance of the plan to submit an alternate ALP to the FAA and disband the AAB.  Specifically, Defendant LANG emailed Kit McKeon at mckeon628@verizon.net, stating:

> Confidential:  Kit, i recommend you put your name in for the Airport Advisory Bd in addition the Planning Commission.  I have

10

encouraged Jim Marble and Mike Rafferty to submit also, but Mike is a little reluctant because he is typically away for several months in the summer. In the event Mike feels he can't do it, we need another person so that both Carlucci and Bartanowitz can be replaced when their terms come up in Feb. Of course, *our first preference is to disband the AABd, but that may take a while and if there are 3 members of the AABd that suggest disbandment and creation of something that is more akin to a citizens oversight board, that would also help the cause!*

See Exhibit H, attached hereto (emphasis added).

    45.    On that same date, Defendant LANG also wrote to Kit McKeon and stated:

> Confidentially i think your chances of getting on Plan Com are very good as only 3 including yourself have applied for the 3 seats. I was thinking that in the event Mike didn't apply for AABd, maybe you could do both and help to get the airport classed as BII, etc. *then disband the AABd...*

See Exhibit I, attached hereto (emphasis added).

    46.    On February 7, 2008, in furtherance of the plan to replace AAB members and eventually disband the AAB, Defendant MARTIN announced his intentions to replace two AAB members. Defendant MARTIN also stated that abolishing the AAB was an option under consideration.

    47.    On February 12, 2008, in furtherance of the plan to replace members of the AAB, Defendant MARTIN recommended to the City Council that Jim Marble and Walter Hake be appointed to the AAB. The City Council voted 4-3 to approve the recommendations.

    48.    Immediately after the February 12th City Council meeting, Defendant MARTIN used one of his personal email accounts (tiltingatwindmills@comcast.net) to communicate with Defendant MOORE via his personal email account (j.k.moore@comcast.net). The email stated:

11

John, I am pleased that we're on the same page on pursuing the airport 'on the grounds' and believe some new blood on the airport board may help. We shall see.

Do you think Dan Boone really cares about the board or was trying to flex his muscles? It is sad that John Simmonds, basically read the script prepared for him, including the mistake about substitution of Jim Marble for Bart, just as Boone had said.

I have not figured Vicki out yet, I though perhaps she might be emancipated, but perhaps she feels we are changing things more than she feels comfortable with, not just on this issue. Or maybe she wants CQG support if she runs again. I hope she will come our way on some issues.

If Bart had used his FAA knowledge to help draft an alternate layout plan, I would have almost certainly have kept him, but from observation and speaking with members, no one, including him, really came up with anything. If Marble, et. Al (sic) had not done the research themselves we would have nothing or have to pay a consultant to do it. Of course, the FAA may not agree with it but we can push pretty hard if we have a cross section of the aviation community supporting it, including try to elicit support from Sen Nelson and perhaps other delegation members.

See Exhibit J, attached hereto.

49.     The following day, Defendant MOORE responded, and stated:

I have recorded your new email address...you still have four, I believe. Is this what I would call your personal email?

I have know (sic) Bart since I first ran for council. I consider him a friend. And, I would welcome his further involvement with the airport, etc. However, these appointments are the Mayor's prerogative. I have never voted against one in five years and wouldn't in this case, especially when you have nominated very qualified people because I believe our boards need new blood. We're fortunate to have so many capable people willing to work on the AAB. I don't want to comment on others motivations...I think it's clear without my 2 cents.

By the way, I thought you did an outstanding job of explaining your appointments in light of John S. sneak attack.

12

See Exhibit K, attached hereto.

50. On June 20, 2008, Defendant MARTIN sent an email to Defendant HOLLOWELL and members of the City Council stating:

> I am wondering whether Council might legitimately question whether the City's interests or the interests of airport users, a small minority of the City's citizens, are the focus of the your and the Board majority's interest and responsibilities.

51. In late July 2008, in furtherance of the plan to disband the AAB, the City Council voted 5-2 to ask that all members of the AAB resign.

