homeowners assn. for
the five years we lived there.  I was also on the GBAI
Board for a year.

--- Local Involvement ---

No matter how much you covet being ?laid back? there
often comes a
time to become involved.  ?'Twas the Airport Plan what
bit me.?

Everyone living at Golden Beach and its surrounds should
tune in on what
was/is being planned for the airport.  I simply
overheard a conversation
about a change to the golf course and then about a
Marriott offer (since
withdrawn) to build a golf resort.

A friend told me the airport had a plan to expand and
because I did not
know what that meant, I attended a MP (master plan)
presentation at
City Hall, then went to the archive and read the 1975,
1986 and 2000
plans.  Some curiosities there led me to search the FAA
web site and
read master plans for airports all over the country.  I
e-mailed some
?involved citizens? who were having their local troubles
with airport
planning....finally, I spoke up at meetings and ?drew
up? some questions
and alternatives for the City and Council to see.

I have proposed a plan for the airport to remain within
its present
?footprint?; where the airport and its neighbors —
residences, beaches,
golf course – have co-existed for about 50 years.

I am a member of the Venice Neighborhood Coalition
airport committee.
Some of the airport issues reach beyond Golden Beach —
but should
not be overlooked.  Community involvement is IMPORTANT
now, so I am
involved. But I am NOT suggesting the GBAI Board take
any ?action? --
what is needed is a ?wary eye ? and vigilance.

--- Looking Forward ---

An upcoming airport issue will be the ?planned? 2008
noise study.
We need to make sure it is conducted in accord with FAA

Page 3

airport planning
guidelines which specify several citizen committees and a survey of ALL
airport proximity residents.  Such a study should include flight patterns.
We would do well to give our support to the Venice Pilots Assn. ?fly
friendly? program -- before the noise study is begun.

There are also certain to be some growth, comprehensive plan (village),
continued short-term-rental and other issues that might impact
Golden Beach. The GBAI Board has developed positions and priorities
on several issues.  Next there needs to be on-going program, perhaps
with some  ?issue investigation? committees.

My planning background reminds me that what ?I think? is not as
important as what ?you think? -- thus it is somewhat difficult to
identify issues that most concern you.  The GBAI Board might well
undertake a simple survey to get some sense of direction and ?listen?
to the GB heartbeat.  The Board should serve the people.

I will fully support and will assist with the social and civic activities as
expressed in the GBAI Charter.

Thank you for listening.....each vote for Jim Marble is appreciated.

......... Jim

---

Be a better pen pal. Text or chat with friends inside Yahoo! Mail. See how.
<http://us.rd.yahoo.com/evt=51732/*http://overview.mail.yahoo.com/>

Filed for Record 10/08/2008 04:28 PM - Karen E. Rushing, Clerk of the Circuit Court - Sarasota County, FL - 2008 CA 008108 SC Dkt-52149839 Page 40 of 61

**From:** Sue Lang
**To:** ljfr@aol.com,Ed Martin,Ernie Zavodnyik,John Simmonds,Lori Stelzer,Rick T...
**CC:** mblack@cl.venice.fl.us,Fwatts@cl.venice.fl.us
**Date:** 12/27/2007 11:58 AM
**Subject:** Re: Venice Airport Issue 10

Response to Council Member Simmonds: To my knowledge, no one is suggesting that Venice ban certain aircraft. What is being proposed is an alternate Airport Layout Plan that is more compatible with our community and which is more conducive to our airfield given the constraints we presently have surrounding the airfield. It is very clear that the implication of a CII layout/classification is that two dozen homes would be in the Runway Protection Zone and that the FAA's ultimate resolution for this condition is to fund the acquisition and demolition of these homes. (MEA is currently facilitating just such a project on the East coast, I understand, for which they are being paid quite handsomely).

I, for one, will not vote for a Master Plan/layout plan with that implication and I do not believe it is necessary or in the interest of our community. All the aircraft presently coming into this airport would still be able to come in here with a BII classification/plan. As you know we have utilized a declared distance at the northeast end of runway 4-22 due to the bridge and this has not prevented any aircraft from using that runway. In fact, the City was proposing to greatly increase the declared distance at that end. The BII plan proposed by Mr. Rafferty and Mr. Marble keeps the runways at 5000 ft. with declared distances at each of the other ends, similar to the one we have now. All reports are that private jet aircraft are getting smaller and more fuel efficient, so they will not need longer take off or approach distances. Unless there is a hidden agenda to expand into commercial or quasi commercial/charter service at this airport, there is no reason for this airport to have a CII classification. Note that the previous Council and Mayor Hammett stated on the record that there were no such plans for expansion of this airport.

If the FAA can fund the re-construction of 13-31 with an incorrect layout plan, erroneous counts, and knowing full well there are 24 homes in a CII RPZone, they should have no problem funding re-construction of our noise abatement runway regardless of whether the MPU is completed or whether the layout is BII vs. CII. The Airport Advisory Board and Airport Manager should be spending their time procuring this grant and making sure that the airport is compatible with the surrounding community. If they are not able to do that, they need to step aside and let others take over who are capable...

# Exhibit D

From: suelang99@hotmail.com
To: swoose411@yahoo.com
Subject: RE: VNC announcement
Date: Sat, 24 Nov 2007 09:29:18 -0500

Tom, don't forget for the Dec. meeting to remind members that January is the Annual meeting and Jan 2008 is election of Officers and Directors (3 year terms). You may need to draft some people into being on the Board, etc. Try to get Maxine to stay on and also Ted, Bill Newnam and Bill Steen. Margaret has stated that she won't run; she's having health problems and very old.. I'd like to see Mike Rigdon on the Board and Tim MacFerrin; also, Mike Rafferty; Bruce Lebedun; Randal Greene. i agree with your approach on dissolving the AAB. If you can confirm Moore, we should have 4...

# Exhibit E

From: suelang99@hotmail.com
To: 2aceman@verizon.net; venice237@juno.com; bob@inova-research.com; jimbythesea@yahoo.com; joyce-in-venice@comcast.net; jtmacf62@hotmail.com; . frontporchpress@comcast.net; ljfr@aol.com; thurmangreene@msn.com; maxiboss@aol.com; vauzanges@comcast.net; willnew@verizon.net; heevac@comcast.net; mcdmiller@comcast.net; tvaug@yahoo.com; swoose411@yahoo.com; suelang99@hotmail.com
Subject: Council/Sunshine Laws
Date: Sat, 1 Dec 2007 16:06:32 -0500

Dear Friends and Coalition Board Members:

Just a quick email to advise you that communications sent to me that are about a subject that is either on the City Council agenda or may in the foreseeable future come before Council, are subject to sunshine laws, freedom of information, etc. To avoid a problem with subjecting my personal email box (suelang99@hotmail.com) to public disclosure, please send any email which concerns or could conceivable concern a matter which is or might be on a City Council agenda to my city email address: slang@ci.venice.fl.us Keep in mind that everything sent to this box is open to the public and can be viewed by other elected and appointed officials. We are also not allowed to discard anything sent to us except incidental announcements, etc.

Feel free to call me if you do not want your comments on the public record. However, if it has to do with a quasi judicial item that is, or may go before Council, (this is an agenda item that requires a public hearing like a re-zone or an appeal, etc.), please be advised that I may not discuss these items with anyone, but you can make comments/express your concerns to me. (I am, however, supposed to document your comment and disclose it if and when the public hearing occurs... Documentation means name, date and brief summary of comment. I must also attest that your comments do not affect or prejudice my judgement.).

A few more facts about sunshine laws: two or more Council Members may not discuss (confer on) anything that is on an agenda or may reasonably be expected to go before City Council. This means that Council Members are allowed to individually comment on items to anyone including other Council Members, verbally or in writing, but no Council Member can respond to, or confer with another, etc. except at a public meeting duly advertised. (On quasi judicial items Council is not supposed to comment...).

If you have any questions, please do not hesitate to call me. And please keep in touch and keep sending your comments and concerns so that our elected and appointed officials will know how you feel/where you stand on an issue, etc.

# Exhibit F

From: suelang99@hotmail.com
To: edwilsonmartin@hotmail.com
Subject: Liaison/Ex Officio Assignments
Date: Sun, 2 Dec 2007 16:17:05 -0500

Mayor Ed,
Since Marty and Anderson said that we can discuss off the record our individual choices/requests re: assignments, i thought i'd send you a note to let you know my latest thinking. I previously sent you my request for my top 3 choices and indicated i'd be willing to do VHA also. As i mentioned the other night, while i'm not desperate to do VHA, i feel i'm the one best suited for this assignment and i think that i have started a relationship with some of the tenants and interested parties, and, i understand from others that the tenants are almost starting to think they may be able to trust me. The lack of trust in previous elected and appointed officials is the biggest problem at VHA. So i think it would be disconcerting if the City, again, changed assignments there right now. It is imperative, i think, that we get some new folks on the VHA Board who have construction experience and aren't aligned with any developers.

I also wanted to tell you that while i would like to be assigned to the Planning Commission, if John Moore has a real interest in it, that would be ok with me. I really hoped that John would take the Airport, but i have a feeling that he won't request it; you would have to ask him to do it.... the important thing is to replace Corlucci and Bartaniwicz in February, and as soon as possible, disband and replace this Board.

I had listed Parks and Rec as my third choice (Airport as my second); there are pro's and cons to my being assigned to the Airport which i'll leave up to your judgement and strategy.
So, in conclusion, if for example you assigned Moore to Planning instead of me and you didn't want to change Simmonds right now, i'd be fine with Parks and Rec. (If I get Planning i hope you assign Ernie to Parks and Rec because it is more important than people realize in light of the need to conserve more land, increase green space and trees, etc.)

I'm also filling in this month at the Architectural Review Board. I am somewhat interested in this, but i realized that they meet twice a month starting at 9am and i think that too much of my time might be consumed by this/i won't be able to keep up with everything. This is one that perhaps Rick Tacy, who will need a replacement assignment assuming he will not be re-assigned to Planning Commission., might be suited for...

Lots of luck trying to make sense of all this...

# Exhibit G

From: suelang99@hotmail.com

To: mckeon628@verizon.net

Subject: RE: Point Paper

Date: Thu, 6 Dec 2007 12:05:43 -0500


Confidential: Kit, i recommend you put your name in for the Airport Advisory Bd in addition the Planning Commission. I have encouraged Jim Marble and Mike Rafferty to submit also, but Mike is a little reluctant because he is typically away for several months in the summer. In the event Mike feels he can't do it, we need another person so that both Carlucci and Bartanowitz can be replaced when their terms come up in Feb. Of course, our first preference is to disband the AABd, but that may take a while and if there are 3 members of the AABd that suggest disbandment and creation of something that is more akin to a citizens oversight board, that would also help the cause!


> Date: Tue, 27 Nov 2007 09:28:02 -0600

> From: mckeon628@verizon.net

> Subject: Point Paper

> To: suelang99@hotmail.com

>

>

>

> Kit (Thomas C.) McKeon

> C:        941-408-3277

> H:        941-485-3193

> E: mckeon628@verizon.net


# Exhibit H

From: suelang99@hotmail.com
To: mckeon628@verizon.net
Subject: RE: Point Paper
Date: Thu, 6 Dec 2007 12:30:34 -0500

Confidentially i think your chances of getting on Plan Com are very good as only 3 including yourself have applied for the 3 seats. I was thinking that in the event Mike didn't apply for AABd, maybe you could do both and help to get the airport classed as BII, etc. then disband the AABd...

