

U.S. Department
of Transportation

**Federal Aviation
Administration**

FEB 23 2009

· February 19, 2009

Mr. Robert C. Anderson
Venice City Attorney
Hall & Anderson, P.A.
1314 East Venice Avenue, Suite E
Venice, Florida 34285

Dear Mr. Anderson,

RE:     Venice Municipal Airport (VNC), Venice Florida

This letter responds to your February 4, 2009 correspondence regarding the Venice Municipal Airport (VNC.) In this letter, you stated the 2000 Airport Layout Plan shows "terminal area" and "future apron area" in the area currently proposed for future Fixed Base Operator (FBO) hangar expansion.    You stated Federal Aviation Administration (FAA) Order 5190.6A, the Airport Compliance Handbook, requires the airport sponsor to adhere to the Airport Layout Plan (ALP) and therefore hangars would not be allowed in this area.

Please refer to my December 4, 2008 correspondence to Dr. Nancy K. Woodley, P.E., Interim Manager of the City of Venice. In this letter I discussed the deed restrictions and grant assurance the City of Venice is obligated to adhere to.   I also stated all land of the Venice Municipal Airport was conveyed for aeronautical purposes until it is released from its aeronautical obligation.    When completing the ALP, airport sponsors frequently label aeronautical parcels with specific aeronautical uses, such as "terminal area" and "future apron area," but they are not bound to develop these aeronautical lands with those specific uses.

The text you cite from the Airport Compliance Handbook refers to airport construction. Although the ALP is a conceptual plan approved by the FAA, the sponsor may not construct any of the planned facilities (and thus not adhering to the ALP) without express FAA approval. The specific FAA approval process you are referring to includes an airspace analysis considering the exact height of the facilities to be constructed.   Once the airspace analysis is complete, the sponsor is free to commence construction, but not before such approval.   If the sponsor constructed the facilities prior to FAA airspace approval, they would be developing the Airport in a manner inconsistent with the ALP, and acting in a manner inconsistent with federal grant assurances.

In summary, the City of Venice may and should approve the construction of hangars in the area you mention. The land is designated for aeronautical use, and the FAA has even processed a "pen and ink" change to the 2000 ALP incorporating hangars in this vicinity. This change included the airspace analysis to approve the construction of the hangars. If the current proposal is to construct four hangars, to date, the FAA has not received a plan for this construction. However, we assume this construction would also be approved, and the City of Venice should forward documentation to this office to regarding the specific buildings to be constructed. In accordance with my previous advice concerning airport compliance matters, this proposal should be forwarded to this office without further delay. Once we receive your proposal, we will analyze the proposed construction for any impacts to air navigation, and a determination will be rendered.

Sincerely,

Original Signed By

Rebecca R. Henry
Planning Specialist

Cc:        Fred Watts, Manager, Venice Municipal Airport
           Jeff Leopold, FDOT/1
           Roger Jernigan, Venice Jet Center



LAW OFFICES

BOONE, BOONE, BOONE, KODA & FROOK, P.A.

P. O. BOX 1596

VENICE, FLORIDA 34284

ESTABLISHED 1956

E.G. (DAN) BOONE
JEFFERY A. BOONE
STEPHEN K. BOONE
JOHN S. KODA
MARGARET (PEGGY) S. FROOK

JAMES T. COLLINS, LAND PLANNER
(NOT A MEMBER OF THE FLORIDA BAR)

STREET ADDRESS:
1001 AVENIDA DEL CIRCO 34285
TELEPHONE (941) 488-6716
FAX (941) 488-7079
e-mail: adm@boone-law.com

February 25, 2009

**_VIA HAND DELIVERY_**

Mayor Ed Martin and Members
  of City Council
City of Venice
401 West Venice Avenue
Venice, Florida 34285

     Re:  Venice Jet Center Application to Build Four New Hangars

Dear Mayor Martin and Members of City Council:

This letter is written on behalf of Burton W. Wiand, the Receiver in the Federal Court case which includes the Venice Jet Center.

A response to Mr. Anderson's letter dated February 4, 2009 has now been received from the FAA and a copy is attached to this letter. It states at the top of Paragraph 4 "In summary, the City of Venice may and should approve the construction of hangars in the area you mention. The land is designated for aeronautical use, and the FAA has even processed a 'pen and ink' change to the 2000 ALP incorporating hangars in this vicinity. This change included the airspace analysis to approve the construction of hangars."

Once again Mr. Wiand joins with the FAA in requesting the hold the City Council has placed on the Venice Jet Center hangar project be released so a building permit can be issued. This subject is scheduled to be on the City Council Agenda for the March 10 meeting and the Receiver and the FAA know of no reason why there should be any further delay in allowing the hangar project to go forward.

Mayor Ed Martin and Members
  of City Council
February 25, 2009
Page 2


Should you have any questions, I will respond immediately.

Very truly yours,

E. G. Boone

EGB/s

Encl.
cc: Burton W. Wiand, Receiver
    Robert C. Anderson, City Attorney
    Lori Stelzer, City Clerk
    Rebecca R. Henry, FAA
    Fred Watts, Airport Director
    Roger Jernigan, Venice Jet Center

N35-12389/MayorMartin022509



U.S. Department
of Transportation

**Federal Aviation
Administration**

Orlando Airports District Office
5950 Hazeltine National Dr., Suite 400
Orlando, FL 32822-5024

Phone: 407-812-6331

March 3, 2009

Mr. Fred Watts
Airport Manager
Venice Municipal Airport
150 Airport Avenue East
Venice, Florida 34285

Dear Mr. Watts,

RE:    Review of Non-Aeronautical Lease
       City of Venice and Venice Pier Group, Inc.

On January 6, 2009, this office received a fully-executed copy of the amended and restated lease
agreement between the City of Venice and the Venice Pier Group, Inc. This lease was executed
on December 17, 2008. As you know, the Federal Aviation Administration (FAA) must review
and concur with all non-aeronautical leases for airport property prior to execution.

We have reviewed the lease and offer the following comments:

- The method used to determine the lease rate is unclear. Airport rates and charges must be
  consistent with the FAA Policy on Airport Rates and Charges, dated June 21, 1996, and
  the FAA's Policy and Procedures Concerning the Use of Airport Revenue, dated February
  16, 1999. Specifically, the FAA requires non-aeronautical airport property to be leased at
  a fair market rental value, which is generally 8-12% of the Fair Market Value (FMV.) To
  determine FMV, the FAA will require a recent (within the past 6 months) appraisal of the
  property, and a map specifying the boundaries of this airport parcel.

- The following standard clauses, designed to protect airport interests, are missing from the
  lease:

  - Escalation
  - Non-discrimination
  - Property Rights Reserved
  - Airport Protection
    - Right of flight/noise
    - FAR Part 77 Height Restrictions
    - Creation of No Hazards

2

- This agreement is between the City of Venice and the Venice Pier Group, Inc. The City of Venice, the airport sponsor, owns all of the land under lease, but only part of this land is obligated airport property. The FAA is concerned that the lease does not discuss the Airport or its rights and responsibilities under this lease. At a minimum, the Airport should execute an agreement with the City of Venice detailing the amount of lease proceeds to be transferred to the Airport Enterprise Fund, and stating what responsibility, if any, the Airport has to maintain their portion of the leasehold.

The above comments must be addressed for the FAA to concur with the lease. Once you have addressed these items, please forward the revised agreements to this office in my attention.

