UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.

CASE NO.: 8:09-cv-0087-T-26TBM

/

**DECLARATION OF BURTON W. WIAND**

Burton W. Wiand declares as follows:

1. This Court appointed me Receiver for Scoop Capital LLC ("Scoop Capital") and the Venice Jet Center, LLC ("the VJC") on January 21, 2009 and January 27, 2009, respectively.

EXHIBIT 4

2. I have personal knowledge of, or have obtained knowledge through my investigation of matters during the course of this Receivership, regarding the matters asserted herein and transactions and agreements entered into with third parties concerning these entities; I am competent to testify thereto.

3. The VJC is a Florida limited liability company, formed in 2006 and managed by Arthur Nadel. Nadel utilized approximately $2.9 million of investors' funds to acquire and develop the VJC.

4. The VJC operates as a fixed-base operator at the Venice Municipal Airport pursuant to a lease agreement entered into with the City of Venice. *See* Motion for Approval of the Sale of the VJC's Assets: Exhibit 4 filed on December 9, 2009 (the "Motion"). The VJC's FBO business includes the operation of a flight school, fueling services and hangar rentals on its leasehold.

5. The VJC is located at 400 Airport Avenue East, Venice, Florida, 34285 and its premises include two hangars, a tie-down area, a fuel farm, a main building, and a secondary building.

6. The VJC has sublease agreements with Hertz Corporation ("Hertz") and the Cockpit Café which operate their businesses (a car rental business and a restaurant, respectively) on the VJC's leasehold.

7. The VJC has earned average monthly revenues of approximately $160,000; which are generated by: (1) rent and commissions from Hertz; (2) hangar and tie-down rentals; (3) monthly rent from the Cockpit Café; and (4) fuel sales. The VJC incurs varying

monthly expenses, which include: rent of approximately $10,500 to the City of Venice, bulk fuel purchases, payroll, and utilities.

8. The VJC's main building and two hangars are encumbered by a loan with Northern Trust, N.A. ("Northern Trust"), on which a balance of approximately $1,960,169.00 remains. Payments were made on this loan until June of 2009.

9. Since taking control of the VJC, its revenue potential has been undermined by the City's interference with its property rights. Prior to going into receivership, the VJC sought approval to build four new hangars on its leasehold. The City has repeatedly denied VJC approval to build the hangars and has acted in a discriminatory and anti-competitive fashion in attempts to prevent the VJC from improving its leasehold. *See* Motion: Exhibit 4.

10. The new hangars would permit the VJC to service additional aircraft and would increase the value and revenues of the company. Prospective purchasers have communicated to me that the ability to build the hangars was a significant factor when considering whether to buy the VJC. Accordingly, I have pursued the VJC's right to build the hangars and this pursuit culminated with the filing of an action with the Federal Aviation Administration against the City of Venice. *See* Motion: Exhibit 4.

11. The Federal Aviation Administration has directed the City of Venice on multiple occasions to approve the hangars project but the City Council continues to actively prevent the construction. The City has gone so far as to announce its intent to purchase the VJC for a nominal amount and take over its operations. *See* Motion: Exhibit 4.

12. The VJC filed a complaint against the City pursuant to Title 14 of the Code of Federal Regulations, Part 16 ("Part 16") on July 2, 2009. *See* Motion: Exhibit 4.

13. The pleading stage of the Part 16 action is complete and I have been informed that the parties have the opportunity to engage in limited discovery before presenting their case at an evidentiary hearing.

14. The proposed purchaser of the VJC, Tristate Aviation Group of Florida LLC ("Tristate"), has informed me that it plans to proceed with this action in an effort to build the additional hangars.

15. Prior to entering into negotiations with Tristate for the sale of the VJC's assets, extensive marketing efforts were undertaken to find a buyer that would present the best and most beneficial offer to the Receivership.

16. These marketing efforts included preparing detailed marketing packages regarding the VJC which were sent to more than 100 FBOs operating in the state of Florida. I received responses from a number of these FBOs.

17. The marketing materials were also posted on the receivership website, www.nadelreceivership.com, in an "Assets for Sale" section. As a result of the information posted on the website, I was also contacted by five prospective purchasers. Marketing packets were provided to these additional prospective purchasers.

18. I requested that all parties interested in purchasing the VJC sign a mutual confidentiality agreement. Twenty prospective purchasers executed such an agreement and requested additional information regarding the VJC. I, or other representatives of the VJC, spoke to all of these prospective purchasers.

19. On May 7, 2009, I sent letters to eight interested parties who appeared to be viable purchasers of the VJC. I invited these parties to tour the VJC and review pertinent

documents, such as the VJC's financial statements, lease agreements, and loan documentation.

20. In the following weeks, twelve other interested parties were sent similar invitations to tour the facility and review documents. Between approximately May 19, 2009 and June 26, 2009, at least eight interested parties accepted this invitation and toured the facility and reviewed documents.

21. On July 8, 2009, I sent a follow-up communication giving 17 of the prospective purchasers who had executed a confidentiality agreement until July 16, 2009 to tour the facility and until July 28, 2009 to make an offer for the purchase of the VJC.

22. In response to my letter, I received six proposals for the purchase of the VJC, which were carefully reviewed. Only two were viable offers. Of those two proposals, I believe that accepting the offer by Tristate is in the best interests of the Receivership.

23. The salient terms of the next highest offer included only the payment of $500,000 with no provision for the satisfaction of the outstanding loan with Northern Trust. This offer would have left a net liability of the Receivership estate to Northern Trust of at least $480,000.

