UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:09-CV-87-T-26TBM

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

vs.

ARTHUR NADEL; SCOOP CAPITAL, INC.;
And SCOOP MANAGEMENT, INC.,

    Defendants,

SCOOP REAL ESTATE, L.P.; VALHALLA
INVESTMENT PARTNERS, L.P.;
VALHALLA MANAGEMENT, INC.;
VICTORY FUND, LTD.;
VICTORY IRA FUND, LLC;
And VIKING MANAGEMENT, LLC,

    Relief Defendants.
_____/

### NON-PARTY CAROLINA MOUNTAIN LAND CONSERVANCY'S RESPONSE TO ORDER TO SHOW CAUSE AND OPPOSITION TO EXTINGUISHMENT OF CONSERVATION EASEMENT

Non-party Carolina Mountain Land Conservancy ("the Conservancy") hereby files its response to this Court's November 24, 2009 Order to Show Cause, and opposes the motion of Burton W. Wiand, as Receiver ("the Receiver") seeking to extinguish a 169 acre conservation easement which is held by the Conservancy and is a part of the 430 acre Laurel Mountain Preserve located North Carolina, and in support states:

### Introduction

In 2003, Laurel Mountain Preserve, LLC ("Laurel Mountain") purchased an approximately 430-acre tract of land ("the Project Property") in Buncombe and McDowell

Counties in the mountains of Western North Carolina. (Declaration of Kieran Roe, "Roe Decl." at ¶ 5). Laurel Mountain worked extensively on a development plan to create an exclusive conservation-based mountain community, called the Laurel Mountain Preserve, consisting of a very limited number of home lots and a 169-acre permanent preserve in which community members could hike and take advantage of the natural environment. (Roe Decl., ¶ 9). This preserve consists of a Rich Cove Forest and a rare Old Growth Forest, never before logged, located on land within the Project Property that is so rugged and steep that it is much less suitable for development and lacks the views that make the contemplated 10 acre lots valuable. (Roe Decl., ¶ 13). Because of its steepness and absence of views the conserved 169 acres does not lend itself to development. (Roe Decl., ¶ 13).

The preserve is an integral part of the Laurel Mountain Preserve development, and adds substantial value and marketability to the lots within the development. (Roe Decl., ¶ 26).

To create the preserve, Laurel Mountain contracted with the Conservancy, a long-established and well-recognized local nonprofit environmental conservation group and land steward. (Roe Decl., ¶ 18). The Conservancy would receive in trust for the community a conservation easement ("the Easement") that would permanently protect approximately 169 acres ("the Easement Property") of the Project Property. (Roe Decl., ¶ 14). For its part, the Conservancy would monitor the environmental health of the Easement Property and defend the Easement in perpetuity, receiving a standard and customary stewardship donation for this purpose. (Roe Decl., ¶¶ 16-17 ). On December 1, 2005, Laurel Mountain granted the Easement to the Conservancy. (Roe Decl., ¶ 23). In addition to the marketing benefits to Laurel Mountain Preserve and the increased value of the lots within the Project Property, Laurel Mountain received substantial federal and state tax benefits for giving the Easement and thereby preserving the Easement Property. (Roe Decl., ¶ 25).

In January of 2009, this action was filed, alleging that Defendant Arthur Nadel ("Nadel") had overstated the value of hedge funds managed by his investment entities, Defendants Scoop Capital, LLC ("Scoop Capital"), and Scoop Management, Inc. ("Scoop Management"). (Doc. 1)

The Receiver was appointed to take control of various Nadel-controlled entities and to gather and protect those entities' assets for the benefit of their creditors. (Doc. 8) The Receivership was expanded to include Laurel Mountain, because Nadel was its member and manager. (Doc. 36, 44) Nadel has denied the allegations. (Doc. 104) Nadel has objected in particular to the Plaintiff's seizure of "assets acquired long before 2008," and to the Plaintiff's seeking assets "back in time without any apparent limit or justification." (Id.) This action is currently set for trial on January 3, 2011, with discovery to be taken through July 31, 2010. (Doc. 128)

The Receiver's Motion seeks, in a summary proceeding to be conducted without any discovery, to extinguish the Easement, an interest in North Carolina real property that belongs to the Conservancy, which is not a party to this action, and the return of $30,429 in stewardship donations from the Nadels or the Guy-Nadel Foundation. The Conservancy has never received proper service of process of either the Receiver's Motion or any complaint. (Roe Decl., ¶ 35). The Receiver's Motion asserts that the Easement should be extinguished, pursuant to the North Carolina Uniform Fraudulent Transfers Act (the "UFTA"), because the grant of the Easement from Laurel Mountain to the Conservancy is alleged to have been fraudulent as to Laurel Mountain's creditors, specifically Scoop Capital and Scoop Management, and by extension certain hedge funds alleged to be their creditors (the "Relief Defendants").

