UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:09-CV-87-T-26TBM

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

vs.

ARTHUR NADEL; SCOOP CAPITAL, INC.;
And SCOOP MANAGEMENT, INC.,

    Defendants,

SCOOP REAL ESTATE, L.P.; VALHALLA
INVESTMENT PARTNERS, L.P.;
VALHALLA MANAGEMENT, INC.;
VICTORY FUND, LTD.;
VICTORY IRA FUND, LLC;
And VIKING MANAGEMENT, LLC,

    Relief Defendants.
_____/

## DECLARATION OF KIERAN ROE

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.     I, Kieran Roe, declare as follows:

2.     I am over the age of 18 and otherwise competent to give this declaration. The following declaration is based on my personal knowledge or on the business records kept by the Carolina Mountain Land Conservancy (the "Conservancy") in the ordinary course of its business.

3.     The Conservancy is a publicly supported, tax-exempt nonprofit organization and a qualified organization under Section 501(3)(c) and 170(h), of the Internal Revenue Code, whose

primary function is to help landowners protect local land and water resources by preserving, protecting, and enhancing a regional network of permanently protected farm, forest, and natural land in the Carolinas.

4. I have been the Executive Director of the Conservancy since 1999. During the course of its 15 year history, the Conservancy has helped preserve over 18,500 acres of land across the Blue Ridge Mountains through 80 different projects, the majority of which involve conservation easements.

5. As the Executive Director of the Conservancy, I am charge of overseeing all aspects of the Conservancy's functions and projects. In particular, I oversee the acquisition, maintenance and defense of all of the conservation easements held in trust by the Conservancy, including a conservation easement over 169 acres (the "Conservation Easement") of the larger 430-acre conservation-based community known as Laurel Mountain Preserve.

## Laurel Mountain Seeks the Conservancy's Assistance

6. In 2003, Laurel Mountain Preserve, LLC ("Laurel Mountain"), purchased an approximately 430-acre parcel of land in Buncombe and McDowell Counties (the "Property"). See, **Exhibit 1** (Deed into Laurel Mountain).

7. In late November of 2004, Arthur Nadel contacted the Conservancy by phone and email seeking assistance for Laurel Mountain in finalizing a master plan for the Laurel Mountain Preserve community, a proposed conservation-community with a limited number of home sites and dedicated conservation areas (the "Community"). See, **Exhibit 2** (Email from Nadel to the Conservancy). Laurel Mountain was seeking, in particular, ways of maximizing the preservation aspects of the Community.

8. During the course of the initial period of communication between the Conservancy and Laurel Mountain, Laurel Mountain consistently and enthusiastically indicated

to the Conservancy that its only plan for the Property was to create a minimal impact, sustainable community of a limited number of 10-acre home sites that would benefit from the key feature of the community, a large, permanently protected tract of land that would preserve the views and indigenous flora and fauna as a resource for the community members.

9. Mr. Nadel and his wife presented themselves and Laurel Mountain to the Conservancy as conservationists and green developers who wanted to develop the Property in an environmentally friendly manner and who were looking to the Conservancy for help in finding the best way to accomplish their goal. As with all contacts with owners who are interested in conserving land, the focus of the Conservancy in its interactions with the Nadels and Laurel Mountain was on the land and the value of conservation project rather than the owner. The Conservancy was thus unaware of any other businesses Mr. Nadel or his wife may have been involved in other than their land development businesses in Florida and North Carolina.

10. Over the course of the next few months, the Conservancy reviewed Laurel Mountain's proposed project and maps and plans prepared by Laurel Mountain's land planners, LandDesign of Asheville. See **Exhibit 3** (Master Plan). The Conservancy worked extensively with Laurel Mountain to develop a strategy that would allow the completion of the Community and best preserve and protect the most critical areas of the Property and that would ultimately result in a very limited development of home sites and a permanent 169-acre preserve in which the community members could hike and enjoy the natural environment.

