C00038-135951

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

v.                                                                Case No.: 8:09-cv-0087-T-26TBM

ARTHUR NADEL,
SCOOP CAPITAL, LLC.,
SCOOP MANAGEMENT, INC.,

              Defendants.

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD.,
VIKING IRA FUND, LLC.,
VIKING FUND, LLC., and
VIKING MANAGEMENT, LLC.

              Relief Defendants.
_____/

## THE CITY OF VENICE'S RESPONSE TO RECEIVER'S MOTION FOR APPROVAL OF SALE OF THE ASSETS OF THE VENICE JET CENTER AND AGREEMENT WITH NORTHERN TRUST, N.A. (Doc No. 254)

THE CITY OF VENICE ("City"), pursuant to this Court's order entered on December 22, 2009 (Doc. No. 274), files this response to the Receiver's Motion for Approval of Sale of The Assets of the Venice Jet Center and Agreement with Northern Trust, N.A. (Doc. No. 254) (the "Sale Motion") and states as follows:

### I.       BACKGROUND

1.       Pursuant to a lease agreement dated May 23, 2006 ("Lease"), the City leased certain real property at the Venice Municipal Airport ("Airport") to Venice Jet Center, LLC ("VJC"). Pursuant to the Lease, VJC assumed possession of real property formerly leased to

21397.1

Dockets.Justia.com

C00038-135951

Triple Diamond, a separate fixed-based operator ("FBO") at the Airport.  During its tenancy, Triple Diamond intended to build so-called "t-hangars" on the site.

2.      According to the Receiver, VJC, through Mr. Nadel, established VJC for the purpose of owning the Triple Diamond assets, entered into an agreement to purchase Triple Diamond, and then consummated a deal in May, 2006 to buy those assets using funds derived from his fraudulent endeavors.  Two years later, VJC sought to build "box hangars" on the site.

3.      The Venice City Council, in evaluating the VJC hangar proposals, faced highly unusual circumstances that changed significantly over time, raising fundamental questions about the City's rights and responsibilities regarding the proposed development.

4.      When Mr. Nadel indicated that VJC intended to build box hangars, which are different from t-hangars, on the site, the City Manager explicitly informed VJC in June 2008, that the proposed hangar project would require approval by the Mayor and City Council and directed VJC to submit a "concept plan" to City staff with sufficient technical detail to allow City staff to determine if there were any "fatal technical flaws" with the plan prior to City Council consideration.

5.      Between June 2008 and August 2008, in a series of letters from VJC and its attorneys, the VJC hangar request evolved from one, to two, then four hangars.  Through the requirement that VJC submit a conceptual plan for the entire parcel, the City's Fire Marshal was able to study the plan and determine that the VJC's plan ultimately to build five hangars was not viable on that site.  Therefore, VJC proposed to build four hangars rather than five.  On August 18, 2008, VJC sent a letter to the City indicating that the proposal was for 4 hangars.

6.      The City scheduled an informational presentation by VJC on its hangar proposal for the August 26, 2008 meeting of the City Council.  While VJC's attorneys argued that the City

should approve the VJC hangar proposal at that time, the City did not do so, as it had scheduled the presentation as an information item only, not an action item.

7.      Rather than pursuing an action item for the next City Council meeting, VJC submitted an informal complaint to the Federal Aviation Administration's (FAA's) local Airports District Office (ADO) on September 2, 2008.  On September 3, the ADO advised the City that VJC had filed the informal complaint.  The City filed a response on September 15, 2008.

8.      In November, 2008, VJC submitted proposed plans to construct hangars to the City's Building and Engineering Departments.

9.      On December 29, 2008, the official at the ADO handling the informal complaint determined that informal resolution was not possible, and advised VJC that it was free to file a formal Part 16 complaint, if it chose.   In the meantime, the City obtained a legal memorandum from Kaplan Kirsch & Rockwell LLP, concerning its obligations under the federal Airport Improvement Program ("AIP") grant assurances with respect to the hangar proposal, based on certain assumed facts.  The factual premise upon which the memorandum was based later proved to be incorrect in several material aspects.

10.      In January, 2009 the fundamental nature of the project, and indeed of VJC itself, changed dramatically when Mr. Nadel was arrested and indicted on several charges. Many of Mr. Nadel's assets, including VJC, were seized by the Receiver.

11.      The appointment of the Receiver for VJC was an unprecedented event for the City, and the City Council appropriately wanted to make sure it understood the consequences of that action.  The City Council discussed in a measured and deliberative way various issues

C00038-135951

relating to VJC as the unusual events surrounding its ownership unfolded.   The Council also sought additional information and guidance in dealing with the situation.

12.     In January, 2009, the City Council reviewed and discussed the hangar project and specifically sought additional input from the ADO concerning Venice Jet Center's request to construct additional hangar space on its leasehold and the potential constraints of the Airport Layout Plan.   The City Attorney asked the ADO on February 4, 2009, specifically whether construction of the hangars would violate grant Assurance 29, Compliance with Airport Layout Plan, since the hangar development appeared to be inconsistent with the ALP, and the City is obliged to comply with Assurance 29 along with other Assurances.

