UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

        Defendants,         CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

        Relief Defendants.
_____/

### RECEIVER'S MOTION FOR POSSESSION OF
### AND TITLE TO THE REAL PROPERTY LOCATED AT
### <u>464 GOLDEN GATE POINT, UNIT 703, SARASOTA, FLORIDA</u>

Pursuant to 28 U.S.C. § 754, Fed. R. Civ. P. 66, and Rule 3.01 of the Local Rules of the Middle District of Florida, Burton W. Wiand, as Receiver (the "Receiver"), moves the Court for possession of and title to the real property located at 464 Golden Gate Point, Unit 703, Sarasota, Florida 34236 (the "Property"), which is a residential condominium unit in a building called La Bellasara purchased on or about May 23, 2006, for $2,160,000 by Neil V. Moody ("Neil Moody") as Trustee of the Neil V. Moody Revocable Trust Agreement

dated February 9, 1995 (the "Moody Trust"). The lender that issued the primary mortgage on the Property has initiated foreclosure proceedings. Thus, it is necessary for the Receiver to take possession of and title to the Property to preserve its value for investors defrauded in the Ponzi scheme underlying this case (the "scheme").

As discussed in more detail below, Neil Moody:

(i)  was an officer, director, and/or principal of two fund management companies used to perpetrate the scheme;

(ii)  controlled and was a fiduciary for three hedge funds used to perpetrate the scheme;

(iii)  received over $23 million of scheme proceeds as fees for purported "services" between 2003 and 2008;

(iv)  received at least $1.65 million of scheme proceeds in connection with "investments" in the scheme; and

(v)  has chosen not to contest claims of federal securities fraud brought by the Securities and Exchange Commission in a recently filed enforcement action arising from his conduct in connection with the scheme, and has consented to the entry of a permanent injunction and to disgorgement of ill-gotten gains.

In light of the large sums of scheme proceeds that flowed into the same account from which mortgage and other payments relating to the Property were made and Neil Moody's uncontested fraudulent role in the scheme, the Receiver is entitled to take possession, control, and ownership of the Property for the benefit of defrauded investors.

**The SEC Enforcement Action.**

On January 21, 2009, the Securities and Exchange Commission ("Commission") initiated this action to prevent the defendants in this action from further defrauding investors of hedge funds operated by them. That same day, the Court entered an order appointing Mr. Wiand as Receiver for Defendants Scoop Capital, LLC ("Scoop Capital") and Scoop

Management, Inc. ("Scoop Management") and Relief Defendants Scoop Real Estate, L.P. ("Scoop Real Estate"); Valhalla Investment Partners, L.P. ("Valhalla Investment"); Valhalla Management, Inc. ("Valhalla Management"); Victory Fund, Ltd. ("Victory Fund"); Victory IRA Fund, Ltd. ("Victory IRA Fund"); Viking IRA Fund, LLC ("Viking IRA Fund"); Viking Fund, LLC ("Viking Fund"); and Viking Management, LLC ("Viking Management") (the "Order Appointing Receiver"). (*See generally* Order Appointing Receiver (Doc. 8).) The Court subsequently appointed the Receiver as receiver over an additional six entities (Order, Jan. 27, 2009 (Doc. 17); Order, Feb. 11, 2009 (Doc. 44); Order, Mar. 9, 2009 (Doc. 68); Amended Order, Mar. 17, 2009 (Doc. 81); Order, July 15, 2009 (Doc. 153); and Order, Aug. 10, 2009 (Doc. 172)). All of the entities in receivership are hereinafter referred to collectively as the "Receivership Entities."

Pursuant to the Order Appointing Receiver, the Receiver has the duty and authority to: "administer and manage the business affairs, funds, assets, choses in action and any other property of the Defendants and Relief Defendants; marshal and safeguard all of the assets of the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors." (Order Appointing Receiver ¶¶ 1-2.)

**The Scheme.**

The Commission concluded that Defendant Arthur G. Nadel ("Nadel") used Scoop Capital, Scoop Management, Valhalla Management, and Viking Management to defraud investors of the hedge funds those companies managed, Relief Defendants Scoop Real Estate, Valhalla Investment, Victory Fund, Victory IRA Fund, Viking IRA Fund; and Viking Fund (collectively, the "Hedge Funds"). (*See* Compl. ¶¶ 5-7 (Doc. 1).) The Commission

contends the Defendants violated federal securities laws from at least January 2008 forward by "massively" overstating investment returns and the value of fund assets to investors and providing false account statements to investors. (*Id.* ¶¶ 3, 36.) The Court found the Commission demonstrated a *prima facie* case that the Defendants committed multiple violations of federal securities laws. (Order Appointing Receiver ¶ 2.)

