## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

v.

ARTHUR NADEL,
SCOOP CAPITAL, LLC,
SCOOP MANAGEMENT, INC.,

                Defendants,                               CASE NO.: 8:09-cv-0087-T-26TBM

SCOOP REAL ESTATE, L.P.,
VALHALLA INVESTMENT PARTNERS, L.P.,
VALHALLA MANAGEMENT, INC.,
VICTORY FUND, LTD,
VIKING IRA FUND, LLC,
VIKING FUND, LLC, AND
VIKING MANAGEMENT, LLC.

                Relief Defendants.
_____/

### RECEIVER'S DECLARATION IN SUPPORT OF THE MOTION FOR POSSESSION OF AND TITLE TO THE REAL PROPERTY LOCATED AT 464 GOLDEN GATE POINT, UNIT 703, SARASOTA, FLORIDA

Burton W. Wiand declares as follows:

1.      I am an attorney with Wiand Guerra King P.L. in Tampa, Florida.

2.      In the January 21, 2009, Order Appointing Receiver (Doc. 8), the Court

appointed me Receiver over (a) defendants Scoop Capital, LLC ("Scoop Capital") and Scoop

Management, Inc. ("Scoop Management") and (b) relief defendants Scoop Real Estate, L.P.

("Scoop Real Estate"); Valhalla Investment Partners, L.P. ("Valhalla Investment"); Valhalla

Dockets.Justia.com

Management, Inc. ("Valhalla Management"); Victory IRA Fund, Ltd. ("Victory IRA Fund");

Victory Fund, Ltd. ("Victory Fund"); Viking IRA Fund, LLC ("Viking IRA Fund"); Viking

Fund, LLC ("Viking Fund"); and Viking Management, LLC ("Viking Management") (Scoop

Real Estate, Valhalla Investment, Victory IRA, Victory Fund, Viking IRA, and Viking Fund

are collectively referred to as the "Hedge Funds;" Scoop Capital, Scoop Management,

Valhalla Management, and Viking Management are collectively referred to as the "Fund

Managers").

3.     The Court subsequently appointed me as receiver over an additional six

entities (Order, Jan. 27, 2009 (Doc. 17); Order, Feb. 11, 2009 (Doc. 44); Order, Mar. 9, 2009

(Doc. 68); Amended Order, Mar. 17, 2009 (Doc. 81); Order, July 15, 2009 (Doc. 153); and

Order, Aug. 10, 2009 (Doc. 172)).  All of the entities in receivership are hereinafter referred

to collectively as the "Receivership Entities."

4.     Since my appointment as Receiver, I and professionals whom I have retained

(including lawyers, accountants, and financial analysts) have continued our investigation,

which has included communicating with persons associated with Nadel and/or the

Receivership Entities; responsible for maintaining the financial books of Receivership

Entities and of other businesses controlled by Nadel; responsible for operating other

businesses controlled by Nadel or for assisting those businesses with their transactions;

responsible for performing accounting services; and responsible for administering the Hedge

Funds.

5.     We have also reviewed documents located in the offices of the Hedge Funds

and Fund Managers; documents obtained from the accountant for Receivership Entities;

information stored on Receivership Entities' computer network; documents obtained from other businesses controlled by Nadel; documents obtained from Neil V. Moody ("Neil Moody"); documents obtained from financial institutions and other third parties, including lawyers and others who assisted Nadel's businesses with their transactions; and information available in the public record.

**The Fraudulent Investment Scheme**

6.     On January 26, 2009, I submitted the Receiver's Declaration in Support of the Receiver's Unopposed Motion to Expand the Scope of Receivership (the "Receiver's January Declaration") (Doc. 16).  On November 25, 2009, I submitted the Receiver's Fourth Interim Report (the "Interim Report") (Doc. 240).

7.     The Receiver's January Declaration, the Interim Report, and Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Other Emergency Relief (the "SEC Emergency Motion") (Doc. 2) and supporting papers establish that Nadel defrauded investors in the six Hedge Funds from at least 2003 through the time he fled in January 2009 by "massively overstating the value of investors' interests in them." (SEC Emerg. Mot. at 2, 6.)[1]  Specifically, from at least 2003 through 2008, the value of the Hedge Funds as represented to investors was significantly overstated. The investment returns and performance as represented to investors were based on the overstated numbers and thus were also false.

---

[1]     Other evidence I have recovered reflects the scheme started at the inception of the first Hedge Fund in 1999, but for purposes of the motion to which this declaration relates evidence relating to 2003 forward is sufficient.

8.     As shown by the SEC, Nadel defrauded investors through his control of the Hedge Funds' advisers and managers, Scoop Capital and Scoop Management, which are now in receivership. (*Id.* at 4-6.) Through those entities, Nadel was ultimately responsible for controlling the Hedge Funds' investment activities.

