For the Exclusive Use of: _____          Copy No. _____

---

# VALHALLA INVESTMENT PARTNERS, L.P.

### (A Delaware Limited Partnership)

#### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE NOT BEEN REGISTERED WITH, OR APPROVED BY, ANY STATE SECURITIES OR BLUE SKY ADMINISTRATOR OR ANY OTHER REGULATORY AUTHORITY. NO SUCH AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, NOR IS IT INTENDED THAT ANY SUCH AUTHORITY WILL DO SO. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE SUBSCRIBER UNDERSTANDS THAT THE GENERAL PARTNER IS NOT REQUIRED TO REGISTER, AND HAS NOT REGISTERED WITH THE CFTC AS A COMMODITY POOL OPERATOR ("CPO") NOR AS A COMMODITY TRADING ADVISOR ("CTA") IN RELIANCE UPON AN EXEMPTION THEREFROM. UNLIKE A REGISTERED CPO OR CTA, THE GENERAL PARTNER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO INVESTORS IN THE LIMITED PARTNERSHIP. THE GENERAL PARTNER HAS FILED NOTICE OF EXEMPTION FROM REGISTRATION WITH THE CFTC AND THE NFA.

---

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OF SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

---

The date of this Confidential Private Placement Memorandum is February 1, 2006.



## EXHIBIT C

GENERAL INFORMATION

VALHALLA INVESTMENT PARTNERS, L.P. (THE "PARTNERSHIP") IS HEREBY OFFERING LIMITED PARTNERSHIP INTERESTS IN THE PARTNERSHIP ("INTERESTS") PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), RULE 506 THEREUNDER, AND APPLICABLE STATE SECURITIES LAWS. INTERESTS ARE AVAILABLE ONLY TO PERSONS WHO ARE WILLING AND ABLE TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT. THE INTERESTS ARE SPECULATIVE AND, BY THEIR NATURE, MAY BE CONSIDERED TO INVOLVE A HIGH DEGREE OF RISK. INVESTMENT IN THE PARTNERSHIP IS DESIGNED ONLY FOR SOPHISTICATED PERSONS WHO ARE ABLE TO BEAR A SUBSTANTIAL LOSS OF THEIR CAPITAL CONTRIBUTIONS IN THE PARTNERSHIP. SEE "RISK FACTORS."

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM ("MEMORANDUM") CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE PROVIDED ON THE COVER PAGE OF THIS MEMORANDUM AND ONLY IF DELIVERY OF THIS MEMORANDUM IS PROPERLY AUTHORIZED BY THE PARTNERSHIP. THIS MEMORANDUM HAS BEEN PREPARED BY THE PARTNERSHIP SOLELY FOR THE BENEFIT OF PERSONS INTERESTED IN THE PROPOSED SALE OF INTERESTS, AND ANY REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE PARTNERSHIP, IS PROHIBITED.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM WHATEVER SHALL BE EMPLOYED IN THE OFFERING OF THE INTERESTS EXCEPT FOR THIS MEMORANDUM. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR PROVIDE ANY INFORMATION WITH RESPECT TO THE INTERESTS EXCEPT SUCH INFORMATION AS IS CONTAINED IN THIS MEMORANDUM. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE HEREOF.

THE GENERAL PARTNER HAS USED ITS BEST EFFORTS TO OBTAIN AND PROVIDE ACCURATE INFORMATION FOR THIS MEMORANDUM, BUT NO WARRANTY IS MADE WITH RESPECT TO THE ACCURACY OF SUCH INFORMATION.

EACH INVESTOR IN THE SECURITIES OFFERED HEREBY MUST ACQUIRE SUCH SECURITIES SOLELY FOR SUCH INVESTOR'S OWN ACCOUNT, FOR INVESTMENT AND NOT WITH AN INTENTION OF DISTRIBUTION, TRANSFER OR RESALE, EITHER IN WHOLE OR IN PART.

THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR IS URGED

TO SEEK INDEPENDENT INVESTMENT, LEGAL AND TAX ADVICE CONCERNING THE CONSEQUENCES OF INVESTING IN THE PARTNERSHIP.

This Memorandum contains statements that constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements appear in a number of places in this Memorandum and include statements regarding the intent, belief or current expectations of the Partnership or the General Partner with respect to, among other things, (i) the use of proceeds of this Offering; (ii) the ability of the Partnership to identify investment opportunities; and (iii) the performance of the Partnership or its affiliates.

Prospective Investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, and that actual results may differ materially from those in the forward-looking statements as a result of various factors. The accompanying information contained in this Memorandum, including, without limitation, the information under "Investment Objectives and Policies," and "Certain Risk Factors" identifies important factors that could cause such differences.

## FOR GEORGIA RESIDENTS

THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT.

## FOR FLORIDA RESIDENTS

PURSUANT TO THE LAWS OF THE STATE OF FLORIDA, IF SALES ARE MADE TO FIVE (5) OR MORE INVESTORS IN FLORIDA, ANY FLORIDA INVESTOR MAY, AT HIS OPTION, WITHDRAW, UPON WRITTEN (OR TELEGRAPHIC) NOTICE, ANY PURCHASE HEREUNDER WITHIN A PERIOD OF THREE (3) DAYS AFTER (A) THE INVESTOR FIRST TENDERS OR PAYS TO THE PARTNERSHIP, AN AGENT OF THE PARTNERSHIP OR AN ESCROW AGENT THE CONSIDERATION REQUIRED HEREUNDER, (B) THE INVESTOR DELIVERS HIS EXECUTED SUBSCRIPTION AGREEMENT OR (C)THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH INVESTOR, WHICHEVER OCCURS LATER.

ii

# TABLE OF CONTENTS

GENERAL INFORMATION ........................................................................................... I

SUMMARY ..................................................................................................................... 1

THE GENERAL PARTNER ......................................................................................... 12

INVESTMENT STRATEGY ......................................................................................... 12

THE INVESTMENT ADVISOR ................................................................................... 15

RISK FACTORS ........................................................................................................... 16

ANTI-MONEY LAUNDERING PROCEDURES ......................................................... 26

ERISA CONSIDERATIONS ....................................................................................... 26

CONFLICTS OF INTEREST ...................................................................................... 29

BROKERAGE ARRANGEMENTS ............................................................................. 31

DESCRIPTION OF FEES, EXPENSES AND THE PERFORMANCE ALLOCATION ........ 34

SUBSCRIPTIONS AND SUBSCRIPTION PROCEDURES ..................................... 36

LOCK-UP PERIOD & WITHDRAWALS .................................................................... 37

THE LIMITED PARTNERSHIP AGREEMENT ....................................................... 39

INCOME TAX ASPECTS ............................................................................................. 41

INVESTMENT REQUIREMENTS ............................................................................. 47

PRIVATE PLACEMENT .............................................................................................. 48

ACCOUNTANT ............................................................................................................ 48

COUNSEL .................................................................................................................... 48

ADDITIONAL INFORMATION ................................................................................. 49

Exhibits

A – Limited Partnership Agreement

B – Form of Subscription Agreement

## SUMMARY

The following summary is qualified in its entirety by reference to the more detailed information included elsewhere in the Partnership's Private Placement Memorandum and the Partnership's constituent documents, including the Limited Partnership Agreement. Capitalized terms used below and not otherwise defined have the meanings assigned to them in the Limited Partnership Agreement.

### VALHALLA INVESTMENT PARTNERS, L.P.

**THE PARTNERSHIP**

Valhalla Investment Partners, L.P. (the "Partnership") was organized as a limited partnership in March,1999 under the Delaware Revised Uniform Limited Partnership Act (the "Act") and commenced trading activities in May 1999.   The Partnership's business address is 1618 Main Street, Sarasota, Florida 34236; telephone (941) 366-0975; fax (941) 365-7612.

