UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.                                                      CASE NO: 8:09-cv-87-T-26CPT

ARTHUR NADEL; SCOOP CAPITAL, LLC;
and SCOOP MANAGEMENT, INC.,

    Defendants,

SCOOP REAL ESTATE, L.P.;
VALHALLA INVESTMENT PARTNERS, L.P.;
VALHALLA MANAGEMENT, INC.;
VICTORY IRA FUND, LTD.; VICTORY FUND, LTD.;
VIKING IRA FUND, LLC; VIKING FUND, LLC;
and VIKING MANAGEMENT, LLC,

    Relief Defendants.
_____/

**O R D E R**

**BEFORE THE COURT** are 1) Wells Fargo's Motion for Order Directing Receiver to Turnover Rents from Rite Aid Property (Dkt. 1332), the Receiver's Objection (Dkt. 1342), Wells Fargo's Notice of Supplemental Authority (Dkt. 1344), Wells Fargo's Request for Judicial Notice (Dkt. 1345), Wells Fargo's Reply (Dkt.1350), and the Receiver's Response to Reply (Dkt. 1351), and 2) Wells Fargo's Motion for Payment of Certain Fees and Costs as Administrative Expenses (Dkt. 1334), the Receiver's Objection (Dkt. 1343), Wells Fargo's Reply (Dkt. 1349), and the Receiver's Response to Reply

(Dkt. 1352). After careful review and consideration of the arguments and submissions of the parties, the Court concludes that the motion to turnover rents should be granted and the motion for fees and costs should be granted in part and denied in part.

## TURNOVER OF RENTS

### *The Loan*

In 2005, Scoop Real Estate L.P. (Scoop), a relief Defendant in these receivership proceedings, purchased the Rite Aid property by borrowing $2,655,000.00 from Wells Fargo.[1] The promissory note was secured by a Deed of Trust and an Assignment of Rents.[2] Under both the Deed of Trust and the Assignment of Rents, the rents were assigned to Wells Fargo but Scoop retained the right to collect the rents prior to any default.[3] Once a default occurred, Scoop's right to rents automatically terminated per the terms of the Assignment of Rents.

---

[1] See docket 1332-1 (Promissory Note). Wachovia Bank, the original lender, is now Wells Fargo.

[2] See dockets 1332-2 (Deed of Trust) and 1332-3 (Assignment of Rents).

[3] Under Article II of the Deed of Trust, section 2.1 provides that Scoop "collaterally assigns and transfers to [Wells Fargo] all the . . . rents . . . [but] Scoop shall have the right to collect such rents . . . prior to the occurrence of an event of default[.]" See docket 1332-2, pages 12-13. Under paragraph 2 of the Assignment of Rents, Scoop "assigns to [Wells Fargo] all of its right, title and interest in and to (1) rents[.]" See docket 1332-3, pages 1-2. Paragraph 7 provides that "so long as no Event of Default has occurred . . . [Scoop] shall have a license . . . to collect, receive and use all Rents and Profits . . . [After] an Event of Default . . . such license shall be automatically revoked without any action required by [Wells Fargo]." See docket 1332-3, page 3

If a default occurred under any one of the three loan documents, a default occurred on all.[4] Of the possible events of default, it is uncontroverted that on January 20, 2009, the day before this receivership proceeding was filed, Scoop signed a voluntary consent to an injunction.[5] The consent states that it is entered into voluntarily and with full knowledge of the terms set forth in the attached proposed Order of Preliminary Injunction.[6] The proposed order, which was entered January 21, 2009, contemplated the appointment of a receiver, freezing of assets, and disgorgement of profits.[7] These acts constituted a default under the terms of the Deed of Trust and therefore the loan.[8] Thus, one would assume that Scoop defaulted on the loan prior to the creation of the receivership or, at the very least, upon its creation on the day this lawsuit was filed, the same day on which the preliminary injunction and the order appointing the Receiver were entered.[9]

---

[4] Paragraph 6 of the Assignment of Rents defined an "event of default" as the occurrence of a default under any of the three loan documents: "the Note, the Deed of Trust or any Loan Document[.]" See docket 1332-3, page 3.