52. On August 11, 2008, in furtherance of the plan to disband the AAB, the City Council voted 4-3 to dissolve the AAB.

**D.    Tramonto Park**

53. On November 28, 2007, Defendant LANG sent an email to private citizen Earl Quandt at equandt@aol.com and Maxine Barritt at maxiboss@aol.com, a board member of the VNC. Defendant LANG asked the recipients not to forward or distribute the email, and directly encouraged the recipients to act as a liaison to other members of the City Council about a matter scheduled to come before the City Council on December 11, 2007, specifically, the development of Tramonto Park, stating:

> Note: do not forward or distribute this email. Great letter Earl; thanks for birddogging the bike connector. [W]e have to keep on them til it gets done. I spoke to Rosemary this morning and she will be calling you and Maxine about Tramonto park; [I] think we need several dozen people to write letters to the Mayor and Council and newspapers stating that residents only want one large pavilion, not 3, and, a small amphitheater, not a large professional style facility... [I] think these are the two main sticking points. Also, keep pushing for less impervious paving and more trees throughout the park. Make sure that people ask Lori to distribute to all Council Members. I need to be able to make the case that there are dozens

13

> of residents who don't want 3 large pavilions or a large
> professional style band shell, etc. in order to counter the Chamber
> groupies who keep coming out and saying they want these
> things... Please call VNC members and your friends and ask them
> to write letters. **Also, it would be helpful if you and Max and
> Rosemary personally call Ernie, Ed Martin and John Moore to
> ask that they not approve 3 large pavilions or a large
> professional style performance facility. Thanks**

See Exhibit L, attached hereto (emphasis in original).

### E.     RTR District & Land Development Code

54.    On November 28, 2007, Defendant MOORE used his private email account (j.k.moore@comcast.net) to send an email to Defendant LANG's private email account (suelang99@hotmail.com). The email was a response to an earlier email dated the same date, which was a response to Defendant MOORE's original email dated November 28, 2007. The email exchange makes extensive reference to RTR zoning districts and other matters pending or reasonably foreseeable to come before the City Council. See Exhibit M, attached hereto. Prior to the email communication by Defendant MOORE to Defendant LANG, the public was not provided with notice that an electronic meeting or discussion of public business would occur, via email, on November 22, 2007.

### F. Tra Ponti

55.    On September 26, 2007, Defendant HAMMETT sent an email to other members of the City Council in which he made comments and suggestions and then solicited comments and suggestions from other City Council members about a matter pending before the City Council, specifically, the Tra Ponti workshops, a CMU development proposal. Defendant HAMMETT's comments included, but were not limited to, whether the project would be a hotel or condo, parking at the project, building height, and design theme.

14

56.     On November 27, 2007, Defendant MOORE sent an email to the City Clerk with a five-page memorandum outlining his comments, questions and concerns to the Mayor and City Council regarding the pending Tra Ponti workshops.  In the memorandum Defendant MOORE specifically commented on the project's characterization as a hotel condominium, parking, building height and density.  The memorandum suggested issues for discussion during the scheduled workshops, recommended repealing the CMU Zoning Ordinance, outlined his reasons for repealing the Zoning Ordinance, and comments and responses on subject matters requiring City Council action.

## I.     AAB & VASI

57.     The Venice Aviation Society, Inc. (VASI), is a non-profit Florida corporation established in 1991. VASI's Mission Statement is: 1) to Promote, support and encourage the continued use of the Venice Municipal Airport as a general aviation facility; 2) to educate concerned citizens as to the airport's importance to the public welfare; 3) to provide a forum whereby those concerned with utilization of the facility may voice their concerns; 4) to advise the appropriate authorities regarding safety, security, utilization and other concerns at the airport; 5) to provide a forum for the flying public regarding aviation matters; and 6) to support the city, county, state and federal authorities in carrying out their duties regarding aviation and the utilization of the Venice Municipal Airport in disaster, welfare and other public service.

58.     From 2005 through 2007, Defendants HOLLOWELL, BARTANOWICZ and CARLUCCI served on the Board of Directors of VASI.  From 2005 through 2008, Defendants HOLLOWELL and CARLUCCI served on the Board of Directors of VASI.  During those periods of time VASI held regular meetings of its board at which HOLLOWELL, BARTANOWIC and CARLUCCI attended.  Additionally, VASI board members, including

15

Defendants HOLLOWELL, BARTANOWICZ and CARLUCCI, routinely communicated via email about a wide range of topics related to the Airport.

59. During the above periods of time, Defendants HOLLOWELL, BARTANOWICZ and CARLUCCI also served on the AAB. Many of the issues which the AAB regularly considered and discussed were also regularly considered and discussed by the board of VASI.

60. Defendants HOLLOWELL, BARTANOWICZ and CARLUCCI held meetings and discussions in their capacity as board members of the AAB which occurred at VASI board meetings outside of publicly noticed meetings of the AAB. Additionally, Defendants HOLLOWELL, BARTANOWICZ and CARLUCCI engaged in electronic discussions and meetings outside of publicly noticed meetings of the AAB.