# Exhibit I

From: tiltingatwindmills@comcast.net
To: John Moore <mailto:j.k.Moore@comcast.net>
Sent: Tuesday, February 12, 2008 9:27 PM
Subject: airport

John, I am pleased that we were on the same page on pursuing
the airport "on the grounds" and believe some new blood on the airport
board may help. We shall see.

Do you think Dan Boone really cares about the board or was
trying to flex his muscles?

It is sad that John Simmonds, basically read the script prepared
for him, including the mistake about substitution of Jim Marble for
Bart, just as Boone had said.

I have not figured Vicki out yet, I thought perhaps she might be
emancipated, but perhaps she feels we are changing things more than she
feels comfortable with, not just on this issue. Or maybe she wants CQG
support if she runs again. I hope she will come our way on some issues.

If Bart had used his FAA knowledge to help draft an alternate
layout plan, I would have almost certainly have kept him, but from
observation and speaking with members, no one, including him, really
came up with anything. If Marble, et.al. had not done the research
themselves we would have nothing or have to pay a consultant to do it.
Of course the FAA may not agree with it, but we can push pretty hard if
we have a cross section of the aviation community supporting it,
including try to elicit support from Sen Nelson and perhaps other
delegation members.


Thanks and best,

Ed.

# Exhibit J

From: John Moore <j.k.moore@comcast.net>
To: tiltingatwindmills@comcast.net
Cc:
Bcc:
Subject: Re: airport
Date: 2/13/2008 8:23:02 PM

I have recorded your new email address...you still have four, I believe.
Is this what I would call your personal email?
I have know Bart since I first ran for council. I consider him a friend.
And, I would welcome his further involvement with the airport, etc.
However, these appointments are the Mayor's prerogative. I have never
voted against one in five years and wouldn't in this case, especially
where you have obviously nominated very qualified people, because I
believe our boards need new blood. We're fortunate to have so many
capable people willing to work on the AAB. I don't want to comment on
others motivations...I think it's clear without my 2 cents.
By the way, I thought you did an outstanding job of explaining your
appointments in light of John S. sneak attack.

# Exhibit K

From: sue lang <suelang99@hotmail.com>
To: equandt@aol.com
Cc: maxiboss@aol.com
Sent: Wed, 28 Nov 2007 9:55 am
Subject: RE: Audubon Talk

Note: do not forward or distribute this email.

Great letter Earl; thanks for birddogging the bike connector. we have to keep on them til it gets done.

I spoke to Rosemary this morning and she will be calling you and Maxine about Tramonto park; i think we need several dozen people to write letters to the Mayor and Council and newspapers stating that residents only want one large pavilion, not 3, and, a small amphitheater, not a large professional style facility... i think these are the two main sticking points. Also, keep pushing for less impervious paving and more trees throughout the park. Make sure that people ask Lori to distribute to all Council Members. I need to be able to make the case that there are dozens of residents who don't want 3 large pavilions or a large professional style band shell, etc. in order to counter the Chamber groupies who keep coming out and saying they want these things... Please call VNC members and your friends and ask them to write letters. Also, it would be helpful if you and Max and Rosemary personally call Ernie, Ed Martin and John Moore to ask that they not approve 3 large pavilions or a large professional style performance facility.

thanks

# Exhibit L

From: suelang99@hotmail.com
To: j.k.moore@comcast.net
Subject: RE: Revised RTR Text
Date: Thu, 29 Nov 2007 09:38:11 -0500

John, I remembered after the meeting that several months ago/maybe longer, you had asked staff to consider using chickee thatch roofs, etc. for the large pavilions at Tramonto. This was a really good suggestion and I feel, would go a long way toward making these pavilions fit in with the natural surroundings in that area. (Although I still feel that we only need one large pavilion.) Perhaps the amphitheater could also be designed with the chickee thatch roof, if there is going to be a roof at all.... (I feel strongly that the amphitheater be small and very natural in design and materials.) I also continue to believe that a lot more trees in this park would be good, not just for the environment, but for people using the park... We need shaded trails for people to walk on and the trails around the pond and to the beach in Tramonto would make a great place for a shaded trail walk. We need to plant trees on both sides of the trails in order to create shade. This needs to be part of the design now....

From: j.k.moore@comcast.net
To: suelang99@hotmail.com
Subject: Re: Revised RTR Text
Date: Wed, 28 Nov 2007 20:43:04 -0500

Thanks, Sue. This may be academic now, but I wanted to have a copy of what you had done to this zoning district. John
----- Original Message -----
From: sue lang
To: john moore
Sent: Wednesday, November 28, 2007 7:49 AM
Subject: Revised RTR Text

John, attached is my revised RTR District. Please note this was revised to allow condo hotels in the RTR zone. Since Miller is now saying he isn't doing a condo hotel, we don't really need all of these revisions. The revisions also clarify how time shares would be treated because the existing RTR isn't clear on these. Also, the current RTR allows 45 ft. plus 10 for parking under. Since developers have been saying they need more than 10 ft for parking under a non residential structure, and/or to allow for commercial use on the same level as the parking under the building, i used a total maximum height of 59 ft. instead of 55 ft. This could be changed to a total of 45 or 49 ft. Let me know how you believe a revised RTR should be structured. There are additional changes i would probably make. At this point, I would be inclined to remove condo hotels and consider them as residential. This would be cleaner.... I would still go with 36 units per acre for hotels, motels and interval occupancy (timeshare) units including allowing all of them to have small kitchenettes/dining areas as long as they are rented nightly or weekly and maximum occupancy is 30 days....

# Exhibit M

From: Rick Tacy
To: Kim.Hackett@heraldtribune.com
Date: Friday - May 2, 2008 8:41 PM
Subject: Re: 4/29/08 Airport Article

Kim, first I understand this e-mail is covered under the sunshine law. I
need to let you know the Mayor and others are deyning your article and it's
content. Further more I can't varify your previous writings, though I'm 100
percent sure you were correct. I can and will testify in court that today
after our meeting, that the Mayor, Sue Lang and a nother non-member of
council were in the meeting room going over their proposed airport plan. A
total violation of the Sunshine Law. Feel free to contact me.

RICK

# Exhibit N

| From: | Lori Stelzer |
| To: | City Council |
| CC: | Martin Black; randerson@hall-anderson.com; Tom Slaughter |
| Date: | Friday - May 9, 2008 9:55 AM |
| Subject: | E-mail |

I have been advised that council members have received e-mails from constituents relative to the Cemex rezone petition. I have not received any of those documents from council members to be entered into the quasi judicial hearing scheduled for 5/27/08. Any correspondence you receive/send that should be part of a public hearing should be forwarded to me. I am not copied on many of the e-mails you receive and I do not monitor your e-mails on the media account.

Also, remember that as an individual user, you are responsible for maintaining your e-mails in accordance with state laws, specifically retention requirements. The e-mails are not backed up by the IS department, nor do they stay in the media account. Some of the key points are:

1. Keep all e-mails received from constituents. You can create folders in your electronic cabinet.
2. You are allowed (and encouraged) to delete transitory e-mails.
3. Keep all e-mails you send (unless they are transitory)
4. You can delete e-mails from staff, because as originator of that e-mail, they are responsible for maintaining the record.
5. You can print out a hard copy and file it in the traditional way and delete the e-mail.

If you have any questions on the best way for you to maintain those records, please see me. Thanks!

# Exhibit O

THE LAW OFFICE OF
# ANDREA FLYNN MOGENSEN, P.A.
200 SOUTH WASHINGTON BOULEVARD, SUITE 5, SARASOTA, FLORIDA, 34236
TELEPHONE: 941-955-1066     ANDREA@SARASOTACRIMINALLAWYER.COM     FACSIMILE: 941-955-1008

May 20, 2008

*VIA EMAIL & FACSIMILE*
Lstelzer.ci.venice.fl.us
(941) 480-3031

Lori Stelzer, City Clerk
City of Venice
401 W. Venice Avenue
Venice, FL 34285

Dear Clerk:

This letter shall constitute our request under section 119.07, Fla. Stat., for the following records:

1. All email communications to and from council members, including non-city account emails utilized by council members, for the period beginning November 14, 2007, through the date of receipt of this letter, including any email attachments.

For purposes of this request, the term "records" shall have the statutory definition set forth in section 119.011(11), Fla. Stat.

If you are contend that any record, or portion thereof, is exempt from inspection, please state in writing the basis for the exemption and include the applicable statutory exemption. See section 119.07(1)(e), Fla. Stat. Additionally, pursuant to the requirements of section 119.07(1)(d), Fla. Stat., we hereby request that you explain in writing and with particularity the reasons for your conclusion that the record is confidential or exempt.

We would direct your attention to the following statutory requirements set forth in section 119.07(1), Fla. Stat.:

(f) Even if an assertion is made by the custodian of public records that a requested record is not a public record subject to public inspection or copying under this subsection, the requested record shall, nevertheless, not be disposed of for a period of 30 days after the date on which a written request to inspect or copy the record was served on or otherwise made to the custodian of public records by the person seeking access to the record. If a civil action is instituted within the 30-day period to enforce the provisions of this section with respect to the requested record, the custodian of public records may not dispose of the record except by order of a court of competent jurisdiction after notice to all affected parties.

# Exhibit P

(g) The absence of a civil action instituted for the purpose stated in paragraph (e) does not relieve the custodian of public records of the duty to maintain the record as a public record if the record is in fact a public record subject to public inspection and copying under this subsection and does not otherwise excuse or exonerate the custodian of public records from any unauthorized or unlawful disposition of such record.

If any of the requested documents are maintained in a common format electronic medium, please provide these documents in such electronic medium and not in paper form. For purposes of this request, common electronic formats include (1) American Standard Code for Information Interchange ("ASCII"), (2) email files formatted in Microsoft Outlook known as a .pst file; (3) files formatted in one of the Microsoft Office Suite, Corel Suite, OpenOffice Suite, or IBM's Lotus Suite applications (.doc, .xls, .ppt, .mdb, .wpd, etc.); (4) a text file (.txt), or (5) hypertext markup language (.html) or similar web page language. This is the preferred format. However, if any of the requested documents are only maintained or can only be produced as electronic images, for example a portable document format (.pdf), then as an alternative, we request this electronic image format. See §119.01(2), Fla. Stat.

By copy of this letter to the City Attorney and all council members, we are requesting that all emails, including emails sent to and from non-city email accounts, be preserved.

If you have any questions about the nature or extent of this request, please do not hesitate to contact our office.

Very truly yours,

Andrea Flynn Mogensen

cc:    Mayor Ed Martin        (emartin.ci.venice.fl.us)
       Sue Lang               (slang.ci.venice.fl.us)
       Vicki Noren            (vnoren.ci.venice.fl.us)
       Ernie Zavodnyik        (ezavodnyik.ci.venice.fl.us)
       John Simmonds          (jsimmonds.ci.venice.fl.us)
       John K. Moore          (jmoore.ci.venice.fl.us)
       Ricky Tacy             (rtacy.ci.venice.fl.us)
       Martin Black           (mblack.ci.venice.fl.us)

TO:        Lori Stelzer, City Clerk

FROM:      John K. Moore

DATE:      May 22, 2008

SUBJECT:   Public Records Request

---

In response to three public record requests which I received via city email on May 21, 2008, requesting all email communications to or from council members in my personal email from November 14, 2007 thru May 21, 2008, I am providing copies of five emails dated November 22, 2007, November 29, 2007, February 13, 2008, February 15, 2008 and April 27, 2008. I could not retrieve the attachment to Ms. Lang's email of November 28, 2007, so I am providing a copy from my file. The document was a proposed revision to the RTR zoning district which Ms. Lang had prepared the year before as a private citizen. I had requested a copy of this document from her because I had misplaced the one she had given me before she ran for city council.