Sincerely,

Rebecca R. Henry
Planning Specialist

# ꟼ𝕀CARD MERRILL

**ATTORNEYS & COUNSELORS**

2033 Main Street
Suite 600
Sarasota, FL 34237
941.366.8100
Fax 941.366.6384
icardmerrill.com

James E. Aker
E. Dusty Aker
Charles J. Bartlett
Paul D. Beitlich
G. Matthew Brockway
Bruce P. Chapnick
André K. R. Charbonneau
Maureen C. Chiofalo
Michael W. Cochran
Stacy Dillard-Spahn
William H. Drumm
Mark C. Dungan
Michael L. Foreman
Michael J. Furen
Arthur D. Ginsburg
Steven R. Greenberg
F. Thomas Hopkins
Thomas F. Icard, Jr.
Todd D. Kaplan
Jo Ann M. Koontz
Jason A. Lessinger
David M. Levin, LL.M.
Robert K. Lincoln
Robert G. Lyons
Patricia C. Meringer
William W. Merrill, III
Robert E. Messick
Troy H. Myers, Jr.
Alyssa M. Nohren
J. Geoffrey Pflugner
Stephen D. Rees
Stephen Douglas Rees, Jr.
Lindsey A. Schneider
Jaime L. Wallace
John J. Waskom
Richard S. Webb, IV
Anne L. Weintraub

### *CONFIDENTIAL ATTORNEY/CLIENT COMMUNICATION*

May 18, 2009

(Via telecopy 480-1446)
City of Venice, Florida
c\o Robert Anderson, City Attorney
Hall & Anderson, P.A.
1314 East Venice Avenue, Suite B1
Venice, Florida 34285

Re:    Lease by and between the City of Venice and Venice Jet Center, LLC.

Dear Mr. Anderson:

You have asked for an opinion concerning several issues involving the tenancy of the Venice Jet Center, LLC (the "Jet Center") on a parcel of property owned by the City of Venice (the "City"). Specifically, on May 23, 2006, the City, as Lessor, entered into a Lease with the Jet Center, as Lessee, under which the Jet Center leased a parcel of property from the City for use as an airport. The Lease indicates a term of 25 years with renewal options. The Lease involves more than one parcel and includes a provision requiring the Jet Center to demolish two hangars on one of the parcels and replace them with a new 10,000 square foot hangar on the identified parcel. It is my understanding that this demolition and construction has taken place. The principal of the Jet Center, at the time the City entered the Lease,

1

May 18, 2009
Page 2

was Arthur Nadel. Since that time, Arthur Nadel has become the subject of both criminal and civil litigation for fraud. On January 27, 2009, United States District Judge Richard A. Lazzara appointed Burton W. Wiand as receiver for the Jet Center. Mr. Wiand has indicated a desire to construct four additional 8,000 square foot hangars outside of the parcel on which the 10,000 square foot hanger was built. Furthermore, Mr. Wiand has indicated a desire to sub-lease some or all of the property to third parties. You have raised several issues concerning the enforceability of the Lease as a general matter, in light of Arthur Nadel's alleged fraudulent activities, as well as the receiver's rights under the Lease, should it be determined that the Lease continues to remain in full force and effect. You asked five specific questions which will be addressed hereinbelow.

1.     Is the May 23, 2006 lease a valid and enforceable agreement?

Briefly yes. As a matter of contract law, the Lease contemplates a transfer of possession of property for a defined term by the City, as Lessor, to the Jet Center, as Lessee, for consideration identified as rent and the construction of the 10,000 square foot hanger. The Lease sets forth certain use restrictions, however, such restrictions do not undermine the legality of the Lease. I would further note that there is authority supporting leases by municipalities for the operation of airports. By way of example, the court in Nolte v. Paris Air, Inc., 975 So.2d 627 (Fla. 4th DCA 2008), observed as follows regarding an airport lease by a municipality:

> We consolidate the above cases for purposes of this opinion. We affirm the trial court decisions finding that the municipal airport property in question, leased by long term leases to full service, fixed base operators who provide goods and services to the general aviation public in the promotion of air commerce, serves a municipal, governmental or public purpose or function and is therefore exempt from the taxation sought to be imposed by the Property Tax Assessor for Indian River County. See § 196.012(6), Fla. Stat. (2007).

Similarly, the court in Page v. City of Fernandina Beach, 714 So.2d 1070 (Fla. 1st DCA 1998), held that an airport, owned and leased by the City of Fernandina Beach, was not used exclusively by city for municipal or public purposes, and did not qualify for tax exemption. See also, Lee County v. Fort Myers Airways, Inc., 688 So.2d 389 (Fla. 2d DCA 1997)(discussing the arbitration of a dispute concerning the lease of real property from Lee County for operation of an air field); Continental Aviation Services, Inc. v. City of Naples Airport, 873 So.2d 567 (Fla. 2d DCA 2004)(addressing a lease of hangar facilities from the City of Naples); Greater

2

May 18, 2009
Page 3

_Orlando Aviation Authority v. Bulldog Airlines, Inc.,_ 705 So.2d 120 (Fla. 5th DCA 1998)(addressing a case where an airport tenant, which allegedly suffered damages during construction by third party, sued the aviation authority, alleging theories of negligence, breach of contract, and third-party beneficiary).

I would note that the Lease does not contain a severability clause, such that, should the City determine that one or more provisions of the Lease are unenforceable, an argument could be made that the entire Lease is voidable. However, my review of the Lease did not disclose any particular provision that is void either facially or on public policy grounds. In sum, the Lease appears to be valid and enforceable as a general matter.

2.   Does the Lease allow the Lessee to construct additional hangars on the leasehold?

Possibly not. Initially on this issue, I would note the specific language of Paragraph 45 of the Lease, which contemplates the demolition of specifically identified hangars and the construction of a single 10,000 square foot hanger in their place. Paragraph 45 provides as follows:

45.   DEMOLITION AND CONSTRUCTION OF IMPROVEMENTS

On or before May 31, 2011 the lessee shall, at lessee's sole expense, demolish the two aircraft hangars currently on the premises; design, permit and construct an aircraft hangar consisting of at least 10,000 square feet; and apply a new Northern Mediterranean exterior finish to the administration building currently located on the premises.

The plans and specifications for these improvements shall be submitted to the lessor for lessor's approval and permitting and construction shall not commence until the lessee obtains written approval of the plans and specifications from the lessor.

As a matter of contract interpretation, the fact that the City and the Jet Center elected to include in the Lease a specific provision identifying the parties' relative rights and duties in the context of hangar construction possibly implies that other demolition and construction is not authorized by the express terms of the Lease. I refer to the long-established maxim of contract law known as "expressio unius est exclusio alterius," "the inclusion of one thing implies the exclusion of the other." _See e.g._, _Shumrak v. Broken Sound Club, Inc.,_ 898 So.2d 1018 (Fla. 4th DCA 2005)(holding

3

that "[i]t is a fundamental principle of contract construction, known as *expressio unius est exclusio alterius*, that "the expression of one thing is the exclusion of the other.");  Coral Cadillac v. Stephens, 867 So.2d 556, 558 (Fla. 4th DCA 2004)(same);  U.S. v. First National Bank of Crestview, 513 So.2d 179 (Fla. 1st DCA 1987)(noting that the maxim "expressio unius est exclusio alterius" applies to contract interpretation as well as statutory interpretation).  In other words, the City and the Jet Center negotiated and included a provision concerning hangar construction which specified one hangar of at least 10,000 square feet.  Had the City and the Jet Center contemplated further hangar construction, they should have indicated as much in the same provision of the Lease.

Aside from viewing the issue under contract construction principles, as a practical matter, the proposed construction of four additional 8,000 square foot hangars on a different parcel is arguably a reasonable extension of the "DEMOLITION AND CONSTRUCTION OF IMPROVEMENTS" language in the Lease.  The proposed construction may be, in fact, a material departure from the dictates of the Lease.  By way of example, the court in Leisure Resorts, Inc. v. City of West Palm Beach, 864 So.2d 1163 (Fla. 4th DCA 2003), addressed a lessee's attempt to expand on the facilities modification permitted by the lease at issue.  The court observed:

We now turn to Article XIX, Section 4. The plain language of this provision allows Leisure to change the spaces, size of spaces, and general configuration of the marina, so long as Leisure retains at least 128 boat spaces (80% of 160). However, we conclude that this provision cannot be read so broadly as to encompass Leisure's expansion plan. While there is no provision in the Amended and Consolidated Lease preventing the expansion of the marina onto submerged land adjacent to the leasehold premises, this fact does not alter the meaning of Article XIX, Section 4. A drastic overhaul of the existing marina, by moving piers, altering docks, relocating boat spaces, changing the number of boat spaces, and repositioning the fuel station is not contemplated by the provision. Undertaking a massive renovation is not as simple as changing the general configuration of the marina. This is especially the case where Leisure has failed to establish that it has complied with Article XIX, Section 4 by providing a plan including not less than 80% of the 160 original boat spaces. The percentage requirement of Article XIX, Section 4 remains of importance even though the City owns only the submerged lands constituting the footprints "1167 of the docks. That submerged land remains subject to the lease and under the control of the City because it would necessarily be used in some way or form for the newly designed marina.