24. Earl Niemoth, another prospective purchaser, who has petitioned this Court for relief on several occasions, offered to pay $100,000 and conditioned that payment on my showing that the VJC had cash in excess of $120,000. I invited this prospective purchaser to submit an offer in excess of the bank debt. No such offer was forthcoming.

25. The City of Venice was kept apprised of my marketing efforts and invited on several occasions to participate in the sale process; however, the City has not made any offer to purchase the VJC.

26. Through the process of marketing and negotiating the sale of the VJC assets to Tristate, I have learned the following:

    A. Tristate, a Florida limited liability company, was formed for the purpose of purchasing the VJC. Tristate's Managing Director, Marty Kretchman, is a former corporate pilot who has extensive experience in private aviation management.

    B. Mr. Kretchman spent over three years as General Manager of Avion Jet Center at the Orlando-Sanford International Airport before accepting the position of General Manager at Volo Aviation's newly acquired FBO in Sarasota in early 2008. He has overseen an operation that delivers over one million gallons of fuel annually including a combined staff of 15 fuelers, customer service representatives, and mechanics, as well as over 40,000 square feet of hangar and office space.

    C. In addition to Mr. Kretchman, Tristate's leadership team will include two other individuals, Brian Ciambra and Henry Paulino. Mr. Ciambra has over 17 years of aviation experience, half of which was spent working with the world's largest FBO chain, Signature Flight Support. Within that organization, he held the title of Regional General Manager covering White

Plains and LaGuardia in New York and Morristown in New Jersey, some of the largest and most successful operations in Signature Flight Support's worldwide network. He personally oversaw the establishment of the Volo Aviation brand name and the acquisition of five FBOs across the country.

D. Mr. Paulino has worked in aviation for over 16 years. He spent 12 years with Signature Flight Support as General Manager of several of their facilities in the Northeast. Along with Mr. Ciambra, he also worked with an entity that acquired a small underutilized FBO in Westchester County, New York in June 2004. As Director of Operations there, he was able to help turn the average EBITDA from $500,000 annually to over $3 million in less than two years.

27. Based on the information I have learned, Tristate is a qualified purchaser and plainly capable of effectively operating the FBO in accordance with FAA guidelines and airport standards.

28. Tristate has agreed to purchase the assets of the VJC, including the VJC's building, according to the terms set forth in the Asset Purchase Agreement attached as Exhibit 1 to the Motion.

29. Tristate will: (1) pay $300,000 cash at closing, (2) execute an unsecured promissory note in the amount of $250,000 payable over a term of three years, (3) resolve the loan with Northern Trust such that Tristate will be named as the new debtor, and (4) assume prosecution of the Part 16 Complaint subject to an offset of the note obligations of up to $50,000 for expenses and costs actually incurred in connection with efforts to resolve all

disputes with the City, including the Part 16 Complaint. Tristate has negotiated a loan agreement with Northern Trust and as a result thereof, will undertake a debt relationship with the Bank and the Bank will waive all claims against the Receivership.

30. I, on behalf of the VJC, have agreed to: (1) sell and transfer all rights in the Assets described on Exhibit 3 to the Motion without making any warranties of any kind, and (2) transfer by assignment the VJC's rights and interests in its lease with the City and the two subleases with Hertz and the Cockpit Café.

31. In connection with the sale of the VJC's assets to Tristate, the lease agreement entered into between the City of Venice and the VJC on May 23, 2006, must be transferred.

32. The terms of the lease agreement provide that the VJC shall not assign the lease without first obtaining the City's written consent, "which consent shall not be unreasonably withheld."

33. I believe that, based upon the City's past conduct, there is a real likelihood the City will unreasonably withhold consent to the transfer of VJC's lease.

34. Past conduct on behalf of the City to thwart the VJC's efforts to build the hangars and to prevent expansion of the airport is set out in detail in the VJC's Part 16 Complaint. *See* Motion: Exhibit 4.

35. Because Tristate is a qualified purchaser with an experienced management team plainly capable of effectively operating the FBO, there is no reasonable basis for the City to withhold its consent to the transfer of the lease to Tristate.

36. Appurtenant subleases with Hertz and the Cockpit Café should also be transferred to Tristate. Tristate is willing to assume the obligations associated with the assignment of these leases.

37. The VJC currently has existing agreements with Hiller Group Incorporated ("Hiller Group") which will be terminated. The Refueler Lease Agreement for the lease of two fuel vehicles was entered into on July 1, 2006 and terminates July 1, 2011. The Aviation Fuel Supply Agreement for the provision of jet fuel was entered into on December 1, 2006 and is set to terminate on November 30, 2011.

38. Tristate has its own equipment and fuel supply and is not interested in assuming these agreements. The Hiller Group has been informed that Tristate will not assume responsibility under the VJC's Refueler Agreement or Fuel Supply Agreement and it has agreed to that termination.

39. As part of my negotiations to sell the VJC, I have reached an agreement with Northern Trust, which will alleviate significant debt obligations of Receivership entities.

40. The details of the agreement with Northern Trust are set forth in the Agreement to Settle Claims and Obligations and Covenant Not to Sue and attached to the Motion. *See* Motion: Exhibit 2.

41. As a result of that agreement, Northern Trust is waiving over $400,000 in swap penalties, approximately $1,000,000 of debt obligations, and the Receivership will gain over $500,000 from the sale of the VJC's assets.

42. Prior to filing the Motion on December 9, 2009, I caused a copy of the Motion and all exhibits thereto to be delivered to the Mayor of the City of Venice and the City Attorney.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated this 9th day of December, 2009.

_____
Burton W. Wiand