**Argument**

The Receiver's Motion should be denied because (1) it has not served the Conservancy with process, contravening the fundamental tenents of due process, and (2) the relief it seeks is not the appropriate subject of a summary proceeding conducted without discovery, and (3) genuine issues of material fact remain on key elements of the substantive law underlying the Receiver's claims.

    **1. The Receiver's Motion Must be Denied Because the Conservancy has not Been Served With Process.**

The Receiver's Motion must be denied because it seeks to deprive the Conservancy of its property without due process. The Conservancy is not a mere nominal defendant, but instead has

3

a genuine interest in the Easement. (Roe Decl., ¶ 24). Yet the Conservancy has not been made a party to this action, and has never been served with process. (Roe Decl., ¶ 35) In the absence of service of process, the Court lacks the personal jurisdiction over the Conservancy that due process requires.

Courts have sometimes held, in a receivership action, that service of process need not be made on a mere "nominal defendant," see SEC v. Colello, 139 F.3d 674 (9th 1998). The Receiver's failure to make any attempt to properly serve the Conservancy or make it a party to this action suggests that the Receiver believes the Conservancy to be a nominal defendant. Clearly, the Conservancy is more than a nominal defendant.

> A "nominal defendant" is a person who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is the subject of litigation. A nominal defendant holds the subject matter of the litigation "in a subordinate or possessory capacity as to which there is no dispute. . . . . A nominal defendant is not a real party in interest, however, because he has no interest in the subject matter litigated. His relation to the suit is merely incidental and "it is of no moment [to him] whether the one or the other side in [the] controversy success[s]." Because of the non-interest status of the nominal defendant, there is no claim against him and it is unncecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established.

SEC v. Cherif, 933 F.2d 403, 414 (7th Cir. 1991). Where, however, there is an actual interest in the subject matter of the controversy, the Court cannot treat an entity like the Conservancy as a mere nominal defendant, subject to having that interest extinguished without service of process. See id.

The Conservancy is not like a depositor institution or escrow agent merely holding the interest of another to be surrendered on given terms. Instead, the Conservancy is the named grantee of the Easement, and is bound by its terms to hold the Easement in perpetuity, and to protect it. (Roe Decl., ¶ 25).

4

Because the Easement is an interest in North Carolina real property, and the Conservancy is the owner of that interest, in order to extinguish the Easement, North Carolina law [1] requires that the Conservancy be made a party to this action. Rice v. Randolph, 384 S.E.2d 295, 297 (N.C. App. 1989) (holding that a dispute as to the extinguishment of an easement could not be resolved without the joinder of those persons with rights in the easement: "Those owners of interests in the easement have a material interest in the subject matter of the controversy, and their interest will be directly affected by the court's decision."); See also Unaka v. Lewis, 159 S.E. 312, 314 (N.C. 1931) (Wife was a necessary party to action by husband's creditor to set aside conveyance or real property to wife); Farmers' Bank & Trust Co. v. Murphy, 127 S.E. 527, 528 (N.C. 1925)("Snell [alleged owner of real property] was a necessary party for a final and complete determination of the ownership of the property. . . . He had a right to intervene or interplead."); (Aman v. Waller, 81 S.E. 162, 164 (N.C. 1914) (Purchaser of real property was a necessary party to an action to set aside fraudulent conveyance of property).