11. Among other things, Laurel Mountain discussed with the Conservancy the possibility of an outright grant of 200 acres of the Property to the Conservancy. The Conservancy, a nonprofit organization, was, however, concerned about the expenses associated

with maintaining such a large track of land. See, **Exhibit 4** (Land Committee Meeting minutes 5.25.05).

12. Laurel Mountain retained Equinox Environmental Consultation & Design, Inc. to prepare a baseline biological inventory of the Property performed in order to define the conservation value of the project. See, **Exhibit 4** (Land Committee Meeting minutes 5.25.05). The inventory identified 283 species of exotic and endangered species of plants and animals and concluded that "additional wildlife inventories would easily provide a much larger yield of wildlife, especially amphibians, mammals and fish, and potentially a few additional rare species." See, **Composite Exhibit 5** (biological inventory of Property and letter from the Conservancy board of trustees dated June 4, 2008).

13. Laurel Mountain also retained David E. Summey, P.L.L.C. to prepare a survey of the Property, and he prepared a survey dated September 10, 2005 entitled "Composite Map for Laurel Mountain Preserve." See, **Exhibit 6** (Survey).

14. Ultimately, Laurel Mountain and the Conservancy determined that the best means of creating the green-development that Laurel Mountain wanted was for Laurel Mountain to grant the Conservation Easement to the Conservancy to be held in trust for the Community over 169 acres of the over all Property which contains a Rich Cove Forest and a rare Old Growth Forest and which has never before been logged. See, **Exhibit 7** (Land Committee Meeting minutes 7.13.05). This 169 acre parcel also happens to contain a much more rugged and steep terrain than the rest of the Property and is thus much less suitable for development. It also lacks the vistas that make the 10 acre home sites that Laurel Mountain was proposing much more valuable.

## Laurel Mountain Grants
## the Conservation Easement to the Conservancy

15.  In the summer of 2005 while reviewing the viability of the Conservation Easement over approximately 169 acres of the Property, the Conservancy prepared calculations as to the costs of the stewardship, defense of, and endowment for the Conservation Easement. See, **Exhibit 8** (Worksheet Calculating the Costs of Stewardship and Defense of a Conservation Easement and the Endowment Needed to Support It). The Conservancy determined that the total annual cost of maintaining and defending the Conservation Easement would be $908.20 and that the Conservancy would require an endowment of $28,499.07 to fund this annual expense. See, **Exhibit 8** (Worksheet Calculating the Costs of Stewardship and Defense of a Conservation Easement and the Endowment Needed to Support It).

16.  In September of 2005, once the initial analysis had been completed and Laurel Mountain had settled on a plan, the Conservancy submitted to Laurel Mountain a standard proposal used by the Conservancy for preparing and holding a conservation easement over 169 acres of the Property (the "Proposal"). In that Proposal, the Conservancy proposed to prepare a "deed or agreement of conservation easement" consistent with Laurel Mountain's conservation objectives and designed to "permanently protect" the Property's "most sensitive natural resources." See, **Exhibit 9** (September 15, 2005 letter to Laurel Mountain Preserve). By accepting the Conservation Easement, the Proposal provides that the Conservancy would agree to "monitor, and enforce if necessary, the terms of the easement in perpetuity." See, **Exhibit 9** (September 15, 2005 letter to Laurel Mountain Preserve).

17.  The Proposal also indicates, as is customary whenever the Conservancy takes on the responsibilities of monitoring and defending a conservation easement, that the Conservancy had created two endowment funds, one for stewardship and one for legal defense, for which the

16059432.1

Conservancy asked for a donation that would be treated as a charitable contribution. See, **Exhibit 9** (September 15, 2005 letter to Laurel Mountain Preserve).

18. The Proposal also advises Laurel Mountain that tax benefits might be available to it and that a qualified appraisal of the easement value would be necessary in order to qualify for such benefits. The Proposal requests a copy of any appraisal for the Conservancy and indicates that the Conservancy will cooperate with application for such benefits, but, importantly, advises that, by signing IRS Tax Form 8283, the Conservancy **"does not represent agreement with the claimed fair market value of the property."** See, **Exhibit 9** (September 15, 2005 letter to Laurel Mountain Preserve).