13.     Over the course of the next several months, the City Council dealt with various aspects of the VJC situation including the City Attorney's February 4, 2009 letter to the FAA, negotiating with the Receiver, seeking to determine whether the City is a creditor of VJC, how to preserve the rights of the City, contacting the FAA regarding other designated hangar locations, whether the City has the right to deny the VJC request for more hangars, new circumstances because of the receivership, additional hangars triggering new lease negotiations, potential relocation of the VJC, funding to move existing facilities, development of an emergency plan if VJC ceased operation, working with the VJC receiver, the City possibly operating the VJC, issues regarding aviation fuel sales, airport leases and vertical improvement and addressing adherence to the ALP.

14.     At its March 10, 2009 meeting, the City Council discussed concerns that the hangars were proposed for a location identified for other purposes, seeking confirmation that VJC had financial resources to build the hangars, and whether VJC had a valid Lease with the City.   The Receiver also spoke before the Council and questioned whether a financial viability

C00038-135951

clause was included in the building codes. He also said that it was unlikely he would use investor funds to construct hangars, and pointed out that financing may be forthcoming from a potential new user. A motion to approve the VJC proposed hangars was defeated.

15.    The Council then discussed the validity of the existing VJC Lease, if the Lease allowed hangar construction, whether or not the lessee defaulted on the Lease, and possible fraud during procurement of VJC, and financial viability of a VJC purchaser. There was consensus to direct the City Attorney to seek an opinion from local outside counsel expert in commercial leases on whether the VJC Lease is valid and entitled VJC to construct hangars. At this meeting, the City Council voted not to approve the VJC request to build 4 box hangars on its lease site.

16.    At subsequent meetings, the Council discussed potentially funding the purchase of VJC, and receiving a VJC marketing packet from the Receiver; issues relating to a possible appraisal of the leasehold; obtaining the outside local counsel opinion on the VJC Lease; a possible right of first refusal in the purchase of VJC; the confidentiality agreement sought by the Receiver; the possible conflict between Florida's sunshine laws and the confidentiality agreement; protecting the City's interests and avoiding potential lawsuits; the results of outside local counsel's opinion; Section 45 of the VJC Lease concerning demolition and construction of improvements; additional facts that had been discovered subsequent to the ADO's letter; requirements for submitting specifications prior to hangar construction; submittal of concept plans; the need for demonstrating financial viability; potentially approving hangars subject to subsequent verification of financial viability; good faith obligations; claims that the City was intentionally lowering the value of the VJC; whether a need for additional hangars was demonstrated; hangar utilization issues; the Lease not being clear in defining obligations of parties; and the Receiver having not responded to the City's request for financial data.

C00038-135951

17.     The Council also discussed Part 16 and Part 13 procedures before the FAA; informal communications with a VJC official on proposed hangar locations, with no definitive response; a staff technical review of conceptual plans (although final drawings would be requested and submitted to Council for approval); submitting a hangar concept to FAA including information on why the City did not favor approval; dealing with the actual purchaser versus conditional approval for proposed construction to enhance property value; Mr. Wiand's lack of communication with the City; and FAA directives regarding hangar approval.

18.     At the June 9, 2009 City Council meeting, a motion to rescind the Council action of March 10, 2009 denying hangar construction failed. City Council then directed the City Manager and the City Attorney to engage in good faith negotiations with the Receiver in an attempt to resolve conflicts and reach a mutually beneficial outcome. City officials met with the Receiver on June 19, 2009 to discuss potential amicable resolution of the dispute.

19.     The Council subsequently discussed the meeting between the Receiver and the City Manager and City Attorney, with a report by the City Manager that Mr. Wiand may possibly show interest in settlement terms that include: 1) the city approving construction of the four hangars and related construction as submitted on the site plan; 2) the VJC demonstrating financial capability prior to the issuing of building permits; 3) consideration of a specific land swap proposal to construct hangars on the opposite side of the taxiway; and 4) consideration of giving the City the right of first refusal regarding sale of the VJC. The City Manager stated that the Receiver advised that he was going to file a Part 16 administrative complaint before the FAA (the "Part 16 Action) and would litigate for damages due to hangar construction not being approved. The City Manager requested specific direction from the City Council regarding the proposed settlement terms.

C00038-135951

20.     The City had further discussions relating to the Receiver's statement that he has no intention of actually building hangars; financial documentation not being provided by the Receiver; problems with the Lease; the eventual owner of the VJC constructing the hangars; acquiring additional options from Mr. Wiand; consideration of a specific land swap proposal to construct hangars on the opposite side of the taxiway; and consideration of obtaining a right of first refusal regarding sale of the VJC.

21.     The Council voted to engage outside counsel to assist in defending the Part 16 Action. In light of the Receiver's anticipated filing of a Part 16 Action, the Council declined to authorize the City Manager and City Attorney to discuss with the Receiver the settlement proposal described in Paragraph 19, above. The Council approved a motion to discuss litigation strategy and settlement at a private Attorney–Client session if the Part 16 Complaint was filed.