During the course of his investigation, the Receiver has uncovered evidence that the Defendants' violations of federal securities laws began at least as early as 2003 forward.[1] (Receiver's Decl. in Support of Mot. to Expand Scope of Receivership ¶¶ 10-12 (Doc. 16) (the "Receiver's January Declaration").) For each year from 2003 through 2007 (and, as shown by the Commission, in 2008), Nadel caused Receivership Entities to grossly overstate the value of the Hedge Funds and to report to investors overstated values and other false performance indicators for those funds. (*Id.*) As detailed in the Receiver's January Declaration (¶ 11), the actual values of the Hedge Funds and the purported year-end values represented to investors from 2003 through 2007 are as follows:

|  | Value as of 12/31/03 ($) | Value as of 12/31/04 ($) | Value as of 12/31/05 ($) | Value as of 12/31/06 ($) | Value as of 12/31/07 ($) |
|---|---|---|---|---|---|
| **Actual Value** | 80,820,378.06 | 143,073,367.23 | 132,731,986.70 | 63,715,094.39 | 18,042,860.67 |
| **Value Represented To Investors** | 128,953,973.27 | 216,868,604.46 | 274,387,098.31 | 282,379,592.45 | 313,960,110.28 |

**Neil Moody's Fraudulent Conduct & the SEC Enforcement Action Filed Against Him.**

Relevant here is that, according to Neil Moody's own representations, three of the five Hedge Funds (Valhalla Investment, Viking Fund, and Viking IRA Fund, collectively the

---

[1] Evidence in the Receiver's possession reflects the scheme began at the inception of the first Hedge Fund in 1999, but for purposes of this motion evidence relating to 2003 forward is sufficient as the purchase of the Property was closed in 2006.

"Moody Funds") were supposed to be managed by him.  Specifically, Neil Moody was a principal, Director, and President of Valhalla Management and also was a principal, Managing Member, and President of Viking Management.  (*See* Receiver's Decl. in Support of Unopposed Mot. for Possession of and Title to Real Property Located at 464 Golden Gate Point, Unit 703, Sarasota, Florida (the "Receiver's Bellasara Declaration") ¶ 9, being filed contemporaneously with this motion).)  In turn, Valhalla Management was the General Partner and manager of Valhalla Investment, and Viking Management was the Managing Member of Viking Fund and Viking IRA Fund.  (*Id.*)  In that capacity, Neil Moody's entities, Valhalla Management and Viking Management, were responsible for managing and administering all facets of the Moody Funds.  (*Id.* ¶ 10.)

But rather than complying with his representations to the investing public and his fiduciary obligations, Neil Moody completely abdicated control, otherwise ignored all of his fiduciary duties and other obligations, and engaged in fraud with respect to each of the Moody Funds and the investors.  For example, the Moody Funds' offices received by U.S. Mail monthly trading account statements from a financial institution showing the trading activities and money balances for each of those funds.  (*Id.* ¶ 15.)  During the course of the scheme, <u>over 260</u> statements would have been received.  (*Id.*)  A review of any of those statements would have revealed the discrepancy between what actually happened in those accounts and what was told to investors.  Neil Moody had access and a legal obligation to review those statements, but in light of the length of the scheme he either did not review any of them or he reviewed them and ignored clear proof that the scheme was being perpetrated.

Neil Moody also made material misrepresentations to the investing public, including in the offering memoranda, by, among other things, (1) representing that he and his entities, Valhalla Management and Viking Management, were in control of the Moody Funds' investment activities when, in reality, he knowingly had abdicated control to Nadel and (2) that the Moody Funds had a purported Certified Public Accountant, Michael Zucker, when in reality Mr. Zucker's CPA license had been "null and void" since 1989 (*i.e.*, ten years before the first Moody Fund was formed). (*See id.* ¶¶ 11-13.) Both representations were clearly material and false.