**Neil Moody's Involvement In The Scheme**

9.     Three of the Hedge Funds used to perpetrate the scheme were supposed to be managed and controlled by Neil Moody.  Specifically, public records and other documents that I have recovered show that Neil Moody was a principal, Director, and President of Valhalla Management and also was a principal, Managing Member, and President of Viking Management.  (The only other principal or officer of either Valhalla Management or Viking Management was Neil Moody's son, Christopher Moody.)  In turn, Valhalla Management was the General Partner and manager of Valhalla Investment, and Viking Management was the Managing Member of Viking Fund and Viking IRA Fund (Valhalla Investment, Viking Fund, and Viking IRA Fund are referred to collectively as the "Moody Funds").

10.     In that capacity, Neil Moody's Fund Managers, Valhalla Management and Viking Management, were responsible for administering all facets of the three Moody Funds.

11.     However, as detailed in the complaint filed in a recent enforcement action brought by the SEC against Neil Moody (the "Moody SEC Action"), from at least January 2003 through January 2009, Neil Moody abdicated his responsibilities and duties in connection with the Moody Funds and made material misrepresentations in connection with the scheme.  Also, Neil Moody ignored several warning signs of fraud.  (A copy of the complaint filed in the Moody SEC Action is attached hereto as Exhibit A.)

12.     Neil Moody does not contest the SEC's allegations in the Moody SEC Action and has consented to the entry of a permanent injunction in that case. *See* Moody SEC Action, Consent of Def. Neil Moody, attached hereto as Exhibit B.

13.     Some of Neil Moody's material misrepresentations were made in the offering documents for the Moody Funds. For example, an offering document for the sale of interests in Valhalla Investment states:

> While all investment decisions ultimately are made by [Valhalla Management], it has contracted with [Nadel's Scoop Management] to provide trading signals, market data, computer investment programs, technical and fundamental research, and entry of trades. (Valhalla Investment Partners, L.P. Confidential Private Placement Mem. at 15, attached hereto as Exhibit C (emphasis added).)

> All decisions with respect to the investment and trading activities of [Valhalla Investment] will be made exclusively by [Valhalla Management] in reliance on investment advice received from [Scoop Management]. . . . [Investors] will be dependent on the judgment and abilities of [Valhalla Management] and its principal officers. . . . Accordingly, no person should purchase an Interest unless he is willing to entrust all aspects of the trading activities of [Valhalla Investment] to [Valhalla Management]. (*Id.* at 16 (emphasis added).)

> As a result of [Valhalla Management's] decision to select itself as [Valhalla Investment's] portfolio manager, the terms upon which it will render investment services to [Valhalla Investment] have not been negotiated at arm's length. (*Id.* at 29 (emphasis added).)

As alleged in the Moody SEC Action, in reality Neil Moody abdicated control and decision-making authority over Valhalla Investment's (and the rest of the Moody Funds') investment activities to Nadel.

14.     Although the SEC complaint's allegations against Neil Moody focus on the period from 2003 forward, as noted above the scheme began before that time, and offering documents for the Moody Funds from before 2003 also contained material

misrepresentations.  For example, aside from containing the same misrepresentations that the SEC relies upon for the period from 2003 forward, a January 2001 Valhalla Investment Confidential Private Placement Memorandum states that "Michael Zucker, C.P.A. serves as [Valhalla Investment's] Certified Public Accountant."  In reality, as Florida public records reveal, Mr. Zucker's CPA license has been "null and void" since 1989.

15.    Also not addressed by the SEC is that on a monthly basis statements for each Moody Fund's trading account were received in the offices of the Moody Funds by U.S. Mail.  In light of the number of Moody Funds and the years they were in operation, the financial institution holding those accounts would have generated and mailed over 260 account statements over the course of the scheme.  The discrepancy between the actual performance and activities in those accounts and the purported performance and activities as represented to investors is clear from a review of those statements.

### La Bellasara Condominium

16.    According to property records, on or about May 23, 2006, Neil Moody as trustee of the Neil V. Moody Revocable Trust Agreement dated February 9, 1995 (the "Moody Trust"), closed on the purchase of a condominium in a building named "La Bellasara" with an address of 64 Golden Gate Point, Unit 703, Sarasota, Florida 34236 (the "Property").  A copy of the May 2006 deed for the Property is attached hereto as Exhibit D.  The  purchase price was $2,160,000.  (*See* Sarasota County Property Appraiser's Information, attached hereto as Exhibit E.)

17.    In connection with the purchase of the Property, Neil Moody obtained two loans secured by the Property:  a primary mortgage in the amount of $956,000.00 from MSC

Mortgage, LLC and a home equity line of credit in the amount of $880,000.00. Attached as Exhibits F and G, respectively, are copies of the mortgages associated with those loans.