**INVESTMENT OBJECTIVE**

The Partnership's investment objective is to achieve capital appreciation primarily through investing and/or trading in securities.   The Partnership may invest and trade, on margin and otherwise, directly or indirectly, long and short, in public and private securities, whether U.S. or non-U.S. issued, including without limitation, equities, exchange traded funds ("ETFs"), other funds, "new issues" (i.e. initial public offerings), options, physical commodities, commodity futures, financial futures, fixed-income securities, convertible securities, warrants, restricted securities, convertible debentures, foreign currencies, forward contracts on currencies and commodities and other instruments and investments, in each case of every kind and character (collectively "Securities"), and may lend funds or assets and borrow money, with and without collateral. The Partnership ordinarily will invest primarily in Securities which trade in sufficient volume to allow for swift execution of transactions. The Partnership will not be subject to specific percentage limitations with respect to any Securities, issuer or industry. Accordingly, the Partnership may, from time to time, invest and/or trade, on margin and otherwise, long and short, a substantial portion of the Partnership's assets into any one of the Securities described herein, or any single issuer thereof, including,

but not limited to, ETFs. Currently, the Partnership invests primarily in long and short positions in ETFs, although this practice may change without notice to Limited Partners. Positions in Securities may be held for very short periods, even as little as a portion of one day. This turnover may increase transaction costs and lead to realization of taxable gains. While most of the Partnership's trading will occur on established stock exchanges or other secondary markets, it from time to time may purchase "new issues" in initial public offerings and restricted Securities that are not publicly traded and which may have to be held for a period of time before they can be sold. In addition, when market conditions or other considerations justify, in the discretion of the General Partner, a temporary defensive position, it may devote a substantial amount of the Partnership's capital to cash, cash equivalents or short-term obligations of the U.S. government, its agencies and instrumentalities. The Partnership reserves the right to alter any investment policy or strategy as deemed appropriate from time to time in its discretion without requiring Limited Partner approval and without notice.

**THE GENERAL PARTNER**

The Partnership's General Partner is Valhalla Management, Inc., a Florida corporation organized in February, 1999 (the "General Partner"). The General Partner's address and telephone number are the same as those of the Partnership. Neil V. Moody and Christopher D. Moody are the sole principals of the General Partner.

**THE INVESTMENT ADVISOR**

The Partnership has entered into an advisory agreement with Scoop Management, Inc. (the "Investment Advisor") to provide trading signals, market data, computer investment and trading programs, technical and fundamental research, and entry of trades. In addition, the Investment Advisor provides the General Partner with office management and technical services in connection with portfolio operations. These services include, without limitation, the use of office space and facilities and bookkeeping.

**CUSTODIAN; BROKERAGE**

The Partnership's custodian (the "Custodian")

2

| | |
|---|---|
| ARRANGEMENTS | is Goldman Sachs Group, Inc. and its affiliates. The Partnership from time-to-time may utilize prime brokerage relationships and may execute transactions through different brokers and dealers. |
| STOP-LOSS EVENT | The General Partner will promptly seek to liquidate all of the Partnership's portfolio positions if the Net Asset Value of the Partnership declines at the end of any business day to at least fifty percent (50%) of the Net Asset Value at the beginning of the calendar year, adjusted for any capital additions and withdrawals and distributions. |
| RISKS | An investment in the Partnership is speculative, and is suitable only for investors who are willing to accept substantial risks of loss, including the risk of loss of an investor's entire investment. These risks also include, but are not limited to, the speculative nature of trading and investing in Securities, the substantial charges which the Partnership will incur, regardless of whether any profits are earned, and the actual and potential conflicts of interest that exist in the structure and operation of the Partnership's business. See "Certain Risk Factors." |

<u>The Offering</u>

| | |
|---|---|
| SECURITIES OFFERED | Limited Partnership Interests in the Partnership ("Interests") are being offered on a private placement basis to persons who satisfy the suitability standards described below. Accepted subscribers will be admitted to the Partnership as Limited Partners as of the beginning of each month, or at such other times as the General Partner, in its sole discretion, shall determine. |
| | Each capital contribution by a Limited Partner will be aggregated with that Limited Partner's existing Interest for purposes of calculating the Performance Allocation. If the Partnership invests in "new issues" (e.g. shares of U.S. initial public offerings or "IPOs"), then, to the extent required by the Conduct Rules of the U.S. National Association of Securities Dealers, Inc. (the "NASD"), as amended from time to time, the securities compromising any "new issue" will be |

3

allocated to the extent required by law so that the shares of any "new issue," and any profits and losses thereon, may only be held by beneficial owners who are not "restricted persons". The definition of "restricted persons" is set forth in the subscription agreement appearing as Exhibit B to this Memorandum (the "Subscription Agreement"). Investors will be required to specify in the Subscription Agreement whether they are "restricted persons," but the General Partner's determination as to whether an Investor is a "restricted person" will be conclusive. Accordingly, a potentially small number of Investors who are not "restricted persons" may be allocated the entire risk and return of any "new issues." The General Partner may determine whether or not to purchase "new" issues in its sole discretion.

The Partnership may, as determined by the General Partner, offer Interests in different categories having different rights and obligations and paying different fees and allocations from the Interests offered hereby.

**MINIMUM SUBSCRIPTION**

The minimum subscription is $250,000.00 per subscriber, which minimum may be waived by the General Partner in its sole discretion. Existing Limited Partners may subscribe for additional amounts with a minimum subscription of $10,000.00. Subscriptions in excess of the foregoing minimums must be made in increments of $1,000.00. Any subscriptions for Interests may be accepted or rejected, in whole or in part, in the sole discretion of the General Partner. All subscriptions for Interests are irrevocable once accepted by the Partnership.

**MAXIMUM NUMBER OF INVESTORS**

The Partnership, under current law, may have a maximum of 100 Limited Partners at any time.

**ELIGIBLE INVESTORS**

In order to be admitted as a Limited Partner, a prospective investor must meet certain minimum suitability requirements, including being an "Accredited Investor," as defined in Rule 501 of Regulation D under the 1933 Act. The Accredited Investor categories are set forth in the

4

Subscription Agreement appearing as Exhibit B to this Memorandum.

An investment in the Partnership is suitable only for persons who have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments.   An investment in the Partnership should not be made by any person who (i) cannot afford a total loss of principal, (ii) has not (either alone or in conjunction with a financial advisor) carefully read or does not understand this Memorandum, including (but not limited to) the portions concerning the risks, conflicts of interest, and the income tax consequences of an investment in the Partnership.  The General Partner, in its sole discretion, may decline to admit any subscriber for any reason, in whole or in part.

An investment in the Partnership may generate unrelated business taxable income and therefore would not be suitable for charitable remainder trusts and might not be suitable for other tax-exempt investors.

The General Partner will, subject to the limitations set forth under "ERISA CONSIDERATIONS," accept subscriptions from investors which are Individual Retirement Accounts, Keogh Plans or employee benefit plans subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  In no event will the General Partner accept a subscription from a prospective investor, if, after accepting such subscription, an aggregate of twenty-five percent (25%) or more (or such other amounts that may be deemed "significant" pursuant to 29 C.F.R. 2510.3-101 or other relevant ERISA guidelines) of the equity interests (without giving effect to the equity interests held by the General Partner or any of its affiliates) in the Partnership would be held by Individual Retirement Accounts, Keogh Plans and employee benefit plans subject to Title I of ERISA. Notwithstanding the preceding limits on the amount of equity participation in the Partnership by Benefit Plan Investors, the General Partner reserves the right to allow such

5

equity participation by Benefit Plan Investors to exceed 25% (or such other amounts that may be deemed "significant" pursuant to 29 C.F.R. 2510.3-101 or other relevant ERISA guidelines), provided that at such time, no equity participation in the Partnership is owned by a person or plan subject to ERISA. See "ERISA CONSIDERATIONS."