[5] See docket 3, pages 3-9 (Consent to Order of Preliminary Injunction and other Relief).

[6] See docket 3, pages 3-4.

[7] See docket 7 (Order of Preliminary Injunction), pages 3-4.

[8] Under Article V, section 5.1 of the Deed of Trust defines events of default in part as "(f) . . . the consent of [Scoop] or any other guarantor to the appointment of a receiver . . . [and] (h) . . . the initiation of an action or proceeding for the dissolution, termination or liquidation of [Scoop] or any guarantor." See docket 1332-2, pages 15-16.

[9] See dockets 7 and 8.

This assumption, however, must be viewed in the context of these receivership proceedings and the borrowed principles of bankruptcy law. "*[I]pso facto* clauses which purport to entitle a creditor to call due an indebtedness solely on account of a bankruptcy filing[,]" or in this case, the institution of receivership proceedings, are disfavored. In re Price Oil, Inc., 2006 WL 3313781, at *3 (Bankr. M.D. Ala. Nov. 14, 2006) (citations omitted). After the receivership action was filed, Wells Fargo could not seek to foreclose on its security interest without violating this Court's injunction.[10] See SEC v. Byers, 671 F.Supp. 2d 531, 540 (S.D. N.Y. 2009).

## *The Receivership Proceedings*

Upon appointment of the Receiver, he took possession of the commercial building on the Rite Aid property, and Wells Fargo notified the Receiver on March 17, 2009, that Scoop was in default on the loan.[11] Wells Fargo timely filed a proof of claim in these receivership proceedings as to the Rite Aid property, claiming a security interest in the property and the rents.[12] In 2012, when this Court ruled on the Receiver's proposed plan for claims determination, it reserved ruling on various objections made by Wells Fargo, including those directed to the Rite Aid property.[13] On the Receiver's later motion to approve the sale of the Rite Aid property, and over objection filed by Wells Fargo, this

---

[10] See docket 7.

[11] See docket 713-6.

[12] This Court set the claims bar date as September 2, 2010. See docket 391.

[13] See docket 776.

Court approved the sale in May 2012.[14] The order provided that all claims, liens and encumbrances relating to the Rite Aid property "shall be transferred to the proceeds of the sale" and title would be free and clear.[15] The proceeds from the sale were $2,229,463.15, and after splitting costs associated with the property, Wells Fargo received $2,224,563.15 in June 2017.[16] The gap between the sale and the disbursement was attributable to litigation over whether Wells Fargo conducted itself in good faith.[17]

### *Wells Fargo as a Secured Creditor*

This Court has not previously ruled directly on Wells Fargo's claim as to the Rite Aid property.[18] Wells Fargo has not waived its right to the rents through any lack of objections in these proceedings. With recent guidance from the Eleventh Circuit in this case, it is clear that Wells Fargo as a secured creditor did not have to file a notice of claim in the receivership, although it did with respect to the Rite Aid property, to protect its pre-existing state property rights. SEC v. Wells Fargo Bank, N.A., 848 F.3d 1339 (11th Cir. 2017). "[A] federal district court cannot order a secured creditor to either file a proof of

---

[14] See dockets 840 and 842.

[15] See docket 842.

[16] According to Wells Fargo, a deficiency of $1,955,876.52 was remaining as of October 11, 2017.

[17] See Wiand v. Wells Fargo Bank, N.A., 677 F. App'x 573 (11th Cir. 2017) (affirming district court's grant of summary judgment in favor of Wells Fargo) (unpublished order).

[18] At the time the order approving the sale was entered, the lawsuit concerning Wells Fargo's participation, if any, in the Ponzi scheme was still pending before another district judge. See docket 840, page 2 n. 4.

claim and submit its claim for determination by the receivership court, or lose its secured state-law property right that existed prior to receivership." Id. at 1345.