**J. AAB**

61. Defendant SIMMONDS is an Ex-Officio member of the AAB.

62. On November 24, 2007, Defendant SIMMONDS sent an email with a proposed letter attached to Kim Stephens, an AAB member, about matters pending or reasonably foreseeable to come before the AAB. Defendant SIMMONDS specifically requested that other AAB members make changes or suggestions to the letter. Stephens subsequently forwarded the email to Defendant BALSINGER and Jim Leis, also an AAB member.

63. On November 28, 2007, Defendant SIMMONDS sent an email to select members of the AAB in which he commented on matters that had occurred at a City Council meeting which was pending or reasonably foreseeable to come before the AAB. In the email Defendant SIMMONDS solicited comments from the AAB members, stating:

> Last night during Council audience participation 3 guys claiming
> impressive credentials "brother in lawed" themselves, one behind
> the other' trying to down play Airport development. Their pitch

16

was to hold up the development plan and lower everything from projected growth through c-2 to v-2. They emphasized that the FAA will not tell a city what to do but, rather; it is up to the cities As Dan Boon said they effectively parlayed 5 minute limitations into a 15 minute presentation. Brenner followed them with his trash. Sue Grinned a lot. I suspect it was her script. There was no one from "our" aviation community to take issue with them. We can expect more of this and we need some of our folks to counter their nonsense. Moore was impressed with their professed qualifications.

I need to back up my impressions with facts. 1st, question: isn't it so, that we are already contracted out to tenants like "Jet Center" past V2? If so We might have to buyout their contract for millions or face a nasty Law suit if we down graded to V2. Right ???? Maybe other tenants also? Who? Talk to me!!!

John

### K.    May 2, 2008 Meeting

64.    On May 2, 2008, after City Hall was closed, Defendants LANG and MARTIN, along with liaison Mike Rafferty, conducted a secret meeting and discussion in Conference Room 106 about the airport. The meeting and discussion was observed by Council Member Rick Tacy. See Exhibit N, attached hereto. It is undisputed that such meeting was not noticed to the public.

### L.    Public Records

65.    On May 9, 2008, the City Clerk reminded each member of the City Council that they were individually responsible for maintaining emails in accordance with state law. The City Clerk reminded the City Council members of the specific retention requirements imposed by law, that their emails were not independently backed up, and that they should not delete their emails without maintaining either an electronic or hard copy of same. See Exhibit O, attached hereto.

17

66.     In May 20, 2008, Plaintiff LORENZO, via the undersigned, made a public records request to the City Clerk and City Council members for public records in their custody. See Exhibit P, attached hereto. The records request specifically directed both the City Clerk and City Council members to the statutory provisions set forth in section 119.07(1)(f) and (g), Fla. Stat., as to their statutory duty to not dispose of any records which were within the subject matter of the request, whether or not they contended the records were public record, absent a court order directing otherwise.

67.     On May 22, 2008, in response to Plaintiff's public records request, Defendant MOORE authored a memo in which he acknowledged that several of the emails on his private email account "could be interpreted as a violation of the Florida Sunshine Law." See Exhibit Q, attached hereto. In that same memo, Defendant MOORE stated he had only five emails from his home computer which were responsive to the public records request dated May 20, 2008.

68.     Defendant MARTIN is unable to produce some public records responsive to the record requests because those records were not saved in one or more of his private email accounts and is therefore unable to retrieve them.

69.     Defendant SIMMONDS uses a private email account of aloha1329@comcast.net. Notwithstanding the well-established duties of a records custodian under the Public Records Law as well as City policy, SIMMONDS intentionally deleted public records from his computer. On May 29, 2008, Defendant SIMMONDS wrote a letter to the City Clerk in which he stated, "I have deleted almost all of my e-mails from my personal computer....I had forgotten that I have to keep e-mails generated at home if they cited city business." See Exhibit R, attached hereto.

18

70.     On June 12, 2008, Plaintiffs made another public records request to all current and former members of the Airport Advisory Board for emails during the period from July 1, 2005, through the date of receipt of the request. See Exhibit S, attached hereto.

71.     On May 29, Defendant BARTANOWICZ stated in writing that he could not produce public records for inspection because he routinely deletes his emails. See Exhibit T, attached hereto.

72.     On May 31, 2008, Defendant CARLUCCI stated in writing that he could not produce public records for inspection because he "routinely delete[s]" his emails. See Exhibit U, attached hereto.

73.     Pursuant to section 119.021(4)(a), Fla. Stat., Defendants CARLUCCI and BARTANOWICZ, had a duty to deliver, at the expiration of their term of office, to their successor or, if there be none, to the records and information management program of the Division of Library and Information Services of the Department of State, all public records kept or received by them in the transaction of official business.