These are all the emails to or from council members on my personal email during the period from November 14, 2007 thru May 22, 2008. I do not have any personal emails to or from any citizen's group regarding the airport.

Although I did not initiate any of these emails, I did respond to three of them in a manner which, at the time, seemed very innocuous, because it was not my intent to engage in a discussion of any issue which would come before city council or upon which I would be required to vote. However, as I look back at my responses now, in hindsight, I can see how some of them could be interpreted as a violation of the Florida Sunshine Law. At the very least, they could give the appearance of a violation and undermine the public's confidence in me as one of their elected representatives. Given my background and length of service on city council, I should have known better. For that I am very sorry and accept full responsibility for my actions.

# Exhibit Q

**John Simmonds**
**1329 Tarpon Ctr. #2**
Venice Fl 34285
May 29, 2008

Ms. Lori Stelser
City Clerk
City of Venice
Venice Fl 34285

Dear Lori

Attached are documents concerning "City Business". Some of the content of these documents have appeared in E-Mails I have sent from my personal computer via my personal e-mail acct.; And on rare occasions I have sent them on the City of Venice e-mail [Group wise] system, when they were generated on my personal Computer.

I have deleted almost all of my e-mails from my personal computer. I now find that City E-mail deleted from my personal computer, also deletes them from the City system. I have asked you and our city computer dept. to see if the ones deleted from the city system can be recovered.

Most of the e-mails concerned were to and from citizens who complained about the City Airport activity. Some of the precipitants were: Ms Kutie, Mike Rafferty, Tom Brenner, Ms.. Cathy Peterson, and John Patten.

I had forgotten that I have to keep e-mails generated at home if they cited city business. I am painfully aware now, and sincerely apologize to my collegues, the City of Venice and anyone who is offended by my actions.

Sincerely,

John Simmonds

Copy:

Robert Anderson
City Attorney

# Exhibit R

THE LAW OFFICE OF

ANDREA FLYNN MOGENSEN, P.A.

200 SOUTH WASHINGTON BOULEVARD SUITE 5 SARASOTA FLORIDA 34236

TELEPHONE 941-955-1066 ANDREA@SARASOTACRIMINALLAWYER.COM FACSIMILE 941-955-1008

June 12, 2008

*VIA EMAIL & FACSIMILE*
Lstelzer@ci.venice.fl.us
(941) 480-3031

Lori Stelzer, City Clerk
City of Venice
401 W. Venice Avenue
Venice, FL 34285

Dear Clerk:

This letter shall constitute a request under section 119.07, Fla. Stat., for the following records:

1. All email communications to and from members of the Airport Advisory Board, including non-city account emails utilized by board members, for the period beginning July 1, 2005, through the date of receipt of this letter, including any email attachments.

For purposes of this request, the term "records" shall have the statutory definition set forth in section 119.011(11), Fla. Stat.

If you are contend that any record, or portion thereof, is exempt from inspection, please state in writing the basis for the exemption and include the applicable statutory exemption. See section 119.07(1)(e), Fla. Stat. Additionally, pursuant to the requirements of section 119.07(1)(f), Fla. Stat., we hereby request that you explain in writing and with particularity the reasons for your conclusion that the record is confidential or exempt.

We would direct your attention to the following statutory requirements set forth in section 119.07(1), Fla. Stat.:

(h) Even if an assertion is made by the custodian of public records that a requested record is not a public record subject to public inspection or copying under this subsection, the requested record shall, nevertheless, not be disposed of for a period of 30 days after the date on which a written request to inspect or copy the record was served on or otherwise made to the custodian of public records by the person seeking access to the record. If a civil action is instituted within the 30-day period to enforce the provisions of this section with respect to the requested record, the custodian of public records may not dispose of the record except by order of a court of competent jurisdiction after notice to all affected parties.

# Exhibit S

(i) The absence of a civil action instituted for the purpose stated in paragraph (g) does not relieve the custodian of public records of the duty to maintain the record as a public record if the record is in fact a public record subject to public inspection and copying under this subsection and does not otherwise excuse or exonerate the custodian of public records from any unauthorized or unlawful disposition of such record.

If any of the requested documents are maintained in a common-format electronic medium, please provide these documents in such electronic medium and not in paper form. For purposes of this request, common electronic formats include (1) American Standard Code for Information Interchange ("ASCII"), (2) email files formatted in Microsoft Outlook known as a .pst file; (3) files formatted in one of the Microsoft Office Suite, Corel Suite, OpenOffice Suite, or IBM's Lotus Suite applications (.doc, .xls, .ppt, .mdb, .wpd, etc.), (4) a text file (.txt), or (5) hypertext markup language (.html) or similar web page language. This is the preferred format. However, if any of the requested documents are only maintained or can only be produced as electronic images, for example a portable document format (.pdf), then as an alternative, we request this electronic-image format. *See* §119.01(2), Fla. Stat.

By copy of this letter to the City Attorney and all current board members, we are requesting that all emails, including emails sent to and from non-city email accounts, be preserved. Additionally, we are requesting that you notify all prior board members during the time period specified of this request.

If you have any questions about the nature or extent of this request, please do not hesitate to contact our office.

Very truly yours,

Andrea Flynn Mogensen

cc:   Robert Anderson   (randerson@hall-anderson.com)
     Martin Black   (mblack@ci.venice.fl.us)
     Walter Hake   (whake@comcast.net)
     Susan Balsinger   (Ssb519@aol.com)
     Paul Hollowell   turbo171@verizon.net
     James Marble   (jimbythesea@yahoo.com)
     Jim Leis   (jleis445@comcast.net)
     Kim Stephens   (kim@homesofvenice.com)
     John Yurosko   (jjyurosko@aol.com)
     John Simmonds   (jsimmonds@ci.venice.fl.us)

| | |
|---|---|
| **From:** | "Bartanowicz" <rbartano@verizon.net> |
| **To:** | <lstelze@ci.venice.fl.us> |
| **Date:** | 5/29/2008 3:21 PM |
| **Subject:** | *FILTERED:* Request for EMails |

Dear Ms Stelzer;
Per your telephone request of May 29, 2008 requesting copies of Email pertaining to the airport:
I routinely delete my Email files. I have Emails on record from 3/20/2008 to the present. I was not reappointed to the Airport Advisory Board and I believe my last official meeting was on Feb 13, 2008.
As such The period from 3/20/2008 to present covers a period when I was no longer on the Airport Advisory Board.

Robert S. "Bart" Bartanowicz

# Exhibit T

From: Nicholas Carlucci <jecessns72@verizon.net>
To: Lori Stelzer <lstelze@ci.venice.fl.us>
Date: 5/31/2008 12:41 PM
Subject: *FILTERED* Re: Public Records Request

I regret that I am unable to comply with your request as I routinely delete my e-mails. I do this at least once a month and more often than not on a weekly basis. The AAB was never tasked by City Council to review any of the airport land development proposals. The AAB reviews of the Master Plan Update/ AEP were extensive and open to the public. Hangar discussions were part of the AAB airport budget/ fair market value MPU public review process. T-hangar rent increases (to bring those rents up to full fair market value) for the past two years were unanimously approved while I was on the AAB. Those rent increases were preceded by a third rent increase that occurred the year before I was on the board. The Airport Manager (Director) sends AAB members FYI e-mails over a wide variety of subjects. Some of his FYI e-mails may have contained some of the key words but I have no record to support that claim. Yours Truly, Nick Carlucci

Lori Stelzer <lstelze@ci.venice.fl.us> wrote:

Pursuant to our discussion today, please provide me with the following documents:

1. All e-mails from your personal e-mail account from 1/1/06 to 2/22/08 with other airport advisory board members, John Simmonds and/or Fred Hammett, with the following key words: Marriott, Golf, lease, and hanger/hangar (both spellings).

2. All e-mails in your personal e-mail account from 1/1/06 to 1/1/08 with John Simmonds, the city manager and/or airport manager, with the key words: Marriott, airport layout plan, VGA or marina.

Also, if you believe you have deleted any e-mails that may fall under this request, please indicate so.

You may forward these e-mails to me or print them out and provide hard copies to my office. Thank you so much for your assistance.

file://C:\Documents and Settings\lstelze\Local Settings\Temp\XPgrpwise\484151A8Venice-...  6/2/2008

# Exhibit U

## Linda Depew - Public Records Request

**From:** <SSB519@aol.com>
**To:** <ldepew@ci.venice.fl.us>
**Date:** 5/27/2008 5:12 PM
**Subject:** Public Records Request

Hi Linda:

I'll be out of town until Saturday, so I cannot comply with your request at this time. In checking my e-mail on AOL, the messages I've found in that time frame cannot be forwarded or restored due to the age. Was wondering if your IS department may know of a way to garner them without me having to print them for you.

Please give me a call on Monday at 650-3741 to discuss my options.

Thanks and have a great weekend.

Susan Balsinger
941-488-1542 (Home)
941-650-3741 (Cell)

---

Get trade secrets for amazing burgers. Watch "Cooking with Tyler Florence" on AOL Food.

# Exhibit V

le://C:\Documents and Settings\ldepew\Local Settings\Temp\XPgrpwise\483C40FCVeni...    5/28/2008

Ms. Rebecca R. Henry                                        September 2, 2008
Program Manager, Planning and Compliance
Federal Aviation Administration
Orlando Airports District Office
5950 Hazeltine National Drive, Rte 400
Orlando, FL 32822

Dear Ms. Henry:

Thank you very much for your prompt reply to my email. In order to expedite the possible mediation
of the issues, I am submitting only an outline of my complaint. The voluminous background
materials, documentation and witness statements can be supplied as needed and requested.

I am the Managing Member of Venice Jet Center, LLC, a Florida Limited Liability Company
("VJC"). On May 23, 2006 VJC and the City of Venice entered into a 25-year lease ("the Lease")
with a five-year renewal option. The lease covered three separate parcels totaling about 9.7 acres.
Two parcels contain buildings and hangars, while the third is completely vacant. At the time the lease
was executed, one 1-acre parcel contained an operating FBO building; another parcel of 6.1 acres
contained a building formerly used as an FBO, plus two old, unusable derelict hangar buildings and
approximately 2.5 acres of vacant land. The third separate vacant parcel contains 2.6 acres.

This complaint is divided into two Parts that I consider to be interrelated. The First Part is:

**IRREPARABLE INJURY TO VJC CAUSED BY THE CITY OF VENICE DUE TO
FAILURE OF THE CITY TO FOLLOW THE TERMS OF ITS LEASE WITH VJC, ITS
OWN MUNICIPAL CODE AND MINIMUM STANDARDS FOR THE AIRPORT, AND THE
FAA RESTRICTIONS AGAINST DISCRIMINATION, EXCLUSIVITY AND UNFAIR
COMPETITION**

The lease required VJC to pay land rent for the entire acreage, demolish and rebuild the two old
hangar buildings, and refurbish the existing FBO building. VJC accomplished this within 18 months,
and has conformed to all provisions of the lease to date. The first paragraph of the lease states that the
purpose is for conducting business as a fixed base operator. The use clause contains language that
authorizes and permits use for any commercial aeronautical activity permitted in the Minimum
Standards, a document that was incorporated into the lease itself. There is no stated language
anywhere requiring that the City Council must give permission or approve a right of construction on
any of the parcels.