4

May 18, 2009
Page 5

In sum, we disagree with the trial court's interpretation that Article XXX, Section 5 was applicable to the proposed expansion plan, and thus, required unanimous City Commission approval. However, we do agree with the City's contention that Article XIX, Section 4 does not permit Leisure's project without a clear declaration of the exact number of boat spaces to remain on the leasehold premises (no fewer than 80% of the 160 boat spaces). We also agree with the trial court's ruling that expansion was not contemplated by the parties. Therefore, because one obstacle only gives way to another for Leisure, we conclude that the trial court did not err in granting a directed verdict to the City and affirm.

See also, Jenkins v. Eckerd Corp., 913 So.2d 43 (Fla. 1st DCA 2005)(holding that a provision in commercial lease allowing shopping center tenant to terminate lease if named anchor store ceased to lease or pay rent in same shopping center did not implicitly include anchor store's successors or assigns, and therefore, tenant was able to terminate lease upon anchor store's assignment to another store; no provision in anchor store's lease restricted its ability to assign the lease, and lessor could have avoided risk of tenant's termination by obtaining tenant's consent to anchor store's assignment.)

It may be possible that the Lessee could argue that, in as much as the new proposed hangars are to be constructed on a separate parcel of property (although a part of the same leasehold), that it was contemplated by the parties at the time of the Lease that improvements would be made to the separate parcel. Since I do not know what use, if any, the "other" parcel has in its current state, I cannot evaluate the strength of this argument. Certainly nothing in the Lease document itself would indicate that there was an intent to improve the "other" parcel. On the other hand, if the "other" parcel is vacant and has no utility to the Lessee unless improvements are made, the Lessee might be able to argue that there would have been no sense in including that separate parcel in the leasehold unless further improvements were contemplated.

I should point out at this juncture that there is the possibility that a court in reviewing this matter could allow the admission of parol evidence to explain the parties' intentions with regard to the construction of additional facilities on the leased premises. My review and opinion as contained in this letter is based upon the "four corners" of the Lease Agreement and does not take into consideration what evidence may exist of an intent on the part of the parties that further construction on other portions of the leased parcels would be permissible. Parol evidence will only be admissible if the court determines that the lease terms are in some way ambiguous

5

Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A. – Established 1953
Offices in Sarasota, Manatee and Charlotte Counties

as to the prospect of construction of additional improvements. If the court does make that interpretation, any evidence concerning the parties' intentions at the time the Lease was entered into will be admissible and could either bolster or substantially weaken the argument that the inclusion of language in paragraph 45 specifically authorizing the construction of certain improvements was intended to be exclusive.

It is important to note that, if the court should determine that the language of paragraph 45 of the Lease did not prohibit further construction, that the City's right to control additional construction would be limited. The City's discretion in the context of construction approval would be subject to standards of commercial reasonableness. The Second District Court of appeal, in the case of Speedway SuperAmerica, LLC v. Tropic Enterprises, Inc., 966 So.2d 1 (Fla. 2d DCA 2007), engaged in a thorough analysis of the discretion issue in the analogous context of a consent to sublease requirement. As you will see, the analysis and reasoning is not tailored to a specific sublease provision or context. The Speedway court held as follows:

> In determining that Tropic had the unfettered right to deny its consent to the assignment of the lease, the trial court relied on the following provision of the lease:
>
> Lessee shall not assign or transfer this lease, or any interest therein, without the prior written consent of Lessor, and a consent to an assignment shall not be deemed a consent to any subsequent assignment. Any such assignment without consent shall be void, and shall, at the option of the Lessor, terminate this lease. Sunoco, Mascot, and Speedway argued to the trial court that Tropic's right of consent under this lease provision was not absolute but was subject to an implied obligation not to arbitrarily deny consent. In rejecting that argument, the trial court relied on the decision of the Florida Supreme Court in Anderson v. Tower Amusement Co., 120 Fla. 476, 163 So. 11 (1935). The trial court understood Tower Amusement to hold that a landlord cannot be subject to an implied duty not to arbitrarily deny consent to an assignment. The trial court concluded that since it was "undisputed" that Tropic "did not give written consent to the assignment of this lease," Tropic was entitled to judgment as a matter of law.
>
> * * *
>
> We have stated that "[t]he implied covenant of good faith exists in virtually all contractual relationships." Sepe v. City of Safety Harbor, 761 So.2d 1182, 1184 (Fla. 2d DCA 2000); see also County of Brevard v. Miorelli Eng'g, Inc.,

6

703 So.2d 1049, 1050 (Fla. 1997) (" '[E]very contract includes an implied covenant that the parties will perform in good faith.' " (quoting Champagne-Webber, Inc. v. City of Fort Lauderdale, 519 So.2d 696, 697 (Fla. 4th DCA 1988))); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

Despite broad characterizations of the implied covenant of good faith, we have recognized that it "is a gap-filling default rule," which comes into play "when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." Publix Super Markets, Inc. v. Wilder Corp. of Del., 876 So.2d 652, 654 (Fla. 2d DCA 2004). "[T]he implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations." Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1097 (Fla. 1st DCA 1999). "[W]here the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." Id. at 1097-98. FN2 The implied obligation of good faith performance has been applied in the context of lease provisions requiring a landlord's consent to a tenant's assignment of a lease. In Fernandez v. Vazquez, 397 So.2d 1171, 1173-74 (Fla. 3d DCA 1981) (footnote omitted), the court recognized the "well-accepted concept that a lease is a contract and, as such, should be governed by the general contract principles of good faith and commercial reasonableness."

* * *

The Fernandez court went on to enumerate various factors that may be considered in determining whether the withholding of consent is arbitrary: "(a) financial responsibility of the proposed subtenant[,] (b) the 'identity' or 'business character' of the subtenant, i.e., suitability for the particular building, © the need for alteration of the premises, (d) the legality of the proposed use, and (e) the nature of the occupancy, i.e., office, factory, clinic, etc." 397 So.2d at 1174. Finally, the Fernandez court made this observation: "Denying consent solely on the basis of personal taste, convenience or sensibility or in order that the landlord may charge a higher rent than originally contracted for have been held arbitrary reasons failing the tests of good faith and reasonableness under commercial leases." Id.

* * *

7

May 18, 2009
Page 8

In the instant case, the lease provision governing assignments simply requires the "prior written consent of Lessor" to any assignment. The provision contains "no standards for exercising discretion" by the landlord. Wilder Corp. of Del., 876 So.2d at 655. Nor does the provision state that the landlord's discretion to withhold consent is absolute. The provision presents a circumstance in which "one party has the power to make a discretionary decision without defined standards," id. at 654, a circumstance in which a "covenant of good faith" will be "implied" to "protect [ ][the] contracting parties' reasonable commercial expectations," Id. at 655. The trial court therefore erred in concluding that the lease granted Tropic the unfettered right to deny consent to the assignment by Speedway to Sunoco.

We therefore reverse the order on appeal and remand for further proceedings

See also, Fernandez v. Vazquez, 397 So.2d 1171 (Fla. 3d DCA 1981)(holding, in the context of a commercial lease (once again, with regard to a consent to an assignment of the lease), that "[u]nderlying the cases abolishing the arbitrary and capricious rule is the now well-accepted concept that a lease is a contract and, as such, should be governed by the general contract principles of good faith and commercial reasonableness. One established contract principle is that a party's good faith cooperation is an implied condition precedent to performance of a contract. Where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing herself of her own wrongdoing.)