Because it was not served as a party in this litigation, this Court does not have personal jurisdiction over the Conservancy. See SEC v. Ross, 504 F.3d 1130 (9th Cir. 2007) (holding that even when a receiver is empowered to exercise nationwide service of process, "in order for the court to assert personal jurisdiction over a party-in-interest, the party must be properly served" in accordance with Fed. R. Civ. P. 4(k), otherwise a district court's in personam power over that party remains "nothing more than a potentiality"). Such jurisdiction has long been required, even in receivership actions. See SEC v. Naftalin ("the general rule [is] that possession of property cannot legally be obtained in a receivership by summary process against a stranger to the record claiming title and right to possession. 'When property, in the possession of a third person, is claimed by the receiver, the complainant must make such person a party by amending

---

[1] As correctly noted by the Receiver, the real property underlying the Easement is situated in North Carolina, and all agreements pertaining to the Easement were executed in North Carolina. As such, the Easement is subject to the laws of North Carolina. See Denison v. Denison, 658 So.2d 581, 582 (Fla. 4th DCA 1995); Beale v. Beale, 807 So.2d 797, 798 (Fla. 1st DCA 2002).

5

16065934.1

the bill, or the receiver must process against him by suit in the ordinary way.' quoting Davis v. Gray, 83 U.S. 203, 218 (1872)).

The Receiver must, therefore, serve the Conservancy with process and make it a party to this action.

2. **The Receiver's Motion Must be Denied Because a Summary Proceeding is not an Appropriate Means to Adjudicate the Receiver's Claims Against the Easement.**

The Receiver's Motion should be denied because the Receiver has not carried its burden to demonstrate that summary proceedings are appropriate in this case. This Court has wide discretion to craft appropriate procedures, even in summary proceedings, to dispose of disputes related to receivership property. Where, as here, a receiver seeks to extinguish a property interest, those procedures consistently include the right to be made a party to the action, to conduct discovery, and to have an evidentiary hearing.

The Receiver's Motion cites SEC v. Universal Financial, 760 F.2d 1034 (9th Cir. 1985) and SEC v. Elliott, 953 F.2d 1560 (11th Cir. 1992) for the proposition that summary proceedings are an appropriate means, in a receivership such as this one, to extinguish a non-party's property rights. Both cases demonstrate instead that summary proceedings are inappropriate here.

In Universal Financial, investors sought to sue to establish their interests in receivership property consisting of notes and deeds of trust. The trial court conducted test trials of their interests and, when the trial court refused to lift a stay against their pursuing these claims outside the receivership, they appealed. The court of appeal rejected their argument that they should have been provided a plenary, rather than a summary proceeding, specifically because "the district court afforded Investors virtually all of the procedural protections which would have been available in plenary proceedings. Investors were allowed extensive discovery, including the right to take deposition, and were permitted to file numerous briefs and exhibits in connection with the test cases." Id. at 1037. Universal Financial holds that substance controls

6

over mere name in determining what process is due, and suggests that the opportunity to conduct discovery to test a receiver's contentions, is a key component of that process.

In Elliott, the court applied this rule to conclude that the district court had violated due process by making findings of fact and ruling on a receiver's fraudulent transfer claim without allowing the grantee of the alleged fraudulent transfer to intervene and become a party, conduct discovery, and have an evidentiary hearing. Id. at 1567-68. "[The grantees] asserted claims that required and evidentiary hearing. It may turn out that the facts are undisputed, but this has not been determined." Id. at 1568. Elliot expansively describes the district court's authority to craft summary proceedings appropriate to the issue before it, then holds that one in the exact position of the Conservancy here should not be deprived party status, discovery, and an evidentiary hearing.

As explained below, the substantive law that the Receiver's Motion seeks to apply requires factual findings that typically cannot be made at summary judgment, but require an evidentiary hearing, just as did the claims in Elliott. Even if the facts turn out to be undisputed after discovery, so that summary judgment could be rendered, the defendant must be allowed discovery before summary judgment. Snook Trust Co. of Ga. Bank, 859 F.2d 865 (11th Cir. 1988).

> Summary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery. The party opposing a motion for summary judgment has a right to challenge the affidavits and other factual materials submitted in support of the motion by conducting sufficient discovery so as to enable him to determine whether he can furnish opposing affidavits. If the documents or other discovery sought would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials.

Id. at 870. See also Galligan v. Raytheon Co., No. 8:08-cv-2427, 2009 WL 2985689 (M.D. Fla. Sept. 15, 2009) (denying motion for summary judgment because discovery had not been conducted); Blumel v. Mylander, 919 F. Supp. 423 (M.D. Fla. 1996) (same).

### 3. Genuine Issues of Material Fact Remain on key Elements of the Substantive Law Applicable to the Receiver's Claims.