19. Laurel Mountain accepted the Conservancy's proposal and engaged Tennille & Associates, Inc., to prepare an appraisal. On or about October 19, 2005, Tennille & Associates, Inc., prepared an appraisal of the 169 acres separate and apart from the rest of the 430 acre Property for Laurel Mountain (the "Appraisal"). See, **Exhibit 10** (Tennille Appraisal). The Appraisal purports to provide the "market value" of the Conservation Easement over the 169 by looking at the value of the 169 acres before and after the Conservation Easement was granted. The Appraisal uses the Sales Comparison Approach to determine the value of the 169 acre parcel as is and also gives the "prospective value" of a 12 lot subdivision of the 169 acres using the "Subdivision Analysis" method of valuation. See, **Exhibit 10** (Tennille Appraisal).

20. The Appraisal provides that the its purpose was to **"estimate for federal income tax purposes the market value of a conservation easement as of the specified date, November 1, 2005. The report was prepared for use and submission to the Internal Revenue Service as evidence of the value of the charitable donation of a conservation**

16059432.1

**easement. It is not to be distributed or to be relied upon by others without our written permission.**" See, **Exhibit 10** (Tennille Appraisal).

21. The Appraisal concludes that the total value of the Conservation Easement is $1,976,000, and that the adjoining owner home sites received a positive "enhancement value" in the amount of $175,000, for a total "contribution value of $1,801,000. See, **Exhibit 10** (Tennille Appraisal).

22. The Conservancy does not necessarily agree with the Appraisal's valuation of the Conservation Easement and, in particular, believes the Appraisal greatly understates the enhancement value of the Conservation Easement to the adjoining parcels owned by Laurel Mountain.

23. On or about November 21, 2005, Arthur Nadel and his wife Peg Nadel, as directors of the Guy-Nadel Foundation, Inc., executed a Pledge Agreement to contribute $28,499 to the Conservancy in four annual installments of $7,214 each in order to fund the stewardship and defense funds. See, **Exhibit 11** (CMLC Pledge Agreement).

24. At the same time, Laurel Mountain's attorney, Robert J. Deutsch, worked with the Conservancy to draft a deed of conservation relating to the 169 acres, and, on December 1, 2005, Laurel Mountain and the Conservancy executed the deed of conservation and caused it to be recorded in the public records of Buncombe County and McDowell County. See, **Exhibit 12** (Deed of Conservation).

25. Consistent with Laurel Mountain's intentions for the development of the Property as a minimal impact, sustainable community that incorporated a permanently protected tract of land, the Deed of Conservation creates a Conservation Easement that is perpetual for the purposes of protecting and conserving the "value of the Property's natural habitat, water quality,

and scenic qualities." See, **Exhibit 12** (Deed of Conservation). In order to accomplish this, the Deed of Conservation "unconditionally and irrevocably give[s], grant[s], and convey[s] forever and in perpetuity" to the Conservancy the Conservation Easement and the "right to preserve and protect the Conservation Values" of the Property. See, **Exhibit 12** (Deed of Conservation). The Deed of Conservation thus gave "rise to a real property right and interest immediately vested" in the Conservancy that the Conservancy is bound to hold in perpetuity. See, **Exhibit 12** (Deed of Conservation).

26. The Deed of Conservation implements the Conservancy's right to protect the Conservation Easment by precluding and restricting certain uses while reserving certain limited rights to Laurel Mountain. Among other things, it precludes the subdivision of the 169 acres subject to the Conservation Easement. See, **Exhibit 12** (Deed of Conservation). It also provides an enforcement mechanism by which the Conservancy can enforce its purpose, the restrictions and limitations. See, **Exhibit 12** (Deed of Conservation).