22.     The Part 16 Complaint was filed before the FAA by the Receiver July 7, 2009. The City filed its Answer, Motion to Dismiss and Memorandum in Support Thereof on September 2, 2009, The Receiver filed a Reply on September 30, 2009, and the City filed its Rebuttal on October 28, 2009. City Officials also met with Mr. Wiand on August 10, 2009 and made a specific proposal to resolve the issue.

## II.     THE SALE MOTION AND THE CITY'S CONSENT TO ASSIGNMENT OF THE LEASE AND SUBLEASES

23.     In the Sale Motion, the Receiver characterizes the City's efforts in seeking to determine and protect its legal interests as described above as constituting "overtly obstructionist" conduct and that such actions constituted "interference with [VJC's] property rights," all with an apparent view towards trying to convince this Court that the City would unreasonably refuse its consent to the proposed lease assignment to Tristate. The Receiver alleges various purported improper actions by the City (Sale Motion at p. 12-14) and asserts that

C00038-135951

these provide a basis for concluding that the City *may* unreasonably withhold consent from the proposed lease assignment. *Id*. at p. 20-21.

24.    After this Court entered its order giving the City additional time within which to undertake appropriate due diligence and otherwise comply with the notice requirements applicable to municipalities under Florida law, City staff and the attorneys for the City conducted an interview with one of the principals for Tristate, reviewed certain confidential financial information, and checked business references. The City Council then met on January 5, 2010 and heard presentations from City staff and the attorneys for the City as well as from Tristate and the public at large. Thereafter, the City Council voted, 5 to 2, to approve VJC's request to assign the lease agreement to Tristate, provided that Tristate should be deemed to be responsible to faithfully perform all of VJC's obligations under the Lease and, further, that VJC was not relieved of any duty, liability or obligation under the Lease. A true and correct copy of the City's consent is attached hereto as Exhibit A and has been provided to the Receiver.

25.    Under Florida law, a lessee's assignment of a lease to a third party does not relieve the lessee from its financial or other obligations to the lessor. *Kornblum v. Henry E. Mangels Co.*, 167 So.2d 16 (Fla.3d DCA 1964). As such, VJC should remain liable for its obligations under the Lease, notwithstanding the assignment to Tristate.

26.    In addition to approving the assignment of the VJC Lease, the City Council also voted to approve the assignment to Tristate of the sub-lease agreements between VJC and Hertz, and VJC and Cockpit Café, LLC (the "Subleases"). See Exhibits B and C.

27.    The fact that the City has consented to the Lease demonstrates that the Receiver's assertions with respect to potential action or inaction by the City concerning the approval of the lease assignment are inappropriate and misguided. However, because the Receiver has made

these allegations on the record in this proceeding, the City is compelled to respond on the record, briefly, as to the substance of the allegations.

28.     The Receiver asserts that the City denied "VJC's request to construct 4 box hangars in July 2008, even though the proposed construction complied with all applicable planning and building code provisions and met all Minimum Standards for the Venice Municipal Airport and Fixed Based Operations (the 'minimum standards')." Sale Motion at 12-13. The City Council scheduled an informational meeting to hear a presentation from Mr. Nadel on the proposal, but did not vote either way on the proposal. Moreover, the project did not meet all minimum standards, as there was no demonstration of financial viability or compliance with other minimum standards for the Airport which are a part of the Lease[1].

29.     Receiver asserts that the City denied the request to build hangars in August 2008 and required VJC to submit a concept plan "even though the VJC had not previously been required to produce a concept plan when it built its first hangars on the leasehold." Sale Motion at 13. In fact, the City did not turn down the project until March 2009. Moreover, the hangars that VJC first built on its leasehold fulfilled a requirement in the Lease imposed by the City that VJC tear down and reconstruct existing hangars. Sale Motion Exhibit 3A-B (VJC's Lease). There would be no reason for the City to approve a concept plan of a project that it *required* VJC to undertake to replace dilapidated hangars on the site.

30.     Contrary to Receiver's assertion (Sale Motion at 13), the City did not misrepresent to the FAA in September 2008 that VJC's request was denied because it made no

---

[1]   As the Receiver is aware, the City's position on these points is discussed extensively in its rebuttal to Venice Jet Center Reply; *Venice Jet Center v. City of Venice, Fl*, FAA Docket No. 16-09-05, at Section V, pp. 28-46 and at pages 41-45 of the City's Memorandum of Points and Authorities in Support of its Answer and its Motion to Dismiss the Receiver's Part 16 Complaint. In the interest of brevity, the City is not appending its filings in the Part 16 Action to this Response but will make those papers available if requested.

C00038-135951

formal request to build the hangars.   Evidence supplied by the City in the Part 16 Action indicates that VJC applied for building permits in November, 2008.

31.     The Receiver seems to imply that there is something wrong with the City "seeking legal advice as to whether the City could terminate the VJC's Lease".   It was reasonable and prudent for the City to investigate whether VJC's being forced into receivership was an event of default under the Lease.