As a result of Neil Moody's conduct, on January 11, 2010, the SEC brought an enforcement action against him, alleging that he violated antifraud provisions of the federal securities laws in connection with his involvement in the scheme. *See generally SEC v. Neil V. Moody et al.*, Case No. 8:10-cv-00053-T-33TBM (M.D. Fla.) (the "Moody SEC Action"), Compl. (attached as Exhibit A to the Receiver's Bellasara Declaration). Specifically, the SEC asserts that Neil Moody misrepresented to the investing public that he actively managed and oversaw the assets of the Moody Funds. In reality, he allowed Nadel to exercise "complete control of the Moody Funds' assets and trading activities without any meaningful oversight or supervision." (*Id.* ¶ 44.) As such, Neil Moody distributed bogus account statements and baseless offering materials to investors (*id.* ¶ 40); never audited or examined the Moody Funds' securities accounts (*id.* ¶ 44); never reviewed the monthly account statements (*id.*); failed to take any adequate measures to ensure accurate account statements and offering materials (*id.*); ignored red flags that should have alerted him that Nadel was engaged in the scheme, including by allowing Nadel to continue providing purported

6

investment advice and controlling the Moody Funds although he both repeatedly threatened to stop providing such advice if Neil Moody insisted on auditing the Moody Funds (*id.* ¶ 42) and refused to provide those statements to Neil Moody's accountant (*id.* ¶ 43).  In short, according to the SEC's complaint, Neil Moody's intentional and reckless conduct allowed Nadel to perpetrate his scheme and amounted to fraud.

Significantly, in the Moody SEC Action Neil Moody has waived his right to deny those allegations in that proceeding as well as in this one.  In that action, he executed a Consent in which he agreed "not to take any action . . . denying . . . any allegation in the complaint . . . ."  (Moody SEC Action, Consent of Def. Neil V. Moody ¶ 3 ("Consent")) (attached as Exhibit B to the Receiver's Bellasara Declaration.)  Although that Consent notes that Neil Moody has not waived the "right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party," here the Commission is a party and thus Neil Moody is precluded from denying in this proceeding the allegations in the Moody SEC Action complaint.  (*Id.* ¶ 9.)  In the Moody SEC Action, Neil Moody also consented to the entry of a permanent injunction against him and agreed to disgorge all ill-gotten gains upon the Commission's request.  (*Id.* ¶ 2.).  In short, the SEC has charged Neil Moody with securities fraud in connection with the scheme, he has agreed not to deny those allegations for purposes of this proceeding, and thus for purposes of this motion (and all other proceedings in this action) Neil Moody cannot deny the claims and allegations of fraud in connection with the scheme as alleged in the Moody SEC Action complaint.

**Neil Moody's Financial Take from the Scheme.**

Although Neil Moody abdicated his obligations to the Moody Funds, he did not abdicate his perceived right to collect large sums of scheme proceeds. On behalf of himself and his revocable trust, Neil Moody collected over $23 million of investors' funds between 2003 and 2008. (Receiver's Bellasara Decl. ¶¶ 20-23). Specifically, the Receiver uncovered that Neil Moody collected large sums of "management" and "advisory" fees for purporting to manage the Moody Funds (collectively, "management fees"). (*Id*. ¶¶ 18-21.) Between 2003 and 2008, Neil Moody collected at least $14,675,314.07 of scheme proceeds through Valhalla Management in the form of management fees and $8,764,921.16 through Viking Management, or a total of at least $23,440,235.23. (*Id*. ¶ 20.) Of those transfers between 2006 and 2008, $13,049,299.86 was deposited directly into a Northern Trust Bank account ending with numbers 9339 which was titled in the Moody Trust's name (the "9339 Account"). (*See id.* ¶ 21 & Comp. Ex. H.)

The Receiver also uncovered that the Moody Trust "invested" with two of the Hedge Funds, namely Scoop Real Estate and Viking Fund, and in connection with those "investments" received at least $1,650,000.00 of scheme proceeds from those Hedge Funds. (*Id*. ¶ 22.) Between 2006 and 2008, the time when the Property was purchased and held by Neil Moody before the collapse of the scheme, at least $861,087.08 of those "investment"-related payments were directly deposited in the 9339 Account. (*Id*. ¶¶ 22, 23.) <u>In short, between 2006 and 2008, $13,910,386.94 of scheme proceeds were deposited directly into the 9339 Account.</u> (*Id*. ¶ 23.)

According to the information gathered by the Receiver, the bulk of Neil Moody's assets and wealth, whether held in his individual capacity or in the name of the Moody Trust, were generated from the scheme. (*Id.* ¶ 24.)

**Payments Relating To The Property.**

According to the information gathered by the Receiver, the vast majority of payments relating to the purchase, financing, improvement, and maintenance of the Property were made from the 9339 Account. (*Id.* ¶ 25.) Specifically, between 2006 and 2008, at least $474,903.27 was spent from the 9339 Account for the purchase, financing, improvement, and maintenance of the Property. (*Id.* ¶ 26 & Comp. Ex. I.) $275,387.91 of that money was used to make monthly payments on a primary mortgage with an initial principal balance of $956,000 and on a home equity line of credit with an initial balance of $880,000, both of which were obtained by Neil Moody on or about the date of the closing of the purchase of the Property. (*Id.* ¶ 27, Exs. F & G, Comp. Ex. I.)