### Transfers Of Scheme Proceeds To Neil Moody

18.     Evidence shows that the Hedge Funds directly or indirectly paid substantial fees to the Fund Managers in the form of management, advisory, and/or incentive fees (collectively, "management fees"). (Receiver's Jan. Decl. ¶ 13.) According to the Hedge Funds' documents, in 2003, the Hedge Funds paid a total of $7,450,565 in management fees; in 2004, they paid $15,381,774 in management fees; in 2005, they paid $20,349,897 in management fees; in 2006, they paid $18,257,590 in management fees; in 2007, they paid $19,873,365 in management fees; and in 2008, they paid $15,854,931 in management fees. *Id.*

19.     At least $73,090,135 of those management fees were paid to Neil Moody's Fund Managers, Valhalla Management and Viking Management. In turn, Valhalla Management and Viking Management transferred approximately $24,427,003 of the management fees to Nadel's Fund Manager, Scoop Management. As such, Valhalla Management and Viking Management kept approximately $48,663,132 of the purported management fees.

20.     A very significant part of the over $48 million in management fees collected by Valhalla Management and Viking Management were transferred to Neil Moody either in his individual capacity or in his capacity as trustee of the Moody Trust. Specifically, between 2003 and 2008 Neil Moody collected at least $14,675,314.07 from Valhalla

Management and $8,764,921.16 from Viking Management, or a total of at least $23,440,235.23 of scheme proceeds, as purported fees for his "services."

21.     Of those transfers between 2006 and 2008, at least $13,049,299.86 was deposited directly into a bank account at Northern Trust Bank ending with numbers 9339 and titled in the name of the Moody Trust (the "9339 Account").   (*See* Composite Exhibit H attached hereto.)[2]   Specifically, the following sums of management fees were deposited into the 9339 Account each year during the relevant time:   2006 – $4,707,461.20; 2007 – $4,399,962.96; and 2008 - $3,941,875.70.

22.     Further, according to the Hedge Funds' records, the Moody Trust invested in two of the Hedge Funds, Scoop Real Estate and Viking Fund, and received at least $1,650,000.00 of scheme proceeds in connection with those "investments."   At least some (if not all) of those proceeds were deposited into the 9339 Account.   Specifically, in 2006 $621,087.08 received by Neil Moody in connection with the Moody Trust's "investment" was deposited into the 9339 Account and in 2007 $240,000 was deposited into that account. (*See* Comp. Ex. H.)

23.     In short, between 2006 and 2008, $13,049,299.86 of scheme proceeds were deposited into the 9339 Account in connection with purported "fees" and $861,087.08 of scheme proceeds were deposited into that account in connection with purported "investment"-related payments, for a total of at least $13,910,386.94.

---

[2]     Composite Exhibit H also includes a listing of "fees" and "investment"-related payments deposited into the 9339 Account in 2005 to show that account was receiving significant sums of scheme proceeds even in the year before the purchase of the Property was closed.   As shown in that exhibit, in 2005, at least $5,942,244.88 of scheme proceeds were deposited into the 9339 Account.

24.     The information I have retrieved indicates that the bulk of Neil Moody and the Moody Trust's assets and wealth was derived directly from the scheme or from other investments funded with proceeds of the scheme.  Indeed, since the collapse of the scheme, it is my understanding that Neil Moody has not been able to make payments on the Property, and thus the lender associated with the primary mortgage has initiated foreclosure proceedings.

**Payments Relating To The Property**

25.     According to records produced by Neil Moody, it appears the vast majority of payments relating to the purchase, financing, improvement, and maintenance of the Property were made from the 9339 Account.

26.     Specifically, as detailed in Composite Exhibit I attached hereto, the records produced by Neil Moody show that between 2006 and 2008, at least $474,903.27 was spent directly from the 9339 Account in connection with the purchase, financing, improvement, and maintenance of the Property ($172,447.02 in 2006, $120,994.53 in 2007, and $181,461.72 in 2008).

27.     Significantly, between the purchase of the Property in May 2006 and the end of 2008, money to make the monthly payments on the primary mortgage and the line of credit secured by the Property came from the 9339 Account.  Payments on those two loans totaled $275,387.91.

28.     In short, according to the records that we have reviewed to date, between 2006 and 2008, $13,910,386.94 of scheme proceeds were deposited into the 9339 Account and at

least $474,903.27 was paid from that account for the purchase, financing, improvement, and maintenance of the Property.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief and is executed this 27th day of January, 2010.

Burton W. Wiand, as Receiver
Email: bwiand@wiandlaw.com
WIAND GUERRA KING P.L.
3000 Bayport Drive
Suite 600
Tampa, FL  33607
Tel.:   (813) 347-5100
Fax:    (813) 347-5155