**OFFERING PERIOD**

The Partnership is accepting subscriptions effective for investment on the first day of each month (each, a "Closing Date") (the "Continuing Offering"), and at such additional times as the General Partner may permit. Because each Limited Partner will purchase an Interest having a Capital Account equal to such Limited Partner's capital contribution, there will be no dilution in existing Interests when additional Interests are sold by the Partnership. The General Partner and its officers may, but are not required to, invest significant amounts.

**SUBSCRIPTION PROCEDURE**

In order to purchase an Interest, a subscriber must (1) complete, execute, and deliver to the General Partner a Subscription Agreement in the form annexed hereto as Exhibit B, and (2) pay the full amount of the subscription by arranging for a wire transfer or check in accordance with the instructions in the Subscription Agreement.

All Subscription Agreements must be received by the Partnership on a timely basis (generally, fifteen (15) business days prior to the requested Closing Date). Subscription funds must be credited to the Partnership's subscription account in order for a subscription to be accepted as of the requested Closing Date. Pending acceptance of a subscription and issuance of an Interest, subscription funds will be held in the Partnership's subscription account. No interest will be paid on subscription amounts from the date of receipt until the subscription is accepted at a Closing Date.

## Fees, Expenses and The Performance Allocation

**PERFORMANCE ALLOCATION**

The General Partner will receive a performance based special allocation equal to twenty-five

6

percent (25%) of the "Net Profits", which are net of all expenses, including the Management Fee, and subject to a loss carry forward or "high water mark" provision (the "Performance Allocation"). The Performance Allocation is allocated to the General Partner from each Limited Partner's Capital Account and calculated separately for each Limited Partner at each calendar quarter-end (or shorter period to the extent that all or part of an Interest is withdrawn prior to a calendar quarter-end).

**MANAGEMENT FEE**

The Partnership pays the General Partner promptly after the end of each month a Management Fee equal to 1/6th of 1 % of the Partnership's month-end Net Asset Value. For purposes of calculating the Management Fee, the Net Asset Value of the Partnership is not reduced by Management Fees, or the Performance Allocation payable or incurred by the Partnership, or any distributions or withdrawal amounts paid during the month.

The Partnership's "Net Asset Value" at any date means the total assets of the Partnership, including all cash and cash equivalents (valued at market plus accrued interest), accrued interest, and the market value of all Securities and other assets of the Partnership, less all Partnership liabilities, including accrued but unpaid Management Fees and Performance Allocations, with each determined on the basis of generally accepted accounting principles in the United States, consistently applied by the General Partner under the accrual method of accounting. However, for the exclusive purpose of calculating the Management Fee, the Net Asset Value will not be reduced by Managements Fees, the Performance Allocation payable or incurred by the Partnership, or any distributions or withdrawal amounts paid during the month.

**INVESTMENT ADVISOR COMPENSATION**

The Partnership pays the Investment Advisor a monthly service fee equal to $5,000.00 (the "Service Fee"), and the General Partner pays the Investment Advisor a portion of its Management Fee and Performance Allocation, after expenses.

7

START-UP EXPENSES            The General Partner paid all of the Partnership's organization and initial offering expenses and has been fully reimbursed by the Partnership.

OPERATING EXPENSES          The Partnership bears its (i) routine legal, accounting, auditing, tax preparation, and related fees and expenses, (ii) expenses associated with the Continuing Offering, (iii) operating expenses, (e.g., clerical, mailing, printing, duplication, office space, salaries and employee benefits and other operational expenses), (iv) interest and commitment fees in connection with investment-related borrowing, (v) transaction related expenses, including brokerage fees and custody charges, (vi) the Management Fee and Service Fee described above, (vii) withholding and transfer taxes, (viii) government fees and expenses, and (ix) extraordinary expenses (e.g., litigation costs and indemnification obligations) (collectively "Operating Expenses"), if any.

### Operation of the Partnership

2 YEAR LOCK-UP PERIOD     Interests purchased, whether by newly accepted subscribers or existing investors, may not be withdrawn, except as otherwise provided in this paragraph, until two years after the "Purchases" of such Interests are made (the "Lock-Up Period"). For purposes of this paragraph, "Purchases" mean the initial or additional capital contributions of Limited Partners. Purchases will be deemed to have occurred on the same date that Limited Partners' capital accounts are allocated Purchases. Each Purchase will be subject to its own Lock-Up. The Partnership will use a First In First Out approach for determining the age of Purchases. Interests may be withdrawn during the Lock-Up Period, subject to the other terms generally applicable to withdrawals under the Limited Partnership Agreement, if (1) such Interests are acquired through reinvestment of distributed capital gains or income; or (2) "Extraordinary Events" occur, in either case, as determined and permitted in the sole discretion of the General Partner.

"Extraordinary Events" may be deemed to have occurred when: (1) continuing to hold the

8

Interest becomes impractical or illegal; (2) a Limited Partner dies or becomes totally disabled; (3) key personnel of the Partnership die, become incapacitated, or cease to be involved in the management of the Partnership for an extended period of time; (4) the Partnership merges with another entity or is reorganized, (5) redemption is necessary to avoid a materially adverse tax or regulatory outcome, including the need to avoid the Partnership's assets from being considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974; (6) the General Partner or the Investment Advisor registers as an investment advisor under the Investment Advisers Act of 1940, as amended; or (6) similar circumstances occur as determined in the sole discretion of the General Partner.

Once Interests have, or will have, been held for their complete Lock-Up Period, such Interests may be withdrawn subject to the other terms generally applicable to withdrawals under the Limited Partnership Agreement.

The Lock-Up Period will not apply to withdrawals of Interests that were purchased prior to February 1, 2006.

**WITHDRAWAL OF INTERESTS**

Subject to certain restrictions, and following any applicable Lock-Up, a Limited Partner may, upon at least thirty (30) business days prior written notice to the General Partner, withdraw all or part of its Interest effective after the close of business as of the last day of each fiscal quarter (a "Withdrawal Date").

Facsimile is acceptable to initiate notice of withdrawal, but remittance of withdrawal proceeds will not be made until the Partnership has received a manually executed withdrawal notification form in good order.

Except in extraordinary circumstances, the Partnership will make payment of approximately ninety percent (90%) of the amount payable to a Limited Partner withdrawing all or part of its Interest within fifteen (15) business days following a Withdrawal Date, with the balance of such amount (the "Retained Amount"), subject to

any necessary adjustments, payable promptly after final determination of the Net Asset Value of the Partnership as of the withdrawal date. See "Distributions." The Partnership will not pay interest on the Retained Amount. In extraordinary circumstances (e.g., the inability of the General Partner to liquidate positions or a delay in payments due the Partnership from its brokers) the General Partner may delay payments of any partial or complete withdrawals until as soon as it is practicable for the General Partner to make such payments.

**DESIGNATED INVESTMENTS**

The General Partner may designate some or all of the investments held directly or indirectly by the Partnership as "Designated Investments" if such investments are, in the judgment of the General Partner, long-term, illiquid and/or without a readily ascertainable market value. Interests acquired after the Partnership's direct or indirect acquisition of a Designated Investment will not participate in the gain, loss or income of such Designated Investment.

In the event that you withdraw all or some of your Interest(s) prior to the sale or other disposition of any Designated Investment(s) in which you participate, unless the General Partner determines otherwise, your economic interest in such Designated Investment(s) may be maintained until the sale or other disposition of the Designated Investment(s) by the Partnership. In such event, for so long as the Partnership continues to own or hold such Designated Investment(s), you would (a) remain entitled to receive your allocable share of the gains, losses and expenses related thereto but (b) would be a Limited Partner in the Partnership only to the extent of your interest in Designated Investments.