Wells Fargo's secured rights, including the right to rents, in the Rite Aid property existed pursuant to the terms of the loan documents before the receivership was formed. The provision in the Assignment of Rents automatically terminating the borrower's right to collect rents upon an event of default was triggered one day before the filing of this action when Scoop consented to the appointment of a receivership and other relief, or the day the receivership was filed. Wells Fargo argues its right to rents became absolute upon the consent or the filing of the receivership, both events of which are defaults under the terms of the loan. See In re Grandfather Mountain L.P., 1997 WL 34740256, at *6 (M.D. N.C. Jan. 29, 1997) (relying on state authority that North Carolina is a title theory state where mortgagee receives legal title, not a lien, for security purposes and also noting that a conditional absolute assignment entitles lender automatically to access to rents upon default); In re Jason Realty, L.P., 59 F.3d 423, 428 (3d Cir. 1995) (holding that bank as assignee of rents under the loan documents had conditional absolute assignment which became absolute upon default of the debt, and rents were therefore not part of bankruptcy estate); First Fidelity Bank, N.A. v. Eleven Hundred Metroplex Assocs., 190 B.R. 510, 512 (S.D. N.Y. 1995) (holding that debtor did not have interest in rents at time bankruptcy petition filed because under the terms of the assignment of rents, absolute title passed to lender upon debtor's prepetition default regardless of purpose of assignment).[19]

---

[19] Cf. Title Max v. Northington, 876 F.3d 1302 (11th Cir. 2017) (holding that Bankruptcy Code did not prevent operation of state pawn law that automatically extinguished

Without deciding the precise moment Wells Fargo became entitled to the rents, at this point in the proceedings, after the declared default in March 2009, Wells Fargo possesses a right to the rents. Even if Wells Fargo holds a lien, as opposed to title, to the rents, this Court's orders regarding the sale of the property did not extinguish the pre-existing state property rights, or if perceived as such an attempt, were unsuccessful.[20]

The rents at issue were paid on the property after the appointment of the Receiver, and the Receiver is holding $1,322,923.00 attributed to those rents which Wells Fargo now seeks.[21] The Receiver has reserved the amount of the rents throughout these proceedings. The Receiver seems to argue that the rents should be denied because Wells Fargo is not entitled to post-receivership interest, attorney's fees and costs, and is limited to the $2,655,000.00 originally claimed of which $2,224,563.15 has already been disbursed to Wells Fargo from the sale of the Rite Aid property.[22] This motion seeks rents pursuant to the Assignment of Rents, however, not interest or attorneys' fees

---

debtor's conditional rights to possess car and vested right to possession in pawnbroker).

[20] This ruling is limited to the facts of this case where the proceedings are long past the time for foreclosure. Although the Receiver cites SEC v. Byers, 671 F.Supp. 2d 531 (S.D. N.Y. 2009), as authority that the mere appointment of a receiver may not be considered a default to thwart the preliminary injunction of the receivership, the issue here is not whether an "end-run around the Court's injunction" is attempted but whether Wells Fargo has the right to the rents paid after the Receiver took possession.

[21] As of January 11, 2018, the indebtedness on the loan was $430,436.85 as principal, contract interest (LIBOR plus 2.15%) of $512.006.63, default interest (3%) of $626,560.31, appraisal fee of $6,840.00, and legal fees of $20,047.29 (Trenam) and $15144.90 (KL Gates), for a total of $1,611.035.98. See docket 1350-1, paragraph 9.

[22] See docket 1350-1, paragraph 8.

relating to the loan or a deficiency claim.  Finally, the Receiver urges that $297,657.72 should be withheld from the rents in the name of equity because the Receiver made payments on the loan through October 2009 when those rents were collected.[23]  Wells Fargo did not respond.  Without more, the Court grants the turnover of rents in the full amount.

## FEES AND COSTS AS AN ADMINISTRATIVE EXPENSE

In addition to the rents, Wells Fargo seeks as an administrative expense $568,622.74 in attorneys' fees ($527,548.10) and costs ($41,074.64) incurred in these receivership proceedings.  The attorneys' fees were incurred by Wells Fargo in these receivership proceedings in monitoring its various security interests.  The costs were awarded by another district court in the case resolving Wells Fargo's liability with respect to the Ponzi scheme ($40,312.94) and by the Eleventh Circuit in the case resolving whether Wells Fargo was required to file a proof of claim to protect its various security interests ($761.70).  Wells Fargo argues that they constitute an administrative expense which should be paid prior to any further distribution to the holders of lower priority claims, including the investors.