74.     On May 27, 2008, Defendant BALSINGER stated in writing that she could not produce public records for inspection because emails could not be "forwarded or restored due to the age." See Exhibit V, attached hereto. Defendant BALSINGER made a subsequent production of emails that were responsive to the public records request. However, Defendant BALSINGER is unable to provide public records for a portion of the time period due to her inability to recover emails from her computer.

75.     Plaintiffs had to file an action for mandamus to compel the inspection of public records in the possession of Defendants LANG and MOORE which were responsive to records request dated May 20, 2008.

19

76. Plaintiffs have retained the undersigned to bring this action and has agreed to pay a reasonable attorneys fee for same.

77. Plaintiffs have incurred costs for bringing this action.

## COUNT I (Alternate ALP)

78. Plaintiffs reallege paragraphs 15 through 40 and 48 as if fully set forth herein.

79. This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY, MARTIN, and LANG.

80. The City Council is required by statute to provide "reasonable notice of all ... meetings." Section 286.011(1), Fla. Stat.

81. The City Council did not provide notice to the public of the electronic meetings and discussions between Defendants MARTIN, LANG and others used as liaisons.

82. Plaintiffs and the public have been irreparably harmed by the failure of the City Council and Defendants to provide notice of its electronic meetings and discussions.

83. By failing to provide the public with notice, the action of the City Council and the Defendants taken outside of the Sunshine to develop an alternate ALP for submission to the FAA and FDOT renders that action void *ab initio*.

84. Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A. A declaration that the CITY, MARTIN and LANG failed to provide notice to the public of the electronic meetings and discussions relating to the development of an alternate ALP for submission to the FAA and FDOT.

20

B. Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City Council as a result of the electronic meetings and discussions that occurred relating to the development of an alternate ALP for submission to the FAA and FDOT.

C. Enjoining the use of electronic communications by members of the City Council to discuss matters pending or reasonably foreseeable to come before the City Council;

D. Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

E. Any other relief the Court deems just and proper.

**COUNT II (Replacement and Disbandment of AAB)**

86. Plaintiffs reallege paragraphs 15 through 32 and 41 through 52 as if fully set forth herein.

87. This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY, MARTIN, LANG and MOORE.

88. The City Council is required by statute to provide "reasonable notice of all ... meetings." Section 286.011(1), Fla. Stat.

89. The City Council did not provide notice to the public of the electronic meetings and discussions between Defendants MARTIN, LANG, MOORE and others used as liaisons.

90. Plaintiffs and the public have been irreparably harmed by the failure of the City Council and Defendants to provide notice of its electronic meetings and discussions.

91. By failing to provide the public with notice of its electronic meetings, the action of the City Council and the Defendants taken outside of the Sunshine to replace AAB board members and eventually disband the AAB renders that action void *ab initio*.

21

92.    Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A.    A declaration that the CITY, MARTIN, LANG and MOORE failed to provide notice to the public of the electronic meetings and discussions relating to replacement of AAB board members and eventually disbandment of the AAB.

B.    Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City Council as a result of the electronic meetings and discussions that occurred relating to the replacement of AAB board members and eventually disbandment of the AAB.

C.    Enjoining the use of electronic communications by members of the City Council to discuss matters pending or reasonably foreseeable to come before the City Council;

D.    Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

E.    Any other relief the Court deems just and proper.

## COUNT III (LIAISONS)

93.    Plaintiffs reallege paragraphs 15 through 40 and paragraph 53 as if fully set forth herein.

94.    This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes against the CITY and Defendant LANG.

95.    Section 286.011, Fla. Stat., prohibits the use of liaisons to discuss those matters which are pending or reasonably foreseeable to come before a board or council.

22

96. Plaintiffs, as well as the public, have been irreparably harmed by Defendant LANG's use of liaisons to communicate with other members of the City Council on matters pending or reasonably foreseeable to come before the City Council.

97. By using liaisons to communicate with other members of the City Council on matters pending or reasonably foreseeable to come before the City Council, the action of the City Council, via the liaisons, relating to the development of an alternate ALP, the replacement of AAB members, disbandment of the AAB, and Tramonto Park renders that action void *ab initio*.

98. Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A. A declaration that Defendant LANG's use of liaisons to communicate with other members of the City Council on matters pending or reasonably foreseeable to come before the Council was unlawful;

B. Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City Council and the Defendants as a result of Defendant LANG's use of liaisons;

C. Enjoining the use of electronic communications via liaisons by members of the City Council to discuss matters pending or reasonably foreseeable to come before the City Council;

D. Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

E. Any other relief the Court deems just and proper.

### COUNT IV (Ad Hoc Committee)

99. Plaintiffs reallege paragraphs 15 through 40 as if fully set forth herein.

23

100. This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY.

101. The CITY is required by statute to provide "reasonable notice of all ... meetings." Section 286.011(1), Fla. Stat.

102. The CITY did not provide notice to the public of the meetings, electronic and otherwise, and discussions between members of an ad hoc committee established to develop an alternate ALP.