One of the primary businesses conducted by VJC is Category "D" in the Minimum Standards,
"Aviation Fuel Sales and Related Services". Paragraph "A" in that Category specifies that the
Operator must supply "storage and parking and area for utility and support facilities..." At the
present time, the need for storage of aircraft has grown to the extent that some aircraft are stored by
other operators in areas not designed or suited for indoor storage. VJC has had numerous inquiries
and requests for indoor storage facilities. No one can remember when a new community hangar was
available, or when such a hangar was ever built, with the possible exception of the ones VJC was
required to tear down and rebuild. The new hangars that VJC constructed on the site were filled on

completion about a year ago. Minimum Standards Section 3A states, "It is the intention of the City of Venice to offer the maximum variety of aviation related services in order to maximize the choice of service providers to the public using the airport".

Section 5 of the Minimum Standards states, "Any proposed construction or facilities developed by the Operator will be subject to the approval of the Venice Municipal Airport and the City of Venice....All such services and improvements shall be constructed in full compliance with the City of Venice, Venice Municipal Airport and FAA standards as well as associated applicable codes". Clearly this is a standard "boiler plate" provision that pertains to the City's various departments having jurisdiction over construction, and in no way implies the right of the City Council to block any construction whatsoever on the vacant parcels in the lease.

VJC made application to the City departments in May of this year, to construct four hangar buildings on the 2.5+ acres of vacant land contained within the 6.1-acre parcel. By June of this year, the various departments had reviewed the site plan and found no flaws in it. VJC was ready to proceed to final building plans, when the City Manager stated that the City Council must review a "concept plan" prior to further processing. Accordingly. VJC attempted to find a place on the Council agenda twice, and the third time was given ten minutes to make a presentation, on August 26, 2008.

At the August 26th meeting VJC and its architect and engineer made a presentation of the site plan, but stressed that it was not asking for approval to build, but only for approval of the site plan so that City staff and Manager could proceed with processing of the building permits. The exchanges that followed indicated clearly that the majority voting bloc and its primary spokesperson, Suzanne Lang, considered that they had the power to say yes or no to the project. Ms. Lang even suggested that the price of approval would be a renegotiation of the lease. No vote was taken and the meeting ended on that note, with the Council failing to review or discuss the details of the site plan at all.

Pursuant to Florida law, the Municipal Code of Venice, Sec. 14-51, provides, "Responsibility for operation. The city manager is hereby designated as the officer responsible for the construction, improvement, maintenance, equipment, operation and regulation of all activities on Venice Municipal Airport properties". This ordinance is being violated because the Acting City Manager states that she has been directed not to process the building application any further without the consent of the City Council. When Council members were questioned at the meeting as to what law or authority gives them the power to abrogate a legally binding lease that was approved by a previous Council, no coherent answer was forthcoming from them. The Municipal Code obviously anticipates that the professionals on City staff, not the City Council, have the expertise to review and approve site plans.

Our complaint begins with this violation of law by the four-member majority voting bloc of the Council for an obviously biased and improper motivation. We rely on the entire history of deed and grant assurances, copies of which most likely can be found in your offices. Beginning with the deeds from the federal government dated June 10, 1947 and July 8, 1948 and covenants therein, all the way through and including the assurances given in connection with the most recent grant, for the rehab of runway 13-31, the City as sponsor must "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities..." (Assurances, Airport Sponsors, C 22a) The lease also specifically allows for construction

and improvements by the Lessee without discrimination. The City is discriminating against VJC in that

1. It failed to follow the Municipal Code provision that required only the City Manager and staff to review and approve the site plan, rather than the Council;
2. It unlawfully and with discrimination directed the City Manager to refuse an application for a building permit unless Council gives its permission;
3. It required VJC to be subjected to an approval vote of the Council for construction that is already permitted and authorized in its lease, a requirement that has never been made as to any other lessee before; and
4. It failed to follow the stated intention in Paragraph 3A of the Minimum Standards to maximize the choice of services and service providers by disallowing the construction of box hangars while the City is exclusively building, providing and renting T-hangars.
5.. The motivation behind these Council acts is the desire to constrict development of the airport, particularly for a class of aircraft, namely jets and turboprops, which constitutes discrimination against a distinct class of aircraft

The lease and Sponsor Grant Assurances (C23) both provide that no exclusive right to provide a given class of services will be granted. Fair competition is mandated. The City has 144 T-hangars for small aircraft and is in the process of building more. VJC also provides hangar service for small aircraft, and so is in competition with the City, but it intends to increase its business of providing hangar service for medium-sized aircraft. The four-member voting bloc has made no secret of its intention not to allow hangars that can be used for medium-sized aircraft. Three of the four were elected to the council last November, running on a platform of restricting airport development and returning it to a time when there were no jets and turboprops there. By requiring that VJC first obtain its consent to construct hangars that are a permitted use in the lease, the voting bloc is violating the ban on exclusivity and unfair competition. These strictures apply equally to both lessor and lessee. [FAA Order 5190.6A].

FAA guidelines for leasing provide that the sponsor is obligated to see that the airport is operated "safely and efficiently." Venice City Council has violated this obligation by blocking VJC's application for hangar construction that will promote safety by eliminating the need for aircraft storage in places where it is not suitable. Such construction will also add to the airport's ability to operate efficiently by increasing revenue stream, e.g. by increased fuel flowage fees and other income from newly generated business. The vacant land in the lease constitutes more than 50% of the entire land area leased. VJC would not have entered into a lease in which so much land area is useless and the FBO could not meet its obligation to supply future demand for hangar space. All of VJC's investment in the airport construction to date was made in reliance on its right to continue construction on the vacant land unimpeded by the whims of local politics and politicians.

The absurdity of the voting bloc's position can be seen if one considers that if they should continue to veto development of this land area, VJC would be obligated to pay the City, over a 30-year period, a total of almost $5 million, without receiving anything of value in exchange. (This is the sum total of the pro-rated rent for the unusable land, taking into consideration CPI increases at 3% per annum, plus sales taxes). In addition, VJC would lose the gross revenue for 11 hangars over the same time period, a sum that would add up to hundreds of millions of dollars.

VJC believes that Part 2 of this complaint is inextricably bound to Part 1 for obvious reasons.

**THE FOUR-MEMBER VOTING BLOC OF COUNCIL MEMBERS HAS IRREPARABLY INJURED ALL OF THE LESSEES AT KVNC BY BLOCKING APPROVAL OF AN MPU**

All of the airport tenants including ourselves are aware of the harm, injury and injustice that will result to themselves and the entire City if the Council continues to stonewall the requirement to file an approved MPU that meets FAA standards. Council has already turned back critical funding requests that would keep KVNC safe, viable and an important part of the National Transportation system. These actions are politically motivated, in order to placate a very small group of residents that live near runway 13-31. Sponsor Grant Assurances 21, "Compatible Land Use" provides, "[Sponsor] will take appropriate action, to the extent possible, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with airport operations, including landing and takeoff of aircraft."

It is too late for zoning, but all of the immediate area residents should have been aware of the federal government's prior rights concerning aircraft fly-over and noise through deed covenants and restrictions and old filed maps that clearly set forth such prior rights. Instead of accepting their obligation to educate their neighbors about this, our four voting bloc Council members chose to make a gigantic political issue about it, and block the completion of an MPU that will be acceptable to the FAA. We have shown above how the voting bloc has quietly taken over all administrative duties of the City Manager regarding the airport, and is therefore in complete control of the airport without any check or balance. We submit that if this continues, an emergency exists that will destroy the very existence of the Venice Municipal Airport.

The current net result is a crumbling, unsafe runway, namely 4-22, without a future (Council member Lang has suggested that the airport tenants pay for its rehabilitation), and a confrontation with FAA and FDOT that cannot be won by the City of Venice and will be very costly to its taxpayers. As an aside, and for your information, after almost everyone including the newspaper reporter left the 8/26 council meeting, the Mayor made a motion to transmit the MEA/Hanson proposed MPU to your office without the Council's approval, and without asking for the FAA's approval. The Mayor is hopeful that the Council will find a consultant that will revise it to the Council's specifications, with or without MEA/Hanson's permission. If you examine the RFQ issued for such a consultant, you will see that the Scope of Services requires the "independent consultant" to develop a "modified or rewritten Airport Master Plan Update (AMPU) which will reflect the runway safety areas, runway protection zones and runway object free areas *entirely on the airfield.*" (emphasis supplied). It looks to us as if this will not be acceptable to the FAA, and will wind up as a waste of time and money.

I will appreciate your advice as to how to proceed from here, with any supporting documentation or witness statements you may wish. Thank you for your kind attention,

Art Nadel, Managing Member
Venice Jet Center, LLC
400 Airport Avenue
Venice, FL 34284

**HALL & ANDERSON, P. A.**
ATTORNEYS AT LAW

1314 EAST VENICE AVENUE
SUITE E
VENICE, FLORIDA 34285

ROBERT C. ANDERSON
WAYNE C. HALL*

Telephone: (941) 480-0999
Facsimile: (941) 480-1446
Website: www.lawyers.com/ha-law
E-mail: whall@hall-anderson.com
randerson@hall-anderson.com

*Board Certified Wills, Trusts,
and Estates Lawyer

September 15, 2008

Ms. Rebecca R. Henry
Program Manager
Planning and Compliance
U. S. Department of Transportation
Federal Aviation Administration
Orlando Airports District Office
5950 Hazeltine National Drive
Suite 400
Orlando, Florida 32822-5024

Re:    Venice Municipal Airport, Venice, Florida
        Informal Complaint
        Airport Access

Dear Ms. Henry:

On September 3, 2008 you advised the Venice Municipal Airport that the FAA had received an informal complaint regarding airport access. The complaint was filed by Venice Jet Center, LLC. The Jet Center is a lessee at the Venice Municipal Airport and your correspondence requested a response to the complaint.

In September, 1995, and in March, 1999, Triple Diamond Enterprises, LLC entered into leases with the City of Venice in order to conduct business as a fixed base operator at the Venice Municipal Airport. In 2006 Venice Jet Center, LLC acquired the two Triple Diamond leaseholds and then negotiated with the City for a new lease to consolidate and replace the 1995 and 1999 Triple Diamond leases. The City of Venice and Venice Jet Center, LLC entered into such a lease on May 23, 2006.

The Jet Center business plan for the leasehold included the demolition of two hangars, the construction of a hangar and the application of a new exterior finish to one building. Consistent with established policy, the Jet Center requested the City's approval of these construction activities. Section 45 of the May 23, 2006 lease specifically authorizes these improvements subject to the City's prior written approval of the plans and specifications. A copy of this section of the lease is attached.

Venice Jet Center, LLC has revised its business plan and now wishes to construct additional hangar space on its leasehold. Contrary to established policy and the parties' past practice, the Jet Center refuses to seek the City Council's approval for the construction of additional leasehold improvements. The City of Venice has not denied the Jet Center's request to construct additional hangar space because no such request has ever been presented.