Thus, the City could not arbitrarily refuse any demolition and construction under the guise of an exercise of the discretion established in Paragraph 45. The exercise of such discretion is, as a matter of law, subject to a standard of commercial reasonableness.

In sum, the Lease specifically contemplates the construction of a single hangar of 10,000 square feet or more. Contract interpretation principles indicate that this specific treatment of a single hangar on a specific parcel necessarily may imply that no further construction was contemplated by the parties. If the City elects to assert this position, it should be stated in reliance on the contract interpretation authorities cited hereinabove (in light of the "commercial reasonableness" standard attendant with the City's exercise of discretion otherwise afforded in Paragraph 45).

Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A. – Established 1953
Offices in Sarasota, Manatee and Charlotte Counties

May 18, 2009
Page 9

**3.   Can the Lessor require the Lessee to provide evidence of its financial capability to construct the proposed hangars?**

Briefly yes.   Paragraph 14 of the Lease, entitled "USE OF PREMISES" specifically incorporates "all of the general operational requirements and the applicable minimum standards" found in the "Minimum Standards for Commercial Aeronautical Activities at Venice Municipal Airport" (hereinafter the "Standards"). A number of the Standards implicate financial capability.

Initially, I would note that the standards apply to any person (or entity) "that propose(s) to conduct commercial aeronautical activities on the property located at the Venice Municipal Airport." (See Section 1 of the Standards).  Aeronautical activities is broadly defined in Section 2 of the Standards in a way that clearly encompasses hangar construction.  Specifically, Section 2 defines "Aeronautical Activities" to include "[a]ny activity that involves, makes possible, or is required for the operation of aircraft, or contributes to or required for the safety of such operation." Common sense dictates that the construction of a hangar falls within this definition. Further, Section 5 of the Standards specifically addresses construction of facilities, indicating that "[a]ny proposed construction or facilities developed by the Operator will be subject to the approval of the Venice Municipal Airport and the City of Venice, respective representatives and/or codes and regulation subject thereto as required by federal, state and local codes." This further confirms the applicability of the Standards to the hangar construction proposed by the Jet Center.  Finally, with regard to the scope and applicability of the Standards, I would note Section 7 of the Standards, entitled "Operations, Facilities, and Accommodations," which provides that "[n]o person shall use the airport or any portion thereof or any of its improvements or facilities for commercial, business or aeronautical activities without first complying with these Standards and obtaining the required approval and written consent associated with those activities by entering into such agreement as may be prescribed by the City of Venice..." Based on the foregoing, it is clear that the Jet Center is required to satisfy the requirements of the Standards as a general matter and specifically with regard to the construction of the hangars.

Having established their applicability, I would note the following Standards which are relevant to the Jet Center's compliance (or lack thereof) with the Standards:

9

May 19 09 07:44p    John                    9414860120                    p.11

05/18/2009 14:07 FAX 941 366 8384        ICARD MERRILL et al.                    Ø011

May 18, 2009
Page 10

_____

Section 8.    Lease Information

A.    ...The City shall then grant or deny the request on such terms and
conditions as the City deems prudent and proper under the
circumstances. Proposed or existing Operators, may be required to
provide evidence of past experience, financial capability and technical
ability to perform the proposed services.

B.    Regarding evidence of financial capability to perform and provide the
services, the City of Venice shall be the sole judge of what constitutes
adequate finances and the procedure to base financial information.
If the Operator or proposed Operator does not, in the opinion of the
City of Venice, exhibit adequate financial responsibility to undertake
the proposed services, the City of Venice may deny any requested
activity.

Section 8 clearly provides the City with the ability to demand and evaluate the
financial and technical capability of the Jet Center in the context of its request to
construct the additional hangars. Section 8 also provides that the City is the "sole
judge" of the Jet Center's satisfaction of the financial responsibility requirements.
The Standards do not set forth any objective criteria to be utilized by the City in
making its "financial responsibility" determination and the Jet Center may attack the
requirement on this basis.    However, the counter is that, while "financial
responsibility" is a subjective assessment under the Standards, it is subject to the
standard of "commercial reasonableness" discussed above. In light of this inherent
limitation on discretion, the "sole judge" language does not grant the City unfettered
discretion. In all events, the City is empowered to demand financial information and
determine whether the proposed improvements are advisable in light of the
information provided.

Further with regard to the Standards, it is my understanding that the Jet
Center plans to either sub-lease the entire airport or, at a minimum, construct the
additional hangars to lease them to third parties.    The Standards also address
"Sublease Requirements." Specifically, Section 9 of the Standards includes the
following:

10

May 18, 2009
Page 11

---

### Section 9.  ·  <u>Sublease Requirements</u>

The Operator shall not sublease said premise or any part thereof without the consent of the City first having been obtained.  To sublease space to another person the following conditions must apply:

A.    The Operator must meet all of the Minimum Standards established by the City of Venice fo the category or categories of services to be furnished.   The standards may be meet in combination by the Operator or the sublease Operator.  The sublease agreement shall be specifically confined to those services authorized by the Operator.

The sublease Operator shall enter into an agreement with the Operator.   The agreement document to be executed shall be a standard lease developed by the City of Venice for Operators to utilized.  The sublease Operator shall provide evidence of minimum insurance coverage as determined by the City of Venice for the services being performed.  The agreement shall be subject to the City of Venice approval based on the Minimum Standards of the Operator lease and must be applicable to all codes and ordinances of the City of Venice.

In other words, the City retains control over the Jet Center's prospective sub-lease of the entire property or portions thereof, once again, subject to the standard of commercial reasonableness.

In sum, the Standards are expressly incorporated by reference in the Lease itself and clearly apply to the Jet Center generally and its desire to construct additional hangars and enter one or more sub-leases specifically.  The Standards incorporate financial criteria, which is to be analyzed by the City to determine the "financial responsibility" of the Jet Center and/or its proposed sub-lessees. This is not a completely subjective "veto" power, but certainly gives the City a position of authority in terms of accepting or rejecting the proposals by the Jet Center.

4.    Does the receivership constitute a prohibited involuntary assignment.
Initially on this point, I would note that leases can, and often do, include specific provisions identifying the appointment of a receiver as a default warranting termination of the lease.  By way of example, the court in <u>Heller Financial, Inc. v.</u>

11

May 18, 2009
Page 12

Plumback, 1988 WL 79596 (N.D. Ill. 1988), discussed a lease containing the following provision:

Section 15 of the Lease provides:

DEFAULT. Any of the following events or conditions shall constitute an event of default hereunder ... (f) the voluntary or involuntary making of an assignment of a substantial portion of its assets by Lessee for the benefit of creditors, appointment of a receiver or trustee for Lessee or for any of Lessee's assets ...