Even though the Conservancy has not yet been provided any opportunity for discovery, it is already clear that disputed issues of material fact would prevent summary extinguishment of the easement. The Receiver has not demonstrated that the transfer was made with the intent to hinder, delay, or defraud creditors, or that Laurel Mountain was insolvent at the time of the transfer. Moreover, with respect to the stewardship grant, the Receiver has not demonstrated that the grant was not given for reasonably equivalent value in the form of the Conservancy's ongoing environmental monitoring of the Easement. These substantial disputed issues of material fact must therefore be the subject of a trial conducted after appropriate discovery.

Under North Carolina's Uniform Fraudulent Transfers Act, N.C. Gen. Stat. § 39.23.1 et seq. (the "UFTA"), the transfer of an asset is not fraudulent merely because it is "voluntary" (i.e., given other than in exchange for reasonably equivalent value). See, e.g., Valdese General Hospital, Inc. v. Burns, 339 S.E. 2d 23 (N.C. App. 1986). In order to avoid a transfer, a creditor must show not only that the transfer was voluntary, but that the transfer either (a) was made at a time when the debtor does not retain sufficient property to satisfy existing debts, or (b) was made with actual intent on the part of the grantor to hinder, delay, or defraud creditors. See id. at 25(holding that although transfer was voluntary it could not be set aside unless insolvency or intent to defraud could be shown).

In Valdese, a hospital sought to set aside a patient's conveyance of land to her children, alleging that the transfer left her unable pay her hospital bills. The defendants did not dispute that the conveyance "was voluntary and without legally cognizable consideration." Id. at 25. The court of appeals nevertheless reversed the summary judgment that had been entered for the plaintiff, finding that there were disputed issues of material fact as to whether the transfer was made with intent to hinder, delay, or defraud creditors, and whether it left the debtor unable to pay what she owed the hospital.

8

> Before a conveyance may be set aside as fraudulent, the finder of fact must find that the conveyance was voluntary, that the conveyance was made without fair and reasonable consideration and that the conveyance was either made with the intent to defraud creditors or made so that at the time of the conveyance the transferor does not retain sufficient property to satisfy his then existing debts.

Id.

The seminal case on North Carolina's UFTA is Aman v. Waller, 81 S.E. 162 (N.C. 1914), which framed the issues in this frequently quoted formulation:

> (1)    If the conveyance in voluntary and the grantor retains property fully sufficient and available to pay his debts then existing and there is no actual intent to defraud, the conveyance is valid.
> (2)    If the conveyance is voluntary and the grantor does not retain property fully sufficient and available to pay his debts then existing, it is invalid as to creditors, but it cannot be impeached by subsequent creditors without proof of the existence of a debt at the time of its execution which is unpaid, and when this is established and the conveyance avoided, subsequent creditors are let in and the property is subjected to the payment of creditors generally.
> (3)    If the conveyance is voluntary and made with the actual intent upon the part of the grantor to defraud creditors, it is void, although this fraudulent intent is not participated in by the grantee, and although property sufficient and available to pay existing debts is retained.

Id. at 164.

Here, as detailed below, even before discovery has been conducted there is already substantial dispute about whether the debtor identified in the Receiver's motion was insolvent as a result of the transfer, and about whether the debtor made the transfer with intent to hinder, delay, or defraud creditors. North Carolina courts have recognized that these issues often are not appropriate for summary judgment.

In Lewis v. Blackman, 448 S.E. 2d 133 (N.C. App. 1994), Mr. Blackman went into the hospital with an aneurism, the Mrs. Blackman injured Lewis in a car accident. While Mr. Blackman was still in the hospital, he and Mrs. Blackman signed deeds of their property to their children for no consideration. Lewis sought to set aside the conveyances as fraudulent transfers made with intent to hinder, delay or defraud. The Blackmans argued that the transfers were part

9

of a pre-existing estate plan and had not been made to frustrate the anticipated judgment creditor Lewis. The district court nevertheless entered summary judgment against the Blackmans, but the court of appeal reversed, noting that summary judgment is generally inappropriate in such action because it "necessarily involves a question concerning the existence of fraudulent intent. . ." Id. at 136.

Similarly, in Valdes, the court reversed summary judgment that had been granted to the allegedly defrauded creditor, concluding that there was a genuine dispute of material fact as to whether the transfer had left the debtor insolvent. Id. at 26 ("Plaintiff disputes the amount retained after the conveyance. Clearly, genuine issues of material fact remain to be resolved.").