27. The 169 acre preserve was conceived as, and is today, an integral part of the Community, which added, and continues to add, substantial value and marketability to the home sites within the Community.

28. After granting the Conservation Easement, Laurel Mountain filed out an IRS 8283 form for Donated Property Over $5,000. See, **Exhibit 13** (IRS Form 8283). The Conservancy acknowledged this form. Laurel Mountain used the form to apply for and obtain a Federal tax deduction in the amount of $1,800,000 for Laurel Mountain's member, Arthur Nadel, based on value of the Conservation Easement derived from the Appraisal and its donation of the Conservation Easement to the Conservancy. See, **Exhibit 13** (IRS Form 8283) and **Exhibit 14** (Nadel Tax Return).

29. Laurel Mountain also applied to the North Carolina Department of Environmental and Natural Resources (the "Department") for a certification that would allow Arthur Nadel to become eligible for a North Carolina income tax credit for the donation of the Conservation Easement. See, **Exhibit 15** (March 27, 2007 letter from the Department). The Department advised Mr. Nadel that, after review of his application, it believed that he "was entitled to an income tax credit to the extent provided by General Statute 105-130.34" in connection with the donation of the Conservation Easement. See, **Exhibit 15** (March 27, 2007 letter from the Department).

30. Thus, in addition to greatly enhancing the value of Laurel Mountain's Property and the individual home sites, the grant of the Conservation Easement also provided Laurel Mountain and its member with a very substantial Federal tax deduction and, apparently, an equally substantial North Carolina state income tax credit.

### Laurel Mountain Publicly Announces and Markets the Property and the Conservation Easement

31. Once the Conservation Easement was in place, Laurel Mountain publicly announced the donation and advertised the 169 acres to the public as the key and defining feature of the Community. See, **Composite Exhibit 16** (Flyers). Laurel Mountain also hosted in conjunction with the Conservancy a "Nature Open House" offering guided trail tours through the 169 acre tract. See, **Exhibit 17** (Flyer). Laurel Mountain's website, now apparently operated by the Receiver, also proudly features the 169 acres as one of, if not the, central selling points for the home sites in the Community. See, http://www.laurelmountainpreserve.com.

32. As a result of their development of the Community and the grant of the Conservation Easement, the Nadels were also publicly recognized and honored for their

conservation efforts by the Buncombe County Board of Commissioners and the county Land Conservation Advisory Board. See, **Exhibit 18** (Flyer).

33. Over the following years, Laurel Mountain continued to market the home sites and the Community, including the 169 acre of preserved land, as it had originally planned and consistent with the Conservation Easement. The Conservancy also held up its stewardship responsibilities under the Deed of Conservation by visiting the Property, monitoring and photographing the 169 acres, and issuing annual reports. See, **Composite Exhibit 19** (CMLC monitoring reports dated 12.29.06, 11.20.07, and 12.16.08).

### The SEC Action

34. The Conservancy was unaware of the factual basis of the allegations in the SEC's Complaint against Arthur Nadel until they became public earlier this year.

35. Neither the Receiver's Motion, nor any complaint, has ever been served on the Conservancy.

36. The Conservancy has never received service of any pleading or motion in the SEC action, including the Receiver's Motion for Order to Show Cause As To Why Conservation Easement Should Not be Extinguished.

37. On the day before the eve of the Thanksgiving Day Holiday, the Receiver's counsel did email copies of the Motion and this Court's Order scheduling a hearing on the Motion to Professor William Weeks, a law professor at the University of Indiana School of Law and an officer of The Nature Conservancy, and Sharon Alexander, a local North Carolina attorney, both of whom volunteer their time for the Conservancy, neither are "counsel of record" in the SEC case as they are denominated in the Order.

38. The Conservancy strenuously objects to the summary proceeding as it disputes most of key facts supporting the Receiver's allegations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: December 17, 2009

**KIERAN ROE**
Executive Director
Carolina Mountain Land Conservancy

16059432.1