32.     The Receiver criticizes the City for "ignoring three separate letters from the FAA encouraging approval of the VJC's hangars project and warning that denying the request would be contrary to federal grant assurances."  Sale Motion at 13.  The referenced letters constitute *informal* guidance from the local FAA Airports District Office, not an official determination by FAA.  Although an official at the FAA ADO did encourage approval of the hangar project, this was done in ignorance of the facts related to VJC's receipt of stolen funds and its inability to demonstrate that it could fund the project without relying on stolen funds, either directly or indirectly.   Moreover, one of the ADO letters referenced in the Sale Motion relating to the Airport Layout Plan (ALP) issue, discussed below, also appeared to be contrary to FAA's official, published guidance that airports not allow development inconsistent with an approved ALP.

33.     The Receiver also complains that the City ignored advice from counsel that "warned the City would likely be exposed to liability if it continued to deny the VJC's request to build the hangars."  Sale Motion at 13.  As discussed extensively in its Part 16 filings, the referenced guidance by outside counsel was based on several critical erroneous factual assumptions.  A further assessment of the actual facts surrounding the VJC and its operation and funding by the infusion of illegal funds by Mr. Nadel results in a different analysis.  Moreover,

C00038-135951

the City Council did follow the memorandum's advice that if the approved ALP depicted future development on the site incompatible with the proposed hangars, the City would have a basis for denying approval for the hangars.  However, the Receiver also objects to the City's position on the ALP issue, thus simultaneously criticizing the City for "ignoring" advice from outside counsel and for following that advice with respect to the ALP issue. Sale Motion at 13.  In any event, a client is, of course, under no obligation to follow counsel's advice and may, instead, assert its position in the appropriate adjudicatory forum, such as a Part 16 proceeding.

34.     As for the City "ignoring the FAA's communication indicating that the ALP presented no such barrier to the project and again encouraging the City to approve construction," (*id.* at 13-14), this was one of the three FAA ADO letters the Receiver already referenced, and the ADO's opinion appears to contradict published FAA guidance.  The ALP issue is the subject of the pending Part 16 Action, which will provide an official FAA determination on the matter.

35.     The Receiver includes three separate assertions that appear to relate to the same action taken by the City Council on March 10, 2009: "denying VJC's written request dated February 2009 to build the hangars," (Sale Motion at 13), "denying VJC's written request dated February 25, 2009 to build the hangars," (Sale Motion at 14) and "formally denying the VJC's request on March 10, 2009 at a City Council meeting and contending the VJC's Lease was void because the company is in receivership" (*id.*).  Peculiarly, after asserting that the City Council contended the Lease was void, the Receiver asserts that the City sought "yet another legal opinion to determine whether the City could terminate the VJC's Lease because the company is in receivership." *Id.*  Thus, it is clear that the City Council had not, in fact, made a determination on this issue, but rather sought to investigate the issue further given the unusual circumstances surrounding VJC and the advent of the receivership.

C00038-135951

36.     Given the allegations of Mr. Nadel's fraud, his funding of VJC with the proceeds of that fraud (as alleged by the Receiver in his motions and filings before this Court), Mr. Nadel's subsequent arrest, the initiation of this proceeding by the SEC, and the extension of the Receivership to include VJC, it was reasonable for the City to investigate whether the involuntary receivership was an event of default under the Lease, as the City explained in the Part 16 Action.

37.     Contrary to the Receiver's assertion, the City did not ignore outside counsel's opinion that the Lease remains valid; in fact, the City has taken no action to void the Lease. The City's action in approving the assignment of the Lease as noted below now renders this assertion moot.  Moreover, the outside counsel opinion also indicated that the City had a reasonable argument that the Lease did not permit additional hangars.

38.     Finally, the Receiver complains that the City denied "VJC's request to build hangars on the basis that the Receiver did not demonstrate financial capability despite the fact that: (1) VJC had not previously been required to demonstrate financial capability to build hangars; (2) no other Airport tenants who have built hangars have been required to show financial capability; and (3) the VJC has satisfied the financial capability requirement." *Id.*

39.     With respect to item (1), VJC's Lease, at Section 45, specifically required VJC to demolish existing dilapidated hangars on the leasehold and build a 10,000 square foot hangar on the site within five (5) years of executing the Lease.  Failure to do so would constitute a default under the Lease and the City could terminate the Lease, among other remedies.  Thus, the City was protected in case VJC did not fully carry out the *prescribed* hangar project because it had the option of terminating the Lease.  The City did not need the additional protection of verifying the financial wherewithal of VJC to comply with Section 45 of the Lease.  Moreover, the Receiver's

C00038-135951

sworn statement to the Court that VJC's purchase of the assets of Triple Diamond was funded completely with stolen funds and that VJC had accepted at least $325,000 in additional stolen funds – and likely more, which had not been tracked down by the Receiver as of the date of the filing – raised legitimate questions as to the financial resources available to VJC to build the hangars.   Thus, it was eminently reasonable for the City to inquire as to VJC's financial resources under the Receivership to complete the project.