**The Receiver Is Entitled To Take Possession Of And Title To The Property.**

The closing on the purchase of the Property occurred on or about May 23, 2006. (*Id.* ¶ 16 & Ex. D.) At that time, the scheme had been ongoing for some time and Neil Moody had already collected large sums of scheme proceeds in the form of management fees and payments related to his purported investment in Hedge Funds, including a total of $5,942,244.88 in 2005 alone. (*Id.* at 8 n.2 & Compl Ex. H.) From 2006 forward, Neil Moody collected at least an additional $13,910,386.94 which was deposited in the 9339 Account. (*Id.* ¶ 23.) In contrast, during that same period, expenses of at least $474,903.27 relating to the purchase, financing, improvement, and maintenance of the Property, including

9

monthly mortgage payments, were paid out of the 9339 Account. (*Id.* ¶ 26.) In light of the large amount of scheme proceeds that were deposited into the same account from which payments relating to the purchase, financing, improvement, and maintenance of the Property were made, the Receiver is entitled to take title and possession of the Property so that it may be preserved for the benefit of the Receivership Estate and defrauded investors.

The Receiver was appointed to, among other things, "marshal and safeguard all of the assets of the Defendants and Relief Defendants; and take whatever actions are necessary for the protection of the investors." (Order Appointing Order at 1-2.) Further, the Receiver was authorized to "institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Entities and their investors and other creditors as the Receiver deems necessary against those individuals . . . which the Receiver may claim have . . . improperly . . . transferred monies . . . directly or indirectly traceable from investors in the Receivership Entities, including against their officers [and] directors . . . or against any transfers of money . . . directly or indirectly traceable from investors in the Receivership Entities . . . ." (*Id.* ¶ 2.)

Consistent with those orders, title and possession of the Property should be transferred to the Receiver because financing payments and other payments used to purchase, maintain, and improve the Property were made from the large volume of money from the scheme that flowed into the account from which those payments were made. Transfer of title and possession of the Property to the Receiver is especially warranted because the current owner of the Property, Neil Moody, also defrauded investors as part of the scheme.

The Receiver seeks immediate transfer of title and possession to him because the Property is currently subject to a foreclosure proceeding in Twelfth Circuit in and for

Sarasota County, Florida. With title and possession, the Receiver can stop the foreclosure, market the Property, and negotiate with the lenders in an effort to generate money for the Receivership Estate. The relief sought by the Receiver is consistent with the wide discretion over this receivership held by the Court under principles of equity. *See, e.g.*, *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989). Short of taking actual physical possession and title of the Property, the Property will likely pass in the hands of the lenders and generate nothing of benefit for the Receivership Estate or injured investors and other creditors of the Receivership Entities.

WHEREFORE, Burton W. Wiand, as Receiver, respectfully requests this Court enter an order giving the Receiver possession of and title to the real property located at 464 Golden Gate Point, Unit 703, Sarasota, Florida 34236, currently titled in the name of Neil V. Moody, as Trustee of the Neil V. Moody Revocable Trust Agreement dated February 9, 1995.

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for the Receiver has conferred with counsel for the SEC and is authorized to represent to the Court that this motion is unopposed.

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following party:

    Arthur G. Nadel
    Register No. 50690-018
    MCC New York
    Metropolitan Correctional Center
    150 Park Row
    New York, New York 10007

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail and email to the following interested parties:

| | | |
|---|---|---|
| Mark A. Danzi, Esq.<br>Hill Ward Henderson<br>P.O. Box 2231<br>Tampa, FL 33601-2231 | Robert B. Glenn, Esq.<br>Glenn Rasmussen Fogarty &<br>Hooker, P.A.<br>P.O. Box 3333<br>Tampa, FL 33601-3333 | James E. Felman<br>Kynes Markman &<br>Felman, P.A.<br>P.O. Box 3396<br>Tampa, FL 33601-3396 |

Attorneys for Neil Moody

<u>**s/ Gianluca Morello**</u>
Gianluca Morello, FBN 034997
gmorello@wiandlaw.com
WIAND GUERRA KING P.L.
3000 Bayport Drive
Suite 600
Tampa, FL  33607
Tel.:   (813) 347-5100
Fax:   (813) 347-5155
*Attorneys for the Receiver, Burton W. Wiand*