In its discretion, the General Partner instead may elect to mark the value of the Designated Investments as of the Withdrawal Date at the lower of cost or market and the Designated Investments therefore may not reflect the full value realizable over time by the Partnership from the holding of the Designated Investments.

10

| | |
|---|---|
| MANDATORY WITHDRAWALS | The General Partner may, in its sole discretion at any time, require any Limited Partner to withdraw all or a portion of such Limited Partner's Interest from the Partnership at any time upon at least 48 hours' prior written notice. |
| DISTRIBUTIONS | Distributions may be made at the discretion of the General Partner, although the General Partner does not presently intend making any. Limited Partners nevertheless will be required to report their share of Partnership taxable income as income for federal income tax purposes.

Any distribution to a Limited Partner by reason of withdrawal or otherwise from the Partnership may be made in cash or, in the discretion of the General Partner, in Securities selected by the General Partner, or partly in cash and partly in Securities as determined by the General Partner. |
| REPORTS | The Partnership will provide Limited Partners with periodic reports and annual income tax statements. |
| HISTORICAL PERFORMANCE | The Partnership's historical performance is available upon request from the General Partner. |
| FISCAL YEAR | The Partnership's fiscal year is the calendar year ending December 31st. |
| COUNSEL | Holland & Knight LLP, 200 South Orange Avenue, Suite 2600, Orlando, Florida, 32801 acts as counsel to the Partnership and the General Partner. Holland & Knight LLP does not represent the Limited Partners as investors in the Partnership. |
| ACCOUNTANT | Michael Zucker, who is neither a certified nor public accountant, serves as the Partnership's Accountant. |

11

## THE GENERAL PARTNER

The General Partner was incorporated in Florida in February, 1999 to act as the general partner of the Partnership. Affiliates or principals of the General Partner have invested substantial capital in the Partnership. The General Partner is not expected to have substantial assets. Neil V. Moody and Christopher D. Moody are the sole principals of the General Partner, which is not a registered investment advisor under the Investment Advisers Act of 1940, as amended (or any similar federal or state law).

*Neil V. Moody*, born in 1938, is President of the General Partner, Managing Member of Viking Managment, LLC., and currently serves as a board member for a Sarasota, FL community bank. After graduating from Lehigh University in 1960, he joined the bond department of Bankers Trust Company on Wall Street. He became an officer in 1964 and left to join Kidder Peabody Incorporated in 1967. Mr. Moody was a Vice-President, shareholder and associated person of Kidder, Peabody Incorporated in New York from 1973 until 1995 when PaineWebber Incorporated took over the operations of Kidder Peabody. He held a similar position with PaineWebber until February, 1999, when he retired from the firm. Mr. Moody is licensed with the Commodity Futures Trading Commission.

*Christopher D. Moody* is Vice President & Treasurer of the General Partner and Co-Managing Member of Viking Management, LLC. After graduating Pine Crest Preparatory School, Mr. Moody went on to Lehigh University and graduated with a B. S. in Finance. He started his business career with American Express Financial Advisors. Desiring to offer his clients more financial products and service, he moved to UBS Paine Webber as a Financial Advisor. Mr. Moody built a successful book of business by offering full financial planning, asset allocation and alternative investments to his domestic and international clients. He managed $100MM for six years until joining his father, Neil Moody, in January of 2003. Christopher carries his National Commodity Futures, General Registered Representative, Uniform Securities Agent, and Uniform Investment Advisor licenses.

## INVESTMENT STRATEGY

The Partnership's investment objective is to achieve capital appreciation primarily through investing and/or trading in securities. The Partnership may invest and trade, on margin and otherwise, directly or indirectly, long and short, in public and private securities, whether U.S. or non-U.S. issued, including without limitation, equities, exchange traded funds ("ETFs"), other funds, "new issues" (i.e. IPOs), options, physical commodities, commodity futures, financial futures, fixed-income securities, convertible securities, warrants, restricted securities, convertible debentures, foreign currencies, forward contracts on currencies and commodities and other instruments and investments, in each case of every kind and character (collectively "Securities"), and may lend funds or assets and borrow money, with and without collateral. The Partnership ordinarily will

invest primarily in Securities which trade in sufficient volume to allow for swift execution of transactions. The Partnership will not be subject to specific percentage limitations with respect to any Securities, issuer or industry. Accordingly, the Partnership may, from time to time, invest and/or trade, on margin and otherwise, long and short, a substantial portion of the Partnership's assets into any one of the Securities described herein, or any single issuer thereof, including, but not limited to, ETFs. Currently, the Partnership invests primarily in long and short positions in ETFs, although this practice may change without notice to Limited Partners. Positions in Securities may be held for very short periods, even as little as a portion of one day. This turnover may increase transaction costs and lead to realization of taxable gains.

While most of the Partnership's trading will occur on established stock exchanges or other secondary markets, it from time to time may purchase "new issues" in initial public offerings and restricted Securities that are not publicly traded and which may have to be held for a period of time before they can be sold. In addition, when market conditions or other considerations justify, in the discretion of the General Partner, a temporary defensive position, it may devote a substantial amount of the Partnership's capital to cash, cash equivalents or short-term obligations of the U.S. government, its agencies and instrumentalities. The Partnership reserves the right to alter any investment policy or strategy as deemed appropriate from time to time in its discretion without requiring Limited Partner approval and without notice.

The General Partner has determined to invest the Partnership's assets according to trading signals and other principles developed by the Investment Advisor.

The Investment Advisor has been engaged in market research, technical systems development and publication of a proprietary trading signal system (the "System") since 1997. A general description of the System is as follows: Equities within a group having a predetermined minimum daily volume are sorted and ranked for high momentum and relative strength during a recent period of time. Minimum rankings determine the building of a portfolio and the generation of sell signals. Positions are held for periods of time that may vary from one day to several months. While the System is based solely on technical factors, some fundamental information as well as news bulletins may affect the General Partner's ultimate buy and sell decisions. The General Partner uses the System as a basis for portfolio management, but may also use other fundamental and technical methods and strategies. Margin loans may be employed at the discretion of the General Partner; however, it is the current intention of the General Partner to use such loans only occasionally and only for short periods of time when needed to maximize trading opportunities.

Additionally, the General Partner, in its sole discretion, may engage, at the Partnership's expense, third parties to assist the General Partner in making investment decisions with respect to the Partnership's commodity investments.

While the Partnership anticipates that most of its funds generally will be invested and does not generally intend to maintain substantial cash balances for long periods of time, the General Partner retains discretion to maintain some or all of the Partnership's assets in cash or cash equivalents. To the extent the Partnership has excess funds that are not fully invested or deposited to satisfy margin requirements, such funds are expected to

13

be held in interest-bearing money market or brokerage accounts or high-grade, short-term investments.

The General Partner may utilize research and recommendations from various brokerage firms and will use such firms for execution of transactions in return for such services. See "BROKERAGE ARRANGEMENTS." It also may use the services of outside advisers and consultants in seeking to implement the Partnership's investment objective.

From time to time, within limits deemed acceptable by the General Partner, the Partnership may make investments in restricted securities and in turnaround situations, all of which have a greater risk of illiquidity in addition to other risks.

The Partnership may utilize various investment techniques, including day trading, margining its positions, using derivative Securities, short selling and other leveraging techniques and, in certain situations, purchasing or selling put or call options in connection with positions in the related Securities.

There can be no assurance that the investment objectives of the Partnership will be achieved. In fact, the practices of short-selling, leverage and limited diversification can, in certain circumstances, maximize the adverse effects to which the Partnership's investment portfolio may be subject.