The theory of recovery as an administrative expense in this case is founded on the "fundamental fairness" that Wells Fargo should be made whole.  Wells Fargo accuses the Receiver of using "aggressive litigation tactics" and making "baseless challenges," which

---

[23] See docket 1342, page 15

visited an unfairness on Wells Fargo for litigating battles that it has now won.[24] Wells Fargo asks this Court to focus on the Receiver's "results obtained."[25] Because the Receiver did not quickly and without controversy release the rents from the Rite Aid property, despite the unresolved litigation regarding whether Wells Fargo was liable, Wells Fargo demands the Receiver must pay for its injury.

Wells Fargo relies on several cases applying bankruptcy law as authority for awarding its fees and costs as administrative expenses of the receivership, save one – SEC v. HWK Trading LLC, 2009 WL 2499146 (M.D. Fla. Aug. 14, 2009), which did not apply or construe bankruptcy law.[26] When minimal authority and guidance exists in the

---

[24] See docket 1334, pages 4 and 6.

[25] Wells Fargo essentially contends that the results obtained for the secured creditors are paramount to the preservation of assets of unsecured creditors. See FTC v. Worldwide Info Servs., Inc., 2015 WL 144389, at *4 (M.D. Fla. Jan. 12, 2015) (noting that the results obtained by a receiver are "always relevant" to determining the fee) (citation omitted); SEC v. Fifth Ave. Coach Lines, Inc., 364 F.Supp. 1220, 1222 (S.D. N.Y. 1973) ("The legal principles applicable to the award of counsel fees in Securities Act receiverships differ from those in bankruptcy proceedings in that preservation of assets for creditors in not a prime concern."). Notably, in one of these two cases relied on by Wells Fargo, the factors to be considered do not include the results obtained, but rather focus only on the "complexity of the problems faced, the benefit to the receivership estate, [and] the quality of work performed[.]" Fifth Ave. Coach Lines, Inc., 364 F.Supp. at 1222.

[26] For the cases applying bankruptcy law, see Reading Co. v. Brown, 391 U.S. 471, 485, 88 S.Ct. 1759, 1767, 20 L.Ed.2d 751 (1968) (holding that "damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to 'actual and necessary costs' of a Chapter XI arrangement."); In re GIC Gov't Sec., Inc., 121 B.R. 647, 649 (Bankr. M.D. Fla. 1990) (permitting recovery of costs as administrative expense by E.F. Hutton in negligence and conversion case unsuccessfully brought by bankruptcy Trustee and reasoning that "parties subjected to loss and expense as a result of the administration of a bankruptcy estate are entitled to be made whole as a matter of fundamental fairness"); In re Carpet Ctr. Leasing Co., 991 F. 2d. 682, 685-86 (11th Cir. 1993) (allowing as administrative expense diminution of value of trucks as "actual and necessary cost of preserving the bankruptcy estate" where post-petition agreement arose for debtor to retain use of trucks to

receivership setting, bankruptcy law provides guidance. Wells Fargo, 848 F.3d at 1344. The Bankruptcy Code permits recovery of administrative expenses "including . . . the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).[27] "The use of the words 'actual and necessary' indicate that the estate must accrue a real benefit from the transaction for which the claim is being filed. The mere potential of benefit to the estate does not satisfy this requirement." Broadcast Corp. of Ga. v. Broadfoot, 54 B.R. 606, 611 (Bankr. N.D. Ga. 1985) (citation omitted), aff'd in part, rev'd in part, In re Subscription Television of Greater Atlanta, 789 F.2d 1530, 1532 (11th Cir. 1986) (noting that the district court "correctly applie[d] the law . . . [and] thoroughly analyzed the pertinent portions of sections 365 and 503 of the Bankruptcy Code").[28]

---

operate business in exchange for adequate protection to creditor); In re CM Sys., Inc., 86 B.R. 286, 287 (Bankr. M.D. Fla. 1988) (allowing as administrative expense post-petition "use" of leased equipment for operation of business by debtor's sublessee); Tribune Media Co., 2015 WL 7307305, at *4 (Bankr. D. Del. Nov. 19, 2015) (limiting post-petition attorney fees and costs to oversecured creditors but noting "[c]reditors may seek payment of postpetition fees and expenses under § 503(b)(3)(D) and § 503(b)(4), which allow an administrative claim for actual, necessary expenses that confer a 'substantial contribution' on the bankruptcy estate."), motion to certify appeal granted sub nom., In re Tribune Media Co., 2016 WL 1451161 (D. Del. Apr. 12, 2016).