103. Plaintiffs and the public have been irreparably harmed by the failure of the CITY to provide notice of such meetings and discussions.

104. By failing to provide the public with notice, the actions of the City Council in relying on an alternate ALP for submission to the FAA and FDOT renders that action void *ab initio*.

105. Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A. A declaration that the CITY failed to provide notice to the public of the meetings and discussions of the ad hoc committee responsible for developing an alternate ALP for submission to the FAA and FDOT.

B. Enjoining the CITY, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City Council as a result of the meetings and discussions of the ad hoc committee.

C. Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

D. Any other relief the Court deems just and proper.

24

## COUNT V (RTR ZONING DISTRICTS)

106.   Plaintiffs reallege paragraphs 15 through 32 and 54 as if fully set forth herein.

107.   This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY, LANG and MOORE.

108.   The City Council is required by statute to provide "reasonable notice of all … meetings." Section 286.011(1), Fla. Stat.

109.   The City Council did not provide notice to the public of the electronic meetings and discussions between Defendants LANG and MOORE relating to RTR zoning districts.

110.   Plaintiffs and the public have been irreparably harmed by the failure of the City Council and Defendants to provide notice of its electronic meetings and discussions.

111.   By failing to provide the public with notice of its electronic meetings, the action of the City Council relating to RTR zoning districts renders that action void *ab initio*.

112.   Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A.   A declaration that the CITY, LANG and MOORE failed to provide notice to the public of the electronic meetings and discussions relating to RTR zoning districts.

B.   Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City Council as a result of the electronic meetings and discussions that occurred relating to RTR zoning districts.

C.   Enjoining the use of electronic communications by members of the City Council to discuss matters pending or reasonably foreseeable to come before the City Council;

25

D.     Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

E.     Any other relief the Court deems just and proper.

## COUNT VI (TRA PONTI)

113.     Plaintiffs reallege paragraphs 15 through 32 and 55 and 56 as if fully set forth herein.

114.     This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY, HAMMETT and MOORE.

115.     The City Council is required by statute to provide "reasonable notice of all … meetings." Section 286.011(1), Fla. Stat.

116.     The City Council did not provide notice to the public of the electronic meetings and discussions between Defendants HAMMETT and MOORE and other members of the City Council relating to the Tra Ponti workshops.

117.     Plaintiffs and the public have been irreparably harmed by the failure of the City Council and Defendants to provide notice of its electronic meetings and discussions.

118.     By failing to provide the public with notice of its electronic meetings, the action of the City Council relating to the Tra Ponti workshops is void *ab initio*.

119.     Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A.     A declaration that the CITY, HAMMETT and MOORE failed to provide notice to the public of the electronic meetings and discussions relating to the Tra Ponti workshops.

B.     Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City

26

Council as a result of the electronic meetings and discussions that occurred relating to the Tra Ponti workshops.

    C.    Enjoining the use of electronic communications by members of the City Council to discuss matters pending or reasonably foreseeable to come before the City Council;

    D.    Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

    E.    Any other relief the Court deems just and proper.

## COUNT VII (AAB & VASI)

    120.    Plaintiffs reallege paragraphs 15 through 32 and 57 through 60 as if fully set forth herein.

    121.    This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY, CARLUCCI, BARTANOWICZ and HOLLOWELL.

    122.    The AAB is required by statute to provide "reasonable notice of all ... meetings." Section 286.011(1), Fla. Stat.

    123.    The AAB did not provide notice to the public of the electronic meetings and discussions between Defendants CARLUCCI, BARTANOWICZ and HOLLOWELL relating to the VASI board meetings.

    124.    Plaintiffs and the public have been irreparably harmed by the failure of the AAB to provide notice of its meetings and discussions.

    125.    By failing to provide the public with notice of its meetings, the actions of the AAB relating to those meetings are void *ab initio*.

    126.    Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

    WHEREFORE, Plaintiffs pray for the following relief:

27

A.     A declaration that the CITY, the AAB, CARLUCCI, BARTANOWICZ and HOLLOWELL failed to provide notice to the public of the meetings and discussions relating to the VASI board meetings.

B.     Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the AAB's recommendations and actions, from implementing any action of the AAB as a result of the electronic meetings and discussions that occurred relating to the VASI board meetings.