As the owner and operator of the Venice Municipal Airport, the City has an obligation to ensure that all airport activities are conducted in accordance with all applicable laws, rules and regulations. Any request submitted by Venice Jet Center, LLC for approval to construct leasehold improvements shall be considered in accordance with the lease, the minimum standards, all applicable federal, state and local laws and the needs of the airport.

Should you require any additional information concerning this matter, please do not hesitate to contact me.

Sincerely,

Robert C. Anderson
City Attorney

RCA/dlc

Attachment

cc:    Venice City Council
       Lori Stelzer, City Clerk
       Nancy Woodley, Acting City Manager
       Fred Watts, Airport Manager

## 45. DEMOLITION AND CONSTRUCTION OF IMPROVEMENTS

On or before May 31, 2011 the lessee shall, at lessee's sole expense, demolish the two aircraft hangars currently located on the premises; design, permit and construct an aircraft hangar consisting of at least 10,000 square feet; and apply a new Northern Mediterranean exterior finish to the administration building currently located on the premises.

The plans and specifications for these improvements shall be submitted to the lessor for lessor's approval and permitting and construction shall not commence until the lessee obtains written approval of the plans and specifications from the lessor.

LESSOR

CITY OF VENICE, FLORIDA

BY: _____

FRED HARRMETT , MAYOR

ATTEST:

_____

LORI STELZER, City Clerk

Approved By City Council

Date: 5-23-2006

LESSEE

VENICE JET CENTER, LLC

BY: _____

ARTHUR NADEL, MEMBER

25



U.S. Department
of Transportation

**Federal Aviation**
**Administration**

Orlando Airports District Office
5950 Hazeltine National Dr., Suite 400
Orlando, FL 32822-5024

Phone: 407-812-6331

December 4, 2008

Dr. Nancy K. Woodley, P.E., Ph. D.
Interim Manager, City of Venice
401 W. Venice Avenue
Venice, Florida 34285

Dear Dr. Woodley,

       RE:    Venice Municipal Airport (VNC), Venice Florida
                Informal Complaint
                Airport Access

On September 2, 2008, the Federal Aviation Administration (FAA) received an informal Part 13 complaint regarding airport access, filed by Art Nadel of the Venice Jet Center. This complaint was forwarded to Venice Municipal Airport Manager Fred Watts on September 3, 2008. The FAA requested the City respond to the Complainant's allegations that the City of Venice was prohibiting them from developing additional aircraft storage areas in accordance with their existing lease.

On October 7, 2008, the City of Venice responded to the FAA stating, in part, that the Venice Jet Center had never formally requested the City's approval for construction of additional leasehold. On November 10, 2008, the Complainant rebutted, stating they had requested approval in the past. They also stated they requested such approval again through written correspondence on October 23, 2008.

Additional information supplied by the Complainant on November 10, 2008, November 20, 2008, and December 2, 2008 stated that, to date, their application to expand at the Venice Municipal Airport has not been included on the City Council agenda for approval, and they are being unnecessarily delayed.

The FAA agrees that the City of Venice appears to be unnecessarily delaying the expansion of the Venice Jet Center. The FAA believes the airport sponsor's primary concern in the development of airport properties should be meeting aeronautical demand (*see FAA Director's Determination Docket No. 16-00-14, United States Construction v. City of Pompano Beach. FL. p. 18*). These delays created by the City appear to be restricting aeronautical access to the Airport, which is inconsistent with federal grant assurances and the Surplus Property Deed restrictions.

In order to prevent further compliance investigation or potential Part 16 Formal Complaints, the FAA strongly advises the City of Venice to include the Venice Jet Center's request for expansion on the January 13, 2009 City Council agenda, and to allow the Jet Center to develop the proposed aircraft storage areas.

This is a preliminary Agency finding. If you have any questions, please feel free to contact me at (407) 812-6331, ext. 122.


Sincerely,

Original Signed By

Rebecca R. Henry
Planning Specialist

Cc:        Fred Watts, Manager, Venice Municipal Airport
           Jeff Leopold, FDOT/1
           Art Nadel, Venice Jet Center

**FROM THE OFFICE OF**
**THE CITY ATTORNEY**

**MEMORANDUM**

TO:        THE VENICE CITY COUNCIL

FROM:    ROBERT C. ANDERSON, City Attorney

DATE:    DECEMBER 29, 2008

RE:        VENICE JET CENTER, LLC

---

Venice Jet Center, LLC is a fixed base operator operating at the Venice Municipal Airport pursuant to a long term lease with the City of Venice. The Jet Center wishes to construct four 8,000 square foot hangars on vacant land located within its leasehold.

I was asked to obtain a legal opinion as to whether applicable federal statutes, grant assurances and related federal guidance and administrative case law restrict the City's ability to deny the Jet Center's request to construct additional hangar space on its leasehold. I engaged Thomas R. Devine and Kaplan Kirsch & Rockwell LLP to research this matter and render the requested legal opinion.

Tom Devine, Kaplan Kirsch & Rockwell and I are all of the opinion that based upon applicable federal statutes, grant assurances and related federal guidance and administrative case law, that the City of Venice would run a significant risk of being found in violation of its grant assurances if it denied the Jet Center's request to construct additional hangar space on its leasehold. A copy of the legal opinion prepared by Thomas R. Devine and Kaplan Kirsch & Rockwell LLP is attached.

Should you have any questions concerning this matter, please do not hesitate to contact me.

RCA/dlc

Attachment

cc:    Nancy Woodley, Interim City Manager (w/attachment)
        Lori Stelzer, City Clerk (w/attachment)
        Fred Watts, Airport Manager (w/attachment)



KAPLAN KIRSCH ROCKWELL

# MEMORANDUM

### PRIVILEGED AND CONFIDENTIAL
### ATTORNEY–CLIENT COMMUNICATION
### IN CONTEMPLATION OF POTENTIAL LITIGATION

**TO:**       Robert C. Anderson

**FROM:**   Kaplan Kirsch & Rockwell

**DATE:**   December 23, 2008

**SUBJECT:** Venice Jet Center

## INTRODUCTION

The purpose of this memorandum is to provide advice as to whether the City of Venice has legal authority to deny Venice Jet Center's ("Jet Center's") request to construct four 8000 square foot hangars on vacant land located within its leasehold at the Venice Municipal Airport.

Per your instructions, our memorandum does not address potential prohibitions or limitations on Jet Center's ability to construct the hangars due to applicable lease provisions, minimum standards, or building and zoning regulations. [1] We understand that, as the City Attorney, you have been directly involved in the drafting and interpretation of these local requirements, and you will analyze and address those issues yourself.

---

[1] There is a federal component to the analysis of these issues. As the cases cited in this memorandum demonstrate, the imposition of terms and conditions that FAA deems to be unreasonable can form the basis of an adverse FAA determination, even if those terms and conditions were, for instance, imposed by lease or minimum standards. FAA has stated that it "encourages airport management, as a matter of prudence, to establish minimum standards to be met by all who would engage in a commercial aeronautical activity at the airport. It is the prerogative of the airport owner to impose conditions on users of the airport to ensure its safe and efficient operation. Such conditions must be fair, equal, and not unjustly discriminatory. They must be relevant the proposed activity, reasonably attainable, and uniformly applied. [See FAA Order 5190.6A, Airport Compliance Requirements, Sec. 3-12]." *Skydance Helicopters Inc. v. Sedona-Oak Creek Airport Authority (operator) and Yavapai County, AZ (owner and sponsor)*, FAA Docket No. 16-02-02 (March 7, 2003), 2003 WL 1524500 (F.A.A.) at *17.

"The FAA ordinarily makes an official determination regarding the relevance and/or reasonableness of the minimum standards only when the effect of a standard denies access to a public-use airport. If such a determination is requested, it is limited to a judgment as to whether failure to meet the qualifications of the standards is a reasonable basis for such denial or whether the standard results in an attempt to create an exclusive right. [See Order, Sec. 3-17(b).]" *Id. See also Robert Kihlstrom v. Port of Orcas, Washington State*, FAA Docket No. 16-02-07 (Sept. 1, 2004), 2004 WL 3198206 (F.A.A.) at *21.

Attorneys at law        Kaplan, Kirsch & Rockwell LLP    tel  (303) 825-7000
Denver   •  New York   •  Washington, DC    1675 Broadway Suite 1900    fax  (303) 825-7005
                         Denver, CO 80202    www.kaplankirsch.com

December 23, 2008
Page 2 of 14

## Short Answer

Based on applicable federal statutes, grant assurances, and related federal guidance and administrative case law, we believe that the City would run a significant risk of being found in violation of its grant assurances if it denied Jet Center's request. Such a finding would put the City in jeopardy of losing future federal Airport Improvement Program (AIP) grants and having current grant fund payments suspended by the FAA.

FAA's formal administrative complaint regulations require a complaining party to attempt informal resolution with the airport sponsor prior to filing a complaint. 14 CFR 16.21; *Jim Martyn v. Port of Anacortes, Washington*, F.A.A. Docket No. 16-02-03 (April 14, 2003), 2003 WL 21002099 (F.A.A.) at *30. However, after dismissing some early Part 16 complaints for failure to attempt informal resolution, FAA has become much more generous to complainants in determining whether they have fulfilled the requirement to attempt informal resolution. Nonetheless, the City should have some warning that a Part 16 complaint is coming and have the opportunity to try to resolve the matter informally before facing a formal administrative complaint.

In investigating allegations of grant assurance violations, FAA is concerned with the airport sponsor's current compliance or lack of compliance. *Richard E. Steere v. County of San Diego*, FAA Docket No. 16-99-15 (Dec. 7, 2004), 2004 WL 3198209 (F.A.A.) at *9, *16, *21, *22. Thus, even if an airport sponsor has, in the past, violated a grant assurance, as long as it has corrected it by the time FAA makes its determination, the airport will not be found in violation. *Id.* at *9, *16, citing *Wilson Air Center LLC v. FAA*, 372 F.3d 807 (6th Cir. 2004) (action by the airport to cure any violation of federal obligations is grounds for dismissal of the case against the airport). *See also Martyn*, 2003 WL 21002099 at *33.

As a practical matter, withholding of such grant funds for up to six months would not occur before the Director of the Office of Airport Compliance and Field Operations issues a Director's Determination in an administrative proceeding against the City.[2] In the event of an adverse Director's Determination, the City would be given an opportunity to come into compliance with its grant assurance obligations, which would result in FAA rescinding any such penalty.

Generally an airport sponsor is required to submit a corrective action plan within 30 days of an adverse Director's Determination showing how it intends to eliminate any violations found by the Director. *See, e.g., Skydance* at * 31. However, FAA may order the corrective action plan to be submitted sooner. *See Martyn* at *35 (Corrective action plan must be submitted within 20 days of Director's Determination.) Moreover, AIP funds cannot be withheld for more than six months unless an airport sponsor has been

---

[2] "Pending FAA approval of the corrective action plan specified in Ordering paragraph No. 1, or until further notice, pursuant to 49 U.S. C. Sec. 47106(d) the FAA will withhold approval of any applications submitted by the Respondent . . . for amounts apportioned under 49 U.S.C. Sec 47114(c) and (d), and/or authorized under 49 U.S.C. Sec. 47115." *Martyn* at *35.