Similarly, the court in Civil Court of Record in and for Dade County v. State ex rel. Leff, 32 So.2d 602 (Fla. 1947), addressed a lease containing a termination provision identifying as a default the appointment of a receiver "for or against the Lessees to take charge of the premises, either in the State Court or in the Federal Court." I would also note the holding in Standard Operations, Inc. v. Montague, 758 S.W.2d 442 (Mo. 1988), wherein the court addressed a lease which identified as a default the lessee's "assignment for the benefit of creditors, or [the filing of] a debtor proceeding ... or for the appointment of a receiver." The court held that the corporate lessee's merger into another corporation was not an "assignment by operation of law" and, thus, did not constitute a default under terms of its lease. The court noted that the lease provision prohibiting assignments by operation of law referred to involuntary assignments and that the lease gave no indication that a merger was a transaction requiring lessor's consent. I note the Standard Operations decision because it raised the issue of an "involuntary assignment," which the airport Lease at issue in this case prohibits (See Paragraph 24). However, despite a nationwide case-law search in both State and Federal libraries, I could find no authority indicating that the appointment of a receiver is tantamount to an "involuntary assignment" of a contract or lease. See e.g., Burrows v. Jorgensen, 323 P.2d 150 (Cal. App. 1958)(holding that the covenants of leases against involuntary assignment were not sufficiently strong to prevent the taking of possession by receiver of leased premises which lessees transferred with intent to delay hinder and defeat lessees' judgment creditors since receiver acquires no title but only the right to possession as an officer of the court and hence his appointment is not a violation of the type of covenant against assignment.); In re Tak Communications, Inc., 138 B.R. 568 (W.D. Wis. 1992)(observing that a court-appointed receiver filed an application with the FCC for the involuntary assignment of a broadcast license). The closest that I could come to a case declaring a lease forfeiture due to the appointment of a receiver is the 1921 case of Clifford v. Androscoggin & K.R. Co., 121 Me. 15; 115 A. 511 (Me. 1921), wherein the court

12

held that a provision in the lease at issue that it shall be forfeited if the estate is taken from the lessee by process of law, or by proceeding in bankruptcy and insolvency, or otherwise, permitted a forfeiture upon the appointment of a receiver for the lessee and the transfer of its property to a corporation organized by its bondholders. Here again, the appointment of a receiver, in and of itself, was not the triggering event.

The bottom line is that the Lease at issue in this case **does not** contain an express provision declaring the appointment of a receiver to be a default. Having said that, I note the established contract principle noted by the court in Beach Resort Hotel Corp. v. Wieder, 79 So.2d 659 (Fla. 1955):

> It is well settled that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain. Savage age v. Horne, 159 Fla. 301, 31 So.2d 477; Quinerly v. Dundee Corp., 159 Fla. 219, 31 So.2d 533; Medard v. Paulson, Fla., 37 So.2d 902; Camichos v. Diana Stores Corp., 157 Fla. 349, 25 So.2d 864; Pierce v. Isaac, 134 Fla. 666, 184 So. 509; Windham v. Windham, 152 Fla. 362, 11 So.2d 797; International Ass'n of Machinists v. State, 153 Fla. 672, 15 So.2d 485.

> "The court can not, in the absence of fraud or the like recognized equitable ground, reconstruct the contract, for the purpose of making its terms accord with a post contractual conception more suitable to the situation of the parties." City of Camden v. South Jersey Port Commission, 1948, 2 N.J.Super. 278, 63 A.2d 552, 566, quoting from Weinstein v. Sheer, 1923, 98 N.J.L. 511, 120 A. 679. See 3 Corbin on Contracts Sec. 541.

See also, Rodeway Inns of America v. Alpaugh, 390 So.2d 370 (Fla. 2d DCA 1980)(holding that in the absence of a contrary agreement, landlord whose tenant has defaulted in payment of rent can reenter and dispossess the tenant, but if there is a lease, its provisions are conclusively controlling and court will not substitute its judgment for that of the parties by rewriting the lease.); Couch v. ADC Realty Corp., 268 S.E.2d 237 (N.C. App. 1980)(holding that the landlords did not have right to forfeit leasehold interest by appointment of receiver pursuant to lease provision allowing landlord to terminate lease upon appointment of receiver in that tenants had not acquiesced in appointment of receiver merely because they did not appear at

13

hearing, especially since they made motion which would have dissolved receivership.).

In other words, a court cannot engraft into the Lease a prohibition against the appointment of a receiver for the benefit of the City where it was not included in the Lease in the first instance either directly or by implication.

In sum, the appointment of a receiver for the Jet Center is not identified in the Lease as a breach, nor does it justify declaring a default under the terms of the Lease. Provisions to this effect have been incorporated into leases, but they do not appear in the Lease at issue and, as noted above, the courts are not at liberty to alter contracting parties' agreement and engraft requirements that are not apparent on the face of the document at issue.

5.     **Can the Lease be terminated because of the alleged fraudulent acts of Arthur Nadel?**

Briefly no. The Lease at issue is by and between the City of Venice as Lessor and Venice Jet Center, LLC as Lessee. From my review of the corporate records of Venice Jet Center LLC, Arthur Nadel was the Managing Member of the LLC (and Registered Agent) until February 26, 2009, when Burton W. Wiand, a receiver appointed by the United States District Court, replaced him in both capacities. Attached hereto is a copy of the 2009 Venice Jet Center, LLC Annual Report showing the change in management. Obviously, had the Lease identified Nadel as the Lessee, Nadel's alleged misdeeds and incarceration might justify termination of the Lease for a variety of reasons. However, the Lessee is a limited liability company, which, under Florida law, is recognized as an entity separate and apart from its members. See, Ch. 608, Florida Statutes. As such, matters of "financial responsibility" are judged from the standpoint of the Jet Center entity, not its former Managing Member. Now, there is a legal theory available which would allow a claimant to disregard the separation between a corporation (or limited liability company) and it's principal. However, as will be discussed, the context in which this theory is generally used is not an exact fit with the facts presented in this case and, moreover, the burden attendant with disregarding a corporate entity is difficult at best.

The doctrine is called "piercing the corporate veil" and it is typically used to impose liability on a corporation's principal. The court in USP Real Estate Inv. Trust v. Discount Auto Parts, Inc., 570 So.2d 386 (Fla. 1st DCA 1990), engaged in a thorough discussion of the doctrine as follows:

14

May 18, 2009
Page 15

_____

The parties are in agreement that the applicable legal principles are set forth in Dania Jai-Alai Place, Inc. v. Sykes, 450 So.2d 1114 (Fla.1984). In that case, the supreme court made it clear that to pierce the corporate veil under Florida law, it must be shown not only that the wholly-owned subsidiary is a mere instrumentality of the parent corporation but also that the subsidiary was organized or used by the parent to mislead creditors or to perpetrate a fraud upon them. Since the trial court found that # 90 North was a mere instrumentality of Discount and Discount agrees with that finding on this appeal, the critical issue before us is whether the record will support the trial court's conclusion that Discount did not use # 90 North to mislead creditors or perpetrate a fraud on them. ·

In addressing this issue, it is important to understand the theory underlying piercing the corporate veil and the type of conduct described in the supreme court's Dania decision as sufficient to constitute misleading or improper conduct that will warrant holding the subsidiary to be the alter ego of the parent. The court, in discussing its decision in Mayer v. Eastwood-Smith & Co., 122 Fla. 34, 164 So. 684 (1935), noted reliance on Biscayne Realty & Insurance Co. v. Ostend Realty Co., 109 Fla. 1, 148 So. 560, 564 (1933), and quoted as follows from its opinion in Mayer:

> "So long as proper use is made of the fiction that corporation is entity apart from stockholders, fiction will not be ignored.... Where stockholders enter into a transaction in individual interests and utilize corporate name merely to mislead creditors or perpetrate fraud, legal entity will be ignored and stockholders held individually liable.... The rule that corporate entity will be disregarded where name of corporation is used by stockholders in transactions to mislead creditors or perpetrate fraud on them is but a logical sequence of the principle that a corporation cannot be formed for the purpose of accomplishing fraud or other illegal act, under the guise of fiction that the corporation is legal entity separate and distinct from its members, since when fraud or illegal act is attempted, fiction will be disregarded by the court and the acts of the real parties dealt with as though no corporation had been formed."

See also, Seminole Boatyard, Inc. v. Christoph, 715 So.2d 987 (Fla. 4th DCA 1998)(holding that, generally, in order for court to pierce corporate veil under Florida law, it must be shown that corporation was organized or used to mislead creditors or to perpetrate fraud upon them. Holding further that three factors must be proven by

15

May 18, 2009
Page 16

preponderance of evidence in order to pierce corporate veil under Florida law: (1)
that shareholder dominated and controlled corporation to such an extent that
corporation's independent existence was, in fact, nonexistent and shareholder was
alter ego of corporation; (2) corporate form was used fraudulently or for improper
purpose; and (3) fraudulent or improper use of corporate form caused injury to
claimant.).