### a. The Receiver has not Established That the Debtor was Insolvent at the Time of the Grant of the Easement.

The Receiver asserts that all of Nadel's investment vehicles ("the Relief Defendants") were operated essentially as one fund, and that the value of that fund was overstated to its investors, resulting in wrongful payments to Nadel and his entities Scoop Capital and Scoop Management. As a result, the Receiver alleges that the Relief Defendants (and, ultimately, their investors) are creditors of Nadel, Scoop Capital, and Scoop Management. The Receiver also asserts that Laurel Mountain was funded by loans and other transfers from Nadel and his entities that ultimately had the investors as their source. As a result, the Receiver alleges that the other Receivership Entities are creditors of Laurel Mountain and, in effect, the investors are creditors of Laurel Mountain.

The Receiver's Motion does not make the Receiver's theory of fraudulent transfer perfectly clear. The theory might be that the other Receivership Entities were creditors of Laurel Mountain, so that the easement was an attempt to delay them in recouping what Laurel Mountain owed them. Or, the theory might be that all of these entities, including Laurel Mountain, were mere alter egos of Nadel, that their corporate forms can therefore be ignored, so that the investors

10

could be considered direct creditors of Laurel Mountain, and the easement part of an elaborate attempt by Nadel to delay them in recouping what he and all these entities owed them.

Under either theory, summary judgment cannot be granted on this record. The issues of whether all of the Receivership Entities' corporate forms can be pierced, and whether and in what amount each Defendant is liable to investors are among the questions that are scheduled to be tried as a result of Nadel's defenses in January of 2011, and as to which discovery is to be taken through July of 2010. The more specific and significant issue here, whether Laurel Mountain itself was insolvent at the time of the transfer of the Easement, presents a disputed fact issue.

Laurel Mountain was heavily engaged in development of the Project Property. (Roe Decl., ¶¶ 9-13). The project itself had substantial value, particularly in light of market conditions at the time of the transfer. (Roe Decl., ¶ 26). While Laurel Mountain had borrowed heavily in the course of developing the project, such borrowing was well within the normal course of business for such a developer. The Easement was an integral part of the project, and added market value to the lots to be sold in the project. (Roe Decl., ¶ 26). In addition, it provided substantial tax benefits to Laurel Mountain.[2] (Roe Decl., ¶¶ 27-28). The Easement did not even approach the level of being all or substantially all of Laurel Mountain's assets.

Determining whether an entity is insolvent for purposes of a claim under North Carolina's UFTA is not merely a matter of examining the entities balance sheet to see whether it could pay off all of its creditors on any given day. Where an entity is engaged in the normal course of business with favorable prospects, regardless of its "balance sheet insolvency," it may

---

[2] The Receiver's Motion suggests these tax benefits are irrelevant because Nadel took the deduction. The Receiver has not pointed to anything suggesting that an LLC's passing such a tax deduction through to its members would be improper. More importantly, since both Laurel Mountain's and Nadel's assets are subject to the receivership, these tax deductions benefited the receivership either way.

16065934.1

not be insolvent for purposes of a fraudulent transfer action. Norman Trucking, Inc. v. Morkoski, 506 S.E. 2d 267, 272 (N.C. App. 1998).

In Norman, a creditor sued to recover alleged fraudulent transfers by a tire recycling business to one of its principals. The transfers had been made at a time when the business's balance sheet showed it heavily indebted, and its business shortly thereafter collapsed. After a jury verdict in favor of the creditor, the court of appeal reversed, noting that businesses often operate with a substantial debt load, and that an ongoing business is not insolvent for purposes of North Carolina's UFTA because of this "not uncommon business occurrence." Id. at 272.