40.   With respect to Item (2), the Receiver has provided no evidence that any other tenant had been forced into receivership (or was capitalized with stolen funds).   This justifies treating the Receiver differently from other tenants seeking approval to fund projects.

41.   As for Item (3), Receiver clearly had not satisfied the financial capability requirement under any reasonable standard.   The Receiver simply made flat assertions as to the total cash or cash equivalents on hand in the entire Receivership, which assertions were unsupported by the Receiver's Reports to the Court and did not indicate that the Receiver had applied for or received permission from the Court to expend Receivership funds to build such hangars.   It would have been irresponsible for the City to rely on the bald assertions made by the Receiver under these circumstances, and such unsupported assertions do not satisfy the financial viability requirement contained in the applicable minimum standards.

## III.   THE ASSIGNMENT OF THE PART 16 CLAIMS

### A. Determinations of Who is a Proper Party in a Part 16 Proceeding Are Within the Purview of the FAA, Not the Court

42.   It would be inappropriate for this Court to grant the Receiver's request for an order conferring on Tristate "the right to be substituted in the VJC's stead in the proceeding before the FAA (FAA Docket No. 16-09-05)" (Sale Motion at p. 21), because determinations of whether an entity is entitled to bring a Part 16 Complaint or take over a Part 16 Complaint before

C00038-135951

the FAA is a matter for the agency to determine, pursuant to Rules of Practice it has issued governing such proceedings, subject to review in the U.S. Courts of Appeals.

43.     In the Sale Motion, the Receiver states that:

(1) "The VJC will also assign its rights in the Part 16 proceeding that will be continued by Tristate" (Sale Motion at p. 11, n. 9)"; and

(2) "Tristate agrees to . . . assume prosecution of the part 16 Complaint subject to an offset of the net obligations to the Receiver up to $50,000 for expenses and costs actually incurred in connection with efforts to resolve all disputes with the City, including the Part 16 Complaint". (Sale Motion at p. 10-11).

Under the Rules of Practice for Federally-Assisted Airport Enforcement Proceedings, 14 C.F.R. Part 16, under which the referenced Part 16 case was filed by the Receiver, *only* the FAA may determine whether a person seeking to undertake a Part 16 proceeding is "directly and substantially affected by any alleged noncompliance by an airport sponsor" and has "engaged in good faith efforts to attempt to resolve the disputed matter informally" with the airport sponsor, and otherwise complies with requirements to confer standing.  *See* 14 C.F.R. § 16.25, citing §§ 16.23 and 16.3. *See also* 14 C.F.R. § 16.21.

44.     Final FAA determinations in Part 16 cases are reviewable exclusively in the U.S. Courts of Appeals, not in U.S. District Courts.  49 U.S.C. § 46110; 14 C.F.R. § 16.247.  Another Federal District Court has acknowledged this point:

Fairview essentially seeks judicial review of the FAA's decision in the Part 16 proceeding. The parties agree, however, that such a review is vested exclusively in the courts of appeals. *See* 14 C.F.R. § 16.247 (a person may seek judicial review in the courts of appeals pursuant to 49 U.S.C. § 46110); *Town of Fairview* [*v. City of McKinney*, FAA Docket No. 16-99-04], 2001 WL 88072 at *[22] [(Final Decision and Order, Jan. 23, 2001)], (directing Fairview to file any appeal in the courts of appeals); 49 U.S.C. § 46110(c) (the courts of appeals have "exclusive jurisdiction" over an appeal from an order under this part).

*Town of Fairview v. Dep't of Transp.*, 201 F. Supp. 2d 64, 70 (D.D.C. 2002).

C00038-135951

45.     Because Congress has vested in the Secretary of Transportation (who has delegated to the FAA) the authority to adjudicate allegations of violations of federal airport improvement program ("AIP") grant assurances[2] mandated by the Airport and Airway Improvement Act of 1982, as amended, 49 U.S.C. § 47101 *et seq.*, there is no private right of action for a party seeking enforcement action against an airport sponsor for such alleged violations.    *Arrow Airways, Inc. v. Dade County*, 749 F.2d 1489, 1491 (11th Cir. 1985); *Northwest Airlines, Inc. v. County of Kent*, 955 F.2d 1054, 1058 (6th Cir. 1992) *aff'd on other grounds*, 510 U.S. 355, 114 S. Ct. 855, 127 L.Ed.2d 183 (1994); *New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 168-69 (1st Cir. 1989).

46.     Thus, a party must turn to the FAA, rather than a U.S. District Court, for relief. As such, it is the FAA, not a district court, that determines whether a purported party meets the standards for pursuing a case against an airport sponsor for alleged violation of the grant assurances.   Indeed, the FAA is given extremely wide latitude, even by the reviewing court (i.e., the Court of Appeals, not the District Court) in determining how to adjudicate such cases. [3]

---

[2] The VJC Part 16 Complaint alleges violations of five grant assurances by the City of Venice.