Partnership investments may range from large, well-established companies to small and less-seasoned companies.  Securities of firms in comparatively early stages of development will also be considered.  Investments in larger companies present certain advantages in that such companies generally have greater financial resources, more extensive research and development, manufacturing, marketing and service capabilities, more stability and greater depth of management and technical personnel. Investments in smaller, less-seasoned companies may present greater opportunities for growth but also involve greater risks than customarily are associated with more established companies. The Securities of medium or smaller companies may be subject to more abrupt or erratic market movements than those of larger, more established companies.  These companies may have limited product lines, markets or financial resources, or they may be dependent upon a limited management group.  Their Securities may be traded only in the over-the-counter market or on a regional Securities exchange and may not be traded daily or in the volume typical of trading on a national Securities exchange.    As a result, the disposition by the Partnership of portfolio Securities to meet its obligations or to effect a distribution may require the Partnership to sell these Securities at a discount from market price, or during periods when such disposition is not desirable.

The Partnership may, from time to time, lend Securities from its portfolio to brokers, dealers and financial institutions such as banks and trust companies and receive collateral in cash or Securities issued or guaranteed by the United States government.  Portfolio Securities of the Partnership will not be purchased from, sold or loaned to the General Partner, or its affiliates or any of their directors, officers or employees.

The investment methods and strategies to be utilized by the General Partner are proprietary and confidential; therefore, the above discussion is of a very general nature and not intended to be exhaustive.  There can be no assurance that the General Partner's

14

assumptions regarding the availability of investment opportunities will prove accurate or that its investment methods and strategies or any particular investment made by the Partnership will prove profitable.

## THE INVESTMENT ADVISOR

While all investment decisions ultimately are made by the General Partner, it has contracted with the Investment Advisor to provide trading signals, market data, computer investment and trading programs, technical and fundamental research, and entry of trades. In addition, the Investment Advisor provides the General Partner with office management and technical services in connection with portfolio operations. These services include, without limitation, the use of office space and facilities and bookkeeping. The Investment Advisor is not a registered investment advisor under the Investment Advisers Act of 1940, as amended (or any similar federal or state law).

Arthur Nadel is the President of the Investment Advisor. Mr. Nadel is a graduate of New York University Law School, receiving a Juris Doctor degree from NYU. In the 1960's, he was a real estate developer and securities investor. In the 1970's, he continued these activities, while additionally serving as CEO of a public company specializing in the construction and ownership of health care facilities. In the 1980's and 1990's, he was engaged in consulting activities for various public and private companies, assisting in the preparation of business plans and budgets, and in obtaining financing. Throughout his career, Mr. Nadel has been a stock investor and trader. In 1997, Mr. Nadel together with Ms. Peg Nadel and others, formed a company with the purpose of studying and using computer-generated investment and trading programs and utilizing the results for portfolio management. The resulting proprietary system has been used since 1999 by other hedge funds.

Peg Nadel is the Secretary of the Investment Advisor. Ms. Nadel has personally invested in securities for much of her adult life. During the 1990's, Ms. Nadel was connected to OSW TeleRadiology, Inc. This is a firm operating out of Lakeland, Florida that developed a system of transmitting images captured from CAT scans, MRIs, and Ultra sound. In this capacity, Ms. Nadel became familiar with the workings of computers, monitors, resolutions and various technical matters. This experience gave her invaluable knowledge of the capabilities of computers. In 1997, Ms. Nadel, along with Mr. Nadel, became a founder of a company that developed a computer-generated investment and trading system. She managed the initial testing of the system.

Geoffrey Quisenberry is the Vice President of the Investment Advisor. Mr. Quisenberry attended Florida Air Academy in Melbourne, Florida and graduated in 1989. He also attended Worcester Academy in Worcester, Massachusetts and Emerson University in Boston, Massachusetts. Since joining the Investment Manager in 1998, he has assisted in all aspects of the services performed, including investment research, technical services, portfolio management and office systems. Since 1999, he has assisted in performing these services for the affiliated funds.

Andrew Martin is a graduate of Cardinal Mooney in Sarasota and completed his education at Cumberland College in Kentucky and Florida State University. Andrew began his management career by organizing and motivating a new team at the Capitol City Country Club in Tallahassee, Florida. This successful management team helped increase profits and membership which allowed investors to realize substantial profits. Mr. Martin went on to join in a start-up venture of a prepaid telephone company located in Worcester, Massachusetts as Lead Organizer and Office Manager. He then returned to Sarasota and started his own company, NBN Communications. In early 1999, Mr. Martin joined the Investment Advisor to become Fund Administrator and helped to grow its fund offerings.

## RISK FACTORS

*There is a high degree of risk associated with the purchase of an Interest of the Partnership, and any such purchase should only be made after consultation with independent qualified sources of investment, legal and tax advice. No one should consider subscribing for more than he/it can comfortably afford to lose and it is recommended that no one should invest more than ten percent (10%) of such person's readily marketable assets in the Partnership. Prospective subscribers should consider the following risks before subscribing for an Interest.*

The identification of attractive investment opportunities is difficult and involves a significant degree of uncertainty. Returns generated from the Partnership's investments may not adequately compensate Limited Partners for the business and financial risks assumed. Although the General Partner's investment and trading methodology seeks to minimize some of the risks and volatility associated with investing in Securities, there can be no assurance that the General Partner will be successful in doing so and, accordingly, the Partnership will be subject to those market risks common to investing in all types of Securities, including market volatility. Also, certain trading techniques employed by the General Partner, such as short selling and option trading, may increase the adverse impact to which the Partnership's investment portfolio may be subject. Subscribers should carefully consider the following risks before subscribing for Interests.

### Business and Trading Risks

<u>Dependence on the General Partner and the Investment Advisor</u>. All decisions with respect to the investment and trading activities of the Partnership will be made exclusively by the General Partner in reliance on investment advice received from the Investment Advisor. Limited Partners will not have the opportunity to evaluate fully for themselves the relevant economic, financial, and other information regarding the Partnership's investments. Limited Partners will be dependent on the judgment and abilities of the General Partner and its principal officers. There is no assurance that the General Partner will be successful. Accordingly, no person should purchase an Interest unless he is willing to entrust all aspects of the trading activities of the Partnership to the General Partner.

16

Investment Risks. The Partnership will invest its assets in Securities, some of which are traded over the counter and some of which may be illiquid. There are several risks inherent in such investments, some of which are specifically referenced below. Such investments are subject to investment-specific price fluctuations as well as to macro-economic, market and industry-specific conditions, including, but not limited to, national and international economic conditions, domestic and international financial policies and performance, conditions affecting particular investments such as the financial viability, sales and product lines of corporate issuers, national and international politics and governmental events, and changes in income tax laws. Moreover, the Partnership may have only limited ability to vary its investment portfolio in response to changing economic, financial and investment conditions.

The Partnership's Investments may be Volatile. A principal risk in speculative Securities investing and trading is the traditional volatility in the market prices of Securities. The profitability of the Partnership depends greatly on predicting market prices. If the General Partner incorrectly predicts price movements, large losses could result.

The Partnership's Investments may be Leveraged. The Partnership may invest and trade on a leveraged basis (i.e., where the Security can be purchased by putting up only a portion of the instrument's face value and borrowing the remainder (margin)). Although the use of borrowed money to purchase Securities will permit the Partnership to make investments in an amount in excess of the Partnership's capital, it also will increase the Partnership's exposure to losses. Thus, a relatively small price movement in such an investment may result in immediate and substantial loss to the Partnership. Like other leveraged investments, the Partnership's transactions may result in losses in excess of the amount invested. Moreover, the Partnership will incur interest charges in servicing the leverage, which charges may be substantial.

Short Sales. The Partnership may engage in short selling activities (i.e., the sale of a Security which the Partnership does not own for the purpose of taking advantage of an anticipated decline in the price by purchasing the same Security at a later date) in which there is no limit to the amount of potential loss. The extent to which the Partnership will engage in short sales will depend upon its investment strategy and perception of market direction. The Partnership will incur a loss as a result of a short sale if the price of the Security increases between the date of the short sale and the date on which the Partnership covers its short positions (i.e., purchases the Security to replace the borrowed Security). The Partnership will realize a gain if the Security declines in price between these dates. A short sale involves the theoretically unlimited risk of an increase in the market price of the Security.