[27] Wells Fargo also asserts that the Claims Procedure Order in this case permits recovery of its fees and costs. The order provides that "[a]ll administrative expenses, including attorneys' fees and costs, litigation expenses, experts, and other administrative costs, will be paid from the Receivership Estate. These administrative expenses will be paid or reserved before any Distribution is made. Administrative expenses may also include, but are not limited to (1) expenses for publishing notice and (2) the retention of one or more consultants to assist in analyzing the validity of filed claims. No previous request for the relief sought herein has been made to this or any other Court." See docket 390, page 11.

[28] See also In re Sports Shinko (Fla.) Co., 333 B.R. 483, 490 (Bankr. M.D. Fla. 2005) (noting that Eleventh Circuit's interpretation of section 503(b) requires concrete benefit to estate) (citations omitted).

Section 503(b)(1)(A) should be narrowly construed in determining whether a benefit occurred to maximize the value of the estate. Varsity Carpet Servs., Inc. v. Richardson, 19 F.3d 1371, 1377 (11th Cir. 1994); In re Moody & Sons, Inc., 473 B.R. 828, 836 (Bankr. M.D. Fla. 2012). The entity requesting the administrative expense has the burden to establish the estate received the benefit. In re F.F. Station LLC, 2007 WL 4898367, at *5 (Bankr. M.D. Fla. Dec. 3, 2007) (citation omitted). The focus is first, whether the estate has received an actual benefit, not whether a creditor sustained a loss. Broadfoot, 54 B.R. at 611.

In the main case relied on by Wells Fargo, the bankruptcy trustee had pursued an action is state court against a brokerage firm, E.F. Hutton, for negligence, conversion and other claims directed to the opening and maintenance of a margin account for GIC and Hutton's sale of the securities in the account to cover GIC's margin debt. In re GIC Gov't Sec., Inc., 121 B.R. 647 (Bankr. M.D. Fla. 1990). The suit was unsuccessful because the trustee was found to lack standing to sue Hutton, a third party, on behalf of the GIC customers (creditors) who fully paid for the securities once held in the margin account before Hutton sold them off to pay the indebtedness. E.F. Hutton & Co. v. Hadley, 901 F.2d 979 (11th Cir. 1990). In awarding Hutton's costs in defending the state court action as an administrative expense, the bankruptcy court reasoned that Hutton would not have incurred the costs "but for" the suit filed by the trustee and the suit was filed as "an attempt to benefit and preserve a property of the estate." GIC Gov't Sec., 121 B.R. at 649. The court employed the term "fundamental fairness" after addressing the

case of Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). No attorneys' fees were sought or awarded.

In Reading Co., a receiver was appointed in a bankruptcy proceeding to conduct the debtor's business including the leasing of an eight-story industrial structure, which was the debtor's only noteworthy asset. The building caught fire through the assumed negligence of the receiver and a workman, and some adjacent buildings were destroyed, including the property of Reading Co. and many others. The total claim of 3.5 million dollars exceeded the total assets of the debtor and the claimants sought recovery as an administrative expense. In holding that the claim was an administrative expense, the Court reasoned that where the receivership creates the tort claim, the actual and necessary costs "should include costs ordinarily incident to operation of a business and not be limited to costs without which rehabilitation would be impossible." Reading Co., 391 U.S. at 483, 88 S.Ct. at 1766. At least one court has effectively articulated that Reading Co. "arose out of a particular set of facts in which the Supreme Court determined that this statutory objective of fundamental fairness would be defeated if the statute were applied literally." In re Jack/Wade Drilling, Inc., 258 F.3d 384 (5th Cir. 2001).