C.     Enjoining the use of electronic communications by members of the City Council to discuss matters pending or reasonably foreseeable to come before the City Council;

D.     Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

E.     Any other relief the Court deems just and proper.

### COUNT VIII (AAB)

127.   Plaintiffs reallege paragraphs 15 through 32 and 61 through 63 as if fully set forth herein.

128.   This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY and SIMMONDS.

129.   The City Council is required by statute to provide "reasonable notice of all ... meetings." Section 286.011(1), Fla. Stat.

130.   The City Council did not provide notice to the public of the electronic meetings and discussions between Defendant SIMMONDS and other members of the AAB relating to the November 24th and 28th email comments and discussions.

131.   Plaintiffs and the public have been irreparably harmed by the failure of the City Council and Defendants to provide notice of its electronic meetings and discussions.

28

132.    By failing to provide the public with notice of its electronic meetings, the actions of the AAB relating to the November 24th and 28th email comments and discussions are void *ab initio*.

133.    Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A.      A declaration that the CITY and SIMMONDS failed to provide notice to the public of the electronic meetings and discussions relating to the November 23[th] and 28th email comments and discussions.

B.      Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City Council as a result of the electronic meetings and discussions that occurred relating to the November 23[th] and 28th email comments and discussions.

C.      Enjoining the use of electronic communications by members of the City Council to discuss matters pending or reasonably foreseeable to come before the City Council;

D.      Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

E.      Any other relief the Court deems just and proper.

## COUNT IX (May 2, 2008 Meeting)

134.    Plaintiffs reallege paragraphs 15 through 32 and 64 as if fully set forth herein.

135.    This is an action seeking declaratory and injunctive relief under chapter 286, Florida Statutes, against the CITY, MARTIN and LANG.

136.    The City Council is required by statute to provide "reasonable notice of all … meetings." Section 286.011(1), Fla. Stat.

29

137. The City Council did not provide notice to the public of the after-hours meeting and discussion between Defendants MARTIN, LANG and Mike Rafferty that occurred on May 2, 2008.

140. Plaintiffs and the public have been irreparably harmed by the failure of the City Council and Defendants to provide notice of such a meeting.

141. By failing to provide the public with notice of its meeting and discussion, the actions of the City Council relating to the May 2nd meeting is void *ab initio*.

142. Plaintiffs are entitled to an award of attorneys fees and costs for prosecuting this action.

WHEREFORE, Plaintiffs pray for the following relief:

A. A declaration that the CITY, MARTIN and LANG failed to provide notice to the public of the meeting and discussion held on May 2, 2008.

B. Enjoining Defendants, its agents, and all other persons acting in concert who are responsible for carrying out the City Council's actions, from implementing any action of the City Council as a result of the meeting and discussion that occurred on May 2, 2008.

C. Awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

D. Any other relief the Court deems just and proper.

### COUNT X (Public Records)

143. Plaintiffs reallege paragraphs 1 through 32 and 65 through 77 as if fully set forth herein.

144. This is an action seeking mandamus relief under chapter 119, Florida Statutes and Rule 1.630, Fla. R. Civ. P., against the CITY, MARTIN, SIMMONDS and BALSINGER.

30

145. Plaintiffs, through undersigned counsel, made a request to inspect public records of the Defendants.

146. Defendants MARTIN, SIMMONDS and BALSINGER had a clear statutory duty to permit inspection and copying of public records.

147. Defendant MARTIN has failed to fully comply with the request to permit inspection and copying of public records and has failed to maintain same as required by law.

148. Defendant SIMMONDS has failed to comply with the request to permit inspection and copying of public records and has knowingly and intentionally deleted same.

149. Defendant BALSINGER has failed to fully comply with the request to permit inspection and copying of public records.

150. The requested records are not subject to any statutory exemption and Defendants MARTIN, SIMMONDS and BALSINGER have failed to assert that such an exemption exists.

WHEREFORE, Plaintiffs prays for the following relief:

A. A declaration that Defendants MARTIN, SIMMONDS and BALSINGER failed to comply with their statutory duty to permit the inspection and copying of public records;

B. An Order directing Defendants MARTIN, SIMMONDS and BALSINGER to make the requested records available for inspection by any and all means necessary, including the use of a computer forensic technician for any records which have been deleted or are not recoverable by normal methods;

C. An Order directing the City Clerk to take possession of all public records and any electronic equipment that contains public records;

D. An Order awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

31

E.    Any other relief the Court deems just and proper.

## COUNT XI (Attorneys Fees – Public Records)

151.    Plaintiffs reallege paragraphs 1 through 32 and 65 through 77 as if fully set forth herein.

152.    This is an action seeking attorneys fees under chapter 119.12, Florida Statutes, against the CITY.

153.    Prior to the filing of this action, Defendant LANG failed to comply with the request to permit inspection and copying of public records.