December 23, 2008
Page 3 of 14

afforded the opportunity for a hearing.[3] In either event, the airport sponsor can appeal to
the Associate Administrator for Airports. Thus, even if the City denied Venice Jet
Center's request, it would have ample opportunity to reverse itself before the FAA could
impose sanctions against it. However, the Part 16 process itself can be very expensive,
and the City may not want to engage in actions that could subject itself to such a
proceeding if the likelihood of success is not great.

The City should also consider the implications beyond formal FAA enforcement action of
denying aeronautical development when the FAA would likely consider this be a
violation of the City's AIP grant assurances. For instance, discretionary actions by the
FAA, including the award of discretionary AIP grants by the FAA, could be delayed or
simply not taken.

## ANALYSIS

### A.     General Rule: Federally-assisted airports must permit development of airport space for aeronautical uses

49 U.S.C. §47107 *et seq.* provides statutory authority for the content of airport grant
assurances, requirements to which an airport sponsor receiving federal financial
assistance must agree.[4]  47 U.S.C. § 47111 and 49 C.F.R. Part 16 provide for
enforcement of the assurances. The statutes and the assurances contain language
emphasizing the priority placed by Congress and the FAA on maximizing public,
aeronautical uses of federally-assisted airports. Grant Assurances Nos. 22 and 23, which
prohibit unjust economic discrimination and the granting of exclusive rights, respectively,
constrain the City's rights with respect to restricting or prohibiting Jet Center's proposed
hangars.

Grant Assurance No. 22, *Economic Nondiscrimination*, deals with both the
reasonableness of airport access and the prohibition against adopting unjustly
discriminatory conditions in order to limit access. It implements the provisions of 49
U.S.C. § 47107(a)(1) through (6), and requires the airport sponsor to "make the airport
available for public use on reasonable terms and without unjust discrimination to all
types, kinds and classes of aeronautical activities, including commercial aeronautical
activities offering services to the public at the airport."

---

[3] "Withholding payments. (1) The Secretary may withhold a payment under a grant agreement under this
subchapter for more than 180 days after the payment is due only if the Secretary (A) notifies the sponsor
and provides and opportunity for a hearing; and (B) finds that the sponsor has violated the agreement". 49
U.S.C. § 47111(d)(1)

[4] "The Secretary of Transportation may approve a project grant application under this subchapter for an
airport development project only if the Secretary receives written assurances, satisfactory to the Secretary,
that ..." 49 U.S.C. § 47107(a).

December 23, 2008
Page 4 of 14

Grant Assurance No. 23, *"Exclusive Rights,"* implements the provisions of 47107(a)(4).[5]
It requires that an airport "permit no exclusive right for the use of the airport by any
persons providing, or intending to provide, aeronautical services to the public," and that
the airport "will not, either directly or indirectly, grant or permit any person, firm, or
corporation, the exclusive right at the airport to conduct any aeronautical activities."

Guidance on the grant assurances is contained in FAA's Airport Compliance
Requirements, FAA Order 5190.6A ("Compliance Handbook"). This is not a regulatory
document (i.e., it is not legally binding on airports), but rather provides guidance for FAA
officials in administering grant assurance compliance. *See Sun's Inc. v. Port of Seattle*,
FAA Docket No. 16-06-13 at 10 (Nov. 14, 2008), *Steere* at \*9. *See also Skydance* at \*19.
("The Order analyzes the various obligations set forth in the standard airport sponsor
assurances, addresses the nature of those assurances, addresses the application of those
assurances in the operation of public-use airports, and facilitates interpretation of the
assurances by FAA personnel."). It is relied upon by FAA in making determinations in a
Part 16 proceeding, and it is also cited in court opinions reviewing FAA decisions.

### 1. Prohibition Against Unjust Discrimination

Chapter 4, Section 4 of the Compliance Handbook ("Availability on Fair and Reasonable
Terms") provides guidance on Grant Assurance No. 22, instructing that the owner of a
federally-assisted airport must operate the airport "for the use and benefit of the public,"
and make it available "to all types, kinds, and classes of aeronautical activity on fair and
reasonable terms and without unjust discrimination." Compliance Handbook at
Paragraph 4-13. A fundamental principle is "the obligation to treat in a uniform manner
those making the same or similar use of the airport." *Steere* at \*11, citing Handbook
Para. 4-14(a)(2) and 3-1.

Paragraph 4-15 covers availability and use of leased space:

> The prime obligation of the owner of a federally-assisted airport is to operate it
> for the use and benefit of the public. ... While the owner is not required to
> construct hangars and terminal facilities, it has the obligation to make available
> suitable areas or space on reasonable terms to those who are willing and otherwise
> qualified to offer flight services to the public ... or support services to aircraft
> operators. This means that unless it undertakes to provide these services itself,
> the airport owner has a duty to negotiate in good faith for the lease of such
> premises as may be available for the conduct of aeronautical activities.[6]

---

[5] Although FAA has, on occasion, stated that Assurance 23 also implements the provisions of 49 U.S.C. §
40103(e), this is a stand-alone provision that is not tied to the receipt of federal funds.
[6] See also *Martyn* at \*17, \*22, citing Para. 4-15.

Thus, even if an aeronautical service provider does not yet lease land at an airport, the grant assurances generally require an airport to negotiate for the lease of such land as is necessary for the provision of aeronautical services the prospective tenant seeks to engage in. In the present case, Jet Center already leases the necessary land.

The Compliance Handbook further provides that:

> If adequate space is available on the airport, and if the airport owner is not providing the service, it is obligated to negotiate on reasonable terms for the lease of space needed by those activities offering flight services to the public, or support services to other flight operators, to the extent that there may be a public need for such services. A willingness by the tenant to lease the space and invest in the facilities required by reasonable standards shall be construed as establishing the need of the public for the services proposed to be offered.

Order 5190.6A, Paragraph 4-15(c)

The FAA has reinforced the interpretations contained in the Compliance Handbook in its Part 16 determinations. It has made clear that an airport sponsor's prime obligation is to operate the airport for aeronautical use, including "the opportunity for leaseholders to develop airport property for aeronautical use." *United States Construction Corporation v. City of Pompano Beach, Fla.*, FAA Docket No. 16-00-14, 2002 WL 1821882 (F.A.A.) (July 10, 2002) at *18, explaining Compliance Handbook Para. 4-15.[7]  Specifically, "unless the airport undertakes to provide these services itself, the airport owner has a duty to negotiate in good faith for the lease of such premises as may be available for the conduct of aeronautical activities." *Robert Kihlstrom v. Port of Orcas, Washington State*, FAA Docket No. 16-02-07 (Sept. 1, 2004), 2004 WL 3198206 (F.A.A.) at *15 (citing to and discussing FAA Order 5190.6A, paragraph 4-15).[8]

These general rules have been applied specifically to requests from current or prospective leaseholders to construct hangars. In *Pompano*, the FAA stated that "Pursuing lease terms that limit the airport's aeronautical utility by restricting development is inconsistent with the City's Federal obligations" *Id.* There, the complainant had requested a

---

[7] *Pompano* was decided under Surplus Property Act obligations that parallel the grant assurance prohibitions against unjust discrimination and exclusive rights. The FAA cited to, and explained, Compliance Handbook Paragraph 4-15, concerning unjust discrimination, in reaching its decision in *Pompano*.

[8]  The FAA rejected the airport sponsor's assertion that its action was not subject to the grant assurances because it "involves a ground lease of land to private individuals for the development of aircraft hangars to be used by private individuals for their personal aircraft." Id. at *11. Instead, FAA found that "The leasing of airport land acquired with Federal assistance for the purpose of developing aircraft storage facilities is an aeronautical activity subject to reasonable access requirements." *Id.* Thus, subject to the hangar-specific grant assurance discussed in Section C, below, the analysis of the general prohibitions against unjust discrimination and exclusive rights is same whether the Jet Center proposal involves constructing hangars for housing its own aircraft or aircraft owned by others.

December 23, 2008
Page 6 of 14

leasehold on which to build hangars. The city, however, was only willing to issue a 10-year lease, rather than the 30-year lease the complainant sought, and insisted on a two-year cancellation clause as well. *Id.* at *11. The FAA held that the city's proposed terms effectively restricted development at the airport. *Id.* at *18. The FAA cited the city's own development plan, which contemplated hangar development, and the Compliance Handbook provisions setting forth the airport sponsor's obligation to allow for the provision of aeronautical services in paragraph 4-15(c). *Id.* at *22. The FAA held that it was "unreasonable for the airport operator to be 'hesitant' to develop this Federally-obligated facility for aeronautical purposes . . .". *Id.* at *18. The FAA was also troubled by its perception that the city had "a past and ongoing pattern of inhibiting aeronautical development at the Airport" (*Id.* at *22) and sought to protect "the City's ability to close the Airport at reduced cost . . .". *Id.* at *18.

Similarly, the FAA held that the Port of Anacortes, Washington, could not deny a request to build a hangar on Airport property that was identified on the Airport Layout Plan as a future hangar area. *Martyn* at *7. There, complainant proposed to lease land at the airport on which to build office space and hangar space. The Port, however, had been engaged in litigation with the city over the zoning of the parcel Martyn proposed to develop, and both the Port and the City had agreed to engage in planning updates for the Airport, including design standards to mitigate potential impacts of the new hangars to Airport neighbors. *Id.* at *6. As a result of these plans, the Port decided to issue an RFP for hangar construction, rather than accepting Martyn's proposal.

Martyn alleged that the denial of his proposal violated the Port's grant assurances, and that the Port was actively taking steps to deny "any type of aeronautical development on the Airport, in spite of a proven need for aircraft hangar storage." *Id.* at *18. The FAA rejected the Port's claim that the denial was "reasonable," in part because hangar space had been needed for over ten years, and the Port had not taken steps to provide it: "The owner of an airport, in this case, the Port, is not required to construct hangars. However, it does have the obligation to make suitable areas or space available on reasonable terms to those who are willing and otherwise qualified to offer the needed services." *Id.*

In addition, the FAA observed that the Port's response to the Complaint was "disingenuous," as "the record evidence shows that the Commissioners' decision was more likely driven by a strong desire to limit growth of the Airport." *Id.* at *23. The FAA specifically cited the fact that the existing Airport Layout Plan (ALP), mandated by statute (49 U.S.C. § 47107(16)) and a separate grant assurance (Grant Assurance #29, "Airport Layout Plan"),[9] depicted hangar construction in the area of the proposal, as evidence that the Port's denial of Martyn's proposal was motivated by an improper desire to prevent airport growth.

---

[9] FAA describes an ALP as "an FAA-approved document depicting the *current* and *planned future* use of Airport property, including designations for aeronautical versus non-aeronautical uses of the property." *Martyn* at *27 (emphasis in original).

Likewise, the FAA found that San Diego County had violated Assurance No. 22 when it refused to lease land designated for aeronautical use to a potential leaseholder proposing to construct hangars on the property. *Steere* at *7, 16 ("Mr. Steere contends that the County failed to make the Airport available for public use on reasonable terms and without unjust discrimination by repeatedly and consistently denying him permission to lease designated aeronautical-use property for the purpose of constructing aircraft storage hangars on the Airport. ... Mr. Steere is correct in noting that [these facts] placed the Airport in violation of its grant assurances ...").[10] Thus, Jet Center is likely to be empowered, under the grant assurances, to build hangars on its leasehold even if the ALP simply designates the area for aeronautical use, and does not specifically reserve any portion of the leasehold for hangars. If the existing ALP depicted other, incompatible aeronautical uses on the parcel, this could preclude the construction of hangars, as discussed in Section B, below. Our understanding is that the ALP designates the area for unspecified aeronautical uses

FAA has gone so far as to say, essentially, that airport sponsors must lease land on terms that do not preclude the economic viability of the proposed aeronautical development. In *Skydance Helicopters*, FAA found that the County violated Grant Assurance 22 when it would not grant a lease on favorable terms to the complainant for the purpose of building a hangar and office and operating a helicopter tour business at the airport. Complainant sought a 30-year lease to develop its operation, but the County refused to issue a license for the business for longer than a 2-year period, and the license was revocable by the County for any reason. The FAA found that this denied reasonable use and access to a party seeking to invest in hangar construction, and moreover found that the county's action was not consistent with its obligation to promote and develop the airport for the use of the public.