In other words, in order to disregard the existence of the limited liability
company, the City would bear the burden of demonstrating 1) that the limited liability
company was formed and used to perpetrate a fraud, 2) that Nadel "dominated" the
limited liability company to the extent that it was merely his alter ego, and 3) that
Nadel's fraudulent activities caused injury to the City of Venice. We can certainly
argue that the limited liability company was formed and used to assist in Nadel's
alleged fraud, and we might be able to show that he used the limited liability
company for his personal purposes, but we must also show damage to the City of
Venice flowing from such activities, which highlights the inexact fit as between the
concept of piercing the corporate veil and the possibility of termination or rescission
of the Lease. The bottom line is that the doctrine of piercing the corporate veil is
intended to allow damage claims against a corporation to be levied against the
corporation's principle. I could find no support for the proposition that piercing the
veil could result in the rescission or termination of a contract or lease. The only cases
I could locate which linked the concepts of contract rescission with piercing the
corporate veil do not establish rescission as a remedy flowing from the piercing of
the corporate veil. See e.g., Kanov v. Bitz, 660 So.2d 1165 (Fla. 3d DCA
1995)(addressing a claim in which an employee sued a corporation and two
physicians for rescission of his employment contract, breach of the employment
contract, compensation due, and sought to pierce the employer's corporate veil to
impose personal liability against the physicians.). In sum, I could find no direct
support for the proposition that the wrongdoing of a member of an otherwise active
limited liability company could justify termination of an agreement by and between
a third party and the limited liability company itself.

I then turned my research to possible avenues for termination or rescission
which are not dependant on the actions of third parties to the Lease itself (Nadel).
Rescission of a contract is an equitable remedy available based on the following
elements (drawn from the case of Billian v. Mobil Corp., 710 So.2d 984 (Fla. 4th
DCA 1998)):

    (1)    The character or relationship of the parties;

16

May 18, 2009
Page 17

    (2)    The making of the contract;

    (3)    The existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation;

    (4)    That the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission.

    (5)    If the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible;

    (6)    Lastly, that the moving party has no adequate remedy at law.

Once again, Nadel is alleged to have engaged in fraudulent activities. However, the fraud element of the test requires that the fraud be a function of the transaction sought to be rescinded. The court in Casey v. Coban, 740 So.2d 59 (Fla. 4th DCA 1999), discussed this concept, holding that:

> Second, as the trial judge ruled, the secret agreement was not "a material fact of the transaction." One aspect of fraud is that there be misrepresentation or concealment of a "material fact." See Hillcrest Pacific Corp. v. Yamamura, 727 So.2d 1053, 1055 (Fla. 4th DCA 1999); Billian v. Mobil Corp., 710 So.2d 984, 990 (Fla. 4th DCA 1998). A concealed fact is material to a transaction if a contract would not have been entered into but for the concealment. See Morris v. Ingraffia, 154 Fla. 432, 18 So.2d 1, 3 (1944); Billian, 710 So.2d at 990; Atlantic Nat'l Bank of Florida v. Vest, 480 So.2d 1328, 1332 (Fla. 2d DCA 1985). Another aspect of materiality is that the concealed fact "must affect the value of the property or cause loss to the purchaser." Pryor, 119 So. at 329. The supreme court in Pryor discussed this second aspect of the materiality of a misrepresentation in a case where fraudulent misrepresentation was the basis for seeking rescission:
>
> > The last element of a misrepresentation, in order that it may be the ground for any relief, affirmative or defensive, in equity or at law, is its materiality. The statement of facts of which it consists must not only be relied upon as an inducement to some action, but it must also be so material to the interests of the party thus relying and acting upon it, that he is pecuniarily prejudiced by its falsity, is placed in a

17

Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A. - Established 1953
Offices in Sarasota, Manatee and Charlotte Counties

May 18, 2009
Page 18

worse position than he otherwise would have been. The party must suffer some pecuniary loss or injury as the natural consequence of the conduct induced by the misrepresentation. In short, the misrepresentation must be so material that its falsity renders it unconscientious in the person making it to enforce the agreement or other transaction which it has caused. Fraud without resulting pecuniary damage is not a ground for the exercise of remedial jurisdiction, equitable or legal; courts of justice do not act as mere tribunals of conscience to enforce duties which are purely moral. If any pecuniary loss is shown to have resulted, the court will not inquire into the extent of the injury; it is sufficient if the party misled has been very slightly prejudiced, if the amount is at all appreciable.

In other words, the fact that Nadel may have defrauded a significant number of people out of a significant amount of money does not mean that he defrauded the City of Venice into entering the Lease. This undermines the availability of the equitable remedy of rescission.

I would also note that a party can seek the equitable remedy of rescission based on a showing that the defendant "fraudulently induced" the claimant to enter the contract at issue. See e.g., Great Harbour Cay Realty and Inv. Co. Ltd. v. Carnes, 862 So.2d 63 (Fla. 4th DCA 2003)(addressing a claim seeking to rescind contract on basis of fraudulent inducement). However, the same problem attendant with seeking rescission as a general matter exists in attempting to show fraudulent inducement. Once again, the fraud must involve the contract itself. The court in Rose v. ADT Sec. Services, Inc., 989 So.2d 1244 (Fla. 1st DCA 2008), set forth the established elements of a claim sounding in fraud in the inducement as follows:

The essential elements to establish a claim for fraudulent inducement are: (1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment.

While the City could possibly show that Nadel made false representations, the City may have difficulty showing that it relied on the representation(s) to its detriment. The fact is, the Lessee is an active limited liability company which is current on the rental payments. Here, again, the damage element presents a problem.

18

May 18, 2009
Page 19
_____

The closest case I could find addressing the effect (or lack thereof) of the arrest of a corporation's principle on a leasehold interest is the case of Baumwald v. Treasure Isle Motel, Inc., 177 So.2d 252 (Fla. 3d DCA 1965), wherein the court observed as follows:

> This is an appeal by the plaintiff below from an adverse summary judgment. Plaintiff was a lessee and operator of a lounge in defendant's premises. The liquor license was issued to the corporation. After the contract became in effect it was learned that for plaintiff to avail himself of the liquor license, as operator of the lounge, it was necessary that he become an officer of the corporation, and he was then made an officer. Following an arrest of plaintiff on a charge of bookmaking on the premises, he was requested to resign as an officer of the corporation and refused. Thereafter, on December 22, 1961, by corporate action he was removed as an officer. Plaintiff tendered his monthly rental check on January 10, 1962. Payment was necessary on or before that date to prevent default. The check was returned unpaid, for insufficient funds. For such non-payment of rent the defendant terminated the contract and re-entered the premises. Later, plaintiff tendered another check for the rent, which was refused. Plaintiff then instituted this action for compensatory and punitive damages, for alleged wrongful termination of the contract. Under the written contract of the parties the defendant was granted the option to terminate the contract and re-enter the premises upon default. The trial judge was eminently correct, on the basis of the facts which were established without issue, in holding that defendant was entitled to judgment as a matter of law.

As is evident from the foregoing, the lease was terminated due to late payment of rent, not because the principal of the lessee was arrested.

In sum, after exploring a number of avenues available under Florida law for rescinding a contract, I could find no solid basis for rescinding the Lease based on Nadel's alleged fraud. Arguments could be made under one or more of the theories discussed above, but the outcome is far from certain.

The opinions set forth in this letter are limited to the facts presented as described and the documents provided for our review. This letter is provided to the City of Venice for its exclusive use, and no other parties shall be entitled to use or rely upon the matters set forth in this letter without the express written permission of the undersigned.

19

May 18, 2009
Page 20

_____

I trust that the matters set forth in this letter are responsive to the questions posed.   If additional clarification is needed or if you or anyone else have questions concerning the matters set forth in this letter, please feel free to contact me. · Thank you for this opportunity to serve the City of Venice.