> In short, the evidence was that the enterprise had favorable prospects and was engaged in the normal course of business, although experiencing cash flow difficulty.
> The instant case is akin to that of Whitley v. Carolina Clinic, Inc., 118 N.C. App. 523, 455 S.E. 2d 896, disc. review denied, 340 N.C. 363, 458 S.E. 2d 197 (1995), in which plaintiffs sought to set aside corporate deferred compensation payments to the defendant's owners and directors in excess of $1,400,000.00, allegedly advanced at a time when the defendant corporation was insolvent. Id. at 525, 455 S.E. 2d at 898. Plaintiffs "base[d] their claim on the fact that the [defendant's] audited balance sheets [for the relevant time period] reflect[ed] liabilities in excess of assets and negative stockholders' equity." Id. at 526, 455 S.E. 2d at 899. In affirming summary judgment on plaintiffs' breach of fiduciary duty claims (analogous to the instant fraudulent conveyance claim) in favor of the owners and directors, this Court observed that more than "balance sheet insolvency," id. at 527, 455 S.E. 2d at 899, is required, explaining in the words of a leading treatise that "a corporation is not insolvent, as a general rule, merely because it is embarrassed and cannot pay its debts as they become due, or because its assets, if sold, would not bring enough to pay all its liabilities, if it is still prosecuting its business in good faith, with a reasonable prospect and expectation of continuing to do so." Id. at 527-28, 455 S.E. 2d at 900 (quoting 15A William A. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 7472 at 273-74 (perm. Edt. Rev. vol. 1990).

Norman, 506 S.E. at 272.

Here, whatever Laurel Mountain's balance sheet may reflect, it appears that it had a valuable project in development, was moving that development forward, and that the transfer the Receiver seeks to set aside was a normal part of such a project. Under Norman, therefore, the

12

question of whether Laurel Mountain was insolvent within the meaning of North Carolina's UFTA will likely present a genuine factual dispute. The Receiver's request for summary relief should, therefore, be denied, and the Conservancy should be provided an opportunity to conduct discovery on this issue.

### b. The Receiver has not Established That the Transfer was Made With the Intent to Hinder, Delay, or Defraud a Creditor.

In both <u>Lewis</u> and <u>Valdese</u>, discussed above, the court of appeals reversed summary judgment for the creditor and pointed out that the issue of actual intent to hinder, delay, or defraud a creditor is rarely a summary judgment issue because of the need to assess the credibility of witnesses and balance circumstantial evidence of the debtor's state of mind. Similarly, here, Laurel Mountain's intent in creating the Easement presents a genuine factual dispute. Indeed, it appears likely that Laurel Mountain's intent was to benefit its core project and provide itself with substantial tax benefits, not to defraud creditors who were yet years away from making any claim.

In the typical fraudulent transfer scenario, as creditors are imminently bearing down on the debtor, the debtor transfers an asset in a way designed to protect it from the creditor while still maintaining its value for the debtor. Both <u>Lewis</u> and <u>Valdese</u> involved exactly this scenario, with the injured motorist and the hospital bearing down, and the debtor's real property transferred to family members (the quintessential insiders), in a way that would allow the debtor to continue to use the property. Yet, in both <u>Lewis</u> and <u>Valdese</u>, when the debtors put forth the suggestion of a legitimate estate planning purpose for the transfer, this was enough to create a fact issue on fraudulent intent.

Tellingly, the factors that North Carolina's UFTA directs courts to consider in determining intent weigh heavily against a finding of fraudulent intent here. <u>See</u> N.C. Gen. Stat. § 39-23.4(b).

> (1) "The transfer or obligation was to an insider;" here, the Conservancy is a well-established charitable organization and not an insider. (Roe Decl., ¶ 3).

13

(2) "The debtor retained possession or control of the property transferred after the transfer;" here, the Easement was permanent and nothing Laurel Mountain could do would allow it to defeat the restrictions of the Easement. (Roe Decl., ¶¶ 24-25).

(3) "The transfer or obligation was disclosed or concealed;" here, the transfer was fully disclosed by recording in the public records, and the Easement itself was advertised to the public by Laurel Mountain as a key feature of its project. (Roe Decl., ¶ 30).

(4) "Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;" here, there is no evidence of any indication in 2005, when the transfer was made, that the SEC's 2009 claims were on the way.

(5) "The transfer was of substantially all the debtor's assets;" here, the Easement represented only a fraction of Laurel Mountain's assets, since it retained the underlying fee interest in the Easement Property, all of the remaining Project Property and, most significantly, a project which increased in value as a result of the Easement. (Roe Decl., ¶ 26).

(6) "The debtor absconded;" far from absconding, Laurel Mountain continued to develop the project and indeed invited prospective purchasers to tour the Easement itself in order to see the value it added to the project. (Roe Decl., ¶ 30).

(7) "The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;" here, while "consideration" in the formal sense was not in play, the value received by Laurel Mountain, in the form of tax benefits and the enhanced value of the project, was substantial, and its exact measure is clearly a fact issue. (Roe Decl., ¶ 26-29).