[3] The extent of the DOT/FAA control over the administrative adjudication of complaints of violations of grant assurances was well-expressed in a decision of the 1st Circuit in a case in which DOT exercised its discretion to hear the case rather than FAA:

> This Congressional anointment of the power "to insure compliance [with the grant assurances]" upon the Secretary, in our view, does more than merely exclude private parties from the right to file an action in court. In terms of the issue before us it has the more significant effect of indicating the standard by which we should review the Secretary's enforcement actions.

> First of all, there should be little doubt that Congress has entrusted the administration of § 511 [the predecessor to 49 U.S.C. 47107] to the Secretary. If this be the case, as it is, even without more we are required by Chevron to give "considerable weight" to the Secretary's construction of § 511, and to the actions taken by him "to insure compliance" therewith. . . .

> There is more, however. The specific language of § 511(b) not only establishes that it is the Secretary that prescribes the requirements of sponsorship, but also that the requirements are those "as the Secretary considers necessary " (emphasis supplied). Additionally, the introductory paragraph to § 511(a) establishes that assurances shall be submitted which are "satisfactory to the Secretary " (emphasis supplied). In other words, in insuring compliance with § 511, it is up to the

C00038-135951

**B. The Court is Not Bound to Implement the Receiver's Request, Which is Based on Fundamental Misunderstandings of the Purpose and Procedures of Part 16 Cases.**

47.     The Receiver has mischaracterized the status of the Part 16 case in his motion to the Court.  The Receiver asserts that "Although the action is now fully briefed, the parties have the opportunity to engage in limited discovery and to then present their case in an evidentiary hearing before the FAA."  Sale Motion at p. 6.  This assertion is incorrect.  There is no discovery or hearing provided prior to the issuance of the FAA's initial decision.

48.     As provided in 14 C.F.R. § 16.31, "After consideration of the pleadings and other information obtained by the FAA after investigation, the Director will render an initial decision and provide it to each party by certified mail within 120 days of the date the last pleading specified in §16.23 was due."  The last pleading specified by § 16.23 was the City's Rebuttal, due and filed by the City on October 28, 2009.  Sale Motion at 6.  "In rendering its initial determination, the FAA may rely entirely on the complaint and the responsive pleadings provided under this subpart.  Each party shall file documents that it considers sufficient to present all relevant facts and argument necessary for the FAA to determine whether the sponsor is in compliance." [4]

---

Secretary to decide what is necessary and satisfactory. This language establishes abuse of discretion review, the most deferential standard of review available for administrative appeals, with the exception of those rare instances in which there is of no judicial review at all. Davis, A Basic Guide to Standards of Judicial Review, 33 S.D.L.Rev. 469, 480 (1988).

*New England Legal Found. v. Mass. Port Auth.*, 883 F.2d 157, 169 (1st Cir. 1989). See 4969.5.47107.

[4] Federal aviation regulations provide that:

[FAA's] investigation may include one or more of the following, *at the sole discretion of the FAA*: (1) A review of the written submissions or pleadings of the parties, as supplemented by any informal investigation the FAA considers necessary and by additional information furnished by the parties at FAA request.  *In rendering its initial determination, the FAA may rely entirely on the complaint and the responsive pleadings provided under this subpart.  Each party shall file documents that it considers sufficient to present all relevant facts and argument necessary for the FAA to determine whether the sponsor is in compliance.* (2) Obtaining oral and documentary

C00038-135951

49.    To the City's knowledge, the FAA has not exercised its discretion to obtain further information beyond that provided by the parties in their pleadings and exhibits attached thereto. Thus, the status of the case is that all pleadings are complete, and the parties are awaiting issuance of the initial determination by the Director.

50.    Moreover, contrary to the implication of the Receiver's representations to the Court (Sale Motion at 6), the Complainant in a Part 16 hearing is not entitled to a hearing. 14 C.F.R. § 16.33. *See also J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391-92 (2d Cir. 2000); *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999). Instead, a hearing is provided only in the instance where the initial determination is adverse to the airport sponsor, it is provided the opportunity for a hearing, and it does not waive the right to a hearing. See 14 C.F.R. §§16.31, 16.33 and 14 C.F.R. § 16.201.

51.    Finally, the administration of a Part 16 proceeding is fundamentally different from adjudication of a dispute between private parties. The purpose of FAA's compliance program, of which the Part 16 process is a part, is to ensure airport sponsor compliance with its federal obligations, *not to provide relief to any specific complainant. Thermco Aviation, Inc. v. County of Los Angeles,* FAA Docket No. 16-06-07, (Dec. 17, 2007) (Final Agency Decision), pps. 15, 25-26.

> *The FAA Compliance program is designed to achieve voluntary compliance with*
> *federal obligations accepted by owners and/or operators of public-use airports*
> *developed with FAA-administered assistance. Therefore, in addressing*
> *allegations of noncompliance, the FAA will make a determination as to whether*
> *an airport sponsor is currently in compliance with the applicable federal*
> *obligations. Consequently, the FAA will consider the successful action by the*

---

evidence by use of the agency's authority to compel production of such evidence . . . (3) Conducting or requiring that the sponsor conduct an audit of airport financial records and transactions . . .