Although the use of short sales can substantially improve the return on invested capital, their use also may increase any adverse impact to which the investment portfolio of the Partnership may be subject. Gains and losses on short sales generally are treated as short-term capital gains and losses for tax purposes. See "INCOME TAX ASPECTS."

Concentration of Investments. There is no limit on the amount of the Partnership's assets that can be invested in any particular position or strategy. Accordingly, a loss in any single position or strategy could materially reduce the Partnership's assets. In addition,

the value of the Partnership's investment positions may be subject to decreases as a result of general economic conditions and/or the adverse effect upon the companies of which the Partnership owns stock.   Furthermore, new legislation or changes in governmental regulations could adversely affect the Partnership's ability to engage in certain of its anticipated investment strategies.

<u>Trading in Small Capitalization Markets</u>.  The Partnership may invest a portion of its assets in Securities of companies with small market capitalizations that may not be well known to the general public and have limited trading volumes.  Some of these companies will have been in operation for fewer than three years.  This trading may entail more risk than investments in companies with higher market capitalizations because of increased volatility and trading liquidity.

<u>Other Funds</u>.  The Partnership may invest in U.S. or offshore unit investment trusts, open-end and closed-end mutual funds and hedge funds, real estate investment trusts or other private investment funds.  These funds will charge their own management and other fees, so that if the Partnership invests in them, an Investor will bear an additional level of fees and expenses.  Some of these funds may pay fees to the General Partner or its affiliates. The General Partner and Partnership generally will have no power to control the management of these funds including investments, valuation, brokerage policies, conflicts of interest, etc.  Also, U.S. mutual funds generally must distribute all gains, including to investors who may not have an economic gain, which can lead to negative tax effects on Investors, particularly non-U.S. persons. The Partnership may also invest in unit investment trusts or other similar vehicles designed to track the performance of a specific index or sector.  The Partnership may hire sub-advisors to manage portions of the Partnership at the Partnership's expense.

<u>Warrants</u>.  The Partnership may invest in warrants, including warrants acquired together with or attached to other securities.  Warrants are pure speculation in that they have no voting rights, pay no dividends and have no rights with respect to the assets of the corporation issuing them. Warrants basically are options to purchase equity securities at a specific price valid for a specific period of time.  Warrants unexercised at their expiration date become void and of no value.

<u>Options Trading</u>.  An option on a Security gives the purchaser of the option the right but not the obligation to take a position at a specified price (the "striking," "strike" or "exercise" price) in a Security.  A "call" option gives the purchaser the right to buy the underlying Security, and the purchaser of a "put" option acquires the right to take a sell position in the underlying Security.  The purchase price of an option is referred to as its "premium." The seller (or "writer") of an option is obligated to take a position at a specified price opposite to the option buyer if the option is exercised.  Thus, in the case of a call option, the seller must be prepared to sell the underlying Security at the strike price if the buyer should exercise the option.  A seller of a put option, on the other hand, stands ready to buy the underlying Security at the strike price.  Both the purchasing and selling of call and put options entail risks.  Although an option buyer's risk is limited to the amount of the original investment for the purchase of the option, an investment in an option may be subject to greater fluctuation than is an investment in the underlying Securities.  In theory, an uncovered call writer's loss is potentially unlimited, but in practice the loss is limited by

the term of existence of the call. The risk for a writer of a put option is that the price of the underlying Security may fall below the exercise price.

Futures and Options on Futures Trading. In addition to the risks with trading in futures and options on futures that arise from the leverage and volatility associated with such investments, futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuations limits" or "daily limits." Under such daily limits, during a single day of trading no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the General Partner from promptly liquidating unfavorable positions and subject the Partnership to substantial losses.

New Issues. The purchase of "new issues" (e.g. shares of U.S. initial public offerings or "IPOs") involves greater risk than Securities trading in general. Securities issued through an IPO can experience an immediate drop in value if the demand for the Securities does not continue to support the offering price. Information about the issuers of IPO Securities is also difficult to acquire since they are new to the market and may not have lengthy operating histories. The Partnership may engage in short-term trading in connection with its IPO investments, which could produce higher trading costs and adverse tax consequences. The number of securities issued in an IPO is limited, so it is likely that IPO Securities will represent a small component of the Partnership's portfolio as the Partnership's assets increase (and thus have a more limited effect on the Partnership's performance).

The Markets and Securities Traded by the Partnership May Be Illiquid. At various times, the markets for Securities purchased or sold by the Partnership may be "thin" or illiquid, making purchase or sale of Securities at desired prices or in desired quantities difficult or impossible. In addition, the Partnership may invest in unregistered, privately issued Securities. To the extent such Securities are traded by a limited range of potential counterparties, such as institutional and/or "accredited investors," the Partnership's ability to participate in or liquidate such investments is restricted, and the value of such investments is subject to wide fluctuation.

Turnover. A significant portion of the Partnership's capital will be invested and traded on the basis of short-term market considerations. The portfolio turnover rate of those investments may be significant, potentially involving substantial brokerage commissions and fees. These commissions and fees will, of course, reduce the Partnership's profits and, consequently, the General Partner's Performance Allocation.

Special Situations. The Partnership may invest in Securities of an issuer based upon, or in anticipation of, an extraordinary corporate event, such as a spin-off, merger, or other reorganization, or which may be highly leveraged or operating in an out-of-favor industry. In special situation investing there are risks that the anticipated special situation will not occur or the anticipated benefit of the special situation will not be realized.

**Risks from Hedging Activities.**  If the General Partner analyzes market conditions incorrectly or employs a risk reduction strategy that does not correlate well with the Partnership's investments, the Partnership's risk reduction techniques could result in a loss, regardless of whether the intent was to reduce risk or increase return.  These risk reduction techniques may also increase the volatility of the Partnership and/or result in a loss if the counterpart to the transaction does not perform as promised.  Moreover, even though the General Partner may employ "stop-losses" on individual positions, there is no assurance that such an order will be executed at or near the desired "stop-loss" level.

**The Markets in Which the Partnership Invests are Highly Competitive.**  The Securities industry is extremely competitive.  In pursuing its investment and trading methods and strategies, the Partnership will compete with Securities firms, including many of the larger investment advisory and private investment firms, as well as institutional investors and, in certain circumstances, market-makers, banks and broker-dealers.  In relative terms, the Partnership has little capital and may have difficulty in competing in markets in which its competitors have substantially greater financial resources, larger research staffs, and more Securities professionals than the Partnership has or expects to have in the future.  In any given transaction, investment and trading activity by other firms will tend to narrow the spread between the price at which a Security may be purchased by the Partnership and the price it expects to receive upon consummation of the transaction.

**"Exchange Traded Fund" Risks**

**Exchange Traded Funds**

The Partnership may invest all or any portion of its assets in one or more Exchange Traded Funds ("ETFs").  ETFs, like index funds, typically represent shares of ownership in funds, unit investment trusts, or depository receipts that hold set portfolios of Securities which closely track the performance and dividend yield of specific indices (i.e. broad market indices, sector indices, international indices…etc.) without being actively managed.  ETFs give investors the opportunity to buy or sell an entire portfolio of stocks in a single security.