In the third case, HWK Trading LLC, the receiver in a separate state interpleader action claimed the right to life insurance proceeds paid to the wife of the deceased Ponzi scheme operator. The receiver claimed the premiums had been paid with proceeds from the scam. The wife filed an offer of judgment under Florida statutory law, which the receiver failed to accept. After she succeeded in the interpleader action, the state court

held that she was entitled to fees under the Florida statute, and she sought those fees as an administrative expense in the SEC receivership proceedings. The court held that fees awarded pursuant to the Florida statute are recoverable as an administrative expense, and the equities in favor of giving priority to the defrauded investors could not trump Florida law on this issue.

The fees sought here involve Wells Fargo seeking to protect its security interests for various properties in the receivership proceedings and prevent the value from reaching the hands of unsecured creditors. The circumstances are distinguishable from those in GIC Gov't Sec., Reading Co., and HWK Trading LLC. Wells Fargo incurred these fees in the normal course of the receivership, not in defending a lawsuit brought against it to benefit the estate, or in negligently allowing third parties's property to be destroyed, or in failing to accept a statutory offer of judgment in a state court action. Indeed, the Receiver collected the rents and held them until the litigation involving the conduct of Wells Fargo was resolved. Hard litigation tactics, even if true, do not equate with negligence causing total loss of property from fire damage, as was the case in Reading Co. Wells Fargo has not shown negligence or any tort attributable to the Receiver, nor has it shown that the Receiver acted wrongfully in collecting the rents until the litigation was resolved.

Finally, Wells Fargo relies on Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), for the proposition that its attorneys' fees are recoverable contractually from the loan documents. In Sprague, a claimant had delivered funds in trust to a bank, which funds were secured by particular bonds. In the bank's

receivership, the claimant sought to enforce a lien on the proceeds of the bonds to recover her trust deposit with the bank. After she was awarded the value of the proceeds, on appeal the case was remanded by the Supreme Court for consideration of attorneys' fees based on the equity jurisdiction of federal courts. Sprague was decided on the principles of an exception to the "common fund" rule in the absence of the creation of a fund. Sprague, 307 U.S. at 167.[29]

Unlike Sprague, Wells Fargo's actions in protecting its security interests would not create a fund available to benefit all secured creditors, and certainly not all victims, of the Ponzi scheme. Analogous bankruptcy law lends itself well to further distinguishing Sprague. Administrative expenses of contractual attorneys' fees may not be recovered, although incurred "post-petition" or post-receivership, if based on "prepetition" or pre-receivership contracts. Cf. In re Hemingway Transp., Inc., 954 F.2d 1, 7 (1st Cir. 1992) (noting that it was unaware of any authority that the Reading exception "encompasses a right to payment originating in a prepetition contract with the debtor."). The loans are pre-receivership contracts, which do not provide a basis for recovery postpetition. See In re Abercrombie, 139 F.3d 755, 759 (9th Cir. 1998).

The Court finds that the attorneys' fees already awarded as costs by another district court and the appellate court, however, are recoverable as an administrative expense. See GIC Gov't Sec.; In re Prop. Mgmt. and Invs., Inc., 91 B.R. 170 (Bankr. M.D. Fla. 1988).

It is therefore **ORDERED AND ADJUDGED** as follows:

---

[29] See, e.g., Chambers v. NASCO, Inc., 501 U.S. 32, 45, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991) (citing Sprague as an exception to "common fund" cases).

(1) Wells Fargo's Motion for Order Directing Receiver to Turnover Rents from Rite Aid Property (Dkt. 1332) is **GRANTED.** All rents collected by the Receiver in connection with the Rite Aid Property totaling $1,322,923.20 must be turned over to Wells Fargo. The Receiver shall pay Wells Fargo no later than ten (10) days from today.

(2) Wells Fargo's Motion for Payment of Certain Fees and Costs as Administrative Expenses (Dkt. 1334) is **GRANTED** as to costs and **DENIED** as to attorneys' fees. The Receiver shall pay costs in the amount of $41,074.64 to Wells Fargo no later than ten (10) days from today.

**DONE AND ORDERED** at Tampa, Florida, on February 20, 2018.

s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

<u>COPIES FURNISHED TO</u>:
Counsel of Record