154.    Prior to the filing of this action, Defendant MOORE failed to comply with the request to permit inspection and copying of public records, in that he provided only five emails in response to the public records request despite the fact that other emails responsive to that request existed as verified by his subsequent production of numerous emails.

155.    The refusal to provide the requested records was unlawful.

WHEREFORE, Plaintiffs prays for the following relief:

A.    A declaration that the CITY failed to comply with its statutory duty to permit the inspection and copying of public records;

B.    An Order awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

C.    Any other relief the Court deems just and proper.

## COUNT XII (Public Records)

156.    Plaintiffs reallege paragraphs 1 through 32 and 65 through 77 as if fully set forth herein.

32

157. This is an action for declaratory and other relief against the CITY, CARLUCCI and BARTANOWICZ.

158. Plaintiffs, through undersigned counsel, made a request to inspect public records on June 12, 2008.

159. Defendants have a clear statutory duty to permit inspection and copying of public records.

160. Defendants failed to comply with the request to permit inspection and copying of public records in the custody of CARLUCCI and BARTANOWICZ.

161. The requested records are not subject to any statutory exemption and Defendants have not asserted that such an exemption exists.

WHEREFORE, Plaintiffs prays for the following relief:

A. A declaration that the CITY, CARLUCCI and BARTANOWICZ failed to comply with their statutory duty to permit the inspection and copying of public records, or alternatively, their duty to deliver, at the expiration of their term of office, to their successor or, if there be none, to the records and information management program of the Division of Library and Information Services of the Department of State, all public records kept or received by them in the transaction of official business;

B. An Order directing the CITY, CARLUCCI and BARTANOWICZ to make the requested records available for inspection by any and all means necessary, including the use of a computer forensic technician for any records which have been deleted;

C. An Order directing the City Clerk to take possession of all public records and any electronic equipment that may contain public records;

33

D.     An Order awarding attorneys fees and costs to Plaintiffs for prosecuting this action; and

E.     Any other relief the Court deems just and proper.

DATED: October 8, 2008                          Respectfully submitted,


                                                ANDREA FLYNN MOGENSEN, Esquire
                                                The Law Office of Andrea Flynn Mogensen, P.A.
                                                200 South Washington Boulevard, Suite 5
                                                Sarasota FL 34236
                                                Telephone: 941.955.1066
                                                Fax: 941.955.1008
                                                Florida Bar No. 0549681
                                                Andrea@SarasotaCriminalLawyer.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished via electronic and Regular U.S. Mail on October 8, 2008, to: DALE SCOTT, Bell, Roper & Kohlmyer, P.A., 2707 E. Jefferson Street, Orlando, FL 32803; ROBERT ANDERSON, Hall & Anderson, 1314 E. Venice Ave., Ste E, Venice, Florida 34285; A. LAMAR MATTHEWS, 1777 Main St Ste 500, Sarasota, Florida 34236-5841; and DAN BOONE, 1001 Avenida Del Circo, Venice, FL 34285.


                                                ANDREA FLYNN MOGENSEN, Esquire

34

From: suelang99@hotmail.com

To: mckeon628@verizon.net

Subject: RE: Point Paper

Date: Thu, 6 Dec 2007 12:30:34 -0500


Confidentially i think your chances of getting on Plan Com are very good as only 3 including yourself have applied for the 3 seats. I was thinking that in the event Mike didn't apply for AABd, maybe you could do both and help to get the airport classed as BII, etc. then disband the AABd...


> Date: Thu, 6 Dec 2007 11:16:04 -0600

> From: mckeon628@verizon.net

> Subject: Re: RE: Point Paper

> To: suelang99@hotmail.com

>

> Sue: I am up in DC and it snowed -- bad news bears! I will be back home Saturday early afternoon. As you and I discussed, I have submited already for the Planning Commission but would be willing to serve in which ever area provide us the best bets on moving forward. I think Ed still favors me for Planning vs Airport.

>

> Jim & Mike have gotten good info this week from the previous airport consultants - I assume you have heard of that. I can talk if you want to - today or over the weekend.