However, this does not mean that an airport owner must provide the opportunity for development on terms dictated by the leaseholder. *Kihlstrom v. Port of Orcas* at *15. FAA grant assurances do not "require a sponsor to lease undeveloped airport land to an interested party under conditions defined by the interested party, including price." *Id.* In *Kihlstrom*, the FAA found the Port of Orcas did not violate its grant assurances when it rejected one proposal to lease land for hanger construction but accepted another proposal, submitted a year after the first one.[11] The FAA stated that the airport was obligated to negotiate in good faith for the lease of undeveloped land for aeronautical purposes, but noted that the airport is not required to accept a proposal on unfavorable terms.

The key to these cases is that the terms of the lease (e.g., lease length, limitless ability of the airport to cancel) cannot make it virtually impossible for the proposed aeronautical

---

[10] Note, although FAA found that San Diego County had previously violated the grant assurance, the County had corrected the violations by the time the Director's Determination was issued. Thus, Steere's complaint was dismissed by the Director and this decision was upheld by the Associate Administrator for Airports.

[11] The first proposal offered $12,000 a year in rent for a 50-year term; the second offered $16,600 a year in rent for a 35 to 40-year term. *Id.* at *16.

December 23, 2008
Page 8 of 14

development to be viable. However, there is no obligation to give parcels away on terms that disadvantage the airport economically.

In the present case, Jet Center has already entered into a lease with the City on mutually agreeable terms. Thus, the terms of the lease, aside from the ability to build hangars or not, is not at issue here. However, the ability of the leaseholder to make economically viable use of the land and the constraints on an airport sponsor's ability to preclude economic use of the leasehold are relevant to evaluating the City's options with respect to the Jet Center proposal. We understand that you are examining the lease to determine if there are specific prohibitions or restrictions on the type of hangar development Jet Center seeks to undertake.

The fact that the reported cases do not involve existing leaseholds does not mean that the cases are not instructive. Given that FAA has forced airport sponsors to negotiate in good faith to lease available land to entities interested in developing the land for aeronautical purposes, such as the construction and operation of hangars, FAA can be expected to be at least as aggressive in requiring the City to allow an existing tenant, Jet Center, to construct and operate hangars on a parcel it already leases from the City. The cited cases provide examples of the application of FAA's general policy toward maximizing the aeronautical use of federally-obligated airports in circumstances where the prospective hangar provider, arguably, is not in as strong a position as Jet Center, which already leases the parcel on which it intends to build hangars. The cases, thus, suggest that restrictions on an existing tenant's request to further develop facilities at the airport will be highly disfavored.

Our understanding is that the ALP for Venice Airport provides for general aeronautical development (though not specifically for hangar space) in Jet Center's leasehold area. The fact that Jet Center is not seeking to lease a new parcel of land on which to build hangars, but rather, merely seeks to build hangars on its existing leasehold, puts it in an even better position than a prospective lessee who needs to acquire the land. As noted above, the FAA guidance indicates that airport sponsors are obligated to negotiate in good faith to provide such land. Thus, Jet Center has a strong case for the basic proposition that, absent specific circumstances discussed in Section C, below, the City must allow it to use its existing leasehold for the aeronautical facilities it seeks to develop.

It is our understanding that other tenants at the Airport currently lease hangars to aircraft operators. Moreover, we understand that the City is closing a City maintenance facility at the airport, and a third party is seeking to lease it and construct hangars and office space. The fact that the City has allowed other tenants to build and lease out hangars would make the City vulnerable to charges of unjust discrimination if it denied Jet Center the right to build hangars. To avoid a finding of unjust discrimination, the City would have to articulate a reasonable distinction between the permitted hangars and the prohibited hangars. We have not been apprised of any such rationale by the City.

2. <u>Prohibition Against Granting Exclusive Rights</u>

We believe that a denial of Jet Center's request would also put the city at risk of violating Grant Assurance No. 23, which prohibits an airport from granting exclusive rights to any provider of aeronautical services.

In addition to the Compliance Handbook, the FAA's Advisory Circular 150/5190-6, *Exclusive Rights at Federally-Obligated Airports* (Jan. 4, 2007), also provides guidance on the prohibition against granting exclusive rights (contained in Assurance 23). The Advisory Circular notes that an unlawful grant of an exclusive right can take many forms, and occurs whenever the airport sponsor impermissibly denies someone the ability to offer an aeronautical service, regardless of whether the airport sponsor intended to grant an exclusive right ("Significant to understanding the exclusive rights policy is the recognition that it is the impact of the activity, and not necessarily the airport sponsor's intent, that constitutes an exclusive rights violation"). Advisory Circular 150/5190-6 at §1.2.

An exclusive rights violation does not necessarily involve granting a right solely to a single entity; it can also result from denial of the right to provide a service when one or more entities have been granted that right.[12] FAA, in fact, has found exclusive rights violations even when more than one entity is allowed to provide a type of aeronautical service, if a significant burden has been placed on one competitor that is not placed on another. *See e.g. Martyn* (finding violation of Grant Assurance 23 when Port Authority permitted another aeronautical user to lease space for the same purpose and under similar conditions to those requested by and denied to Complainant);[13] *Pompano Beach v. FAA*, 774 F2d 1529, 1532 (11th Cir, 1985) (city's conduct had the effect of granting incumbent lessees an exclusive right, when it refused to grant Complainant a lease with identical or materially similar terms).

---

[12] As defined in the Advisory Circular, an exclusive right is "a power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right can be conferred either by express agreement, by the imposition of unreasonable standards or requirements, or by any other means. Such a right *conferred on one or more parties, but excluding others from enjoying or exercising a similar right or rights,* would be an exclusive right. Advisory Circular 150/5190-6 at Appendix 1, Sec. 1.1(f) (emphasis added).

[13] "As stated earlier ... in order to sustain an exclusive rights violation, the FAA would have to find that the Respondent granted special rights or privileges to others making the same or similar use of the Airport while denying the same to the Complainant. Specifically, the FAA would have to find that the Port permitted others on the Airport to engage in activities that have been denied to the Complainant. . . .The official minutes from [a Port Commission] meeting indicate that the Port recognized it had already set a precedent with two other private hangars on the Airport leased under similar terms as those requested by Mr. Martyn." *Martyn* at *24-25. *See also id.* at 21 (the record reflects that "the Port has already permitted two other aeronautical users to build private hangars and lease ground space from the Port").

December 23, 2008
Page 10 of 14

FAA has taken the position that the application of "any unreasonable requirement or any
standard that is applied in an unjustly discriminatory manner may constitute the
constructive grant of an exclusive right." *41 North 73 West Inc. v. Westchester County,
New York*, FAA Docket No. 16-07-13 at *18 (June 12, 2008)[14]; *see also Skydance
Helicopters, Inc. v. Sedona Oak-Creek Airport Authority*, FAA Docket No. 16-02-02
(March 7, 2003) (providing long-term leases to one set of commercial operators
constructing hangars while denying the same to another commercial operator "results in
the constructive grant of an exclusive right to those operators given the preferential long-
term leases").

Therefore, to the extent that other entities have been permitted to build hangars at the
Airport, denial of the same right to Jet Center may be regarded as unjust discrimination
and either a direct or a constructive violation of Grant Assurance No. 23. *See Martyn* at
*35 ("The Respondent, by denying a lease to the Complainant, whose proposal was
essentially on the same terms as a lease already held by another aeronautical user, has
effectively granted an exclusive right to the other aeronautical leaseholder in violation of
49 U.S.C. Sec. 47107(a)(4) and 40103(e) and related Federal Grant Assurance No. 23,
*Exclusive Rights*.") The existence of other hangars provided by third parties, plus the
possible award of a new lease to another third party to build hangars on the old City
maintenance site, puts the City at considerable risk of being found in violation of the
prohibitions against unjust discrimination and against granting exclusive rights if it
denies Jet Center's request to build hangars on its existing leasehold.

B.    **Exceptions to the general rules:**

There are some exceptions to the general rules discussed above, but, based on the limited
facts presented to us, it does not appear that any of them apply to Venice Jet Center's
proposal.

*Safety and Efficiency Exception.* An airport operator can deny a prospective business
operator the right to engage in aeronautical activity at the airport for "safety and
efficiency reasons." Advisory Circular 150/5190-6 at § 1.3(a)(1). *See also* Assurance
22(i). "A denial based on safety must be based on evidence demonstrating that airport
safety will be compromised if the applicant is allowed to engage in the proposed
aeronautical activity." AC 150/5190-6 at § 1.3(a)(1). The City has not indicated that
there are any safety or efficiency issues at the site that would preclude hangars. Of
course, Jet Center will have to comply with any reasonable minimum standards the City
has in place concerning hangars,[15] along with any applicable building code and other

---

[14] The FAA found the complainant had not met this standard in the *Westchester* case, holding that the
airport sponsor had neither violated grant assurance 22 nor had constructively granted an exclusive right.
[15] As mentioned above, minimum standards must meet federal requirements. "It is the prerogative of the
airport owner to impose conditions on users of the airport to ensure its safe and efficient operation. Such
conditions must, however, be reasonable and not unjustly discriminatory. They must be relevant to the
proposed activity, reasonably attainable, and uniformly applied. [See FAA Order 5190.6A, Sec. 3-12].
[footnote continued on next page.]

December 23, 2008
Page 11 of 14

safety requirements. We understand that you are covering these issues in your own review and analysis.

*Proprietor's Exclusive Exception.* The airport owner may elect to provide an aeronautical activity itself, on an exclusive basis.[16] Advisory Circular 150/5190-6 at § 1.3(b)(1). *See also Martyn* at *21 citing Compliance handbook Para. 3-9(d). However, there are already other tenants with 25-year leases at the airport who provide hangar space to aircraft operators. Also, as noted above, we understand that the City is also in the process of negotiating with a third party for the lease of the decommissioned City maintenance facility, on which the prospective lessee would construct office space and hangars to be leased to aircraft operators. Thus, it does not appear that the City is in a position to be the sole provider of hangars at the airport using its own facilities and personnel. This is similar to the situation in *Martyn*:

> In this case, however, the Port may not be in a position to invoke a proprietary exclusive right to become the only provider of airport hangars. The administrative record reflects that the Port has already permitted two other aeronautical users to build private hangars and lease ground space from the Port. The record is not clear on whether either one of these tenants rents out space to any other aeronautical user."

*Martyn* at *21 (citation omitted).

Moreover, FAA has placed limits on the scope of the proprietor's exclusive exception, where the airport operator does not provide aeronautical facilities or services for which there is a demonstrated need.