Very truly yours,

CHARLES J. BARTLETT
For the Firm

CJB:mcd
Enclosure
u\admpm\w\venice.ltr

20



# FOWLER WHITE BOGGS

Attorneys at Law
Est 1943

Burton W. Wiand
Direct Dial: 813-222-2029
Direct Fax: 813-384-2848
954.703.3928 (Ft. Lauderdale)
bwiand@fowlerwhite.com

May 4, 2009

<u>**Sent Via Facsimile and E-mail**</u>

Robert C. Anderson, Esq.
Hall & Anderson, P.A.
1314 East Venice Avenue, Suite E
Venice, FL 34285
*randerson@hall-anderson.com*

> **Re:**   *Securities and Exchange Commission v. Arthur Nadel, et al.*
> *USDC MD Florida, Tampa Division, Case No. 8:09-cv-87-T-26TBM*

Dear Mr. Anderson:

Enclosed herewith is a copy of a packet of materials that is being disseminated to potential purchasers of the Venice Jet Center. There are a number of purchasers who have indicated strong interest in the Venice Jet Center. As part of submitting these materials, I have included a copy of a Confidentiality Agreement that is being required of all interested parties. Once that Agreement has been executed, certain documents will be made available at the Venice Jet Center for further review. These would include material contracts relating to the operations of the Venice Jet Center, financial statements, etc. Prior to the City having access to these further documents, I will need direct, firm and binding assurances from the City that it can comply with the Confidentiality Agreement.

Subsequent to my last letter, we have been considering furthering the actions of the City of Venice that are impeding the Venice Jet Center's continuing development and hurting its value. It is my conclusion that these actions are in violation of federal law administered by the Federal Aviation Administration. It is also my conclusion that these laws are an intentional interference with an asset of the Receivership that is prohibited by the order of the United States District Court in Tampa. Further research indicates that in light of the City's announced intent to participate in the sales process of the Venice Jet Center and to "purchase the property for pennies" and recently learned information that the City intends to develop its own hangars in

FOWLER WHITE BOGGS P.A.

TAMPA • FORT MYERS • TALLAHASSEE • JACKSONVILLE • FORT LAUDERDALE

501 EAST KENNEDY BLVD., SUITE 1700 • TAMPA, FLORIDA 33602 • P.O. BOX 1438 • TAMPA, FL 33601
TELEPHONE (813) 228-7411 • FAX (813) 229-8313 • www.fowlerwhite.com

competition with the Venice Jet Center, the City's actions may constitute violation of the federal anti-trust laws.

I want to again renew my request that the City grant the Venice Jet Center authorization to construct the four proposed hangars that are currently proposed to the City of Venice. In the absence of the approval of authorization to go forward with those hangars, I am obligated to pursue the rights of the Venice Jet Center LLC and Receivership either to compel the City to allow the construction of those hangars or seek damages that will occur as the result of the sale of the Venice Jet Center without that approval.

With respect to your review of the information relating to the City's potential participation in the sale of the Venice Jet Center, please contact me at your convenience with regard to providing assurances that the City can comply with the Confidentiality requirements applicable to all potential purchasers.

Sincerely yours,

Burton W. Wiand

BWW/djb
Enclosure

Cc:     Mayor of City of Venice
        Scott Maisel, United States Securities and
           Exchange Commission

40695486

# MUTUAL CONFIDENTIALITY AGREEMENT

**THIS MUTUAL CONFIDENTIALITY AGREEMENT** (this "Agreement") by and between **Burton W. Wiand**, as **Receiver** in the matter of Securities and Exchange Commission v. Arthur Nadel, et al, with office at 501 E. Kennedy Blvd, Suite 1700, Tampa, Florida 33602 ("Receiver"), and _____, a _____corporation with office at _____ ("Potential Buyer") is effective as of _____, 2009.

**Background.** To further discussions between Receiver and Potential Buyer relating to a possible business transaction relating to the Venice Jet Center between the parties hereto (the "Transaction"), each of Potential Buyer and Receiver may want to disclose certain information to the other party (the "Receiving Party") which such party (the "Disclosing Party") regards as confidential. Each party has agreed to treat all such information of the other party as confidential.

In consideration of the mutual promises, covenants and agreements stated below, and intending to be legally bound, the parties agree as follows:

**1.** **Confidential Information.** As used herein the term "Confidential Information" shall mean any and all confidential, proprietary, or trade secret information or material of a party, whether or not marked as "Confidential," including, without limitation, information resulting from or directly or indirectly related to (i) the Transaction; (ii) proprietary software, program flowcharts, file layouts, source code, diagnostic testing methodologies, validation information, reagents, processes, techniques, technical "know-how," inventions, and other information related thereto, of such party; (iii) information regarding the business practices, plans, marketing and sales plans, manufacturing, compliance, pricing information, forecasts, new product plans, product development efforts or relationships of such party; and (iv) any other information, products, technology, methodologies, samples, or material that such party designates as Confidential Information. Confidential Information may be disclosed either orally, visually, or in writing.

"Confidential Information" shall not include material or information which is: (a) already in the public domain at the time of disclosure; (b) rightfully received from a third party without any obligation of confidentiality; (c) generally made available to third parties by the Disclosing Party without restriction on disclosure; or (d) demonstrated by the Receiving Party to be already known to the Receiving Party or independently developed by the Receiving Party without any reference to the Disclosing Party's Confidential Information.

**2.** **Obligations of Receiving Party.** The Receiving Party shall not (i) use any Confidential Information except as required for the performance of its duties directly related to the Transaction, or (ii) disclose Confidential Information to any third party without the prior written consent of the Disclosing Party. Notwithstanding the foregoing, the Receiving Party may disclose to its agents, subsidiaries or parent companies, on a need to know basis, Confidential Information disclosed to it by the Disclosing Party under this Agreement, provided that each

such agent, subsidiary or parent shall first agree in writing to be bound by the terms and conditions of this Agreement or is already bound, with respect to Confidential Information, by confidentiality obligations at least as restrictive as those contained in this Agreement. The Receiving Party shall maintain the Confidential Information with the same degree of care that the Receiving Party uses to protect its own confidential and proprietary information of a like nature, but in no event less than a reasonable degree of care.

3. **Nondisclosure of Relationship or Possible Transaction.** Each of the parties agrees that, without the prior written consent of the other party, it will not disclose to any person or entity the fact that Confidential Information has been made available hereunder, that discussions or negotiations are taking place concerning a possible transaction involving the parties, or otherwise disclose any of the terms, conditions, or other facts with respect hereto, including but not limited to the status thereof.

4. **No Representation.** Although the parties have endeavored to include in the Confidential Information which they believe to be relevant for the purpose of the evaluation of a possible transaction between the parties, neither makes any representation or warranty as to the accuracy or completeness of the Confidential Information.

5. **Compliance with Law.** This Agreement shall not be deemed to restrict the Receiving Party from complying with a lawfully issued governmental order or decree or any other legal requirement to produce or disclose Confidential Information. The Receiving Party shall notify the Disclosing Party of any such request so that the Disclosing Party may seek an appropriate protective order. The Receiving Party warrants that it shall cooperate fully with the Disclosing Party in seeking any protective order.

6. **Return of Confidential Information.** Upon written request from the Disclosing Party, the Receiving Party shall return to the Disclosing Party all Confidential Information and cause all copies and summaries and synopses thereof to be returned or destroyed.

7. **Period of Confidentiality.** The terms and obligations arising from this Agreement shall run for a period of ten (10) years from the date of this Agreement.

8. **Title.** The Receiving Party agrees that any and all Confidential Information is and shall continue to be the sole and exclusive property of the Disclosing Party and that title and the right to possess Confidential Information shall at all times remain with the Disclosing Party. No right or interest of any kind in Confidential Information is transferred to the Receiving Party under this Agreement and any such transfer shall be made only by separate and specific agreement. Without limiting the generality of the foregoing, neither this Agreement nor any disclosure of Confidential Information grants the Receiving Party any right or license under any trademark, copyright, patent, or any other intellectual property right owned or disclosed by the Disclosing Party.