(8) "The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred;" as discussed above, Laurel Mountain's solvency as an ongoing concern is clearly a fact issue, as Laurel Mountain continued to operate in the normal course and develop the project well after the creation of the Easement. (Roe Decl., ¶¶ 30-32).

(9) "The transfer occurred shortly before or shortly after a substantial debt was incurred;" as discussed above, Laurel Mountain's debts were a normal part of its development activities, so this factor does not weigh in favor of a finding of fraudulent intent.

(10) "The debtor transferred the essential assets of the business to a leinor who transferred the assets to an insider of the debtor;" such a scenario is not even alleged here.

14

(11) "The debtor made the transfer or incurred the obligation without receiving a reasonable equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due;" as discussed above, the benefits Laurel Mountain derived from creation of the Easement were substantial, though they were not formal consideration, and every indication is that Laurel Mountain's expectation was of substantial profit from the project. Indeed, third parties, the institutional creditors who provided mortgage financing for the land acquisition clearly anticipated the same. (Roe Decl., ¶¶ 26-29).

(12) "The debtor transferred the assets in the course of legitimate estate or tax planning;" here, the transfer provided substantial state and federal tax benefits to Laurel Mountain. (Roe Decl., ¶ 27-28).

The question of the grantor's intent, therefore, remains a key disputed issue of fact.

### c. The Receiver has not Established That the Stewardship Grant was not Given in Exchange for Reasonably Equivalent Value.

Finally, the Receiver's Motion also seeks the return of $30,429 in stewardship donations from the Nadels or the Guy-Nadel Foundation. These donations, however, were given in conjunction with the Easement, in exchange for reasonably equivalent value provided by the Conservancy in the form on ongoing environmental monitoring and reporting. (Roe Decl., ¶¶ 15-17, 33). The Receiver has pointed to no evidence indicating that they were not. Further, the Receiver has pointed to no evidence that the Conservancy had any knowledge or notice of any fraudulent intent on the part of the grantor, and indeed the Conservancy had no such notice. (Roe Decl., ¶ 9).

Where, as here, a transfer is made in exchange for reasonably equivalent value, then it may not be set aside as fraudulent under North Carolina's UFTA unless the grantor had a fraudulent intent <u>and</u> the grantee has knowledge or notice of such intent. See <u>Aman v. Waller</u>, 81 S.E. 162, 164 (N.C. 1914) ("If the conveyance is upon a valuable consideration, and made with the actual intent to defraud creditors upon the part of the grantor alone, not participated in by the grantee, and of which intent he has no notice, it is valid.").

Since the stewardship grant was given for reasonably equivalent value and the Conservancy had no knowledge or notice of any fraudulent intent on the part of the grantor (if,

15

indeed, there even was such intent), the stewardship grant may not be set aside, and certainly not in a summary proceeding. A genuine fact issue, at the very least, remains on these issues.

Thus, even before the Conservancy has been provided any opportunity to conduct discovery, it already appears that Laurel Mountain did not transfer the Easement with the requisite intent to hinder, delay, or defraud creditors. Instead, it did so in good faith, and for legitimate business purposes. Indeed, in doing so, it likely substantially increased the value of a project that is now within the control of the Receiver. Nor does it appear that the stewardship grant was given without reasonably equivalent value or with any knowledge or notice of fraudulent intent.

## Conclusion

For the reasons set forth above, Carolina Mountain Land Conservancy respectfully requests that the Court deny the Receiver's motion to extinguish the conservation easement or, in the alternative, set a discovery schedule for trial of the issue, and for such other relief as is appropriate.

Dated: December 18, 2009

Respectfully submitted,

By: __/s/ Marty J. Solomon_____
Marty J. Solomon, Trial Counsel
Florida Bar No. 523151
CARLTON FIELDS, P.A.
P.O. Box 3239
Tampa, Florida 33601-3239
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
Email: msolomon@carltonfields.com
Attorneys for Carolina Mountain Land Conservancy

## CERTIFICATE OF SERVICE

16

16065934.1

I hereby certify that on December 18, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Marty J. Solomon*
Attorney

**SERVICE LIST**
CASE NO. 8:09-CV-87-T-26TBM
Securities and Exchange Commission v. Nadel, et al.
United States District Court Middle District of Florida