14 C.F.R. § 16.29 (Emphasis added).

C00038-135951

> airport to cure any alleged or potential past violation of applicable federal
> obligation to be grounds for dismissal of such allegations. . . .
>
> Not only does the FAA policy stand for 'current compliance,' but it also stands
> for the concept of voluntary compliance.
>
> The voluntary actions taken by the City in corrective action are appropriate and
> the Director was correct in using his discretion declining to find the City non-
> compliant when corrective action is under way or, perhaps, completed. As it is,
> Thermco would not be due any preferential treatment over any other aeronautical
> user for the lease of Airport property.

*Id.* at 25-26 (emphasis in original.) *See also id.* at 15.

52.    As such, "prosecution" of a Part 16 case, unlike a case for money damages or choses in action, is not a property right that is transferrable as an "asset."   The FAA has no authority to award money damages in a Part 16 case. *J & B Enters., Inc. v. Metro. Nashville Airport Auth.*, FAA Docket No. 16-08-07, 2009 WL 1800821 at *16 (Director's Determination, May 5, 2009).  Had the receiver filed an action for money damages or a chose in action in a state or federal civil court, he might be able to make a case for seeking to transfer the right to continue the action to Tristate.  However, the Receiver did not do so.  Instead, he filed a much different type of action[5] – seeking an FAA determination of a violation by the City of its federal grant

---

[5] In seeking to initiate the Part 16 action, the Receiver acknowledged that it was different from the type of action typically undertaken, or authorized, by a receiver pursuant to the Court's order on extending the receivership:

> Pursuant to the Order Appointing Receiver (Dkt. 8), the Receiver has the duty and authority to: '[i]nstitute such actions and legal proceedings, for the benefit and on behalf of the Defendants and Relief Defendants and their investors and other creditors as the Receiver deems necessary . . . .' Dkt. 8 at ¶ 2. The discretion provided to the Receiver to initiate actions pursuant to the Order Appointing Receiver does not clearly encompass the institution of a Part 16 Complaint. Therefore, the Receiver brings this matter to the Court's attention for approval prior to proceeding.

Receiver's Unopposed Request for Leave to File Complaint Pursuant to Title 14 C.F.R. Part 16, at pps 2-3, n. 2. While it was reasonable for the Receiver to seek leave of the Court to file the Part 16 complaint, once the action is filed, procedural determinations relating to that action are within the jurisdiction of the FAA, not the Court.

C00038-135951

assurance commitments.[6]  The Receiver is not entitled to transfer the right to pursue such a case

without leave of the agency that is adjudicating the matter pursuant to its congressional mandate.

53.    Moreover, the Receiver has not provided any reason, legal or otherwise, in

support of his motion to transfer the Part 16 action from VJC to Tristate and offers no authority

for the proposition that this Court can entertain issues which are within the exclusive jurisdiction

of the FAA and the Court of Appeals.  Instead, he simply asserts that the Court should issue an

order because the Receiver and Tristate have agreed to the transfer.  Of course, this leaves two

important parties out of the equation – the FAA and the City.  The desires of the Receiver and

the prospective buyer of VJC's assets are insufficient to warrant the Court's intruding on the

prerogatives of the agency charged by Congress with adjudicating alleged violations of the grant

assurances.  Thus, the Court should not grant the Receiver's motion as to the transfer of the

authority to pursue the Part 16 case.

54.    Although the City believes that it is not appropriate to order that the right to

pursue the Part 16 case be transferred to Tristate, the City has no objection to the Receiver

providing a credit of up to $50,000 to Tristate for actual costs it incurs to resolve all disputes

with the City.  This can be accomplished by deleting the reference to the Part 16 case in the

Receiver's proposed order.  Nor would the City object to the Court making clear in its order that

the Court has no objection to the transfer, if the Receiver and Tristate are able to obtain FAA

permission to do so.  Of course, the City, as the Respondent to that action, would be given an

opportunity by the FAA to respond to any such proposed transfer.

---

[6] As further evidence of the fact that a Part 16 proceeding is concerned with determining compliance with an airport sponsor's federal obligations, rather than the provision of relief to any individual complainant, if the initial decision in the Part 16 process, the Director's Determination, were adverse to the City, and the City exercised its right to a hearing, the party asserting a grant assurance violation by the City at the hearing stage of the proceeding would not be the Complainant, but rather the FAA, and an FAA attorney serves as the "prosecutor" for the agency.  14 C.F.R. §16.203(b).

C00038-135951

55.     In conclusion, the City submits that this Court need not and cannot adjudicate any of the procedural or substantive aspects of the Part 16 Action including the entry of an order which substitutes Tristate for VJC in that action.  Rather, this Court should find and order that it is not ruling on any issues with respect to the ability of Tristate to be substituted in the stead of VJC in the Part 16 Action as the result of any approval of the sale Motion.  Such a finding would be consistent with the terms of the Asset Purchase Agreement whereby Tristate is agreeing to purchase VJC's rights, title and interest in the Part 16 Action and the other VJC assets on an "as is", "where is" basis "with all faults and without representations of any type, kind, character or nature..."  (See Exhibit A to Sale Motion at ¶1.(a) and (b) and ¶11.(g).  Including this provision would uphold the bargains reached between the Receiver and Tristate and preserve the rights of the City in the Part 16 Action as well as recognizing the appropriate jurisdiction of the FAA over such a proceeding.