Unlike traditional mutual and index funds, ETFs typically issue and redeem shares only in large increments called "Creation Units" (e.g. a single Creation Unit may consist of 50,000 or 100,000 shares worth several million dollars).  Purchases of Creation Units are made by tendering a basket of designated stocks to an ETF and redemption proceeds are paid with a basket of securities from an ETF's portfolio.  These are called "in-kind" transactions.  ETFs calculate their shares' value ("NAV") once a day in the same fashion as traditional mutual and index funds.  An ETF's shares can also be purchased and sold in much smaller increments and for cash in the secondary market.  Because ETFs trade like stock (unlike traditional mutual and index funds), the Partnership can margin, utilize hedging strategies on, and sell short ETFs in addition to simply buying ETFs long.  These transactions, however, are not made at the ETF's NAV, but rather are made at market prices which may vary throughout the day and may differ from the ETF's NAV ("Market Price"). Like any listed security, ETF shares can generally be purchased and sold at any time a secondary market is open.

20

*Except when aggregated in Creation Units, shares of an ETF are not redeemable securities. Accordingly, there is no guarantee that ETF shares will trade at or near NAV (see "ETF RISKS").*

The Partnership may be subject to an expense fee that is typically based upon a small percentage of an ETF's NAV accrued daily ("ETF Expense Fee"). If the Partnership purchases shares of an ETF in the secondary market, it will generally be subject to ETF Expense Fees. As a result of ETF Expense Fees, Limited Partners may bear an additional level of fees in addition to those fees charged by the Partnership (i.e. the Management and any Performance Fee) if the Partnership invests and/or trades ETFs. Furthermore, brokerage commissions accumulated by the Partnership in trading and/or investing in ETF shares may reduce the Partnership's profits, if any.

**ETF Risks**

An ETF's NAV changes daily based on changes in market conditions and interest rates and in response to other economic, political, or financial developments. Factors that may cause an ETF's NAV to react to such developments include, but are not limited to, (1) the types of securities in which an ETF invests, (2) the financial condition, industry and economic sector, and geographic location of an issuer, and (3) an ETF's level of investment in the Securities of an issuer. An ETF's performance could depend heavily on the performance of an industry or group of industries and could be more volatile than the performance of less concentrated funds. In addition, because certain ETF's may invest a significant percentage of their assets in a single issuer, such an ETF's performance could be closely tied to one such issuer and could be more volatile than the performance of other, more diversified, funds.

An ETF's NAV will generally fluctuate with changes in the market value of an ETF's holdings. ETFs are listed and can be bought and sold in the secondary market at market prices. Although an EFT's market price is expected to approximate its NAV, it is possible that the market price and NAV will vary significantly. As a result, the Partnership may pay more than the ETF's NAV when buying such ETF in the secondary market and receive less than the ETF's NAV when selling such ETF.

The market price of ETFs during the trading day, like the price of any exchange-traded security, includes a "bid/ask" spread charged by the exchange specialist, market makers, or other participants that trade the particular security. In times of severe market disruption, the bid/ask spread can increase significantly. At those times, ETFs are most likely to be traded at a discount to NAV, and the discount is likely to be greatest when the price of ETFs are falling fastest, which may be the time that the Partnership most wants to sell its interest in an ETF.

Correlation to Index. The performance of an index based ETF (an "Indexed ETF") and its corresponding index ("Index") may vary somewhat due to factors such as fees and expenses of an Indexed ETF, imperfect correlation between an Indexed ETF's securities and those in the Index, timing differences associated with additions to and deletions from the Index, and changes in the shares outstanding of the component securities. An Indexed ETF may not be fully invested at times. The use of sampling techniques or futures or other derivative positions may affect an Indexed ETF's ability to achieve close correlation with the Index.

<u>Trading Issues</u>. Although shares of ETFs are listed, there can be no assurance that an active trading market will be maintained.   Trading of ETFs in the secondary market may be halted, for example, due to activation of marketwide "circuit breakers."

## THE Nasdaq - 100 Trust

The Nasdaq - 100 Trust (the "QQQQ") is an Indexed ETF and unit investment trust designed to correspond generally to the performance, before fees and expenses, of the Nasdaq-100 Index.  The QQQQ has an ETF Expense Fee accrued daily and reflected in its NAV.  The QQQQ holds all the stocks in the Nasdaq-100 Index, which consists of the largest non-financial securities listed on the Nasdaq Stock Market.  The Nasdaq -100 Trust issues and redeems shares of the QQQQ in multiples of 50,000 in exchange for the stocks in the Nasdaq-100 Trust and cash.  The QQQQ may be purchased in the secondary market in smaller increments.  At times, the Partnership may invest and/or trade all or any portion of the Partnership's assets in the QQQQ.

<u>Technology Exposure and Risks</u>.   If the Partnership invests and/or trades in the QQQQ, Limited Partners may be heavily exposed to the Securities of technology companies. Securities of technology companies may be subject to greater price volatility than Securities of companies in other sectors.  Technology companies may produce or use products or services that prove commercially unsuccessful, or become obsolete, or may be adversely impacted by government regulation.    Technology companies in particular can be significantly affected by competitive pressures and pricing as product cycles shorten, manufacturing capacity increases, and the number of competing companies and new products increase.  Furthermore, Technology Securities may experience significant price movements caused by disproportionate investor optimism and pessimism.

<u>Partnership Risks</u>

<u>Interests are Illiquid</u>.  Because of the limitations on transfers and withdrawals, during and after the Lock-Up Period, and the fact that Interests are not tradable, an investment in the Partnership is relatively illiquid and involves a high degree of risk.  A subscription for Interests should be considered only by sophisticated investors financially able to maintain their investment and who can afford to lose all or a substantial part of such investment. INTERESTS MAY NOT BE TRANSFERRED OR ASSIGNED WITHOUT THE CONSENT OF THE GENERAL PARTNER.

<u>Limitations on Withdrawals</u>.  Once the Lock-Up Period is no longer applicable to an Interest, withdrawals are permitted only at the end of a calendar quarter upon at least thirty (30) business days prior written notice to the General Partner.  Under extraordinary circumstances, the Partnership may suspend withdrawals entirely or delay payment until such time as the extraordinary circumstance no longer exists.  After the Withdrawal Date, a withdrawing Limited Partner is a creditor of the Partnership.   If the Partnership experiences losses after a Withdrawal Date, it is possible that the Partnership may have insufficient assets to pay all or even a portion of the withdrawal proceeds due to the withdrawn Limited Partner.

<u>Mandatory Withdrawal</u>.  Without being initiated by a Limited Partner, the General Partner may, in its sole discretion and for any or no reason, cause a Limited Partner to

22

withdraw, in whole or in part, from the Partnership upon at least 48 hours prior written notice. Under such circumstances, the Partnership will have the irrevocable power to act in the name of such Partner to withdraw his Interest.

Liability and Indemnification of the General Partner. The General Partner, and its members, officers, employees, agents, and affiliates, will not be liable, responsible or accountable in damages or otherwise to the Partnership, any of the Limited Partners or any of their respective successors, assignees or transferees for any act or omission performed or omitted by any of them on behalf of the Partnership and in a manner reasonably believed by them to be within the scope of the authority granted to them by the Partnership, except when such action or failure to act constitutes gross negligence or a breach of fiduciary obligation. The Partnership is required to indemnify the General Partner and its members, officers, employees, agents, and affiliates for any claims, losses, damages, or expenses they suffer or sustain as a result of, or in connection with, any act they perform on behalf of the Partnership if, in good faith, they acted or failed to act in a manner they reasonably believed to be in, or not opposed to, the best interests of the Partnership.

Substantial Fees and Expenses Payable Regardless of Profits. The Partnership will incur obligations to pay brokerage commissions, option premiums, "bid-ask" spreads, and other transaction costs to its brokers, and all of the overhead and Operating Expenses of the Partnership. The foregoing expenses are payable by the Partnership regardless of whether the Partnership realizes any profits.

No Certified or Public Accountant. Currently, the Partnership's accountant (the "Accountant") is neither a certified public accountant nor a public accountant. However, all of the Partnership's accounting is generally calculated in accordance with generally accepted accounting principles in the United States.