>

> Kit


# Exhibit A

From: suelang99@hotmail.com
To: jimbythesea@yahoo.com
Subject: RE: ho ho
Date: Mon, 19 Nov 2007 15:00:27 -0500

that's a good idea to meet with Ed; keep in mind that i can't talk to Ed about anything that Council may vote on.... so you have to convince Ed to convince Marty that instead of sending 50 questions to FAA that it would be better to send FAA a draft alternate plan such as the one you prepared and really lobby for it; if Venice is really behind it, FAA will only make them change what is absolutely necessary from their perspective.... maybe Ed should bring this up at Council meeting so we can vote to direct Marty and Fred to do this....  i have already suggested this before i was sworn in, to Ed, Ernie, John Moore, and just put it in a response to marty that was part of a whole list that he asked us to give him some direction on... so now is the time to get Ed to push for this...


Date: Mon, 19 Nov 2007 09:44:27 -0800
From: jimbythesea@yahoo.com
Subject: ho ho
To: suelang99@hotmail.com

Hi Sue,

My mail program would not allow all the GB's addresses at once, so I had to split it into 4 groups......and the word processor made mild hash out of some text....but, otherwise life is GREAT tee hee. I may re-send the text.

For your info only -- Mike is chomping at the bit to DO something. I told him I prefer to cool it to give everyone a chance to re-think the airport "next steps" -- he and Tom want to go ahead anyway. I really don't want to get too much "out in the open" right now.

So, just thot I would let you know what The Marble is up to. I spoke with Ed and we -- just two of us -- are going to get together for a couple of hours in probably early Dec. -- I plan to tell him everything I know -- give him copies of all documents -- offer a couple of "slow it down" solutions. I thought about talking with Marty, but don't think that is a good idea -- better that the Council "strategize" this problem.....

Is that good with you ???

Jim


# Exhibit B

From: John Moore <j.k.moore@comcast.net>
To: tiltingatwindmills@comcast.net
Cc:
Bcc:
Subject: Re: Jim Marble,fyi
Date: 11/22/2007 3:06:52 PM


Hello Mayor,

That has a nice ring to it. Thanks for sending me Jim's email. I'm a
little behind in my email because I've had some problems connecting to
the internet the past few days. I really don't know Jim personally
myself, but I have met with him on a couple of occasions this past year
about the Airport Layout Plan Protection Zones and he has met with Marty
on the subject several times as well.

Have a great Thanksgiving

John

    ----- Original Message -----
    From: tiltingatwindmills@comcast.net
    To: j.k.moore@comcast.net
    Sent: Tuesday, November 20, 2007 9:37 PM
    Subject: FW: Jim Marble,fyi



       --------------- Forwarded Message: ---------------
       From: Jim Marble jimbythesea@yahoo.com
       John, I don't know if you know Jim Marble, but he is a
thoughtful fellow, as I determine from his emails. I have met him and we
have mutual friends, but I do not know him personally at this point. I
think he may have some things to offer on airport issues, so thought I
would send this along.

       Best, Ed

       : Mon, 19 Nov 2007 18:05:30 +0000
       -----------
       Dear Golden Beach Associates Member,

       I am Jim Marble, candidate for GBAI Vice-President. I
never thought
       I would do this, but I now believe it is important that
I do.

       Plain and simple, my pledge to you is ?Do my best to
maintain and
       enhance the life we enjoy at Golden Beach. ?

       But there is a lot more at the moment than my asking for
your vote.

# Exhibit C

We need to be more aware of and more involved in actions that have
the potential to truly alter our ?paradise.? There are times when it
really matters to ?stand up.?

Anonymity wears well. Go to school, work, retire, move and enter a
?new life? where you mow your lawn and play some golf. Golfers don?t
ask ?what you did,? only ?what?s your problem? when you miss putts.

--- Education & Prior Experience ---

History ? -- born and lived in Washington state for 60 or so
years. BA, MA, PhD in English fro m Univ. of Wash. Taught at several
colleges, then was one of four hired to start a new community college.
Became Dean, hired everyone and even picked out the furniture.

After four years went to a larger college (15,000 students) and was
Dean for R&D, Budget, Planning and Info Systems. Took a year off
and traveled around the world. Retired early. Learned computer
programming, started a nationwide educational software business.
Got obsolete (over the age of 16) and started a toy business.
Chose not to learn the secrets of Asian importing. Retired final time.

While at the colleges I conducted community workshops and management
seminars. Directed the planning that involved the entire community
of approx. 100,000 residents. Planning ?starts? with the people. It
has been curious to me that many Venice city plans are ?done? before
they are presented ?for your comment.? Expedient unless things go wrong.< BR>
Moved to San Juan Island Wash. where Pam and I built a house -- did
it all except foundation -- moved to New Hampshire and build another
house (except pouring the basement). Moved to Golden Beach nine
years ago. Mowed the lawn. Played golf. Smiled.

While on San Juan Island I was President of the