> Even if the Port could invoke a proprietary exclusive right to reserve unto itself the right to construct and lease hangars, it could not limit or prevent construction of hangars by other aeronautical users if a need exists that is not being filled by the Port. Specifically, if adequate space is available on the Airport, and if the airport owner is not providing the service, the airport owner is obligated to negotiate on reasonable terms to lease space to those entities offering flight services to the public, or support services to

---

"The FAA ordinarily makes an official determination regarding the relevance and/or reasonableness of the minimum standards only when the effect of a standard denies an aeronautical activity access to a public-use airport. Such determinations often include consideration of whether failure to meet the qualifications of the standard is a reasonable basis for such denial and/or whether the application of the standard results in an attempt to create an exclusive right. [See FAA Order 5190.6A, Sec. 3-17(b).]" *Steere* at *13. *See also Kihlstrom* at *21 and FAA Advisory Circular No. 150/5190-7 "Minimum Standards for Commercial Aeronautical Activities," sections 1.1, 1.2(a).

[16] Note, however, that "if the airport sponsor opts to provide an aeronautical service exclusively, it must use its own employees and resources. Thus, an airport owner or sponsor cannot exercise a proprietary exclusive right through a management contract." AC 150/5190-6 § 1.3(b)(1) and Appendix 1, Sec. 1.1(k).

other flight operators, to the extent that there may be a public need for
such services.

*Id.* at *22.

Thus, to the extent that Jet Center seeks to provide needed aeronautical services or
facilities that the City is not providing, and will not provide, it is not clear that invoking
the proprietor's exclusive exception would empower the City to deny Jet Center the right
to construct the hangars.

*Designation for Other Aeronautical Use.* The airport sponsor may deny one proposed use
of vacant airport land if the land is designated for, and will be used for, a different
aeronautical use. *Hill Air Co. v. Broward County,* FAA Docket No. 13-93-7 (Jan. 31,
2006), 2006 WL 325373 (F.A.A.) at *31: "it is not unreasonable to impose land use
limitations on general aviation development in order to accommodate all classes of
aeronautical users at the Airport." Moreover, "the County as airport proprietor has the
right to determine how scarce airport land will be allocated among all classes of
aeronautical users and to consider changing aeronautical demand as one of the factors in
reallocating the use of airport land."

In *Hill,* the FAA held that the County did not violate Grant Assurance 22 when it limited
general aviation growth at the airport and consequently denied complainant the
opportunity to lease airport land for general aviation purposes. *Hill Air Co.* at *31. The
airport sponsor stated that the primary mission of the airport had changed in recent years
to emphasize air carrier and cargo service development over general aviation, resulting in
a portion of airport land dedicated to general aviation use being converted to airline and
air cargo use within the previous decade. *Id.* at *30. FAA thus found that "vacant land
allocated for general aviation use was not available at the Airport." *Id.* at *32.[17]

Thus, if the ALP already depicted some other aeronautical use, the City would have a
potential justification for refusing to allow development that conflicts with the use shown
on the ALP. Our understanding, however, is that the ALP for the Airport only provides
for general aeronautical use; hangar development is consistent with this ALP designation,
and the City could not justify requiring that the land be used for a different aeronautical
use. *See Steere.* Attempting to change the ALP after the request for hangar development
has been received would likely be perceived by FAA as a pretext for denying otherwise
allowable development. In *Martyn,* FAA was not persuaded by an airport rationale for its
actions that FAA viewed as disingenuous. Moreover, revisions to the ALP are subject to
FAA approval, so the agency makes the final decision on whether an ALP may be
amended.

---

[17] The airport sponsor however, asserted that it still supported general aviation at the airport, although it had
to prioritize land use for air carrier or cargo use, and that many general aviation functions could be
accommodated at other general aviation reliever airports, including a specific airport owned by the sponsor.
*Id.* at *30.

December 23, 2008
Page 14 of 14

*Medberry v. Crosby*, 351 F.3d 1049, 1060 (11th Cir. 2003). The introductory language of Grant Assurance #38 has not yet been interpreted by the FAA, however.

Moreover, the hangar-specific statutory/grant assurance provisions may provide broader discretion than the airport sponsor may have under Assurances 22 and 23 to impose terms and conditions on the construction of the hangars, through the language "subject to such terms and conditions on the hangar as the airport owner or operator may impose." However, the FAA has not provided guidance on this language or issued a decision interpreting it in a Part 16 proceeding.

In any event, Assurance 38 would not control over the general requirement to allow a tenant to provide hangars for aircraft *not* owned by the tenant, since Assurance 38 does not relate to the provision of such hangars. Thus, the City should determine the extent to which Jet Center seeks to lease out hangars to third parties, rather than housing its own aircraft in the hangars.

## CONCLUSION

In our opinion, the applicable federal statutes, grant assurances, guidance, and cases, as discussed above, circumscribe the City's ability to deny Jet Center's request to construct hangars on its existing leasehold. The FAA opposes denial of a tenant or prospective tenant's ability to provide aeronautical services on airport land designated as available for aeronautical uses, as is Jet Center's leasehold, unless the airport has already designated a different, incompatible aeronautical use for the parcel. Here, the ALP simply provides for aeronautical use, and hangar development would be consistent with that designation.

FAA scrutinizes an airport's denial of aeronautical development when it suspects it is based on a locality's desire to limit growth at the airport. Thus, the City should expect FAA to closely examine a denial of Jet Center's proposal, if brought to FAA's attention by Jet Center. While there are exceptions to the general rule requiring the Airport to permit the hangar construction, it does not appear that any of them apply to the Jet Center situation.

If the City were to deny permission for Jet Center to construct hangars, there would be some time before the City would be subject to formal sanctions by the agency. However, the FAA would not look favorably upon this action, and the City should consider whether it has other issues before the FAA, or other reasons not to antagonize the agency. Moreover, a formal Part 16 proceeding would be expensive and City's ultimate likelihood of success is very low.



U.S. Department
of Transportation
**Federal Aviation
Administration**

Orlando Airports District Office
5950 Hazeltine National Dr., Suite 400
Orlando, FL 32822-5024

Phone: 407-812-6331

December 29, 2008

Mr. Art Nadel
Venice Jet Center, LLC
400 Airport Road East
Venice, FL 34285

Dear Mr. Nadel,

RE:   Venice Municipal Airport (VNC), Venice Florida
Informal Complaint Regarding Airport Access
Conclusion of Investigation

On September 2, 2008, you filed an informal Part 13 complaint regarding airport access on behalf of the Venice Jet Center. This complaint was forwarded to Venice Municipal Airport Manager Fred Watts on September 3, 2008. The FAA requested the City of Venice respond to your allegations that they were prohibiting you from developing additional aircraft storage areas in accordance with your existing lease.

On October 7, 2008, the City of Venice responded to the FAA stating, in part, that the Venice Jet Center had never formally requested the City's approval for construction of additional leasehold. On November 10, 2008, you rebutted, stating you had requested approval in the past; you also stated you requested such approval again through written correspondence on October 23, 2008.

To our knowledge, to date, your application to expand at the Venice Municipal Airport has not been included on the City Council agenda for approval, and the FAA believes you are being unnecessarily delayed. This position was communicated to the Interim City Manager, Dr. Nancy Woodley, on December 4, 2008.

On December 15, 2008, Dr. Woodley responded to our correspondence stating, in part, your request would be addressed in the upcoming Master Plan (see attachment.)

In our December 4, 2008 letter to Dr. Woodley, and in other historical Agency correspondence at locations throughout the Country, the FAA has clearly stated the airport sponsor's primary concern in the development of airport properties should be meeting aeronautical demand (*see FAA Director's Determination Docket No. 16-00-14, United States Construction v. City of Pompano Beach, FL, p. 18*). An ongoing planning study may not be cited as a reason for delaying lease negotiations or airport access. The delays created by the City of Venice appear to

be restricting aeronautical access to the Airport, which is inconsistent with federal grant assurances and Surplus Property Deed restrictions.

At this time, we are forced to conclude this informal complaint investigation without resolution. It appears we will be unable to assist you with an informal resolution to this complaint, as the City of Venice is unwilling to address your application for expansion.

We feel an informal resolution to this matter is in the best interest of all concerned parties, and we are hopeful the City of Venice will realize the importance of their federal obligations and agree to work through this matter with you. However, if you are unable to resolve this matter informally, you are free to file a formal Part 16 complaint. Guidance on formal complaints may be found on the FAA's website at:

http://www.faa.gov/airports_airtraffic/airports/airport_obligations/complaints/

This is a preliminary Agency finding. If you have any questions, please feel free to contact me at (407) 812-6331, ext. 122.

Sincerely,

Rebecca R. Henry

Rebecca R. Henry
Planning Specialist

Cc:     Nancy Woodley, Interim City Manager, Venice
        Fred Watts, Manager, Venice Municipal Airport
        Jeff Leopold, FDOT/1



# FOWLER WHITE BOGGS
Attorneys at Law
Est 1943

Burton W. Wiand
Direct Dial: 813-222-2029 (Tampa)
954.703.3928 (Ft. Lauderdale)
bwiand@fowlerwhite.com

February 2, 2009

Mayor Ed Martin
City of Venice
401 West Venice Avenue
Venice, FL 34285

Re:     Venice Jet Center Application to Build Four New Hangars

Dear Mayor Martin:

The purpose of this letter is to introduce myself to the Venice City Council and to request Council to release the hold it has on the Venice Jet Center hangar project in order to allow the Venice Building Department to process and issue the building permit for the four new hangars.

I am enclosing with this letter a copy of the Order appointing me (Burton Wiand) Receiver in the Federal Court Case of Securities and Exchange Commission vs. Arthur Nadel, et al, and enclosing a copy of the Federal Court Order placing the Venice Jet Center under the scope of the Receivership.

I understand the matter of the Venice Jet Center's request for a building permit to construct the hangars on its leased airport property is to be on the City Council agenda for its meeting on February 10, 2009. As Receiver, I request the City Council to release its hold on the hangar project so a building permit can be issued.

This hangar request of the Venice Jet Center has been pending since May 2008 and it is essential and imperative and my duty to do everything in my power to have the Venice Jet Center continue to operate so that the assets of the entity are preserved for future Order of the Court. I am further charged to operate the Venice Jet Center to move it forward so it increases in value or at least does not lose value. Further, I invite your attention to paragraph 15 of the Order appointing me Receiver issued by the United States District Court. This paragraph prohibits any person from in any way disturbing the assets or proceeds under my Receivership, including the Venice Jet Center.

FOWLER WHITE BOGGS P.A.

TAMPA • FORT MYERS • TALLAHASSEE • JACKSONVILLE • FORT LAUDERDALE

501 EAST KENNEDY BLVD., SUITE 1700 • TAMPA, FLORIDA 33602 • P.O. BOX 1438 • TAMPA, FL 33601
TELEPHONE (813) 228-7411 • FAX (813) 229-8313 • www.fowlerwhite.com

I have a copy of the December 4, 2008 letter from the FAA to the City of Venice concerning construction of the hangars and see no reason why there can be any further delay on the part of the City. I will await the outcome of the City Council meeting on February 10 before taking further action.

Should you have any questions, I can be reached at my address and telephone number on the letterhead of this letter.

Sincerely,

Burton W. Wiand

BWW/djb
Enclosures

cc:     Robert C. Anderson, City Attorney
        Lori Stelzer, City Clerk
        Rebecca R. Henry, FAA

40581012