9. **Equitable Relief.** The Receiving Party acknowledges that money damages may not be a sufficient remedy for breach of this Agreement and that the Disclosing Party shall also be entitled to seek preliminary and permanent injunctive relief for any such breach without having to prove actual damages or to post a bond and that the Disclosing Party shall also be

entitled to an equitable accounting of all such earnings, profits and other benefits arising from any such breach, which rights shall be cumulative and in addition to any other rights or remedies to which the Disclosing Party may be entitled in law or equity. If the Disclosing Party enforces the Receiving Party's obligations hereunder, the Receiving Party shall reimburse the Disclosing Party for all reasonable costs and expenses, including attorney's fees, incurred by the Disclosing Party in this regard.

**10.    Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Florida without reference to principles of conflicts or choice of laws. The parties hereby submit to the exclusive jurisdiction of, and waive any venue or other objections against, any United States Federal or Florida state court located in Hillsborough County, in any litigation arising under or in connection with this Agreement

**11.    Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, understandings, offers, representations or agreements between the parties, whether oral or written, relating to the subject matter hereof. No amendment or modification hereof shall be binding unless in writing and duly executed by authorized representatives of both parties.

**12.    Severability.** The provisions of this Agreement shall be severable. Invalidity or unenforceability of one provision shall not affect any other provision of this Agreement.

**13.    No Benefit to Others.** The provisions set forth in this Agreement are for the sole benefit of the parties hereto and their successors and assigns, and they shall not be construed as conferring any rights on any other persons.

**14.    Enforcement.** Each party shall have the right to enforce the provisions of this Agreement in strict accordance with its terms. The failure of a party at any time to enforce its rights hereunder strictly in accordance with the same shall not be construed as having created a custom contrary to the specific provisions hereof or as having in any way modified or waived the same.

**15.    Notices.** Any required notice shall be in writing and shall be deemed given only if delivered personally or by telecopy (with transmission confirmed), registered or certified mail, return receipt requested, or overnight delivery service. Any notice must be addressed to the parties at their respective addresses listed above or the party's last known address.

**16.    Headings.** The headings in this Agreement are for convenience only and do not in any way limit or amplify the terms in this Agreement.

**17.    Counterparts.** The parties may execute this Agreement in one or more counterpart copies, each of which shall be deemed an original. The parties agree that faxed signature copies of this Agreement shall be legally binding.

*[Signatures on next page]*

locx

The parties, each by a duly authorized representative, have executed this Agreement as of the date first above-written.

**RECEIVER**

By:_____

Name:  Burton W. Wiand
Title:  Receiver in the matter of Securities
        and Exchange Commission v.
        Arthur Nadel, et al.

**POTENTIAL BUYER**

By:_____

Name:
Title:

**Presented by:**

Burton W. Wiand, Receiver in the Matter of SEC v. Nadel et al.

**Introduction:**

Pursuant to the Order Appointing Receiver, the Receiver has the duty and authority to: "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants; marshal and safeguard all of the assets of the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors."

As the Court appointed Receiver, Mr. Wiand has the duty, responsibility, and the ultimate authority to dispose of the subject properties referenced in this material.

The subject property is the Venice Jet Center located in Venice, Florida. The property offers a full array of aviation services, including but not limited to, Jet A, AV-Gas full service, AV-Gas self service terminal, flight school and hangar space. See more info at: www.venicejetcenter.com

It is the Receiver's goal and desire to sell this property, and will entertain all reasonable offers or proposals from qualified entities or individuals.

**Pertinent information, including financial data:**

| | |
|---|---|
| Fuel Sales: | In excess of 500,000 gallons for calendar year 2008 |
| Income: | Rental income from restaurant, car rental, hanger and tie-down rentals |
| Expense: | Varies, includes monthly rent of $9,580.59 to City of Venice; insurance |
| Liabilities: | Mortgage with Northern Trust (monthly payment based on 20 years S-L for 4 years and balloon payment due 7/10/2012; Swap agreement with Northern Trust maturing on 7/10/2013 |
| Lease: | 25 year triple net lease from 6/1/06-5/31/31 with option to renew for an additional 5 yrs by notice on or before 12/31/30); adjusted every 3-yrs based on CPI (upward adjustment only) |
| Operations: | A full fixed based operation that includes a flight school, fueling service, Jet A, AV-Gas full service, AV-Gas self service terminal, hangar rentals, car rental, and café; includes all associated FBO equipment (i.e. refuelers, tugs, lav carts, GPU, golf carts); 2.5 acres of vacant land; 5000 sq/ft building available located on 1 acre parcel with ramp space for rent |
| Expansion Plans: | Proposed plan to construct 4 new 8,000 square-foot hangars |
| Aircraft: | Possible inclusion of Baron, Cessna and Cherokee |

**Photos of Venice Jet Center:**



## Land Survey (Venice Jet Center):





Brigham Surveying, Inc.
Land Surveyors
712 Shamrock Blvd.
Venice, Florida 34293
ph. (941) 493-4430

"THIS IS NOT A BOUNDARY SURVEY"





Brigham Surveying, Inc.
Land Surveyors
712 Shamrock Blvd.
Venice, Florida 34293
ph. (941) 493-4430

Title: SKETCH & DESCRIPTION
Prepared for: BRICE AIR
Certified to: BRICE AIR
Sketch No.
Field Book:
Drawn By: ____ BAX
Scale: 1" = 30'
Project
Checked By: BAX

NOTE: THIS IS NOT A SURVEY.

SURVEYOR'S CERTIFICATE

COCKRILL STREET

AIRPORT AVENUE

N

**Additional Information:**



Located in South West Florida

*Venice Jet Center*

www.venicejetcenter.com

5000 Sq ft Aviation Related Corporate Office Building and Aircraft Ramp available at Venice Airport, in beautiful Venice Florida for 3 to 25 year lease.

- On a 1 acre parcel with a large ramp
- 6 Offices
- Two 5000' runways located directly on the Gulf of Mexico
- Conference room
- Weather/Flight Planning room
- 4 Bathrooms, shower, washer dryer
- 2 Very Large Lobby Areas
- Large Reception Area
- 2 Additional Large Private Offices
- AvGas & Jet A Fuel Discount for Lessee

Contact: Roger Jernigan ● 941-915-0044 ● rwj@venicejetcenter.com



ARCHITECTURAL SITE PLAN
SCALE : 1"=50'

NORTH

VENICE JET CENTER

www.fowlerwhite.com

**From:** Rebecca.Henry@faa.gov [mailto:Rebecca.Henry@faa.gov]
**Sent:** Monday, May 18, 2009 2:08 PM
**To:** Wiand, Burton
**Cc:** william.garrison@faa.gov
**Subject:** Venice Jet Center--Procedure for filing a Part 16 Formal Complaint

Mr. Wiand,

This e-mail responds to your recent correspondence regarding the filing of a formal Part 16 complaint. As you know, we were unsuccessful in assisting Venice Jet Center with an informal Part 13 resolution to their complaint regarding airport access. You are free to file a Formal Part 16 Complaint, which will be handled by the Federal Aviation Administration's Washington Headquarters. The process for filing a formal complaint may be reviewed at:

http://www.faa.gov/airports_airtraffic/airports/airport_obligations/complaints/

I trust this information is helpful.

Rebecca Henry
Orlando Airports District Office

------------------------------------------------------------------------------------------
Disclaimer under IRS Circular 230: Unless expressly stated otherwise in this transmission, nothing contained in this message is intended or written to be used, nor may it be relied upon or used, (1) by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code of 1986, as amended and/or (2) by any person to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed in this message.
If you desire a formal opinion on a particular tax matter for the purpose of avoiding the imposition of any penalties, we will discuss the additional Treasury requirements that must be met and whether it is possible to meet those requirements under the circumstances, as well as the anticipated time and additional fees involved.
------------------------------------------------------------------------------------------
Confidentiality Disclaimer: This e-mail message and any attachments are private communications sent by a law firm, Fowler White Boggs P.A., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.