WHEREFORE, the City respectfully requests this Court to enter its order (1) approving the transfer of the Lease and Subleases to Tristate in accordance with the consents approved by the City Council in the forms attached hereto as Exhibits A, B, and C, and (2) find and order that the Court is not ruling on any procedural or substantive aspects of the Part 16 Action including any claim that Tristate is authorized to be substituted for VJC in the Part 16 Action.

Respectfully submitted,

SHUMAKER, LOOP & KENDRICK, LLP
240 South Pineapple Av, P.O. Box 49948
Sarasota, FL 34230-6948
(941) 366-6660/(941) 366-3999 Facsimile
Attorneys for City of Venice

Mark D. Hildreth, Esquire
Florida Bar No. 454893

C00038-135951

- and -
Thomas R. Devine, Esquire
KAPLAN KIRSCH & ROCKWELL, LLP
1001 Connecticut Ave NW, Ste. 905
Washington, DC 20036
(202) 955-5600/(202)955-5616 Facsimile
*Attorneys for City of Venice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ⎧⎩ day of January, 2010, a true copy of the foregoing *City of Venice's Response to Receiver's Motion for Approval of Sale of the Assets of the Venice Jet Center and Agreement with Northern Trust, N.A. (Doc No. 254)* has been furnished by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system. I further certify that a true and correct copy has been furnished via First Class United States Mail, postage pre-paid, to the following non-CM/ECF participant:

Arthur G. Nadel
Register No. 50690-018
MCC New York
Metropolitan Correctional Center
150 Park Row
New York, NY 10007

Mark D. Hildreth

## CONSENT TO ASSIGNMENT AND ASSUMPTION OF LEASE

The CITY OF VENICE, as lessor under the May 23, 2006 Lease, hereby consents to the assignment and assumption of the lease to and by TRISTATE AVIATION GROUP OF FLORIDA LLC upon the following terms and conditions:

1.       TRISTATE AVIATION GROUP OF FLORIDA LLC shall utilize the leased premises only for the uses authorized by the May 23, 2006 Lease and shall faithfully perform all of the lessee's duties and obligations under said lease.

2.       As between the CITY OF VENICE and VENICE JET CENTER, LLC, the assignment and assumption of the lease to and by TRISTATE AVIATION GROUP OF FLORIDA LLC shall not release or relieve VENICE JET CENTER, LLC from any duty, obligation or liability under the terms and conditions of the May 23, 2006 Lease.

Dated this _6th_ day of ___January___, 2010.

CITY OF VENICE

By: _____
Ed Martin, Mayor

ATTEST:

By: _____
Lori Stelzer, City Clerk

Approved By City Council

Date: _January 5, 2010_



EXHIBIT

A

## CONSENT TO ASSIGNMENT AND ASSUMPTION OF SUBLEASE AGREEMENT

The CITY OF VENICE, as lessor under the May 23, 2006 Lease, hereby consents to the assignment and assumption of the HERTZ CORPORATION sublease dated October 22, 2009 to and by TRISTATE AVIATION GROUP OF FLORIDA LLC upon the following terms and conditions:

1.      HERTZ CORPORATION, as subleasee, shall abide by all of the terms and conditions contained within the May 23, 2006 Lease and shall not acquire any greater rights in the use and enjoyment of the leased premises than those possessed by the original lessee.

2.      TRISTATE AVIATION GROUP OF FLORIDA LLC shall remain liable for the performance of all of the lessee's duties and obligations contained within the May 23, 2006 Lease.

Dated this _6th_ day of _JANUARY_, 2010.

CITY OF VENICE

By: _____
          Ed Martin, Mayor

ATTEST:

By: _____
          Lori Stelzer, City Clerk

**Approved By City Council**
Date: _JANUARY 5, 2010_



EXHIBIT
B

## CONSENT TO ASSIGNMENT AND ASSUMPTION OF SUBLEASE AGREEMENT

The CITY OF VENICE, as lessor under the May 23, 2006 Lease, hereby consents to the assignment and assumption of the COCKPIT CAFÉ, LLC sublease dated February 26, 2008 to and by TRISTATE AVIATION GROUP OF FLORIDA LLC upon the following terms and conditions:

1.    COCKPIT CAFÉ, LLC, as subleasee, shall abide by all of the terms and conditions contained within the May 23, 2006 Lease and shall not acquire any greater rights in the use and enjoyment of the leased premises than those possessed by the original lessee.

2.    TRISTATE AVIATION GROUP OF FLORIDA LLC shall remain liable for the performance of all of the lessee's duties and obligations contained within the May 23, 2006 Lease.

Dated this _6th_ day of ___January___, 2010.

CITY OF VENICE

By: _____
Ed Martin, Mayor

ATTEST:

By: _____
Lori Stelzer, City Clerk

Approved By City Council
Date: _January 5, 2010_



EXHIBIT
C