Potential Conflicts of Interest. The General Partner has several actual and potential conflicts of interest relating to its management of the Partnership. See "CONFLICTS OF INTEREST."

Limited Partners Do Not Participate in Management. Limited Partners do not participate in the management of the Partnership or in the conduct of its business.

Tax Considerations

Limited Partners Will be Taxed on Profits Whether or Not Distributed. The Partnership is not required to, and currently does not intend to, make distributions. If the Partnership has taxable income, such income will be taxable to the Limited Partners in accordance with their distributive shares of the Partnership's profits, whether or not such profits have been distributed to the Limited Partners. In the event the Partnership's trading were to sustain losses, Limited Partners may still be required to pay tax on ordinary income earned by the Partnership because any trading losses sustained will be, in most if not all cases, capital losses which are deductible by individuals against ordinary income only to the extent of $3,000 in any taxable year. The tax liability of Limited Partners for any profits of the Partnership very likely will exceed any distributions received from the Partnership. Also, the Partnership could sustain losses at the beginning of a year which offset profits recognized at the end of the prior year (when taxable income is

23

determined), so that a Limited Partner who did not withdraw his Interest as of the prior year-end would never receive any of the profits on which taxes were paid.

Tax Laws Subject to Change.   It is possible that the current United States federal income tax treatment accorded an investment in the Partnership will be modified by legislative, administrative, or judicial action in the future.   The nature of possible future changes in federal income tax law, if any, cannot be determined.   However, new legislation could significantly alter the tax consequences and decrease the after-tax rate of return of an investment in the Partnership.   Prospective Limited Partners should seek, and must rely on, the advice of their own tax advisers with respect to the possible impact on their investments of existing tax law as well as any future proposed tax legislation or administrative or judicial action.

Limits on Deductibility of Passive Activity Losses.   The Internal Revenue Service (the "IRS") has issued regulations which treat all Partnership gains and losses allocable to Limited Partners as non-passive activity gains and losses.   Accordingly, Partnership gains allocable to Limited Partners will not be subject to being offset by passive activity losses from other investments, but Partnership losses will not be subject to the limitations imposed on the deductibility of passive activity losses.

Limits on Deductibility by Individuals for Investment Expenses.   The Partnership may be required to treat the amount of any management, administrative or direct or indirect performance-based fees as "investment advisory fees" which are subject to substantial restrictions on deductibility for federal income tax purposes.   Any such classification of these amounts could significantly increase the effective tax rate to Limited Partners on Partnership profits (if any).   The General Partner will determine, in its sole discretion and without consulting with Limited Partners, how to classify these expenses for federal income tax purposes.

Possibility of Tax Audit.   There can be no assurance that the Partnership's tax returns will not be audited by the IRS or that adjustments to such returns will not be made as a result of such an audit.   If an audit results in an adjustment, Limited Partners may be required to file amended returns (which may themselves be audited) and to pay back taxes, plus interest.

Unrelated Business Taxable Income of a Tax-Exempt Organization.   Income derived from certain "debt financed property" will be treated as "unrelated business taxable income" taxable to a tax-exempt organization.   The Partnership intends to trade securities on margin and/or acquire government bonds or physical commodities with borrowed funds. Any gain derived from such trading would likely constitute "unrelated business taxable income."

## Regulation

Statutory Regulation; Lack of Protection Under the Investment Company Act.   The offering of Interests hereunder is exempt from registration under the 1933 Act in reliance upon the exemption from registration thereunder provided by Rule 506 of Regulation D thereunder.   Each purchaser will be required to represent that he is acquiring his Interest for investment and not for resale or distribution.   In addition, except as otherwise provided

in the Limited Partnership Agreement, the Interests in the Partnership may not be sold, transferred, assigned, pledged, or otherwise hypothecated or disposed of, in whole or in part, without the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion, and any attempt to do so shall be null and void.

The Partnership is similar in operation to an open-end investment company (a mutual fund) in that it is engaged in the business of investing in, holding and trading securities, and permits periodic withdrawals of its Interests.  The Partnership will not register under the Investment Company Act of 1940, as amended (the "1940 Act") in reliance on the exclusion from the definition of an "investment company" provided by Section 3(c)(1) of the 1940 Act (requiring beneficial ownership by not more than 100 persons).  Accordingly, the provisions of the 1940 Act, which, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of the fund's activities and contractual relationships, prohibit certain trading and investment activities, and prohibit the fund from engaging in certain transactions with its affiliates, will not be applicable.

In addition, neither the General Partner nor the Investment Advisor is registered, and is not required to be registered by reason of an exemption from registration, as an investment advisor under the Investment Advisers Act of 1940, as amended (or any similar federal or state law).  Investors, therefore, are not accorded the protective measures provided by such legislation.

Pursuant to rules adopted by the Commodity Futures Trading Commission ("CFTC"), the General Partner is not required to register and is not registered with the CFTC as a Commodity Pool Operator ("CPO").  The General Partner has filed a notice of exemption with the National Futures Association (the "NFA") and the CFTC.  The rules require that the General Partner believe that all Partnership investors are "accredited", the Partnership not be marketed as a commodity pool and aggregate notional value of the Partnership's commodity interest positions does not exceed one hundred percent (100%) of the liquidation value of the Partnership's portfolio or the aggregate initial margin and premiums required to establish such positions not exceed five percent (5%) of such liquidation value.

Pursuant to rules adopted by the CFTC, the General Partner is not required to register, and is not registered, with the CFTC as a Commodity Trading Advisor ("CTA").  The General Partner has filed a notice of exemption with the NFA and the CFTC.  The rules also require that the General Partner provide advice solely to pools whose managers have filed a corresponding notice of exemption.

**THE FOREGOING RISK FACTORS DO NOT PURPORT TO BE A COMPLETE EXPLANATION OF ALL OF THE RISKS INVOLVED IN THE OFFERING. POTENTIAL INVESTORS SHOULD READ THIS MEMORANDUM IN ITS ENTIRETY BEFORE DETERMINING WHETHER TO SUBSCRIBE FOR INTERESTS.**

## ANTI-MONEY LAUNDERING PROCEDURES

Measures aimed towards the prevention of money laundering and applicable "know your customer" legislation may require that an applicant verify his/her identity to the Partnership.

In addition, the Partnership may request further information and documents before processing the application. This may result in Interests being issued on a day subsequent to the day on which an applicant initially wished to have Interests issued.

It is further acknowledged that the Partnership and its affiliates shall be held harmless and indemnified by the applicant against any loss arising as a result of a failure to process the Subscription Agreement if such documentation is required by the Partnership and has not been provided by the applicant to the General Partner's satisfaction.

The Partnership will establish an Anti-Money Laundering Compliance Program (the "Program") as required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"). In order to ensure compliance with this law, the Partnership's Program would provide for the development of internal practices, procedures and controls, designation of anti-money laundering compliance officers, an ongoing training program and an independent audit function to determine the effectiveness of the Program.

Procedures to implement the Program would include, but not be limited to, determining that any Partnership vendor who processes purchases has established proper anti-money laundering procedures, reporting suspicious and/or fraudulent activity and a complete and thorough review of all new Subscription Agreements. The Partnership will not transact business with any person or entity whose identity cannot be adequately verified under the applicable provisions of the USA PATRIOT Act.

## ERISA CONSIDERATIONS

The General Partner will, subject to the limitation below, accept subscriptions from IRAs and Keogh Plans which cover only self-employed persons and their spouses and no employees, from employee benefit plans covering only the sole owner of a business and/or his or her spouse (collectively, "**Individual Retirement Partnerships**"), from Employee Benefit Plans ("**Plans**") subject to Title I of ERISA (defined below), and from government plans, church plans, and foreign employee benefit plans, etc. (collectively, "**Non-ERISA Plans**").